4

|  | Issac M. Pachulski, Esq. |
| --- | --- |
| (Via telephone) | Stutman Treister & Glatt, PC |
|  | 1900 Ave. of the Stars-12th Fl. |
|  | Los Angeles, CA 90067 |

For AIG Insurance:              Michael Davis, Esq.
                                Davis, Polk & Wardwell
(Via telephone)                 450 Lexington Ave.
                                New York, NY 10017

For Foster & Sear, LLP:         Bruce H. White, Esq.
                                Greenberg Traurig, LLP
                                600 Three Galleria Tower
                                13155 Noel Road
                                Dallas, TX 75240

For The Creditor's Committee:   Lowell Gordon Harris, Esq.
                                Davis, Polk & Wardwell
(Via telephone)                 450 Lexington Ave.
                                New York, NY 10017

For Roberta A. DeAngelis:       David Klauder, Esq.
(Acting US Trustee-Reg.3)       USTP
                                Department of Justice
                                844 King Street-Ste. 2313
                                Lock Box 35
                                Wilmington, DE 19801

Audio Operator:                 Brandon McCarthy

Transcribing Firm:              Writer's Cramp, Inc.
                                6 Norton Rd.
                                Monmouth Jct., NJ 08852
                                732-329-0191

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

5

1          THE COURT:  Good morning.  Please be seated.  This is

2    the matter of Owens Corning, #00-3837.  The list of

3    participants I have by phone are Anna Engh, Barbara Yglecias,

4    Gordon Harris, John Shaffer, Joseph Gibbons, Michael Davis,

5    Monty Travis, Bruce White, Marti Murray, Scott Beechert, Daniel

6    Chandra, David Witkin, Rebecca Packholder, Gary Pachulski.  And

7    good morning, Mr. Pernick.

8          MR. PERNICK:  Good morning, Your Honor.  Norman

9    Pernick on behalf of the Debtors.

10          THE COURT:  Why don't I take -- quickly, folks --

11   line up, let's just do introductions now and get the record

12   fixed.

13          MR. ROLEN:  Good morning, Your Honor.  Andrew Rolen

14   on behalf of the Bondholders and Trade Creditors.

15          MS. ESKIN:  Marla Eskin, Campbell & Levine, on

16   behalf of the Asbestos Claimants Committee.

17          MR. BECKER:  Gary Becker on behalf of Credit Suisse

18   First Boston as agent.

19          MR. LOCKWOOD:  Peter Lockwood of Caplin & Drysdale

20   on behalf of the Asbestos Committee.

21          MR. SUDELL:  William Sudell of Morris Nichols on

22   behalf of the Creditors Committee.

23          MR. EMRICH:  Edmund Emrich with Kaye, Scholer for

24   the Futures Representative.

25          MS. ZIEG:  Sharon Zieg of Young, Conaway, Stargatt &

6

1   Taylor, also on behalf of the Asbestos Futures Representative.

2          MS. JONES:  Laura Davis Jones, Pachulski Stang Ziehl

3   Young Jones & Weintraub, on behalf of Inacom.  Your Honor, I

4   would introduce to the Court my partner, Alan Kornfeld.  I did

5   move his admission this morning.

6          THE COURT:  All right.  Thank you.

7          MR. KORNFELD:  Good morning, Your Honor.

8          THE COURT:  Good morning.

9          MR. ESSERMAN:  Morning, Your Honor, Sander L.

10  Esserman for Baron & Budd firm.

11         MR. PASQUALE:  Ken Pasquale from Stroock, for

12  Certain Bondholders.

13         MS. CARMICHAEL:  Good morning, Your Honor.  Linda

14  Carmichael of White & William on behalf of Century Indemnity.

15         MR. GIBBONS:  Good morning, Your Honor, Joseph

16  Gibbons on behalf of Century Indemnity from White & Williams.

17  I think you have me listed as on the phone, but I was able to

18  make it today.

19         THE COURT:  All right.  Thank you.

20         MR. ISENBERG:  Good morning, Your Honor, Adam

21  Isenberg, Saul, Ewing also on behalf of the Debtors.

22         THE COURT:  Okay.  Mr. Pernick.

23         MR. PERNICK:  Good morning, Your Honor.  Your Honor,

24  I have the following matters as being continued to November

25  14th -- that's Item #1, which is the supplement to the Motion

7

1  of the Unsecured Creditors Committee for the Appointment of a

2  Chapter 11 Trustee.  #2, which is related to that, the Debtor's

3  Motion for a Protective Order.  #3, which is the 29th Omnibus

4  Substantive Objection to claims and it's just as to that one

5  Claimant, T.F. -- I apologize if I don't say it right -- Tigert

6  company?  And #15, which is the Debtor's Motion for an Order

7  Pursuant to Section 1121(d) for an extension of exclusivity

8  period.  I'm actually going to deal with that one after I get

9  through the preliminaries.  I have a Form of Consensual Orders

10  to submit to the Court continuing that to the next hearing and

11  I can explain that in a moment.  Item #10, which is the

12  Debtor's Motion for an Order pursuant to 11 -- Section 11 USC

13  Sections 105 and 363 authorizing amendments to certain key

14  employment management severance agreements.  We're gonna need a

15  special hearing for that.  We've actually been in contact with

16  Chambers.  And we'll just renotice that once we get that

17  hearing date set.

18            THE COURT:  All right.

19            MR. PERNICK:  But right now, that's likely to be an

20  evidentiary hearing.  #5, --

21            THE COURT:  Pardon me, Mr. Pernick --

22            MR. PERNICK:  Yes.

23            THE COURT:  -- before you back off of 10.  Were you

24  talking to Pittsburgh staff or Ms. Fellow about a date?

25            MR. PERNICK:  Kate Stickles was handling -- I think

299

8

1    she talked to Pittsburgh.

2              THE COURT:  Okay.

3              MR. PERNICK:  And I know we have a couple of January

4    dates that are possible that we're just checking out.

5              THE COURT:  All right.

6              MR. PERNICK:  Item #5, which is the 33rd Omnibus

7    Objection of Claims.  We did file a Certification of Counsel on

8    that.  And the same for Item #12 --

9              THE COURT:  Was an Order entered on 5?  I'm sorry --

10             MR. PERNICK:  I did not see an Order on the record.

11   There were a number of Orders entered but that was actually the

12   only one where there was not one entered yet.

13             THE COURT:  Okay.  And what's next, 12?

14             MR. PERNICK:  Item #12 is the Motion of Century

15   Indemnity Company to Compel Assumption or Rejection of the

16   Wellington Agreements.  And we actually filed a Certification

17   of Counsel on that with a Consensual Order also.  And I believe

18   that if Your Honor has any questions, Anna Engh from Covington

19   & Burling is on the phone, to respond to those.

20             THE COURT:  Yes, I have not seen either -- I guess,

21   5 -- I thought I did see 5.  That was submitted -- I thought --

22   a while ago.  I'm -- so I'm surprised the Order isn't entered.

23   But I haven't seen the Certification on 12.

24             MR. PERNICK:  And 5 may be entered, it just didn't

25   show up on the docket yet, Your Honor.

9

1           THE COURT:  Okay.  So yes, I would like to know

2   what's happening with 12.

3           MR. PERNICK:  Okay.

4           MS. ENGH:  Okay.  Your Honor, Anna Engh on behalf of

5   the Debtors.  The -- Century filed a Motion to Compel

6   Assumption or Rejection of Wellington Agreement as executory

7   contract and for stay of arbitration pending assumption or

8   rejection of Wellington Agreement.  This relates to a pending

9   Wellington ADR coverage proceeding.  And we were able to reach

10  a consensual stipulation and the effect of the stipulation

11  would be that both Century and Owens Corning reserve on the

12  question of whether the Wellington Agreement is or is not an

13  executory contract and whether any cure amounts are due.  But

14  the Debtor agrees that it will not reject the Wellington

15  Agreement as an executory contract, that rulings in the

16  Wellington will be binding to the extent provided for in the

17  Wellington Agreement.  And that there will not be a stay of the

18  pending coverage ADR proceeding.  And that is a stipulation

19  that we filed together with the Certification of Counsel on

20  Friday.

21          THE COURT:  All right.  Thank you.  Good morning.

22          MR. GIBBONS:  Morning, Your Honor, Joseph Gibbons

23  for Century.  I agree with Mrs. Engh's presentation of the

24  stipulation.

25          THE COURT:  Okay.  I'll take a look at it when I see

10

1    it so that I can take a look at -- so that I can more fully

2    understand the terms of what you've agreed to.  It sounds as

3    though I'll enter it, but I want to see it.

4            MS. ENGH:  Okay, thank you, Your Honor.

5            THE COURT:  Thank you.

6            MR. PERNICK:  Your Honor, the Court did enter orders

7    on #4, #6, #7, #8, #9, #11 and #14.  That leaves us with a

8    couple of items.  I have as going forward item #13, which is

9    Inacom's Motion to Allow the Filing of a Late Proof-of-Claim

10   and #16, which is really just a status conference.  And then

11   #15 which is the Exclusivity Order.  So I think I'd like to

12   deal with 15 and 16, 'cause I think they'll be quick --

13           THE COURT:  All right.

14           MR. PERNICK:  -- and that'll leave us with Inacom.

15   On item #15, as the Court may recall, the Exclusivity Order

16   that's in effect right now extends exclusivity through today

17   and the banks at the end of the week suggested that we continue

18   the hearing with the Court's -- if the Court's agreeable to the

19   November 14th hearing.  I'm pleased to report the parties are

20   still talking, the negotiations are still substantive and the

21   parties are hopeful that we'll be able to reach a resolution.

22   No matter what, the commitment that the Court required and that

23   we are still making is that no matter what, the Debtor will be

24   filing a Confirmable Plan by the end of the year.  We're still

25   on track to do that.

11

1      And the only other statement just for the record is

2   there's obviously a fair number of statements in the bank's

3   pleading that they filed, which are objectionable to the Debtor

4   and we don't believe are accurate. I don't think it's

5   productive to deal with those today. It's one of the reasons

6   that we've all agreed with the Court's consent to continue the

7   hearing over. Hopefully we won't have a full hearing on the

8   14th. We'll either have a Plan far enough along that the

9   parties won't be contesting the short extension that the Debtor

10   requested, but I can't say that right now so that's everybody's

11   hope or at least a possibility. And we're just gonna take this

12   step by step.

13              THE COURT: Right. Does anyone object to an

14   extension until November 14th?

15              MR. PERNICK: We have passed the Form of Order,

16   which I'll hand up to the Court in a moment with permission, to

17   all of the key constituents and everybody's agreeable to the

18   Form of Order.

19              THE COURT: All right. I'll take it. Thank you.

20   And just for the benefit of the Court and the parties in the

21   Courtroom, the Order is very short and sweet. It says that on

22   consent of the parties, the hearing on the motion is continued

23   to the November 14th hearing at 10 a.m., that the exclusive

24   periods are extended through and including the next omnibus

25   hearing in these cases, which is currently scheduled for the

12

1  14th.  And it's ordered that the Court shall retain

2  jurisdiction to hear and determine all matters arising from the

3  implementation of the Order.

4             THE COURT:  Okay.  You gave me several copies.  Do

5  you need signed copies back?

6             MR. PERNICK:  No, I don't.  I just gave you an

7  original and one.  I don't know if you need the second one or

8  not.  I'm sorry.

9             THE COURT:  Okay.  Thank you.

10            MR. PERNICK:  Item #16 is the status conference

11 regarding the Official Committee of Unsecured Creditors

12 Professionals.  I know the report was filed during the week

13 last week.  I don't know if the Court has any questions but I

14 believe that counsel for the parties is here to deal with that.

15            THE COURT:  Actually, unless there's some

16 supplement, I think at this point in time it's not productive

17 for me to make a change, so I don't expect to do anything

18 except ask for another status report next month.  If there's no

19 change, you can just tell me orally that there's no change.  If

20 you're negotiating I'm comfortable keeping this the way it is,

21 but when the negotiations -- on the Plan, that is -- stop and

22 at some point in time then I still want to look at this issue.

23 So unless there's some supplement, I'll hear it from you next

24 month rather than this month.

25            MR. LOCKWOOD:  Understood, Your Honor.

13

1          THE COURT:  Okay.

2          MR. PERNICK:  Your Honor, just to clarify.  So even

3   if there is no change, you would still like the Committee or

4   counsel to file a quick statement that says that just so you're

5   aware?  Or not?

6          THE COURT:  I think it would be helpful for me just

7   to have somebody say, you know, nothing's changed.  And I am

8   confident that with certain issues on appeal and some other

9   matters that you're going to intend to litigate in the event

10  that you can't consensually resolve it, that for now you need

11  separate counsel.  I've been saying I think at some point that

12  has to end.  I don't -- I'm not comfortable that this is the

13  time to end it.  But I'd still like you folks to be analyzing

14  that month by month so that I can analyze it month by month.

15  So, yes, I would -- except for next month based on the fact

16  that your negotiations are under way, something that simply

17  says there's no material change and that's fine.  Then for the

18  month after that, I want another status report to find out how

19  you're doing.  Okay?

20         MR. LOCKWOOD:  Your Honor, we'll undertake to do

21  that.

22         THE COURT:  Okay.  Thanks.

23         MR. PERNICK:  Thank you, Your Honor.  That leaves us

24  with item #16 and I'll turn the podium over.  Oh, I'm sorry.

25  Item #13, I apologize.

14

1     (Pause in proceedings)

2          THE COURT:  Good morning.

3          MS. JONES:  Good morning, Your Honor.  For the

4     record, Laura Davis Jones of Pachulski Stang Ziehl Young Jones

5     & Weintraub on behalf of the Inacom Corporation.  Your Honor,

6     we have filed a Motion to Allow the Filing of a Late Claim in

7     this case.  The Debtor has filed an objection and we have filed

8     a reply.  Your Honor, from the papers, I think Your Honor can

9     see that we all agree on what the four standards are that need

10    to be considered in determining whether excusable neglect

11    exists here.  And looking at those standards, Your Honor,

12    there's been no assertion of bad faith so I don't think we'll

13    have to deal with that issue.  And I think we both agree that

14    the Debtor's case is still in process, a Plan has not been

15    finally confirmed.  And claims are still being reviewed.  We

16    agree that Inacom is late with its claim, but the Debtor does

17    not agree that there is an excusable neglect for that delay,

18    which we assert there is.

19        Your Honor, we have a witness, Alaine Agie of Inacom, who

20    is here to provide evidence to the Court on why there was a

21    delay in Inacom filing its claim, and after the testimony I

22    would offer --

23          THE COURT:  I never take testimony on motions days,

24    Ms. Jones.  I don't have time.  You know, I start at 8:30 in

25    the morning, and I go until 6:30 at night with no witnesses,

15

1   and my Bench Order and my Case Administration Orders, and my

2   web site are all very clear about that.  So if you need an

3   evidentiary hearing you can ask for one, but today's not it.

4       MS. JONES:  Your Honor, I think it would be helpful

5   to the Court if we did provide you with the evidence.  We have

6   talked with counsel to see if we could reach an agreement on

7   filing the claim late and then later work through the numbers,

8   or whether we could work through the numbers first, and if the

9   amount of the claim made sense then later proceed with this

10  motion.

11      Debtor did want to proceed with the motion today, and we

12  were obviously willing to do that being it is our motion.  Your

13  Honor, so in terms of testimony, we will do what the Court

14  wants.  I believe the testimony that we would provide through

15  Ms. Agie would be about 10 minutes, and I expect there to be

16  some limited cross, but it would be mainly on why it was their

17  delay on filing the claim, which I think we have to burden to

18  prove to the Court.

19      THE COURT:  Mr. Isenberg?

20      MR. ISENBERG:  Yes, Your Honor.  Your Honor, for the

21  record, Adam Isenberg, Saul Ewing on behalf of the Debtors.

22  Your Honor, I will try to be brief, and I will try not to

23  repeat what I put in our objection to this motion.  As

24  Ms. Jones said, we did file an objection to this motion.  Your

25  Honor, just a couple of preliminary points.  This is not a

16

1  situation where a Creditor is a couple days, a couple weeks, or

2  a couple of months late.  We're 3½ years past the bar date,

3  Judge.

4      Second, Your Honor, this is not a situation where a Debtor

5  is trying to take advantage of the Creditor's mistake to

6  realize a windfall.  This is a claim that is vigorously

7  contested.  We scheduled this claim as disputed for a reason,

8  and we lay out that reason in the papers that we filed.

9      Finally, Judge, a couple of points regarding excusable

10  neglect.  We do not think these facts here could come close to

11  constituting excusable neglect.  For a couple of reasons.  Here

12  are the facts that I think Inacom admits in its papers, Judge.

13  I don't think these are controverted.  That Inacom's accounts

14  receivable collection team knew that the Owens Corning accounts

15  receivable was one of Inacom's largest receivables.  That

16  Inacom contacted its counsel to discuss the filing of a Proof

17  of Claim against Owens Corning, but that -- and I'll quote from

18  the motion, {quote} "Follow up by either Inacom employees or

19  counsel did not occur," {end quote}.  That Inacom received

20  notice of the Owens Corning bar date.  That Inacom actually

21  looked at its books and records in late 2001 to see if it had

22  any claims against Owens Corning, but {quote}, and I'll quote

23  from their motion again, "Apparently due to a misunderstanding

24  the Owens Corning accounts receivable were written off in

25  December of 2000, resulting in a loss of disability and follow

17

1  up," {unquote}.  And that the it was only after being contacted

2  by a claims trader in November of 2004, about 10 months ago or

3  11 months ago, Judge, that they started looking into this.

4       Those are the facts that they admit, Judge.  I want to

5  just make a couple of observations regarding these facts, which

6  might help get at the equities of this, which is really the

7  underlying Pioneer standard.

8       First, Judge, Inacom seeks exculpation for its failure to

9  timely file a Proof of Claim, because of its downsizing.  It

10 says that it lost a bunch of employees because of its own

11 financial problems.  Couple of observations, Judge.  First,

12 this downsizing, again, based on an admitted statement in the

13 Inacom motion did not prevent Inacom from getting its bills out

14 for May and June of 2000, which is the relevant time frame

15 vis-a-vis this claim.

16      Second, Judge, this downsizing occurred in June of 2000.

17 The Owens Corning bar date was April 15, 2002, which was a

18 considerable period of time later, to the extent folks made a

19 mistake in writing off this claim, seemingly they would have

20 had plenty of time to fix that mistake.

21      Your Honor, Inacom explains that it did not file a Proof

22 of Claim, as I said, because it mistakenly wrote off this

23 account receivable.  Whether or not that happened is a fair

24 point, Judge, but you have to keep in mind that the bar date

25 materials that Owens Corning sent out specifically listed the

18

1  specific amount of these Proofs of Claims.  This is not a

2  situation where blank Proof of Claim forms would have been sent

3  to Creditors, Your Honor.  If the Court recalls, Owens Corning

4  amended and restated its schedules right around the time it

5  filed its motion for the establishment of a bar date.  The two

6  worked together, and --

7        MS. JONES:  Your Honor, I'm sorry, I hate to

8  interrupt, but -- and I really tried to be patient here.  Your

9  Honor suggested that we should not go forward with facts today

10 --

11        THE COURT:  No, I did not.  I said we should not go

12 forward with an evidentiary hearing.  I certainly expect to

13 hear the arguments on these motions, because frankly, based on

14 the admissions I don't know that I need an evidentiary hearing.

15 I really don't know that I need one.  If there is some

16 supplemental fact, Ms. Jones, that you have a witness here to

17 present, I think you should make me a proffer as to what that

18 witness is going to say so that I can see whether it's going to

19 change the analysis that's already in the papers.  Because I

20 think your briefs are very clear, the admissions are of record,

21 Inacom certainly had notice, it certainly investigated this

22 claim, it certainly decided affirmatively not to file one.  I

23 don't see how that's neglect at all, let alone excusable

24 neglect.  So if there's some fact that's going to show me that

25 that -- the conclusions from the papers are incorrect I'd like

19

1  to hear it.  Otherwise, I don't think we're going to get too

2  far with this.

3          MS. JONES:  Okay.  And I would like to offer that to

4  Your Honor, and I apologize to counsel for interrupting him,

5  but I did not understand that we were gonna go into him

6  characterizing our facts.  So, Your Honor, if I -- I don't know

7  if you want counsel to finish what he's saying -- I think he's

8  almost finished his closing arguments.  It would be helpful for

9  us to give you a very brief Offer of Proof on what our client

10  would say, and I think it is excusable neglect, Your Honor.

11          THE COURT:  All right.  Mr. Isenberg, why don't I

12  stop your recitation, let Ms. Jones make me a proffer as to

13  what her witness would say, and then let you pick up your

14  recitation, because I'm not sure at this point how anything is

15  going to change what they've admitted.  But --

16          MR. ISENBERG:  Your Honor, of course that's fine.  We

17  did have concerns -- we have not -- we did not want to take the

18  -- we thought this was very clear that this is not excusable

19  neglect, and as a result we did not take discovery, we have not

20  done depositions, we have not seen documents.  We would like to

21  reserve the right to do that, Your Honor.  I mean, they're

22  gonna present a one-sided -- and I'm -- you know, that's our

23  view of the facts.  Maybe that's true maybe those facts are not

24  quite as stated, or maybe there are other facts, and obviously

25  we're not having an opportunity today to present that.

20

1          THE COURT:  Well, I agree, and as I stated, my web

2   site can't be clearer that I do not do testimony on evidentiary

3   -- or on motions days.  If you can read you can understand that

4   premise, and therefore I'm not going to take any testimony

5   today.  But nonetheless, it seems to me that if there is some

6   material fact as to which you do need discovery we ought to

7   look at that issue, and if -- even if the witness is called

8   it's not going to change my mind from what I see in the

9   admissions then I think we ought to just deal with it today.

10          MR. ISENBERG:  Thank you, Your Honor.

11          THE COURT:  Mr. Cart -- Cartwright, I'm sorry.

12          MR. KORNFELD:  It's Alan Kornfeld, Your Honor.

13          THE COURT:  Kornfeld, I'm sorry, okay.

14          MR. KORNFELD:  Thank you, no problem.  The witness we

15   have in Court today is Alaine Agie, who is Inacom's Vice

16   President of Operations, pre-petition, who is continued

17   post-Inacom's petition.  The date of Inacom's petition was June

18   16, 2000, to be responsible for, among other things, the

19   collection of accounts receivable.  Ms. Agie, if called as a

20   witness, would testify as following -- as follows.

21          That the Inacom bankruptcy was in essence a free fall

22   unplanned bankruptcy that arose out of the failure of Inacom to

23   find a solution to its enormous financial problems, as we

24   explained in our paper, that prior to the period of June 16,

25   2000, Inacom had $7 billion of yearly business, that in 1999

21

1   Inacom merged with a competitor, that merger is very relevant

2   to what we're here on today because as a result of that merger

3   there was an effort to merge accounting systems.  The effort to

4   merge accounting systems was a failure.  That failure created

5   problems with respect to the collectibility and the ability the

6   monitor accounts receivable.

7        In February of 2000, Ms. Agie would testify, there was a

8   sale of the hardware distribution business to Compac Computers.

9            THE COURT:  I'm sorry, when was that?

10           MR. KORNFELD:  February of 2000.

11           THE COURT:  All right.

12           MR. KORNFELD:  In the February 2000 sale that sale

13  also created accounting challenges, in particular, challenges

14  with respect to the collectibility and monitoring of accounts

15  receivable because the sale meant that certain accounts

16  receivable monitoring systems went to Compac, that sale of

17  accounts receivable monitoring systems was certainly anything

18  but smooth, as a result of accounting systems going to Compac

19  and Inacom still having to collect accounts that it had that it

20  had not sold there was even more dislocation and chaos in the

21  Inacom accounts receivable function.

22       Ms. Agie would testify in general about Inacom's

23  accounting, that Inacom's accounting was anything but

24  centralized, that as a result of the lack of centralization

25  there were problems in monitoring accounts receivable also.

25

1  neglect because the source of that mistake was, as we

2  discussed, a change in computer systems when the information

3  was --

4          THE COURT:  So what?

5          MR. KORNFELD:  Well, when the information was

6  migrated from the large system to the PC-based system the

7  information didn't get transferred correctly.

8          THE COURT:  So it's another mistake, but it's still

9  not neglect.  You know, the problem is that somebody is dealing

10 on a deliberate basis with this Owens Corning claim.  If they

11 made a mistake, they made a mistake.  But the question is, is

12 there neglect?  The standard in Pioneer is excusable neglect.

13 Not every mistake that somebody makes.

14         MR. KORNFELD:  Well, Your Honor, in terms of the

15 argument, let me get to one more point factually, and then we

16 can address your argument but certainly in terms of

17 carelessness, and Pioneer talks about carelessness in the

18 Bryant case after Pioneer talks about carelessness.  There

19 can't be a more classic case of mistakes/carelessness/neglect

20 than this one.  This is a company that due to its bankruptcy

21 filing, this company being Inacom, that due to its bankruptcy

22 filing and due to the problems with its accounts receivable

23 system, and due to its problems trying to deal with the claims

24 that are filed in its bankruptcy case, with a skeleton staff is

25 doing everything possible to try to get its shop in order.  And

26

1    certainly when a company is trying to do that in the magnitude

2    --

3              THE COURT:  Every Chapter 11 Debtor is trying to do

4    that.  Some with less reduction in staff than others, and

5    sometimes even when the companies start to do well with an

6    increase in staff, but very few Debtors file Chapter 11,

7    maintain the same staff, don't get down to some skeleton crew,

8    especially when they're attempting to liquidate, don't have

9    problems with accounts receivable.  If anything, the heightened

10   duty that the officers and directors of that company have to

11   their own Shareholders and Creditors would mean that they'd

12   monitor this with more care, not less.

13             MR. KORNFELD:  Absolutely, and they --

14             THE COURT:  I absolutely can't see how this is

15   neglectful.  It was deliberate course of events.  They simply

16   made a mistake.

17             MR. KORNFELD:  Your Honor, I simply disagree that

18   this was --

19             THE COURT:  Well, you've got an appeal right.

20             MR. KORNFELD:  Well, this was not a deliberate course

21   of events.  What this company --

22             THE COURT:  Well, it certainly was.  You just

23   described the deliberation.  You were meeting on a nearly

24   weekly basis to discuss the Owens claim.  The accounting people

25   were aware of it.  They knew about the bankruptcy, they knew it

27

1    was disputed.  They got the Proof of Claim.  They checked to

2    determine whether, in their own system, they needed to do

3    something and determined that they didn't, when in fact they

4    did.  That is not neglectful.  That is deliberate.

5            MR. KORNFELD:  Your Honor, the neglect is they

6    thought they had filed a claim.

7            THE COURT:  But that's -- that --

8            MR. KORNFELD:  When they thought they had filed a

9    claim they discussed whether they filed a claim, they looked on

10   the records where they were supposed to monitor claims --

11           THE COURT:  _Pioneer_ does not open up the entire world

12   for everybody's mistakes.  There are other remedies for

13   mistakes.  Go collect on your other remedies for the mistakes.

14           MR. KORNFELD:  Your Honor --

15           THE COURT:  Filing a Proof of Claim here isn't the

16   remedy.

17           MR. KORNFELD:  Your Honor, let me go into some other

18   facts that I think might be of interest to the Court.

19           THE COURT:  Quickly, because you're already past the

20   10 minutes of testimony that I was told this would be.  It's

21   already been 20 minutes, and you're still making a proffer.

22   So, all right, let's get to it.

23           MR. KORNFELD:  If I may, Your Honor.  The other fact

24   was this only became a subject of Inacom's awareness in

25   November '04 when Inacom was contacted by claims traders --

28

1          THE COURT:  No, it became a subject of awareness at
2  least by April of 2002, or approximately then when the bar date
3  expired, not to mention when it got notice that it was listed
4  as a disputed Creditor in Owens' bankruptcy case in October of
5  2000, and then again in 2004 when it was contacted by a claims
6  trader.  It had notice of the bankruptcy in 2000, it had a bar
7  date in 2002, and then it had this effort to purchase a claim
8  which no longer exist because it wasn't timely filed in 2004.
9          MR. KORNFELD:  Your Honor, when it had notice of the
10 claims bar date it looked on its claims schedule, and on it
11 claims --
12         THE COURT:  We've been past that.  I've already ruled
13 on that.
14         MR. KORNFELD:  -- schedule -- but in November of '04,
15 Your Honor, when Inacom was contacted by a claims trader Inacom
16 began looking into the process of trying to sell this claim.
17 And what Inacom did, and Ms. Agie would testify, she picked up
18 the phone and she called Owens Corning, and she spoke to a
19 Jeremy Miller at Owens Corning, and she asked Mr. Miller the
20 status of the Inacom claims, and he was told you have a claim
21 in the amount of roughly $3 million.  And apparently, Your
22 Honor, Owens Corning also thought that Inacom had a claim.
23 Only upon --
24         THE COURT:  The standard isn't whether Owens thinks
25 anything.  The question is was the claim timely filed, and if

29

1  not, was the lack of filing excusable neglect, not by the

2  Debtor.  The Debtor already listed this as a disputed claim.

3  The Debtor did everything it had to do.  But by Inacom.

4      MR. KORNFELD:  Your Honor, this is a case where a

5  company tried to do -- Inacom tried to do everything within its

6  power --

7      THE COURT:  Well, it may have.

8      MR. KORNFELD:  -- to stay on top of this bankruptcy.

9      THE COURT:  But it made mistakes.

10     MR. KORNFELD:  It did make mistakes, and Your Honor,

11 we would respectfully submit that these are the type mistakes

12 that come within the standard of Pioneer.

13     THE COURT:  And I've already said I disagree.  There

14 is nothing, a) excusable in the fact that you don't double

15 check a record to make sure that a claim has been filed when

16 you've got outside counsel apparently working with you on that

17 issue.  You certainly can pick up the phone and call counsel

18 and say, "Did you really file the claim?"  That's #1.  But even

19 if you don't do that, relying on your own records when you are

20 telling me that your records are in such a shambles that

21 they're not reliable is itself not excusable.

22     MR. KORNFELD:  Your Honor --

23     THE COURT:  And that may be neglectful, but it's

24 certainly not excusable.

25     MR. KORNFELD:  Your Honor, the record that was being

30

1    relied upon was a schedule that was prepared by counsel, that

2    was exchanged with the company, that everybody looked at and

3    frequently discussed.

4            THE COURT:  That's what I said.

5            MR. KORNFELD:  And of all --

6            THE COURT:  There may be other remedies, but the late

7    filing of the claim in this case isn't it.  So I see no need

8    under this proffer for an evidentiary hearing, because even if

9    all of those facts were produced in evidence by a witness, even

10   without cross examination, I would not find that they rise to

11   the level of excusable neglect for the reasons that I've

12   already expressed.  Mr. Isenberg, do you still need some

13   discovery?  I'm prepared to make this ruling.

14           MR. ISENBERG:  I don't think so, Your Honor.

15           THE COURT:  All right.  I will take an Order from --

16   I don't -- Ms. Jones, do you want to prepare it with

17   Mr. Pernick and submit it on a certification that will deny the

18   motion to file the late claim?  I'm not asking for your

19   consent, I just want to make sure that it reflects the record

20   correctly.

21           MS. JONES:  We'll do that, Your Honor.

22           THE COURT:  All right.  Mr. Pernick?

23           MR. PERNICK:  Your Honor, the Debtor has nothing

24   further.

25           THE COURT:  Housekeeping matters?

31

```
 1          ALL:  (No verbal response).

 2          THE COURT:  Okay, we're adjourned.  Thank you.

 3          MR. PERNICK:  Thank you, Your Honor.

 4      (Court adjourned)

 5

 6                      CERTIFICATION
 7  I certify that the foregoing is a correct transcript from the
 8  electronic sound recording of the proceedings in the above-
 9  entitled matter.
10
11  Lewis Parham                    11/1/05
12  _____          _____
13  Signature of Transcriber             Date
```

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                                    :
                                          :   Chapter 11
OWENS CORNING, et al.,                    :   Case Nos. 00-3837 (JKF)
                                          :   (Jointly Administered)
          Debtors.                        :
                                          :   Related to Docket No. 15935
                                              Hearing Date: ~~October 24, 2005~~  Nov. 14, 2005
                                              Agenda Item No. 4

ORDER, PURSUANT TO 11 U.S.C. § 1121(d), FURTHER
EXTENDING THE EXCLUSIVE PERIODS DURING WHICH
THE DEBTORS MAY FILE PLANS OF REORGANIZATION
AND SOLICIT ACCEPTANCES THERETO

Upon the motion, dated September 29, 2005 (the "Motion"),[1] of above-captioned debtors

and debtors-in-possession (collectively, the "Debtors"), seeking the entry of an order pursuant to

section 1121(d) of the Bankruptcy Code extending the exclusive periods of 11 U.S.C. § 1121

within which no other party may file a plan so that the Debtors may file and solicit acceptances

of a plan of reorganization through and including January 31, 2006, without prejudice to requests

of the Debtors for further extensions of the Exclusive Periods; and upon consideration of the

Motion after due deliberation thereon; and good and sufficient cause appearing therefor; and due

and proper notice of the Motion having been given; and it appearing that extending the Exclusive

Periods through and including January 31, 2006 is in the best interests of the Debtors and their

estates and creditors and other parties-in-interest; it is hereby

FOUND THAT:

---

[1] Unless otherwise, defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Motion.

527394.1

Docket # 1631l
Date 11-14-05

A.     Due and proper notice of the Motion has been given, and no other or further notice is required;

B.     For the reasons set forth in the Motion, sufficient cause exists to extend the Exclusive Periods through and including January 31, 2006, because, among other things:

> (1)    the Debtors' cases are extremely large and complex;
>
> (2)    the Debtors have made good faith progress toward proposing a plan of reorganization;
>
> (3)    sufficient time is necessary to permit the Debtors to negotiate an amended plan of reorganization;
>
> (4)    the Debtors are not using exclusivity to prejudice creditors; and
>
> (5)    granting the relief requested would not prejudice any party-in-interest.

C.     The relief requested in the Motion is appropriate and necessary to assist the Debtors in their efforts to reorganize or otherwise maximize the value of their estates; and it is therefore

ORDERED, ADJUDGED AND DECREED THAT:

1.     The Motion is GRANTED.

2.     The Exclusive Periods are, and hereby shall be, extended through and including January 31, 2006.

3.     Entry of this Order is, and hereby shall be, without prejudice to the Debtors' right to seek further extensions of the Exclusive Periods.

4.     Entry of this Order is, and hereby shall be, without prejudice to the right of parties-in-interest to seek to terminate or modify the Exclusive Periods.

     5.    This Court shall retain jurisdiction to hear and determine all matters

arising from the implementation of this Order.

Dated: ~~October~~ **Nov. 14**, 2005

_Judith K. Fitzgerald_
Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

326

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:         :
            :  Chapter 11
OWENS CORNING, *et al.*,   :  Case Nos. 00-3837 (JKF)
            :  (Jointly Administered)
    Debtors.     :
             Related to Docket No. 15935
             Hearing Date: ~~October 24, 2005.~~ Nov. 14, 2005
             Agenda Item No. 4

### ORDER, PURSUANT TO 11 U.S.C. § 1121(d), FURTHER EXTENDING THE EXCLUSIVE PERIODS DURING WHICH THE DEBTORS MAY FILE PLANS OF REORGANIZATION AND SOLICIT ACCEPTANCES THERETO

Upon the motion, dated September 29, 2005 (the "Motion"),[1] of above-captioned debtors

and debtors-in-possession (collectively, the "Debtors"), seeking the entry of an order pursuant to

section 1121(d) of the Bankruptcy Code extending the exclusive periods of 11 U.S.C. § 1121

within which no other party may file a plan so that the Debtors may file and solicit acceptances

of a plan of reorganization through and including January 31, 2006, without prejudice to requests

of the Debtors for further extensions of the Exclusive Periods; and upon consideration of the

Motion after due deliberation thereon; and good and sufficient cause appearing therefor; and due

and proper notice of the Motion having been given; and it appearing that extending the Exclusive

Periods through and including January 31, 2006 is in the best interests of the Debtors and their

estates and creditors and other parties-in-interest; it is hereby

FOUND THAT:

---

[1] Unless otherwise, defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Motion.

527394.1

327

A.    Due and proper notice of the Motion has been given, and no other or further notice is required;

B.    For the reasons set forth in the Motion, sufficient cause exists to extend the Exclusive Periods through and including January 31, 2006, because, among other things:

(1)    the Debtors' cases are extremely large and complex;

(2)    the Debtors have made good faith progress toward proposing a plan of reorganization;

(3)    sufficient time is necessary to permit the Debtors to negotiate an amended plan of reorganization;

(4)    the Debtors are not using exclusivity to prejudice creditors; and

(5)    granting the relief requested would not prejudice any party-in-interest.

C.    The relief requested in the Motion is appropriate and necessary to assist the Debtors in their efforts to reorganize or otherwise maximize the value of their estates; and it is therefore

ORDERED, ADJUDGED AND DECREED THAT:

1.    The Motion is GRANTED.

2.    The Exclusive Periods are, and hereby shall be, extended through and including January 31, 2006.

3.    Entry of this Order is, and hereby shall be, without prejudice to the Debtors' right to seek further extensions of the Exclusive Periods.

4.    Entry of this Order is, and hereby shall be, without prejudice to the right of parties-in-interest to seek to terminate or modify the Exclusive Periods.

5.    This Court shall retain jurisdiction to hear and determine all matters

arising from the implementation of this Order.

Dated: ~~October~~ Nov. 14, 2005

_Judith K. Fitzgerald_
Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

S77394.1

-3-

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                    .    Chapter 11
                                          .
OWENS CORNING, *et al.*,                  .    Case No. 00-03837(JKF)
                                          .    Jointly Administered
           Debtors.                       .
                                          .    Nov. 14, 2005 (10:03 a.m.)
                                          .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.


Docket # 16333
Date 11-18-05

1    THE COURT: This is the matter of Owens Corning, 00-3837.

2    The parties I have listed to participate by phone are Jay

3    Shulman, Isaac Pachulski, Joseph Gibbons, Michael Davis,

4    David Parsons, Warren Smith, Monte Travis, Bruce White,

5    Adrian Rand Robison, Stephen Vogel, Marti Murray, Scott

6    Beechert, David Witkin, Rebecca Pacholder, Stuart Kovensky,

7    and Gary Pakulski.  Good morning.

8        MR. PERNICK: Your Honor, I think there was actually

9    an amended list that was done because we got another one.  I

10   think Stephen Oroza was to be on the phone with respect to

11   the Mira Vista matter.

12       THE COURT: All right.

13       MR. OROZA (TELEPHONIC): Yes, Your Honor, I am.

14       MR. PERNICK: And I think on the original list, I'm

15   not sure if I heard Your Honor say Gordon Harriss and James

16   McClammy for the Committee.

17       THE COURT: Oh, I think I didn't.  Thank you.

18       MR. PERNICK: I'm not sure if they're on or not, but

19   they were supposed to be on.

20       THE COURT: I think I passed them by.  I saw their

21   name and must have just not stated it.

22       MR. PERNICK: That's fine, just so the Court knew.

23   Your Honor, I think we have two items that are going to be

24   substantive today.  One major one is the exclusivity motion,

25   and then the second one, just I think is a much smaller one

1    dealing with Kaye Scholer's fee application, but let me just

2    go through the agenda to make sure that our records comport

3    with the Court's so that everybody on the phone and in the

4    courtroom knows what the status is.  I have as continued to

5    the 12/19 hearing number 1 and number 2, which is the

6    supplement to the motion of the Creditors Committee for the

7    appointment of a Chapter 11 Trustee and the related motion

8    for a protective order.  Number 3, which was the twenty-ninth

9    omnibus objection to claims, that is resolved, and a

10   certification and 9019 is going to be filed on that.  Number

11   5, 6, and 7 the Court entered orders already.  Five is the

12   monthly fee requests for the thirteenth and fourteenth

13   interim periods.  Six is the motion of Owens Corning for

14   authorization to capitalize a non-debtor Chinese Trading

15   Company, and 7 is the motion - I'm sorry, the 365(d)(4)

16   motion for non-residential real property leases.  That leaves

17   us going forward with number 4, which is the exclusivity

18   motion; number 5, in part, with respect to Kaye Scholer;

19   number 8, which is a status conference - short status

20   conference on the Mira Vista settlement; and number 9, which

21   is the status conference that goes monthly regarding the

22   Official Committee of Unsecured Creditors' professionals, and

23   what I propose to the Court is I think we can move through 5,

24   8, and 9 pretty quickly, and then we'll come back to 4.

25            THE COURT: All right.

4

1        MR. PERNICK: As to number 5, I'm going to turn the

2    podium over to Ed Emrich from Kaye Scholer.

3        THE COURT: Good morning.

4        MR. EMRICH: Good morning, Your Honor.  Your Honor,

5    I apologize for burdening the Court with this.  We had tried

6    very hard to resolve these issues with the fee auditor.  We

7    had exceeded to all of the fee auditor's requests for the

8    thirteenth and fourteenth interim periods, save only two

9    types of entries, six entries in all.  Your Honor, the first

10   type of entry that is a live objection relates to meetings

11   with the future's representative attended by multiple

12   attorneys from my office.  There were four partners attending

13   periodic meetings with Mr. McMonagle, we're talking about a

14   total of four meetings over a six-month period.  The purpose,

15   Your Honor, was to download Mr. McMonagle who represents the

16   biggest constituency in this case, Your Honor, the future

17   claimants with the matters that each of us were working on in

18   addition to discuss matters of critical importance.  By way

19   of example, on December 3rd, there was a meeting for three and

20   a half hours with Mr. McMonagle to discuss issues relating to

21   the mandamus litigation involving Judge Wolin and matters

22   relating to the plan of reorganization and disclosure

23   statement.  On January 20th, we met with Mr. McMonagle and his

24   court-appointed asbestos valuation consultant to discuss

25   asbestos valuation issues.  Again, one of the critical issues

333

5

1    in this case, on May 5th, we met to discuss term sheet issues.

2    That meeting was attended by the future's rep's financial

3    advisors, Peter J. Solomon.  It was an hour and a half

4    meeting.  And finally, on May 20th, we attended a meeting with

5    Mr. McMonagle and his financial advisors to discuss the Third

6    Circuit's recusal decision, term sheet issues, plan of

7    reorganization issues, and asbestos estimation issues.  That

8    was a two hour meeting, Your Honor.  So, we're talking about

9    over a six-month period of time, very little aggregate time,

10   but these were critical issues.  They were issues where Mr.

11   McMonagle expected his attorneys to meet with him to confer

12   with him on what they were working on and strategy going

13   forward, and, Your Honor, we recognize that sometimes over-

14   lawyering can occur when more than one attorney attends a

15   meeting.  There are times when it is the most efficient way

16   to handle a meeting and to handle strategy with your client.

17   Given the few number of instances when this occurred and the

18   importance of the subject matter covered, Your Honor, we do

19   not believe that these are at all unreasonable.  And the only

20   reason, Your Honor - I should say, one of the primary reasons

21   we're raising this as - or contesting the fee auditor's

22   objection is because this occurs not only in this case, but

23   it occurs in some other cases that are before Your Honor, and

24   we think it's important to, at least if the fee auditor was

25   unwilling to compromise it as we had tried, to get a ruling

6

1    from Your Honor on it.

2         THE COURT: Well, what's the total time and how many

3    people were involved because it seems to me that yes, there

4    are some efficiencies, but over-lawyering is still not

5    necessary, and there is time built in Kaye Scholer's

6    applications where I'll say lower level people involved in a

7    specific issue are reporting up the chain. So if that is

8    already occurring in-house, why is it that those meetings

9    just don't include either the high level or the lower level.

10         MR. EMRICH: We're not contesting those, Your Honor.

11    We gave into all of the fee auditor's requests save for these

12    specific meetings.

13         THE COURT: I understand. And I'm asking why, if in

14    other meetings in-house at Kaye Scholer, the information is

15    being transmitted to whoever is managing the specific piece

16    of litigation, then why isn't that the appropriate person to

17    meet with the fee auditor? Why do you have everyone

18    involved, not just the issue manager?

19         MR. EMRICH: Your Honor, Mr. McMonagle requests that

20    his team meet with him once in a while, not every week, but

21    once in a while periodically four times in this six-month

22    period, and he wants to see us face-to-face and discuss the

23    different matters that each of us has been responsible for.

24    Clearly, Your Honor, I can update one of my partners on what

25    I'm doing, but they can't know everything that I'm doing, and

7

1    they can't know every statement that's made in a court

2    hearing, for example. Each of us has a different role. Mr.

3    Fraims (phonetical), as Your Honor, is aware, was a senior

4    partner in our firm until very recently. He had vast

5    experience in all facets of Chapter 11s, Your Honor. I

6    handled the day-to-day aspects of this case for my office,

7    and handled the court hearings, as Your Honor knows. Jane

8    Parver (phonetical), Your Honor, is a litigation partner and

9    brings that expertise to these meetings, and the only other

10   person attending these meetings, Your Honor, was Andrew Cress

11   from my office, who Your Honor knows from the USG case and

12   the Armstrong case, and Mr. Cress has a wealth of experience,

13   Your Honor, not only in USG and Armstrong, he also worked

14   very - was very involved in the Manville asbestos

15   proceedings. He brings another layer of expertise to these

16   meetings, Your Honor, and in a way, helps us run these

17   efficiently. So, Your Honor, again, it is just these four

18   meetings that we're talking about. We believe it is

19   reasonable for the futures rep to have the right once in a

20   while, to meet with his team to discuss matters face-to-face

21   to get the answers straight as opposed to being translated by

22   a partner.

23        MR. SMITH (TELEPHONIC): Your Honor, this is Warren

24   Smith, the fee auditor.

25        THE COURT: Yes.

336

1          MR. SMITH (TELEPHONIC): And we did try very hard to

2    settle this matter, but what Kaye Scholer kept emphasizing to

3    me was that the client had specifically requested that he

4    meet with all these attorneys.  Your Honor, one of the

5    problems that courts identify over and over again with fees

6    in the bankruptcy context, is that a client in a particular

7    bankruptcy case, such as the futures representative or a

8    committee, they aren't necessarily the ones that are paying

9    for their own lawyers, and thus, there is not the normal

10   restraint on a client making a request of its attorney that

11   may be expensive.  And so counsel is expected to provide, I

12   guess, some sort of a restraint when its client makes a

13   request that would involve over-lawyering, and I didn't get

14   the impression that Kaye Scholer was operating as a restraint

15   on its counsel in these instances.

16         MR. EMRICH: Your Honor, that statement may be true

17   in general terms.  In this particular case, Mr. McMonagle is

18   as focused as any person in this entire case on holding down

19   costs to the point, Your Honor, where he voluntarily, on his

20   own, reduced the fees of his financial advisor while there

21   was a lull in the case.  He didn't have to do that, Your

22   Honor.  They were on a retainer where they could have gotten

23   their $175,000 or whatever the exact number was per month.

24   He didn't see fit to do that.  He voluntarily reduced it, and

25   that obviously is not a thing that makes your financial

1    advisor very happy, but he did it because he thought that it

2    was not the most efficient way to run the case.  He is very

3    focused on these things, Your Honor.  He does not want over-

4    lawyering.  He only wants - He wants to meet with his team,

5    again, once in awhile, get straight answers, and to discuss

6    strategy.

7            THE COURT:  But here's the issue, and I appreciate

8    the fact that maybe a strategy meeting from time to time is

9    appropriate, but he could have had the same discussion with

10   you independently that wouldn't be billed by three other

11   lawyers, and then with Mr. Cress independently that wouldn't

12   then also be billed by three other lawyers.  Now, if you want

13   to meet in a team, it seems to me you can, but typically what

14   you ought to do is figure out that maybe these senior

15   person's fees will be paid, and everybody else is along for

16   the ride because you're filling in for the senior person.

17   From time to time, there may be issues that need to be

18   addressed that really do involve more than one entity, and

19   maybe it is the most efficient way to go about doing things,

20   but as a general proposition, I'm not going to approve it.

21   Not in this case and not in any others.  So, if Kaye's doing

22   it in other cases, you'd better figure it out because I think

23   it's over-lawyering, and I'm not going to approve it, not for

24   Kaye Scholer and not for anybody else.  So, in this instance,

25   you know, I think it's fair that when objections are raised,

1    you don't have guidelines and so you don't know the answer

2    until the issues are raised.  Tell me what the specific

3    charge is for these four meetings, for all four people and

4    the total time that was involved?

5            MR. EMRICH: Your Honor, I can easily get that.  I

6    don't have it added up, but we have - All right, I'm looking

7    first at the thirteenth interim - I'm sorry, wrong -

8    thirteenth interim period, and the first entry was for -

9            MR. SMITH (TELEPHONIC): Well, Your Honor, I have

10   some figures here.

11           MR. EMRICH: Okay.

12           MR. SMITH (TELEPHONIC): And maybe I can get some

13   confirmation from Kaye Scholer.

14           THE COURT: Sure.

15           MR. SMITH (TELEPHONIC):  There's an office

16   conference on 12/3 in which we had recommended a reduction of

17   $2,178; an office conference on January 20th, we had

18   recommended a reduction of $2,830; a conference on May 20th,

19   we had recommended a reduction of $1,415; and a conference on

20   May 5th, in which we had recommended a reduction of $1,061.25.

21   I think those are the four that we're talking about.

22           MR. EMRICH: That sounds right, Your Honor.

23           THE COURT: Okay, and those are the reductions based

24   on what, Mr. Smith?

25           MR. SMITH (TELEPHONIC): Your Honor, that's a

11

1   reduction basically when they had four partners there.

2          THE COURT: Yes, but those are not the reductions

3   for the entire conference; correct?

4          MR. SMITH (TELEPHONIC): No, no.  It's basically

5   reducing down to three partners that we felt that they

6   identified as having a necessity to be at these meetings.

7          THE COURT: So, it's essentially taking out one

8   attorney's presence in those meetings?

9          MR. SMITH (TELEPHONIC): Yes, it is.  That wasn't

10  the analysis, Your Honor, but that was the result.

11         MR. EMRICH: Your Honor, one point on that, and I

12  think we reached agreement with the fee auditor on this, and

13  I'm not quite sure, is if Your Honor is inclined to cut it to

14  three attorneys, we ought to have the right to send the three

15  attorneys that we think are the ones that should be charging

16  instead of the fee auditor averaging the fees.

17         THE COURT: Well, I agree that the averaging of the

18  fees, if that's the way this is done, is probably not the way

19  to do it.  It should be the specific fees because of those

20  hourly rates so far haven't been challenged by anyone.  So

21  I'm assuming the hourly rates are appropriate, and so it

22  should be, I guess, the three partners who are most involved.

23  However, I'm not saying the three partners are okay in any

24  specific instance.  It's just that if you've resolved it in

25  this instance so that three partners are okay, I'm not going

1    to take that issue on.    Frankly, we'll spend more time

2    worrying about it with everybody in court than we will taking

3    the fees out of the case, and there's no economic justice to

4    that either, but it is an issue that does need to be

5    addressed, I think, in the future, and as a general

6    proposition, I don't see the need for wholesale meetings

7    overstaffed by let's say more than one or two lawyers

8    depending on what the issues are.    So, as a general rule, I

9    don't think they ought to be approved.    From time to time, do

10    issues come up?    Yes, I'm sure they do.    Four times in the

11    six-month period, frankly, doesn't in this instance given

12    what was going on in the case at the time overwhelm me but it

13    might in other circumstances.    I think in this instance,

14    unless there's some reduction in what Mr. Smith has done that

15    would be lessened if you picked the three partners instead of

16    this averaging, I'm happy to have the three partners' hourly

17    rates put in.    You can work out that analysis, but again, I

18    don't want it to be said that I'm saying that for all

19    purposes it's okay to take three partners.    I'm not saying

20    that.    I don't think it's appropriate to take three partners

21    for every meeting, and I'm likely not to approve it again.

22    So, but I'll approve it in this instance.    You can work with

23    Mr. Smith and get the appropriate numbers.

24            MR. EMRICH: All right, Your Honor.

25            THE COURT: All right.

13

1        MR. EMRICH: Just for completeness of the record, I

2   think I know where Your Honor is coming out, I mentioned

3   there were two issues.  That was one.

4        THE COURT: Yes.

5        MR. EMRICH: The second issue was that there were

6   two all-hands meetings involving the debtors and other

7   constituencies to discuss the recusal litigation.  I say

8   other constituencies, the bondholders and the debtors, to

9   discuss the recusal litigation and the briefs that were being

10  worked on with regard to the proceedings in the Third

11  Circuit.  Those meetings occurred on January 14th and April 8th

12  of 2004.  It's the same kind of situation, Your Honor, and

13  again, matters of great importance.  We have to also factor

14  in, Your Honor, this was - you know, it's easy in hindsight

15  to say you should have staffed it more leanly.  Please

16  remember (a) it was an issue of vital importance to the case

17  at the time, and (b) we were up against a bank group that had

18  at least four sets of attorneys, and we also had briefs that

19  had to be worked on that related to the other cases that were

20  also involved in the recusal litigation, W.R. Grace and USG.

21  So, it was a very complicated situation.

22        THE COURT: And so I'm not going to get fee requests

23  in the other cases, only in this one for the same meetings?

24        MR. EMRICH: Oh, Your Honor, absolutely.  This was

25  an Owens Corning meeting.

342

14

1            THE COURT: Okay.

2            MR. SMITH (TELEPHONIC): Your Honor?

3            THE COURT: Yes.

4            MR. SMITH (TELEPHONIC): Yes.  I'm familiar with

5    these meetings, and again, we found - we believed that an

6    explanation was provided, and its explanation was

7    satisfactory to establish the presence of three partners, and

8    we thought that there wasn't an explanation to establish to

9    us the necessity of four partners, and thus, we recommended a

10   reduction for that fourth partner, and that was for both of

11   these meetings, Your Honor.

12           THE COURT: Excuse me one second.  Okay, why were

13   all four partners needed here?

14           MR. EMRICH: Your Honor, the four partners - just

15   give me one second.  The four partners, Your Honor, were Mr.

16   Frames, Ms. Parver, myself, and Aaron Steeple from my office,

17   Your Honor, who was a litigation partner actively involved in

18   the drafting of the briefs on recusal.  The active - the lead

19   in drafting these briefs I think it's fair to say was Mr.

20   Steeple and myself, basically, from the bankruptcy

21   standpoint, I was involved and from the litigation standpoint

22   he was involved, and at the senior level, Your Honor, we had

23   Jane Parver as the litigation senior partner on it, and Mr.

24   Frames, the senior bankruptcy partner on it.  Again, it's two

25   meetings.  That's all we're talking about.

15

1          THE COURT: Yeah, but it's not the number of

2    meetings.  It's the necessity for staffing it the way it's

3    staffed that's at issue.

4          MR. EMRICH: Well, Your Honor, at least one of the

5    two meetings was a meeting with the debtors and the

6    bondholders to discuss - We had to file a joint brief.  So

7    everybody had to weave their thoughts together -

8          THE COURT: That's fine, and I think all four

9    partners are appropriate for that meeting where it was a

10   joint meeting.  I'll approve all four in that instance.  What

11   about the other one?

12         MR. EMRICH: The other meeting was also a joint

13   meeting, Your Honor.

14         THE COURT: Yes, but for what purpose?

15         MR. EMRICH: It was to discuss the recusal

16   litigation on - let me just - It was on January 14th of '04,

17   and that was in connection with the recusal proceedings; then

18   before Judge Wolin for the same purpose.

19         THE COURT: I don't see the necessity for it at that

20   meeting.  Those litigation proceedings before Judge Wolin

21   were going on for a very long time, and I don't see the need

22   for four.  In fact, I'm not sure I even see the need for

23   three in that, but nonetheless, if Mr. Smith's content with

24   three, I'll approve three for that one.  I'll approve all

25   four for the April 8th meeting.  And again, I think the hourly

344

1    rate's not an average or the things that should apply, so you

2    can work with Mr. Smith to come up with the correct numbers.

3            MR. EMRICH: Thank you, Your Honor.

4            THE COURT: All right.  I think yours is the only

5    fee that was not previously approved, so you can just give me

6    an order on a certification of counsel, and I'll get it

7    entered.

8            MR. EMRICH: Will do, Your Honor.

9            THE COURT: All right, thank you.

10           MR. EMRICH: Thank you.

11           MR. SMITH (TELEPHONIC): Thank you very much, Your

12   Honor.

13           THE COURT: Thank you.

14           MR. SMITH (TELEPHONIC): May I be excused?

15           THE COURT: Yes, sir, thanks.

16           MR. SMITH (TELEPHONIC): Thank you.

17           THE COURT: Mr. Pernick?

18           MR. PERNICK: Your Honor, I'm just going to ask Mr.

19   Padester to give the Court and the parties a quick update on

20   Mira Vista.

21           THE COURT: All right.

22           MR. PADESTER: Good morning, Your Honor.

23           THE COURT: Good morning.

24           MR. PADESTER: Roger Padester for the debtors.  As

25   Your Honor may recall, Owens Corning is a defendant in two

1    alleged class actions.  One originally filed in this Court

2    involving pre-petition purchases of Mira Vista roofing

3    products, and the other transferred to this Court from the

4    Bankruptcy Court in California involving post-petition

5    roofing products.  We've had an extensive amount of discovery

6    on class certification and even merits issues, and we

7    prepared expert reports, and we had a mediation this summer

8    before retired California Superior Court Judge Fannan

9    (phonetical) in an effort to resolve the issues, and after

10    protracted negotiations and very challenging ones, I'm

11    pleased to report that we've reached an agreement in

12    principal to settle both of the class actions and that we are

13    now in the process of drafting settlement papers.  There are

14    some material allocation issues.  There's some difficult

15    allocation issues that we have to finally work out, but we

16    would hope, depending on how quickly the drafting process

17    proceeds, to be able to present the proposed settlement to

18    Your Honor either at the January 30th or the February 2006

19    hearings.

20          THE COURT: All right, that's fine.  Thank you.

21    Counsel for Mira Vista want to add anything?

22          MR. OROZA (TELEPHONIC): No, Your Honor, I think

23    that the summary is correct.  There are some material details

24    that need to be worked out and it will take some time, but we

25    have reached agreement in principal.

1          THE COURT: All right.  Thank you.  Do I need

2    another status report for any reason or is your 9019 motion

3    going to take care of everything, Mr. Padester?

4          MR. PADESTER: I believe the 9019 motion will take

5    care of everything.  If there's an unexpected snag, we will

6    ask Mr. Pernick to put a status conference on the agenda for

7    consideration.

8          THE COURT: Okay.  Thank you.

9          MR. PERNICK: Your Honor, Mr. Becker, I think, is

10   going to deal with item number 9.

11         MR. BECKER: Good morning, Your Honor.

12         THE COURT: Good morning.

13         MR. BECKER: Gary Becker for Credit Suisse.  Your

14   Honor, as we discussed last time we were here that we would

15   report if there were any changes this month, and there have

16   not been any changes.  I filed a brief report last -

17         THE COURT: Yes, I got it, thank you.

18         MR. PERNICK: Your Honor, that takes us to item

19   number 4, which is the debtors' request for an extension of

20   the exclusivity period.

21         THE COURT: Okay.

22         MR. PERNICK: Let me start first just by introducing

23   to the Court who's in the courtroom from the debtors' side

24   just so the Court knows who's here.  I have Jeffrey Stean

25   from the Sidley & Austin firm and Mr. Stean is one of the key

1    lawyers at Sidley who's assisting us on the plan and

2    disclosure statement.

3           THE COURT: All right.

4           MR. STEAN: Good morning.

5           MR. PERNICK: And then Mark Minuti from my office

6    who the Court knows, and Steve Krull is in the courtroom

7    also.  He is vice president and general counsel of the

8    company.  Your Honor, let me start I guess by apologizing

9    which I don't know is necessarily a good way to start, but I

10   really think that concerning the limited relief that we

11   requested, while I don't think it's our fault that we're here

12   arguing this today, I'm a little bit surprised that we are,

13   and I apologize because of the opposition, we think it's

14   necessary that we have to at least have to put a proffer on.

15   We have a witness in the courtroom, and that's Mr. Krull.

16   With the Court's permission, I'd like to put that proffer on

17   and then we'll have any cross-examination that's required or

18   requested, and then we can deal with argument after that.

19          THE COURT: Okay.  As long as it's within your

20   allotted time.  You know I don't do evidentiary motions or

21   hearings on motions days.

22          MR. PERNICK: I do know –

23          THE COURT: But since this is a very limited agenda,

24   there's probably time to do it.

25          MR. PERNICK: Right, and I think – I'll try to do –

1    It's a relatively brief proffer, but unfortunately we've been
2    put in a position where we have to make a record and
3    exclusivity was running out today.  So that's the reason that
4    it was - at least we're prepared to go forward.
5              THE COURT: All right.
6              MR. PERNICK: If called to testify in support of the
7    motion of the debtors for an order under § 1121(d) granting a
8    further extension of exclusive periods, Stephen K. Krull,
9    who's a senior vice president, general counsel, and secretary
10   of Owens Corning would testify as follows: First, as the
11   debtors' case is being large and complex, these cases
12   involve, as the Court's well aware, eighteen debtors, dozens
13   of non-debtor entities whose assets and business operations
14   are spread throughout the United States and numerous foreign
15   countries.  As of the petition date, the debtors have
16   scheduled assets in excess of $14 billion and scheduled
17   liabilities in excess of 11 billion, and they employed more
18   than 16,000 employees.  Today the debtors actually employ
19   approximately 20,000 employees, a significant increase over
20   where we were on the petition date.  Mr. Krull would also
21   testify that the company has had net sales that have grown
22   from under $5 billion per year to more than $6 billion per
23   year in the last five years, and that those sales have grown
24   approximately $1.5 billion over the past five-year period
25   that the company's been in bankruptcy.  Mr. Krull would

1    further testify that these cases involve numerous complex

2    issues, including two complex issues which have been and

3    continue to be the subject of litigation although they are

4    very far down the road, that is substantive consolidation and

5    estimation of the debtors' asbestos liabilities, although he

6    believes that each now has sufficient clarity to allow the

7    debtors to formulate and prosecute a confirmable plan.  With

8    respect to the debtors' good faith progress towards proposing

9    a successful plan, Mr. Krull would testify as follows: On

10   January 17th of 2003, the debtors, together with the Asbestos

11   Committee and the futures representative as plan proponents

12   filed their joint plan of reorganization.  On March 28, 2003,

13   the plan proponents filed an amended version of that plan

14   together with a disclosure statement. On December 2nd, 2003,

15   this Court entered an order approving the disclosure

16   statement in all respects subject in part to the issuance of

17   a ruling on substantive consolidation and also gave tentative

18   approval to voting procedures subject to approval of those

19   procedures by the District Court.  Mr. Krull would also

20   testify that a number of factors have prohibited the debtors

21   from moving forward with the joint plan and disclosure

22   statement prior to August 15th of 2005.  And just to summarize

23   a couple of those, Mr. Krull would testify and I think the

24   record is pretty clear about the recusal of Judge Wolin and

25   substantive consolidation which I think the Court is well

22

1    aware of what the status of that is culminating with an

2    opinion by the Third Circuit Court of Appeals on August 15th

3    of 2005 where the Third Circuit reversed Judge Fullam's order

4    granting substantive consolidation.  Since then, the Third

5    Circuit has denied several petitions for rehearing regarding

6    that ruling.  With respect to the asbestos claims valuation

7    process, again, most of this is in the record, but just to

8    refresh everyone's recollection and make the record, Mr.

9    Krull would testify that Judge Fullam withdrew the reference

10   with respect to asbestos claims estimation.  He held a

11   hearing from January 13th to the 20th of 2005 to determine the

12   aggregate amount of the debtors' asbestos personal injury

13   liabilities.  By an order dated March 31, 2005, Judge Fullam

14   issued a decision estimating Owens Corning's aggregate

15   present and future asbestos liabilities at 7 billion.

16   Certain parties in interest filed notices of appeal of the

17   estimation decision to the Third Circuit, and that as of

18   today, no briefing or other schedule has been established by

19   the Third Circuit with respect to those appeals.  With

20   respect to events subsequent to the rulings on substantive

21   consolidation and asbestos estimation, Mr. Krull would

22   testify as follows: At this Court's suggestion, the debtors

23   did not proceed to solicit votes with respect to the joint

24   plan that was filed earlier, choosing instead to prosecute

25   the substantive consolidation and estimation issues

1    diligently with the understanding that once those two issues

2    were resolved by the courts, the key constituencies would

3    either agree on a consensual plan of reorganization or the

4    debtors would pursue a confirmable plan of reorganization.

5    Second, he would testify that the asbestos estimation order

6    is subject to appeal, and that it is his understanding that a

7    writ of certiorari has been or will be filed regarding the

8    Third Circuit's substantive consolidation opinion.

9    Notwithstanding those appeals, the rulings to date on both of

10   those issues have provided in Mr. Krull's view clarification

11   to the debtors and other interested parties and have, in

12   fact, fostered negotiations which will hopefully lead to a

13   consensual or at least a confirmable plan.  Mr. Krull would

14   further testify that since the Third Circuit issued its

15   decision on substantive consolidation in August, the debtors

16   have been working and negotiating with its key creditor

17   groups in the hopes of reaching agreement on the terms of a

18   consensual plan.  Equally as important, the debtors have

19   fostered and facilitated direct discussions between certain

20   of the key creditor groups.  Mr. Krull would further testify

21   that for the first week - six weeks or so, after the

22   substantive consolidation decision, the debtors were not in

23   the negotiation room for plan discussions between asbestos

24   and the banks at their request, but this reflects nothing

25   more than the debtors' initial agreement that a consensual

24.

1    plan was more likely if the banks and asbestos creditor

2    groups could reach a deal with the debtors' facilitation and

3    information.    Even when the debtors - where the debtors chose

4    not to directly participate in such discussions, the debtors

5    were involved in these negotiations behind the scenes and

6    have been doing what they can to encourage these talks to

7    continue and to provide information to each of those groups

8    so that they could have the most productive discussions

9    possible, and he would further testify that not only did the

10   debtor provide information, but the debtor provided

11   suggestions about plan structures to some of those groups

12   individually to try to facilitate those discussions.    Mr.

13   Krull would further testify that the debtors have since taken

14   a more visible role in an effort to formulate a confirmable

15   plan.    Extensive discussions and progress have been made with

16   the ACC and the futures rep, and numerous iterations of a

17   plan term sheet have been exchanged.    Discussions have been

18   held with the designated members, and the banks' bondholders

19   that are represented by the Stroock firm.    Initial

20   discussions were had with the banks and additional

21   discussions have been suggested by the debtors and will be

22   pursued with the banks that are represented by the Weil,

23   Gotshal firm.    Mr. Krull would further testify that the

24   debtors will file a confirmable plan by December 31, 2005 in

25   accordance with the Court's instructions and will continue to

1    make whatever efforts are necessary to gain the support of

2    the banks, the bonds, the ACC, and the futures rep.  Further,

3    he would testify that the debtors fully intend to continue to

4    engage the banks, the bondholders, the ACC, and the futures

5    rep in substantive plan discussions prior to filing their

6    amended plan.  With respect to case administration, Mr. Krull

7    would testify that since the last extension of the debtors'

8    exclusive period, and this is the one in the spring, not the

9    one in September, although some of these events are included

10   in that shorter time frame, Mr. Krull would testify that the

11   debtors' management has continued to focus on operating the

12   debtors' businesses and continue to do so successfully.  By

13   way of example, between 2002 and 2004, the debtors' EBITDA,

14   excluding certain costs and expenses related to the Chapter

15   11 proceedings, asbestos liability and restructuring

16   activities has increased from $505 million to $680 million.

17   As a result, EBITDA margin has increased from 10.4 percent to

18   12 percent.  During the same period, the debtors' income from

19   operations rose from 300 million to 452 million, and return

20   on that assets increased from 9.1 percent to 15 percent.  In

21   addition, cash on hand as of year end 2004 was more than $1.1

22   billion.  Mr. Krull would testify that the debtor obtained a

23   case management order relating to asbestos property claims,

24   that the debtor obtained court approval of a stipulation

25   resolving the asbestos school litigation class proof of

1    claims, and that 17 of 18 class claims were disallowed and

2    expunged in their entirety sparing the debtors the expense of

3    claims litigation.  Mr. Krull would further testify that the

4    debtors filed an objection seeking an order disallowing and

5    expunging the disputed asbestos property damage claims of the

6    schools in the diocese of Arlington Virginia.  The parties

7    are negotiating a resolution of this objection.  Mr. Krull

8    would further testify that the Court has entered orders on

9    the debtors' twenty-ninth, thirtieth, thirty-first, and

10   thirty-second omnibus objections to non-asbestos claims which

11   have eliminated approximately 3.7 million in claims filed

12   against the debtors.  The debtors have filed for additional

13   omnibus objections to claims seeking to reduce or modify an

14   additional 900 claims.  In addition to the omnibus

15   objections, Mr. Krull would testify that the debtors filed

16   individual objections to several large claims, including OCI

17   Chemical Corporation and Shinteck, Incorporated (phonetical).

18   Moreover, the Court has approved stipulations resolving other

19   large claims including the claims of Centurion Capital Trade

20   Claims, LP, as assignee of AT&T Corp., Ohio Edison Company,

21   Sun Guard Recovery, and Express Services.  Mr. Krull would

22   testify that the debtors continue to review and will continue

23   to object to claims in a move towards confirmation.  Mr.

24   Krull would testify as Mr. Padester just spoke to that the

25   debtors have settled at least preliminarily, subject to

1    documentation, a $275 million alleged class action claim with

2    respect to Mira Vista Roofing Products.  He would also

3    testify that the debtors obtained approval for a procedure to

4    dispose of aircraft, and have successfully disposed of two of

5    those three aircraft with the third under contract that they

6    expect to close this week.  The debtors have sought and

7    obtained approval for the purchase of assets from Wolverine

8    Fabricating, Inc., one of the four primary companies serving

9    the fabrication needs of the West Coast RV and Cargo Trailer

10   Industries.  Mr. Krull would further testify that Owens

11   Corning has been developing a market in China for its

12   products since 1995 and continues to evaluate and analyze the

13   market in China for new opportunities to further the debtors'

14   opportunities in China.  The debtors have filed a motion

15   authorizing Owens Corning to lend money to its non-debtor

16   China subsidiary.  The debtors have also sought and obtained

17   approval for a foreign fund repatriation program, for

18   approval of a technical amendment to a DIP provision in order

19   to reconcile two potential discrepancies, sought and obtained

20   authority to make a contribution numerous times to their

21   pension plans each year.  The debtors have sought and

22   obtained approval to sell certain real property which is all

23   of record with the Court, and the debtors have reached

24   settlements with FM Insurance Company and the AIG Companies

25   resolving insurance coverage disputes with respect to