Approval by the Bankruptcy Court of this Disclosure Statement means the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable such Claim holders to make an informed judgment whether to accept or reject the Plan. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES AND SCHEDULES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors other than the information contained herein. No such information shall be relied upon in making a determination to vote to accept or reject the Plan.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. Except with respect to the Pro Forma Financial Projections and Reorganization Balance Sheet set forth in Appendix B attached hereto and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not purport to reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. The Debtors do not undertake any obligation to, and do not intend to, update the Financial Projections; thus, the Financial Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Financial Projections. Further, the Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement shall not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

**EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTING FIRM AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.**

**C.    Solicitation Package**

Each person entitled to vote to accept or reject this Plan is being transmitted: (1) this Disclosure Statement; (2) the Plan (attached as Appendix A to this Disclosure Statement); (3) notification of (a) the time by which Ballots or Master Ballots, as applicable, to accept or reject the Plan must be submitted, (b) the date, time and place of the hearing to consider confirmation of the Plan and related matters, and (c) the time for filing objections to confirmation of the Plan; and (4) a Ballot or Master Ballot, as applicable (and return envelopes), to be used in voting to accept or reject the Plan. Any person who receives this Disclosure Statement but does not receive a Ballot or Master Ballot and who believes that he is entitled to vote to accept or reject the Plan or who believes he received an incorrect Ballot or Master Ballot should contact the Voting Agent at the address or telephone number set forth in Section XVII of this Disclosure Statement.

**D.    Voting Procedures, Ballots and Voting Deadline**

After carefully reviewing the Plan, this Disclosure Statement and all related material including, without limitation, the Voting Procedures attached hereto as Appendix J (the "Voting Procedures"), creditors should indicate acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot or Master Ballot and return it in the envelope provided. Only original Ballots and Master Ballots will be accepted.

Each Ballot and Master Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, only the coded Ballots or Master Ballots accompanying this Disclosure Statement may be used.

IN ORDER FOR VOTES TO BE COUNTED, BALLOTS AND MASTER BALLOTS MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING PROCEDURES AND RECEIVED NO LATER THAN [DATE], AT [TIME] (-_- TIME) (THE "VOTING DEADLINE") BY OMNI MANAGEMENT GROUP, LLC (THE "VOTING AGENT") OR BY FINANCIAL BALLOTING GROUP LLC (THE "SPECIAL VOTING AGENT"). NO STOCK CERTIFICATES OR DEBT INSTRUMENTS OR OTHER INSTRUMENTS OR DOCUMENTS REPRESENTING CLAIMS OR INTERESTS SHOULD BE RETURNED WITH THE BALLOT OR MASTER BALLOT.

Questions about (1) the Voting Procedures, (2) the packet of materials that has been transmitted, (3) the amount of a Claim or (4) requests for an additional copy of the Plan, this Disclosure Statement or any appendices or exhibits to such documents (for which a charge may be imposed unless otherwise specifically provided by Federal Rule of Bankruptcy Procedure 3017(d)) should be directed to:

OWENS CORNING<br>
c/o Omni Management Group, LLC<br>
16161 Ventura Blvd., PMB 517<br>
Encino, CA 91436<br>
818-905-6542 (fax)<br>
contact@omnimgt.com

FOR FURTHER INFORMATION AND INSTRUCTION ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE SECTION XVII OF THIS DISCLOSURE STATEMENT ENTITLED "THE SOLICITATION; VOTING PROCEDURE."

### E.   Confirmation Hearing and Deadline for Objections to Confirmation

Pursuant to Section 1128 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3017(c), a hearing has been scheduled on confirmation of the Plan (the "Confirmation Hearing") for _____ __, 2006, at ____ _.m. The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. Objections to confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection, and the amount and class of the Claim. Any such objection must be filed with the Bankruptcy Court on or before _____ __, 2006 at ____ _.m. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. Additional information regarding the filing of any objections to confirmation of the Plan is contained in the Notice accompanying this Disclosure Statement.

### III.   GENERAL INFORMATION CONCERNING THE DEBTORS

*The following information is only a summary and is qualified in its entirety by reference to OC's Annual Report on Form 10-K for the year ended December 31, 2004, OC's Quarterly Report on Form 10-Q for the quarter ended September 30, 2005, OC's Annual Report on Form 10-K for the year ended December 31, 2003, OC's Annual Report on Form 10-K for the year ended December 31, 2002, OC's Annual Report on Form 10-K for the year ended December 31, 2001, and OC's Annual Report on Form 10-K for the year ended December 31, 2000, copies of which may be obtained, free of charge, through OC's website at www.owenscorning.com. Readers of this Disclosure Statement are directed to the full text of those reports for additional information concerning the historical business and operations of OC. OC's Annual Report on Form 10-K for the year ended December 31, 2004, may also be obtained by sending a written request. See directions for obtaining this document in Appendix D.*

### A.   History and Description of Business

#### 1.   Introduction

OCD began as a glass fiber joint venture in the 1930's between Owens-Illinois and Corning Glass. At the end of 1938, the year in which it was incorporated, OCD reported sales of $2,555,000 and had 632 employees. Today, OCD, along with its approximately 90 direct and indirect subsidiaries in the United States and throughout the world (collectively, OCD and its subsidiaries are referred to as "OC" or the "Company") is a global leading producer of glass fiber materials used in composites and a leading home building products company. For the year ended December 31, 2004, OC had over $5.6 billion in sales, approximately 19,400 employees around the world, and manufacturing, sales and research facilities, including joint venture and licensee relationships, in more than 30 countries. See Appendix G for a chart

525

depicting OC's corporate structure, and Appendix H for a description of the anticipated corporate structure of the Reorganized Debtors after the Effective Date.

### 2. General Description of OC's Business

OC operates in two business segments: Building Materials Systems and Composite Solutions. In 2004, the Building Materials Systems segment accounted for approximately 80% of OC's total sales, while Composite Solutions accounted for the remainder. The products and systems provided by OC's Building Materials Systems segment are used in residential remodeling and repair, commercial improvement, new residential and commercial construction, and other related markets. The products and systems offered by OC's Composite Solutions segment are used in end-use markets such as building construction, automotive, telecommunications, marine, aerospace, energy, appliance, packaging and electronics. Many of OC's products are marketed under registered trademarks, including Propink®, Advantex® and/or the color PINK.

OC has affiliate companies in a number of countries. Generally, affiliated companies' sales, earnings and assets are not included in either operating segment unless OC owns more than 50% of the affiliate and the ownership is not considered temporary.

Revenue from external customers, income from operations and total assets attributable to each of OC's operating segments and geographic regions, as well as information concerning the dependence of its operating segments on foreign operations, for each of the years 2004, 2003, and 2002, are contained in Note 3 to OC's Consolidated Financial Statements, entitled "Segment Data" contained in OC's Annual Report on Form 10-K for the year ended December 31, 2004. See also OC's Quarterly Report on Form 10-Q for the quarter ended September 30, 2005, OC's Annual Report on Form 10-K for the year ended December 31, 2003, OC's Annual Report on Form 10-K for the year ended December 31, 2002, and OC's Annual Report on Form 10-K for the year ended December 31, 2001, copies of which may be obtained, free of charge, through OC's website at www.owenscorning.com. OC's Annual Report on Form 10-K for the year ended December 31, 2004, may also be obtained by sending a written request. See directions for obtaining this document in Appendix D.

(a) Building Materials Systems

Principal Products and Methods of Distribution. Building Materials Systems operates primarily in the United States and Canada. It also has a presence in Asia Pacific and Mexico. Building Materials Systems sells a variety of products and systems in two major categories: (i) insulating systems, including thermal and acoustical insulation, air ducts formed from glass wool fibers, and foam insulation; and (ii) exterior systems for the home, including roofing shingles, vinyl and siding and accessories, windows and doors, stone veneer building products, and branded housewrap. These products are used primarily in the home improvement, new residential construction, manufactured housing and commercial construction markets.

Sales of building insulation systems, roofing shingles and accessories, housewrap, and vinyl siding are made through home centers, lumberyards, retailers and distributors. Other channels of distribution for insulation systems in North America include

insulation contractors, wholesalers, specialty distributors, metal building insulation laminators, mechanical insulation distributors and fabricators, manufactured housing producers and appliance, and automotive manufacturers. Foam insulation and related products are sold to distributors and retailers who resell to residential builders, remodelers and do-it-yourself customers; commercial and industrial markets through specialty distributors; and, in some cases, large contractors, particularly in the agricultural and cold storage markets. Vinyl siding and accessories are also sold through company-owned retail distribution centers.

OC sells asphalt products that are used internally in the manufacture of residential roofing products and are also sold to other shingle manufacturers. In addition, asphalt is sold to roofing contractors and distributors for Built-Up Roofing Asphalt ("BURA") systems and to manufacturers in a variety of other industries, including automotive, chemical, rubber and construction.

In Latin America, OC sells building and mechanical insulation primarily through a subsidiary in Mexico, as well as exports from U.S. plants. In Asia Pacific, OC sells primarily insulation through joint venture businesses, including two majority owned insulation plants and an insulation fabrication center in China, a minority owned joint venture in Saudi Arabia, and licensees.

Seasonality. Sales of the Building Materials Systems segment tend to follow seasonal patterns in the home improvement, remodeling and renovation, and new construction markets. The peak season for home construction and remodeling generally corresponds with the second and third calendar quarters. Sales levels for the segment, therefore, are typically lower in the winter months.

Major Customers. No customer of the Building Materials Systems segment accounted for more than 6% of the segment's sales in 2004.

(b)     Composite Solutions Segment

Principal Products and Methods of Distribution. Composite Solutions operates in North America, Europe, Latin America and Asia Pacific, with affiliates and licensees around the world.

OC is a leading producer of glass fiber materials used in composites. Composites are made up of two or more components (e.g., plastic resin and a fiber, traditionally a glass fiber) and are used in various applications to replace traditional materials, such as aluminum, wood and steel. OC is increasingly providing systems that are designed for a specific end-use application and entail a material, a proprietary process and a fully assembled part or system. The global composites industry has thousands of end-use applications. OC has selected strategic markets and end-users in which OC provides integral solutions, such as the building construction and transportation markets.

Within the building construction market, OC sells glass fiber and/or materials directly to a small number of major shingle manufacturers, including its own roofing business. Tubs, showers and other related internal building components used for both remodeling and new construction are also major applications of composite materials in the

527

construction market. These end-use products are some of the first successful material substitution conversions normally encountered in developing countries. Glass fiber reinforcements and composite material solutions for these markets are sold to direct accounts, and to distributors around the world, who in turn service thousands of customers.

A significant portion of transportation-related composite solutions are used in automotive applications. Non-automotive transportation applications include heavy trucks, rail cars, shipping containers, refrigerated containers, trailers and commercial ships. Growth continues in automotive applications, as composite systems create new applications or displace other materials in existing applications. There are hundreds of composites applications, including body panels, door modules, integrated front-end systems, instrument panels, chassis and underbody components and systems, pick-up truck beds, and heat and noise shields. These composite parts are either produced by original equipment manufacturers or are purchased by original equipment manufacturers from first-tier suppliers.

The Composite Solutions segment also serves thousands of applications within the consumer, industrial and infrastructure markets, which include sporting goods and marine applications. OC sells composite materials to original equipment manufacturers and other finished goods manufacturers, both directly and through distributors.

Major Customers. No customer of the Composite Solutions segment accounted for more than 8% of the segment's sales in 2004.

(c)   Business Realignment Preceding Commencement of Chapter 11 Cases

Prior to the commencement of the Chapter 11 Cases, OC consummated several significant acquisitions and divestitures of non-strategic businesses and realigned existing businesses.

During the period 1994 through 1996, OC made a number of acquisitions for its Building Materials Systems segment in the United States and Europe. The combined purchase price for the acquisitions totaled approximately $370 million. The largest of these acquisitions was the $110 million acquisition in 1994 of Pilkington Insulation Limited and Kitsons Insulation Products Limited, the United Kingdom-based insulation manufacturing and industrial supply businesses of Pilkington PLC.

On June 27, 1997, OC acquired Fibreboard Corporation ("Fibreboard"), a North American manufacturer of vinyl siding and accessories, and manufactured stone. At the time of the acquisition, Fibreboard was a leading producer of vinyl siding and accessories, with plants in Georgia, Missouri and North Carolina in the United States, and British Columbia and Ontario in Canada. Marketing products under the brand names Norandex and Vytec, Fibreboard also operated more than 130 company-owned distribution centers in 32 states. The purchase price of the acquisition totaled approximately $660 million, including assumed debt of $138 million.

On July 28, 1997, OC acquired Amerimark Building Products, Inc. ("Amerimark") (including its wholly-owned subsidiaries, Wolverine Coil Coating, Inc. and RBP, Inc.) for a purchase price of approximately $317 million. Amerimark was a specialty building

814526.7                                    8

products company serving the exterior residential housing industry. Major product lines included vinyl siding, vinyl windows and aluminum accessories for the exterior of the home.

In April 1998, OC completed the sale of its 50% interest in the Alpha/Owens Corning, L.L.C. joint venture, a manufacturer and marketer of unsaturated polyester and vinylester resins. OC sold its interest to the joint venture and Alpha Corporation of Tennessee. OC and Alpha Corporation of Tennessee had created the joint venture in 1994, combining their existing resin businesses to form the largest manufacturer of polyester resins in North America.

In September 1998, OC completed the formation of a joint venture with a U.S. subsidiary of Groupe Porcher Industries. The joint venture manufactured and sold yarns and specialty materials. OC contributed two manufacturing plants and certain proprietary technology to the joint venture, in return for a 49% interest in the joint venture. The remaining 51% interest in the joint venture was sold to the Groupe Porcher subsidiary for approximately $550 million. OC's 49% interest was extinguished as a result of a bankruptcy case filed by the joint venture.

In late 1999, certain OC entities, including Fibreboard, underwent an internal reorganization. On December 15, 1999, OCD approved the transfer of the assets and liabilities of Cultured Stone Corporation ("Cultured Stone"), a Fibreboard subsidiary, to OCD in exchange for the transfer by OCD of stock of Amerimark to Fibreboard. Effective December 31, 1999, Cultured Stone and Vytec Sales Corporation, also a Fibreboard subsidiary, merged with and into Fibreboard. On that same date, Fibreboard exchanged the Cultured Stone assets and liabilities for the Amerimark stock. Also on the same date, Fabwel, Inc. ("Fabwel"), a Fibreboard subsidiary, and the newly acquired Amerimark were merged with and into Norandex, Inc. ("Norandex"), a Fibreboard subsidiary, which then changed its name to Exterior Systems, Inc. ("Exterior Systems").

During 2000, OC implemented the first phase of a strategic restructuring program, which continued throughout 2001. On February 2, 2000, OC completed the sale of the assets of Falcon Foam, a producer of expanded polystyrene foam insulation in Michigan and California, to Atlas Roofing Corp. for net proceeds of approximately $50 million. On June 5, 2000, OC completed the sale of its European building materials business to Alcopor Owens Corning Holding AG ("Alcopor Owens Corning"), an unconsolidated joint venture between OC and Alcopor Holding AG, in which OC retained a 40% interest. Proceeds from the sale, net of OC's $34 million cash infusion into the joint venture, were $177 million.

### 3. Acquisitions, Divestitures and Business Realignments During the Pendency of the Chapter 11 Cases

(a)   Business Realignments

Beginning in 2000, and continuing after the filing with the Bankruptcy Court of voluntary petitions for relief under Chapter 11 made by OCD and the Subsidiary Debtors (the "Filing"), OC reviewed its cost structures at that time as a response to the overall slowed economy in both the building materials and composites industries. As a result of that review, various restructuring programs were put into place as OC assessed cost structures of

814526.7

9

certain businesses and facilities as well as overhead expenditures for the entire company. One result of such assessments was the determination to exit certain businesses and consolidate in others, leading to significant restructuring charges as assets were written down to realizable value or other exit costs were recognized. In addition, a strategic review of OC's businesses resulted in additional restructuring charges in 2002.

By Order dated December 9, 2002, OC received Bankruptcy Court approval for the restructuring of two of OC's joint ventures in China, namely OC Shanghai and OC Guangzhou. The restructuring involved the extension of certain debt maturities and the reduction of principal by the China Lenders (as defined below), who were owed approximately $22 million, which debt was originally guaranteed by OCD. The restructuring, pursuant to the terms of the parties' "China Standstill Agreement", extended the debt maturities through December 31, 2005, and reduced the principal. The amounts due under this restructuring have been satisfied at an agreed discount. See Section V.F.4(b). In consideration for the maturity extensions and reduction in principal, OC agreed that the China Lenders have an Allowed unsecured guaranty Claim against the Estate in the aggregate amount of $22 million.

(b)  Acquisitions

In June 2002, OC received Bankruptcy Court approval to consummate the restructuring of OC's Indian joint venture, Owens-Corning (India) Limited ("OCIL"), a producer of composite material. As part of the restructuring, OC, through its wholly-owned subsidiary, IPM Inc. ("IPM"), contributed approximately $3 million of cash into OCIL and agreed to allow a guaranty claim in the amount of approximately $19 million in its Chapter 11 proceedings in respect of OCIL's junior debt. In addition, OCIL's senior debt maturities were extended, and its junior debt was converted to approximately $7 million of redeemable convertible debentures. Through these restructuring efforts, OC's ownership interest in OCIL increased from approximately 50% to approximately 60%. OC began consolidating OCIL on July 1, 2002, when the restructuring was consummated by all of the parties to the restructuring and approved by the Indian Government.

As of the Petition Date, Owens Corning VF Holdings, Inc. ("OCVF"), a wholly-owned subsidiary of IPM, owned 40% of Vitro OCF, SA de C.V. ("VF"), a Mexican holding company for subsidiaries engaged in the manufacturing and selling of fiberglass insulation and reinforcements in Mexico, the United States, Central and South America and the Caribbean. The remaining 60% of VF was owned by Vitro Envases Norteamerica, S.A. de C.V. ("VENA"), a corporation organized under the laws of Mexico.

By Order dated March 22, 2004, the Bankruptcy Court authorized Owens Corning and OCVF to consummate the terms of a Stock Purchase Agreement with VENA and VENA's corporate parent, Vitro, S.A. de C.V. ("Vitro"). Among other things, the Stock Purchase Agreement provided for OCVF to purchase VENA's 60% interest in VF for approximately $73 million. With approval of the Bankruptcy Court, OCVF obtained the funds necessary to purchase the stock via a sale of its preferred stock to Owens Corning Canada, Inc. ("OCC"), a wholly-owned, non-debtor, indirect subsidiary of IPM.

In September 2005, the Bankruptcy Court authorized Exterior Systems, Inc. to purchase substantially all of the assets of Wolverine Fabricating, Inc., a California

814526.7                                10

corporation engaged in the business of supplying fabricated parts to customers in the recreational vehicle and cargo trailer industries. The purchase price for this acquisition was approximately $15 million, subject to certain adjustments and various terms and conditions. In connection with the transaction, the parties also executed lease, consulting, transition services and other agreements. This acquisition was designed to enable the Debtors to expand their recreational vehicle exterior business and operations to the West Coast, serve the recreation vehicle fabrication needs of California, Oregon and Washington and enable the Debtors to add new product lines to the Debtors' recreational vehicle exterior business.

On December 21, 2005, the Debtors filed their motion, Pursuant to 11 U.S.C. §§ 105(a) and 363(b), for Approval of Share Purchase Agreement by and Among Owens Corning, Owens Corning Japan Ltd., Asahi Fiber Glass Co., Ltd. and Asahi Glass Company and Related Agreements and Transactions, seeking approval of certain agreements regarding the acquisition by Owens Corning Japan Ltd. ("OC Japan"), a wholly-owned subsidiary of IPM, of the stock of a newly-formed company that will own certain composite-related assets previously owned by Asahi Fiber Glass Co., Ltd. Such agreements, which are subject to Bankruptcy Court approval, provide for the following: (a) Asahi Fiber Glass Co., Ltd.'s transfer of its reinforcement and compounding businesses to NewCo, a newly-formed, wholly-owned subsidiary of Asahi Fiber Glass Co., Ltd.; (b) OC Japan's purchase of 100% of the shares of NewCo; (c) NewCo's lease of certain buildings and land from Asahi Fiber Glass Co., Ltd.; (d) the lease of certain precious metals from Asahi Fiber Glass Co., Ltd.; and (e) the allocation among the parties of certain potential liabilities for specified environmental, health and safety obligation. A hearing on the Motion is scheduled for January 30, 2006.

(c) Divestitures

During the first quarter of 2001, OC completed the sale of the majority of its interest in Engineered Pipe Systems, Inc. ("EPS"), a producer of glass-reinforced plastic pipe with operations mostly in Europe. EPS and Saudi Arabian Amiantit Co. ("Amiantit") had entered into a Stock Purchase Agreement, dated February 28, 2001, pursuant to which EPS sold to Amiantit all of the capital stock of its wholly-owned subsidiaries, Flowtite A/S and Flowtite Technology A/S. Also pursuant to the Stock Purchase Agreement, Amiantit purchased from Norske EPS BOT A/S, its interest in Flowtite Botswana Ltd. The purchase price was $2 million. By letter dated May 29, 2001, the Unsecured Creditors' Committee represented to the Debtors that it had no objection to the Stock Purchase Agreement, or the implementation of the transactions related to these agreements. Net proceeds from the sale were $22 million.

OC completed its divestiture of the pipe business with a sale of certain other operations to Amiantit pursuant to a Stock Purchase Agreement, dated November 21, 2001. The purchase price for the sale of these interests was $2.6 million. By letter dated November 29, 2001, the Unsecured Creditors' Committee represented to the Debtors that it had no objection to the Stock Purchase Agreement or the implementation of the transactions provided for under the agreement.

During the fourth quarter of 2001, OC sold its remaining 40% interest in Alcopor Owens Corning, an unconsolidated joint venture for net proceeds of $23 million. On

October 29, 2001, OC received approval from the Bankruptcy Court to finalize the transaction, as modified.

During the first quarter of 2003, OC sold the assets of its metal systems and mineral wool businesses to ALSCO Metals Corporation. The purchase price for the sale of these assets was $56 million. The company received Bankruptcy Court approval to sell such assets on May 19, 2003. See Section V.F.18(f).

**B.      Financial Structure of the Company at the Petition Date**

**1.      Capitalization**

The following table sets forth the consolidated current liabilities and capitalization of OC as of the dates indicated. The table does not reflect OC's pre-petition asbestos liability. This information is qualified in its entirety by, and should be read in connection with, the Consolidated Financial Statements of OC (including the notes thereto) that are included in OC's Annual Report on Form 10-K for the year ended December 31, 2004, as well as the Consolidated Financial statements of OC included in OC's other reports filed with the SEC, which may be obtained, free of charge, through OC's website at www.owenscorning.com. OC's Annual Report on Form 10-K for the year ended December 31, 2004, may also be obtained by sending a written request. See directions for obtaining this document in Appendix D.

| (in millions of dollars) | As of | |
|---|---|---|
|  | October 4, 2000 | December 31, 2004 |
| **Current Liabilities** |  |  |
| Accounts Payable and Accrued Liabilities | $ 281 | $ 909 |
| Short-term Debt | 50 | 11 |
| Long-term Debt – current portion | 10 | 31 |
| Long-term Debt | 66 | 38 |
| **Other** |  |  |
| Other employee benefits liability | 322 | 401 |
| Pension Plan liability | 41 | 731 |
| Other | 133 | 178 |
| Liabilities Subject to Compromise (excluding Asbestos) | 3,503 | 3,297 |
| Company-obligated Securities of Entities Holding Solely Parent Debentures-subject to compromise | 195 | 200 |
| Minority Interest | 47 | 49 |
| Total Liabilities and Minority Interest | $ 4,648 | $ 5,845 |
| **Stockholders' Equity** |  |  |
| Common Stock | 6 | 6 |
| Additional Paid-In Capital | 694 | 692 |
| Deficit | (1,876) | (4,447) |
| Accumulated other comprehensive loss | (103) | (330) |

| Other | (9) | (1) |
|---|---|---|
| Total Stockholders' Equity | (1,288) | (4,080) |
| Total Liabilities and Stockholders' Equity (excluding Asbestos) | $ 3,360 | $ 1,765 |

## 2. Pre-petition Indebtedness

As of the Petition Date, OCD, the Subsidiary Debtors and certain Non-Debtor Subsidiaries were parties to a Credit Agreement, dated as of June 26, 1997 (the "Credit Agreement"), with certain banks listed in Annex A thereto and with Credit Suisse First Boston, as agent for the lenders signatory thereto. The Credit Agreement initially provided a revolving credit line of up to $2 billion available in the form of revolving loans. The initial borrowers under the Credit Agreement were: OCD, European Owens-Corning Fiberglas S.A., N.V., Owens-Corning S.A., Owens-Corning Canada Inc., Owens-Corning UK Holdings Ltd. and Sierra Corp. (and Fibreboard as successor to Sierra Corp. after the merger of Sierra Corp. with Fibreboard). The Credit Agreement was amended by Amendment No. 1, dated as of February 20, 1998 ("Amendment No. 1"), pursuant to which Owens-Corning Fiberglas (U.K.) Ltd., Owens Corning Building Products (U.K.) Ltd., Owens Corning Polyfoam UK Ltd. and Owens-Corning Isolation France S.A. were added as borrowers under the credit facility. In addition, Amendment No. 1, among other things, reduced the maximum amount of the commitment under the credit facility to $1.8 billion. The Credit Agreement was again amended by Amendment No. 2, dated as of November 30, 1998, pursuant to which, among other things, certain financial covenants were modified to accommodate the National Settlement Program ("NSP") ("Amendment No. 2", and the Credit Agreement as amended by Amendment No. 1 and Amendment No. 2, the "1997 Credit Agreement"). The obligations under the 1997 Credit Agreement were guaranteed by certain Subsidiaries of OCD (collectively, the "Subsidiary Guarantors"). OCD was a guarantor, in addition to a borrower, under the 1997 Credit Agreement.

At the Petition Date, IPM, Vytec Corporation, Owens-Corning Fiberglas Sweden Inc., Falcon Foam Corporation, Integrex, Fibreboard, Exterior Systems, Inc., Owens-Corning Fiberglas Technology Inc., and Soltech, Inc. were Subsidiary Guarantors of the obligations under the 1997 Credit Agreement. As of the Petition Date, the principal amount outstanding under the 1997 Credit Agreement was $1,565,919,519 (including contingent liabilities for undrawn letters of credit in the amount of $250,919,519). In the joint plans filed by the Plan Proponents which pre-dated the current Plan, the plans provided for substantive consolidation of the Debtors who were borrowers or guarantors under the 1997 Credit Agreement. Based on the proposed substantive consolidation, the Bank Holders would have had a single claim against the consolidated Debtors. Under the previously proposed plans, the Bank Holders would likely have not been paid in full and claims for postpetition interest would not have been Allowed.

On August 15, 2005, United States Court of Appeal for the Third Circuit (the "Third Circuit") reversed the Memorandum and Order Concerning Substantive Consolidation (the "Substantive Consolidation Order") previously issued by the District Court. In the Substantive Consolidation Order, the District Court had granted the motion of OCD and certain of its subsidiaries for substantive consolidation. Petitions for rehearing were denied by the Third

Circuit on September 28, 2005. The Third Circuit's reversal of the District Court's Substantive Consolidation Order has resulted in significant modifications of the Plan and impacts the relative amounts ultimately payable to various creditor classes, including the extent to which post-petition interest and certain other post-petition fees are payable to the Bank Holders. See also Section V.F.11(b)(i).

As a result of the Third Circuit's reversal of the District Court's Substantive Consolidation Order and the Debtors' evaluation of the distributable values of OCD and its subsidiaries considered on a non-substantively consolidated basis, OC recorded, for the period ended September 30, 2005, expenses with respect to the obligations under the 1997 Credit Agreement for the period from October 5, 2000, the Petition Date, through September 30, 2005, in the amount of $531 million relating to post-petition interest and $7 million relating to certain other post-petition fees. These expenses were accrued because the Debtors have determined that, based upon the Third Circuit's reversal of the Substantive Consolidation Order and the Debtors' resulting evaluation of the distributable values (considered on a non-substantively consolidated basis) of OCD and certain of its debtor and non-debtor subsidiaries, it is probable that such expenses will be payable by certain of the debtors and/or non-debtor subsidiaries which are either obligors under, or guarantors of, the 1997 Credit Agreement. The recorded amount of $538 million is the Debtors' best estimate of the potential liability for post-petition interest and certain other post-petition fees under the 1997 Credit Agreement through September 30, 2005, and, with respect to interest, reflects the application of the Base Rate plus 2% (as described below) applied on a non-compounding basis. However, this estimate is based on numerous factual and legal uncertainties, including the interpretation of contractual provisions concerning such interest and other fees, and the Debtors reserve the right to object, if and as appropriate in its judgment, to the ultimate entitlements to such interest and other fees and to the amount of such interest and other fees in the Chapter 11 cases (or other proceedings). Moreover, the actual amount of post-petition interest and fees, if any, that may be payable with respect to the 1997 Credit Agreement is subject to various factors, including the outcome of negotiations among various creditor constituencies and/or the resolution of litigation between various claimants regarding the liability of OCD and its subsidiaries for certain pre-petition liabilities. Absent developments that alter the Debtors' determination as to the probability that post-petition interest and other fees will be payable or the best estimate of the amount of post-petition interest and other fees that may be payable, and subject to the distributable values it estimates from time to time are available to satisfy such post-petition interest and other fees under the 1997 Credit Agreement on a non-substantively consolidated basis, the Debtors expect to continue to accrue interest on the obligations under the 1997 Credit Agreement in future periods, to the extent required under applicable law, at a rate equal to the Base Rate (as defined in the 1997 Credit Agreement) plus 2%. The Base Rate (as defined in the 1997 Credit Agreement) is a floating rate equal to the higher of (i) the prime commercial lending rate of Credit Suisse First Boston and (ii) the Federal Funds Rate plus 0.50% per annum. Actual amounts of post-petition interest and other fees, if any, that are ultimately determined to be payable under the 1997 Credit Agreement for the period from the petition date through September 30, 2005, or for future periods may be significantly higher or lower than the amounts indicated above. For example, certain holders of debt under the 1997 Credit Agreement have taken the position that the provisions of the 1997 Credit Agreement should be interpreted as providing for post-petition interest amounts that are in the range of double the amounts indicated above, whereas certain other parties have taken the position that there exist legal theories under which no post-petition interest would be payable.

See Section V.F.11(b)(i) of this Disclosure Statement entitled "Substantive Consolidation Proceedings" and Section V.F.10 entitled "Implementation of Process for Resolution of Inter-Creditor Issues" and Section V.G. entitled "Avoidance Actions in the Chapter 11 Cases" of this Disclosure Statement, for further description of the litigation relating to the Subsidiary Guarantees.

OC's other principal loan indebtedness as of the Petition Date (excluding intercompany indebtedness) included:

| Notes | Aggregate Original Principal Amount | Amount Outstanding (principal and accrued interest) as of October 1, 2000 |
|---|---|---|
| $400 Million Debentures due 2018 (7.5%) | $400,000,000 | $405,333,333 ($400,000,000 / $5,333,333) |
| $550 Million Term Notes (First Series) due 2005 (7.500%) | $300,000,000 | $309,625,000 ($300,000,000 / $9,625,000) |
| $550 Million Term Notes (Second Series) due 2008 (7.700%) | $250,000,000 | $258,234,722 ($250,000,000 / $8,234,722) |
| $250 Million Notes due 2009 (7.000%) | $250,000,000 | $250,923,611 ($250,000,000 / $923,611) |
| $150 million 8.875% Debentures of the $300 Million High Coupon Debentures due 2002 | $150,000,000 | $41,269,153 ($40,045,000 / $1,224,153) |
| $150 million 9.375% Debentures of the $300 Million High Coupon Debentures due 2012 | $150,000,000 | $7,213,654 ($6,988,000 / $225,654) |
| 130 Million DEM Bearer Bonds due 2000 (7.250%) | 130,000,000 DEM | $62,776,357 ($60,572,174 / $2,204,183) |
| Industrial Revenue Bonds | | $9,950,000 |
| TOTAL | | $1,345,325,830 ($1,317,555,174 / $27,770,656) |

Collectively, the debt securities listed above are referred to as the "Pre-petition Bonds". See Section VII.C.3.b(v) of this Disclosure Statement for a description of the treatment of Bondholders Claims under the Plan.

In May 1995, Owens-Corning Capital L.L.C., a special purpose Delaware limited liability company, issued and sold four million shares of 6.5% Convertible Monthly Income Preferred Securities (the "MIPS") for aggregate gross proceeds of approximately $200 million. Owens-Corning Capital L.L.C. then lent the proceeds from the MIPS issuance, together with the proceeds from the issuance of common limited liability company interests, to OCD, which loan was evidenced by the issuance by OCD to Owens-Corning Capital L.L.C. of approximately $253 million in aggregate principal amount of OC's 6.5% Convertible Subordinated Debentures due 2002. As of December 31, 2004, $253,104,600 of these convertible subordinated debentures remained outstanding. Under the Plan, the term "MIPS Claims and Interests" are defined to mean all Claims directly or indirectly against OCD (or Interests to the extent any such Claims may be characterized as Interests) by the holders of the 6.5% Convertible Monthly Income Preferred Securities issued by Owens-Corning Capital L.L.C. or any Person (including any trustee) asserting such Claims derivatively or otherwise on behalf of such holders, including (i) the Claims of Owens-Corning Capital L.L.C. for approximately $253 million original aggregate principal amount arising from OCD's 6.5% Convertible Subordinated Debentures due 2002, issued pursuant to an indenture dated as of May 10, 1995, between OCD, Owens-Corning

814526.7

15

Capital L.L.C. and Harris Trust and Savings Bank, as trustee, (ii) Claims arising under the guarantee agreement, dated as of May 10, 1995, in respect of such Convertible Subordinated Debentures executed by OCD as guarantor, (iii) the Claim of The Bank of New York ("BONY"), as Special Trustee on behalf of the holders of the 6.5% Convertible Monthly Income Preferred Securities, and (iv) any Interests of the foregoing to the extent any rights of such holders may be characterized as OCD Interests. The rights against OCD under the Convertible Subordinated Debentures, to the extent they are Claims, are contractually subordinated to substantially all indebtedness. As a result, the distributions, which would otherwise be made to holders of the MIPS Claims, had the MIPS Claims not been subordinated, are paid or issued to the holders of Allowed Claims in Classes A5 and A6-B (and, under certain circumstances, to holders of Allowed Class A4 Claims) in accordance with the subordination provisions of the agreements or instruments providing for the subordination and the Plan. Any Interests in OCD with respect to the MIPS, including, but not limited to conversion rights to OCD stock, shall be deemed extinguished. No holder shall be entitled to, or shall receive or retain any property or interest in property on account the MIPS Claims or Interests. For a discussion of the treatment of OCD Subordinated Claims, see Section VII.B.3(h) of this Disclosure Statement entitled "ClassA11: Old Subordinated Claims." For a discussion of the treatment of OCD Interests, see Section VII.B.3(i) of this Disclosure Statement entitled "Class A12: OCD Interests."

BONY, as successor Trustee under the Indenture dated as of May 10, 1995, for the 6.5% Convertible Subordinated Debentures due 2002 (the "MIPS Indenture"), and certain holders of MIPS Claims and Interests have alleged several defects in prior plans with respect to its asserted claims and the rights of the holders of the MIPS. BONY and such holders have asserted: (a) that, to the extent the Plan's definition of "MIPS Claims" includes claims of BONY for fees and expenses, the Plan improperly classifies claims that are not subordinated with subordinated claims; (b) that the Plan improperly discriminates between The Bank of New York's claim for fees and expenses and the claims of Pre-petition Indenture Trustees, by excluding the MIPS Indenture from the Plan's definition of Pre-Petition Bond Indentures; (c) the Plan fails to limit the recovery of the holders of Senior Indebtedness from the distributions to the Subordinated Claims to 100% of the claim of any holder of Senior Indebtedness; and (d) purports to cancel interests in an entity that is not a Debtor. The Debtors disagree with each of these assertions. The Debtors believe that whether or not the parties holding or asserting rights under the MIPS Indenture hold "claims" or "interests," such rights are subject to contractual subordination such that they are not entitled to receive any recovery under the Plan. The Debtors similarly believe that there are no circumstances that would support the payment of fees and expenses to BONY. Although the Plan gives BONY, as trustee, different treatment, regarding fees and expenses, than it provides to Pre-petition Indenture Trustees (e.g., by not providing for BONY to retain its liens, if any, on any payments or distribution made to the holders of the MIPS Claims and Interests), the Debtors believe such disparate treatment is justified. The holders of Subordinated Claims and the holders of Interests receive no distributions under the Plan and, as a consequence, BONY will not be disbursing any funds to such holders and there will be no property to which its lien could attach.

In 1991, OCD formed O. C. Funding B.V. ("O.C. Funding"), a closed company with limited liability organized under the laws of The Netherlands, as a wholly-owned subsidiary of OCD for the purposes of obtaining financing for OCD and its subsidiaries. O.C. Funding subsequently issued $150,000,000 aggregate principal amount of its 10% Guaranteed Debentures

due 2001 (the "O.C. Funding B.V. Debentures"), which were guaranteed as to payment of principal and interest, on an unsubordinated basis, by OCD. The O.C. Funding B.V. Debentures were issued pursuant to an indenture dated as of May 15, 1991, between O.C. Funding, OCD and The Bank of New York, as trustee. The guarantee by OCD was issued pursuant to that indenture.

Substantially all of the net proceeds of the issuance of the O.C. Funding B.V. Debentures were lent by O.C. Funding to OCD pursuant to a loan agreement dated June 11, 1991. The intercompany loan was evidenced by a promissory note in the principal amount of $148,000,000 (the "Debentures Intercompany Note"). Payment on the intercompany loan was made subject to the terms of an attached schedule containing certain subordination provisions.

As of the Petition Date, $42,395,000 aggregate principal amount of the O.C. Funding B.V. Debentures remained outstanding. Wilmington Trust Company, as successor trustee, filed a proof of claim against OCD in the amount of $43,855,272 on account of the foregoing guaranty plus accrued interest.

KBC Bank Nederland N.V. ("KBC Bank") loaned $20 million to O.C. Funding under a Credit Agreement dated August 10, 1999, between O.C. Funding and KBC Bank (the "KBC Agreement"). The loan to O.C. Funding was guaranteed on an unsubordinated basis by OCD. O.C. Funding subsequently lent the proceeds of its borrowing under the KBC Agreement to OCD, which intercompany borrowing was represented by a promissory note in the principal amount of $20,000,000.

Westdeutsche Landesbank Girozentrale ("West LB") loaned $10 million to O.C. Funding under a Credit Facility dated February 24, 2000, between O.C. Funding and West LB (the "West LB Facility"). The loan to O.C. Funding was guaranteed on an unsubordinated basis by OCD. O.C. Funding subsequently lent the proceeds of its borrowing under the KBC Agreement to OCD, which intercompany borrowing was represented by a promissory note in the principal amount of $11,800,000.

As of the Petition Date, $20,379,264 (including accrued interest) was outstanding under the KBC Agreement, and $10,135,236 (including accrued interest) was outstanding under the West LB Facility. KBC Bank filed a proof of claim based on its guaranty from OCD in the amount of $20,379,264 and West LB filed a proof of claim based on its guaranty from OCD in the amount of $10,135,236, exclusive of postpetition interest.

In July 2003, certain holders of the outstanding O.C. Funding B.V. Debentures advised OCD that they were cooperating with the holders of the outstanding debt under the KBC Agreement and West LB Facility concerning the assertion of claims relating to the O.C. Funding B.V. Debentures, the KBC Agreement and the West LB Facility (collectively, the "O.C. Funding Creditors"). The O.C. Funding Creditors made a number of claims relating to the indebtedness under the O.C. Funding B.V. Debentures, including that the subordination provisions governing certain of the intercompany indebtedness were not enforceable. A holder of the O.C. Funding B.V. Debentures, in its capacity as a creditor of O.C. Funding, began court proceedings in The Netherlands seeking, among other relief, to compel O.C. Funding to assert its claim under such intercompany indebtedness on an unsubordinated basis. Although OCD believed that it had meritorious positions with respect to the assertions made by the O.C. Funding Creditors, OCD

believed it was in the best interests of its creditors and the maintenance of undisrupted business operations to settle the O.C. Funding Creditors claims by reaching an agreement as to the amount and priority of claims that OCD would support as allowed claims in the bankruptcy proceedings. Accordingly, OCD reached an agreement with the O.C. Funding Creditors pursuant to which there would be (a) Allowed Claims in Class A5 aggregating $43,855,272 in respect of the claims of the holders of the O.C. Funding B.V. Debentures, Allowed Claims in Class A6-B aggregating $20,387,333 under the KBC Agreement and Allowed Claims in Class A6-B aggregating $10,135,236 under the West LB Facility arising under the direct guarantees by OCD of each such obligation, (ii) Allowed Claims in Class A6-A aggregating $50,858,291 in respect of a negotiated portion of the claims of O.C. Funding against OCD under the intercompany notes entered into for financings relating to the loan of proceeds from the O.C. Funding B.V. Debentures, the KBC Agreement and the West LB Facility, and (iii) an Allowed Claim in Class A11 of $23,336,305 in respect of the remaining claims of O.C. Funding against OCD under the intercompany notes entered into for financings relating to the loan of proceeds from the O.C. Funding B.V. Debentures, the KBC Agreement and the West LB Facility. The settlement was approved by the Bankruptcy Court by Order entered June 25, 2004.

OC's other indebtedness subject to compromise at the Petition Date and as of December 31, 2004, consisted of other long-term debt through 2012 at rates from 6.25% to 13.8% in an aggregate amount of $62 million and $92 million, respectively. For a description of other indebtedness, see OC's Annual Report on Form 10-K for the year ended December 31, 2004, OC's Quarterly Report on Form 10-Q for the quarter ended September 30, 2005, OC's Annual Report on Form 10-K for the year ended December 31, 2003, OC's Annual Report on Form 10-K for the year ended December 31, 2002, OC's Annual Report on Form 10-K for the year ended December 31, 2001, and OC's Annual Report on Form 10-K for the year ended December 31, 2000, copies of which may be obtained, free of charge, through OC's website at www.owenscorning.com. OC's Annual Report on Form 10-K for the year ended December 31, 2004, may also be obtained by sending a written request. See directions for obtaining this document in Appendix D.

3. **Pre-petition Intercompany Debt**

In addition to the foregoing pre-petition indebtedness, the Debtors' Amended and Restated Schedules reflected intercompany indebtedness as of the Petition Date. For a discussion of prepetition Intercompany Claims, see Section V.F.14(e).

4. **Pre-petition Equity**

Prior to the Petition Date, OCD's common stock, par value $0.10 per share (the "Existing OCD Common Stock") was listed on the New York Stock Exchange ("NYSE") under the ticker symbol "OWC." As of the Petition Date, OCD had 100 million shares of authorized common stock, of which 55,423,132 shares were outstanding. Effective January 30, 2003, OCD's common stock was removed from listing and registration on the NYSE for failing to meet certain continued listing standards of the NYSE. Effective December 19, 2002, OCD's common stock has been traded on the Over-The-Counter Bulletin Board under the ticker symbol "OWENQ."

OCD declared and paid regular dividends of $0.75 per share of Existing OCD Common Stock for each of the first two quarters of 2000. As a result of the Filing, on October 5, 2000, OCD declared but did not pay the regular dividend for the third quarter of 2000. See Section V.G.3.a of this Disclosure Statement entitled "Dividend Action" for a discussion of certain actions that have been filed in the Chapter 11 Cases to avoid certain dividends paid to certain of the Debtors' shareholders and to recover such dividends for the Debtors' Estates as a fraudulent conveyance.

As of November 30, 2005, there were 6,547 stockholders of record of the Existing OCD Common Stock.

See Section V.F.21 of this Disclosure Statement entitled "Notice Procedures and Transfer Restrictions on Trading of Equity Securities."

See Section VII.B.3(i) of this Disclosure Statement for a description of the treatment of the Existing OCD Common Stock under the Plan.

## IV. BACKGROUND OF ASBESTOS-RELATED LITIGATION

### A. Pre-Petition Claims Against OCD

Prior to the Petition Date, numerous claims had been asserted against OCD alleging personal injuries arising from inhalation of asbestos fibers. Virtually all of these claims arose out of OCD's manufacture, distribution, sale or installation of an asbestos-containing calcium silicate, high temperature insulation product, the manufacture and distribution of which was discontinued in 1972. OCD received approximately 18,000 asbestos personal injury claims during 2000, approximately 32,000 such claims during 1999 and approximately 69,000 such claims during 1998.

### B. Pre-Petition Claims Against Fibreboard

Prior to 1972, Fibreboard manufactured asbestos-containing products, including insulation products. Fibreboard has since been named as a defendant in many thousands of personal injury claims for injuries allegedly caused by asbestos exposure. Fibreboard received approximately 22,000 asbestos personal injury claims during 2000.

#### 1. The Fibreboard Insurance Settlement Trust

In an effort to deal with the financial impact of its existing and future asbestos-related personal liability in the early 1990's, Fibreboard entered into a settlement agreement with two of its insurers, ultimately resulting in the creation of a trust (the "Fibreboard Insurance Settlement Trust"). See Section IV.C.3(c) of this Disclosure Statement entitled "Insurance Settlement" for a discussion of the Insurance Settlement entered into by Fibreboard with respect to its asbestos-related liability.

During the fourth quarter of 1999, the Fibreboard Insurance Settlement Trust was funded with $1.873 billion in proceeds from the settlement referred to above. The terms of the Fibreboard Insurance Settlement Trust provided for the funds in the trust to be applied solely to

814526.7                              19

the costs of resolving pending and future Fibreboard asbestos-related liabilities, whether incurred as a result of a judgment in litigation or a settlement, or otherwise.

During 2000 prior to the Petition Date, payments made out of the Fibreboard Insurance Settlement Trust for asbestos-related claims against Fibreboard totaled $820 million, including $45 million in defense, claims processing and administrative expenses. As a result of the Filing, no payments for such claims have been made from the Fibreboard Insurance Settlement Trust since the Petition Date.

The assets of the Fibreboard Insurance Settlement Trust are comprised of marketable securities. The Fibreboard Insurance Settlement Trust has received a ruling from the United States Internal Revenue Service ("IRS") that it is a "qualified settlement fund" for United States federal income tax purposes. At September 30, 2005, the fair value of assets in the Fibreboard Insurance Settlement Trust was $1.301 billion. In addition, there are approximately $127 million in Administrative Deposits held in settlement accounts to pay applicable Fibreboard asbestos claim settlements. See Section IV.C.4 of this Disclosure Statement entitled "NSP Administrative Deposits" for a discussion of these Administrative Deposits.

2. The Committed Claims Account

Fibreboard also has an interest of approximately $33 million in the balance of the account (the "Committed Claims Account") established by Fibreboard and Continental Casualty Company ("Continental") pursuant to the Agreement Between Fibreboard and Continental On Remaining Issues, dated December 13, 1999, which was the subject of a Stipulation and Agreed Order Between Debtors and Continental Casualty Company Regarding Status and Disposition of Funds in Committed Claims Account and Related Matters Under Buckets Agreement, entered by the Bankruptcy Court on June 27, 2001. Under the Plan, the Committed Claims Account is being transferred to the FB Sub-Account of the Asbestos Personal Injury Trust for the benefit of the holders of Allowed Claims in Class B8, FB Asbestos Personal Injury Claims. See Section VII.C.3.b(ix) of this Disclosure Statement entitled "Impaired Classes of Claims — Class B8: FB Asbestos Personal Injury Claims."

C. National Settlement Program

1. General

Beginning in late 1998, OCD implemented the NSP to resolve personal injury asbestos claims through settlement agreements with individual plaintiffs' law firms (the "NSP Agreements").

The NSP was intended to better manage the asbestos liabilities of OCD and to help OCD better predict the timing and amount of indemnity payments for both pending and future asbestos claims. The number of law firms participating in the NSP expanded from approximately 50 when the NSP was established to approximately 120 as of the Petition Date. The NSP Agreements extended through at least 2008 and provided for the resolution of existing asbestos claims, including unfiled claims pending with the participating law firm at the time it entered into an NSP Agreement ("Initial Claims"). The NSP Agreements also established procedures and fixed payments for resolving, without litigation, claims against either OCD or

Fibreboard, or both, arising after a participating firm entered into an NSP Agreement ("Future Claims").

Settlement amounts for both Initial Claims and Future Claims were negotiated with each firm participating in the NSP, and each firm was to communicate with its respective clients to obtain authority to settle individual claims. Payments to individual claimants were to vary based on a number of factors, including the type and severity of disease, age and occupation. All such payments were subject to delivery of satisfactory evidence of a qualifying medical condition and exposure to OCD's and/or Fibreboard's products, delivery of customary releases by each claimant, and other conditions. Certain claimants settling non-malignancy claims with OCD and/or Fibreboard were entitled to an agreed pre-determined amount of additional compensation if they later developed a more severe asbestos-related medical condition.

As to Future Claims, each participating NSP firm agreed (consistent with applicable legal requirements) to recommend to its future clients, based on appropriately exercised professional judgment, to resolve their asbestos personal injury claims against OCD and/or Fibreboard through an administrative processing arrangement, rather than litigation. In the case of Future Claims involving non-malignancy, claimants were required to present medical evidence of functional impairment, as well as the product exposure criteria and other requirements set forth above, to be entitled to compensation.

2. **OCD's Experience with the NSP**

(a) NSP Claims Against OCD

As of the Petition Date, the NSP covered approximately 239,000 Initial Claims against OCD, approximately 150,000 of which had satisfied all conditions to final settlement, including receipt of executed releases, or other resolution (the "Final NSP Settlements") at an average cost per claim of approximately $9,300. As of the Petition Date, approximately 89,000 of such Final NSP Settlements had been paid in full or otherwise resolved, and approximately 61,000 were unpaid in whole or in part. As of such date, the remaining balance payable under NSP Agreements in connection with these unpaid Final NSP Settlements was approximately $510 million. Through the Petition Date, OCD had received approximately 6,000 Future Claims under the NSP.

(b) Non-NSP Claims Against OCD

As of the Petition Date, approximately 29,000 asbestos personal injury claims were pending against OCD outside the NSP. This compares to approximately 25,000 such claims pending on December 31, 1999. The information needed for a critical evaluation of pending claims, including the nature and severity of disease and definitive identifying information concerning claimants, typically becomes available only through the discovery process or as a result of settlement negotiations, which often occur years after particular claims are filed. As a result, OCD has limited information about many of such claims.

OCD resolved (by settlement or otherwise) approximately 10,000 asbestos personal injury claims outside the NSP during 1998, 5,000 such claims during 1999 and 3,000

such claims during 2000 prior to the Petition Date. The average cost of resolution was approximately $35,900 per claim for claims resolved during 1998, $34,600 per claim for claims resolved during 1999, and $44,800 per claim for claims resolved during 2000 prior to the Petition Date. Generally, these claims were settled as they were scheduled for trial, and they typically involved more serious injuries and diseases. Accordingly, OCD does not believe that such average costs of resolution are representative of the value of the non-NSP claims then pending against OCD.

(c)     Asbestos-Related Payments by OCD

As a result of the Filing, OCD has not made any asbestos-related payments since the Petition Date except for approximately $20 million paid on its behalf by third parties pursuant to appeal bonds issued prior to the Petition Date. During 1999 and 2000 (prior to the Petition Date), OCD made asbestos-related payments falling within four major categories: (1) settlements in respect of verdicts incurred or claims resolved prior to the implementation of the NSP; (2) NSP settlements; (3) non-NSP settlements covering cases not resolved by the NSP; and (4) defense, claims processing and administrative expenses, as follows:

|  | 1999 (In millions of dollars) | 2000 (through October 4)[1] (In millions of dollars) |
|---|---|---|
| Pre-NSP Settlements | $170 | $ 51 |
| NSP Settlements | 570 | 538 |
| Non-NSP Settlements | 30 | 42 |
| Defense, Claims Processing and Administrative Expenses | 90 | 54 |
| Total[2] | $860 | $685 |

Prior to the Petition Date, OCD deposited certain amounts in settlement accounts to facilitate claims processing under the NSP ("Administrative Deposits"). See Section IV.C.4 of this Disclosure Statement entitled "NSP Administrative Deposits."

3.      **Fibreboard's Experience with the NSP**

(a)     NSP Claims Against Fibreboard

As described above, OCD acquired Fibreboard in 1997. Fibreboard executed the NSP Agreements and became a participant in the NSP effective in the fourth quarter of 1999. The NSP Agreements settled asbestos personal injury claims that had been filed against Fibreboard by participating plaintiffs' law firms and claims that could have been filed against Fibreboard by such firms following the lifting, in the third quarter of 1999, of an injunction which had barred the filing of asbestos personal injury claims against Fibreboard.

As of the Petition Date, the NSP covered approximately 206,000 Initial Claims against Fibreboard, approximately 118,000 of which had satisfied all conditions to final

---

[1]  Since the Petition date, all pre-petition asbestos claims and pending litigation against the Debtors, including, without limitation, claims under the NSP, have been automatically stayed.

[2]  Amounts shown are before tax and application of insurance recoveries.