settlement, including receipt of executed releases, or other resolution as Final NSP Settlements at an average cost per claim of approximately $7,400. As of the Petition Date, approximately 62,000 of such Final NSP Settlements had been paid in full or otherwise resolved, and approximately 56,000 were unpaid in whole or in part. As of such date, the remaining balance payable under NSP Agreements in connection with these unpaid Final NSP Settlements was approximately $330 million. The NSP Agreements also provided for the resolution of Future Claims under the NSP against Fibreboard through the administrative processing arrangement described above. Through the Petition Date, Fibreboard had received approximately 6,000 Future Claims under the NSP.

      (b)    Non-NSP Claims Against Fibreboard

As of the Petition Date, approximately 9,000 asbestos personal injury claims were pending against Fibreboard outside the NSP. This compares to approximately 1,000 such claims pending on December 31, 1999. Fibreboard resolved (by settlement or otherwise) approximately 2,000 asbestos personal injury claims outside the NSP during 2000 prior to the Petition Date at an average cost of resolution of approximately $45,000 per claim. Generally, these claims were settled as they were scheduled for trial, and they typically involved more serious injuries and diseases. Accordingly, OC does not believe that such average costs of resolution are representative of the value of the non-NSP claims then pending against Fibreboard.

      (c)    Insurance Settlement

In 1993, Fibreboard entered into certain settlement arrangements in an attempt to address the financial impact of its existing and future asbestos-related personal injury liabilities. One such arrangement was an insurance settlement (the "Insurance Settlement") between Fibreboard and two of its insurers, Continental and Pacific Indemnity Company ("Pacific"). Under the terms of the Insurance Settlement, Continental and Pacific were, among other things, to provide up to $2 billion minus interim settlements, plus accrued interest, to resolve asbestos personal injury claims pending against Fibreboard as of August 27, 1993 and all future asbestos personal injury claims asserted against Fibreboard after such date, including defense costs. These funds were to be put into the Fibreboard Insurance Settlement Trust. See Section V.F.7of this Disclosure Statement entitled "Insurance" and OC's Annual Report on Form 10-K for the year ended December 31, 2004 (which is available free of charge from OC's website, www.owenscorning.com), for a further description of the Insurance Settlement. OC's Annual Report on Form 10-K for the year ended December 31, 2004, may also be obtained by sending a written request. See directions for obtaining this document in Appendix D.

The Insurance Settlement became effective in 1999 and, during the fourth quarter of 1999, Continental and Pacific funded the Fibreboard Insurance Settlement Trust with $1.873 billion.

      (d)    Asbestos-Related Payments by Fibreboard

As a result of the Filing, Fibreboard has not made any asbestos-related payments since the Petition Date. During 2000 (prior to the Petition Date), gross payments for

814526.7

23

543

asbestos-related claims against Fibreboard, all of which were paid/reimbursed by the Fibreboard Insurance Settlement Trust, fell within four major categories, as follows:

| | 2000 (through October 4, 2000)[3] (In millions of dollars) |
|---|---|
| Pre-NSP Settlements | $29 |
| NSP Settlements | 705 |
| Non-NSP Settlements | 41 |
| Defense, Claims Processing and Administrative Expenses | 45 |
| Total | $820 |

The payments for settlements under the NSP include certain administrative deposits during the reporting period in respect of Fibreboard claims. Of this, approximately $127 million remains in settlement accounts and is or will be the subject of litigation to determine if any of these funds are recoverable by Fibreboard's estate. See Section IV.C.4 of this Disclosure Statement entitled "NSP Administrative Deposits."

### 4.    NSP Administrative Deposits

As referred to above, prior to the Petition Date, OCD and Fibreboard entered into settlement agreements with four law firms including Baron & Budd, P.C. ("B&B"), whereby OCD and Fibreboard would make certain Administrative Deposits to facilitate claims processing under the NSP Agreements. These Administrative Deposits were made to settlement accounts maintained by such law firms for the benefit of their clients under the NSP Agreements. Each of the NSP Agreements contemplated that clients of the four firms, who received written approval from OCD and/or Fibreboard that they qualified for settlement payments pursuant to the terms of the particular NSP Agreement, would receive their settlement distribution from the Administrative Deposits maintained by their law firm. B&B asserts that under some circumstances its clients may be entitled to receive their settlement distribution from the Administrative Deposits even without receipt of written approval from OCD and/or Fibreboard, while the Debtors contend that the written approval of OCD/Fibreboard was a requirement for disbursement under the NSP Agreements. B&B asserts that approval pursuant to the terms of the NSP Agreement with B&B would be deemed to have occurred after the passing of certain time-period without approval or disapproval and that the Debtors waived the right to approve payments by their inaction.

After the Petition Date, the Debtors did not authorize any further distributions from the Administrative Deposits. Nonetheless, at least one law firm, Waters & Kraus LLP, made distributions after the Petition Date in the amount of approximately $11.6 million. As of September 30, 2005, approximately $109 million of Administrative Deposits previously made by OCD, and approximately $127 million of Administrative Deposits previously made by Fibreboard had not been finally distributed to claimants and are reflected in OCD's consolidated

---

[3]    Only payments through October 4, 2000, are reflected. Since the Petition Date, all pre-petition asbestos claims and pending litigation against the Debtors, including, without limitation, claims under the NSP, have been automatically stayed.

balance sheet as restricted assets ("Restricted Cash") and have not been subtracted from OCD's or Fibreboard's reserve for asbestos personal injury claims.

The Administrative Deposits held by B&B have been the subject of litigation during the Chapter 11 Cases. Certain of the issues have been determined, but those matters are on appeal. See Section V.F.8 of this Disclosure Statement entitled "Baron & Budd Administrative Deposits." The Debtors are negotiating with the three other law firms holding Administrative Deposits to resolve disputes relating to the Debtors' rights to the return of some portion of the Administrative Deposits. If no settlement is reached, the Debtors will pursue the return of an appropriate portion of the Administrative Deposits.

**D.    Establishment of Financial Reserves for Asbestos Liability; Estimation of Asbestos Liability**

**1.    Financial Statement Reserves for Asbestos Liability**

For financial reporting purposes, OC has historically estimated a reserve in accordance with generally accepted accounting principles to reflect asbestos-related liabilities that have been asserted or are probable of assertion. Accounting principles require accruals with respect to contingent liabilities (including asbestos liabilities) only to the extent that such liabilities are both probable and reasonably estimable. With respect to such liabilities that are probable as to which a reasonable estimate can be made only in terms of a range (with no point within the range determined to be more probable than any other point in such range), such accounting principles require only the accrual of the amount representing the low point in such range.

As OC has discussed in its public filings, any estimate for financial reporting purposes of its liabilities for pending and expected future asbestos claims is subject to considerable uncertainty because such liabilities are influenced by numerous variables that are inherently difficult to predict. Prior to the Petition Date, such variables included, among others, the cost of resolving pending non-NSP claims; the disease mix and severity of disease of pending NSP claims; the number, severity of disease, and jurisdiction of claims filed in the future (especially the number of mesothelioma claims); how many future claimants were covered by an NSP Agreement; the extent, if any, to which individual claimants exercised a right to opt out of an NSP Agreement and/or engage counsel not participating in the NSP; the extent, if any, to which counsel not bound by an NSP Agreement undertook the representation of asbestos personal injury plaintiffs against OCD and Fibreboard; the extent, if any, to which OC exercised its right to terminate one or more of the NSP Agreements due to excessive opt-outs or for other reasons; and the success in controlling the costs of resolving future non-NSP claims. As discussed further below, such uncertainties significantly increased as a result of the Filing.

OCD's reserve in respect of asbestos-related liabilities was established through a charge to income in 1991 with additional charges to income of $1.1 billion in 1996, $1.4 billion in 1998, $1.0 billion in 2000 and $1.4 billion in 2002 and as of December 31, 2004, the reserve in respect of OCD asbestos-related liabilities was approximately $3.6 billion. As a result of the Filing, the difficulties of estimating the number and cost of resolution of present and future asbestos-related claims significantly increased. In order to obtain a Section 524(g) injunction that would channel funds for pending and future asbestos-related claims to a trust and protect the

545

Debtor from asbestos-related litigation post-reorganization, it became necessary for OCD to make provisions for all of its asbestos liability, not just for the time period required for financial reporting, but through the year 2049, the time by which all claims are expected.

In response to the District Court's Memorandum and Order dated March 31, 2005 estimating OCD's total amount of contingent and unliquidated claims, including pending claims, future claims through the year 2049, and contract claims, at $7 billion, OCD increased its reserves for asbestos-related liability by $3.435 million for the period ended March 31, 2005, so that its recorded reserve equaled the level of asbestos liability estimated by the District Court. As of December 31, 2004, the aggregate reserve in respect of Fibreboard asbestos-related liabilities was approximately $2.3 billion. Although the District Court's Memorandum and Order did not specifically address the potential asbestos-related liability of Fibreboard, based upon the analysis that the District Court followed in estimating the asbestos liability for OCD, Fibreboard's recorded reserve for potential asbestos-related liability was increased by $907 million for the period ended March 31, 2005, bringing it to a total of approximately $3.2 billion. Thus, OC's aggregate reserve for potential asbestos-related liability was approximately $10.2 billion as of March 31, 2005. For additional information with respect to the establishment and amount of reserves for asbestos-related liability, see Note 19 of the Notes to Consolidated Financial Statements set forth in OC's Annual Report on Form 10-K for the year ended December 31, 2004, and Note 9 of the Notes to Consolidated Financial Statements set forth in OC's Quarterly Report on Form 10-Q for the quarter ended September 30, 2005, copies of which may be obtained, free of charge, through OC's website at www.owenscorning.com. Copies of OC's Annual Report on Form 10-K for the year ended December 31, 2004 and OC's Quarterly Report on Form 10-Q for the quarter ended September 30, 2005, may also be obtained by sending a written request in accordance with the directions set forth in Appendix D.

### 2. Estimation of Asbestos Liability for Plan Purposes

The estimation of asbestos-related liability for the purposes of determining the relative allocation of plan consideration is based upon an estimation of the number of Allowed Claims and their value, including all future claims through the year 2049.

In connection with establishing the number and estimated aggregate value of Asbestos Personal Injury Claims, and as a basis for establishing the alternative scenarios for creditor recoveries, the Debtors, the Unsecured Creditors' Committee, the Asbestos Claimants' Committee and the Future Claimants' Representative retained experts to assist them in estimating the number and value of OC Asbestos Personal Injury Claims and FB Asbestos Personal Injury Claims. Such estimates are necessary under Section 524(g) of the Bankruptcy Code, which, as noted, requires an estimate of the number of claims that will be filed against the Debtors in the future. These estimates, particularly in light of the extended length of the forecast period, necessarily result in more uncertainty than generally holds for estimates of other types of contingent liability. In addition, each of the experts made certain assumptions, including the propensity of asbestos claimants to file a claim against the Debtors, the timing and disease severity of those claims, and the appropriate average settlement value of claims, all of which add to the uncertainty and can result in significant variations in the final estimates.

Beginning on January 13, 2005, a six day claims estimation hearing was held before the District Court. The purpose of the hearing was to establish the amount of OCD's current and future asbestos liability to be allowed as claims in the Chapter 11 Cases. At the hearing, experts offered a range of estimates of OCD's asbestos liability from a low of $2.08 billion offered by the expert for the Bank Debt Holders to a high of $11.1 billion provided by the expert for the Asbestos Claimants' Committee. Intermediate estimates were offered by experts retained by OCD and the Futures Claimants' Representative.

At the hearing, experts for the Asbestos Claimants' Committee, the Futures Claimants' Representative, and the Debtors offered estimates of Fibreboard's current and future asbestos liability. The Asbestos Claimants' Committee and the Future Claimants' Representative offered preferred forecasts of $7.5 billion and $6.49 billion respectively. Experts retained by the Debtors offered estimates of Fibreboard's present and future asbestos-related liability between $2.12 and $3.22 billion. The Bank Debt Holders did not offer an estimate.

On March 31, 2005, the District Court issued a Memorandum and Order estimating the total amount of contingent and unliquidated claims against OCD for personal injury or death caused by exposure to asbestos (including pending claims, future claims and contract claims) at $7 billion. On April 28, 2005, the District Court denied a motion for reconsideration brought by Bank Debt Holders and other parties. These parties appealed the District Court's ruling to the Third Circuit. Briefing is expected to be completed in February 2006 under the schedule established by the Third Circuit.

Unless the parties reach a negotiated resolution, estimates of OCD's asbestos liability will be determined by the judicial process.

## V.    CHAPTER 11 CASES

### A.    Events Leading to the Chapter 11 Filings

Since the adoption of its NSP in the fourth quarter of 1998, OC's strategy had been to use that program to avoid the costly and unpredictable traditional tort system and to quantify the amount of payments to asbestos claimants and control the timing of those payments to match the Company's ability to make such payments. The NSP achieved these goals in many respects and also facilitated the negotiation of the deferral of payments to NSP participants during 2000 prior to the Filing. As discussed in more detail below, however, OC's inability to obtain ongoing financing on acceptable terms, the lack of support for additional payment deferrals, the higher than anticipated number of asbestos-related claims (which adversely affected the Company's estimated liquidity needs through 2004), and the deterioration of OC's operations during 2000, resulted in the decision by OC to seek protection for the Debtors under Chapter 11 of the Bankruptcy Code.

During the third quarter of 2000, OC met on a number of occasions with CSFB, as the agent for the lenders under the 1997 Credit Agreement, to discuss a refinancing of its $1.8 billion credit facility under the 1997 Credit Agreement, which was scheduled to expire in June 2002. OC requested that the refinancing extend into 2005 and be increased to an amount sufficient to meet its expected liquidity needs, including the repayment on maturity of $300 million of debentures in 2005. Following extended negotiations, OC concluded at the end of the third

quarter of 2000 that its lenders would not be willing to agree to a refinancing that would meet OC's needs. Moreover, OC concluded that the lenders would require, as a part of any refinancing, that OC pledge its assets to secure the loans and agree to limits on payments for asbestos liabilities that would be inconsistent with its anticipated asbestos payment obligations.

During the course of the third quarter of 2000, support for asbestos payment deferrals was adversely impacted by several factors. First, as a result of the downturn in the Company's operations in the third quarter of 2000 (discussed below), OC approached certain NSP firms to request additional payment deferrals. Based on those discussions, OC determined that it would not be feasible to obtain additional payment deferrals and that the likely terms of the refinancing would be unacceptable to the NSP participants. Second, the executive committee under the NSP and other participants in the NSP declined to agree to any deferral in payments due from Fibreboard. Finally, several NSP firms declined to grant the deferrals previously agreed upon in principle and initiated legal proceedings to enforce the terms of their respective NSP Agreements.

Prior to the Filing, OC noted several trends which indicated that it would likely be required to defer asbestos-related payments in excess of deferrals previously negotiated with law firms participating in the NSP. First, OC began to see evidence that a higher than anticipated number of new asbestos-related claims, particularly higher value claims, was being filed by non-NSP firms, including new firms (where the timing of resolution is uncertain and the amount and timing of payments may be determined by the traditional tort system). Second, OC noted a substantial increase in the rate of claims filed, particularly during September 2000. Approximately 7,800 asbestos-related claims were received by OC (excluding Fibreboard) during the third quarter of 2000, compared to approximately 3,400 and 4,200 claims received during the first and second quarters, respectively. While OC believed that this increase in claims filings represented an acceleration of claims from future periods as a result of the downgrading of OC's credit rating in mid-2000, rather than an increase in the total number of asbestos-related claims to be expected, this trend would have had the effect of accelerating the related settlement payments and increasing liquidity needs through 2004 and/or the need to negotiate further deferrals of asbestos payments.

OC's results of operations deteriorated significantly in the third quarter of 2000, with expectations for the quarter declining particularly during the last half of the period. As a result of, among other factors, the fall in demand for building materials, elevated energy and raw materials costs and the inability of OC to fully recapture these costs in price adjustments, OC's margins and income from operations were significantly reduced. As a result, OC's ability to service its ongoing asbestos payments and continue to comply with its pre-petition loan covenants was adversely affected. OC concluded at the end of the third quarter of 2000 that, unless it used a substantial portion of its cash to repay a portion of its debt under the 1997 Credit Agreement, OC would be in violation of the leverage ratio covenant under that agreement. Moreover, in view of reduced expectations concerning operating results in the fourth quarter of 2000 and beyond, OC concluded that its long-term liquidity needs (driven in large measure by asbestos payment obligations) could not likely be met by its cash and available credit under the 1997 Credit Agreement (which was limited by leverage ratio and other loan covenants).

814526.7

28

As a result of the above factors, OC's management determined late in the third quarter that it was unlikely that OC would be able to meet its long-term liquidity needs, including agreed and other required asbestos payments and repayment of debt on maturity. While OC held $378 million of Cash and cash equivalents at the end of the third quarter of 2000, and OC's operations (excluding the effects of asbestos) were traditionally profitable and generated strong positive cash flow, management determined that a Chapter 11 filing in October would be in the best interest of all OC stakeholders.

### B.      The Chapter 11 Filings

On October 5, 2000, OCD and the Subsidiary Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court. The cases are being jointly administered as In re Owens Corning, et al., Case No. 00-03837 (JKF) (the "Chapter 11 Cases"). The Subsidiary Debtors that also filed for protection under Chapter 11 of the Bankruptcy Code on the Petition Date are:

| | |
|---|---|
| CDC Corporation | Integrex Testing Systems LLC |
| Engineered Yarns America, Inc. | HOMExperts LLC |
| Falcon Foam Corporation | Jefferson Holdings, Inc. |
| Integrex | Owens-Corning Fiberglas Technology Inc. |
| Fibreboard Corporation | Owens Corning HT, Inc. |
| Exterior Systems, Inc. | Owens-Corning Overseas Holdings, Inc. |
| Integrex Ventures LLC | Owens Corning Remodeling Systems, LLC |
| Integrex Professional Services LLC | Soltech, Inc. |
| Integrex Supply Chain Solutions LLC | |

The Subsidiary Debtors include only the Subsidiaries listed above and do not include any other United States Subsidiaries of OCD or any of OCD's foreign Subsidiaries (collectively, the "Non-Debtor Subsidiaries"). A list of the Non-Debtor Subsidiaries may be found in Schedule II to the Plan, attached to this Disclosure Statement as Appendix A.

### C.      Continuation of Business; Stay of Litigation

Since the Petition Date, the Debtors have continued to operate their businesses as debtors-in-possession under the Bankruptcy Code. Pursuant to the Bankruptcy Code, the Debtors are required to comply with certain statutory reporting requirements, including the filing of monthly operating reports. As of the date hereof, the Debtors have complied with such requirements, and intend to continue to comply with such requirements. The Debtors are authorized to operate their businesses in the ordinary course of business, with transactions out of the ordinary course of business requiring Bankruptcy Court approval. In accordance with the Bankruptcy Code, the Debtors are not permitted to pay any claims or obligations that arose prior to the Petition Date unless specifically authorized by the Bankruptcy Court. Similarly, claimants may not enforce any Claims against the Debtors that arose prior to the Petition Date unless specifically authorized by the Bankruptcy Court. As debtors-in-possession, the Debtors have the right, under Section 365 of the Bankruptcy Code, subject to the Bankruptcy Court's approval, to assume or reject pre-petition executory contracts and unexpired leases in existence at the Petition Date. Parties to contracts or leases that are rejected may assert rejection damages claims as

permitted by the Bankruptcy Code.  See Section VII.F of this Disclosure Statement entitled "Treatment of Executory Contracts and Unexpired Leases".

As a consequence of the Filing, all pending litigation against the Debtors was stayed automatically by Section 362 of the Bankruptcy Code and, absent further order of the Bankruptcy Court, no party may take any action to recover on pre-petition claims against the Debtors.

### D.    Professionals Retained in the Chapter 11 Cases

### 1.    The Debtors' Professionals

The attorneys and advisors that have been retained by the Debtors to assist them in the conduct of their Chapter 11 Cases are set forth below:

*Reorganization Counsel to the Debtors:*

Saul Ewing LLP
222 Delaware Avenue
Wilmington, DE 19899-1266

*Co-Reorganization Counsel to the Debtors:*

Sidley Austin LLP
One South Dearborn St.
Chicago, IL 60603

*Special Counsel to the Debtors:*

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036-6522

*Special Reorganization Counsel to the Debtors:*

Arnold & Caruso, LTD.*
1822 Cherry Street
Toledo, OH 43608
* On August 26, 2002, the Bankruptcy Court entered an order vacating the employment and retention of Arnold & Caruso, Ltd.; however, Arnold & Caruso, Ltd. was retained as an ordinary course professional.

*Special Reorganization Counsel to the Debtors:*

Shumaker, Loop & Kendrick, LLP
North Courthouse Square
1000 Jackson
Toledo, OH 43624

814526.7

30

550

*Special Reorganization Counsel to the Debtors:*

Brobeck, Phleger & Harrison, LLP*
Spear Street Tower
One Market
San Francisco, CA 94105
* Brobeck, Phleger & Harrison, LLP has ceased performing services for the Debtors.

*Special Counsel to the Debtors:*

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

*Special Appellate Counsel to the Debtors:*

Richard E. Flamm, Esquire
2840 College Avenue, Suite A
Berkeley, CA 94705

*Special Counsel to the Debtors:*

Forman Perry Watkins Krutz & Tardy, PLLC
1200 One Jackson Place
188 East Capitol Street
Jackson, MS 39225-2608

*Special International Counsel to the Debtors:*

Bingham McCutchen LLP
One State Street
Hartford, CT 06103

*Special Insurance Counsel to the Debtors:*

Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401

*Special Conflict Counsel for the Debtors:*

Adelman Lavine Gold and Levin
1100 North Market Street, 11th Floor
Wilmington, DE 19801-1292

814526.7

*Auditor, Tax Advisor, Accounting Advisor & Financial Advisor to the Debtors:*

Arthur Andersen LLP*
33 West Monroe
Chicago, IL 60603
* Arthur Andersen LLP has ceased performing services for the Debtors.

*Special Financial Advisor to the Debtors:*

Pricewaterhousecoopers LLP
203 North LaSalle Street
Chicago, IL 60601

*Information Technology Advisor to the Debtors:*

Cap Gemini Ernst & Young US LLC
1200 Skylight Office Tower
1660 West 2nd Street
Cleveland, OH 44113

*Financial and Consulting Services to the Debtors:*

Crawford Financial Consulting LLC
(d/b/a Crawford & Winiarski)
Suite 1500
535 Griswold
Detroit, MI 48226

*Audit, Accounting, Actuarial and Tax Advisory Services to the Debtors:*

Ernst & Young LLP
555 California Street
San Francisco, CA 94104

*Investment Banker and Financial Advisor to the Debtors:*

Lazard Freres & Co. LLC ("Lazard")
30 Rockefeller Plaza , 61st Floor
New York, NY 10020

*Investment Banker to the Debtors:*

Goldsmith Agio Helms Securities, Inc.
601 Second Avenue South, 46th Floor
Minneapolis, MN 55402

*Asbestos Personal Injury Claims Valuation Consultants to the Debtors:*

Thomas E. Vasquez, Ph.D.
ARPC
420 Lexington Ave.
Suite 1840
New York, NY 10170

### 2.    The Debtors' Ordinary Course Professionals

Separately, throughout the Chapter 11 Cases, the Debtors have employed certain other professionals to render post-petition services to the Debtors in the ordinary course of their businesses, pursuant to an order of the Bankruptcy Court dated November 30, 2000 (the "OCP Order"). The OCP Order establishes certain standards, guidelines and procedures for the Debtors' retention and payment of ordinary course professionals during the Chapter 11 Cases. The OCP Order authorizes the Debtors to employ and compensate ordinary course professionals without additional approval from the Bankruptcy Court subject to certain limitations. Among other limitations, the OCP Order requires the Debtors to obtain approval under Sections 330 and 331 of the Bankruptcy Code if payments to the ordinary course professionals exceed an average of $35,000 per month for the professionals (with certain exceptions), and/or if the payments to all ordinary course professionals exceed a total of $3 million in any given month. In accordance with the terms of the OCP Order, every two months throughout the Chapter 11 Cases, the Debtors have submitted (and continue to submit) a statement with the Bankruptcy Court which reports the name of the ordinary course professionals, the amounts paid as compensation for services rendered and reimbursement of expenses incurred by each ordinary course professional during the previous two-month period, and a general description of the services rendered by each ordinary course professional.

### 3.    The Appointment of Official Committees

On October 23, 2000, the United States Trustee for the District of Delaware appointed two official committees, pursuant to Section 1102(a) of the Bankruptcy Code, one representing general unsecured creditors (as thereafter amended or reconstituted, the "Unsecured Creditors' Committee") and the other representing asbestos claimants (as thereafter amended or reconstituted, the "Asbestos Claimants' Committee" and, together with the Unsecured Creditors' Committee, the "Committees").

#### (a)    Unsecured Creditors' Committee

The Unsecured Creditors' Committee represents general unsecured creditors of the Debtors, including the Bank Holders, the Bondholders, trade creditors and holders of Environmental Claims. The current four members of, and professionals retained by, the Unsecured Creditors' Committee are set forth below:

814526.7

33

553

*Members of the Unsecured Creditors' Committee:*

Credit Suisse (f/k/a Credit Suisse First Boston)
Eleven Madison Avenue
New York, NY 10010-3629

JP Morgan Chase Manhattan Bank
380 Madison Avenue
New York, NY 10017-2513

John Hancock Life Insurance Company
200 Clarendon Street
Boston, MA 02117

Wilmington Trust Company, as Indenture Trustee
Corporate Trust Department
1100 North Market Street
Wilmington, DE 19890

*Counsel to the Unsecured Creditors' Committee:*

Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

*Financial Advisors and Investment Banker to the Unsecured Creditors' Committee:*

Houlihan Lokey Howard & Zukin Capital
685 Third Avenue
15th Floor
New York, NY 10017

*Claims Expert and Consultants to the Unsecured Creditors' Committee:*

Navigant Consulting, Inc. (f/k/a Chambers Associates, Inc.)
1801 K Street N.W., Suite 500
Washington, D.C. 20006

*Actuarial and Benefits Consultant to the Unsecured Creditors'
Committee:*

Towers, Perrin, Forster & Crosby, Inc.
1000 Town Center, Suite 950
Southfield, MI 48075-1225

   The Unsecured Creditors' Committee has established two unofficial sub-
committees (the Bank Holders' sub-committee and the Bondholders' and trade creditors' sub-
committee), each of which is represented by separate counsel and financial advisors.

   The Bank Holders' unofficial sub-committee is represented by the
following attorneys and financial advisors:

*Counsel to the Bank Holders' Sub-Committee:*

Kramer Levin, Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Landis, Rath & Cobb, LLP
919 Market Street, Suite 600
Wilmington, DE 19810

Richards Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Robbins, Russell, Englert, Orseck & Untereiner LLP
1801 K Street, N.W., Suite 411
Washington, D.C. 20006

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

*Financial Advisors to the Bank Holders' Sub-Committee:*

FTI Policano & Manzo
622 Third Avenue
New York, NY 10017

   On July 16, 2001, the Bankruptcy Court entered an order authorizing and
approving the employment of special counsel for the Bondholders' and trade creditors' unofficial
sub-committee (also referred to herein as the "Designated Members" or the "Committee
Representatives of the Interests of Bondholders and Trade Creditors"). The Bondholders' and

trade creditors' unofficial sub-committee is represented by the following attorneys and financial advisors:

> *Counsel to the Bondholders' and Trade Creditors' Unofficial Sub-Committee:*
>
> Anderson Kill & Olick, P.C.
> 1251 Avenue of the Americas
> New York, NY 10020
>
> Monzack and Monaco, P.A.
> (f/k/a Walsh Monzack and Monaco, PA)
> 400 Commerce Ctr.
> 1201 Orange Street
> P.O. Box 2031
> Wilmington, DE 19899
>
> *Financial Advisors to the Bondholders' and Trade Creditors' Unofficial Sub-Committee:*
>
> BDO Seidman, LLP
> 330 Madison Avenue
> New York, NY 10017

    (b)    Asbestos Claimants' Committee

The Asbestos Claimants' Committee represents persons alleging asbestos-related personal injuries due to exposure to products manufactured by the Debtors. The current thirteen members of, and professionals retained by, the Asbestos Claimants' Committee are set forth below:

> *Members of the Asbestos Claimants' Committee:*
>
> David Fitts
> c/o Brayton & Purcell
> 222 Rush Landing Road
> P.O. Box 2109
> Novato, CA 94948
>
> Delores Ramsey
> c/o Baron & Budd
> Attn: Fred Baron, Esquire
> The Centrum
> 3102 Oak Lawn Avenue
> Suite 1100
> Dallas, TX 75219-4281

556

Charles Barrett
c/o Weitz & Luxenberg
Attn: Perry Weitz, Esquire
180 Maiden Lane
New York, NY 10038

John Edward Keane
c/o Kelley & Ferraro, LLP
1901 Bond Court Building
1300 E. 9th Street
Cleveland, OH 44114

Mary F. Stone
c/o Hartley & O'Brien
Attn: R. Dean Hartley, Esquire
827 Main Street
Wheeling, WV 26003

Glenn L. Arnott
c/o Goldberg, Perskey, Jennings & White, P.C.
Attn: Mark C. Meyer, Esquire
1030 Fifth Avenue
Pittsburgh, PA 15219

Elmer Richardson
c/o Cumbest, Cumbest, Hunter & McCormick P.A.
Attn: David O. McCormick, Esquire
729 Watts Avenue
P.O. Drawer 1176
Pascagoula, MS 39568

Barbara Casey
c/o Cooney & Conway
Attn: John D. Cooney, Esquire
701 6th Avenue
LaGrange, IL 60425

James Nelson Allen
c/o Glasser & Glasser
Attn: Richard S. Glasser, Esquire
Crown Center Building, 6th Floor
580 E. Main Street
Norfolk, VA 23510

Margaret Elizabeth Fitzgerald
c/o Thornton & Naumes, LLP
Attn: Michael P. Thornton, Esquire
100 Summer Street
30th Floor
Boston, MA 02110

Yolanda England
c/o Peter G. Angelos, Esquire
5905 Harford Road
Baltimore, MD 21214

Deborah Jean Johnson
Personal Representative of the Estate of Stephen Johnson
c/o Bergman Senn Pageler & Frockt
Attn: Matthew Bergman, Esquire
P.O. Box 2010
17530 Vashon Highway SW
Vashon, WA 98070

Joyce Salinas
Plaintiff on her own behalf and representative of John Salinas (deceased)
c/o Kazan, McClain, Eaises, Abrams, Fernandez, Lyons & Farrise
Attn: Steven Kazan, Esquire
171 Twelfth Street, 3rd Floor
Oakland, CA 94607

*Counsel for the Asbestos Claimants' Committee:*

Caplin & Drysdale, Chartered
375 Park Avenue, 35th Floor
New York, NY 10152-3500

Campbell & Levine, LLC
800 King Street
Wilmington, DE 19801

*Financial Advisors and Asbestos Personal Injury Claims Valuation
Consultants for the Asbestos Claimants' Committee:*

L. Tersigni Consulting, P.C.
1010 Summer Street, Suite 201
Stamford, CT 06905

814526.7

38

558

*Claims Expert for the Asbestos Claimants' Committee:*

Legal Analysis Systems
970 Calle Arroyo
Thousand Oaks, CA 91360

**4.    Future Claimants' Representative**

A key element of the Plan is the Asbestos Personal Injury Permanent Channeling Injunction, pursuant to which all current and future personal injury asbestos-related Claims and Demands against the Debtors and other covered Persons will be channeled to the Asbestos Personal Injury Trust established to equitably distribute available assets to holders of all such Allowed Claims and Demands. A channeling injunction is permitted by Section 524(g) of the Bankruptcy Code and may be issued if a number of specific conditions are met, including the appointment of a legal representative for the purpose of protecting the rights of persons that might subsequently assert future Demands against the Debtors. Specifically, Congress and the courts have recognized the need in Chapter 11 cases involving asbestos claims to protect and represent the interests of persons who may have claims and/or Demands against a debtor arising in the future, and have directed bankruptcy courts to appoint a legal representative (the "Future Claimants' Representative") for such claimants in cases where a channeling injunction is sought.

Shortly after the commencement of the Chapter 11 Cases, the Debtors began discussions with the Committees, and their respective legal and financial advisors, to consider the appointment of a Future Claimants' Representative. Following careful consideration of the potential candidates for Future Claimants' Representative, the Debtors determined that James J. McMonagle was well-qualified to represent the interests of any and all persons described in Section 524(g)(4)(B)(i) of the Bankruptcy Code who may assert Demands against one or more of the Debtors, and therefore, should be appointed as the Future Claimants' Representative for such persons in these Chapter 11 cases.

On September 28, 2001, the Court appointed James J. McMonagle, *nunc pro tunc* to June 12, 2001, as the Future Claimants' Representative of any and all persons described in Section 524(g)(4)(B)(i) of the Bankruptcy Code who may assert Demands for asbestos-related personal injury claims against one or more of the Debtors, including without limitation, OCD and Fibreboard.

The name and address of the Future Claimants' Representative and the professionals retained by him are set forth below:

*Future Claimants' Representative:*

James J. McMonagle, Esquire
Vorys Sater Seymour & Pease LLP
2100 One Cleveland Center
1375 E. Ninth Street
Cleveland, OH 44114

559

*Counsel to the Future Claimants' Representative:*

Kaye Scholer LLP
425 Park Avenue
New York, NY 10022

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

*Financial Advisor to the Future Claimants' Representative:*

Peter J. Solomon Company
520 Madison Avenue, 29th Floor
New York, NY 1022

*Asbestos Personal Injury Claims Valuation Consultants for the Future Claimants' Representative:*

Hamilton, Rabinovitz & Alschuler, Inc.
Francine Rabinovitz, Executive Vice President
6033 West Century Blvd., Suite 890
Los Angeles, CA 90045

5.    **Other Professionals and Advisors**

(a)    The Claims, Noticing and Balloting Agent

On October 6, 2000, the Bankruptcy Court appointed Robert L. Berger & Associates, Inc., n/k/a Omni Management Group, LLC, 16161 Ventura Blvd., PMB 517, Encino, CA 91436, as the claims, noticing and balloting agent ("Claims Agent" or "Voting Agent", as the context requires) in the Chapter 11 Cases, pursuant to 28 U.S.C. § 156(c).

(b)    Special Voting Agent

By Order dated April 22, 2003, the Bankruptcy Court authorized the Debtors to retain and employ Innisfree M&A Incorporated, 501 Madison Avenue, 20th Floor, New York, NY 10022, as special noticing, balloting and tabulation agent to address notice issues related to securities. Upon the application of the Debtors, on December 20, 2004, the Bankruptcy Court vacated its prior Order authorizing the retention and employment of Innisfree M&A Incorporated and authorized the Debtors to retain, employ, compensate and reimburse Financial Balloting Group LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017, as special noticing, balloting and tabulation agent.

(c)    Fee Auditor

On June 20, 2002, the Bankruptcy Court appointed Warren H. Smith & Associates, P.C., Republic Center, 325 N. St. Paul, Suite 4080, Dallas, Texas 75201, as the Fee Auditor, to act as a special consultant to the Bankruptcy Court for professional fee and expense review and analysis, *nunc pro tunc* to April 29, 2002.

E.    "First Day" and Other Orders

On or about October 6, 2000, the Debtors filed a series of motions seeking relief by virtue of so-called "first day" orders. First day orders are intended to facilitate the transition between a debtor's pre-petition and post-petition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court. These orders were designed to allow the Debtors to continue business operations with minimum disruptions and to ease the strain on the Debtors' relationships with their employees and other parties. The first day orders obtained in these cases are typical for large Chapter 11 cases. Set forth below is a brief summary of the significant first day orders and other orders relating to motions filed by the Debtors at or near the commencement of the Chapter 11 Cases. **The descriptions of the relief sought or obtained in the Chapter 11 Cases set forth below and throughout this Disclosure Statement are summaries only and reference should be made to the actual pleadings and orders for their complete content.**

The first day orders and other orders, entered at or near the commencement of the Chapter 11 Cases, provide for, among other things:

- the payment of employees' accrued pre-petition wages, salaries, commissions and reimbursable business expenses; the continuation of employee benefit plans and programs post-petition; and the direction for all banks to honor pre-petition checks for payment of employee obligations;

- the payment of certain pre-petition import obligations (including customs duties, freight, trucking charges and brokerage fees), shipping charges and related possessory liens;

- the payment of certain miscellaneous contractors in satisfaction of perfected or potential mechanics', materialmen's or similar liens;

- a prohibition on the Debtors' utility services providers from discontinuing services on account of outstanding pre-petition invoices and establishing procedures for utility providers to seek adequate assurance of the Debtors' future performance;

- the payment of certain pre-petition tax claims;

- the honoring of certain pre-petition obligations to customers under various warranty and other customer programs, and the continuation of warranty and customer programs post-petition;

- the payment of certain critical pre-petition trade vendors' claims;

- the joint administration of each of the Debtors' bankruptcy cases;

- confirming administrative expense treatment for obligations arising from post-petition delivery of goods, administrative expense treatment for certain holders of valid reclamation claims and a prohibition against third parties reclaiming goods or interfering with delivery of goods to the Debtors; and

- the extension of time for filing the Debtors' Schedules and Statement of Financial Affairs (the "SOFAS").

### F. Significant Events During the Chapter 11 Cases

In addition to the first day relief sought and received in the Chapter 11 Cases, the Debtors have sought and received authority with respect to various matters designed to assist in the administration of the Chapter 11 Cases, to maximize the value of the Debtors' Estates and to provide the foundation for the Debtors' emergence from Chapter 11. Set forth below is a brief summary of the principal motions the Debtors have filed, and to which they have been granted relief by the Bankruptcy Court, during the pendency of the Chapter 11 Cases.

#### 1. Employee Related Matters

In connection with the filing of the Chapter 11 Cases, the Debtors obtained authorization from the Bankruptcy Court to (a) pay employees pre-petition wages, salaries and other compensation, (b) continue certain employee benefit programs, including maintenance of self-insured workers' compensation programs, (c) adopt a Retention Program and a supplemental Severance Program (as defined in the Retention and Severance Motion described below), and (d) modify certain employee retirement benefits programs to provide limited enhancement to those programs and to bring them into compliance with certain provisions of the Tax Reform Act of 1986.

On December 22, 2000, the Debtors filed a Motion For Order Under 11 U.S.C. §§ 105, 363 and 365 Authorizing Continuation or Implementation of Employee Retention, Emergence, Severance, Incentive, 401(k) Contribution and Global Awards Programs (the "Retention and Severance Motion"), which sought approval of various new or existing programs designed to prevent excessive turnover of key employees during the Chapter 11 Cases. On January 17, 2001, the Bankruptcy Court entered an Order approving in part the Retention and Severance Motion. Thereafter, on February 16, 2001, the Debtors filed a Supplement to the Retention and Severance Motion by which the Debtors sought approving and authorizing the continuation, modification and implementation of certain employee compensation programs. On March 26, 2001, following certain modifications, the Bankruptcy Court approved the remaining portion of the Retention and Severance Motion.

562

Pursuant to the January 17, 2001 and March 26, 2001 Orders approving the Retention and Severance Motion, the Debtors were authorized to continue or to implement the following programs: (a) an employee retention program under which the Debtors were authorized to pay retention bonuses at specified intervals to approximately 236 key employees; (b) a supplemental employee retention and emergence program, under which certain key employees were entitled to receive additional bonuses in the event that the Debtors emerged from bankruptcy by 2004; (c) continuation of the Debtors' existing employee severance programs consisting of a "Salaried Employee Separation Allowance Plan," which extends to all salaried employees in the United States except senior management, as well as individually negotiated severance agreements; (d) certain of the Debtors' existing incentive-based compensation programs, consisting of (i) the "Corporate Incentive Plan," which provides for discretionary performance-based incentive payments to approximately 1,250 of the Debtors' employees, and (ii) the "Officer Stretch Incentive Plan," an incentive program for approximately 59 of the Debtors' senior managers and key employees; (e) certain of the Debtors' existing 401(k)-related employee programs, consisting of (i) a 401(k) plan, a non-incentive based program pursuant to which the Debtors make matching contributions for the benefit of a broad cross-section of the Debtors' employees and (ii) the "Profit Sharing Contribution Plan," an incentive-based program pursuant to which the Debtors make additional cash contributions for the benefit of a broad cross-section of the Debtors' employees in an amount based on objective Company performance measures; and (f) the Debtors' "Global Awards Program," originally a stock-based employee incentive program, which, as modified, provides for additional cash awards to employees based on objective company performance measures.

On March 5, 2002, the Debtors filed a Motion to Authorize the Continuance of Employee Compensation Programs. On September 10, 2002, the Court entered an Order Authorizing Continuation, Modification and Implementation of Employee Compensation Programs. In addition, the Court authorized the Debtors to continue the employee compensation programs in the ordinary course of the Debtors' business without additional court approval, subject to a specific procedure identified in the motion. Specifically, court authority is unnecessary to continue the compensation programs; provided, however, that the Debtors advise the Committees and the Future Claimants' Representative of the Company's annual Business Plan and annual funding criteria for the employee compensation programs, including the data necessary to assess the reasonableness of the Debtors' business judgment as soon as possible after January 1 in any given year, but under no circumstances later than February 28. In the event that the Committees and/or the Future Claimants' Representative do not consent to the Debtors' proposed employee compensation programs, they are required, within 30 days after receipt of the annual program review, to provide written notice to the Debtors' counsel of their specific objections to the proposed employee compensation programs. If the parties are unable to resolve the objections, the Debtors are required to file the appropriate pleading with the Bankruptcy Court.

On April 28, 2003, the Court approved a Stipulation and Order Regarding Employee Compensation Programs, by and between the Debtors, Committees, and Future Claimants' Representative, which authorized the continuation of the Employee Compensation Programs (as defined in the Stipulation), eliminated the Corporate Stretch Incentive Plan, and approved the implementation of the Long Term Incentive Plan by the Debtors. The Court's

814526.7

43

approval of the Stipulation was intended to constitute "shareholder approval" for the purposes of all applicable law, including, without limitation, Section 162(m) of the IRC.

Given the already expired and expiring programs for Tier 1, 2, 3 and 4 Participants under the supplemental employee retention program, and in light of the Debtors' continued need to retain its key employees, on February 11, 2004, the Debtors filed a motion for entry of an order authorizing the Debtors to implement a new retention program (the "New Retention Program") for its key managers and employees. The Unsecured Creditors' Committee objected to the motion, but certain changes were made to the New Retention Program which resolved the objection, in part, and on July 22, 2004, the Court signed an order approving the New Retention Program for Tier 2, 3 and 4 Participants. In order to obtain prompt approval of the New Retention Program for the approximately 270 participants other than the Debtors' top five most senior managers, the Debtors agreed to defer their request for approval of the program as related to the Tier 1 Participants.

On July 8, 2004, the Debtors filed a motion for authorization to implement the balance of their New Retention Program. Credit Suisse First Boston, as Agent, objected to the Motion. Following discovery, a hearing was held on the motion and, on October 12, 2004, the Court signed an order authorizing the Debtors to implement the New Retention Program for Tier 1 Participants for calendar years 2004 and 2005 as modified by the Court. On October 22, 2004, Credit Suisse First Boston, as Agent, appealed the Bankruptcy Court's Order to the District Court. To date, no further action has taken place on the appeal.

On September 14, 2005, the Debtors filed a motion for entry of an order authorizing Owens Corning to amend its Key Management Severance Agreements with its President and Chief Executive Officer, David T. Brown, and its Chairman of the Board of Directors and Chief Financial Officer, Michael H. Thaman (the "Severance Motion"). The Debtors seek approval of the amendments to the Key Management Severance Agreements as a valid exercise of the Debtors' business judgment, consistent with good corporate governance and succession planning.

The Severance Motion is scheduled for hearing on February 7, 2006. The deadline to file objections to the Severance Motion was October 7, 2005, and no objections were filed. By agreement, the objection deadline was extended to January 6, 2006 at 4:00 p.m. for Credit Suisse, as Agent, only.

On December 29, 2005, the Debtors filed a motion for authority pursuant to Sections 105(a) and 363 of the Bankruptcy Code to implement the 2006 Retention Program (as defined in the motion) in an effort to minimize the turnover of the Debtors' Key Employees by (as defined in the motion) providing incentives for these employees to remain in the Debtors' employ and to work towards a successful resolution of the Chapter 11 Cases. Subject to Court approval of the Severance Motion, Messrs. Brown and Thaman will not participate in the 2006 Retention Program. In the event the Severance Motion is not granted, the Debtors reserve the right to seek authority to expand the 2006 Retention Program to include Messrs. Brown and Thaman. The hearing on this motion is scheduled for January 7, 2006.

44

2.    **Vendor and Customer Issues**

Immediately following the commencement of the Chapter 11 Cases, the Debtors received numerous inquiries from their vendors, customers, and other parties providing services to the Debtors concerning the Debtors' ability to satisfy debts incurred prior to the Petition Date and their continuing commitments. The Debtors believe that the maintenance of relationships with their vendors, customers and other business partners has been, and will continue to be, a critical factor in the continued viability of the Debtors' ongoing business operations and the ultimate success of their rehabilitation effort.

(a)    Relief at Commencement of Chapter 11 Cases

In order to enable the Debtors to minimize the adverse effects of the Chapter 11 Cases, and in their efforts to maintain relationships and goodwill with certain of their vendors and customers, the Debtors obtained orders from the Bankruptcy Court that authorized them to:

(i)    honor certain pre-petition obligations to customers under the Debtors' warranty and other customer programs (including product warranties, cash discounts, rebates, category management, preferred contractor incentive programs, and customer dispute resolution), and to continue and maintain such programs on a post-petition basis;

(ii)    pay pre-petition claims of contractors (including mechanics, tradespersons and other contractors) in satisfaction of perfected or potential mechanics', materialmen's or similar liens or interests;

(iii)    grant administrative expense status to vendors and suppliers for undisputed obligations arising from pre-petition purchase orders outstanding as of the Petition Date for products and goods received by the Debtors on or subsequent to the Petition Date;

(iv)    pay vendors and suppliers for post-petition delivery of goods in the ordinary course of business;

(v)    pay critical pre-petition trade claims (discussed below); and

(vi)    grant administrative expense treatment for certain holders of valid reclamation claims; and prohibit third parties from reclaiming goods or interfering with the delivery of goods to the Debtors (discussed below).

(b)    Critical Trade Vendors

Recognizing the importance of certain vendors to the Debtors' businesses, the Debtors included among their first day motions several motions for authorization to pay critical pre-petition trade vendors, which were granted by orders of the Bankruptcy Court dated October 6, 2000 (the "Critical Vendor Orders"). The Critical Vendor Orders authorized, but did not require, the Debtors to pay the pre-petition claims of certain critical suppliers of raw and

814526.7                                    45

processed materials, goods and services with whom the Debtors continued to do business and whose materials, goods and services were essential to the Debtors' business operations. In connection with the Critical Vendor Orders, the Debtors were authorized to pay critical vendors up to an aggregate amount of approximately $123 million. Such amount was comprised of certain elements: (a) $3.0 million for critical trade payments on account of customs duties, ocean freight, air freight and the like; (b) $25 million on account of amounts owed to commercial common carriers; (c) $48 million on account of amounts owed to critical materials vendors; (d) $19 million, on account of amounts owed to critical project vendors; (e) $23 million, on account of amounts owed to critical affiliated vendors; and (f) $5.0 million, on account of amounts owed to mechanics lien creditors. In return for receiving payment of these claims, the critical vendors were required to extend normalized trade credit terms to the Debtors for the duration of the Chapter 11 Cases. By order dated November 21, 2000, the Bankruptcy Court supplemented one of the Critical Vendor Orders and granted the Debtors authority to pay the pre-petition claims of foreign taxing authorities, foreign landlords and other foreign creditors, as necessary to facilitate the continued operation of the Debtors' foreign divisions.

The Debtors identified approximately 860 of its vendors and suppliers as "critical" vendors, many of which were freight carriers. The Debtors reached settlements with the critical vendors whereby, in general, the Debtors paid the vendors less than the total pre-petition amounts owed in satisfaction of claims those vendors may have held against the Debtors for pre-petition goods or services, and those vendors agreed to maintain or return to normal credit terms.

 (c) Reclamation Claims

At the commencement of the Chapter 11 Cases, the Debtors anticipated that many of their vendors and suppliers would attempt to assert their right to reclaim goods delivered to the Debtors shortly before or soon after the Petition Date pursuant to Section 546(c) of the Bankruptcy Code and Section 2-702 of the Uniform Commercial Code. As part of their "first day" motions, the Debtors sought certain initial relief in connection with the treatment of reclamation claims, which relief was granted by order dated October 6, 2000 (the "Initial Reclamation Procedures Order"). The Initial Reclamation Procedures Order established preliminary reclamation procedures in order to facilitate the continued operation of the Debtors' businesses, to prevent distraction of the Debtors' management and professionals and to allow the Debtors the opportunity to conduct a thorough review and evaluation of the reclamation claims. Among other things, the Initial Reclamation Procedures Order provided that vendors would be entitled to administrative expense claims if and to the extent that the vendor made a valid, written reclamation demand for the goods at issue, and to the extent that such vendor proved the validity of its demand. The Initial Reclamation Procedures Order also prohibited vendors and other third-parties from reclaiming or interfering with the post-petition delivery of goods to the Debtors.

As anticipated, the Debtors received a large number of reclamation claims – approximately 220 claims, with an aggregate approximate amount of $34 million, exclusive of claims which did not specify an amount. The Debtors devoted substantial time and effort in reviewing and analyzing the claims, in order to determine which claims were valid reclamation claims.

Between February and September, 2002, the Debtors filed five separate motions (each of which addressed certain of the 220 reclamation claims), requesting orders approving their proposed allowance and/or disallowance of the reclamation claims, and approving their proposed treatment of the allowed reclamation claims (together, the "Reclamation Motions"). More specifically, in the Reclamation Motions, the Debtors requested orders: (i) granting administrative expense priority status for reclamation claims to the extent, and in the amounts, the Debtors determined such claims to be allowable pursuant to the applicable provisions of the Bankruptcy Code; (ii) denying administrative expense priority status for all other reclamation claims; and (iii) authorizing the Debtors to pay the Allowed amount of each valid reclamation claim. The Bankruptcy Court granted the Reclamation Motions and, upon Court approval of the Debtors' proposed treatment of the individual reclamation claims, the Debtors were authorized to pay the Allowed claims.

Approximately sixteen reclamation claimants filed objections and/or responses to the Reclamation Motions, and many other reclamation claimants contacted the Debtors concerning the Debtors' proposed treatment of their claims as described in the Reclamation Motions. Through discussions, negotiations and/or the exchange of documents and information between parties, the Debtors reached a consensual resolution with the majority of these claimants, either by entering a settlement stipulation or by the Bankruptcy Court's entry of a modified order.

As of the date of this Disclosure Statement, all but one reclamation claim have been resolved.

      (d)     Setoffs

Section 553 of the Bankruptcy Code recognizes the right of setoff of mutual, pre-petition obligations if certain criteria are met. However, Section 362(a)(7) of the Bankruptcy Code operates as a stay of the setoff of any debt owing to the debtor that arose pre-petition against any pre-petition claim against the debtor. Bankruptcy Rule 4001 allows parties to consensually modify the automatic stay provisions to allow for setoff in appropriate circumstances.

Throughout the Chapter 11 Cases, the Debtors have entered a number of stipulations (the "Setoff Stipulations") with various vendors and suppliers authorizing a modification of the automatic stay to effectuate the setoff of pre-petition mutual debts. The Debtors determined that entering the Setoff Stipulations would be in the best interest of the Debtors' estates and their creditors because, in general, among other reasons, the setoffs allowed the Debtors to reconcile their books and records without further dispute, maintain amicable relationships with their customers and vendors, and continue the free flow of goods and services from their customers and vendors.

     3.     **Debtor-in-Possession Financing and the DIP Facility**

In connection with the Filing, and in order to fund their on-going business operations during the pendency of the Chapter 11 Cases, the Debtors, excluding Jefferson Holdings, Inc., obtained a debtor-in-possession credit facility (the "DIP Facility") from a group of lenders (the "DIP Lenders") led by Bank of America, N.A., as administrative agent (the "DIP

Agent"). On November 17, 2000, the Bankruptcy Court approved the Final Order Authorizing Post-Petition Financing on a Superpriority Administrative Claim Basis Pursuant to 11 U.S.C. § 364(c)(1) and Granting Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362 (the "DIP Order"). The DIP Order authorized, among other things, (a) the Debtors to borrow from the DIP Lenders, on specified terms and conditions, post-petition financing of up to $500 million, including revolving loans and letters of credit, pursuant to an agreement among the Debtors and Lenders; (b) the execution by the Debtors of notes and other documents requested by the DIP Lenders evidencing the post-petition financing; and (c) the granting of certain protections to the DIP Agent and the DIP Lenders including without limitation a superpriority administrative claim over any and all administrative expenses of the kinds specified in Sections 503(b), 105, 326, 328, 330, 331, 506(c), 507(a), 546(c), 726 or 1112 of the Bankruptcy Code.

The DIP Facility also provided for unsecured post-petition financing from the DIP Lenders for general working capital and other general corporate purposes in an aggregate principal amount not to exceed $500 million. The amount available under the DIP Facility depends on a borrowing base of qualifying receivables and inventory of the Debtors. Borrowings under the DIP Facility bear interest at a floating rate equal to LIBOR plus a margin varying from 0.75% to 2.00%, based upon the average daily outstanding balance. In addition, a commitment fee is payable on unused portions of the aggregate commitment amount under the DIP Facility of 0.375% per annum and a letter of credit fee is payable based on the average daily maximum aggregate amount available to be drawn under all outstanding letters of credit and certain other expenses incurred by the DIP Lenders issuing the letters of credit. The DIP Facility contains covenants, representations and warranties, events of default, and other terms and conditions typical of credit facilities of a similar nature.

The DIP Facility was to expire on November 15, 2002, in accordance with its terms. On October 28, 2002, the DIP Lenders and the Debtors entered into an amendment to the DIP Facility, approved by the Bankruptcy Court, pursuant to which, among other things, the maximum available credit amount under the DIP Facility was reduced at the Debtors' request to $250 million and its term was extended through November 15, 2004.

The DIP Facility, as amended in 2002, was due to expire on November 15, 2004, in accordance with its terms. By Order entered October 28, 2004, the Court approved an amendment to the DIP Facility by which the term of the DIP Facility was extended through November 15, 2006. Such amendment also replaced certain of the DIP Lenders with other lenders, and made certain other specified revisions to the DIP Facility. By Order entered July 13, 2005, the Court approved various technical amendments to its prior Order regarding the DIP Facility, dated October 28, 2004.

The Debtors have never utilized the facility except for standby letter of credit and similar uses. As of November 30, 2005, approximately $150 million of availability under this facility was utilized for standby letters of credit and similar uses. As of the Effective Date, the Debtors expect to have no outstanding borrowings, but approximately $175 million in outstanding standby letters of credit and similar uses.

Obligations under the DIP Facility have "superpriority" claim status under Section 364(c)(1) of the Bankruptcy Code, meaning that such obligations have priority as to

repayment over all administrative expenses, with certain limited exceptions. The claims of the DIP Lenders are subject to the fees and expenses of the Office of the United States Trustee (under Section 1930 of Title 28 of the United States Code) and the Clerk of the Bankruptcy Court, and are also subject to the payment of professional fees and disbursements (capped at $10 million upon the occurrence of an event of default under the DIP Facility) incurred by the borrowers under the DIP Facility and statutory committees approved under the Chapter 11 Cases.

    **4.**    **Standstill Agreement with the Bank Holders**

        (a)    The Standstill Agreement

        Prior to the Petition Date, OCD, as borrower and guarantor, certain other borrowers and guarantors and Credit Suisse First Boston, as agent and lender (the "Pre-petition Agent") and approximately forty-six banks (including their assignees and participants, the "Bank Holders") entered into the 1997 Credit Agreement. On or about the Petition Date, certain of the Bank Holders imposed an administrative freeze on funds of certain Debtors and Non-Debtor Subsidiaries, including foreign Subsidiaries and Affiliates in the approximate amount of $46 million.

        On the Petition Date, the Debtors filed a Verified Complaint for Declaratory and Injunctive Relief (the "Complaint") against the Bank Holders, commencing the adversary proceeding entitled Owens Corning, et al. v. Credit Suisse First Boston, et al., Adv. Pro. No. A-00-1575 (the "Standstill Adversary Proceeding"). By the Complaint, the Debtors sought to enjoin the Bank Holders from (i) exercising their purported rights of setoff under Section 13.06 of the 1997 Credit Agreement against money in bank accounts of the Debtors and Non-Debtor Subsidiaries held by the Bank Holders; (ii) declaring any Non-Debtor Subsidiaries in default under any separate banking agreements as a result of the Filings; (iii) accelerating the payments under any separate banking agreements as a result of the Filings; (iv) freezing, impairing or otherwise moving against the funds of Non-Debtor Subsidiaries that are held by the Bank Holders as a result of the Filings; and (v) declaring the rights and obligations of the parties under Section 13.06 of the 1997 Credit Agreement.

        Concurrent with the filing of the Complaint, the Debtors filed a Motion for Temporary Restraining Order and Preliminary Injunction under Sections 105(a) and 362(a) of the Bankruptcy Code (the "TRO Motion"). By the TRO Motion, the Debtors requested an order that enjoined (i) the Bank Holders from calling, canceling, or revoking credit facilities of the Non-Debtor Subsidiaries solely as a result of the Debtors' seeking relief under Chapter 11 of the Bankruptcy Code; and (ii) the Bank Holders and their affiliates from setting off against funds deposited by the Non-Debtor Subsidiaries in bank accounts at the Bank Holders or their affiliates.

        The purpose of the Standstill Adversary Proceeding and the TRO Motion was to protect the assets of the Non-Debtor Subsidiaries by preventing their assets from being used to satisfy all or a portion of the obligations under the 1997 Credit Agreement that had been guaranteed by certain Non-Debtor Subsidiaries.

        On October 10, 2000, with the consent of the Bank Holders, the Bankruptcy Court entered a temporary restraining order ("TRO") enjoining and restraining the

Bank Holders from exercising any enforcement right or remedy under the 1997 Credit Agreement against any Non-Debtor Subsidiaries, including any setoff rights, under any other agreement, or under applicable law. Notwithstanding the injunction, the TRO permitted the Bank Holders to impose an administrative freeze on any funds in accounts of the designated Non-Debtor Subsidiaries as of the Petition Date and to refuse to make additional loans or advances to the Non-Debtor Subsidiaries.

Following negotiations between counsel for the Debtors and the Bank Holders (except for the China Lenders as discussed below), and in order to preserve the status quo for the benefit of the Debtors' bankruptcy estates and their creditors, the Debtors and the Bank Holders entered into various modifications and extensions of the TRO, which were approved by the Court.

The Debtors and the Bank Holders continued to engage in discussions for the purpose of entering into an agreement pursuant to which the Bank Holders would stand still from exercising certain enforcement rights and remedies against the Non-Debtor Subsidiaries, waive certain rights and remedies under the 1997 Credit Agreement and certain credit facilities with the Non-Debtor Subsidiaries (the "Bilateral Facilities"), amend the 1997 Credit Agreement to release, discharge and waive all claims against certain Non-Debtor Subsidiaries, and resolve disputes regarding setoff rights. On May 30, 2001, after successful negotiations between the Debtors and the Bank Holders, the Debtors filed the Motion for Order Under 11 U.S.C. §§ 105(a), 362(a), and Fed. R. Bankr. P. 6004, 7065 and 9019 (I) Authorizing the Debtors to Enter Into, and to Take All Necessary or Appropriate Action to Effectuate the Terms of, a Standstill and Waiver Agreement with Certain Defendants, (II) Terminating the Temporary Restraining Order Entered with Respect to Certain Defendants, (III) Dismissing this Adversary Proceeding with Respect to Certain Defendants, (IV) Authorizing the Debtors to Compromise and Settle Setoff Rights Asserted by the Defendants and Terminating the Stay of 11 U.S.C. § 362(a) with Respect to Certain Setoff Rights, and (V) Releasing, Discharging, and Waiving Certain Claims of Defendants (the "Standstill Motion").

The Standstill Motion was approved by Court Order dated June 19, 2001 (the "Standstill Order"). The Standstill Order, among other things, authorized the Debtors to enter into the Standstill and Waiver Agreement among the Debtors, certain Non-Debtor Subsidiaries and the Bank Holders (the "Standstill Agreement"), authorized the Debtors to settle the setoff rights asserted by the Bank Holders, released, discharged and waived certain claims of the Defendants, and dismissed, without prejudice, the Standstill Adversary Proceeding and terminated the TRO with respect to all the Defendants except the China Lenders, as defined below.

Pursuant to the terms of the Standstill Agreement, the Bank Holders agreed not to exercise certain remedies against the Non-Debtor Subsidiaries during the Specified Period (the "Standstill Period") in consideration of certain undertakings of the Debtors and Non-Debtor Subsidiaries, including subjecting certain Non-Debtor Subsidiaries to affirmative and negative covenants. The Standstill Period would expire on the earliest to occur of (i) the date of filing of a plan or plans of reorganization, (ii) a termination due to an event of default under the Standstill Agreement, or (iii) a date no earlier than October 31, 2002 which is 45 days after written notice to the Debtors and their counsel by the Pre-petition Agent that the requisite

814526.7                                50

number of Bank Holders (as determined in the 1997 Credit Agreement) elected to terminate the Standstill Period.

More specifically, the Standstill Agreement provides that, during the Standstill Period, the Bank Holders are not to exercise any right or remedy for the enforcement, collection or recovery of any of the guaranteed obligations under the 1997 Credit Agreement from any of the Non-Debtor Subsidiaries other than with respect to valid setoff rights in existence on the Petition Date. In addition, the Standstill Agreement precludes those Bank Holders that are parties to the Bilateral Facilities from exercising, as a result of any default under such facilities arising solely from the commencement of the Chapter 11 Cases (which default is waived during the Standstill Period), enforcement rights or remedies against such Non-Debtor Subsidiaries other than with respect to valid setoff rights existing as of the Petition Date. However, the Bank Holders are not required to make additional loans or advances under a Bilateral Facility nor are they prevented from exercising any other rights or remedies available to them under a Bilateral Facility.

The Standstill Agreement also provided that the Debtors, the Non-Debtor Subsidiaries and the Bank Holders would provide information to determine the validity of setoff rights and seek in good faith to resolve all disputes regarding setoff rights. Pending resolution of the setoff rights, the TRO remained in effect and all parties' rights with respect to the setoff issue were preserved.

Pursuant to the Standstill Agreement, OCD made a payment of $3 million to the Pre-petition Agent for and on behalf of the Bank Holders executing the Standstill Agreement (the "Participating Lenders") with each Participating Lender receiving a pro rata share of such fee based on such Participating Lender's outstanding commitment under the 1997 Credit Agreement. OCD also paid a fee of $200,000 to each of the Pre-petition Agent and Chase Manhattan Bank, in their respective capacities as co-chairs of the Steering Committee. OCD was also responsible for payment of certain fees and expenses of the Bank Holders, subject to certain monetary limits.

On November 25, 2002, the parties to the Standstill Agreement executed a Stipulation and Order to Amend the Standstill and Waiver Agreement (the "Standstill Amendment") to, among other things, extend the Standstill Period, which was approved by the Court on November 25, 2002. The Standstill Amendment provides, in part, that the extended Standstill Period will end on the earliest to occur of (i) a termination due to an event of default specified in the Standstill Amendment, or (ii) the date which is 45 days after written notice of intention to terminate the Standstill Agreement has been given to OCD or the Pre-petition Agent as provided in the Standstill Amendment. The Standstill Amendment also provides that the Pre-petition Agent approved of the first amendment to the DIP Facility and that the fraudulent conveyance actions filed on or about October 4, 2002, by the Debtors, as described in more detail below, or the appointment of a limited purpose trustee or examiner would not constitute an event of default under the Standstill Agreement.

With respect to the proceedings relating to the "Estimation of Asbestos Liability for Plan Purposes," see Section IV.D.2, the Debtors objected to requests for payments of attorneys fees for the Bank Holders for participating in such proceedings as unreasonable. At

the same time, the Debtors and the Committee Representatives of the Interests of Bondholders and Trade Creditors agreed to extend the deadline to object to the fees of the attorneys for the Committee Representatives of the Interests of Bondholders and Trade Creditors for participating in proceedings concerning the estimation of Asbestos Personal Injury Claims. Because the Unsecured Creditors' Committee was representing the interests of all creditors not holding Asbestos Personal Injury Claims, the Debtors asserted that they were not required to pay attorneys fees and expenses of parties other than counsel for the Unsecured Creditors' Committee in such proceedings. In response to the Debtors' position, on April 16, 2004, CSFB filed a Motion to Compel Debtors' Compliance with the Standstill and Waiver Agreement. The Debtors filed an objection to this Motion on May 14, 2004, which objection was joined by the Asbestos Claimants' Committee and the Future Claimants' Representative. The parties resolved the issues regarding this dispute in December, 2004.

        (b)      The China Standstill Agreement

        The Debtors were engaged as of the Petition Date in ongoing negotiations with Standard Chartered Bank ("SCB"), as agent and co-coordinating arranger for the Loan Facility Agreement, dated March 12, 1998 (the "Revolving Loan Facility") among SCB, Societe Generale ("Soc Gen") and KBC Bank, N.V. ("KBC") and, together with SCB and Soc Gen, the "China Lenders"), Owens Corning (China) Investment Company, Ltd. ("OCI"), Owens-Corning (Guangzhou) Fiberglas Co., Ltd. ("OC Guangzhou"), Owens-Corning (Shanghai) Fiberglas Co., Ltd. ("OC Shanghai"), as borrowers, and OCD as guarantor, to effectuate the continued servicing of the Revolving Loan Facility and to settle certain setoff rights asserted by SCB in the approximate amount of $7.8 million. Resolution of the issues surrounding the Revolving Loan Facility was necessary to settle the setoff rights asserted by SCB and would permit OC to realize future value and profits from OC Guangzhou and OC Shanghai, which provide valuable production support to OC's global insulation business and are strategically important to OC's long term business strategy in China.

        Following negotiations, OCD, OC Guangzhou, OC Shanghai and the China Lenders reached agreement on the key terms of a Standstill and Amendment Agreement (the "China Standstill Agreement"). On October 16, 2002, the Debtors filed a motion for an order under 11 U.S.C. §§ 363 and 105, and Fed. R. Bankr. P. 6004 and 9019 authorizing and (i) approving execution of the China Standstill Agreement by and among OCD, OC Guangzhou, OC Shanghai, and the China Lenders; (ii) approving consummation of the transactions contemplated in the China Standstill Agreement; and (iii) granting the China Lenders an Allowed General Unsecured Claim against OCD in the amount of $22 million conditioned upon the closing of the China Standstill Agreement (the "China Standstill Motion"). The Court approved the China Standstill Motion on December 9, 2002.

        The China Standstill Agreement became effective and on January 27, 2003, the Bankruptcy Court entered a Stipulation and Order terminating the TRO and dismissing the Standstill Adversary Proceeding as related to the China Lenders.

        Under the terms of the China Standstill Agreement, and among other things, the outstanding amounts under the Revolving Loan Facility – $12 million for OC Guangzhou and $5.6 for OC Shanghai – plus certain other amounts, were to become due and

payable on December 31, 2005. In anticipation of this deadline, OC, OC Guangzhou and OC Shanghai entered into discussions which resulted in the China Lenders' agreement to accept, with respect to OC Guangzhou, 60% of the principal amount due under the Revolving Loan Facility, plus certain other amounts, in full satisfaction of OC Guangzhou's payment obligations under the Revolving Loan Facility. Under the terms of this agreement, OC Shanghai is to pay the China Lenders the full amount of its obligations under the Revolving Loan Facility. On November 9, 2005, OC filed a motion seeking authority for certain inter-company loans to OC Guangzhou, as required to fund this settlement. Such motion was approved by the Bankruptcy Court by Order dated December 20, 2005.

(c)    Setoff of Bank Accounts

In connection with the consummation of the Standstill Agreement, the Debtors and the Bank Holders agreed to conduct discussions in an attempt to reach a consensual resolution with respect to the Bank Holders' setoff rights against both the Debtors and the Non-Debtor Subsidiaries. The dispute concerning the Bank Holders' potential setoff rights centered around the accounts upon which the Bank Holders had placed an administrative freeze after the commencement of the Chapter 11 Cases (as described above). In their efforts to reach a resolution, the parties to the Standstill Agreement exchanged information and documents which enabled them to stipulate to material facts regarding most of the frozen accounts. These facts were set forth in a Stipulation Concerning Debtors' Frozen Bank Accounts, which was filed in the Bankruptcy Court on February 15, 2002.

Contemporaneous with the filing of the factual stipulation, the Bank Holders filed a motion in the Bankruptcy Court, entitled Motion of Credit Suisse First Boston, as Agent, for an Order Modifying the Automatic Stay to Permit Setoff of Frozen Funds (the "Setoff Motion"). In the Setoff Motion, the Bank Holders requested relief from the automatic stay to exercise setoff rights against 22 frozen bank accounts of certain Debtors and Non-Debtor Subsidiaries, totaling approximately $35 million. The Debtors, as well as certain other creditor groups, objected to the Setoff Motion. In their objection, the Debtors disputed the amount of the Bank Holders' setoff rights and asserted, among other things, that the Bank Holders were wrongfully withholding the entire balance of many of the frozen accounts, and that the Bank Holders did not have valid setoff rights with respect to a substantial number of the frozen accounts.

After extensive settlement negotiations, the Debtors and the Bank Holders agreed to settle the Setoff Motion and the parties' competing claims to the bank accounts at issue, together with certain other bank accounts not covered by the Setoff Motion, which accounts totaled $36,779,719.99, plus interest earned after the Petition Date. The parties executed an agreement for the settlement of the Setoff Motion, the terms of which authorized the release of specified funds totaling $18,953,325.31 plus 51.532% of the interest accrued on the frozen funds to the Debtors and permitted the Bank Holders to exercise their setoff rights with respect to the balance of the frozen funds, $17,826,394.68 plus 48.468% of the accrued interest. The settlement agreement was approved by order of the Bankruptcy Court, dated June 20, 2002.

(d)    Cash Management System

On October 6, 2000, the Debtors filed a motion for interim and final orders (i) authorizing (a) the maintenance of certain existing bank accounts, (b) the continued use of existing business forms, (c) the use of a modified cash management system and (d) the transfer of funds to Non-Debtor Subsidiaries and (ii) waiving certain investment and deposit requirements of Section 345(b) of the Bankruptcy Code (the "Cash Management Motion"). The Court granted the relief requested in the Cash Management Motion, as modified by an "Exhibit D-1" (which was introduced into evidence at the hearing on the Cash Management Motion), by "so ordering" the record, to be followed by the submission of an agreed-upon form of written order.

On June 19, 2001, the Court approved the Agreed-Upon Interim Order Under 11 U.S.C. §§ 105, 345(b) and 363 (I) Authorizing (A) Maintenance of Certain Existing Bank Accounts, (B) Continued Use of Existing Business Forms, (C) Use of Modified Cash Management System, and (D) Transfer of Funds to Non-Debtor Subsidiaries; and (II) Waiving, on an Interim Basis, Investment and Deposit Requirements of 11 U.S.C. § 345(b) (the "Interim CMO").

The Interim CMO originally had an expiration date of December 18, 2001. On December 17, 2001, the Court entered a Stipulation and Order that extended the expiration date of the Interim CMO until February 26, 2002. The Debtors and Creditors submitted and the Court approved the final cash management order (the "Final CMO"), which became effective on February 25, 2002 and is to continue in effect until confirmation of the Plan.

Pursuant to the Final CMO, in accordance with Sections 105 and 363 of the Bankruptcy Code, the Debtors may (i) designate, maintain and continue to use all of their respective collection, collateral, operating, depository, payroll and other accounts existing at the Petition Date in accordance with existing account agreements, (ii) close any such accounts, and (iii) treat such accounts as accounts of the Debtors in their capacity as debtors-in-possession. The Final CMO provides that the Debtors and Non-Debtor Subsidiaries are permitted to utilize their cash management system existing prior to the Petition Date.

With certain allowed exceptions, the Final CMO prohibits the Debtors and Non-Debtor Subsidiaries from transferring funds to pay pre-petition intercompany indebtedness. However, the Final CMO permits transfers of funds among Debtors and Non-Debtor Subsidiaries in payment for goods and services provided to the payor after the Petition Date. The Final CMO also permits transfers of funds among Debtors and Non-Debtor Subsidiaries for capital expenditures, working capital and short term liquidity as long as the transfers are evidenced as loans, within the appropriate monetary limits and properly recorded on applicable accounts, with additional limits on transfers of funds to negative net worth Debtors and Non-Debtor Subsidiaries. The Final CMO permits the Debtors and Non-Debtor Subsidiaries to invest and deposit funds in accordance with their established deposit and investment practices as of the Petition Date. The Final CMO also approved eight specific transactions as exceptions to the limitations set forth in the Final CMO.

5.     **B-Reader Litigation**

In January of 2005, CSFB demanded that the Debtors commence litigation against physicians that it alleged had falsely and fraudulently diagnosed asbestos-related disease in the x-rays of thousands of individuals who subsequently asserted personal injury claims against the Debtors. The Debtors responded that they were not opposed to pursing the litigation in principle, however, there were serious concerns that the potential costs of the litigation would outweigh any benefits to the Debtors' estate. OCD had commenced similar fraud and RICO litigation against certain medical screening facilities in 1996 and 1997. At that time, it considered bringing lawsuits against individual physicians, but because of strategic considerations, it decided not to do so. The Debtors believed that the considerations applicable to the litigation in the late 1990s were also applicable to CSFB's 2005 proposal. These considerations included the fact that evidence of fraud was difficult to prove; the statute of limitations would pose a serious obstacle; and filing a lawsuit would subject the Debtors to the risk and expense of litigating against sizeable counterclaims. Also, the Debtors' experience in the earlier fraud and RICO litigation demonstrated that the attorneys' fees and costs incurred in pursuing such litigation were likely to substantially exceed any potential for recovery. CSFB agreed to advance attorneys' fees and costs in connection with the proposed litigation subject to potential reimbursement ordered by the Bankruptcy Court if such litigation was found to be beneficial to the estate, but refused to indemnify the Debtors against counterclaims. For that reason, the Debtors exercised their business judgment and declined to commence the litigation.

On January 12, 2005, CSFB filed a motion seeking an order authorizing CSFB to commence an adversary proceeding on behalf of the Debtors' estate against the B-readers. The Debtors opposed the motion for the reasons set forth above, but agreed to withdraw the opposition if CSFB agreed to indemnify the Debtors for liability and expenses related to potential counterclaims by the defendants in the proposed litigation. The matter was heard before the Bankruptcy Court on February 28, 2005. The Bankruptcy Court specifically credited the evidence behind the Debtors' business and legal decision not to pursue the litigation unless CSFB indemnified the estate for liability and expenses from potential counterclaims. At the hearing, CSFB agreed to provide the requested indemnity. A few days later, CSFB disavowed the agreement and insisted that it be permitted to proceed in the litigation without indemnifying the estate against counterclaims. On March 21, 2005, the Bankruptcy Court denied CSFB's motion. On appeal, the District Court affirmed the Bankruptcy Court's ruling. CSFB did not appeal the District Court's ruling and the time for appeal has expired.

6.     **Unexpired Leases and Executory Contracts**

As of the Petition Date, the Debtors were party to thousands of unexpired leases and executory contracts, including, among others, real property leases, information technology agreements, equipment leases, plant-related service agreements, and supply agreements. During the pendency of the Chapter 11 Cases, the Debtors have evaluated the costs and potential benefits of these agreements, including the availability of alternate services and more profitable end-users for its products, all without disrupting core business operations.

Section 365 of the Bankruptcy Code authorizes a debtor, subject to approval of the Bankruptcy Court, to assume or reject unexpired leases and executory contracts. Under the

Bankruptcy Code, a debtor has until confirmation of a plan of reorganization to assume or reject executory contracts and unexpired leases of residential real property or of personal property of the debtor. A debtor in a Chapter 11 case ordinarily must assume or reject unexpired leases of nonresidential real property within sixty (60) days after commencement of the case. If a debtor fails to assume this type of lease within the applicable time period, the lease is deemed rejected. The bankruptcy court may extend the relevant time periods for cause.

      (a)     Real Property Leases

As of the Petition Date, the Debtors were lessees under approximately 347 unexpired nonresidential real property leases. Most of the unexpired leases were for space used by the Debtors for conducting the production, warehousing, distribution, sales, sourcing, accounting and general administrative functions that comprise the Debtors' businesses. Given the size and complexity of the Chapter 11 Cases, the Debtors determined that they would be unable to complete their analyses of all nonresidential real property leases during the time limitation prescribed in Section 365(d)(4) of the Bankruptcy Code. Accordingly, the Debtors sought, and the Bankruptcy Court approved, extensions of the time by which the Debtors must assume or reject their unexpired leases of nonresidential real property. The latest extension was granted by the Bankruptcy Court on November 11, 2005 and expires on June 5, 2006.

Throughout the Chapter 11 Cases, the Debtors have been engaged in an ongoing review of the unexpired nonresidential real property leases to determine whether the rejection or assumption and assignment of the leases was in the best interest of their respective estates. Through the end of November, 2005, the Debtors had rejected approximately seventy-five (75) nonresidential real property leases; assumed twelve (12) nonresidential real property leases; and assumed and assigned nine (9) nonresidential real property leases. The Debtors continue their review and analysis of their unexpired nonresidential real property leases.

Generally, all unexpired nonresidential real property leases that have not previously been assumed or rejected by the Debtors will be assumed under the Plan, except for those leases specified on Schedule IV of the Plan, which must be filed at least ten (10) days prior to the Objection Deadline. See Section VII.F of this Disclosure Statement entitled "Treatment of Executory Contracts and Unexpired Leases."

      (b)     Executory Contracts and Unexpired Leases

Since the Petition Date, the Debtors have instituted an internal process to review all executory contracts and unexpired leases to evaluate the economic costs and benefits to each of them. Throughout the Chapter 11 Cases, the Debtors have successfully renegotiated or rejected numerous leases and executory contracts, resulting in a reduction in fixed costs. The Debtors also have assumed, assumed as modified, or assumed and assigned a number of executory contracts and unexpired personal property leases since the Petition Date. By their review process, the Debtors have realized significant savings without business interruption.

Generally, all unexpired nonresidential real property leases that have not previously been assumed or rejected by the Debtors will be assumed under the Plan, except for those leases specified on Schedule IV of the Plan, which must be filed at least ten (10) days prior

to the Objection Deadline. See Section VII.E of this Disclosure Statement entitled "Treatment of Executory Contracts and Unexpired Leases."

The following is a description of the disposition of certain of the Debtors' executory contracts and unexpired leases throughout the Chapter 11 Cases:

(i)    Enron.  In January 2001, the Debtors, with Bankruptcy Court authority, assumed their various executory contracts with Enron Energy Services, Inc. and other Enron-related entities.  Among other things, these contracts required Enron to provide to the Debtors certain commodities and commodity-related services, as well as certain energy, energy efficiency, and consultation services.  Among the services provided by Enron were billing consolidation services, by which Enron would assemble and consolidate third-party energy bills for presentation to OCD.  OCD would make payment on such bills to Enron, which was contractually obligated to convey the appropriate portion of such payments to the underlying third-party providers.  In connection with the assumption of these contracts, the Debtors made a cure payment of approximately $20 million to Enron, on account of funds owed to Enron and/or to third-party energy providers.  By order dated August 28, 2001, the Debtors obtained Bankruptcy Court approval to amend the previously-assumed Enron agreements so as to, among other things, expand the services provided thereunder to additional facilities of the Debtors.  On December 2, 2001, Enron Corp. and certain of its affiliates filed Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the Southern District of New York.  Prior to Enron Corp.'s bankruptcy filing, the Debtors sent one or more notices to Enron by which the Debtors terminated their various contractual agreements with Enron.  Enron asserted significant post-petition claims against OCD as a result of the foregoing contract terminations.  By motion filed on May 9, 2003, OCD sought Court approval of a settlement with Enron Corp. and certain of its affiliates that would resolve all disputes among the parties.  Among other things, such settlement resolved the following issues: (i) the amount owed by OCD to Enron on account of OCD's purchase of commodities from Enron subsequent to the Petition Date; (ii) the amount owed by OCD in connection with certain projects under construction for OC by Enron or parties controlled by Enron, including incomplete projects; (iii) the amount owed by OCD on account of OCD's alleged cost savings from such projects; and (iv) invoices allegedly issued by Enron or affiliated parties in connection with uncompleted projects under construction for OCD; (v) the appropriate disposition of Owens Corning Energy LLC, a limited liability company owned by OCD and an Enron affiliate; (vi) whether OCD or any of its affiliates were entitled to an allowed claim against any of the Enron bankruptcy cases; (vii) whether any of the Enron debtors were entitled to an allowed administrative or other claim against OCD or any of the Debtors; (viii) the status and disposition of certain of the property leased to OCD pursuant to certain lease agreements among the parties; and (ix) which of the parties was entitled to certain natural gas stored at OCD's natural gas storage facilities.

Under the terms of such settlement, which was approved by Court Order dated June 13, 2003: (a) certain agreements among the parties were deemed to have been terminated as of December 1, 2001; (b) the master leases among the parties were terminated and the property leased to OCD thereunder was transferred to OCD "as is, where is and with all faults" with no representations or warranties and free and clear of the liens or encumbrances, other than certain excluded liens; (c) OCD paid to Enron Energy Services Operations, Enron

814526.7                          57

Energy Services International Leasing, Inc. and Owens Corning Energy LLC $43.0 million in cash as follows: $13,805,312 to Owens Corning Energy LLC, $427,505 to Enron Energy Services International Leasing, Inc. and the remainder to Enron Energy Services Operations; (d) releases were exchanged among the parties; (e) certain other assets were transferred to OCD free and clear of all liens, claims and encumbrances, other than specified excluded liens; (f) OCD withdrew with prejudice any claims filed by it or any controlled affiliate in the Enron bankruptcy cases arising out of certain specified agreements and the transactions contemplated thereby; (g) Enron and certain affiliates are to withdraw with prejudice any proof of claim filed by them or any controlled affiliate against any of the Debtors arising out of specified agreements and the transactions contemplated thereby; (h) OCD assigned its interests in Owens Corning Energy LLC to Enron Energy Services Organization; and (i) Enron and specified affiliates transferred to OCD any natural gas currently stored at OCD's natural gas storage facilities.

          (ii)    <u>Xerox Corp.</u>  OCD and Xerox Corp. were parties to a pre-petition services agreement pursuant to which Xerox Corp. was obligated to operate OCD's global documents management systems, the term of which expired on December 31, 2001. Prior to the expiration of the agreement, and after extensive negotiations, OCD and Xerox Corp. entered into a post-petition document services agreement, which was approved by order of the Bankruptcy Court dated July 16, 2001. OCD's execution of the post-petition document services agreement, which replaced the original agreement as of May 21, 2001, was necessary to the Debtors' ongoing business operations. In accordance with the entry of the post-petition agreement, Xerox Corp. became entitled to an allowed General Unsecured Claim against OCD in the approximate amount of $3 million, and became entitled to assert an additional General Unsecured Claim against OCD in the approximate amount of $892,000.

          (iii)    <u>SAP America, Inc.</u>  With Bankruptcy Court approval in June 2001, OCD assumed, with certain modifications, its software license agreement with SAP America, Inc.  Under the agreement, SAP America, Inc. licenses certain software to OCD, which software is fundamental to the Debtors' business operations. Upon the assumption of the agreement, OCD and SAP America, Inc. agreed to make modifications to the agreement in order to provide the Debtors with greater operational flexibility and to facilitate the Debtors' potential divestiture of certain assets and/or business units. In connection with the assumption of the agreement, OCD made a cure payment to SAP America, Inc. in the approximate amount of $6.3 million. In addition, SAP America, Inc. became entitled to an Allowed General Unsecured Claim against OCD in the approximate amount of $287,000.

          (iv)    <u>Owens-Corning (India) Limited.</u>  In connection with the restructuring of OCD's Indian joint venture, Owens-Corning (India) Limited ("OCIL") (discussed in Section III.A.3(b) of this Disclosure Statement), OCD assumed, as amended and restated, several executory contracts between OCD and OCIL pursuant to which OCD provides OCIL with certain services and OCIL provides certain products to OCD. Assumption of the agreements, as modified (which included technology license agreements, a trademark and trade name license agreement, an alloy services agreement, an offtake contract, a shareholder agreement and an investment agreement), was part of the overall restructuring of OCIL, which provided significant benefit to OCD's estate. No cure

payments were owed with respect to the assumption of the agreements. The Bankruptcy Court authorized OCD's assumption of the agreements by Order dated June 18, 2002.

(v)    Owens Corning World Headquarters Restructuring. The Debtors maintain their World Headquarters in a 400,000 square foot facility located on a 42-acre tract of land in Toledo, Ohio. Approximately 1,100 of the Debtors' employees are located in the World Headquarters, including key management, business unit employees, customer service, sales support and business process personnel. As of the Petition Date, OCD leased the World Headquarters facility from the Toledo Lucas County Port Authority (the "Port Authority") pursuant to two leases. The payments due under the first lease primarily were used to pay principal, interest and other amounts owing under the Port Authority's $85.4 million Taxable World Headquarters Revenue Bonds, Series 1995 (the "Revenue Bonds"), as well as amounts due under the Port Authority's $10 million Taxable State Loan Revenue Note, payable to the State of Ohio. The Port Authority leases the ground underlying the World Headquarters facility pursuant to third-party ground leases that were scheduled to expire on May 31, 2030.

After negotiations with the necessary parties, the Debtors reached a comprehensive agreement to restructure the leases on the World Headquarters and resolve the underlying bond debt. By Order dated May 19, 2003, the Court approved this proposed restructuring. The principal terms of the agreement consisted of the following: (a) OCD's purchase of the Revenue Bonds for $691.961 per $1,000 of the outstanding principal of such bonds (for a total purchase price of $32 million); (b) the allowance of General Unsecured Claims to the holders of the Revenue Bonds in the amount of $399.039 per $1,000 of outstanding principal amount of such bonds (for total allowed General Unsecured Claims of approximately $21.4 million); (c) the modification of OCD's second lease for the World Headquarters, to provide for (x) extensions through 2075, at Owens Corning's option, and (y) a more favorable purchase option; and (d) modifications of the underlying ground leases with respect to the World Headquarters, through 2075, at OCD's option.

(vi)    Jackson, TN Lease Assumption. By Order entered February 25, 2004, the Bankruptcy Court authorized Owens Corning to assume its Master Industrial Development Lease Agreement dated as of December 14, 1993 (the "Master Lease") with the Industrial Development Board of the City of Jackson, Tennessee (the "IDB") and its equipment Sublease Agreement dated as of December 15, 1993 with US Bank, as lessor, and Owens Corning, as lessee (as amended and supplemented by that certain Qualifying Addition Supplement to Sublease Agreement dated as of December 23, 1996, the "Sublease") and to exercise its purchase options thereunder. The relief granted by this Order permitted Owens Corning to take title to a 199-acre facility in Jackson, Tennessee, at which the Debtors manufacture a fiberglass underlayment product that is a critical component in the production of roofing shingles, together with equipment and machinery located at such facility including a solid waste disposal and recycling facility. In connection with its exercise of purchase options with respect to these assets, Owens Corning made purchase and "cure" payments of approximately $29.6 million, inclusive of a final semi-annual rent payment under the Sublease of approximately $5.28 million.

(vii)    Miscellaneous Equipment Lease Buy-Outs and Settlements.
The Court has authorized the Debtors to exercise purchase options or otherwise buy out various equipment leases upon such leases' termination, including the following:

| Lessor(s) | Date of Agreement | Equipment Leased | Purchase Terms |
|-----------|-------------------|------------------|----------------|
| Pitney Bowes Credit Corporation | December 20, 1994 | Office furniture and equipment and leasehold improvements at the facility in Granville, OH. | Pursuant to a Bankruptcy Court order dated November 15, 2002, OCD purchased the equipment subject to the lease for $330,335.83. Pursuant to such Order, Pitney Bowes Credit Corporation was allowed a General Unsecured Claim of $325,508.57. |
| Pitney Bowes Credit Corporation/John Hancock Life Insurance Company | December 31, 1996 | Equipment used in the facilities in Huntington, PA, Anderson, SC, Aiken, SC, Summit, IL, Memphis, TN, Fairburn, GA and Newark, OH. Equipment in Aiken, SC was subleased to Advanced Glassfiber Yarns LLC. | Pursuant to a Bankruptcy Court Order dated December 17, 2001, OCD was authorized to purchase the equipment subject to the lease for $10,024,896 and to sell a portion of the equipment to Advanced Glassfiber Yarns LLC for $4,229,671. |
| Pitney Bowes Credit Corporation | December 31, 1997 | • Equipment and machinery comprising an electrical substation at the Newark, OH facility.<br>• Poly packaging equipment utilized at the Denver, CO and Atlanta, GA manufacturing facilities.<br>• Automated packaging system used at the Amarillo, TX facility.<br>• Vacuum treatment oven at the Aiken, SC facility. | Pursuant to a Bankruptcy Court Order dated December 12, 2003, OCD was authorized to purchase the equipment subject to the lease for $1,714,161.07. Pursuant to such Order, Pitney Bowes Credit Corporation was allowed a General Unsecured Claim of $206,634.72. |
| Medina 1997 Leasing Trust | September 30, 1997 | Manufacturing machinery and equipment used at the roofing plant in Medina, OH | Pursuant to a Bankruptcy Court Order dated December 4, 2002, OCD was authorized to purchase the equipment subject to the lease for $8,942,504.33. |
| Carly 1995 Leasing Trust | December 15, 1995 | Manufacturing, production and equipment used at the facilities in Denver, CO, Delmar, NY, Fairburn, GA, Newark, OH, Kansas City, KS, Aiken, SC, Amarillo, TX and Anderson, SC | Pursuant to the Bankruptcy Court's April 23, 2001 Order approving a stipulation between OCD and the Carly 1995 Leasing Trust by which the Debtors paid Carly $8,796,241.18, plus rent and other charges. |

580

| Dresdner Kleinwort Benson | | Equipment used in the facilities in Medina, OH, Kearny, NJ, Jacksonville, FL, Amarillo, TX, Kansas City, KS and Fairburn, GA. | Pursuant to a Bankruptcy Court Order dated January 23, 2004, OCD was authorized to purchase the equipment subject to this lease for $13,353,792. |
| --- | --- | --- | --- |

(viii)    Aircraft.  The Debtors have utilized corporate aircraft in their business operations for fifty years.  As of the Petition Date, Owens Corning was the lessee under three separate aircraft lease agreements for the lease of two Raytheon Hawker 800 aircraft (the "Hawkers") and a Dassault Falcon 900 EX aircraft (the "Falcon").  The initial lessor under each of these lease agreements was Pitney Bowes Credit Corporation ("PBCC").  PBCC subsequently assigned all of its rights, interests, duties and obligations as lessor with respect to one of the Hawkers to Hitachi Capital America Corp., f/k/a Hitachi Credit America Corp. ("Hitachi").  The expiration dates for each of the aircraft agreements were as follows: for the Hawkers – November 30, 2005 and December 1, 2005, and for the Falcon – August 31, 2005.

In November 2001, Owens Corning and PBCC, and separately Owens Corning and Hitachi, entered into Stipulations by which, among other things, Owens Corning agreed to make monthly (as opposed to semi-annual) payments of the amounts due under the parties' lease agreements, and PBCC and Hitachi agreed, subject to certain conditions, not to take any action against the Debtors with respect to the aircraft.  The Stipulations also provided that any determination with respect to the characterization of the respective aircraft agreements, or the allocation of any payments made pursuant to such agreements, was to be deferred.

In advance of the expiration of the aircraft agreements, Owens Corning undertook an evaluation of whether it should attempt to retain its existing aircraft or whether it should consider leasing or purchasing more efficient aircraft.  Ultimately, Owens Corning determined to market, for the benefit of the lessors, its existing aircraft for sale to a third party and to lease new corporate aircraft.  Pursuant to a Bankruptcy Court Order entered June 30, 2005, CDC Corporation was authorized to lease three Cessna Citation Sovereign aircraft from Canal Air LLC and to enter into a rental agreement with Owens Corning with respect to these aircraft.  On August 23, 2005, the Bankruptcy Court entered an Order authorizing a procedure for the disposition of Owens Corning's existing aircraft and the distribution of the proceeds from such sales.  Ultimately, the Hawkers and the Falcon were sold, via arms-length transactions, to separate third-party purchasers.  The resulting aggregate excess net proceeds of sale realized by Owens Corning from the disposition of the aircraft was approximately $2 million.

(ix)    Miscellaneous executory contracts and unexpired leases.  Since the Petition Date and through the end of November, 2005, the Debtors have filed twelve (12) motions rejecting miscellaneous contracts and unexpired leases that no longer were required for the Debtors' business operations, and have filed numerous additional motions to reject specific contracts and leases, which have resulted in the rejection of such contracts and unexpired leases.

814526.7    61

7.    **Insurance**

    (a)    General

    During the 20-year period prior to the initiation of the Chapter 11 Cases, billions of dollars of insurance proceeds were paid out by various insurers to directly fund or reimburse OCD for funding the settlement and defense of asbestos claims. During the pendency of the Chapter 11 Cases, the Debtors have been involved in litigation, arbitration and negotiation in which the Debtors have sought to establish asbestos-related coverage rights under policies that were not previously released in full with respect to asbestos claims. To date, OCD has reached settlements of such matters with solvent insurers involving payments either immediately or over time of more than $100 million in the aggregate into escrow accounts and/or as ultimately provided for by the Plan. Some such settlements have been finalized and approved by the Bankruptcy Court; one other awaits Court approval. During the pendency of the Chapter 11 Cases, OCD has also received substantial payments in respect of previously allowed claims from liquidators of insolvent insurers, and expects to receive significant additional amounts over the next several years in respect of distribution on asbestos claims previously allowed. OCD has also concluded two settlements during the pendency of the Chapter 11 Cases, both approved by the Bankruptcy Court, concerning the obligation of insolvent insurers with respect to asbestos and other claims, which settlements have involved and are expected to involve payments of significant amounts.

    OCD also has other unconfirmed potential coverage rights for asbestos-related bodily injury claims against solvent excess level carriers who now bear responsibility for insolvent carriers. Under the ADR procedures of the Wellington Agreement, OCD is seeking recovery for asbestos non-products claims against two excess carriers and if necessary will initiate ADRs against additional Wellington insurers with which it has not previously settled all asbestos products and non-products issues. OCD is also pursuing litigation against a state guaranty association on account of its responsibility for asbestos claims that would otherwise have been paid by a now-insolvent excess insurer. In addition, on June 27, 2001, the Court entered an Order approving the stipulation between Fibreboard and Continental, one of Fibreboard's insurers, resolving disputes relating to Continental's obligations under a certain settlement agreement and directing funds be transferred to the Fibreboard Insurance Settlement Trust. Prior to the Petition Date, Fibreboard and Continental had entered into an agreement (the "Buckets Agreement") that reapportioned their respective liabilities to certain asbestos personal injury claimants. The Buckets Agreement provided for, among other things, the payment of Committed Disputed Presently Settled Claims and Committed Unsettled Present Claims (collectively, the "Committed Claims") through a $44 million Committed Claims Account funded by Continental. Continental and Fibreboard further agreed that any money remaining in the Committed Claims Account after all Committed Claims have been paid pursuant to the Buckets Agreement would be transferred to the Fibreboard Insurance Settlement Trust. The Stipulation approved by the Court provides, among others, that no funds would be released from the Committed Claims Account while the Chapter 11 Cases were pending, and that Continental would have a first priority perfected security interest in the Committed Claims Account securing its rights under the Buckets Agreement to reimbursement or other payment in respect of Continental's payments under the Buckets Agreement. Approximately $33 million remains in the Committed Claims Account. The Plan provides that, pursuant to the Stipulation, the

remaining funds in the Committed Claims Account will be transferred to the FB Sub-Account of the Asbestos Personal Injury Trust to compensate holders of Allowed FB Asbestos Personal Injury Claims.

In connection with the asbestos claims estimation hearing held before the District Court in January of 2005, all insurers except Century Indemnity Company and its affiliate Central National Insurance Company (collectively "Century Indemnity") entered into a stipulation agreeing that they would neither participate nor be bound by the District Court's findings in subsequent coverage actions. Century Indemnity declined to so stipulate and consequently is bound by the ultimate judicial resolution of the asbestos liability estimation.

(b)     Insurance Coverage Issues

OCD has unconfirmed potential coverage rights for asbestos-related bodily injury claims against solvent excess level carriers and liquidators and others who now bear responsibility for insolvent carriers. OCD is actively pursuing insurance recoveries under these remaining excess policies in litigation, arbitration and otherwise.

(i)     Litigation Against Non-Wellington Carriers

On October 26, 2001, OCD filed a lawsuit in Lucas County, Ohio, styled Owens Corning v. Birmingham Fire Insurance Co. et al., No. CI0200104929, against ten excess level insurance carriers for declaratory relief and damages for failure to make payments for asbestos non-products claims under excess policies issued in the period between June 18, 1974 and September 1, 1984.  After extensive litigation but before trial, OCD settled its claims with all of these insurers, and they have been dismissed from the case.  Of the five settlements with the ten insurer defendants, two have been approved by the Court.  Motions for approval of the other three settlements are pending.

(ii)     Wellington ADR Proceedings

The Wellington Agreement is an agreement that was entered into in 1985 between certain asbestos producers (as defined therein), including OCD, and various insurers that, *inter alia,* (1) resolved certain insurance coverage disputes; and (2) established certain alternative dispute resolution ("ADR") procedures. The OC Asbestos Personal Injury Liability Insurance Assets include rights to coverage under certain insurance policies issued by insurers that are signatories to the Wellington Agreement.  OCD has agreed that it will not reject the Wellington Agreement as an executory contract.  The Reorganized Debtors intend to transfer the OC Asbestos Personal Injury Liability Insurance Assets to the Asbestos Personal Injury Trust.  Certain insurer signatories to the Wellington Agreement assert that issues concerning the transfer of the OC Asbestos Personal Injury Insurance Assets to the Asbestos Personal Injury Trust cannot be resolved by the Bankruptcy Court (or the District Court); the Plan Proponents disagree with this assertion.  Under the ADR procedures of the Wellington Agreement, OCD is seeking recovery for asbestos non-products claims under policies issued by Insurance Company of North America ("INA") and by Royal Indemnity Company.  Owens Corning is also pursuing coverage for asbestos non-products claims from the following insurer groups that are signatories to the Wellington Agreement:  affiliates of ACE USA (in addition to INA), Continental, and Zurich.  Those companies have reserved their rights with respect to coverage.  These claims are

not yet in an ADR proceeding. During the earlier stages of the Chapter 11 Cases, OCD obtained Court approval of a settlement with a group of carriers as to which OCD was engaged in an ADR proceeding concerning asbestos non-products claims.

(iii)    Proceedings Involving Policies Issued By Insolvent Carriers

OCD is pursuing litigation against a state guaranty association, in which OCD has asserted that the state guaranty association is responsible for asbestos claims that would otherwise have been paid by a now-insolvent excess insurer. Following an adverse trial court ruling, that claim is now pending on appeal.

### 8.    Baron & Budd Administrative Deposits

Prior to the Petition Date, B&B was the law firm of record for various plaintiffs in a number of asbestos-related personal injury lawsuits against OCD and Fibreboard who were participants in the NSP. Under a settlement agreement between OCD, Fibreboard and B&B, OCD and Fibreboard were required to pay Administrative Deposits into settlement accounts to be maintained by B&B for the benefit of its clients. The settlement agreement provided for payments to be made in each of 2000, 2001, and 2002. OCD made its first required payment of approximately $66 million on March 13, 2000. The first required Fibreboard payment of approximately $44 million was made on April 6, 2000 from funds obtained from the Fibreboard Insurance Settlement Trust. Prior to the Petition Date, and after receiving written approval from OCD and/or Fibreboard, B&B distributed approximately $23 million from the settlement accounts to its clients pursuant to the terms of the settlement agreement. Because of the Chapter 11 filings, the Debtors did not make the 2001 or 2002 payments to B&B and B&B did not make the 2001 or 2002 distributions to plaintiffs.

Under the settlement agreement, B&B was required to invest the funds held for the plaintiffs and maintain the funds in settlement accounts. Any income from the funds was designated as Investment Proceeds under the agreement ("Investment Proceeds"). It is the Debtors' position that all such Investment Proceeds are the property of either OCD or Fibreboard. B&B contends that at least a portion of the Investment Proceeds is properly considered property of the plaintiffs for whose benefit the funds were deposited with B&B.

After the Petition Date, B&B proposed to distribute the funds remaining in the settlement accounts to its various beneficiaries and, on September 12, 2001, filed a motion with the Bankruptcy Court for an order determining that the automatic stay does not apply to the undistributed settlement funds made by OCD and Fibreboard or, in the alternative, terminating the automatic stay. B&B argued that the settlement payments were not property of the Debtors' Estate because an enforceable trust had been created and the Debtors did not retain an equitable interest in the payments.

Numerous objections and/or responses were filed to B&B's motion, including by the Debtors, the Unsecured Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative and Plant Insulation Company ("Plant"). In their response, the Debtors disagreed with B&B's characterization that the settlement agreement created an express trust; instead, the Debtors argued that the agreement created an escrow account. On November 15, 2001, B&B filed an amended motion for relief from the stay (if the automatic stay were

applicable). The parties currently dispute whether B&B changed its position that the settlement agreement created an express trust in the amended motion. B&B asserted if the funds were held in an escrow account, the Debtors were still not entitled to the funds under Texas escrow law. B&B asserted that whether the agreement created an express trust or an escrow account, the automatic stay did not apply to B&B's proposed disbursement of the funds.

The Future Claimants' Representative and the Unsecured Creditors' Committee disputed the existence of a trust or an escrow arrangement and asserted that the entire balance in each of the settlement accounts was property of OCD's and Fibreboard's respective estates.

After numerous hearings on the pleadings during 2001 and 2002, on June 20, 2002, the Bankruptcy Court issued an order granting B&B's amended motion in part and denying it in part. The Bankruptcy Court ordered, among other things, that: (a) the Investment Proceeds (approximately $8 million) were property of OCD and Fibreboard's respective estates and must be returned to OCD and Fibreboard; (b) as to those plaintiffs who received written notice of approval for payment pursuant to the agreement from OCD or Fibreboard, and who had received payment of the first installment of their settlement prior to the Petition Date (the "Qualifying OC and Fibreboard Plaintiffs"), B&B, OCD and Fibreboard had met the standards under Texas law to establish that the requirements of an escrow were fulfilled pre-petition as to the principal balance; (c) to the extent that the principal balance in the B&B settlement accounts of the settlement payments by OCD and Fibreboard represented amounts due under the settlement agreement to the Qualifying OC and Fibreboard Plaintiffs, then such balance (the "Qualifying OC and Fibreboard Balance," approximately $70 million) was not property of the Debtors' estates; (d) the Qualifying OC and Fibreboard Plaintiffs were entitled to receive the second and third installments of their settlement out of the Qualifying OC and Fibreboard Balance; and (e) the principal balance remaining in the B&B settlement account, after deducting the Qualifying OC and Fibreboard Balance (the "OC and Fibreboard Residual Balance", approximately $6 million) was property of the Debtors' estates and must be returned to OCD (amounts due under settlement agreements to Qualifying Fibreboard Plaintiffs would exhaust the remaining principal balance in the Fibreboard settlement account).

On June 27, 2002, B&B filed a motion to amend the judgment, requesting that the Bankruptcy Court amend its June 20, 2002 Order to clarify the method of calculating the Investment Proceeds and the OC and Fibreboard Residual Balance, or, in the alternative, for a new trial. In the motion, B&B asserted that the Qualifying OC and Fibreboard Plaintiffs were entitled to the payment of interest from the dates they were to have received their second and third installments. The Debtors, the Unsecured Creditors' Committee, the Future Claimants' Representative and Plant each filed objections to B&B's motion to amend the judgment.

On September 20, 2002, the Bankruptcy Court amended its Order of June 20, 2002 and ordered that the Investment Proceeds earned subsequent to June 20, 2002 and all interest and other earnings on the post-June 20, 2002 Investment Proceeds, should be allocated as follows: (i) the Investment Proceeds on the Qualifying OC and Fibreboard Balance should be allocated respectively to the Qualifying OC and Fibreboard Plaintiffs; and (ii) the Investment Proceeds on the OC and Fibreboard Residual Balance should be payable respectively to OCD and Fibreboard. The Bankruptcy Court further ordered that the Investment Proceeds, interest and other earnings on the Qualifying OC and Fibreboard Balance and the OC and Fibreboard

65

Residual Balance earned prior to June 20, 2002, should be payable respectively to OCD and Fibreboard.

On October 2, 2002, B&B filed a notice of appeal of the Bankruptcy Court's September 20, 2002 Order. The Future Claimants' Representative and the Unsecured Creditors' Committee also filed notices of appeal from the June 20 and September 20, 2002 Orders. The appeals have been consolidated and the parties proceeded under a briefing schedule established by the District Court, by Order dated December 23, 2002. The briefing of the issues is complete and the appeal is pending before the District Court. The Plan Proponents express no opinion as to the outcome of the appeal.

### 9. Coordination Between the Debtors, the Committees and the Future Claimants' Representative

Since their formation, the Committees and the Future Claimants' Representative have consulted with the Debtors concerning the administration of the Chapter 11 Cases. The Debtors have kept the Committees and the Future Claimants' Representative informed concerning their operations and have sought the concurrence of the Committees and the Future Claimants' Representative for actions outside the ordinary course of business.

### 10. Implementation of Process for Resolution of Inter-Creditor Issues

Shortly after the Petition Date, the Debtors' counsel began an extensive review of the facts and circumstances relating to certain potential inter-creditor issues (the "Inter-Creditor Issues"), including issues relating to the Guarantees (the "Subsidiary Guarantees") entered into by the Subsidiary Guarantors under the 1997 Credit Agreement, which include a number of the Debtors and certain Non-Debtor Subsidiaries. (See Section V.G.3(c) of this Disclosure Statement for further discussion of the adversary proceedings filed in the Chapter 11 Cases to avoid and set aside or equitably subordinate the Claims of the Bank Holders under the Subsidiary Guarantees as fraudulent conveyances.) The Inter-Creditor Issues include any and all claims, objections, motions, contested matters, adversary proceedings or any other proceedings involving, related to or affecting issues of the amount, validity, enforceability or priority of Claims by the Bank Holders against any of the Debtors or any Non-Debtor Subsidiary (to the extent the Bankruptcy Court has jurisdiction to affect the Claims against Non-Debtor Subsidiaries) which is a Subsidiary Guarantor of the Debtors' obligations to the Bank Holders, including without limitation: (a) any claims relating to substantive consolidation of the Debtors; (b) any claims relating to the validity, enforcement or priority of the Pre-petition Bonds; (c) any claims relating to the validity or enforceability of a License Agreement, dated as of October 1, 1991, by and between OCD and OCFT (as amended) and a License Agreement, dated as of April 27, 1999, by and between OCFT and Amerimark; (d) any claims regarding the amount, validity, enforceability or priority of the Subsidiary Guarantees; (e) any claims against any direct or indirect Subsidiary of OCD in respect of OCD's asbestos liability; and (f) any claims as to the amount, validity, enforceability, priority or avoidability of any intercompany transfers.

The Debtors' counsel advised the various creditor constituencies that the manner of resolution of Inter-Creditor Issues could materially impact their respective recoveries. To assist the various creditor constituencies in their analysis of the Inter-Creditor Issues, the Debtors proposed a process by which the corporate and financial interrelationships between the

814526.7

66

Subsidiary Debtors and the Non-Debtor Subsidiaries could efficiently be reviewed. The Debtors' goal was to inform the creditor constituencies about these issues in order to initiate negotiations and thus avoid a litigated resolution of the complex legal and factual issues, or in the event that a consensual resolution could not be reached, to provide an efficient manner for conducting factual discovery.

To facilitate a consensual resolution of the Chapter 11 Cases, in the spring of 2001, the Debtors voluntarily agreed to produce a documentary record that would aid in this review. During the period between July 2001 and October 2001, the Debtors produced a large volume of documents designed to be a compilation of relevant documents that would be useful in reviewing and investigating each Debtor or Subsidiary Guarantor's corporate history, major creditor relationships, and significant cash and value transfers (the "Inter-Creditor Project").

The Debtors established an information and document depository (the "Information Depository") at the offices of Skadden, Arps, Slate, Meagher & Flom LLP in New York City. Over four hundred-fifty thousand pages of information and materials have been deposited in the Information Depository, available to be reviewed by those who entered into a confidentiality agreement with the Company (the "Participating Parties"), which confidentiality agreements were necessary to assure the protection of privileged and confidential material included in the production of documents to the Information Depository.

In addition to the Information Depository, the Debtors also created a secure, web-enabled database by which the Participating Parties were able to access the same documents and materials located in the Information Depository.

After the initial production of the Debtors' documents and materials described above, the parties formalized the Inter-Creditor Project. On September 24, 2001, the Debtors proposed an "Inter-Creditor Stipulation and Order," which the Bankruptcy Court adopted on such date after hearing from the various creditor constituencies. The Inter-Creditor Stipulation and Order delineated a schedule for additional discovery regarding the investigation of the Inter-Creditor Issues. The Inter-Creditor Stipulation and Order also directed the Debtors to provide a report to the Court at each omnibus hearing regarding the status of compliance with the Inter-Creditor Stipulation and Order.

Pursuant to the Inter-Creditor Stipulation and Order, on October 20, 2001, the Debtors and the Participating Parties exchanged written discovery requests. The Debtors searched for documents potentially relevant to such requests at the Company's headquarters, at its off-site storage facility in Toledo, Ohio, at its off-site storage facility in Granville, Ohio, and at the offices of certain of the Debtors' outside professionals. Debtors' counsel responded to the request for documents.

In addition to the Debtors' production, in December, 2001, and January, 2002, the Participating Parties commenced document production in response to the requests received from the other Participating Parties.

In January and February, 2002, the Debtors and the Participating Parties met to discuss the results of their review and to share their views regarding the issues. The Debtors and