other Participating Parties identified certain issues and entities for further investigation and resolution.

On February 19, 2002, the Pre-petition Agent under the 1997 Credit Agreement filed a statement (the "Statement") regarding the resolution of Inter-Creditor Issues. The Statement requested the implementation of a process designed to result in the efficient resolution of questions relating to the value of the Subsidiary Guarantors.

On February 22, 2002, the Debtors filed a Status Report recommending that the Inter-Creditor Project proceed. More specifically, the Debtors proposed that they develop proposed factual stipulations and proffer them to the other Participating Parties pursuant to a specific schedule. Further, the Debtors urged the continuance of the monthly meetings with the Participating Parties and the presentation of status reports to the Court.

By Order dated March 18, 2002 (the "Inter-Creditor Issues Order"), the Bankruptcy Court established a schedule for addressing the resolution of Inter-Creditor Issues. The schedule established the dates on which the Debtors were to submit to the Participating Parties certain proposed factual stipulations, generally concerning corporate history and governance, management and business operations, the financial condition of the entities, and relationships with Affiliates, the dates on which the Participating Parties were to provide the Debtors with responses and comments to the proposed factual stipulations, and the dates of the circulation by the Debtors of a revised version of the proposed factual stipulations. At a hearing on June 20, 2002, the Bankruptcy Court authorized the filing of the stipulations under seal if the parties so desired.

In June 2002, Blue Ridge Investments LLC ("Blue Ridge") moved, in part, to compel the Debtors to comply with the Inter-Creditor Stipulation and Order and the Inter-Creditor Issues Order and sought to be deemed a Participating Party. Following a hearing on Blue Ridge's motion, the Debtors and Blue Ridge agreed to a consensual resolution of the motion, which was approved by the Court on August 26, 2002, whereby upon executing a confidentiality agreement, Blue Ridge was granted full access to the Information Depository and was also entitled to receive and comment on the proposed Stipulations of Fact concerning Integrex. Blue Ridge was also entitled to receipt of the final stipulations of fact concerning OCFT, OCD, IPM and Fibreboard.

In response to the Inter-Creditor Issues Order, the Debtors submitted their proposed factual stipulations with respect to OCFT, IPM, OCD, Integrex and Fibreboard to the Participating Parties; the Participating Parties responded and commented on the proposed factual stipulations and the Debtors circulated revised versions of each of the proposed factual stipulations.

Pursuant to the Inter-Creditor Issues Order, with certain modified deadlines, the Debtors filed, under seal, the following Final Stipulations:

(1) On November 21, 2002, the Debtors filed, under seal, Stipulations and Objections to Proposed Stipulations of Fact Concerning OC, and Document Summaries.

(2) On November 21, 2002, the Debtors filed, under seal, Stipulations and Objections to Proposed Stipulations of Fact Concerning Integrex, and Document Summaries.

(3) On December 18, 2002, the Debtors filed, under seal, Stipulations and Objections to Proposed Stipulations of Fact Concerning IPM, Inc., and Document Summaries.

(4) On January 7, 2003, the Debtors filed, under seal, Stipulations and Objections to Proposed Stipulations of Fact Concerning Fibreboard Corporation.

(5) On January 16, 2003, the Debtors filed, under seal, Stipulations and Objections to Proposed Stipulations of Fact Concerning OCFT, and Document Summaries.

At the omnibus hearing on January 27, 2003, the Debtors' counsel advised the Court that, as a result of the Inter-Creditor Project, approximately 4,500 proposed stipulations had been filed with the Court.

**11. Consolidation of Five Asbestos Bankruptcy Cases Before Judge Wolin, Subsequent Recusal of Judge Wolin, Deconsolidation of the Five Asbestos Bankruptcy Cases, and the Appointment of Judge Fullam**

(a) Asbestos-Related Chapter 11 Cases in Delaware

On November 27, 2001, five asbestos-related Chapter 11 cases pending in the District of Delaware (the Chapter 11 Cases of the Debtors and the cases of Armstrong World Industries, Inc. ("<u>Armstrong</u>"), W.R. Grace & Co. ("<u>Grace</u>"), Federal-Mogul Global, Inc. ("<u>Federal-Mogul</u>"), and USG Corporation ("<u>USG</u>")) were ordered transferred from the Bankruptcy Court to the United States District Court for the District of Delaware and were assigned to the Honorable Alfred M. Wolin of the United States District Court for the District of New Jersey (sitting by designation) to facilitate development and implementation of a coordinated plan for management of the cases.

On December 10, 2001, the District Court entered an order referring these Chapter 11 Cases back to the Bankruptcy Court for resolution, subject to the District Court's ongoing right to withdraw such referral with respect to any proceedings or issues.

The case issues were allocated between the District Court and the Bankruptcy Court as follows:

> <u>District Court</u>: Future and present asbestos claims, valuation and litigation analysis (if the parties were unable to consensually resolve them in an agreed-upon time frame); co-defendant asbestos issues; Section 524(g) trust and trust distribution provisions; asbestos automatic stay matters; and asbestos bar date matters.
>
> <u>Bankruptcy Court</u>: Inter-Creditor Issues; retention, fee application, employee, environmental, cash management, tax, executory contract and lease matters, avoidance actions, utilities, asset acquisitions and dispositions, business

operational matters, bank claims and litigation, intellectual property and licenses, non-asbestos automatic stay and claims matters, settlements of bonded asbestos appeals, and NSP settlement escrow issues.

(b) Withdrawal of the Reference

On December 23, 2002, Judge Wolin signed an order (the "Case Management Order") withdrawing the reference with respect to the adversary proceeding captioned Owens Corning, et al. v. Credit Suisse First Boston, et al., No. 02-5829 (the "Bank Holders Action", also referred to by Judge Wolin as the "Bank Guarantee Adversary") and the Debtors' Motion for Approval of Substantive Consolidation as Part of Proposed Chapter 11 Plan of Reorganization (the "Substantive Consolidation Motion"), which was filed on January 17, 2003. Under the Case Management Order, the Honorable Judith K. Fitzgerald was appointed settlement judge for the two matters for which the reference was withdrawn. Professor Francis McGovern was appointed mediator for those same matters and the parties were directed to appear for mediation. In addition, the Court appointed William A. Drier, Esquire, as Special Master for limited purposes related to discovery.

(i) Substantive Consolidation

The Court scheduled a hearing on the Substantive Consolidation Motion, as part of the proceedings concerning confirmation of the pending version of the plan of reorganization. The proceedings began on April 8, 2003, and concluded on May 2, 2003. The hearing on the Substantive Consolidation Motion was for the purpose of taking evidence regarding the positions of the Debtors, the Asbestos Claimants' Committee, the Future Claimants' Representative, the Unsecured Creditors' Committee, the Committee Representatives of the Interests of Bondholders and Trade Creditors, and CSFB as Agent for the Bank Holders with respect to the Bank Holders' opposition to the substantive consolidation provisions of the pending plan. Before issuing a decision, Judge Wolin recused himself from the Chapter 11 Cases. See Section V.F.11(e). On October 15, 2004, following a review of the transcripts and exhibits from the substantive consolidation proceedings before Judge Wolin, a review of post-hearing briefs, and oral argument, Judge Fullam issued the Substantive Consolidation Order granting the Substantive Consolidation Motion. On August 15, 2005, the Third Circuit reversed the Substantive Consolidation Order. Petitions for rehearing were denied by the Third Circuit on September 28, 2005. On or about December 16, 2005, the Bondholders and Trade Creditors of the Debtors filed an Application to Extend Time to file the Petition for Writ of Certiorari, which was granted by the Supreme Court of the United States. On December 23, 2005, the Future Claimants' Representative filed a Petition for Writ of Certiorari with the Supreme Court. As of the date hereof, such writ is pending.

(ii) Bank Holders Action

A hearing on the Bank Holders Action was scheduled to commence in April 2003, but was subsequently postponed. The Bank Holders Action was to include the taking of evidence regarding the positions of the parties on the validity, extent and value of the Subsidiary Guarantees for the purpose of determining any benefits and harms resulting from the substantive consolidation provisions of the Plan. No hearing has been scheduled on this matter as of the date of this Disclosure Statement. Under the Plan, effective as

of the Confirmation Date, but subject to the occurrence of the Effective Date, the Bank Holders Action would be dismissed with prejudice.

(c) The Appointment of Consultants

By order dated December 28, 2001 (the "Consultants Order"), the District Court ordered that William A. Drier, Esq., David R. Gross, Esq., C. Judson Hamlin, Esq., John E. Keefe, Esq., and Professor Francis E. McGovern be designated as court appointed consultants (the "Court Appointed Consultants") to advise the District Court and to undertake, in connection with the Chapter 11 Cases of the Debtors and the cases of Armstrong World Industries, Inc., W.R. Grace & Co., Federal-Mogul Global, Inc., and USG Corporation, such responsibilities, including by way of example and not limitation, mediation of disputes, holding case management conferences, and consultation with counsel, as the District Court may delegate to them individually. The Consultants Order also provided that the District Court could, without further notice, appoint any of the Court-Appointed Consultants to act as a special master ("Special Master") to hear any disputed matter and to make a report and recommendation to the District Court on the disposition of such matter. By the same Order, the District Court ordered that the fees of the Court Appointed Consultants and Special Masters are to be borne by the Debtors in such manner and apportionment as the District Court or the bankruptcy court of each respective case may direct.

During the recusal proceedings, discussed below, the impartiality of certain of the Court Appointed Consultants was challenged based on their involvement in the Chapter 11 case of G-I Holdings, Inc. The Court Appointed Consultants as a group became functionally obsolete after May 2002, although Judge Wolin did not dismiss the Court Appointed Consultants by formal order.

(d) The Appointment of a Mediator

Consistent with the terms and purpose of the Consultants Order, on June 17, 2002, the Debtors filed a motion seeking an order appointing Professor Francis E. McGovern as mediator ("Mediator") *nunc pro tunc* to May 1, 2002, and directing the Mediator to report periodically to the District Court and Bankruptcy Court during the pendency of the Chapter 11 Cases on the status of the mediation process between the Committees. The Bankruptcy Court appointed Professor McGovern as Mediator, effective May 1, 2002, and ordered that the Mediator report periodically to the District Court and/or the Bankruptcy Court (as may be determined by the circumstances or by future orders of either court) on the status of the negotiations between the parties. The Bankruptcy Court further ordered that the Mediator not serve as Special Master to hear disputed matters and report to the Bankruptcy Court or the District Court on any matters on which he previously served as mediator, or on any matter materially related thereto, and not serve as Mediator on any disputed matter on which he previously heard and reported to the Bankruptcy Court or the District Court as a Special Master, or on any matter materially related thereto.

Pursuant to Judge Wolin's December 23, 2002 Order directing mediation, the Debtors, the Bank Holders, the Committee Representatives of the Interests of Bondholders and Trade Creditors, the Committees and the Future Claimants' Representative reported for mediation.

On June 16, 2004, the Debtors filed a certification of counsel, together with a stipulation and order (the "Stipulation") terminating the services of the Mediator, effective June 30, 2004 on the basis that the Mediator's duties had been fulfilled in the Chapter 11 Cases, with the exception of the mediation of property damage claims. On June 25, 2004, Kensington International Limited and Springfield Associates LLC, and Angelo Gordon & Co., on behalf of certain managed funds and accounts, filed a statement with respect to the Stipulation, but did not object to the termination of Professor McGovern.

(e) Proceedings Leading to the Recusal of Judge Wolin

On or about October 10, 2003, Kensington International Limited ("Kensington") and Springfield Associates, LLC ("Springfield") (collectively, the "Petitioning Bank Holders"), two assignees of lenders under OC's 1997 Credit Agreement, filed a motion to recuse Judge Wolin from further participation in the Chapter 11 Cases. On October 28, 2003, the Petitioning Bank Holders filed a Petition for Writ of Mandamus with the Third Circuit, seeking an order from the Third Circuit compelling Judge Wolin to recuse himself. Motions for recusal and petitions for mandamus were also filed by various parties in Grace and USG. The Third Circuit stayed all proceedings before Judge Wolin, which stay remained in effect until the conclusion of the recusal proceedings. The Plan Proponents and other parties in the Chapter 11 Cases, as well as various parties in Grace and USG, opposed the petitions. On December 18, 2003, after briefing and argument, the Third Circuit issued an opinion sending the matters back to Judge Wolin for expedited discovery, briefing, argument and decision. On February 2, 2004, Judge Wolin denied the various motions seeking his recusal.

After further briefing and argument, on May 17, 2004, the Third Circuit entered an order requiring Judge Wolin to recuse himself from further participation in the Chapter 11 Cases, Grace and USG, and vacated the stay of proceedings in the District Court.

(f) Designation and Assignment of Judge Fullam

Following the recusal of Judge Wolin, on May 27, 2004, the Third Circuit designated and assigned Judge John P. Fullam of the United States District Court for the Eastern District of Pennsylvania to the Chapter 11 Cases. The Third Circuit designated and assigned other judges to preside over the other asbestos bankruptcy cases that had previously been consolidated under the terms of the administrative consolidation before Judge Wolin, effectively terminating the consolidation.

### 12. Extension of Exclusive Right to File and Confirm a Plan

Section 1121(b) of the Bankruptcy Code provides for an initial 120-day period after the Petition Date within which the Debtors have the exclusive right to file a plan of reorganization in their cases (the "Exclusive Period"). Section 1121(c) of the Bankruptcy Code further provides for an initial 180-day period after the Petition Date within which the Debtors have the exclusive right to solicit and obtain acceptances of a plan filed by the Debtors during the Exclusive Period (the "Solicitation Period," and together with the Exclusive Period, the "Exclusive Periods"). Pursuant to the provisions of Section 1121 of the Bankruptcy Code, the Debtors' Exclusive Period expired on February 2, 2001, and the Solicitation Period expired on April 3, 2001.

By motions filed with the Bankruptcy Court, the Debtors have requested multiple extensions of the Exclusive Periods. The Debtors requested such extensions in light of the unique procedural posture of these cases and to afford the Debtors additional time to develop, negotiate and propose a plan of reorganization. In certain instances, certain creditor groups lodged limited objections and/or responses to the Debtors' request for extensions.

On December 23, 2002 Judge Wolin issued an Order partially withdrawing the reference and directed the Debtors to file their plan of reorganization on or before January 17, 2003. On January 17, 2003, the Debtors, together with the Asbestos Claimants' Committee and the Future Claimants' Representative, filed a plan within the Exclusive Period. On March 7, 2003, the Debtors filed a motion seeking extension of the Solicitation Period through September 30, 2003. By Order dated May 12, 2003, the Court extended the Solicitation Period to November 30, 2003. On March 13, 2003, the Debtors filed a motion seeking an extension from March 14, 2003, until March 31, 2003, to file their proposed disclosure statement. By Order dated April 22, 2003, the Court further extended until March 31, 2003 the Debtors' time to file their disclosure statement. The proposed disclosure statement was filed on March 28, 2003. Several hearings on the disclosure statement were held from June, 2003 through November 2003. On December 2, 2003, the Bankruptcy Court entered an Order approving the disclosure statement, subject in part to "the issuance of an order by the District Court, or such other court with appropriate jurisdiction after notice, that the Disclosure Statement shall be circulated for voting ...." Due to a series of events, including the issuance of a stay by the Third Circuit during the Recusal Proceedings, the litigation in the District Court regarding substantive consolidation and the subsequent appeal of the Substantive Consolidation Order, and asbestos claims estimation litigation, the previous disclosure statement and plan were not circulated for voting.

On September 29, 2005, the Debtors filed a request for an extension of the Exclusive Periods through and including January 31, 2006, without prejudice to the Debtors' right to seek further extensions. CSFB, as Agent, filed a limited objection to the motion and certain bondholders filed a response. By Order dated November 14, 2005, the Court extended the Exclusive Periods through and including January 31, 2006, without prejudice to (i) the Debtors' right to seek further extensions of the Exclusive Periods and (ii) the right of parties-in-interest to seek to terminate or modify the Exclusive Periods.

On or about the date hereof, the Debtors filed a request for a further extension of the Exclusive Periods, without prejudice to the Debtors' right to seek further extensions. The hearing on this request is scheduled for January 30, 2006.

**13. Extension of Time to Remove Actions**

The Debtors are parties to numerous judicial and administrative proceedings currently pending in multiple forums throughout the country (collectively, the "Actions"). The Actions involve a wide variety of claims. Pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027(a)(2), the Bankruptcy Court has entered orders extending the time period within which the Debtors may review Actions and determine whether to remove them to the District Court or the Bankruptcy Court. The date by which the Debtors must file notices of removal under Bankruptcy Rule 9027(a)(2)(A) has been extended through and including the later of (a) thirty (30) days after

confirmation of a plan of reorganization, or (b) thirty (30) days after the entry of an order terminating the automatic stay with respect to the particular action sought to be removed.

**14. Summary of Claims Process and Bar Dates**

(a) Schedules and Statements of Financial Affairs

As part of their first day motions, the Debtors filed a motion requesting additional time to file their SOFAS. Such motion was granted by Order of the Bankruptcy Court dated October 6, 2000, and the Debtors were granted an extension until November 24, 2000. On November 22, 2000, the Debtors filed separate SOFAS for OCD and each of the 17 Subsidiary Debtors. Among other things, the SOFAS set forth the Claims of known creditors against each of the Debtors as of the Petition Date, based upon the Debtors' books and records.

On November 20, 2001, the Debtors filed Amended and Restated Schedules of Assets and Liabilities (the "Amended Schedules") for OCD and each of the 17 Subsidiary Debtors. The Amended Schedules amended and wholly superseded the Schedules filed by the Debtors in November 2000. Revisions to the Amended Schedules were filed on January 30, 2002 for certain of the Debtors.

Exclusive of asbestos-related personal injury and wrongful death claims, the total amount of liabilities listed in the Debtors' Amended Schedules was approximately $8,470 million, consisting of $1,460 million of pre-petition bank debt; $1,338 million of pre-petition bond debt; $190 million of pre-petition trade debt; $10 million of pre-petition tax debt; and $5,270 million in pre-petition intercompany debt and $212 million in other pre-petition debt.

(b) General Claims Bar Date and Proofs of Claim

The Bankruptcy Court set April 15, 2002 as the last date by which holders of certain pre-petition Claims against the Debtors were required to file Proofs of Claim (the "General Bar Date"). The General Bar Date did not apply to certain claims, including intercompany claims, Asbestos Personal Injury Claims other than OC Indirect Asbestos PI Trust Claims and FB Indirect Asbestos PI Trust Claims. Pursuant to Order of the Bankruptcy Court dated November 27, 2001, any holder of a Claim that was required to but failed to file a Claim on or before the General Bar Date was barred from asserting such Claim against any of the Debtors and will not participate in any distribution in the chapter 11 Cases on account of such Claim.

Pursuant to notice procedures approved by the Bankruptcy Court, the Debtors sent approximately 204,000 Proof of Claim forms and notices of the General Bar Date to known claimants and their attorneys, and published notice of the General Bar Date twice in the national and (if applicable) international editions of *The New York Times, The Wall Street Journal* and *USA Today*; once in approximately 250 regional or local newspapers in the areas in which the Debtors had significant business operations at the time of publication; and once in approximately 35 trade publications in the primary lines of business in which the Debtors operate or formerly operated.

In response to the General Bar Date, approximately 25,000 Proofs of Claim, including late-filed claims, were filed with the Claims Agent and/or Bankruptcy Court, asserting approximately $16.6 billion of aggregate liabilities. The Debtors are investigating these claims to determine their validity. As to the obligations under the 1997 Credit Agreement, the claim total reflects only a single claim (in the amount of approximately $1.6 billion) although the holders have asserted this claim against Owens Corning and each of six other Debtors that issued a guarantee with respect to the 1997 Credit Agreement.

As of September 30, 2005, the Debtors had identified approximately 16,000 claims, asserting approximately $8.6 billion of aggregate liabilities, which they believed should be disallowed by the Bankruptcy Court, primarily because such claims appear to be duplicate or amended claims or claims that are not related to any of the Debtors' cases (the "Currently Disputed Claims"). Owens Corning has filed omnibus objections to certain of these Currently Disputed Claims and likely will file additional objections. As of September 30, 2005 approximately 7,000 of the Currently Disputed Claims totaling approximately $5.7 billion had either been disallowed by the Bankruptcy Court or withdrawn by the claimants. In addition, other Currently Disputed Claims had been voluntarily reduced by the claimants by approximately $1.8 billion. While the Bankruptcy Court will ultimately determine liability amounts, if any, that will be allowed as part of these Chapter 11 Cases, the Debtors believe that all or substantially all of these claims will be disallowed.

As of the date of the filing of this Disclosure Statement, the Debtors have filed thirty-eight omnibus claim objections, as well as individual objections to various other specific proofs of claim.

In addition to the Currently Disputed Claims described above, the remaining Proofs of Claim included approximately 9,000 claims, totaling approximately $8.0 billion. As of September 30, 2005 approximately 1,000 of the remaining claims totaling approximately $0.4 billion had either been withdrawn by the claimants, disallowed by the Bankruptcy Court, or otherwise resolved, and other such claims had been reduced by the claimants by approximately $0.3 billion. The remaining claims consist of:

- Approximately 2,900 OC Indirect Asbestos PI Trust Claims and FB Indirect Asbestos PI Trust Claims, totaling approximately $1.4 billion of asserted liabilities.

- Approximately 100 OC Asbestos Property Damage Claims, OC Indirect Asbestos Property Damage Claims, FB Asbestos Property Damage Claims and FB Indirect Asbestos Property Damage Claims. Based upon their historic experience with respect to asbestos-related property damage claims, the Debtors do not anticipate significant liability from such claims. See discussion, below.

- Approximately 5,000 claims, totaling approximately $5.3 billion, alleging rights to payment for financial, environmental, trade and other matters (the "General Claims"). The Company has previously recorded approximately $3.5 billion in liabilities for these claims. The General Claims with the largest variance from the recorded amounts are: claims by the United States

Department of Treasury, totaling approximately $538 million, in connection with taxes; a contingent claim for approximately $458 million by the Pension Benefit Guaranty Corporation (the "PBGC"); claims for contract rejections, totaling approximately $95 million, of which approximately $28 million are protective claims covering contracts which have not yet been rejected by the Debtors; a $275 million class action claim involving alleged problems with a specialty roofing product, which claim the Debtors do not believe is meritorious based upon their historic experience with servicing their warranty program for such product; and environmental claims, totaling approximately $109 million.

As indicated, the above-cited date reflects claim status as of September 30, 2005. See Appendix E-1, for claims data as of November 30, 2005.

(c) Asbestos Property Damage Claims

Holders of OC Asbestos Property Damage Claims were required to file Proofs of Claim by the April 15, 2002 General Bar Date. OCD received over 300 property damage Proofs of Claim. Of these, approximately 65 claims asserted aggregate damages of approximately $730 million, including the claim of the State of Louisiana in the amount of $582 million. The remaining claims did not provide a claimed amount and provided almost no documentation to support their claim or to allow the Debtors to estimate the value of their claim. On January 7, 2003, the Debtors filed a motion for an order establishing case management procedures for asbestos-related property damage claims requesting that property damage claimants be required to provide the Debtors with basic supporting evidence to enable the Debtors to value their claims. On March 31, 2003, the Bankruptcy Court entered an Order Establishing Case Management Procedures for Asbestos-Related Property Damage Claims (the "Asbestos-Related Property Damage Case Management Order") which required, in part, that each holder of an OC Asbestos Property Damage Claim provide the Debtors with certain supporting evidence within 120 days of the date of the Order to enable the Debtors to value their claims. Many OC Asbestos Property Damage claimants failed to respond to the Asbestos-Related Property Damage Case Management Order. Following the dismissals of those claims by the Bankruptcy Court, as well as voluntary withdrawals of numerous other OC Asbestos Property Damage Claims, approximately 35 claims remained against OCD.

On July 8, 2005, the Bankruptcy Court dismissed the OC Asbestos Property Damage Claim of the State of North Dakota on the grounds that it was barred by a North Dakota statute that required all State of North Dakota asbestos property damage claims to be brought by August 1, 1997. Since North Dakota's claims against Owens Corning were not brought until 2002, the Bankruptcy Court ruled that the claim was untimely. Claimant North Dakota appealed that order, which was affirmed by the District Court (Fullam, J.) on October 11, 2005. North Dakota filed a Notice of Appeal to the Third Circuit. OC believes the appeal is without merit and will oppose the appeal.

On September 29, 2005, the Bankruptcy Court entered the Revised Order Establishing Case Management Procedures For Asbestos-Related Property Damage Claims (the "Revised Order Establishing Case Management Procedures For Asbestos-Related Property

Damage Claims") which, in part, set deadlines for the production of supporting information by the remaining Property Damage Claimants.

As a result of dismissals, voluntary withdrawals and 20 settlements in principle for an aggregate value of $100,000, there are as of the date of this Disclosure Statement approximately six remaining Property Damage Claims against OCD with a claimed value of $74.3 million. Prior to the Petition Date, OCD had six pending property damage claims, four of which had been dormant for several years, and had resolved 93% of all property damage claims against it for $0 per claim. The Debtors also note that in other asbestos bankruptcies in which hundreds of property damage claims were filed, such claims were resolved for substantially less than the claimed amounts. For example, Eagle-Picher Industries received 1,000 property damage proofs of claim asserting $11.5 billion and its plan of reorganization provided only $3 million to resolve such claims. More recently, Armstrong settled 360 property damage claims (four of which alone asserted claims in excess of $200 million), for $2 million. Given the lack of information, the remaining OC Asbestos Property Damage Claims at this time, the Debtors cannot estimate the likely amount of Allowed OC Asbestos Property Damage Claims with certainty, but believe that such claims will likely be allowed in the aggregate range between $1 million and $5 million. This estimated amount may be revised based on Debtors' analysis of the information provided pursuant to the Revised Order Establishing Case Management Procedures for Asbestos-Related Property Damage Claims.

Holders of FB Asbestos Property Damage Claims were required to file Proofs of Claim by the General Bar Date. Fibreboard received over 275 property damage Proofs of Claim, 26 of which collectively asserted damages in excess of $592 million. One of these claims was filed by the State of Louisiana in the amount of $582 million. The State of Louisiana also filed a claim in the same amount against OCD, but the Debtors understand that the State of Louisiana believes it has a single claim against the Debtors in the aggregate amount of $582 million. The Bankruptcy Court dismissed 11 of these claims after the Debtors filed objections. The remaining claims did not state a claimed amount and provided almost no documentation to support their claim or to enable Fibreboard to estimate the value of their claims. The Debtors filed a motion for a case management order requesting that property damage claimants be required to provide the Debtors with basic supporting evidence to enable the Debtors to value their claims. On March 31, 2003, the Court entered Asbestos-Related Property Damage Case Management Order which required, in part, that each holder of an FB Asbestos Property Damage Claim provide the Debtors with certain supporting evidence within 120 days of the date of the Order to enable the Debtors to value their claims. Many FB Asbestos Property Damage claimants failed to respond to the Asbestos-Related Property Damage Case Management Order. Following the dismissals of those claims by the Bankruptcy Court, as well as voluntary withdrawals of numerous other OC Property Damage Claims, approximately 30 claims remained against Fibreboard.

On July 8, 2005, the Bankruptcy Court dismissed the FB Asbestos Property Damage Claim of the State of North Dakota on the grounds that it was barred by a North Dakota statute that required all State of North Dakota asbestos property damage claims to be brought by August 1, 1997. Since North Dakota's claims against Fibreboard was not brought until 2002, the Bankruptcy Court ruled that the claim was untimely. Claimant North Dakota appealed that order, which was affirmed by the United States District Court for the Eastern District of Pennsylvania (Fullam, J.) on October 11, 2005. North Dakota filed a Notice of Appeal to the

United States Court of Appeal for the Third Circuit. Fibreboard believes the appeal is without merit and will oppose the appeal.

On September 29, 2005, the Bankruptcy Court entered the Revised Order Establishing Case Management Procedures For Asbestos-Related Property Damage Claims (the "Revised Order Establishing Case Management Procedures For Asbestos-Related Property Damage Claims") which, in part, set deadlines for the production of supporting information by the remaining Property Damage Claimants.

As a result of dismissals, voluntary withdrawals and 21 settlements in principle for an aggregate value of $105,000, there are as of the date of this Disclosure Statement approximately four remaining Property Damage Claims against FB with a claimed value of approximately $3.4 million. As of the Petition Date, only six property damage claims were pending against Fibreboard, four of which had been dormant for more than five years. Prior to the Petition Date, Fibreboard had resolved 92% of all property damage claims against it for $0 per claim. Fibreboard also notes that in other asbestos bankruptcies in which hundreds of property damage claims were filed, such claims were resolved for substantially less than the claimed amounts. For example, Eagle-Picher Industries received 1,000 property damage proofs of claim asserting $11.5 billion and its plan of reorganization provided only $3 million to resolve such claims. More recently, Armstrong World Industries settled 360 property damage claims (four of which alone asserted claims in excess of $200 million), for $2 million. Of these settled claims, 144 were also asserted against Fibreboard. Given the lack of information on the remaining FB Asbestos Property Damage Claims at this time, the Debtors cannot estimate the likely amount of Allowed FB Asbestos Property Damage Claims with certainty, but believe that such claims will likely be allowed in the aggregate range between $1 million and $3 million. This estimated amount may be revised based on Debtors' analysis of the information provided pursuant to the Revised Order Establishing Case Management Procedures for Asbestos-Related Property Damage Claims.

(d) Asbestos Personal Injury Claims Bar Date and Proofs of Claim

As indicated above, the General Bar Date did not apply to asbestos-related personal injury and asbestos-related wrongful death claims, although it did apply to asbestos property damage claims, OC Indirect Asbestos PI Trust Claims and FB Indirect Asbestos PI Trust Claims. A bar date for filing Proofs of Claim against the Debtors with respect to these types of Claims has not been set. Despite this, approximately 3,300 Proofs of Claim in addition to the Claims described above, totaling approximately $2.6 billion, were filed in response to the General Bar Date on account of asserted asbestos-related personal injury and asbestos-related wrongful death claims.

On April 11, 2003, the Unsecured Creditors' Committee filed a Motion for Order Establishing a Bar Date for Filing Proofs of Claim for Asbestos Claims ("Asbestos Bar Date Motion"), requesting an order establishing a bar date for Asbestos Personal Injury Claims. By Order dated April 25, 2003, Judge Wolin withdrew the reference with regard to the Asbestos Bar Date Motion. The proceedings with regard to the Motion were also stayed pending further Order of the District Court before responses were due. This matter was stayed when the Third Circuit issued an Order staying actions by the District Court during the pendency of the recusal

proceedings. Following the designation and assignment of Judge Fullam, on July 27, 2004, CSFB filed a Joinder and Supplement to the Bar Date Motion and the Plan Proponents filed an Opposition.

In the Bar Date Motion and Joinder and Supplement, the supporters of the Bar Date Motion asserted that the Debtors should implement procedures requiring holders of Asbestos Personal Injury Claims to provide evidence with respect to the claims in the manner in which holders of OC Asbestos Property Damage Claims are required to file claims and provide evidence. The Plan Proponents asserted that there were valid reasons for the different approaches to these claims including the fact that prior to the Petition Date, OC had only six property damage claims, four of which had been dormant for over five years, while it faced hundreds of thousands of pending and future Asbestos Personal Injury Claims. In addition, the Plan Proponents noted that the OC Asbestos Property Damage Claims will not be channeled to a trust and will receive distributions as Class A6-A Claims. In order to resolve these claims and reduce reserves needed to be maintained for Disputed Claims, the Debtors commenced the process of analyzing the OC Asbestos Property Damage Claims as part of the claims review and objection process. Because the determination of Asbestos Personal Injury Claims will be governed by the Asbestos Personal Injury Trust Distribution Procedures after confirmation, as required by Section 524(g), the Plan Proponents contend that there is no valid reason for the Debtors to supplant the function of the Asbestos Personal Injury Trust Distribution Procedures.

On August 2, 2004, CSFB filed a motion seeking to withdraw the reference of the Chapter 11 Cases and to refer to the Bankruptcy Court only specified matters. The Debtors, the Future Claimants' Representative and the Asbestos Claimants' Committee filed oppositions to this motion. On August 19, 2004, the District Court (Fullam, J.) heard argument on CSFB's motion to withdraw the reference. On August 19, 2004, the District Court entered an order withdrawing the reference only with respect to the asbestos valuation process, including discovery and scheduling issues. That same day, the District Court entered a scheduling order for the claims estimation hearing which stated that data previously available including Debtors' claim history, its experience in other cases, viewed in light of the expert testimony at the scheduled hearing "should probably suffice" for claims estimation purposes. The Order by the District Court added that if it determined that additional information was needed, it would reconsider its Order. No such reconsideration occurred. A hearing on estimation commenced on January 13, 2005. The District Court issued an Order in the claims estimation hearing on March 31, 2005 without revisiting whether additional information was required. Thus, the issuance of a decision without reconsideration of its earlier ruling in effect denied the Asbestos Bar Date Motion.

**(e) Claim Summaries**

The Debtors have recorded liability amounts for those claims that can be reasonably estimated and which they believe are probable of being allowed by the Bankruptcy Court. At this time, it is impossible to reasonably estimate the value of all the claims that will ultimately be allowed by the Bankruptcy Court, due to the uncertainties of the Chapter 11 process, the in-progress state of the Debtors' investigation of submitted claims, and the lack of documentation submitted in support of many claims. The Debtors continue to evaluate claims filed in the Chapter 11 Cases and will make such adjustments as may be appropriate.

Although the Debtors' review of all Claims filed is anticipated to be completed after the Confirmation Date, based on their analysis of the Claims thus far, the Debtors have estimated the Claims that are likely to become Allowed Claims. Such estimates have been prepared on a Debtor-by-Debtor and Class-by-Class basis and are attached hereto as Appendix E-1. As further described in Appendix E-1, the Debtors' assignment of Claims as the obligations of specific Debtors has been undertaken in light of the Third Circuit's reversal of the District Court's Substantive Consolidation Order, described in Section V.F.11(b)(1). The assignment has been made based upon the Debtors' books and records and the Debtors' review of the Claims. Nothing contained in Appendix E-1 is intended to restrict or otherwise affect any creditor's right to contest any objection by the Debtors to any Claim, including without limitation any objection seeking to have one or more Claims determined to be Allowed against a Debtor which is additional or different than the Debtor to which the Debtors have assigned the Claim.

In addition to Claim amounts discussed above, the Amended Schedules reflected approximately $5,270 million of pre-petition intercompany indebtedness owed by Debtors as of the Petition Date. This intercompany indebtedness is set forth on Appendix E-2 hereto. No bar date has been set for intercompany indebtedness and the Debtor, reserve the right to revise these amounts and/or amend their SOFAs. Moreover, the amounts set forth on Appendix E-2 may be revised on account of pre-petition intercompany indebtedness owed by Debtors for allocations of overhead or expenses, including without limitation, management cost and taxes, among the Debtors.

**NOTWITHSTANDING THE DEBTORS' ESTIMATES, THE ACTUAL AMOUNT OF CLAIMS AGAINST THE DEBTORS THAT ULTIMATELY BECOME ALLOWED CLAIMS WITH RESPECT TO ANY DEBTOR OR ANY CLASS COULD MATERIALLY EXCEED THE AMOUNTS SET FORTH ON APPENDIX E-1 AND/OR E-2, AND IN SUCH EVENT, THE ESTIMATED PERCENTAGE RECOVERIES FOR HOLDERS OF SOME OR ALL CLAIMS COULD BE MATERIALLY LESS THAN AS ESTIMATED IN THIS DISCLOSURE STATEMENT.**

**15. Plant Insulation Company Motion to Appoint Examiner**

On September 28, 2001, Plant filed a motion (the "Plant Motion") under Section 1104(c)(2) of the Bankruptcy Code for an order appointing a disinterested examiner to conduct an examination of Fibreboard, including an investigation as to whether Fibreboard assets were diverted to pay OCD debts. Plant alleged that funds which were purportedly set aside for payment of Fibreboard's asbestos liability had been diverted to pay for certain liability of OCD, or, that when OCD and Fibreboard entered into various joint settlements for liability, disproportionate liability was assessed to Fibreboard. Plant argued that the appointment of an examiner was mandatory pursuant to Section 1104(c)(2) of the Bankruptcy Code, which provides, in part, that "on request of a party in interest…the court shall order the appointment of an examiner to conduct…an investigation of the debtor as is appropriate…if…the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000." Plant argued that an examiner should be appointed because Fibreboard's fixed, liquidated, unsecured asbestos debts exceeded $5 million and because there was allegedly

reason to believe that assets of the Fibreboard Insurance Settlement Trust had been diverted to help pay OCD's asbestos debts.

The Plant Motion was opposed by the Debtors, the Future Claimants' Representative, the Unsecured Creditors' Committee and the Asbestos Claimants' Committee, all of which filed an objection and/or response to the Plant Motion. A fundamental dispute between Plant and the responding parties was whether Section 1104(c)(2) of the Bankruptcy Code is a mandatory provision which allegedly requires the Bankruptcy Court to appoint an examiner if the $5 million debt threshold is satisfied, or whether the Court retains discretion to deny a request for the appointment of an examiner under these circumstances. The United States Trustee also filed a response to the Plant Motion, stating its position that if the $5 million debt threshold of Section 1104(c)(2) of the Bankruptcy Code is satisfied, the appointment of an examiner is mandatory.

Following a hearing, the Bankruptcy Court denied the Plant Motion for the appointment of an examiner without prejudice, by Order entered March 22, 2002.

On March 27, 2002, Plant filed a notice of appeal of the Bankruptcy Court's Order. By Order dated December 4, 2002, Judge Wolin granted Plant's appeal and further ordered that "the Order of the Bankruptcy Court denying Plant's application for the appointment of an examiner on the ground that no motion for a trustee had been denied by the Bankruptcy Court is hereby vacated solely on the ground upon which it was based...." The District Court remanded the matter to the Bankruptcy Court for further proceedings on Plant's motion for the appointment of an examiner.

On remand, the Bankruptcy Court directed the parties to file supplemental briefs and, following a hearing on April 8, 2003, the Court entered an Order for the Appointment of an Examiner. The Order directed the United States Trustee to appoint, subject to the Court's approval, one disinterested person to serve as an examiner and further ordered that "the examiner is not to perform any task or take up any duty or in any way perform any work or incur cost to the estate without further order of the Court."

On May 2, 2003, Plant filed an appeal of the Order appointing an examiner. On May 5, 2003, Shirley Gore, an individual asbestos claimant, also filed an appeal, although this appeal is not docketed in the District Court. The Debtors and the Futures Claimants' Representative are opposing the appeal. The Plant appeal was docketed in the District Court on October 20, 2003, shortly before the Third Circuit issued its stay of all proceedings before Judge Wolin in the recusal proceedings. Even though the Third Circuit's stay is no longer in effect, no further action has occurred with respect to these appeals.

**16. Environmental Claims Arising Under Environmental Laws**

The Debtors have been deemed by the United States Environmental Protection Agency ("<u>EPA</u>") to be a Potentially Responsible Party ("<u>PRP</u>") with respect to certain third-party sites under the Comprehensive Environmental Response, Compensation and Liability Act ("<u>Superfund</u>"). The Debtors have also been deemed a PRP under similar state or local laws. In other instances, other PRPs have made Claims against the Debtors as a PRP for contribution under such federal, state or local laws or under contractual agreements.

The Debtors have established reserves for their Superfund (and similar state, local and private action) contingent liabilities. In connection with the Filing, the Debtors have initiated a program to identify and discharge contingent environmental liabilities as part of their Plan. Under the program, the Debtors sought settlements, subject to approval of the Bankruptcy Court, with various federal, state and local authorities, as well as private claimants. The Debtors will continue to review environmental reserves in light of such program and make such adjustments as may be appropriate.

The Debtors are involved with environmental investigation or remediation at a number of other sites at which they have not been designated a PRP, particularly sites that they formerly owned or operated. Environmental conditions at currently owned and/or operated sites are being addressed in the ordinary course of the Debtors' business.

As of the General Bar Date, approximately 100 Proofs of Claim asserting liabilities arising under environmental laws had been filed with the Bankruptcy Court. Many of such Proofs of Claim did not state a dollar amount. Many of the Proofs of Claim that did state an amount assert liabilities beyond which the Debtors believe they could reasonably be held liable, if any liability exists, in that (a) they seek recovery of the total costs of cleanup at sites where numerous parties other than the Debtors were also jointly and severally liable, or (b) they originated from multiple parties potentially liable at the same site. Claims arising under environmental laws relating to conduct of the Debtors before the Petition Date consisted of (a) Claims by the EPA against the Debtors for the costs of environmental investigation and clean up of sites that may have been contaminated as a result of releases of hazardous substances by the Debtors, including releases at third-party disposal sites used by the Debtors; (b) similar Claims by State and local environmental agencies; (c) Claims by private parties against the Debtors asserting contribution or indemnification claims with respect to cleanup costs under statutory law or contractual agreements; and (d) enforcement actions by federal, state and local environmental authorities with respect to alleged violations of environmental laws. The Debtors have been involved in negotiations to resolve as many of these Claims as possible. As of the present date, nearly half of the Claims have been resolved. In addition, in some cases where a Proof of Claim has not been filed, but where regulatory authorities are likely to exercise their police and regulatory authority against the Debtors with respect to environmental conditions, such as sites currently or formerly owned by the Debtors, the Debtors have been negotiating with regulatory authorities regarding environmental investigation and remediation.

(a) Resolved as Allowed Class A6-A Claims

(i) EPA Claims

The Debtors and the EPA signed a proposed agreement to resolve EPA's Claims at most of the sites where waste materials of the Debtors were disposed before the Petition Date and, consequently, for which the Debtors may be liable for cleanup and related costs. The proposed Environmental Settlement Agreement between the Debtors and the EPA quantifies liability at existing known sites as pre-petition Claims, with respect to some of which the EPA would have an Allowed Class A6-A Claim (the "<u>Liquidated Sites</u>"). The proposed Environmental Settlement Agreement with the EPA also contains a provision that waste disposal sites, used by the Debtors before the Petition Date, that are not discovered until after

confirmation of the Plan or where the Debtors' use of the site has been confirmed but an allocable share of liability cannot yet be determined (known as "Additional Sites"), will be paid by the Reorganized Debtors at the rate of distribution for Allowed Class A6-A Claims. The proposed Environmental Settlement Agreement also contains work plans for limited removal actions by the Debtors at two Rhode Island sites. The United States has lodged the proposed Environmental Settlement Agreement with the Court and published a notice of the lodging in the Federal Register on June 5, 2003. On June 17, 2003, the Debtors filed a Motion for Approval of Settlement of Environmental Claims of the United States (the "EPA Settlement Motion"). On July 17, 2003, the United States filed a joinder in support of the EPA Settlement Motion. The Court approved the EPA Settlement Motion on July 23, 2003. The Debtors completed the limited removal action required by the Environmental Settlement Agreement in September 2005.

(ii) State Claims

The Debtors have negotiated an Environmental Settlement Agreement similar to the Environmental Settlement Agreement with the EPA, discussed above, with the State of New York, where the Debtors conducted operations, which agreement covers only that State's costs at sites that are presently unknown. The Debtors also negotiated settlement agreements with the Texas Commission on Environmental Quality and the City of Tacoma. The Debtors are currently negotiating a similar settlement agreement with the Ohio Environmental Protection Agency.

(iii) Private Party Claims

The Debtors have settled various Claims covering various formerly owned properties (Ashton, Rhode Island, Snyder Lumber Sites and Gardena, California) or prior waste disposal sites (GBF Site).

(iv) Enforcement Action Claims

The Debtors have resolved most prepetition environmental actions, including an Ohio air settlement ($201,633), a Colorado air settlement ($9,000) and a federal Clean Water settlement ($40,000).

(b) Claims Arising Under Environmental Laws Involving Formerly owned Properties Resolved as Administrative Claims

The Debtors resolved the following claims: Oregon Department of Environmental Quality for the former St. Helens Plant ($900,000) and Industry factory rental for the former Ashton Plant ($75,000).

(c) Unresolved Claims Arising Under Environmental Laws

(i) State Claims

The Debtors have been engaged in extensive negotiations with the Rhode Island Department of Environmental Management ("RIDEM") regarding its Proof of Claim in the amount of $80 million with respect to five sites in Rhode Island where alleged

releases of hazardous substances by the Debtors may have contributed to contamination. In an effort to focus settlement negotiations, the Debtors have recently completed a limited investigation of environmental conditions at the Dupraw and Mackland Farms sites and an investigation to identify other parties that used that site for waste disposal. Discussions with Rhode Island regarding its Proof of Claim are ongoing.

The Debtors have also been engaged in extensive negotiations with the New Jersey Department of Environmental Protection ("NJDEP") regarding its Proof of Claim in the amount of approximately $74 million, concerning the BEMS landfill in Burlington, a multi-party waste disposal site used by the Debtors. Ongoing litigation may continue beyond the Debtors' emergence from bankruptcy. The Debtors are participating in an Alternative Dispute Resolution process to determine their share of BEMS liability.

The Kansas Department of Health and Environment ("KDHE") has filed a Proof of Claim in the amount of approximately $1.9 million with respect to remedial costs at a landfill previously operated by the City of Kansas City and used for disposal by the Debtors and a number of other parties. The Debtors have been engaged in discussions with KDHE regarding this Claim and at this point, the Debtors expect that this Claim, and a related Claim by the Kansas National Guard, may require an estimation proceeding.

The State of California has filed a Proof of Claim in the amount of $40 million with respect to costs at two disposal sites: Operating Industries, Inc. and the GBF landfill. The Debtors believe that the State's claim is without merit because, in each case, the Debtors have resolved their liability for cleanup costs through settlements with the EPA or private parties.

Liabilities arising from environmental conditions at properties currently owned and operated by the Debtors are not generally subject to discharge and may need to be satisfied as Administrative Claims or by the Debtors after emergence from bankruptcy. On that basis, the Oklahoma Department of Environmental Quality has withdrawn a protective Proof of Claim regarding site conditions at the Debtors' facility in Oklahoma City, which the Debtors expect to resolve.

(ii) Private Party Claims

At the request of a Berlin Borough official, the Debtors and Owens-Illinois agreed to investigate the New Freedom Rd. Landfill, a former waste site believed to have been used by both companies in the 1950's. A Proof of Claim in an undetermined amount was filed by Owens-Illinois regarding cleanup costs which may be incurred.

Several other private parties have filed Proofs of Claim for alleged contribution obligations with respect to a few different sites, but none of these claims is for any material amount, even without taking into account the Debtors' grounds for objecting to them.

The Debtors believe that the following Claims by private parties arising under environmental laws are without merit, and the Debtors intend to object to them: a Proof of Claim based on contribution for cleanup costs with respect to the Dexter Quarry site in the amount of $5,000,000 by the estate of the former owner/operator; a Proof of Claim in the

amount of $3,000,000 by Akzo Nobel Coatings, Inc. seeking indemnification for cleanup costs that it incurred with respect to the Mercer Drum site in Ohio; a Proof of Claim by GE Glegg alleging damages for soil and groundwater contamination in the vicinity of the Debtors' former Guelph, Ontario plant; a Proof of Claim by Bigge Investors in the amount of $350,000 regarding environmental conditions on property sold to it by the Debtors based on allegations of fraud in the sale; Proofs of Claim in the amount of approximately $4,000,000 by Wallace Development/Bezley based on allegations of fraud in the sale by Debtors of industrial real estate in California; and a Proof of Claim by Dr. and Mrs. Gregory Pharo alleging diminished value of their residence due to the nearby presence of Debtors' Aerohaven landfill.

**17. IRS Claims**

The Company's federal income tax returns typically are audited by the IRS in multi–year audit cycles. The audit for the years 1992–1995 was completed in late 2000. Due to the Filing, the IRS also accelerated and completed the audit for the years ended 1996–1999 by March of 2001. As the result of these audits and unresolved issues from prior audit cycles, the IRS is asserting claims for $305,210,712 in income taxes plus interest of $174,997,818.

Pending audit of the Company's federal income tax return for the year 2000, the IRS has also filed a protective administrative claim in the amount of $57,830,624, covering a tax refund received by the Company for such year, plus interest.

The United States Department of Treasury has filed Proofs of Claim totaling approximately $538 million, in connection with these tax claims. The United States Tax Court lifted its Stay of Proceedings regarding taxable years 1986 - 1988 on October 6, 2005, and entered its Decision on October 11, 2005. As a result, the IRS should be in a position to amend its claim for the taxable years 1982 - 1999 to reflect the actual, agreed to tax deficiencies. The interest on the deficiencies for this period has not yet been finalized by the IRS.

In accordance with generally accepted accounting principles, the Company maintains tax reserves to cover audit issues. While the Company believes that the existing reserves are appropriate in light of the audit issues involved, its defenses, its prior experience in resolving audit issues, and its ability to realize the benefit of certain challenged deductions in subsequent tax returns if the IRS is successful, there can be no assurance that such reserves will be sufficient. The Company will continue to review its tax reserves on a periodic basis and to make such adjustments as may be appropriate. Any such revision could be material to the Company's consolidated financial position and results of operations in any given period.

In this regard, the Company has negotiated a settlement of the United States federal income tax audits of the Company's taxable years 1982 - 1999 at the Appeals level of the IRS. The settlement was approved by the Bankruptcy Court by Order dated November 15, 2004, and by the Congressional Joint Committee on Taxation on May 17, 2005. The IRS is currently in the process of implementing the settlement, including performing its calculation of the interest component, which could vary from the amount of interest as calculated by the Company. As part of the implementation of the settlement described above, the filed Proofs of Claim will be amended appropriately.

**18. Asset Dispositions**

Section 363(f) of the Bankruptcy Code authorizes a debtor, under certain circumstances and subject to approval of the Bankruptcy Court, to sell property of the estate free and clear of liens, claims and encumbrances, with such liens, claims and encumbrances to attach to the proceeds of sale. Since the Petition Date, the Debtors have, pursuant to section 363(f) of the Bankruptcy Code, sold certain property, including, but not limited to, the following assets.

(a) Sale of Bradenton, Florida Plant Assets

Exterior Systems, Inc. designed and manufactured aluminum windows and patio doors products at a plant located at 4504 30th Street, W., Bradenton, Florida. Unfortunately, due to a number of factors, including the older technology employed at the plant, Exterior Systems, Inc. was unable to operate the plant profitably. As a result, the Debtors contemplated selling the plant assets or, if a sale could not be consummated, closing the plant to limit their losses.

Throughout the year 2002, the Debtors contacted and solicited levels of interest for the purchase of the plant from potential purchasers that would have an interest in such assets. Simonton Building Products, Inc. was determined to be the only viable purchaser, and the parties entered into an Asset Sale and Purchase Agreement, dated December 17, 2002, with a sale price of $4,351,500, subject to certain adjustments and other calculations. The parties also agreed to enter into a lease agreement pursuant to which the plant will be leased to the buyer and to enter into a supply agreement.

On December 19, 2002, the Debtors filed a motion seeking authorization to sell the assets to Simonton Building Products, Inc. The motion was granted and the sale was approved by Order of the Bankruptcy Court, dated January 27, 2003.

(b) Sale of Real Property in South Gate, California

OCD owned an approximately 6.9 acre parcel of real property located at 4452 Ardine Street in South Gate, California, on which there was situated an outdated manufacturing facility. The Debtors' only use of the property was the storage of product manufactured at a nearby plant, for which they were in the process of securing other storage facilities. Accordingly, OCD engaged a broker and ultimately entered into Purchase and Sale Agreement, dated December 10, 2002, with Chan Hwa Trading Corporation, as buyer, for a sale price of $4,250,000.

On December 19, 2002, the Debtors filed a motion seeking authorization to sell the property to Chan Hwa Trading Corporation. The motion was granted and the sale was approved by Order of the Bankruptcy Court, dated January 27, 2003.

(c) Sale of Atlanta, Georgia Plant Assets

Exterior Systems, Inc. designed and manufactured vinyl siding and related products at leased facilities located at 5625, 5655 and 5675 Fulton Industrial Boulevard in Atlanta, Georgia. As part of an ongoing review of its business operations, Exterior Systems, Inc.

decided to reduce the excess capacity in its vinyl siding operations and to reduce the number of competing brands offered. To that end, the Debtors made a formal announcement in the fall of 2002 to discontinue the manufacture and sale of the OC brand of vinyl siding products, which were manufactured only at the Atlanta plant. Several potential purchasers in the vinyl siding manufacturing business expressed an interest in acquiring the assets of the plant. Alcoa Home Exteriors, Inc. was the only party that submitted an offer to acquire the ongoing operations of the plant, including hiring essentially all of the plant's employees. The proposal also contemplated an assignment of the real estate leases of the subject premises. The parties ultimately entered into an Asset Purchase Agreement, dated January 15, 2003, for a sale price of $5.5 million.

On January 15, 2003, the Debtors filed a motion seeking authorization to sell the assets to Alcoa Home Exteriors, Inc. The motion was granted and the sale was approved by Order of the Bankruptcy Court, dated February 27, 2003.

(d) Sale of Real Property in Mishawaka, IN

As of the Petition Date, OCD owned approximately 14.43 acres of vacant land located at 1623 E. Jefferson Road, Mishawaka, Indiana. OCD determined that it did not need the property for its operations and accordingly engaged in efforts to sell the property. OCD entered into a Purchase and Sale Agreement with S & D Realty, LLC, as buyer, for a sale price of $200,000. Such Purchase and Sale Agreement was approved by the Bankruptcy Court by Order dated February 27, 2003.

(e) Sale of Real Property in Nappannee, Indiana

Exterior Systems owned real property located at 851 Tomahawk Drive, Nappannee, Indiana, at which the Debtors had ceased their equipment reconditioning activity. Before a brokerage firm could be engaged, an adjoining property owner expressed an interest in purchasing the property. Based on the opportunity for an immediate sale without the associated cost of a broker's commission and marketing time, Exterior Systems, Inc. negotiated and entered into a Purchase and Sale Agreement, dated March 17, 2003, with Dutch Real Estate Corp., as buyer, for a sale price of $476,000.

On March 19, 2003, the Debtors filed a motion seeking authorization to sell the property to Dutch Real Estate Corp. The Debtors also sought in the motion authorization to pay from the sale proceeds certain real estate taxes totaling approximately $14,196.73 in principal. The motion was granted and the sale was approved by Order of the Bankruptcy Court, dated April 24, 2003.

(f) Sale of Phenix City, Alabama Plant Assets

Owens Corning HT, Inc. ("OCHT") owned a plant located at 908 Owens Corning Drive, Phenix City, Alabama, at which it manufactured rock wool pipe, board and batts for use in insulation applications. As part of the Debtors' ongoing review of its business operations, the Debtors determined that the business at the facility was non-strategic and non-core. The business consistently under-performed financially and lost money at the gross margin level for the year 2002. Consequently, the Debtors decided to sell the assets of the Phenix City plant.

The Debtors undertook marketing efforts targeted to sell the assets of the Phenix City plant to commercial and industrial insulation competitors, as well as to manufacturers of other insulation materials. After negotiating with the two interested parties who had made acceptable preliminary offers, OCHT and OCD entered into an Agreement of Sale, dated March 18, 2003, with IIG Minwool, LLC ("IIG"). IIG agreed to purchase certain assets of the Phenix City plant for a purchase price of $6.7 million, $3.7 million of which was due at closing by wire transfer and $3 million of which was payable pursuant to a promissory note attached to the Agreement of Sale, which obligation was to be secured by security interests in all of the assets being acquired under the Agreement of Sale. On March 19, 2003, the Debtors filed a motion seeking authorization to sell the Phenix City plant assets. The Debtors also sought authorization to pay from the sale proceeds certain personal property taxes totaling approximately $121,069.18.

Subsequent to the filing of the motion, the other interested party, Fibrex Insulation, LLC ("Fibrex"), contacted the Debtors to propose a counteroffer to the offer by IIG as set forth in the Agreement of Sale. The Debtors conducted an auction on April 28, 2003. After spirited bidding by IIG and Fibrex, IIG emerged as the highest bidder with its final bid of $8 million in cash. A hearing was held before the Bankruptcy Court on April 28, 2003. The sale to IIG was approved, subject to the submission of a revised proposed sale order. On May 12, 2003, the Bankruptcy Court entered an Order approving the sale to IIG, *nunc pro tunc* to April 28, 2003.

(g) Sale of Owens Corning Metal Systems Assets

Owens Corning Metal Systems ("OCMS"), a division of Exterior Systems, Inc., was in the aluminum building products industry. As part of the Debtors' ongoing review of its business operations, the Debtors determined that the business of OCMS was non-strategic and non-core. Consequently, the Debtors decided to sell the assets utilized in the business of OCMS at auction.

The Debtors, through their investment banker, Goldsmith Agio Helms Securities, Inc., undertook solicitation and marketing efforts directed at potential strategic buyers and financial sponsors. After consideration of the proposals submitted by interested bidders in January 2003 and following on-going discussions with those interested bidders who had made acceptable proposals, the Debtors determined that the offer proposed by ALSCO Acquisition Corp., now known as ALSCO Metals Corporation ("ALSCO"), was the highest and best offer. Accordingly, Exterior Systems, Inc., Owens-Corning Fiberglas Technology, Inc. and, for limited purposes, Owens Corning, entered into an Asset Purchase Agreement, dated March 19, 2003, with ALSCO for the sale of certain assets, the assumption by ALSCO of certain liabilities, the execution and entry of a supply agreement and a transition services agreement and the Debtors' assumption and assignment to ALSCO of certain executory contracts and unexpired leases. The purchase price set forth in the Asset Purchase Agreement was $50 million in cash plus certain assumed liabilities. The Asset Purchase Agreement was subject to higher and better offers.

On March 19, 2003, the Debtors filed a motion to approve sale procedures and bidding protections. This Motion was granted by Order of the Bankruptcy Court, dated

April 22, 2003. On March 19, 2003, the Debtors also filed a motion seeking authorization to sell the assets to ALSCO or to the successful bidder.

The Debtors conducted an auction on May 16, 2003. After spirited bidding by ALSCO and another bidder, MIC Acquisition Corp., ALSCO emerged as the highest bidder with its final bid of $53 million in cash and a $3 million note. A hearing was held before the Bankruptcy Court on May 19, 2003. The sale to ALSCO was approved by order by the Bankruptcy Court, dated May 19, 2003.

(h) Sale of Real Property in Hebron, Ohio

OCD owned property located at 341 O'Neill Drive in Hebron, Ohio, consisting of approximately 7.38 acres of land and a closed 81,106 sq. foot facility at which OCD previously manufactured insulation for appliances and other applications. The property was no longer needed for the Debtors' operations; accordingly, OCD entered into a Purchase and Sale Agreement, dated June 18, 2003, with Golden Property Management LLC, as buyer, for a sale price of $1,015,000. Such Purchase and Sale Agreement was approved by Order of the Bankruptcy Court dated July 23, 2003, but was not consummated because Golden Property Management LLC terminated the agreement when it was discovered that the roof at the facility needed to be replaced, at an estimated cost of $288,000.

Upon termination of the sale agreement with Golden Property Management LLC, the Debtors recommenced their efforts to sell the property. As a result of such efforts, OCD entered into a Purchase and Sale Agreement with River Valley Stone Co., with a purchase price of $825,000. On March 8, 2005, the Bankruptcy Court entered an Order approving the sale.

(i) Sale of Real Property in Lynchburg, Virginia

Exterior Systems owned an approximately 4.875 acre parcel of land located at 6222 Logan Lane in Lynchburg, Virginia, on which there was a vacant vinyl siding production plant no longer needed for the Company's operations. Exterior Systems initially entered into a Purchase and Sale Agreement with Home Depot USA, Inc. ("Home Depot") to sell the property for a sale price of $950,000. Such Purchase and Sale Agreement was approved by the Bankruptcy Court by Order dated October 23, 2003. The sale between Exterior Systems and Home Depot was not consummated because Home Depot exercised its contractual right to terminate the Purchase and Sale Agreement during an agreed-upon investigation period.

Upon termination of the sale agreement with Home Depot, the Debtors recommenced their efforts to sell the property. Ultimately, Exterior Systems entered into a Purchase and Sale Agreement with Hendricks Commercial Properties, LLC for a sale price of $900,000, which was approved by Order of the Bankruptcy Court dated June 23, 2004.

(j) Sale of Real Property in Valparaiso, Indiana

OCD owned approximately 40.49 acres of undeveloped land located at 2552 Industrial Drive in Valparaiso, Indiana. OCD determined that it did not need the property for its operations and accordingly engaged in efforts to sell the property. After considering

several lesser offers, OCD entered into a Purchase and Sale Agreement with Shipshehanna, LLC, as buyer, for a sale price of $325,000. Such Purchase and Sale Agreement was approved by the Bankruptcy Court by Order dated December 20, 2004.

(k) Sale of Real Properties in Newark, Ohio

As of the Petition Date, OCD owned property located at 365 Cedar Run Road in Newark, Ohio, comprised of approximately 3.645 acres of land containing a single family dwelling. The property is adjacent to an OC landfill and served as a buffer between the landfill and properties owned by third parties. Because this property was not needed for OC's operations, it entered into an agreement to sell the property to a third party, Robert Arenz for $144,000, subject to certain adjustments. This agreement was approved by Bankruptcy Court Order dated September 30, 2005.

As of the Petition Date, OCD owned a second parcel in Newark, Ohio located at 422 Cedar Run Road. Such property, which was adjacent to an Owens Corning landfill, consisted of a residence and approximately 5.2 acres of land. On December 21, 2005, the Debtors filed a motion with the Bankruptcy Court seeking authority to sell this property to Rick Cody for $131,000. Such motion is scheduled to be heard by the Bankruptcy Court on January 30, 2006.

(l) Sale of Asphalt Facility and Real Property in Channelview, Texas

As of the Petition Date, OCD owned an asphalt manufacturing facility located in Harris County, Texas, which was situated on approximately 4.836 acres of land (the "Channelview Facility"). The Channelview Facility was closed in 2004 as part of the Debtors' re-assessment of their asphalt business, and the Debtors solicited potential purchasers for the property. OCD entered into an Asset Purchase Agreement with Pelican Refining Company, LLC ("Pelican"), as buyer, for a purchase price of $3,150,000 and requested the Bankruptcy Court to approve such agreement. Upon objection by a potential purchaser who offered a higher price for the Channelview Facility, the Debtors conducted an auction sale of the property on June 24, 2005. At such auction, Pelican increased its offer to $4.75 million and was selected by the Debtors as the party making the highest and best offer for the Channelview Facility. The parties modified the Asset Purchase Agreement to reflect a purchase price of $4.75 million, which was approved by Bankruptcy Court Order dated June 27, 2005.

(m) Sale of Real Property in Elkhart, Indiana

As of the Petition Date, OCD owned real property located at 1838 Middlebury Street in Elkhart, Indiana, comprised of approximately 4 acres of land and a 42,500 square ft. laminating plant. After marketing the property, the Debtors entered into a Purchase and Sale Agreement with Silver Valley Properties, LLC to sell the property and certain related property for $825,000. Such Purchase and Sale Agreement was approved by Bankruptcy Court Order dated June 23, 2004.

(n) Sale of Manufacturing Solutions' Assets

In December 2005, the Debtors received Bankruptcy Court approval to sell certain assets to American Dietze & Schell Corp. ("Dietze & Schell") pursuant to an Asset Purchase Agreement with Dietze & Schell. The Asset Purchase Agreement provided for OCD to sell to Dietze & Schell the assets OCD used in its winding and chopping equipment production business, for a purchase price of $6.8 million to be paid in four installments between December 31, 2006 and December 31, 2009. In connection with the asset sale, the parties also entered into a Supply Agreement which requires Dietze & Schell to supply OCD with certain equipment and a License Agreement which requires OCD to license to Dietze & Schell certain know-how related to equipment to be provided under the Supply Agreement. This motion was approved by the Bankruptcy Court by Order entered December 20, 2005.

(o) Sale of North Bend, Ohio Asphalt Manufacturing Facility and Real Property

As of the Petition Date, OCD owned an asphalt manufacturing facility located at 10100 Brower Road in North Bend, Ohio, which was situated on an approximately 53 acre parcel of land. The facility was closed in 2004 as a part of the Debtors' re-assessment of their asphalt business, and the Debtors solicited potential purchasers for the sale of the property. OCD entered into a Purchase and Sale Agreement with Valley Asphalt Corporation to sell the facility for $2,050,000, subject to a downward adjustment to $1,850,000 if certain permits were not assigned by OCD. Such Purchase and Sale Agreement was approved by Bankruptcy Court Order dated August 30, 2005.

(p) Sale of Real Property in Athens, Alabama

As of the Petition Date, OCD owned property located at 8468 Highway 72 in Athens, Alabama, consisting of approximately 2.039 acres of land and a vacant 26,091 square foot plant. Such plant had previously been used for the manufacture of molded fiberglass products used in the production of partition panels for commercial office furniture. The Debtors engaged in efforts to market the property and, in September 2005, entered into a Purchase and Sale Agreement with Tecvox OEM Solutions LLC, as buyer, for a sale price of $197,000. The Purchase and Sale Agreement was approved by Bankruptcy Court Order dated October 20, 2005.

(q) Sale of Real Property in Berlin, New Jersey

As of the Petition Date, OCD owned property located at 160 Jackson Avenue, Berlin, New Jersey, which consisted of approximately 45 acres of land and 303,200 square feet of buildings and other structures. Such facility had previously been used for the production of asbestos-containing insulation product known as Kaylo. Certain of the buildings on the property, as well as a landfill and a settling pond, contained asbestos. Separately, the soil and groundwater at the property contained significant amounts of oils used in the Kaylo manufacturing process. With the exception of environmental remediation activity on the property, all activity at the property ceased and the Debtors no longer needed the property for their operations. Accordingly, OCD entered into a Purchase and Sale Agreement with Berlin Jackson LLC, which (subject to certain terms and conditions) agreed to take title to the property for $1 in exchange for assuming responsibility for the remediation of the property's

environmental condition. The Bankruptcy Court approved the Purchase and Sale Agreement by Order dated September 26, 2005.

(r) Sale of Real Property in Douglas, Georgia

As of the Petition Date, Exterior Systems owned an approximately five acre parcel of property and an approximately half-acre parcel of property, located at 2141 Broxton Highway in Douglas, Georgia. The five acre parcel contained a 92,000 square foot manufacturing facility at which Exterior Systems previously manufactured specialty roofing products. The property was no longer needed for the Debtors' operations; accordingly, Exterior Systems entered into a Purchase and Sale Agreement with Douglas Metal Roofing, Inc. to sell the property for a sale price of $550,000, of which $543,600 was attributable to the five acre parcel and $6,400 was attributable to the one-half acre parcel. By Order dated June 30, 2005, the Bankruptcy Court approved the Purchase and Sale Agreement and authorized Exterior Systems to sell the five acre parcel and (upon resolution of certain title issues with respect to the half-acre parcel) to sell the half-acre parcel to Douglas Metal Roofing, Inc.

(s) Sale of Real Property in Tucker, Texas

As of the Petition Date, OCD owned real property located at 10658 State Highway 294 in Tucker, Texas, comprised of three parcels. The first parcel consisted of approximately 20 acres of land on which there was a vacant 64,423 square foot insulation plant; the second and third parcels consisted of a total of approximately 17.56 acres of land and contained several buildings. The Debtors no longer needed the property for their operations. Accordingly, Owens Corning entered into a Purchase and Sale Agreement with Weissker Properties, L.P. with a purchase price of $625,000, subject to certain adjustments. The Purchase and Sale Agreement was approved by Order of the Bankruptcy Court dated October 18, 2005.

**19. Certain Proposed Asbestos Legislation**

On April 19, 2005, Senators Arlen Specter and Patrick Leahy introduced and co-sponsored an asbestos litigation reform bill (S-852) entitled the Fairness in Asbestos Resolution Act of 2005 (the "FAIR Act"), which proposes to establish an asbestos administrative claims resolution structure through which all asbestos claims would be channeled and reviewed. The FAIR Act would establish a national trust fund, supported through mandated contributions from defendant companies, insurance companies and existing trusts, that would be the source of compensation of all approved claims. Under the FAIR Act, companies like the Debtors that have filed for bankruptcy but have not yet emerged through a confirmed plan of reorganization, would be included as participants in the resolution structure. The FAIR Act was voted out of the Senate Judiciary Committee on May 26, 2005, but it has not yet been considered by the full Senate. Depending on when (and if) enacted, the legistation could impact recoveries by non-asbestos, unsecured creditors and possibly, holders of Interests. However, at this point, it is impossible to determine if the proposed legislation will be enacted, and what the final terms of the legislation will be, if enacted.

**20. Pension Claims**

The Company has several defined benefit pension plans covering most employees. Under the plans, pension benefits are generally based on an employee's pay and number of years of service. Company contributions to these pension plans are determined by an independent actuary to meet or exceed minimum funding requirements. Plan assets consist primarily of equity securities with the balance in fixed income investments.

The pension plans are managed by an investment review committee that meets periodically to provide oversight, review long term investment strategies, assess plan and individual manager investment performance and evaluate the funding status of the plans. Over the last several years, various factors, such as the decline in asset value due to market conditions, the decrease in the discount rate, as well as the review of assumptions related to the valuation of pension plan liabilities have impacted the Company's long-term pension plan liability and funding.

Certain of the Company's pension plans have an accumulated benefit obligation in excess of the fair market value of plan assets. The accumulated benefit obligation and fair market value of plan assets for such plans are $1.357 billion and $1.051 billion, respectively, at October 31, 2004. Certain of the Company's pension plans are not funded. The portion of the total projected benefit obligation attributable to unfunded plans is approximately $10 million at October 31, 2004.

The Company also sponsors defined contribution plans available to substantially all United States employees. Company contributions reflect a matching of a percentage of employee savings up to a maximum savings level and certain profit sharing awards. The Company recognized expense of $22 million in 2004.

The "PBGC", an agency of the United States, filed a Claim on the General Bar Date in the amount of approximately $458 million, in connection with statutory liability for unfunded benefit liabilities of the Owens Corning Merged Retirement Plan (the "Merged Plan"). The Claim states that it is contingent upon termination of the Merged Plan. The Merged Plan is a tax-qualified defined benefit pension plan covered by and subject to Title IV of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1301-1462 ("ERISA"). Pursuant to Title IV, each of the Debtors is a contributing sponsor of the Merged Plan or a member of a contributing sponsor's controlled group. 29 U.S.C. § 1301(a)(13)(14). The Plan specifically provides that OCD and any other of the Reorganized Debtors whose employees are covered by the Merged Plan shall assume and continue the Merged Plan, satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, and administer the Merged Plan in accordance with its terms and the provisions of ERISA. Further, nothing in the Plan of Reorganization shall be construed in any way as discharging, releasing or relieving the Debtors or the Debtors' successors, including the Reorganized Debtors, or any party, in any capacity, from liability imposed under any law or regulatory provision with respect to the Merged Plan or PBGC.

OCD is required to comply with ERISA's minimum funding requirements. Funding is generally in cash but may also be in stock or debt (in general, not exceeding 10% of

the plan's assets). During these Chapter 11 Cases, with the Bankruptcy Court's approval, the Company has funded its pension obligations with approximately $600 million.

The 2005 pension payments will be made from cash on hand and operating cash flow. As a consequence, for purposes of this Disclosure Statement it is assumed for purposes of projections of future performance and projected distributions under the Plan that (1) the Merged Plan will not be terminated, (2) OCD will make all minimum funding payments and (3) the Pension Plan will be less than 100% funded at December 31, 2005, and (4) OCD will not be required to reserve assets in the Plan to fully fund the Pension Plan, but will be required to demonstrate its ability to adequately fund the Merged Plan in future periods.

**21. Notice Procedures and Transfer Restrictions on Trading of Equity Securities**

On February 23, 2005, the Debtors filed a motion in the Bankruptcy Court for the entry of interim and final orders pursuant to Sections 105(a), 362(a)(3) and 541 of the Bankruptcy Code to enable the Debtors to avoid limitations on the use of their tax net operating loss carry-forwards and certain other tax attributes by imposing certain notice procedures and transfer restrictions on the trading of equity securities of OCD. The Bankruptcy Court granted the requested interim order (the "Interim Equity Order") on March 1, 2005, and granted the requested final order (the "Final Equity Order") on April 15, 2005.

In general, the Final Equity Order applies to any person or entity that, directly or indirectly, beneficially owns (or would beneficially own as a result of a proposed transfer) at least 4.75% of the outstanding equity securities of OCD. Under the Final Equity Order, all persons or entities who at the time of the Final Equity Order or in the future beneficially own at least 4.75% of the outstanding equity securities of Owens Corning (each a "Substantial Equityholder") is required to file with the Bankruptcy Court and serve upon the Debtors and the Debtors' counsel a notice of such status. In addition, the Final Equity Order provides that a person or entity that would become a Substantial Equityholder by reason of a proposed acquisition of equity securities of OCD is also required to comply with the notice and service provisions before effecting that transaction. The Final Equity Order gives the Debtors the right to object in the Bankruptcy Court to certain acquisitions or sales of OCD common stock if the acquisition or sale would pose a material risk of adversely affecting the Debtors' ability to utilize such tax attributes.

Under the Final Equity Order, prior to any proposed acquisition of equity securities that would result in an increase in the amount of OCD equity securities owned by a Substantial Equityholder, or that would result in a person or entity becoming a Substantial Equityholder, such person, entity or Substantial Equityholder is required to file with the Bankruptcy Court, and serve on the Debtors and the Debtors' counsel, a Notice of Intent to Purchase, Acquire or Otherwise Accumulate an Equity Security. In addition, prior to effecting any disposition of OCD's equity securities that would result in a decrease in the amount of OCD equity securities beneficially owned by a Substantial Equityholder, such Substantial Equityholder is required to file with the Bankruptcy Court, and serve on the Debtors and the Debtors' counsel, a Notice of Intent to Sell, Trade or Otherwise Transfer Equity Securities.

Any purchase, sale or other transfer of OCD equity securities in violation of the restrictions of the Final Equity Order would be null and void *ab initio* as an act in violation of the Final Equity Order and would therefore confer no rights on a proposed transferee.

**22. Glenview Stipulation and Private Letter Ruling**

By Order entered May 12, 2005, the Bankruptcy Court approved a Stipulation (the "Glenview Stipulation") between and among OCD, Glenview Capital Partners, LP, ("GCP"), Glenview Institutional Partners, LP ("GIP"), and Glenview Capital Master Fund, Ltd. ("GCM" and with GCP and GIP, the "Glenview Funds"), which addressed certain issues arising under the Interim Equity Order and Final Equity Order. Specifically, the Stipulation addressed the acquisition of certain shares of OCD common stock by one or more of the Glenview Funds after the entry of the Interim Equity Order. Under the terms of the Glenview Stipulation, OCD agreed to seek a Private Letter Ruling from the IRS that would confirm that the Glenview Funds' acquisition of OCD common stock did not cause any one or more of the Glenview Funds to become a "5% shareholder" of OCD for purposes of section 382 of the IRC, so that the Glenview Funds' acquisition of Owens Corning stock would be disregarded in determining whether Owens Corning experienced an "ownership change" for purposes of Section 382. The Glenview Stipulation further provided, among other things, that in the event that such a Private Letter Ruling was not obtained, the Glenview Funds would unwind their relevant acquisitions and disposition of Owens Corning common stock in a manner reasonably acceptable to OCD. On October 28, 2005, the IRS issued the requested Private Letter Ruling, which confirmed that the Glenview Funds were separate entities for purposes of the Interim and Final Orders.

**23. Rule 2019 Orders**

By Orders dated August 27, 2004, October 22, 2004, and July 8, 2005, the Bankruptcy Court established certain procedures regarding the filing of Statements pursuant to Federal Rule of Bankruptcy Procedure 2019. Each party filing a Rule 2019 Statement is required to provide with such Statement certain specified information in a designated format, as further specified in such Orders.

**24. The Trustee Motion**

On October 17, 2003, the Unsecured Creditors' Committee filed a motion in the Bankruptcy Court requesting the appointment of a Chapter 11 trustee under Section 1104(a) of the Bankruptcy Code based upon an alleged breach of the Debtors' fiduciary duty of undivided loyalty to act in the best interest of all creditors. On October 29, 2003, such motion was dismissed by the Bankruptcy Court for failure to comply with local court rules. On October 30, 2003, the Unsecured Creditors' Committee re-filed such motion (the "Trustee Motion"), which was subsequently "supplemented" on May 28, 2004 (the "Supplemented Trustee Motion"). On July 13, 2004, Credit Suisse First Boston, as Agent, joined in the Trustee Motion and Supplemented Trustee Motion. In addition, Mt. McKinley Insurance Company and Century Indemnity Insurance Company filed responses in support of the Trustee Motion. Various filings in opposition to the Trustee Motion and Supplemented Trustee Motion were filed by the Debtors, the Futures Claimants' Representative, and the Asbestos Claimants' Committee. Further proceedings on this matter have been voluntarily continued by the movants on a monthly basis.

When the Supplemented Trustee Motion was filed, the Unsecured Creditors' Committee served on the Debtors its first set of amended interrogatories and the first amended request for production of documents generally seeking discovery of information related to either (1) the process, including all discussions and negotiations, by which the draft and filed plans of reorganization were created; (2) discovery related to the contacts between the parties and Judge Wolin or his former advisors, including Frances McGovern, the court-appointed mediator, during the period prior to Judge Wolin's recusal; (3) asbestos valuation and the process and means by which asbestos valuation should be determined, including the decision to oppose an asbestos bar date and claims objection process; and (4) the acts underlying the alleged claims against certain law firms concerning payments made under the National Settlement Program that the Court either stayed or which are the subject of tolling agreements authorized by the Court. The Debtors filed a motion for a protective order asserting that the requested discovery was inappropriate, threatens to waste the assets of the Debtors' bankruptcy estates, and seeks to circumvent the process by which the Court has determined issues in this case should be resolved. Credit Suisse First Boston, as Agent, filed an opposition to the motion for a protective order and an *ad hoc* committee of bondholders filed a joinder in the opposition. Further proceedings on this matter have been voluntarily continued by the movant on a monthly basis.

The Debtors believe that the Trustee Motion and the Supplemental Trustee Motion are without merit and intend to continue to vigorously oppose the Trustee Motion. In particular, the Debtors believe that the Trustee Motion and the Supplemented Trustee Motion are stale and are rendered moot by the filing of the Plan, and should therefore be dismissed with prejudice.

**25. The Bank Holders' Examiner Motion**

On May 24, 2004, Credit Suisse First Boston, Kensington International Limited, Springfield Associates LLC and Angelo Gordon filed a motion in the Bankruptcy Court requesting the appointment of a Chapter 11 examiner under Section 1104(c) of the bankruptcy Code to examine (i) alleged improper conduct by management of the Debtors, (ii) alleged breaches of fiduciary duty by management of the Debtors resulting from the influence of the Futures Claimants' Representative and the Asbestos Claimants' Committee on the process of developing a Plan and the tort estimation process, (iii) alleged connections between the asbestos plaintiffs' interests, a Court appointed mediator, and the Debtors' asbestos liability estimation firm, and (iv) other alleged improper conduct (the "Bank Holders' Examiner Motion"). Owens Corning, the Futures Claimants' Representative, and the Asbestos Claimants' Committee have each filed responsive pleadings objecting to the Bank Holders' Examiner Motion. The Bankruptcy Court heard argument on the Bank Holders' Examiner Motion on June 21, 2004 and, on July 7, 2004, signed an Order continuing the Bank Holders' Examiner Motion until a final order is entered by the Bankruptcy Court with respect to the Trustee Motion.

The Debtors believe that the Bank Holders' Examiner Motion is without merit and intend to continue to vigorously oppose the Bank Holders' Examiner Motion. In particular, the Debtors believe that the Bank Holders' Examiner Motion are stale and are rendered moot by the filing of the Plan, and should therefore be dismissed with prejudice.

**26. Section 965 Motion**

By Order entered October 20, 2005, the Bankruptcy Court authorized the Company to implement a "foreign fund repatriation program" by which certain of Owens Corning's subsidiaries could repatriate to the United States and, specifically, to IPM approximately $220 million of excess cash. This program was implemented in order to take advantage of section 965 of the IRC, 26 U.S.C. § 965, which was enacted to provide a temporary reduction in the U.S. tax on repatriated dividends. Under section 965, certain dividends received by a U.S. corporation from controlled foreign corporations, to the extent in excess of certain threshold amounts, are eligible for an 85% dividends-received deduction. If applicable, this deduction results in a greatly reduced effective federal tax rate of 5.25% on the amount of the qualifying dividend. The excess cash was actually repatriated under the program to IPM on December 15, 2005. The sources of such excess cash were as follows: Owens Corning Canada Inc. ($165 million); Vytec Corporation ($25 million); and Owens Corning Veil Netherlands B.V. ($30 million).

**27. Shareholder Motion for Appointment of an Equity Holders Committee**

Shareholders made requests to the United States Trustee in 2003 and 2004 for the appointment of an official committee of equity security holders and in 2005 for the appointment of an official committee of preferred and equity security holders. Because the Debtors did not believe there was any reasonable prospect for recovery by shareholders or preferred security holders in the absence of enactment of asbestos litigation reform legislation, the Debtors opposed each such request. The United States Trustee agreed with the Debtors' position and in each instance declined such requests. On December 20, 2005, an *ad hoc* committee of shareholders filed a motion seeking an order from the Bankruptcy Court directing the United States Trustee to appoint an official committee of preferred and equity security holders. As of the date hereof, the Debtors have not yet filed their response to this motion. A hearing on this motion is scheduled for January 30, 2006.

**28. Shareholder Motion Regarding Shareholders' Meeting**

In addition to filing its motion for the appointment of an official committee of preferred and equity security holders, on December 20, 2005, the same *ad hoc* committee filed a motion with the Bankruptcy Court seeking confirmation of its right to bring an action in Delaware Chancery Court to compel OCD to hold an annual shareholders' meeting. In the alternative, the *ad hoc* committee requested an order granting the shareholders relief from the automatic stay of section 362(a) of the Bankruptcy Code to prosecute such action. The motion alleges that OCD is required to hold annual shareholders' meetings and that the shareholders should be permitted to elect directors of OCD. As of the date hereof, the Debtors have not yet filed their response with respect to this motion. A hearing on this motion is scheduled for January 30, 2006.

**29. Summary of Certain Litigation**

(a) John Hancock Litigation

Certain of OCD's current and former directors and officers, as well as certain underwriters, are named defendants in a class action lawsuit captioned John Hancock Life Insurance Company, et al. v. Goldman, Sachs & Co., et al., CA No. 01-10729-RWZ, pending in the United States District Court for the District of Massachusetts (the "Hancock Litigation"). The suit, commenced on or about April 30, 2001, is a securities-related class action on behalf of purchasers of securities pursuant to, or traceable to, two public offerings by OCD on or about April 30, 1998 and July 22, 1998. No Debtors are named as defendants in the lawsuit.

On or about April 27, 2001, a complaint was filed on behalf of purchasers of the $300 million aggregate principal amount of $550 Million Term Notes (First Series) issued by OCD due May 1, 2005 (consisting of 7.5% Term Notes) and the $250 million aggregate principal amount of $550 Million Term Notes (Second Series) issued by OCD due May 1, 2008 (consisting of 7.7% Term Notes) in offerings occurring on or about April 30, 1998. On or about July 5, 2001, an amended complaint was filed that added reference to the $400 million aggregate principal amount of $400 Million Debentures issued by OCD due August 1, 2018 (consisting of 7.5% Debentures), in an offering occurring on or about July 23, 1998.

By the amended complaint, the plaintiffs allege, among other things, that the defendants violated the Securities Act of 1933 in that the SEC Form S-3 registration statements, including the prospectus and prospectus supplements, pursuant to which the debt offerings were made, contained untrue and misleading statements of material fact and omitted to provide certain required material facts. In particular, the amended complaint alleges that the registration statements for the debt securities contained the following untrue and misleading statements of fact and omissions of material facts: (a) the representation that the debt securities would "rank equally with all other unsecured and unsubordinated indebtedness of the Company," (b) misleading representations concerning OCD's other unsecured indebtedness, (c) the failure to disclose that certain of OCD's other unsecured and unsubordinated indebtedness was guaranteed by one or more of OCD's Subsidiaries, (d) the failure to disclose that OCD had a substantial debt to one of its Subsidiaries, (e) the failure to disclose the existence of and the terms of certain promissory notes issued by OCD to one of its Subsidiaries, and (f) the failure to disclose the existence of and terms of an intellectual property licensing arrangement between OCD and one of its Subsidiaries. The amended complaint sought, among other things, an unspecified amount of damages or, where appropriate, rescission of the plaintiffs' purchases of the securities.

On November 14, 2001, and November 20, 2001, respectively, the underwriter defendants and the individual defendants filed motions to dismiss the amended complaint for failure to state a claim upon which relief can be granted. The individual defendants argued that the plaintiffs' action should be dismissed because the information that plaintiffs claim was omitted either was disclosed in OCD's filings with the SEC and incorporated by reference into the registration statements, or was not required to be disclosed under applicable SEC regulations. The individual defendants further argued that the plaintiffs' action was barred by the applicable statute of limitations because it was brought more than one year after the allegedly concealed facts were disclosed in public filings.

On January 28, 2002, the plaintiffs filed a combined opposition to the underwriter and individual defendants' motions to dismiss. On March 29, 2002, both the individual defendants and the underwriter defendants filed reply memoranda in further support of their respective motions. A hearing was held on the motions to dismiss on April 11, 2002.

On August 26, 2002, the United States District Court for the District of Massachusetts issued a memorandum of decision, wherein it determined that dismissal of the amended complaint is inappropriate because "several questions of fact remain," including: (i) "whether defendants' statement that the securities would 'rank equally with other unsecured and unsubordinated obligations of the Company,' was false or misleading when read in context with the rest of the information provided in the registration statement;" (ii) "whether the defendants' disclosures about intercompany licensing agreements and guarantees on other debt by OCD's subsidiaries were false or misleading with respect to the subordination rights of securities purchasers;" and (iii) "whether the registration statements provided plaintiffs with sufficient information to fully understand their rights relevant to other unsecured creditors." The Court further concluded that, contrary to the defendants' argument, the plaintiffs' claims were not time-barred. The Court, therefore, denied the defendants' motions to dismiss the amended complaint.

On March 9, 2004, the Court granted class certification as to those claims relating to written representations, but denied certification as to claims relating to alleged oral representations. Mediation was conducted on November 2, 2005, at which mediation the plaintiffs and the underwriter defendants agreed to settlement terms. A status conference on this matter was held on November 8, 2005. A trial was scheduled to commence on June 12, 2006, as to the director and officer defendants. Owens Corning believes that the claim is without merit.

The named defendants in this proceeding have each filed contingent indemnification claims with respect to this litigation against OC pursuant to the General Bar Date process.

Executive Risk Indemnity Inc. ("Executive Risk") issued to OCD Directors and Officers Liability Insurance Policy No. 8165-4021 for the policy period March 29, 2001 to March 29, 2002 (the "Policy"). Executive Risk received notice under the Policy relating to the Hancock Litigation and has indicated a willingness to pay on a current basis certain defense expenses, as that term is used in the Policy, incurred on or after March 29, 2002 under the Policy, subject to mutual reservations of rights, in connection with the Hancock Litigation to or on behalf of the insureds. A proposed Stipulation and Order Among Debtors, Executive Risk Indemnity Inc., Norman P. Blake, Jr., Gaston Caperton, Domenic Cecere, Leonard S. Coleman, Jr., William W. Colville, John H. Dasburg, Landon Hilliard, Glen H. Hiner, Sir Trevor Holdsworth, Jon M. Huntsman, Jr., Ann Iverson, W. Walker Lewis, Michael I. Miller, Furman C. Moseley, Jr., W. Ann Reynolds, and Steven J. Strobel was filed with the Bankruptcy Court providing *inter alia* that, notwithstanding the automatic stay of 11 U.S.C. § 362, Executive Risk shall be and hereby is authorized to make payments under the Policy to or for the benefit of the Insureds for Defense Expenses incurred in connection with the Hancock Litigation. The Bankruptcy Court approved the stipulation on March 25, 2003.

(b) Deloitte Litigation

On August 10, 2001, Deloitte Consulting, L.P. ("Deloitte") filed an Administrative Claim (the "Deloitte Administrative Claim") in the Chapter 11 Cases seeking not less than $2 million, on the theory that after the Petition Date, the Debtors had converted Deloitte's contributions to Debtors' HOMExperts home repair and inspection business. On February 5, 2002, Deloitte filed its adversary complaint against the Debtors, asserting copyright infringement, conversion, and post-petition use and benefit, seeking not less than $2 million in damages and/or administrative expenses (the "Deloitte Adversary Action"). The Debtors vigorously contested the Deloitte Administrative Claim and the Deloitte Adversary Action and moved to dismiss the Deloitte Administrative Claim.

The Debtors and Deloitte exchanged discovery requests, documents and written responses, and commenced depositions. After considerable negotiations, the Debtors and Deloitte reached a settlement resolving, without further litigation, all of Deloitte's claims related to HOMExperts, the Deloitte Administrative Claim, and the Deloitte Adversary Action. Pursuant to the terms of the settlement, Deloitte was allowed an administrative expense claim of $350,000 to be paid within 30 days after entry of the order approving the settlement; Deloitte was allowed an unsecured pre-petition claim against OCD in the net amount of $400,000 by reason of the matters asserted in the Deloitte Administrative Claim and the Deloitte Adversary Action against OCD, Integrex and HOMExperts LLC, which shall be treated in the Chapter 11 Cases and pursuant to applicable provisions of the Bankruptcy Code as an Allowed General Unsecured Claim; the Deloitte Adversary Action was automatically dismissed upon entry of the order approving the settlement; and Deloitte released the Debtors for all claims resolved under the settlement.

(c) Tobacco Litigation

OC has spent significant monies to resolve claims of asbestos claimants whose injuries were caused or exacerbated by cigarette smoking. OCD and Fibreboard are pursuing litigation against tobacco companies (discussed below) for restitution/unjust enrichment, fraud, and violations of state antitrust law to obtain payment of monetary damages (including punitive damages) for payments made by OCD and Fibreboard to asbestos claimants who developed smoking-related diseases. There can be no assurance that any such litigation will go to trial or be successful.

In October 1998, the Circuit Court for Jefferson County, Mississippi granted leave to file an amended complaint in an existing action to add claims by OCD against seven tobacco companies and several other tobacco industry defendants. The action brought by OCD in the Circuit Court of Jefferson County, Mississippi is styled Ezell Thomas, et al. v. R.J. Reynolds Tobacco Company, et al. and Owens Corning v. R.J. Reynolds Tobacco Company, Docket No. 96-0065. On June 17, 2001, the Jefferson County court entered an Order dismissing OCD's case in response to the defendants' motion for summary judgment on the basis that OCD's injuries were indirect and thus too remote under Mississippi law to allow recovery. OCD appealed the dismissal to the Supreme Court of Mississippi. The Supreme Court of Mississippi issued an opinion upholding the dismissal on March 18, 2004.

In addition to the Mississippi lawsuit, in December 1997, OCD and Fibreboard brought a lawsuit in the Superior Court of California, County of Alameda, against the same tobacco companies. That lawsuit, which is currently pending, is styled Fibreboard Corp., et al. v. R.J. Reynolds Tobacco Company, et al., Case No. 791919-8. In August 2001, the defendants filed motions to dismiss OCD's and Fibreboard's claims on the basis of the decision in the Mississippi lawsuit as well as California law. After a hearing on these motions on November 20, 2001, the California court denied the motion to dismiss Fibreboard's claims on the basis of the decision in the Mississippi lawsuit and otherwise stayed the proceeding pending the outcome of the Mississippi suit. If OCD and Fibreboard prevail, OCD's and Fibreboard's recoveries from such lawsuits against the tobacco companies will be transferred to the Litigation Trust.

(d) Greenburg Class Action Securities Litigation

On or about January 27, 2003, certain of the Company's current and former directors and officers were named as defendants in a lawsuit captioned Robert Greenburg, et al. v. Glen Hiner, et al. in the United States District Court for the Northern District of Ohio, Western Division. Subsequent to January 27, 2003, three substantially similar actions, with named plaintiffs Nicholas Radosevich, Howard E. Leppla, and William Benanchietti, respectively, were filed against the same defendants in the same court. On July 30, 2003, the Court consolidated the four cases under the caption Robert Greenburg, et al. v. Glen Hiner, et al., and appointed as lead plaintiffs JKF Investment Co., Icarus Trading, Inc. and HGK Asset Management. An amended complaint was filed by the plaintiffs on or about September 8, 2003. Owens Corning was not named in the lawsuit. The suit purported to be a class action for securities fraud under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, on behalf of a class comprised of persons who purchased stock of Owens Corning during the period from September 20, 1999, through October 4, 2000. The complaint sought an unspecified amount of damages and/or, where appropriate, rescission. On March 3, 2005, the Court granted the defendants' motion to dismiss the action, on the grounds that the plaintiffs' claims are time-barred under the applicable statute of limitations. The plaintiffs filed a notice of appeal of the dismissal. Briefing on appeal has been completed and oral argument is scheduled for January 26, 2006. Owens Corning believes that the claim is without merit.

(e) New York Packaging Corp.'s Administrative Claim

New York Packaging Corporation ("NYPC"), a supplier of plastic sheets to certain of the Debtors' manufacturing facilities, filed a motion for allowance of administrative expense on January 22, 2002. NYPC claimed that the Debtors owed it approximately $1.4 million in connection with an unpaid invoice for the purchase order of plastic sheets placed by the Debtors in or around April 2001. The Debtors filed an objection to the motion on March 25, 2002, wherein they contended that the invoice was incorrect and that the Debtors owe NYPC only $7,154 on account of the order. The parties engaged in discovery and a trial was held before the Bankruptcy Court on January 21, 2003. The primary issues before the Court were (i) whether the purchase order contained an obvious mistake such that the contract should be rescinded or reformed under New York law; (ii) whether the purchase order should be interpreted consistently with the parties' prior course of dealing in accordance with the Uniform

Commercial Code; and (iii) whether Section 503 of the Bankruptcy Code limits NYPC's claim to the actual value to the Debtors' Estates.

On April 9, 2003, the Court issued a Memorandum Opinion finding that the purchase order contained an error in the price based upon a mistake of material fact. The Court reformed the contract and modified the price to avoid an unconscionable result. Having found that the Debtors previously paid the sum due, the Court determined that nothing further was owed to NYPC.

(f) Foreland Refining Corporation

Prior to the Petition Date, on or about April 5, 1999, OC and Foreland Refining Corporation ("Foreland") entered into a Joint Asphalt Production and Marketing Agreement (the "Foreland Agreement"). The Foreland Agreement provided that Foreland would produce certain quantities of asphalt that would be purchased by OC and that Foreland would act as OC's non-exclusive sales agent for the sale of the asphalt in certain geographic areas, and that OC would market, promote and sell the asphalt in other areas. On the Petition Date, Foreland was in possession of certain asphalt produced by Foreland for OC pursuant to the Foreland Agreement, to which both OC and Foreland claimed title. On or about July 18, 2001, the Debtors and Foreland entered into a Stipulation and Consent Order whereby the parties agreed to the consensual rejection of the Foreland Agreement.

After the Foreland Agreement was rejected, Foreland continued to sell asphalt product to Debtors. On or about March 6, 2002, Foreland filed an amended application alleging an administrative expense claim for the post-petition delivery of asphalt product to $104,853.93. The Debtors objected to the application. Thereafter, the Debtors and Foreland resolved the dispute and entered into a stipulation whereby Foreland withdrew its applications with prejudice subject to the Debtors payment of $75,000 in full and complete satisfaction of any and all claims asserted by Foreland with respect to the post-petition delivery of asphalt product, but without prejudice to other claims.

OC scheduled a general unsecured (non-priority) claim in favor of Foreland in the amount of $394,107. On August 16, 2001, Foreland filed proof of claim No. 3064 in the amount of $20,365,882.65. Foreland also alleged that the exclusive marketing provisions were an enforceable claim notwithstanding the rejection and gave rise to an administrative claim in excess of $11 million. The Debtors maintained that pursuant to Sections 101(5) and 365(g) of the Bankruptcy Code, the rejection rendered all damages for breach of the Foreland Agreement as general unsecured claims. On September 10, 2003, the Debtors filed an objection to the filed claim together with a counterclaim. On September 3, 2004, the Court granted summary judgment in favor of the Debtors and against Foreland as to the "Production Short Fall" and "Violation of Exclusive Territories Provisions" claims asserted by Foreland. Foreland represented that it intended to pursue an appeal.

On December 31, 2004, the Debtors and Foreland entered a settlement and release as to all remaining issues related to Foreland's pre-petition claim, its filed proof of claim, its alleged administrative claims and Debtors' counterclaim. The settlement provided, *inter alia*, that the filed claim be reduced and allowed as an unsecured, non-priority claim in the amount of $300,000 against OC, which would supersede the scheduled claim, and the counterclaim be

deemed withdrawn with prejudice. Additionally the Debtors issued a wire transfer to Foreland in the amount of $100,000. On January 19, 2005, the Debtors filed a motion under Bankruptcy Rule 9019 seeking approval of the settlement and, by Order dated February 24, 2005, the Bankruptcy Court granted the motion.

(g) The ServiceLane Litigation

Owens Corning owns 54% of the stock in SL.com, the parent company of ServiceLane.com, Inc. ("ServiceLane"), an internet-based home repair and remodeling business. SL.com commenced a Chapter 7 bankruptcy case in the United States Bankruptcy Court for the Northern District of Texas, Case No. 01-36045. The Chapter 7 case was closed in July, 2002.

In July, 2001, ServiceLane also commenced a chapter 7 bankruptcy case in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 01-36044-HCA-7 (B.J.). The ServiceLane case remains open. In early 2003, the ServiceLane Trustee engaged the counsel representing two former employees of ServiceLane, Michael Burchfield ("Burchfield") and R.Q. Whitmire ("Whitmire") to pursue claims on behalf of the ServiceLane estate. On July 24, 2003, Burchfield and Whitmire, along with the ServiceLane Trustee, brought suit against Michael H. Thaman ("Thaman") and Charles W. Stein ("Stein"), OCD officers, who also were directors of ServiceLane, in the United States District Court for the Northern District of Ohio, Western Division. In the complaint, entitled ServiceLane.com, Inc., et al. v. Stein, et al., Case No. 3:03CV7448 (Carr, J.), ServiceLane alleged a breach of fiduciary duty against both Thaman and Stein and Burchfield and Whitmire alleged fraud solely against Stein. Thaman and Stein were represented by their own counsel in this action. This lawsuit has been dismissed.

Prior to this lawsuit, Burchfield and Whitmire each filed a proof of claim against OCD in the Chapter 11 Cases, alleging fraud and misrepresentation, similar to the claim alleged against Thaman and Stein. On September 10, 2003, the Debtors filed the Debtors' Fourteenth Omnibus (Substantive) Objection to Proofs of Claim filed by Michael Burchfield and R.Q. Whitmire and Counterclaim, objecting to the Burchfield and Whitmire proofs of claim and asserting a counterclaim seeking declaratory relief that neither OCD, nor Thaman and Stein, harmed Burchfield and Whitmire. The objection and counterclaim was assigned Adv. No. 03-55737. On October 10, 2003, Burchfield and Whitmire moved to dismiss Owens Corning's counterclaim, and the Company filed an opposition to that motion. That motion is pending.

On October 1, 2003, Thaman and Stein filed an adversary action against Burchfield and Whitmire in the Bankruptcy Court, Adv. No. 03-56302, seeking a declaratory judgment that neither Thaman nor Stein engaged in any wrongdoing with respect to Burchfield and Whitmire. Burchfield and Whitmire, individually and on behalf of the ServiceLane estate, counterclaimed, alleging fraud and misrepresentation. Thaman and Stein moved to dismiss this counterclaim. On December 21, 2005, the Bankruptcy Court issued a Memorandum Opinion and entered an Order dismissing all claims derivative of or on behalf of the ServiceLane estate with prejudice. With respect to the allegations of liability to Burchfield and Whitmire individually for the alleged fraud by Stein, the Bankruptcy Court found that the complaint "barely" met the pleading requirements of Rule 9(b) of Fed R. Civ. P. and denied the motion to dismiss on the claim without prejudice as to dispositive motions after discovery.

In October, 2005 the ServiceLane Trustee moved to abandon ServiceLane's claims against Owens Corning, Thaman and Stein. Owens Corning objected and offered to acquire those claims in order to extinguish them. Burchfield and Whitmire asked the Texas Bankruptcy Court to assign the estate's claims to them. After a hearing in December, 2005, the Texas Bankruptcy Court authorized the requested abandonment.

Owens Corning believes the claims asserted by Burchfield, Whitmire and the ServiceLane estate are without merit.

(h) The Kensington Action

On or about September 2, 2003, certain of the Company's current and former directors and officers were named as defendants in a lawsuit captioned Kensington International Limited, et al. v. Glen Hiner, et al. in the Supreme Court of the State of New York, County of New York, Index No. 602748/03. OCD is not named in the lawsuit. The suit, which was brought by Kensington International Limited ("Kensington") and Springfield Associates, LLC ("Springfield"), two assignees of lenders under the 1997 Credit Agreement, alleges causes of action (1) against all defendants for breach of fiduciary duty, and (2) against certain defendants for fraud in connection with certain loans made under the 1997 Credit Agreement. The complaint seeks an unspecified amount of damages. On October 6, 2003, the Debtors filed in the United States Bankruptcy Court for the District of Delaware, Adv. No. A-03-56359 (JKF), a Complaint for Temporary Restraining Order, Preliminary Injunction and Enforcement of the Automatic Stay, requesting a preliminary injunction against further prosecution of the suit until after confirmation of a plan of reorganization for the Debtors. By Order of the Bankruptcy Court entered May 3, 2004, the New York action was preliminarily enjoined, with limited exceptions, until the earlier of the entry of an order confirming a plan of reorganization for the Debtors or further order of the Court.

On January 11, 2005, the Bankruptcy Court entered a further Consent Order enjoining the New York action until the entry of an Order confirming a plan of reorganization, subject to the following exceptions: (1) Kensington and Springfield were permitted to amend their Complaint to add and serve certain additional defendants; (2) any defendant could respond to the Complaint, including by way of motion to dismiss, to which Kensington and Springfield could respond; and (3) the Supreme Court of the State of New York could rule upon any outstanding motion to dismiss. Following such a ruling the parties are to report the outcome to the Bankruptcy Court.

No new defendants were added to the New York action. On February 7, 2005, all defendants filed a joint motion to dismiss, to which Kensington and Springfield responded. A hearing on the motion to dismiss was held on May 2, 2005. No decision has been issued.

OCD believes that the claim is without merit.

(i) Proposed Class Action Relating to MiraVista® Roofing Products

From 1996-2002, OCD manufactured and distributed specialty roofing products under the name MiraVista®. In response to the April 15, 2002 bar date, 12 proofs of

claim were filed alleging product defects and resulting damages. Three of those 12 proofs of claim were brought by individuals acting for themselves and as representatives of a purported class of all purchasers of MiraVista® roofing products. The aggregate amount of their claims was $275 million although the claimants have stated in pleadings filed with the Bankruptcy Court that their claims total only $80 million. Claimants thereafter filed a motion for certification of a class of all pre-petition purchasers on April 2, 2004. In July of 2004, plaintiffs, in an already pending class action in California state court, amended their complaint to include claims against OCD arising from the purchase of MiraVista® products after the Petition Date. The complaint against OCD was removed from California state court to federal bankruptcy court in California. The matter was then transferred to the Bankruptcy Court. Both actions allege that MiraVista® products had an undue tendency to lift, warp and curl, break off and slide out of place, crack, leak, and/or discolor, resulting in *inter alia* weather damage to roofing paper, fasteners, flashing, underlayment, and wood substrate.

OCD believes that it has substantial defenses as to both the merits of the plaintiffs' claims and the propriety of class certification. Nonetheless, because class action litigation is costly and the results are difficult to predict, OCD has agreed, in principle, to enter into a settlement. The parties are in the process of drafting the settlement agreement including the proposed plan of distribution and eligibility criteria for compensable claims. When the settlement documents are finalized, they will be presented to the Bankruptcy Court with a request to approve the formation of a temporary settlement class, direct the provision of notice to class members, and schedule a fairness hearing. As part of the notice process, class members will be permitted to opt out of the class settlement and pursue their claims individually. If the Bankruptcy Court enters the requested order, a fairness hearing will likely be conducted in the Spring of 2006. In its current form, the settlement will require OCD to pay $11 million in exchange for a release of all claims and potential claims by class members. The settlement is presently designed to occur independently of the Plan, but is nevertheless subject to approval of the Bankruptcy Court.

**THE CHAPTER 11 CASES ARE ONGOING AND PARTIES WHO DESIRE CURRENT INFORMATION ON EVENTS WHICH MAY AFFECT THESE CASES SHOULD REGULARLY REVIEW THE DOCKETS AND PLEADINGS, WHICH ARE AVAILABLE FROM THE BANKRUPTCY COURT AND THE DISTRICT COURT, CONSULT WITH THEIR COUNSEL AND/OR ATTEND OR PARTICIPATE IN HEARINGS SCHEDULED IN THE CHAPTER 11 CASES, EITHER IN PERSON OR TELEPHONICALLY.**

### G. Avoidance Actions In the Chapter 11 Cases

#### 1. General Background

The Bankruptcy Code creates certain "avoidance actions" which a debtor-in-possession or a trustee may pursue on behalf of the bankruptcy estate to recover funds transferred prior to and, in certain circumstances, after the filing of a debtor's bankruptcy petition. Included among such avoidance actions are "preferences" and "fraudulent conveyances."

Preferences. Pursuant to the Bankruptcy Code, a debtor may recover (or "avoid") as "preferential" payments of funds and other transfers of property that were (a) made to or for the benefit of a creditor, (b) made while the debtor was insolvent, (c) made on account of pre-existing debts and (d) made during the ninety (90) days immediately prior to the debtor's bankruptcy filing, but only to the extent such payment or transfer permitted the recipient to receive more than it would have received if (i) the transfer had not been made, (ii) the debtor had been liquidated under Chapter 7 of the Bankruptcy Code and (iii) the transferee was paid in accordance with applicable bankruptcy law. The ninety (90) day recovery period is extended to one year if the recipient of the preferential transfer is an "insider" of the debtor.

There are various defenses to preference actions. For example, transfers made in the ordinary course of the debtor's and the transferee's businesses, and made in accordance with ordinary business terms, may not be avoidable. Similarly, a transferee that extended credit subsequent to its receipt of an otherwise preferential transfer (and prior to the commencement of the debtor's bankruptcy case) for which the transferee was not repaid, is entitled to an offset/credit against an otherwise avoidable preference for the amount of such new value provided.

Fraudulent Conveyances. Under Sections 548 and 544 of the Bankruptcy Code and under various state laws, a debtor may recover, on a "fraudulent conveyance" theory, transfers of property made while the debtor was insolvent or which rendered the debtor insolvent if and to the extent the debtor received less than reasonably equivalent value for such transfer. A debtor also may be able to recover, as a fraudulent conveyance, transfers made with the actual intent to hinder, delay or defraud creditors.

**2. Description of Avoidance Actions During Chapter 11 Cases**

In accordance with their duties as debtors-in-possession, the Debtors undertook a review to determine the extent to which avoidance actions existed on behalf of their estates. The Debtors shared the results of their review with the Committees and the Future Claimants' Representative and discussed with them what avoidance actions should be commenced. The Debtors, the Committees and the Future Claimants' Representative generally agreed that the Debtors would (a) pursue actions against non-key vendors that received potential preferential transfers in the aggregate amount of $200,000 or more, to the extent tolling agreements could not be obtained, (b) obtain tolling agreements with each of their outside professionals that received potentially preferential payments exceeding $200,000, and (c) obtain tolling agreements from each of their present and former officers who received more than $200,000 of so-called "CIP" and/or "OSIP" incentive payments in September 2000. With the exception of three non-key vendors, the Debtors obtained each of the referenced tolling agreements. The Debtors commenced preference actions against the three vendors that did not execute tolling agreements, as described below.

An intercompany tolling agreement was also executed between and among each of the Debtors and their Non-Debtor Subsidiaries. Such tolling agreement expires thirty (30) days after the effective date of a plan of reorganization.

Because not all parties agreed as to which actions should be brought or which party should bring certain avoidance actions, the Unsecured Creditors' Committee, the Future

Claimants' Representative and the Designated Members filed motions to prosecute certain avoidance actions on behalf of the Debtors' estates.

(a) The Future Claimants' Representative's Motion

On September 6, 2002, the Future Claimants' Representative filed a motion (the "Future Claimants' Motion") for an order authorizing the Future Claimants' Representative (either alone or in combination with the other creditor constituencies) to commence certain avoidance actions on behalf of the Debtors' Estates under Sections 544, 545, 547, 548 and/or 553 of the Bankruptcy Code. The Future Claimants' Representative sought to bring avoidance actions against, among other parties, certain (i) trade vendors and outside professionals retained by the Debtors, and (ii) law firms holding NSP-related funds pursuant to the NSP Agreements. The Asbestos Claimants Committee joined in the Future Claimants' Motion.

(b) The Unsecured Creditors' Committee Motion

On September 10, 2002, the Unsecured Creditors' Committee filed a motion (the "Unsecured Committee Motion") for an order authorizing it to commence the following avoidance actions on behalf of the Debtors' Estates:

(i) an action under Sections 547 and 550 of the Bankruptcy Code seeking the return of approximately $115 million in preferential transfers made to NSP claimants and their law firms during the 90 days prior to the Petition Date;

(ii) an action under Sections 547 and 550 of the Bankruptcy Code seeking the return of approximately $290 million in preferential transfers made to NSP executive committee members and the NSP claimants represented by those members between approximately March 2000 and the Petition Date;

(iii) an action under Sections 547 and 550 of the Bankruptcy Code seeking the return of payments made to the Debtors' officers and directors within one year prior to the Petition Date (which included mid-year bonuses based on performance during the first six months of 2000);

(iv) an action under Sections 548, 544 and 550 of the Bankruptcy Code seeking the return of approximately $700 million in cash transferred by OCD and/or Fibreboard into the accounts of certain law firms participating in the NSP; and

(v) an action under Sections 548, 544 and 550 of the Bankruptcy Code seeking to avoid obligations incurred, and the return of funds transferred, by OCD pursuant to some or all NSP Agreements which OCD entered into after January 1, 2000 and agreements entered into earlier but allegedly converted or accelerated as a result of OCD's financial difficulties.

On September 17, 2002, the Unsecured Creditors' Committee filed a joinder and response to the Future Claimants' Motion, seeking authority to prosecute the claims