identified in the Future Claimants' Motion, either with the Future Claimants' Representative, or independently, if the Future Claimants' Representative did not prosecute the claims.

The Debtors filed a response to the Unsecured Committee Motion, in which the Debtors asked the Bankruptcy Court to deny the motion on several grounds. Among other things, the Debtors stated that they were actively pursuing tolling agreements with the NSP firms specified in the Unsecured Committee Motion and, if the Debtors were able to obtain tolling agreements, the Unsecured Committee Motion would be largely mooted. Further, the Debtors requested that the Unsecured Committee Motion be denied on substantive grounds because the Unsecured Creditors' Committee had not met its burden of establishing that the claims it sought to assert were colorable.

Waters & Kraus LLP ("W&K") also filed a response in opposition to the Unsecured Committee Motion.

W&K has contested the claims on the grounds that the administrative deposit held by W&K came exclusively from the Fibreboard Insurance Settlement Trust under the NSP and that the Fibreboard Insurance Settlement Trust is an independent legal entity, separate from the Debtors. Therefore, W&K asserts that the property of the Fibreboard Insurance Settlement Trust was not property of Fibreboard on the Petition Date. Accordingly, W&K believes that the Debtors lack standing to pursue recovery of the administrative deposit held by W&K. As noted above, W&K made post-petition distributions from Administrative Deposits that it held in the amount of approximately $11.6 million without obtaining authorization from the Bankruptcy Court. W&K executed a tolling agreement and no action has been filed against W&K as of the date of this Disclosure Statement.

(c)    The Designated Members' Motion

On September 11, 2002, the Designated Members filed a motion for an order authorizing them to commence the following avoidance actions on behalf of the Debtors' Estates in addition to the actions sought to be asserted by the Unsecured Committee's Motion:

(i)    a fraudulent conveyance action pursuant to Section 544 of the Bankruptcy Code to avoid and set aside OCD's acquisition of Fibreboard's capital stock and related transactions. The Designated Members sought recovery of the property transferred or the value of such property for the benefit of the Debtors' estates and for creditors, as well as other relief, including realignment of the allocation of the purported asbestos liabilities of the Debtors as between Fibreboard and its pre-acquisition affiliates, on the one hand, and the rest of the Debtors, on the other;

(ii)    a fraudulent conveyance action pursuant to Section 544 of the Bankruptcy Code to avoid and set aside the claims of the Bank Holders against the Debtors and their Non-Debtor Subsidiaries under Subsidiary Guarantees supporting the Pre-petition loans made by the Bank Holders to certain of the Debtors or, alternatively, to equitably subordinate such claims; and

                    (iii)     a fraudulent conveyance action pursuant to Sections 544 and
548 of the Bankruptcy Code to avoid dividends paid to the Debtors' shareholders between
1996 and 2000, and to recover such dividends for the Debtors' Estates.

          (d)     Subsequent Developments Relating to Motions Concerning Avoidance
                  Actions

                    On September 20, 2002, several days before the hearing on the above-
described motions and the expiration of the statute of limitations, the Third Circuit (in <u>Official
Comm. v. Chinery (In re Cybergenics Corp.)</u>, 304 F.3d 316 (3d Cir. 2002) <u>reh'g en banc granted,
op. vacated</u>, 310 F.3d 785 (3d Cir. 2002), <u>rev'd en banc</u>, 330 F.3d 548 (3d Cir. 2003) determined
that official creditors' committees in Chapter 11 cases cannot properly bring avoidance actions
on behalf of a debtor and that such actions can only be prosecuted by a debtor-in-possession or
trustee (the initial opinion, which was vacated and ultimately reversed, the "<u>Cybergenics I
Decision</u>").

                    At a hearing held on September 24, 2002, the Bankruptcy Court, in
accordance with the Cybergenics I Decision, denied the motions of the Future Claimants'
Representative, the Unsecured Creditors' Committee and the Designated Members to assert
avoidance actions on behalf of the Debtors' Estates.  By Order dated September 25, 2002, the
Bankruptcy Court ordered that the Debtors file by September 27, 2002 a statement as to which
Avoidance Actions they would not commence.  It was further ordered that the Unsecured
Creditors' Committee and any other interested party inform the Bankruptcy Court on October 1,
2002, based on the Debtors' September 27th statement: (i) whether it believed that the Debtors
were unreasonably refusing to pursue any cause of action; and (ii) whether, as a result, such party
sought the appointment of a trustee with special powers to bring any such avoidance action on
behalf of the Estates.

                    The Court's September 25, 2002 Order also provided that, in the event any
party believed the Debtors were unreasonably refusing to commence any Avoidance Action, a
hearing would be held on October 3, 2002, to consider whether a "special trustee" should be
appointed to commence such action on behalf of the Estates.  The Bankruptcy Court noted that it
would not permit actions to be filed to recover settlement payments made to individual asbestos
claimants on any legal theory.  The Bankruptcy Court also required the Debtors to obtain any
tolling agreements by noon on October 3, 2002.

                    In accordance with the Bankruptcy Court's September 25, 2002 Order, the
Debtors sent a letter to the Bankruptcy Court on September 27, 2002, which set forth their view
that the alleged Avoidance Actions identified by the Unsecured Creditors' Committee should not
be brought.  Such letter concluded that, if the Bankruptcy Court were to find that the Unsecured
Creditors' Committee's proposed Avoidance Actions stated a colorable claim as to particular
NSP payments, the Debtors would file actions against named NSP firms that did not sign a
tolling agreement.

                    By Order dated October 2, 2002, the Bankruptcy Court (i) directed the
Debtors to obtain valid and enforceable tolling agreements from certain specified law firms, (ii)
directed the Debtors to commence an avoidance action against any NSP law firm that had not
executed a tolling agreement, (iii) directed the Debtors to commence appropriate actions against

any asbestos plaintiff as to whom an NSP law firm failed to produce, prior to the payments, sufficient evidence that the plaintiff had satisfied the conditions precedent to the payment, unless a tolling agreement had been obtained, and (iv) canceled the hearing scheduled for October 3, 2002.

On November 18, 2002, the Third Circuit vacated the September 20, 2002 opinion and judgment in Cybergenics and granted rehearing en banc. On May 29, 2003, the Third Circuit, *en banc*, held that "bankruptcy courts can authorize creditors' committees to sue derivatively to avoid fraudulent transfers for the benefit of the estate."

### 3.    Commencement of Avoidance Actions

(a)    Dividend Action

On October 2, 2002, the Debtors filed a class action complaint with the Bankruptcy Court pursuant to Sections 105, 544, 548 and 550 of the Bankruptcy Code, Sections 2201(a) and 2202 of Title 28 of the United States Code and Bankruptcy Rules 7001 and 7023, against certain shareholders of OCD common stock who had each received at least $100,000 in total dividends from June 1996 through the Petition Date, seeking the return of up to approximately $62 million. The Debtors' complaint sought (i) a determination that the dividend payments constituted fraudulent transfers pursuant to bankruptcy and state law and were therefore voidable and (ii) the recovery of such transfers, or the value thereof, together with interest.

(b)    Bank of America Action

On October 2, 2002, the Debtors filed a complaint against Bank of America Corp. with the Bankruptcy Court pursuant to Sections 105, 544 and 550 of the Bankruptcy Code, Sections 2201(a) and 2202 of Title 28 of the United States Code and Federal Rule of Bankruptcy Procedure 7001 seeking (i) a determination that the repayment of approximately $133 million of debt of Fibreboard to Bank of America Corp. in connection with the acquisition of Fibreboard was a fraudulent transfer and was therefore voidable and (ii) recovery of such transfer or the value thereof, with interest.

(c)    Guarantee/Bank Holders Action

On October 3, 2002, the Debtors and certain Non-Debtors filed a complaint against the Bank Holders with the Bankruptcy Court entitled <u>Owens Corning, et al. v. Credit Suisse First Boston, et al.</u>, A-02-5829, (i) to avoid the fraudulent incurrence of the obligations under the Subsidiary Guarantees; (ii) in the alternative, for declaratory relief to limit and determine respective amounts of such obligations; (iii) to avoid and recover preferential transfers; and (iv) to determine the allowed amount of claims of the Pre-petition Agent and certain lenders party to the 1997 Credit Agreement. The plaintiffs argued that, given the opinion in <u>Official Committee of Asbestos Personal Injury Claimants v. Sealed Air Corporation (In re: W.R. Grace & Co.)</u>, 281 B.R. 852 (D. Del. 2002) ("<u>Grace</u>" or "<u>Sealed Air</u>") and the latency periods inherent in the continuing development of asbestos-related personal injuries, the entities subject to such asbestos-related claims may have been insolvent far earlier than previously understood and earlier than the entities themselves reasonably believed. The plaintiffs

accordingly asserted, among other things, that (i) the Subsidiary Guarantors were insolvent or became insolvent and/or had unreasonably small capital in relation to their business or the transaction at the time or as a result of the guaranteed obligations incurred within a year of the Petition Date; (ii) within a year before the Petition Date, each Subsidiary Guarantor incurred guaranteed obligations for which they received less than reasonably equivalent value; and (iii) the obligations at issue could be avoided under applicable state law, including the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act. In addition, the Debtors sought avoidance and recovery of transfers of certain payments made by OC during the 90-day period prior to the Petition Date to the Pre-petition Agent as "preferences" under Sections 547 and 550 of the Bankruptcy Code.

      (d)    Fibreboard Shareholders Action

On October 3, 2002, OCD and Fibreboard filed a class action complaint with the Bankruptcy Court seeking a determination that the tender offer and payment by OCD of up to approximately $515 million to Fibreboard's shareholders, through its wholly-owned subsidiary Sierra Corporation, for the acquisition of Fibreboard were fraudulent transfers pursuant to Section 544 of the Bankruptcy Code and applicable state law and seeking recovery of payments to those shareholders who received $198,000 or more. OCD and Fibreboard sought to recover these transfers or their value pursuant to Section 550 of the Bankruptcy Code. In applying the rationale set out in the Sealed Air decision discussed above, OCD and Fibreboard asserted that OCD and Sierra Corporation were insolvent at the time of, or were rendered insolvent by, and/or had unreasonably small assets or capital in relation to their business or the transaction at the time or as a result of the tender offer or payment for the acquisition of Fibreboard, and Fibreboard was also insolvent at that time. OCD and Fibreboard accordingly asserted that the tender offer and payments at issue were voidable as fraudulent transfers by OCD and should be avoided pursuant to Section 544 of the Bankruptcy Code and applicable law, including the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act.

      (e)    NSP Actions, Tolling Agreements, and the Resolution Incorporated in the Plan

The Debtors executed tolling agreements with approximately 104 of the approximately 115 law firms that entered into NSP or non-NSP Agreements with the Debtors on behalf of claimants asserting asbestos-related personal injury or wrongful death claims.

With respect to those law firms that did not sign tolling agreements, on October 4, 2002, OCD, Fibreboard and Integrex filed 11 complaints with the Bankruptcy Court, pursuant to Sections 544, 548 and 550 of the Bankruptcy Code, Sections 2201(a) and 2202 of Title 28 of the United States Code and Federal Rule of Bankruptcy Procedure 7001. These complaints sought declaratory relief determining, among other things, whether (i) the NSP Agreement with each respective defendant was a valid agreement enforceable in accordance with its terms, subject to applicable bankruptcy law; or (ii) the NSP payments made to each respective defendant were avoidable or recoverable as fraudulent transfers under applicable state and federal fraudulent conveyance law.

These complaints were filed as declaratory judgment actions to preserve certain allegations asserted by the Unsecured Creditors' Committee, but that do not reflect the

views of the Debtors. In light of the Cybergenics I Decision, the Unsecured Creditors' Committee was named as a defendant in each of these actions to make it a party to permit it to present its own position on the allegations. In the event that the Bankruptcy Court determines that the NSP payments made to each respective defendant are avoidable or recoverable as fraudulent transfers under applicable state and federal fraudulent conveyance law, one or more claims will exist against each defendant to avoid and recover some or all of the NSP-related payments at issue.

On or before September 29, 2003, similar lawsuits were brought against 5 additional law firms whose tolling agreements were about to expire. The Unsecured Creditors' Committee was named as a defendant in all such lawsuits, solely with respect to the declaratory relief sought. During the first quarter of 2004, the lawsuit against one of the law firms was dismissed with consent of the Unsecured Creditors Committee and Bankruptcy Court approval. The Debtors requested a stay of the litigation pending the determination of the disposition of such litigation under the plan of reorganization. Pursuant to Court Order, the litigation has been stayed until February 28, 2006. On October 3, 2005, the Debtors brought additional adversary actions against Gertler, Gertler, Vincent & Ploktin, LLP, et al. and Murray Law Firm, et al. These two defendants, which had signed previous tolling agreements, were located in Louisiana and could not be contacted to extend the tolling agreements because of Hurricane Katrina. On November 14, 2005, the Debtors moved to stay the Gertler and Murray adversary actions, so that the stay of the adversary actions would be consistent with the stay currently in place as to the other adversary actions, i.e., until February 28, 2006.

Recoveries, if any, of funds held by attorneys under the NSP paid from the Fibreboard Insurance Settlement Trust are included in the definition of FB Reversions under the Plan. As such, any such recoveries would be transferred to the FB Sub-Account of the Asbestos Personal Injury Trust under the Plan.

Recoveries net of expenses of recovery, if any, of funds held by attorneys under the NSP paid by OCD constitute OCD Reversions under the Plan. OCD Reversions that are Cash as of the Effective Date are included as Available Cash to be distributed to creditors of OCD on the Initial Distribution Date under the Plan. Similarly, any such funds which are determined to constitute OCD Reversions after the Effective Date shall be included as Excess Available Cash to be distributed to creditors of OCD on the Final Distribution Date under the Plan.

(f)    Third-Party Preference Actions

The Debtors identified (i) approximately 44 non-affiliated parties that received potential preferences under Section 547 of the Bankruptcy Code, exceeding a threshold amount of $200,000; (ii) 12 present and former officers that received certain incentive payments exceeding a threshold of $200,000 in the aggregate per officer, in September 2000; (iii) one director that received a pre-petition pension payment in September 2000; and (iv) a joint venture affiliate of OC that received approximately $3.8 million in the one-year period prior to the commencement of the Chapter 11 proceedings. The Debtors executed tolling agreements with approximately 54 of the parties mentioned above, including some present and former officers, the director and the affiliate of OC. The officers and directors who executed tolling agreements

each received amounts in excess of $200,000 in supplemental compensation within 90 days of the Petition Date; the Unsecured Creditors' Committee has alleged that such payments are either preferences or fraudulent conveyances.

Between September 30, 2002 and October 2, 2002, the Debtors commenced actions against three vendors who had not executed tolling agreements, seeking the return of potential preferential funds received by those parties in an amount totaling approximately $1.2 million.

        (g)    Turnover Action

On October 2, 2002, the Debtors commenced an action against The Northern Trust Company, styled Owens Corning v. The Northern Trust Company, Adv. No. 02-5818, seeking the turnover of approximately $65,400 that the Debtors believed had been improperly retained by the bank in October 2000, or improperly charged against Owens Corning's account, due to certain banking errors. Further investigation revealed that the bank's actions were largely appropriate, and the parties entered into a stipulation, approved by Bankruptcy Court Order entered August 23, 2005, that (a) required The Northern Trust Company to pay OCD $2,993.04 plus certain interest and (b) permitted The Northern Trust Company to retain the balance of the funds at issue.

        4.    Events Subsequent to Filing of Avoidance Actions

On October 16, 2002, the Debtors filed in each of the Avoidance Actions discussed above a Motion for Order Staying Adversary Actions Pending Introduction and Confirmation of Plan of Reorganization (the "Stay Motion"). In the Stay Motion, the Debtors asserted that staying the Avoidance Actions would (a) permit the Debtors and creditor constituencies to focus attention and resources on creating a consensual plan of reorganization, (b) allow the creditor constituencies to participate in the decision regarding whether and to what extent these claims are litigated and (c) maximize the efficient use of judicial and Debtor resources. Certain parties filed objections to the Stay Motion, including, among others, the Designated Members, and CSFB, as Agent for the Bank Holders.

On January 13, 2003, the Bankruptcy Court entered an Order that stayed the Avoidance Actions until January 27, 2003 (with the exception of service of process). By further Orders of the Bankruptcy Court, the stay was further extended. Currently, the Avoidance Actions are stayed until February 26, 2006.

        (a)    The Guarantee/Bank Holders Action

On November 7, 2002, the Designated Members filed a cross-motion to intervene in the Bank Holders Action, to which CSFB, as Agent, filed an objection.

Pursuant to Judge Wolin's Case Management Order, dated December 23, 2002, the reference to the Bankruptcy Court was withdrawn with respect to the Bank Holders Action. In accordance with the terms of the order, on December 31, 2002, the Designated Members filed an amended motion to intervene and a proposed complaint, which was amended on January 10, 2003. The Debtors and certain non-Debtors filed a partial opposition to the

amended motion to intervene. Also on December 31, 2002, the Future Claimants'
Representative and the Asbestos Claimants' Committee filed motions to intervene. On January
10, 2003, CSFB, as Agent, filed a motion to dismiss the Bank Holders Action, an objection to the
Designated Members' amended motion to intervene and a memorandum of law. The Debtors
filed a memorandum of law in opposition to CSFB's motion to dismiss on January 16, 2003.

At the request of the Debtors and in an effort to limit the number of issues
to be presented at trial, on January 20, 2003, the Future Claimants' Representative filed a notice
of withdrawal of certain counts of its complaint in intervention, but reserved the right to pursue
such claims in the future.

Although a hearing was scheduled to commence April 2003, it was
postponed. Under the Plan, the Bank Holders Action would be dismissed.

> (b)    The Unsecured Creditors' Committee Motion to Intervene

On August 5, 2003, the Unsecured Creditors' Committee filed a motion to
intervene as of right as a party plaintiff and to file complaints in the Avoidance Actions
involving payments to law firms under NSP Agreements. This Motion also sought to lift the stay
applicable to those actions, as well as an order authorizing the Committee to commence actions
against all of the law firms with which the Debtors have entered into tolling agreements. The
Unsecured Creditors' Committee also requested a hearing on its motion on shortened notice.
The Debtors objected to the Unsecured Creditors' Committee's motion to shorten notice on
August 18, 2003 and responded to the Unsecured Creditors' Committee's motion to intervene on
September 9, 2003.

On August 19, 2003, the Bankruptcy Court entered an Order denying the
Unsecured Creditors' Committee's motion to shorten notice. A hearing was held on the motion
to intervene on September 22, 2003, and on September 24, 2003, the Bankruptcy Court entered
two Orders addressing the motion. The first Order directed all law firms that had entered into
NSP Agreements or non-NSP agreements with the Debtors, and their professionals, to preserve
all records related to such NSP Agreements or non-NSP agreements. The second Order
authorized the Unsecured Creditors' Committee, upon filing appropriate motions in the
Avoidance Actions involving payments to law firms under NSP Agreements, to intervene in such
actions. However, the Order did not authorize the Unsecured Creditors' Committee to file
amended or other complaints in such actions and did not modify the stay in effect with respect to
such actions. The second Order also directed the Debtors, on or before September 29, 2003, to
either (a) obtain and file new tolling agreements, to the extent necessary, from the appropriate
law firms, or (b) commence suits against such law firms. To the extent the Debtors did not
obtain tolling agreements or file suits, the Unsecured Creditors' Committee was authorized by
such Order to commence suits against such firms.

By September 29, 2003, the Debtors entered into approximately 79 new
tolling agreements. With respect to those law firms that did not sign new tolling agreements,
OCD, Fibreboard and Integrex filed five complaints with the Bankruptcy Court in substantially
the same form as the complaints filed on October 4, 2002. See Section V.G.3.e of this
Disclosure Statement entitled "NSP Actions and Tolling Agreements." The Unsecured
Creditors' Committee was named as defendant in all such lawsuits, solely with respect to

declaratory relief sought.  During the first quarter of 2004, the lawsuit against one of the law firms was dismissed with the consent of the Official Committee of Unsecured Creditors and Bankruptcy court approval.  Debtors later requested a stay of the litigation pending its disposition in a plan of reorganization.  Pursuant to court order, the litigation has been stayed until February 28, 2006.

       (c)     Settlement of Preference Action against A.C. Leadbetter & Son, Inc.

Between September 30, 2002 and October 2, 2002, the Debtors commenced actions against three vendors who had not executed tolling agreements, seeking the return of potentially preferential funds received by those parties in an amount totaling approximately $1.2 million.  One of these actions has been settled.  By Order entered October 30, 2003, the Bankruptcy Court approved a stipulation between OCD and A.C. Leadbetter & Son, Inc. in <u>Owens Corning v. A.C. Leadbetter & Son, Inc.,</u> Adv. No. 02-5810, in which, among other things, (a) OCD agreed to release its preference action against A.C. Leadbetter & Son, Inc., in the amount of $466,749 net of certain "subsequent new value," and (b) A.C. Leadbetter & Son, Inc. agreed to amend to $0.00 two secured proof of claims against OCD, each in the amount of $657,575.22 plus interest, costs and other charges.

**THE CHAPTER 11 CASES ARE ONGOING AND PARTIES WHO DESIRE CURRENT INFORMATION ON EVENTS THAT MAY AFFECT THESE CASES SHOULD REGULARLY REVIEW THE DOCKETS AND PLEADINGS, WHICH ARE AVAILABLE FROM THE BANKRUPTCY COURT AND THE DISTRICT COURT, AND/OR ATTEND OR PARTICIPATE IN HEARINGS SCHEDULED IN THE CHAPTER 11 CASES, EITHER IN PERSON OR TELEPHONICALLY.**

## VI.    FUTURE BUSINESS OF THE REORGANIZED DEBTORS

### A.    Structure and Business of the Reorganized Debtors

Following the Effective Date, the Reorganized Debtors intend to continue to operate their businesses as they have been operated to date, with the exception of such reorganization, divestitures and other restructurings as may be contemplated by the Plan.  In addition, the Reorganized Debtors reserve the right, subject to such approvals of their respective boards of directors or shareholders as shall be required by law, to entertain and implement such opportunities for acquisitions, divestitures, restructuring or other internal reorganizations as shall be deemed appropriate under the circumstances.  In that regard, OC intends to implement a restructuring plan that would reorganize OCD and its Subsidiaries along OC's major business lines.  The planning for this restructuring is in a preliminary stage.  A more detailed description of the Restructuring Transactions will be set forth on <u>Appendix H</u> to this Disclosure Statement to be filed no later than ten (10) Business Days prior to the Objection Deadline.  A detailed description of the actions and steps required to implement the Restructuring Transactions will be filed at least ten (10) Business Days prior to the Objection Deadline.  On or prior to, or as soon as practicable after, the Effective Date, the Debtors or the Reorganized Debtors may take such steps as may be necessary or appropriate to effectuate Restructuring Transactions that satisfy the requirements set forth in Section 5.6 of the Plan.

**B.      Board of Directors and Management of Reorganized Debtors**

As of September 30, 2005, OCD's Board of Directors was composed of ten directors, divided into three classes. Each class of directors serves for a term expiring at the third succeeding annual meeting of stockholders after the year of election of such class, and until their successors are elected and qualified.

**1.      Composition of the Board of Directors as of Date of Disclosure Statement**

The following is a list, as of the date of the filing of this Disclosure Statement, of the names of each of the Directors of OCD:

| Name | Title |
|------|-------|
| Norman P. Blake, Jr. | Director |
| David T. Brown | Director, President and Chief Executive Officer |
| Gaston Caperton | Director |
| William W. Colville | Director |
| Landon Hilliard | Director |
| Ann Iverson | Director |
| W. Walker Lewis | Director |
| W. Ann Reynolds | Director |
| Robert B. Smith, Jr. | Director |
| Michael H. Thaman | Director, Chairman of the Board and Chief Financial Officer |

Norman P. Blake, Jr. has been a Director since 1992. He is former Chairman, President and Chief Executive Officer of Comdisco, Inc., global technology services, Rosemont, IL. A graduate of Purdue University, Mr. Blake previously has served as Chief Executive Officer of the United States Olympic Committee; Chairman, Chief Executive Officer and President of Promus Hotel Corporation; Chairman, Chief Executive Officer and President of USF&G Corporation; and Chairman and Chief Executive Officer of Heller International Corporation of Chicago. Mr. Blake is a member of the Purdue Research Foundation and Purdue University's President's Council and Dean's Advisory Council, Krannert Graduate School of Management. He is the recipient of the degree of Doctor of Economics *honoris causa* from Purdue University, granted jointly by the Krannert Graduate School of Management and School of Liberal Arts. He has also been awarded The Ellis Island Medal of Honor.

David T. Brown has been a Director since January, 2002, and, since April 18, 2002, has been President and Chief Executive Officer of OCD. A graduate of Purdue University, Mr. Brown became Executive Vice President and Chief Operating Officer in January 2001. Previously, he held numerous leadership positions in sales and marketing at OC, including serving as President of the Insulating Systems Business beginning in 1998, President of Building Materials Sales and Distribution beginning in 1996, and President of the Roofing and Asphalt Business beginning in 1994. Mr. Brown joined OC in 1978 after working for Procter & Gamble, Shearson Hammill and Eli Lilly. Mr. Brown serves on the Board of Directors of Borg Warner, Inc. He also is on the Board of the Toledo Museum of Art and the Dean's Advisory Council for the Purdue's Krannert School of Management. Mr. Brown is a past board member of Asphalt Roofing Manufacturers Association Executive Committee, National Roofing Contractors

636

Association Advisory Board, Thermal Insulation Manufacturers Association and Executive Committee of the North American Insulation Manufacturers Association.

Gaston Caperton has been a Director since 1997. He is President and Chief Executive Officer of The College Board, a not-for-profit educational association, New York, NY, Chairman of The Caperton Group, a business investment and development company, Shepherdstown, WV and former Governor of the State of West Virginia. A graduate of the University of North Carolina, Mr. Caperton began his career in a small insurance agency, became its principal owner and chief operating officer, and led the firm to become the tenth largest privately-owned insurance brokerage firm in the U.S. He also has owned a bank and mortgage banking company. Mr. Caperton was elected Governor of West Virginia in 1988 and 1992. In 1997, Mr. Caperton taught at Harvard University as a fellow at the John F. Kennedy Institute of Politics. Prior to beginning his current position in mid-1999, Mr. Caperton also taught at Columbia University, where he served as Director of the Institute on Education and Government at Teachers College. Mr. Caperton is a director of United Bankshares, Inc., Energy Corporation of America, West Virginia Media Holdings, and Prudential Financial. He was the 1996 Chair of the Democratic Governors' Association, and served on the National Governors' Association executive committee and as a member of the Intergovernmental Policy Advisory Committee on U.S. Trade. He also was Chairman of the Appalachian Regional Commission, Southern Regional Education Board, and the Southern Growth Policy Board.

William W. Colville has been a Director since 1995. He is now retired and was a former Senior Vice President, General Counsel and Secretary of OC. A graduate of Yale University and the Columbia University Law School, Mr. Colville began his career at OC in 1984 as Senior Vice President and General Counsel. Prior to joining OC, he was President of the Sohio Processed Minerals Group from 1982 to 1984, and General Counsel of Kennecott Corporation from 1980 to 1982. Mr. Colville is also a director of Nordson Corporation.

Landon Hilliard has been a Director since 1989. He is a partner with Brown Brothers Harriman & Co., private bankers, New York, NY. A graduate of the University of Virginia, Mr. Hilliard began his career at Morgan Guaranty Trust Company of New York. He joined Brown Brothers Harriman in 1974 and became a partner in 1979. Mr. Hilliard is a director of Norfolk Southern Corporation, Western World Insurance Company and Russell Reynolds Associates, Inc. He is also Chairman of the Board of Trustees of the Provident Loan Society of New York and Secretary of The Economic Club of New York.

Ann Iverson has been a Director since 1996. She is President and Chief Executive Officer of International Link, an international consulting firm, Scottsdale, AZ. Ms. Iverson began her career in retailing and held various buying and executive positions at retail stores in the U.S. through 1989, including Bloomingdales, Dayton Hudson, and US Shoe. She then joined British Home Stores as Director of Merchandising and Operations in 1990; Mothercare as Chief Executive Officer in 1992; Kay-Bee Toy Stores as President and Chief Executive Officer in 1994; and Laura Ashley Holdings plc. as Group Chief Executive in 1995. In 1998, she founded and became President and Chief Executive Officer of International Link. Ms. Iverson is a director of several privately-held companies. She is also a member of the Board of Trustees of the Thunderbird School of International Management, and a member of Financo Global Consulting.

814526.7

117

W. Walker Lewis has been a Director since 1993. He is Chairman of Devon Value Advisers, a financial consulting and investment banking firm in Greenwich, CT and New York, NY. Previously, Mr. Lewis served as Senior Advisor to SBC Warburg Dillon Read; Senior Advisor to Marakon Associates; and Managing Director, Kidder, Peabody & Co., Inc. Prior to April 1994, he was President of Avon U.S. and Executive Vice President, Avon Products, Inc. Prior to March 1992, Mr. Lewis was Chairman of Mercer Management Consulting, Inc., a wholly-owned subsidiary of Marsh & McLennan, which is the successor to Strategic Planning Associates, a management consulting firm he founded in 1972. He is a graduate of Harvard College, where he was President and Publisher of the Harvard Lampoon. Mr. Lewis is Chairman of London Fog Industries, Inc. and a director of Mrs. Fields' Original Cookies, Inc. He is also a member of the Council on Foreign Relations and the Washington Institute of Foreign Affairs.

W. Ann Reynolds has been a Director since 1993. She is a former President and Professor of Biology at The University of Alabama at Birmingham, Birmingham, AL. A graduate of Kansas State Teachers College and the University of Iowa, Dr. Reynolds previously served as Chancellor of City University of New York for seven years and for eight years as Chancellor of the twenty-campus California State University system. Dr. Reynolds is a director of Humana, Inc., Abbott Laboratories, Maytag Corporation, and the Post-Gazette, Champaign-Urbana, IL. She is also a member of the Society for Gynecological Investigation, and the Perinatal Research Society.

Robert B. Smith, Jr. has been a Director since 2004. He is Director of the Virginia Environmental Endowment, a nonprofit, funded, grant making corporation dedicated to improving the environment. A graduate of the University of North Carolina and the University of North Carolina Law School, Mr. Smith's previous experience included serving as Trustee of the Dalkon Shield Claimants Trust, a public interest trust created by the Federal Bankruptcy Court to compensate those damaged by the Dalkon Shield, and as Vice President for Government Relations of the Pharmaceutical Manufacturers Association. His prior experience also included various positions related to the U.S. Senate, including: Chief Counsel and Staff Director, U.S. Senate Government Operations Committee; Chief Counsel, U.S. Senate Subcommittee on Revision and Codification of the Laws; Chief Legislative Assistant, Senator Sam J. Ervin, Jr.; Special Counsel, U.S. Senate Antitrust and Monopoly Subcommittee; and Counsel, U.S. Senate Subcommittee on Constitutional Rights.

Michael H. Thaman has been a Director since January 2002 and is Chairman of the Board and Chief Financial Officer of OCD. A graduate of Princeton University, Mr. Thaman joined OC in 1992. He was elected Chairman of the Board in April 2002 and became Chief Financial Officer in 2000. Before assuming his current position, Mr. Thaman held a variety of leadership positions at OC, including serving as President of the Exterior Systems Business beginning in 1999 and President of the Engineered Pipe Systems Business beginning in 1997. Prior to joining OC, Mr. Thaman spent six years as a strategy consultant at Mercer Management Consulting, including as a Vice President in their New York office. Mr. Thaman is a director of Florida Power and Light Group, Inc.

814526.7

118

2.    **Identity of Executive Officers as of Date of Disclosure Statement**

The following is a list, as of the date of the filing of this Disclosure Statement, of the names of the executive officers of OC and the positions held by each such executive officer at OC:

| Name | Title |
|------|-------|
| Sheree L. Bargabos | Vice President and President, Roofing and Asphalt Business |
| David T. Brown | President and Chief Executive Officer |
| Brian D. Chambers | Vice President and President, Sidings Solution Business |
| Charles E. Dana | Vice President and President, Composite Solutions Business |
| Roy D. Dean | Vice President and Corporate Controller |
| Joseph C. High | Senior Vice President, Human Resources |
| David L. Johns | Senior Vice President and Chief Supply Chain and Information Technology Officer |
| George E. Kiemle | Vice President and President, Insulating Systems Business |
| Stephen K. Krull | Senior Vice President, General Counsel and Secretary |
| Frank C. O'Brien-Bernini | Vice President, Science and Technology |
| Charles W. Stein, Jr. | Vice President and President, Cultured Stone Business |
| Michael H. Thaman | Chairman of the Board and Chief Financial Officer |

Sheree L. Bargabos has been Vice President and President, Roofing and Asphalt Business since October 2005. She was formerly Vice President and President of Exterior Systems, Vice President of Training and Development, Vice President and General Manager of the Foam Business, General Manager of the Foam Business and Sales Leader of the Building Materials Sales and Distribution, Canada.

David T. Brown has been President and Chief Executive Officer of OCD since April 2002. He was formerly Executive Vice President and Chief Operating Officer and has also formerly served as Vice President and President of the Insulating Systems Business, President of Building Materials Sales and Distribution. He has also been a Director since January 2002.

Brian D. Chambers was elected President, Sidings Solution Business in October, 2005. Previously, Mr. Chambers was Vice President and General Manager of the Residential Roofing Business.

Charles E. Dana has been President of the Composite Solutions Business since February 2004. He was formerly Vice President of the Global Sourcing and eBusiness, Vice President of Owens Corning Supply Chain Solutions, Vice President of Global Sourcing Management and Vice President of Planning and Analysis - Composite Systems.

Roy D. Dean has been Vice President & Corporate Controller since March 2004. He was formerly Vice President and Controller of the Insulating Systems Business.

Joseph C. High has been Senior Vice President, Human Resources since January 1, 2004.

David L. Johns has been Senior Vice President and Chief Supply Chain and Information Technology Officer since April 2001. He was formerly Vice President and Chief Technology Officer.

George E. Kiemle has been Vice President and President of the Insulating Systems Business since February 2001. He was formerly Vice President, Manufacturing, of the Insulating Systems Business.

Stephen K. Krull became Senior Vice President, General Counsel and Secretary of OCD on February 6, 2003. He was formerly Vice President of Corporate Communications, Vice President and General Counsel of Operations, Director, Law, and Senior Counsel, Law.

Frank C. O'Brien-Bernini was appointed Vice President, Science and Technology in March 2001. Previously he was Director, Research and Development and Vice President, Technology of the Insulating Systems Business; Director of Platform Development of Insulation North America; Director, Miraflex Product and Process Technology Laboratory; Director, Composite Product and Process Technology Laboratory and Manager of Composites Continuous Fiber Forming Laboratory.

Charles W. Stein, Jr. was elected Vice President and President, Cultured Stone Business in October of 2005. Previously he was Vice President and General Manager, OC Construction Services, Communications Specialist and Vice President, Services; Vice President, Service Development; General Manager of Building Materials; and Commercial Director of European Building Materials.

Michael H. Thaman has been Chairman of the Board and Chief Financial Officer of OCD since April 2002. He was formerly Senior Vice President and Chief Financial Officer, Vice President and President of the Exterior Systems Business and Vice President and President of Engineered Pipe Systems. He has also been a Director since January 2002.

Of the executive officers referenced above, only Messrs. Brown, Johns, and Thaman served as executive officers of OC at or within two years before the Petition Date. In addition, Messrs. Brown, Dean, Krull, and Thaman also served as executive officers of one or more of the Subsidiary Debtors at or within two years before the Petition Date.

### 3.     Directors and Officers of Reorganized Debtors as of the Effective Date

As disclosed in the Plan, the identities of the individuals who shall serve on the Board of Directors for Reorganized OCD (the "Reorganized OCD Board") shall be disclosed on Schedule XIX to the Plan, to be filed no later than five (5) Business Days prior to the Disclosure Statement Hearing, subject to such further modiciations, revisions and supplementation as may be satisfactory in form and substance to the Debtors, the Asbestos Claimants' Committee and the Future Claimants' Representative up to ten (10) Business Days prior to the Objection Deadline. In addition, as long as the Asbestos Personal Injury Trust owns 20% of the outstanding common equity of Reorganized OCD, the TAC and the Future Claimants' Representative shall each be entitled to designate a non-voting board observer, each of whom shall be reasonably acceptable to Reorganized OCD, which board observer will be entitled to participate in all of Reorganized OCD's board of directors meetings. The directors shall be such that Reorganized OCD shall satisfy the standards for listing the New OCD Common Stock on the NYSE or for quotation in the NASDAQ stock market, so that the New OCD Common Stock could be listed or quoted on such market (as well as satisfying the requirements necessary for the board to be able to establish committees, including an audit committee, that qualify under the applicable market rules and

applicable laws and SEC Rule 16b-3 and Internal Revenue Code ("IRC") § 162(m)). In addition, one of the directors shall qualify as an "audit committee financial expert" within the meaning of the SEC Regulation S-K, Item 401(h).

### 4.    Treatment of Director and Officer Indemnification Under the Plan

The Plan provides that the Debtors will treat indemnity obligations to directors and officers under their charters, by-laws, statutes or contracts as executory contracts that will be assumed by the Debtors. As a result, the Debtors will be obligated in accordance with the terms of their charters, by-laws, statutes or contracts to indemnify directors and officers for their services, except that such indemnification will not cover willful misconduct by any director or officer. However, the Debtors are not obligated to indemnify any director or officer from liability arising out of any actions excluded from the definition of Indemnified Obligations

The Plan also provides that after the Effective Date, the Reorganized Debtors will obtain and maintain tail insurance coverage and will indemnify and hold harmless all Persons who were directors and officers of the Debtors on the Petition Date or thereafter.

### 5.    Compensation of Executive Officers

The following table sets forth information concerning compensation and stock-based awards received by each individual that served as Chief Executive Officer during 2004 and each of the next four highest paid executive officers who were serving as executive officers of the Company at the end of 2004 (these five individuals collectively are referred to as the "Named Executive Officers").

| Name and Principal Position[4] | Year | Annual Compensation | | | | Long Term Compensation | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Awards | | Payouts | |
| | | Salary ($) | Bonus ($)[5] | Other Annual Compensation ($)[6] | | Restricted Stock Award(s) ($)[7] | Securities Underlying Options/ SARs(#)[8] | LTIP Payouts ($) | All Other Compensation ($) |
| David T. Brown President and Chief Executive Officer | 2004 2003 2002 | 750,000 750,000 647,916 | 3,062,640[8] 1,470,000[9] 1,713,199 | | | | | 3,008,250[9] 2,625,000[9] | 6,250[10] 10,000 15,300 |
| Michael H. Thaman Chairman of the Board and Chief Financial Officer | 2004 2003 2002 | 650,000 650,000 362,500 | 1,902,680[9] 828,000[9] 1,380,000 | | | | | 2,483,000[9] 2,145,000[9] | 5,417[10] 10,000 15,300 |
| George E. Kiemle Vice President and President, Insulating | 2004 2003 2002 | 284,625 275,000 266,667 | 788,819[9] 270,000[9] 528,8000 | | | | | 652,361[9] 577,500[9] | 10,250[10] 10,000 15,300 |

[4]    Prior to April 2002, Mr. Brown served as Executive Vice President and Chief Operating Officer. Prior to April 2002, Mr. Thaman served as Senior Vice President and Chief Financial Officer. Prior to February 2004, Mr. Dana served as Vice President – Corporate Controller and Global Sourcing. Mr. High joined Owens Corning in January 2004.

[5]    In addition to payments under Owens Corning's annual Corporate Incentive Plan, the amounts shown for 2004 include (1) payments under Owens Corning's Key Employee Retention Incentive Plan as follows: Mr. Brown, $750,000; Mr. Thaman, $650,000; Mr. Kiemle, $286,000; Mr. Dana, $275,000; and Mr. High, $244,000 and (2) in the case of Mr. High, a one-time sign-on bonus of $100,000.

[6]    "Other Annual Compensation" includes perquisites and personal benefits, where such perquisites and personal benefits exceed the lesser of $50,000 or 10% of the Named Executive Officer's annual salary and bonus for the year, as well as certain other items of compensation. For the years shown, none of the Named Executive Officers received perquisites and/or personal benefits in excess of the applicable threshold. Mr. High received $54,258 as payment of certain taxes on his sign-on bonus.

[7]    There were no restricted stock awards to any of the Named Executive Officers in 2002, 2003, or 2004.

    At the end of 2004, Messrs. Brown and Thaman each held a total of 6,666 shares of restricted stock, valued at $31,330; Messrs. Kiemle and Dana each held a total of 2,666 shares of restricted stock, valued at $12,530; and Mr. High held no shares of restricted stock. The value of these aggregate restricted stock holdings was calculated by multiplying the number of shares held by the closing price of Owens Corning common stock on December 31, 2004 (as reported on the Over The Counter Bulletin Board). Dividends are paid by Owens Corning on restricted stock held by the Named Executive Officers if paid on stock generally.

[8]    No stock options or stock appreciation rights (SARs) were awarded to any of the Named Executive Officers in 2000, 2001, or 2002.

[9]    The amounts reflected in the LTIP Payouts column represent amounts payable pursuant to Owens Corning's Long Term Incentive Plan with respect to one-year transition performance period cycles adopted in connection with phase-in of the new plan, which became effective January 1, 2003.

[10]    The amounts shown for each Named Executive Officer represents contributions made by Owens Corning to such officer's account in the Owens Corning Savings Plan during the year.

| | | | | | Long Term Compensation | | | |
| | Annual Compensation | | | | Awards | | Payouts | |
| Name and Principal Position[4] | Year | Salary ($) | Bonus ($)[5] | Other Annual Compensation ($)[6] | Restricted Stock Award(s) ($)[7] | Securities Underlying Options/ SARs(#)[8] | LTIP Payouts ($) | All Other Compensation ($) |
|---|---|---|---|---|---|---|---|---|
| **Systems Business** | | | | | | | | |
| Charles E. Dana | 2004 | 271,875 | 755,294[9] | | | | 623,137[9] | 10,250[10] |
| Vice President and | 2003 | 250,000 | 275,000[9] | | | | 525,000[9] | 10,000 |
| President, Composite Solutions Business | 2002 | 250,000 | 495,000 | | | | | 15,300 |
| Joseph C. High | | | | | | | | |
| Senior Vice President, Human Resources | 2004 | 325,000 | 803,316[9] | 54,258 | | | 744,900[9] | 10,250[10] |

### 6.   Compensation/Retirement Plans/Retirement Benefits

OC maintains a tax-qualified Cash Balance Plan covering certain of its salaried and hourly employees in the United States, including each of the Named Executive Officers, in lieu of the qualified Salaried Employees' Retirement Plan maintained prior to 1996 ("Prior Plan"), which provided retirement benefits primarily on the basis of age at retirement, years of service and average earnings from the highest three consecutive years of service. In addition, OC has a non-qualified Executive Supplemental Benefit Plan ("ESBP") to pay eligible employees leaving OC the difference between the benefits payable under OC's tax-qualified retirement plan and those benefits which would have been payable except for limitations imposed by the IRC. Named Executive Officers are eligible to participate in both the Cash Balance Plan and the ESBP.

Cash Balance Plan – Under the Cash Balance Plan, each covered employee's earned retirement benefit under the Prior Plan (including the ESBP) was converted to an opening cash balance. Each year, eligible employees earn a benefit based on a percentage of such employee's covered pay. Prior to July 1, 2003, the percentage was 2% for covered pay up to 50% of the Social Security Taxable Wage Base and 4% for covered pay in excess of such wage base; effective July 1, 2003, the percentage became 4% for all subsequent covered pay. For this purpose, covered pay includes base pay, and certain annual incentive bonuses payable during the year. Accrued benefits earn monthly interest based on the average interest rate for five-year U.S. treasury securities. Employees vest in the Cash Balance Plan on completion of five years of service. Vested employees may receive their benefit under the Cash Balance Plan as a lump sum or as a monthly payment when they leave OC.

For employees who were at least age 40 with 10 years of service as of December 31, 1995 ("Grandfathered Employees"), including Messrs. Brown and Kiemle, the credit percentages applied to covered pay are increased pursuant to a formula based on age and years of service on such date. In addition, Grandfathered Employees are entitled to receive the greater of their benefit under the Prior Plan frozen as of December 31, 2000, or under the Cash Balance Plan (in each case including the ESBP).

Supplemental Executive Retirement Plan – OC maintains a Supplemental Executive Retirement Plan ("SERP") covering certain employees, including Mr. High, who

643

joined OC mid-career. The SERP provides for a lump sum payment following termination of employment equal to a multiple of the covered employee's Cash Balance Plan balance minus an offset equal to the present value of retirement benefits attributable to prior employment. The applicable multiplier for each covered employee ranges from 0.5 to 4.0 (determined by the covered employee's age when first employed by OC) and is 2.4 in the case of Mr. High.

Other Arrangements – Owens Corning has agreed to provide Mr. Dana a supplemental pension benefit, under Owens Corning's pension plan formula in existence on his employment date, determined as if he had earned 1 ½ years of service for each year worked, provided that he remains an Owens Corning employee for no less than ten years following his November 15, 1995 employment date.

In 1992, OC established a Pension Preservation Trust for amounts payable under the ESBP as well as under the individual pension arrangements described above. The Compensation Committee determines the participants in and any amounts to be paid with respect to the Pension Preservation Trust, which may include a portion of benefits earned under the ESBP and the pension agreements described above. Amounts paid into the Trust and income from the Trust reduce the pension otherwise payable at retirement. During 2004, no payments were made to the Trust.

The Debtors have analyzed the Pension Preservation Trust and provided the Unsecured Creditors' Committee the documents relating to the Pension Preservation Trust and the SERP. According to the Debtors' analysis, the Pension Preservation Trust is a true or "secular" trust, which is not property of the estate.

The Compensation Committee continually reviews the nature of compensation and incentive plans available to officers and key employees and suggests revisions from time to time as it deems appropriate to reflect current trends in compensation programs and the needs of OC. To the extent that any changes in compensation programs are approved and proposed to be implemented, they will be described in an amendment to this Disclosure Statement.

### 7.    Management Employment, Severance and Certain Other Agreements

On January 18, 2001, the Bankruptcy Court approved the Order Under 11 U.S.C. §§ 105, 363 and 365 Authorizing Continuation or Implementation of Employee, Emergence and Severance Programs. The Bankruptcy Court found that the reaffirmation of the Debtors' existing Employee Severance Program as defined in the Debtors' underlying motion was necessary to the Debtors reorganization efforts and specifically authorized the Debtors to provide severance benefits to their employees in accordance with the Employee Severance Program and in accordance with certain employment contracts identified in Exhibit D thereto. The Bankruptcy Court also authorized the filing of the exhibits to the motion under seal.

OC maintains a Corporate Incentive Plan under which participating employees, including each of the Named Executive Officers, are eligible to receive annual cash incentive awards based on their individual performance and on corporate performance against annual performance goals set by the Compensation Committee. For the 2004 and 2005 annual performance periods, the funding measures set by the Compensation Committee are based on "income from operations" (weighted at 75%) and "cash flow from operations" (weighted at

25%). Cash awards paid to the Named Executive Officers under the Corporate Incentive Plan for the 2004 performance period are reflected in the compensation table above.

Effective beginning with calendar year 2004, OC maintains a Key Employee Retention Incentive Plan ("KERP") to provide an incentive to designated key employees, including each of the Named Executive Officers, to remain in the employ of OC through the date of OC's emergence from Chapter 11. Under the KERP, each eligible employee is entitled to a cash payment equal to (1) a specified percentage of his or her annual base salary if such employee remains employed by OC through the end of the applicable calendar year or (2) a prorated portion of such specified percentage in the event of OC's emergence from Chapter 11 proceedings (or such employee's termination of employment due to death, disability, or termination other than for cause) prior to the end of the applicable calendar year. As of the current time, the Bankruptcy Court has approved the KERP for calendar years 2004 and 2005. Cash awards paid to the Named Executive Officers under the KERP for calendar year 2004 are reflected in the Summary Compensation Table above.

OC has entered into a Key Management Severance Agreement with each of the Named Executive Officers (the "Severance Agreement"). Under the terms of the Severance Agreement, if the Named Executive Officer's employment is terminated without "cause" or if the Named Executive Officer terminates his or her employment due to "Constructive Termination" (which among other things, following the occurrence of a "change of control," includes a reduction in base pay or incentive opportunity) the Named Executive Officer is entitled to a payment in an amount equal to two times the sum of base salary and annual incentive bonuses (based on an average of the three previous years' annual incentive payments or the average of the three previous years' annual incentive targets, whichever is greater), plus continuation of insurance benefits for a period of up to two years and, in the case of Messrs. Brown, Thaman and Kiemle, a payment equal to the additional lump sum pension benefit that would have accrued had such individuals been three years older, with three additional years of service, at the time of employment termination. Under the terms of the Severance Agreement, the consummation of the Plan on the Effective Date will constitute a "change of control" for purposes of the Severance Agreement.

On September 14, 2005, the Debtors filed a motion for entry of an order authorizing Owens Corning to amend its Key Management Severance Agreements with its President and Chief Executive Officer, David T. Brown, and its Chairman of the Board of Directors and Chief Financial Officer, Michael H. Thaman (the "Severance Motion"). The Debtors seek approval of the amendments to the Key Management Severance Agreements as a valid exercise of the Debtors' business judgment, consistent with good corporate governance and succession planning.

The Severance Motion is scheduled for hearing on February 7, 2006. The deadline to file objections to the Severance Motion was October 7, 2005, and no objections were filed. By agreement, the Objection Deadline was extended to January 6, 2006 at 4:00 p.m. for Credit Suisse, as Agent, only.

B14526.7

125

645

8.    **Directors' Compensation**

**Retainer and Meeting Fees** - OC compensates each director who is not an OC employee pursuant to a standard annual retainer/meeting fee arrangement. Effective July 1, 2004, such arrangement provides each non-employee director an annual retainer of $100,000, a fee of $1,500 for attendance at each meeting of a Board Committee of which such director is a member, no fees for attendance at meetings of the Board of Directors, and a fee of $1,500 for each day's attendance at other functions in which directors are requested to participate. In addition, Chairmen of Board Committee receive an additional annual retainer of $7,500. Prior to July 1, 2004, OC paid each director who was not an OC employee an annual retainer of $35,000 and a fee of $1,200 for (a) attendance at one or more meetings of the Board of Directors on the same day, (b) attendance at one or more meetings of each Committee of the Board of Directors on the same day, and (c) each day's attendance at other functions in which directors were requested to participate. In addition, Committee Chairmen received an additional retainer of $4,000 each year.

Prior to December 2000, a director could elect to defer all or a portion of his or her annual retainer and meeting fees under the Directors' Deferred Compensation Plan, in which case his or her account was credited with the number of shares of common stock that such deferred compensation could have purchased on the date of payment. The account was also credited with the number of shares that dividends on previously credited shares could have purchased on dividend payment dates. The Deferred Compensation Plan provides that account balances are payable in cash based on the value of the account, which is determined by the then fair market value of OC common stock, at the time the participant ceases to be a director. Under the terms of the Deferred Compensation Plan, the claims of directors to the cash value of such deferred shares is effectively equivalent to a claim as a general unsecured creditor of OC. Although no assurance can be given as to the value, if any, that would be attributed to such a claim under any plan or plans of reorganization ultimately confirmed in the Chapter 11 proceedings, any value ascribed to such a claim may be greater than the value of the number of shares of Owens Corning common stock the receipt of which was deferred if, as anticipated, the outstanding Owens Corning common stock is cancelled as part of the implementation of such plan or plans of reorganization.

**Stock Plan for Directors** – OC has a pre-petition stockholder approved Stock Plan for Directors, applicable to each director who is not an OC employee. The plan provides for two types of grants to each eligible director: (1) a one-time non-recurring grant of options to each new outside director to acquire 10,000 shares of common stock at a per share exercise price of 100 percent of the value of a share of common stock on the date of grant, and (2) an annual grant of 500 shares of common stock on the fourth Friday in April.

Initial option grants become exercisable in equal installments over five years from date of grant, subject to acceleration in certain events, and generally expire ten years from date of grant. No grant may be made under the plan after August 20, 2007, and a director may not receive an annual grant of common stock in the same calendar year he or she receives an initial option grant. A director entitled to receive an annual grant may elect to defer receipt of the common stock until he or she leaves the Board of Directors.

Pursuant to action of the Board of Directors, additional option grants and annual grants under the Plan were suspended effective April 1, 2002, pending further action by the Board. No initial option grants or annual grants were made under the Plan during 2004.

**Indemnity Agreements** - OC has entered into an indemnity agreement with each member of the Board of Directors which provides that, if the director becomes involved in a claim (as defined in the agreement) by reason of an indemnifiable event (as defined in the agreement), OC will indemnify the director to the fullest extent authorized by OC's by-laws, notwithstanding any subsequent amendment, repeal or modification of the by-laws, against any and all expenses, judgments, fines, penalties and amounts paid in settlement of the claim.

The indemnity agreement also provides that, in the event of a potential change of control (as defined in the agreement), the director is entitled to require the creation of a trust for his or her benefit, the assets of which would be subject to the claims of OC's general creditors, and the funding of such trust from time to time in amounts sufficient to satisfy OC's indemnification obligations reasonably anticipated at the time of the funding request. For a discussion of the treatment of Indemnity Agreements under the Plan, see Section VI.B.4 entitled "Treatment of Director and Officer Indemnification Under the Plan," above and Section VII.E.5 entitled "Indemnification Obligations."

9.    **Incentive Plans to be Implemented in Connection with Emergence from Chapter 11 Reorganization**

The Plan Proponents have negotiated the principal terms and conditions of certain incentive plans to be made available to employees generally and to certain management employees in connection with the emergence of the Reorganized Debtors from reorganization under Chapter 11. These plans include a broad-based Employee Incentive Program and a Management Incentive Program. A summary of the terms of these programs is set forth below. The summaries set forth below are qualified in their entirety to the terms of the plan documents, which will be filed up to ten (10) Business Days prior to the Objection Deadline, and to the terms of any individual agreements that may be entered into pursuant to those plan documents.

**Employee Incentive Program.** It is currently contemplated that all full-time employees and regular part-time employees of OCD and its Affiliates as of the Effective Date (excluding any employee who participates in the management incentive program described below, as of the Effective Date) shall be eligible to receive a grant of 100 shares of New OCD Common Stock, or appropriate equivalent interest, upon the Effective Date, as described in the Employee Arrangements set forth on Exhibit F to the Plan to be filed no later than five (5) Business Days prior to the Disclosure Statement Hearing, as it may be amended up to ten (10) Business Days prior to the Objection Deadline. Accordingly, OCD shall reserve 1,800,000 shares of New OCD Common Stock for issuance to such employees (assuming 18,000 eligible employees worldwide), which shares represent approximately 1.4% of the primary number of shares of New OCD Common Stock to be outstanding immediately after the Effective Date (assuming issuance of approximately 130.8 million shares on the Effective Date). Each award of 100 shares of New OCD Common Stock, or equivalent interest, will vest in its entirety on the

647

third anniversary of the Effective Date, subject to accelerated vesting for OCD-approved retirements or in the event that OCD terminates the employee's employment without cause.

**Management Incentive Program.** It is currently contemplated that on the Effective Date, Reorganized OCD will adopt Management Arrangements, the terms and conditions of which shall be summarized in greater detail in Exhibit F to the Plan, to be filed at least five (5) Business Days prior to the Disclosure Statement Hearing, as it may be amended up to ten (10) Business Days prior to the Objection Deadline. On the Effective Date, management and designated employees of Reorganized OCD and the other Reorganized Debtors shall receive the benefits provided under such Management Arrangements on the terms and conditions provided for therein.

### C.    Terms of Certificate of Incorporation of Reorganized OCD

The Amended and Restated Certificate of Incorporation of Reorganized OCD and the Amended and Restated Bylaws of Reorganized OCD will include provisions (i) creating the New OCD Common Stock, and (ii) to the extent necessary or appropriate, effectuating the provisions of the Plan. The Amended and Restated Certificate of Incorporation of Reorganized OCD and the Amended and Restated Bylaws of Reorganized OCD shall be in substantially the forms of Exhibit A and Exhibit B to the Plan, to be filed at least ten (10) Business Days prior to the Objection Deadline.

### D.    Projected Financial Information

### 1.    Responsibility For and Purpose of the Financial Projections

Appendix B to this Disclosure Statement sets forth certain financial information with respect to the projected future operations of OC ("Financial Projections"). As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that the plan is "feasible" (i.e., that confirmation is not likely to be followed by a liquidation or the need for further financial reorganization of the debtor) as set forth in Section 1129(a)(11) of the Bankruptcy Code. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, OC's management has, through the development of financial projections, analyzed the ability of OC to meet its obligations under the Plan to maintain sufficient liquidity and capital resources to conduct its business. The Financial Projections were also prepared to assist each holder of a claim entitled to vote under the Plan in determining whether to accept or reject the Plan.

The Financial Projections indicate that the Reorganized Debtors should have sufficient cash flow to (a) make the payments required under the Plan, (b) repay service debt obligations, and (c) maintain operations on a going-forward basis. Accordingly, the Debtors believe that the Plan complies with Section 1129(a)(11) of the Bankruptcy Code. The Financial Projections should be read in conjunction with the assumptions, qualifications and footnotes to tables containing the projections set forth herein, the historical consolidated financial information (including the notes and schedules thereto) and the other information set forth in OC's Annual Report on Form 10-K for the year ended December 31, 2004, as well as OC's Quarterly Report on Form 10-Q for the quarter ended September 30, 2005, OC's Annual Report on Form 10-K for the year ended December 31, 2003, OC's Annual Report on Form 10-K for the year ended

December 31, 2002, OC's Annual Report on Form 10-K for the year ended December 31, 2001, and OC's Annual Report on Form 10-K for the year ended December 31, 2000, copies of which may be obtained, free of charge, through OC's website at www.owenscorning.com. OC's Annual Report on Form 10-K for the year ended December 31, 2002, may also be obtained by sending a written request. See directions for obtaining this document in Appendix D. The Financial Projections were prepared in good faith based upon assumptions believed to be reasonable and applied in a manner consistent with past practice. The Financial Projections are based on assumptions as of December 31, 2005.

The Financial Projections were not prepared with a view towards complying with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants, but to comply with the disclosure requirement of Section 1125(a) of the Bankruptcy Code. Neither the Debtors' independent auditors, nor any other independent accountants, have compiled or examined the accompanying prospective financial information to determine the reasonableness thereof and, accordingly, have not expressed an opinion or any other form of assurance with respect thereto.

The accompanying prospective financial information, in the view of the Debtors' management, was prepared on a reasonable basis, reflects the best available estimates and judgments at the time made, and presents, to the best of management's knowledge and belief, the expected course of action and the respective expected future financial performance of OC. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Disclosure Statement are cautioned not to place undue reliance on the Financial Projections. Accordingly, the Debtors do not intend, and disclaim any obligation, to (a) furnish updated projections to holders of Claims or Interests prior to the Effective Date or to any party after the Effective Date, (b) include such updated information in any documents that may be required to be filed with the SEC, or (c) otherwise make such updated information publicly available. See the Disclaimer set forth below.

2.      **Summary of Significant Assumptions**

The Debtors' management has developed the Financial Projections to assist holders of Claims and Interests in their evaluation of the Plan and to analyze its feasibility. The Financial Projections are based upon a number of significant assumptions, which along with the Financial Projections are set forth in Appendix B.

### DISCLAIMER

**THE FINANCIAL PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED EXCLUSIVELY BY THE DEBTORS' MANAGEMENT. THESE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF**

THESE FINANCIAL PROJECTIONS OR TO OC'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. THESE FINANCIAL PROJECTIONS SHOULD BE CONSIDERED IN CONJUNCTION WITH THE RISK FACTORS SET FORTH IN SECTION XV OF THIS DISCLOSURE STATEMENT ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED."

## VII. SUMMARY OF THE PLAN OF REORGANIZATION

### A. Introduction

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN), WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS APPENDIX A.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENTS WILL CONTROL.

The Debtors, the Asbestos Claimants' Committee, and the Future Claimants' Representative are the proponents of the Plan within the meaning of Section 1129 of the Bankruptcy Code. The Steering Committee supports the Plan.

Although IPM, Inc., Vytec Corporation and Owens-Corning Fibreglas Sweden Inc. have not filed under Chapter 11 at the present time, OCD reserves the right to initiate Chapter 11

814526.7                                  130

proceedings on behalf of some or all of such entities prior to the Confirmation Date, in the event OCD deems it necessary to do so in order to effectuate the terms of the Plan, in which case such entities would be included in the Plan. Certain other of OCD's Subsidiaries (including certain foreign entities and joint ventures) also have not commenced cases under Chapter 11 of the Bankruptcy Code, and accordingly continue to operate their businesses in the ordinary course. A list of the Non-Debtor Subsidiaries is attached to the Plan as Schedule II. Although the Non-Debtor Subsidiaries have not filed under Chapter 11 at the present time, one or more of the Non-Debtor Subsidiaries may file for reorganization under Chapter 11 in the future. The timing of any such filing would be determined at a later date, but any such filing would be made to permit the inclusion of such entities as part of the Plan. In the event of such filings, the Debtors reserve the right to file first day motions seeking authority to pay all trade creditors as critical vendors in order to avoid any potential disruption of OC's foreign operations. Moreover, the Plan will provide for full payment of all such trade creditors. In the event that any such additional filings are not required to effectuate the terms of the Plan, the Debtors reserve the right not to cause such entities to file for bankruptcy protection.

Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and Section 14.4 of the Plan, the Plan Proponents reserve the right to alter, amend, modify, revoke or withdraw the Plan prior to its substantial consummation.

## B.    TREATMENT OF CLAIMS AND INTERESTS

### 1.    Unclassified Claims

#### (a)    DIP Facility Claims

On, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date on which a DIP Facility Claim becomes an Allowed DIP Facility Claim or (iii) the date on which a DIP Facility Claim becomes payable pursuant to any agreement between a Debtor and the holder of such DIP Facility Claim, each holder of an Allowed DIP Facility Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed DIP Facility Claim (x) Cash equal to the unpaid portion of such Allowed DIP Facility Claim or (y) such other treatment as the applicable Debtor and such holder shall have agreed in writing. In addition, on or as soon as reasonably practicable after the Effective Date, letters of credit under the DIP Facility shall be refinanced under the Exit Facility.

#### (b)    Administrative Claims

Except as otherwise provided herein and subject to the requirements hereof, on, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date on which an Administrative Claim becomes an Allowed Administrative Claim or (iii) the date on which an Administrative Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Administrative Claim, each holder of an Allowed Administrative Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Administrative Claim (a) Cash equal to the unpaid portion of such Allowed Administrative Claim or (b) such other treatment as the applicable Debtor and such holder shall have agreed in writing; *provided, however*, that Allowed Administrative Claims with

respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

Holders of Administrative Claims based on liabilities incurred by the Debtors in the ordinary course of their businesses shall not be required to file or serve any request for payment of such Claims, as such liabilities shall be paid, performed or settled when due in accordance with the terms and conditions of the particular agreements governing such obligations.

 (c) Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Initial Distribution Date or has agreed in writing to a different treatment, each holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Tax Claim, at the sole discretion of the Debtors, (i) Cash equal to the amount of such Allowed Priority Tax Claim on the later of the Initial Distribution Date and the date such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as is practicable, (ii) deferred Cash payments, having a value as of the Effective Date equal to such Allowed Priority Tax Claim (based upon interest at a rate of 4% per annum), over a period not exceeding six (6) years after the assessment of the tax on which such Claim is based as the applicable Debtor and such holder shall have agreed in writing, or (iii) such other treatment as the applicable Debtor and such holder shall have agreed in writing.

 **2.** **Unimpaired Claims: Other Priority Claims (Classes A1 through U1), Other Secured Tax Claims (Classes A2-A through U2-A) and Other Secured Claims (A2-B through U2-B)**

 (a) Classes A1 through U1: Other Priority Claims

  (i) Treatment

On, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) the date on which such Other Priority Claim becomes due and payable pursuant to any agreement between the Debtors and a holder of an Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Other Priority Claim (a) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (b) such other treatment as the Debtors and such holder shall have agreed in writing. All Allowed Other Priority Claims which are not by their terms due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

(ii)    Status

Other Priority Claims are Unimpaired. Holders of Other Priority Claims shall be deemed to have accepted the Plan, and accordingly are not entitled to vote to accept or reject the Plan.

(b)    Class A2-A through U2-A: Other Secured Tax Claims

(i)    Treatment

Except to the extent that a holder of an Allowed Other Secured Tax Claim has been paid by the Debtors prior to the Initial Distribution Date or has agreed in writing to a different treatment, each holder of an Allowed Other Secured Tax Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Other Secured Tax Claim, at the sole discretion of the Debtors, (i) Cash equal to the amount of such Allowed Other Secured Tax Claim, including any interest on such Allowed Other Secured Tax Claim required to be paid pursuant to Section 506(b) of the Bankruptcy Code, on the later of the Initial Distribution Date and the date such Other Secured Tax Claim becomes an Allowed Claim, or as soon thereafter as is practicable, (ii) deferred Cash payments, having a value as of the Effective Date equal to such Allowed Other Secured Tax Claim (based upon interest at a rate of 4% per annum), over a period not exceeding six (6) years after the assessment of the tax on which such Claim is based as the Debtors and such holder shall have agreed in writing, or (iii) such other treatment as the Debtors and such holder shall have agreed in writing. The Debtors' failure to object to any Other Secured Tax Claim in the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the holder of such Claim. Nothing in the Plan or elsewhere shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Encumbrance on any asset of a Debtor or Reorganized Debtor or the value of any collateral.

Each holder of an Allowed Other Secured Tax Claim shall retain the Encumbrances (or replacement Encumbrances as may be contemplated under nonbankruptcy law) securing its Allowed Other Secured Tax Claim as of the Effective Date until full and final payment of such Allowed Other Secured Tax Claim is made as provided in the Plan, and upon such full and final payment, such Encumbrances shall be deemed null and void and shall be unenforceable for all purposes.

(ii)    Status

Other Secured Tax Claims are Unimpaired. Holders of Other Secured Tax Claims shall be deemed to have accepted the Plan, and accordingly are not entitled to vote to accept or reject the Plan.

(c)    Class A2-B through U2-B: Other Secured Claims

(i)    Treatment

On, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim or (iii) the date on which such Other Secured Claim becomes due and payable pursuant to any agreement between a Debtor and the holder of an Allowed Other Secured Claim, each holder of an Allowed Other Secured Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the sole discretion of the Debtors, (a) Cash equal to the unpaid portion of such Allowed Other Secured Claim, (b) Reinstatement of the legal equitable and contractual rights of the holder of such Allowed Other Secured Claim, subject to the provisions of Article VII of the Plan, or (c) such other treatment as the Debtors and such holder shall have agreed in writing. The Debtors' failure to object to any Other Secured Claim in the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the holder of such Claim. Nothing in the Plan or elsewhere shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Encumbrance on any asset of a Debtor or the value of any collateral.

(ii)    Status

Other Secured Claims are Unimpaired. Holders of Other Secured Claims shall be deemed to have accepted the Plan, and accordingly are not entitled to vote to accept or reject the Plan.

3.    **OCD (Classes A3 through A12)**

(a)    Class A3: OCD Convenience Claims

(i)    Treatment

On, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date on which such Class A3 Claim becomes an Allowed Class A3 Claim, or (iii) the date on which such Class A3 Claim becomes due and payable pursuant to any agreement between OCD and a holder of a Class A3 Claim, each holder of an Allowed Class A3 Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Class A3 Claim (a) Cash equal to the amount of such Allowed Class A3 Claim or (b) such other treatment as OCD and such holder shall have agreed in writing.

(ii)    Election

Any holder of a Claim in Class A6-A or A6-B that desires treatment of such Claim as a Convenience Claim shall make such election on the Ballot to be provided to holders of Impaired Claims entitled to vote to accept or reject the Plan (as specified in Section 4.1 of the Plan) and return such Ballot to the address specified therein on or before the Voting Deadline. Any election made after the Voting Deadline shall not be binding on the

Debtors unless the Voting Deadline is expressly waived in writing by the Debtors with respect to any such Claim.

          (iii)     Status

          Class A3 Claims are Impaired.  To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class A3 shall be entitled to vote to accept or reject the Plan.

          (b)     Class A4:  OCD Bank Holders Claims

          (i)     Allowance

          The Class A4 Claims shall be Allowed in the amount of approximately $1.467 billion (excluding (i) approximately $69 million of undrawn pre-petition letters of credit and (ii) certain pre-petition interest, subject to further reconciliation)[11].

          (ii)     Treatment

          (A)     If Class A4 is deemed Unimpaired, or if Class A4 is deemed Impaired and accepts the Plan, then, in full satisfaction, release and discharge of, and in exchange for their Allowed Claims against the various Debtors (including, without limitation, their Allowed Class A4 Claims), on or after the Initial Distribution Date, each holder of an Allowed Class A4 Claim shall receive such holder's Pro Rata share of Cash in an aggregate amount as of the Effective Date equal to the sum of the amount of the Allowed Class A4 Claims plus the Bank Default Interest and Fee Amount;[12]

          (B)     If Class A4 is deemed Impaired and rejects the Plan, then, in full satisfaction, release and discharge of, and in exchange for their Allowed Claims against the various Debtors (including, without limitation, their Allowed Class A4 Claims), on or after the Initial Distribution Date, each holder of an Allowed Class A4 Claim shall receive such holder's Pro Rata share of Cash and cash pay Senior Notes (in form and substance satisfactory to the Debtors) in an aggregate amount as of the Effective Date as may be determined by the Court at or prior to the Confirmation Hearing pursuant to Section 12.1(j) of the Plan (on account of the Bank Holders' Claims under the 1997 Credit Agreement as of the Petition Date and unpaid post-petition interest, fees and expenses, if any);

---

[11] This estimate of Class A4 Claims represents the amount outstanding under the 1997 Credit Agreement as of the Petition Date, including certain amounts related to letters of credit drawn or expected to be drawn prior to the Effective Date, less the application of certain frozen funds.  It does not include any amounts for post-petition interest or fees.

[12] For purposes of distribution, the Bank Holders Claims shall be deemed to have been satisfied (a) first, against OCD to the fullest extent permissible under applicable law (except as otherwise provided in the Plan) and (b) second, against the various Debtor guarantors and, if applicable, non-Debtor guarantors up to an amount against each such guarantor that would still allow the holders of allowed third-party claims (x) against each such Debtor guarantor to be paid in full, as set forth herein, and (y) to retain their respective rights against each such non-Debtor guarantor under applicable non-bankruptcy law.

(C)    As of the Effective Date, the undrawn pre-petition letters of credit shall be cancelled or replaced by new letters of credit under the Exit Facility; and

(D)    As of the Effective Date but subject to the Debtors having made the Initial Bank Holders' Distribution, if Class A4 is deemed Unimpaired, or if Class A4 is deemed Impaired and accepts the Plan, then the rights of any and all Bank Holders to pursue, and receive any benefits of, from or under, the pending appeal of the OCD Asbestos Personal Injury Estimation Order shall be deemed to have been waived and released under the Plan to the fullest extent permissible under applicable law.

(iii)    Status

To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class A4 shall be entitled to vote to accept or reject the Plan.

(c)    Class A5: OCD  Bondholders Claims

(i)    Allowance

The Class A5 Claims shall be Allowed in the amount of approximately $1.389 billion, plus accrued but unpaid interest as of the Petition Date.[13]

(ii)    Treatment

(A)    Initial Distribution.

(1)    If Class A5 and Class A6-B accept the Plan, then:

(a)    in full satisfaction, release and discharge of, and in exchange for, its Allowed Class A5 Claim, each holder of an Allowed Class A5 Claim who has complied with Section 8.8 of the Plan shall receive on, or as soon as reasonably practicable after, the later of the Initial Distribution Date or the date on which such Class A5 Claim becomes due and payable pursuant to any agreement between a Debtor and a holder of an Allowed Class A5 Claim, (i) such holder's Pro Rata share of the product of (w) the Combined OCD Distribution Package and (x) the Class A5 Initial Distribution Percentage, and (ii) such holder's Pro Rata share of the product of (y) the Combined OCD Supplemental Distribution Package and (z) a fraction, the numerator of which is the total amount of Allowed Claims in Class A5, and the denominator of which is the aggregate amount of all Allowed Claims in Classes A5 and A6-B; and

(b)    the claim arising under the Contribution Agreement shall be deemed to be an Allowed Intercompany Claim by OCD against Integrex in the amount of $833.3 million, and the distribution on account of such claim shall be made to OCD.

---

[13] This amount of Class A5 Claims represents the principal amount outstanding under the Pre-petition Bond Indentures as of the Petition Date based upon OCD's books and records, and excludes any amounts for post-petition interest or fees.

(2)    If Class A5 or Class A6-B rejects the Plan, then:

(a)    in full satisfaction, release and discharge of, and in exchange for, its Allowed Class A5 Claim, each holder of an Allowed Class A5 Claim who has complied with Section 8.8 of the Plan shall receive on, or as soon as reasonably practicable after, the later of the Initial Distribution Date or the date on which such Class A5 Claim becomes due and payable pursuant to any agreement between OCD and a holder of an Allowed Class A5 Claim, (i) such holder's Pro Rata share of the product of (w) the Combined OCD Distribution Package and (x) the Class A5 Initial Distribution Percentage, and, subject to Section 3.3(c)(ii)(B)(3) of the Plan, (ii) such holder's Pro Rata share of the product of (y) the Combined OCD Supplemental Distribution Package and (z) a fraction, the numerator of which is the total amount of Allowed Claims in Class A5, and the denominator of which is the aggregate amount of all Allowed Claims in Classes A4, A5 and A6-B;

(b)    the rights of holders of Asbestos Personal Injury Claims, the Asbestos Claimants' Committee and the Future Claimants' Representative to assert Integrex Asbestos Personal Injury Claims against Integrex shall be reserved; and

(c)    the Asbestos Claimants' Committee and the Future Claimants' Representative shall have the right to seek a determination at the Confirmation Hearing that certain or all of the Class A11 Claims should be equitably subordinated or recharacterized.

(B)    Final Distribution.

(1)    On or as soon as reasonably practicable after the Final Distribution Date, each holder of an Allowed Class A5 Claim shall receive its Pro Rata share of:

(a)    Cash in an amount equal to the Class A5 Final Distribution Percentage of the Excess Available Cash, (ii) shares of New OCD Common Stock in an aggregate number equal to the Class A5 Final Distribution Percentage of the Excess New OCD Common Stock, and (iii) Cash in an amount equal to the Class A5 Final Distribution Percentage of the Excess Litigation Trust Recoveries; and

(b)    if Class A5 and Class A6-B accept the Plan, Cash, New OCD Common Stock and Litigation Trust Recoveries in an aggregate amount or number, in each case, equal to the product of (w) the Supplemental Excess Available Cash, the Supplemental Excess New OCD Common Stock, and the Supplemental Excess Litigation Trust Recoveries, respectively, and (x) a fraction, the numerator of which is the total amount of Allowed Claims in Class A5, and the denominator of which is the aggregate amount of all Allowed Claims in Classes A5 and A6-B; or

(c)    if Class A5 or Class A6-B rejects the Plan, Cash, New OCD Common Stock and Litigation Trust Recoveries in an aggregate amount or number, in each case, equal to the product of (w) the Supplemental Excess Available Cash, the Supplemental Excess New OCD Common Stock, and the Supplemental Excess Litigation Trust Recoveries, respectively, and (x) a fraction, the numerator of which is the total amount of

814526.7

137

Allowed Claims in Class A5, and the denominator of which is the aggregate amount of all Allowed Claims in Classes A4, A5 and A6-B.

(2)    As of the Effective Date, if Class A5 accepts the Plan, the rights of any and all members of Class A5 to pursue, and receive any benefits of, from or under, the pending appeal of the OCD Asbestos Personal Injury Estimation Order shall be deemed to have been waived and released under the Plan to the fullest extent permissible under applicable law.

(3)    Holders of Class A5 Bondholder Claims may have their distributions under the Plan reduced to the extent that any of the Pre-petition Indenture Trustees exercises any applicable rights under the Pre-petition Bond Indentures to recover its costs and/or expenses from the distributions to be paid to Holders of Class A5 Bondholder Claims under the Plan. Any payment of such costs or expenses shall commensurately reduce the recovery realized under the Plan by holders of Class A5 Bondholder Claims.

(iii)    Status

Class A5 Claims are Impaired. To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class A5 shall be entitled to vote to accept or reject the Plan.

(d)    Class A6-A: OCD General Unsecured Claims

(i)    Allowance

The Class A6-A Claims shall be allowed or disallowed pursuant to the procedures for resolving disputed, contingent and unliquidated Claims set forth in Article IX of the Plan.

(ii)    Treatment

(A)    Initial Distribution.

(1)    In full satisfaction, release and discharge of, and in exchange for, its Allowed Class A6-A Claim, each holder of an Allowed Class A6-A Claim shall receive on, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date on which such Class A6-A Claim becomes an Allowed Class A6-A Claim, or (iii) the date on which such Class A6-A Claim becomes due and payable pursuant to any agreement between a Debtor and a holder of a Class A6-A Claim, such holder's Pro Rata share of the product of (x) the Class A6-A Initial Distribution Percentage and (y) the Combined OCD Distribution Package; *provided, however,* for the avoidance of doubt, that each holder of a Class A6-A Claim that becomes an Allowed Claim after the Effective Date shall receive (from the Disputed Distribution Reserve, as set forth in Section 9.4(c) of the Plan) the same distribution as such holder would have received had such Claim been an Allowed Claim as of the Effective Date.

(B)     Final Distribution.

(1)     On or as soon as reasonably practicable after the Final Distribution Date, each holder of an Allowed Class A6-A Claim shall receive its Pro Rata share of (i) Cash in an amount equal to the Class A6-A Final Distribution Percentage of Excess Available Cash, (ii) shares of New OCD Common Stock in an aggregate number equal to the Class A6-A Final Distribution Percentage of the Excess New OCD Common Stock, and (iii) Cash in an amount equal to the Class A6-A Final Distribution Percentage of the Excess Litigation Trust Recoveries.

(2)     As of the Effective Date, if Class A6-A accepts the Plan, the rights of any and all members of Class A6-A to pursue, and receive any benefits of, from or under, the pending appeal of the OCD Asbestos Personal Injury Estimation Order shall be deemed to have been waived and released under the Plan to the fullest extent permissible under applicable law.

(iii)     Status

Class A6-A Claims are Impaired.  To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class A6-A shall be entitled to vote to accept or reject the Plan.

(e)     Class A6-B: OCD General Unsecured/Senior Indebtedness Claims

(i)     Allowance

The Class A6-B Claims shall be allowed or disallowed pursuant to the procedures for resolving disputed, contingent and unliquidated Claims set forth in Article IX of the Plan.

(ii)     Treatment

(A)     Initial Distribution.

(1)     If Class A5 and Class A6-B accept the Plan, then:

(a)     In full satisfaction, release and discharge of, and in exchange for, its Allowed Class A6-B Claim, each holder of an Allowed Class A6-B Claim shall receive on, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date on which such Class A6-B Claim becomes an Allowed Class A6-B Claim, or (iii) the date on which such Class A6-B Claim becomes due and payable pursuant to any agreement between a Debtor and a holder of an Allowed Class A6-B Claim, (i) such holder's Pro Rata share of the product of (w) the Combined OCD Distribution Package and (x) the Class A6-B Initial Distribution Percentage, and (ii) such holder's Pro Rata share of the product of (y) the Combined OCD Supplemental Distribution Package and (z) a fraction, the numerator of which is the total amount of Allowed Claims in Class A6-B, and the denominator of which is the aggregate amount of all Allowed Claims in Classes A5 and A6-B; *provided, however*, for the avoidance of doubt, that each holder of a Class A6-B Claim that becomes an Allowed Claim

after the Effective Date shall receive (from the Disputed Distribution Reserve, as set forth in Section 9.4(c) of the Plan) the same distribution as such holder would have received had such Claim been an Allowed Claim as of the Effective Date; and

(b)     the claim arising under the Contribution Agreement shall be deemed to be an Allowed Intercompany Claim by OCD against Integrex in the amount of $833.3 million, and the distribution on account of such claim shall be made to OCD.

(2)     If Class A5 or Class A6-B rejects the Plan, then:

(a)     in full satisfaction, release and discharge of, and in exchange for, its Allowed Class A6-B Claim, each holder of an Allowed Class A6-B Claim shall receive on, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date on which such Class A6-B Claim becomes an Allowed Class A6-B Claim, or (iii) the date on which such Class A6-B Claim becomes due and payable pursuant to any agreement between a Debtor and a holder of a Class A6-B Claim, (i) such holder's Pro Rata share of the product of (w) the Combined OCD Distribution Package and (x) the Class A6-B Initial Distribution Percentage, and, subject to Section 3.3(e)(ii)(B)(3) of the Plan, (ii) such holder's Pro Rata share of the product of (y) the Combined OCD Supplemental Distribution Package and (z) a fraction, the numerator of which is the total amount of Allowed Claims in Class A6-B, and the denominator of which is the aggregate amount of all Allowed Claims in Classes A4, A5 and A6-B;

(b)     the rights of holders of Asbestos Personal Injury Claims, the Asbestos Claimants' Committee and the Future Claimants' Representative to assert Integrex Asbestos Personal Injury Claims against Integrex shall be reserved; and

(c)     the Asbestos Claimants' Committee and the Future Claimants' Representative shall have the right to seek a determination at the Confirmation Hearing that certain or all of the Class A11 Claims should be equitably subordinated or recharacterized.

(B)     Final Distribution.

(1)     On or as soon as reasonably practicable after the Final Distribution Date, each holder of an Allowed Class A6-B Claim shall receive its Pro Rata share of:

(a)     Cash in an amount equal to the Class A6-B Final Distribution Percentage of the Excess Available Cash, (ii) shares of New OCD Common Stock in an aggregate number equal to the Class A6-B Final Distribution Percentage of the Excess New OCD Common Stock, and (iii) Cash in an amount equal to the Class A6-B Final Distribution Percentage of the Excess Litigation Trust Recoveries; and

(b)     if Class A5 and Class A6-B accept the Plan, Cash, New OCD Common Stock and Litigation Trust Recoveries in an aggregate amount or number, in each case, equal to the product of (w) the Supplemental Excess Available Cash, the

Supplemental Excess New OCD Common Stock, and the Supplemental Excess Litigation Trust Recoveries, respectively, and (x) a fraction, the numerator of which is the total amount of Allowed Claims in Class A6-B, and the denominator of which is the aggregate amount of all Allowed Claims in Classes A5 and A6-B; or

(c)    if Class A5 or Class A6-B rejects the Plan, Cash, New OCD Common Stock and Litigation Trust Recoveries in an aggregate amount or number, in each case, equal to the product of (w) the Supplemental Excess Available Cash, the Supplemental Excess New OCD Common Stock, and the Supplemental Excess Litigation Trust Recoveries, respectively, and (x) a fraction, the numerator of which is the total amount of Allowed Claims in Class A6-B, and the denominator of which is the aggregate amount of all Allowed Claims in Classes A4, A5 and A6-B.

(d)    As of the Effective Date, if Class A6-B accepts the Plan, the rights of any and all members of Class A6-B to pursue, and receive any benefits of, from or under, the pending appeal of the OCD Asbestos Personal Injury Estimation Order shall be deemed to have been waived and released under the Plan to the fullest extent permissible under applicable law.

(iii)    Status

Class A6-B Claims are Impaired. To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class A6-B shall be entitled to vote to accept or reject the Plan.

(f)    Class A7: OC Asbestos Personal Injury Claims

(i)    Estimated Amount

Solely for purposes of the Plan (but not for Allowance or distribution purposes), the Class A7 Claims shall be estimated at the Class A7 Aggregate Amount.

(ii)    Treatment

ALL OC ASBESTOS PERSONAL INJURY CLAIMS SHALL BE CHANNELED TO THE ASBESTOS PERSONAL INJURY TRUST, AND SHALL BE PROCESSED, LIQUIDATED AND PAID PURSUANT TO THE TERMS AND PROVISIONS OF THE ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES AND THE ASBESTOS PERSONAL INJURY TRUST AGREEMENT. THE ASBESTOS PERSONAL INJURY TRUST SHALL BE FUNDED IN THE MANNER DESCRIBED BELOW. THE SOLE RECOURSE OF THE HOLDER OF AN OC ASBESTOS PERSONAL INJURY CLAIM SHALL BE THE ASBESTOS PERSONAL INJURY TRUST, AND SUCH HOLDER SHALL HAVE NO RIGHT WHATSOEVER AT ANY TIME TO ASSERT ITS CLAIM OR DEMAND AGAINST ANY DEBTOR, REORGANIZED DEBTOR OR PROTECTED PARTY. WITHOUT LIMITING THE FOREGOING, ON THE EFFECTIVE DATE, ALL PERSONS SHALL BE PERMANENTLY AND FOREVER STAYED, RESTRAINED, AND ENJOINED FROM

**TAKING ANY ENJOINED ACTIONS FOR THE PURPOSE OF, DIRECTLY OR INDIRECTLY, COLLECTING, RECOVERING, OR RECEIVING PAYMENT OF, ON, OR WITH RESPECT TO ANY OC ASBESTOS PERSONAL INJURY CLAIM (OTHER THAN ACTIONS BROUGHT TO ENFORCE ANY RIGHT OR OBLIGATION UNDER THE PLAN, ANY EXHIBITS TO THE PLAN, OR ANY OTHER AGREEMENT OR INSTRUMENT BETWEEN THE DEBTORS OR REORGANIZED DEBTORS AND THE ASBESTOS PERSONAL INJURY TRUST, WHICH ACTIONS SHALL BE IN CONFORMITY AND COMPLIANCE WITH THE PROVISIONS OF THE PLAN).**

Nothing contained in Section 3.3(f) of the Plan shall constitute or be deemed a waiver of any claim, right, or cause of action that the Debtors, the Reorganized Debtors or the Asbestos Personal Injury Trust may have against any Person in connection with or arising out of a Class A7 Claim, and the injunction shall not apply to the assertion of any such claim, right, or cause of action by the Debtors, the Reorganized Debtors, the Asbestos Personal Injury Trust, or the Litigation Trust.

(A)     Funding of the OC Sub-Account

On the Effective Date, or as soon as practicable thereafter, the Reorganized Debtors shall irrevocably transfer and assign to the Asbestos Personal Injury Trust for allocation to the OC Sub-Account: (i) the OC Asbestos Personal Injury Liability Insurance Assets; (ii) the OCD Insurance Escrow; and (iii) the right to receive settlement payments due under the AIG Settlement Agreement and the Affiliated FM Settlement Agreement as provided for therein. Additionally, the Reorganized Debtors shall irrevocably transfer and assign to the Asbestos Personal Injury Trust for allocation to the OC Sub-Account the portion of the Combined OCD Distribution Package equal to the product of (x) the Class A7 Initial Distribution Percentage and (y) the Combined OCD Distribution Package; *provided, however,* that the Reorganized Debtors shall transfer the Cash portion of such amount to the OC Sub-Account on the Effective Date and the New OCD Common Stock portion of such amount to the OC Sub-Account on the Initial Distribution Date, or as soon as practicable thereafter, provided that, notwithstanding the date on which any distribution of New OCD Common Stock is actually made to the Asbestos Personal Injury Trust, the Asbestos Personal Injury Trust shall be deemed to have the rights and benefits of a holder of such New OCD Common Stock as if it were distributed as of the Effective Date; *provided further, however,* that on and immediately after the Effective Date, the Asbestos Personal Injury Trust shall own, or by the exercise of rights shall be entitled to own if specified contingencies occur, no less than 50.1% of the New OCD Common Stock.

On or as soon as reasonably practicable after the Final Distribution Date, the Reorganized Debtors shall irrevocably transfer and assign to the Asbestos Personal Injury Trust for allocation to the OC Sub-Account the following: (i) Cash in an amount equal to the Class A7 Final Distribution Percentage of Excess Available Cash, (ii) shares of New OCD Common Stock in an aggregate number equal to the Class A7 Final Distribution Percentage of the Excess New OCD Common Stock, and (iii) Cash in an amount equal to the Class A7 Final Distribution Percentage of the Excess Litigation Trust Recoveries.

(iii)    Status

Class A7 Claims are Impaired. To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class A7 shall be entitled to vote to accept or reject the Plan.

(g)    Class A10:  OCD Intercompany Claims

(i)    Allowance

All material issues regarding Class A10 Claims that are not resolved among the Plan Proponents or otherwise prior to the Confirmation Hearing, shall be determined by the Court at the Confirmation Hearing.

(ii)    Treatment

In full satisfaction, release and discharge of, and in exchange for, its Allowed Class A10 Claim, on, or as soon as reasonably practicable after, the Initial Distribution Date, each holder of an Allowed Class A10 Claim shall be credited with value equal to such holder's Pro Rata share of the Class A10 Distribution Amount.

(iii)    Status

Class A10 Claims are Impaired. To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class A10 shall be entitled to vote to accept or reject the Plan.

(h)    Class A11:  OCD Subordinated Claims

(i)    Allowance

Subject to Sections 3.3(c)(ii)(B)(3) and 3.3(e)(ii)(B)(3) of the Plan, the Class A11 Claims related to the MIPS Claims and Interests and the OCFBV Class A11 Claim shall be Allowed in the amounts of approximately $253.2 million and $23.3 million, respectively. All material issues regarding any other asserted Class A11 Claims that are not resolved among the Plan Proponents or otherwise prior to the Confirmation Hearing (including any issues regarding the distributions on account of such asserted Class A11 Claims) shall be determined by the Court at the Confirmation Hearing.

(ii)    Treatment

(A)    Subject to Sections 3.3(c)(ii)(B)(3) and 3.3(e)(ii)(B)(3) of the Plan, the distributions which otherwise would have been made to holders of Allowed Claims in Class A11 had such Claims not been subordinated in accordance with the applicable agreements or instruments subordinating such Claims shall be paid or issued to the holders of Allowed Claims in Classes A4, A5 and/or A6-B in accordance with the distribution procedures for such Classes in Sections 3.3(b)(ii), 3.3(c)(ii) and 3.3(e)(ii) of the Plan, respectively.

(B)    As of the Effective Date, if Class A11 accepts the Plan, the rights of any and all members of Class A11 to pursue, and receive any benefits of, from or under, the pending appeal of the OCD Asbestos Personal Injury Estimation Order shall be deemed to have been waived and released under the Plan to the fullest extent permissible under applicable law.

(iii)    Status

Class A11 Claims are Impaired.  To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class A11 shall be entitled to vote to accept or reject the Plan.

(i)    Class A12:  OCD Interests

(i)    Treatment

On the Effective Date, all of the Class A12 Interests outstanding as of the Effective Date shall be deemed cancelled and extinguished.  No holder thereof shall be entitled to, or shall receive or retain, any property or interest in property on account of such Class A12 Interests.

(ii)    Status

Class A12 Interests are Impaired.  The holders of the Interests in Class A12 are deemed to have rejected the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

**4.    <u>Fibreboard</u> (Classes B1 through B12)**

(a)    Class B3: Fibreboard Convenience Claims

(i)    Treatment

On, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date on which such Class B3 Claim becomes an Allowed Class B3 Claim, or (iii) the date on which such Class B3 Claim becomes due and payable pursuant to any agreement between Fibreboard and a holder of a Class B3 Claim, each holder of an Allowed Class B3 Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Class B3 Claim (a) Cash equal to the amount of such Allowed Class B3 Claim or (b) such other treatment as Fibreboard and such holder shall have agreed in writing.

(ii)    Election

Any holder of a Claim in Class B6 or Class B9 that desires treatment of such Claim as a Fibreboard Convenience Claim shall make such election on the Ballot to be provided to holders of Impaired Claims entitled to vote to accept or reject the Plan (as specified in Section 4.1 of the Plan) and return such Ballot to the address specified therein on or before the Voting Deadline.  Any election made after the Voting Deadline shall not be binding

on the Debtors unless the Voting Deadline is expressly waived in writing by the Debtors with respect to any such Claim.

         (iii)    Status

         Class B3 Claims are Impaired. To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class B3 shall be entitled to vote to accept or reject the Plan.

     (b)    Class B4: Fibreboard Bank Holders Claims

         (i)    Treatment

         In full satisfaction, release and discharge of, and in exchange for, its Allowed Class B4 Claim, each holder of an Allowed Class B4 Claim shall receive the treatment set forth in Section 3.3(b)(ii) of the Plan; *provided, however*, that, solely for purposes of calculating distributions to other holders of Claims against and Interests in Fibreboard, an amount equal to the Class B4 Distribution Amount shall be, and shall be deemed to be, distributable to the Bank Holders on the Initial Distribution Date on account of their Allowed Class B4 Claims.

         (ii)    Status

         To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class B4 shall be entitled to vote to accept or reject the Plan.

     (c)    Class B6: Fibreboard General Unsecured Claims

         (i)    Treatment

         In full satisfaction, release and discharge of, and in exchange for, its Allowed Class B6 Claim, on, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date on which such Class B6 Claim becomes an Allowed Class B6 Claim, and (iii) the date on which such Class B6 Claim becomes due and payable pursuant to any agreement between Fibreboard and a holder of a Class B6 Claim, each holder of an Allowed Class B6 Claim shall receive Cash and New OCD Common Stock with an aggregate value as of the Effective Date equal to the amount of such Allowed Class B6 Claim (excluding post-petition interest) in the Standard Combination; *provided, however*, that distributions with respect to Class B6 Claims that become Allowed Claims after the Effective Date shall be made from the Disputed Distribution Reserve, as set forth in Section 9.4(d) of the Plan.

         (ii)    Status

         Class B6 Claims are Impaired. To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class B6 shall be entitled to vote to accept or reject the Plan.

(d)    Class B8:  FB Asbestos Personal Injury Claims

(i)    Estimated Amount

Solely for purposes of the Plan (but not for Allowance or distribution purposes), the Class B8 Claims shall be estimated at the Class B8 Aggregate Amount.

(ii)    Treatment

**ALL FB ASBESTOS PERSONAL INJURY CLAIMS SHALL BE CHANNELED TO THE ASBESTOS PERSONAL INJURY TRUST, AND SHALL BE PROCESSED, LIQUIDATED AND PAID PURSUANT TO THE TERMS AND PROVISIONS OF THE ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES AND THE ASBESTOS PERSONAL INJURY TRUST AGREEMENT. THE ASBESTOS PERSONAL INJURY TRUST SHALL BE FUNDED IN THE MANNER DESCRIBED BELOW.  THE SOLE RECOURSE OF THE HOLDER OF AN FB ASBESTOS PERSONAL INJURY CLAIM SHALL BE THE ASBESTOS PERSONAL INJURY TRUST AND SUCH HOLDER SHALL HAVE NO RIGHT WHATSOEVER AT ANY TIME TO ASSERT ITS CLAIM OR DEMAND AGAINST ANY DEBTOR, REORGANIZED DEBTOR OR PROTECTED PARTY.  WITHOUT LIMITING THE FOREGOING, ON THE EFFECTIVE DATE, ALL PERSONS SHALL BE PERMANENTLY AND FOREVER STAYED, RESTRAINED, AND ENJOINED FROM TAKING ANY ENJOINED ACTIONS FOR THE PURPOSE OF, DIRECTLY OR INDIRECTLY, COLLECTING, RECOVERING, OR RECEIVING PAYMENT OF, ON, OR WITH RESPECT TO ANY FB ASBESTOS PERSONAL INJURY CLAIM (OTHER THAN ACTIONS BROUGHT TO ENFORCE ANY RIGHT OR OBLIGATION UNDER THE PLAN, ANY EXHIBITS TO THE PLAN, OR ANY OTHER AGREEMENT OR INSTRUMENT BETWEEN THE DEBTORS OR REORGANIZED DEBTORS AND THE ASBESTOS PERSONAL INJURY TRUST, WHICH ACTIONS SHALL BE IN CONFORMITY AND COMPLIANCE WITH THE PROVISIONS OF THE PLAN).**

Nothing contained in Section 3.4(d) of the Plan shall constitute or be deemed a waiver of any claim, right, or cause of action that the Debtors, the Reorganized Debtors or the Asbestos Personal Injury Trust may have against any Person in connection with or arising out of a Class B8 Claim, and the injunction shall not apply to the assertion of any such claim, right, or cause of action by the Debtors, the Reorganized Debtors, the Asbestos Personal Injury Trust, or the Litigation Trust.

(iii)    Funding of the FB Sub-Account

On the Effective Date, or as soon as practicable thereafter, the Reorganized Debtors shall irrevocably transfer and assign to the Asbestos Personal Injury Trust for allocation to the FB Sub-Account the following: (i) the FB Reversions; (ii) the Committed Claims Account; and (iii) the FB Sub-Account Settlement Payment.

666

The Reorganized Debtors will, or will use all commercially reasonable efforts to, cause the trustee of the Fibreboard Insurance Settlement Trust to irrevocably transfer and assign (i) the Existing Fibreboard Insurance Settlement Trust Assets, and (ii) any and all of the Fibreboard Insurance Settlement Trust's rights in the FB Reversions, to the Asbestos Personal Injury Trust, for allocation to the FB Sub-Account, on the Effective Date or as soon as practicable thereafter.

The Reorganized Debtors will also execute and deliver, or will use all commercially reasonable efforts to cause the trustee of the Fibreboard Insurance Settlement Trust to execute and deliver, to the Asbestos Personal Injury Trust such documents as the Asbestos Personal Injury Trustees reasonably request in connection with the transfer and assignment of the Existing Fibreboard Insurance Settlement Trust Assets and the FB Reversions.

        (iv)     Status

Class B8 Claims are Impaired. To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class B8 shall be entitled to vote to accept or reject the Plan.

      (e)     Class B9: FB Asbestos Property Damage Claims

        (i)     Treatment

**ALL CLASS B9 CLAIMS SHALL BE CHANNELED TO FB ASBESTOS PROPERTY DAMAGE TRUST, AND SHALL BE PROCESSED, LIQUIDATED AND PAID PURSUANT TO THE TERMS AND PROVISIONS OF THE FB ASBESTOS PROPERTY DAMAGE TRUST AGREEMENT AND THE FB ASBESTOS PROPERTY DAMAGE TRUST DISTRIBUTION PROCEDURES. THE FB ASBESTOS PROPERTY DAMAGE TRUST SHALL BE FUNDED IN THE MANNER DESCRIBED BELOW. THE SOLE RECOURSE OF THE HOLDER OF AN ALLOWED CLASS B9 CLAIM SHALL BE THE FB ASBESTOS PROPERTY DAMAGE TRUST, AND SUCH HOLDER SHALL HAVE NO RIGHT WHATSOEVER AT ANY TIME TO ASSERT ITS CLASS B9 CLAIM AGAINST ANY REORGANIZED DEBTOR, FB PERSON, OR ANY OF THEIR RESPECTIVE RELATED PERSONS. WITHOUT LIMITING THE FOREGOING, ON THE EFFECTIVE DATE, ALL PERSONS SHALL BE PERMANENTLY AND FOREVER STAYED, RESTRAINED, AND ENJOINED FROM TAKING ANY ENJOINED ACTIONS FOR THE PURPOSE OF, DIRECTLY OR INDIRECTLY, COLLECTING, RECOVERING, OR RECEIVING PAYMENT OF, ON, OR WITH RESPECT TO ANY FB ASBESTOS PROPERTY DAMAGE CLAIMS (OTHER THAN ACTIONS BROUGHT TO ENFORCE ANY RIGHT OR OBLIGATION UNDER THE PLAN, ANY EXHIBITS TO THE PLAN, OR ANY OTHER AGREEMENT OR INSTRUMENT BETWEEN THE DEBTORS OR REORGANIZED DEBTORS AND THE FB ASBESTOS PROPERTY DAMAGE TRUST, WHICH ACTIONS SHALL BE IN CONFORMITY AND COMPLIANCE WITH THE PROVISIONS OF THE PLAN).**

Nothing contained in Section 3.4(e) of the Plan shall constitute or be deemed a waiver of any claim, right, or cause of action that the Debtors, the Reorganized Debtors or the FB Asbestos Property Damage Trust may have against any Person in connection

with or arising out of a Class B9 Claim, and the injunction shall not apply to the assertion of any such claim, right, or cause of action by the Debtors, the Reorganized Debtors, the FB Asbestos Property Damage Trust, or the Litigation Trust.

(ii)     Funding of the FB Asbestos Property Damage Trust

On the later of the Effective Date and the date by which the FB Asbestos Property Damage Trustee has executed the FB Asbestos Property Damage Trust Agreement, or as soon as practicable thereafter, the Reorganized Debtors shall transfer and assign, or cause to be transferred and assigned, the FB Asbestos Property Damage Insurance Assets to the FB Asbestos Property Damage Trust.

(iii)     Status

Class B9 Claims are Impaired.  To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class B9 shall be entitled to vote to accept or reject the Plan.

(f)     Class B10: Fibreboard Intercompany Claims

(i)     Treatment

In full satisfaction, release and discharge of, and in exchange for, its Allowed Class B10 Claim, each holder of an Allowed Class B10 Claim shall be credited with value on, or as soon as reasonably practicable after, the Initial Distribution Date, equal to the amount of such Allowed Class B10 Claim (excluding post-petition interest).

(ii)     Status

Class B10 Claims are Impaired.  To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class B10 shall be entitled to vote to accept or reject the Plan.

(g)     Class B12: Fibreboard Interests

(i)     Treatment

Each holder of an Allowed Interest in Class B12 shall retain unaltered, the legal, equitable and contractual rights to which such Allowed Interest entitles the holder.

(ii)     Status

Class B12 is Unimpaired and holders of Class B12 Interests are thus not entitled to vote to accept or reject the Plan.

668

5.    **ESI (Classes C1 through C12)**

    (a)    Class C3: ESI Convenience Claims

        (i)    Treatment

        On, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date on which such Class C3 Claim becomes an Allowed Class C3 Claim, or (iii) the date on which such Class C3 Claim becomes due and payable pursuant to any agreement between ESI and a holder of a Class C3 Claim, each holder of an Allowed Class C3 Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Class C3 Claim (a) Cash equal to the amount of such Allowed Class C3 Claim or (b) such other treatment as ESI and such holder shall have agreed in writing.

        (ii)    Election

        Any holder of a Claim in Class C6 that desires treatment of such Claim as an ESI Convenience Claim shall make such election on the Ballot to be provided to holders of Impaired Claims entitled to vote to accept or reject the Plan (as specified in Section 4.1 of the Plan) and return such Ballot to the address specified therein on or before the Voting Deadline. Any election made after the Voting Deadline shall not be binding on the Debtors unless the Voting Deadline is expressly waived in writing by the Debtors with respect to any such Claim.

        (iii)    Status

        Class C3 Claims are Impaired. To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class C3 shall be entitled to vote to accept or reject the Plan.

    (b)    Class C4: ESI Bank Holders Claims

        (i)    Treatment

        In full satisfaction, release and discharge of, and in exchange for, its Allowed Class C4 Claim, each holder of an Allowed Class C4 Claim shall receive the treatment set forth in Section 3.3(b)(ii) of the Plan; *provided, however,* that, solely for purposes of calculating distributions to other holders of Claims against and Interests in ESI, an amount equal to the Class C4 Distribution Amount shall be, and shall be deemed to be, distributable to the Bank Holders on the Initial Distribution Date on account of their Allowed Class C4 Claims.

        (ii)    Status

        To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class C4 shall be entitled to vote to accept or reject the Plan.

(c)    Class C6: ESI General Unsecured Claims

    (i)    Treatment

In full satisfaction, release and discharge of, and in exchange for, its Allowed Class C6 Claim, on, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date on which such Class C6 Claim becomes an Allowed Class C6 Claim, and (iii) the date on which such Class C6 Claim becomes due and payable pursuant to any agreement between ESI and a holder of a Class C6 Claim, each holder of an Allowed Class C6 Claim shall receive Cash and New OCD Common Stock with an aggregate value as of the Effective Date equal to the amount of such Allowed Class C6 Claim (excluding post-petition interest) in the Standard Combination; *provided, however,* that distributions with respect to Class C6 Claims that become Allowed Claims after the Effective Date shall be made from the Disputed Distribution Reserve, as set forth in Section 9.4(d) of the Plan.

    (ii)    Status

Class C6 Claims are Impaired. To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class C6 shall be entitled to vote to accept or reject the Plan.

(d)    *Class C10: ESI Intercompany Claims*

    (i)    Treatment

In full satisfaction, release and discharge of, and in exchange for, its Allowed Class C10 Claim, each holder of an Allowed Class C10 Claim shall be credited with value on, or as soon as reasonably practicable after, the Initial Distribution Date, equal to the amount of such Allowed Class C10 Claim (excluding post-petition interest).

    (ii)    Status

Class C10 Claims are Impaired. To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class C10 shall be entitled to vote to accept or reject the Plan.

(e)    Class C12: ESI Interests

    (i)    Treatment

Each holder of an Allowed Interest in Class C12 shall retain unaltered, the legal, equitable and contractual rights to which such Allowed Interest entitles the holder.

    (ii)    Status

Class C12 is Unimpaired and holders of Class C12 Interests are thus not entitled to vote to accept or reject the Plan.

6.     **Vytec (Classes D1 through D12)**

    (a)    Class D3: Vytec Convenience Claims

        (i)    Treatment

        On, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date on which such Class D3 Claim becomes an Allowed Class D3 Claim, or (iii) the date on which such Class D3 Claim becomes due and payable pursuant to any agreement between Vytec and a holder of a Class D3 Claim, each holder of an Allowed Class D3 Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Class D3 Claim (a) Cash equal to the amount of such Allowed Class D3 Claim or (b) such other treatment as Vytec and such holder shall have agreed in writing.

        (ii)    Election

        Any holder of a Claim in Class D6 that desires treatment of such Claim as an Vytec Convenience Claim shall make such election on the Ballot to be provided to holders of Impaired Claims entitled to vote to accept or reject the Plan (as specified in Section 4.1 of the Plan) and return such Ballot to the address specified therein on or before the Voting Deadline. Any election made after the Voting Deadline shall not be binding on the Debtors unless the Voting Deadline is expressly waived in writing by the Debtors with respect to any such Claim.

        (iii)    Status

        Class D3 Claims are Impaired. To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class D3 shall be entitled to vote to accept or reject the Plan.

    (b)    Class D4: Vytec Bank Holders Claims

        (i)    Treatment

        In full satisfaction, release and discharge of, and in exchange for, its Allowed Class D4 Claim, each holder of an Allowed Class D4 Claim shall receive the treatment set forth in Section 3.3(b)(ii) of the Plan; *provided, however*, that, solely for purposes of calculating distributions to other holders of Claims against and Interests in Vytec, an amount equal to the Class D4 Distribution Amount shall be, and shall be deemed to be, distributable to the Bank Holders on the Initial Distribution Date on account of their Allowed Class D4 Claims.

        (ii)    Status

        To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class D4 shall be entitled to vote to accept or reject the Plan.

    (c)    Class D6: Vytec General Unsecured Claims

671

(i)    Treatment

In full satisfaction, release and discharge of, and in exchange for, its Allowed Class D6 Claim, on, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date on which such Class D6 Claim becomes an Allowed Class D6 Claim, and (iii) the date on which such Class D6 Claim becomes due and payable pursuant to any agreement between Vytec and a holder of a Class D6 Claim, each holder of an Allowed Class D6 Claim shall receive Cash and New OCD Common Stock with an aggregate value as of the Effective Date equal to the amount of such Allowed Class D6 Claim (excluding post-petition interest) in the Standard Combination[14]; *provided, however*, that distributions with respect to Class D6 Claims that become Allowed Claims after the Effective Date shall be made from the Disputed Distribution Reserve, as set forth in Section 9.4(d) of the Plan.

(ii)    Status

Class D6 Claims are Impaired.  To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class D6 shall be entitled to vote to accept or reject the Plan.

(d)    Class D10: Vytec Intercompany Claims

(i)    Treatment

In full satisfaction, release and discharge of, and in exchange for, its Allowed Class D10 Claim, each holder of an Allowed Class D10 Claim shall be credited with value on, or as soon as reasonably practicable after, the Initial Distribution Date, equal to the amount of such Allowed Class D10 Claim (excluding post-petition interest).

(ii)    Status

Class D10 Claims are Impaired.  To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class D10 shall be entitled to vote to accept or reject the Plan.

(e)    Class D12: Vytec Interests

(i)    Treatment

Each holder of an Allowed Interest in Class D12 shall retain unaltered, the legal, equitable and contractual rights to which such Allowed Interest entitles the holder.

---

[14] In the event that Vytec files a Chapter 11 case prior to the Confirmation Hearing, the Debtors and Vytec reserve the right, to the extent the Debtors and Vytec then deem appropriate, to file a motion as promptly after Vytec's petition date as practicable seeking the payment of any outstanding pre-petition amounts owing to Vytec's critical trade vendors.

(ii)     Status

Class D12 is Unimpaired and holders of Class D12 Interests are thus not entitled to vote to accept or reject the Plan.

7.     **Soltech (Classes E1 through E12)**

(a)     Class E3: Soltech Convenience Claims

(i)     Treatment

On, or as soon as reasonably practicable after, the latest of (i) the Initial Distribution Date, (ii) the date on which such Class E3 Claim becomes an Allowed Class E3 Claim, or (iii) the date on which such Class E3 Claim becomes due and payable pursuant to any agreement between Soltech and a holder of a Class E3 Claim, each holder of an Allowed Class E3 Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Class E3 Claim (a) Cash equal to the amount of such Allowed Class E3 Claim or (b) such other treatment as Soltech and such holder shall have agreed in writing.

(ii)     Election

Any holder of a Claim in Class E6 that desires treatment of such Claim as a Soltech Convenience Claim shall make such election on the Ballot to be provided to holders of Impaired Claims entitled to vote to accept or reject the Plan (as specified in Section 4.1 of the Plan) and return such Ballot to the address specified therein on or before the Voting Deadline. Any election made after the Voting Deadline shall not be binding on the Debtors unless the Voting Deadline is expressly waived in writing by the Debtors with respect to any such Claim.

(iii)     Status

Class E3 Claims are Impaired. To the extent and in the manner provided in the Voting Procedures Order, holders of the Claims in Class E3 shall be entitled to vote to accept or reject the Plan.

(b)     Class E4: Soltech Bank Holders Claims

(i)     Treatment

In full satisfaction, release and discharge of, and in exchange for, its Allowed Class E4 Claim, each holder of an Allowed Class E4 Claim shall receive the treatment set forth in Section 3.3(b)(ii) of the Plan; *provided, however*, that, solely for purposes of calculating distributions to other holders of Claims against and Interests in Soltech, an amount equal to the Class E4 Distribution Amount shall be, and shall be deemed to be, distributable to the Bank Holders on the Initial Distribution Date on account of their Allowed Class E4 Claims.