A claimant may assert separate claims against the OC Sub-Account and the Fibreboard Sub-Account based on separate exposures to asbestos or asbestos-containing products manufactured or distributed by OCD and Fibreboard, respectively ("Multiple Exposure Claims"); however, all such Multiple Exposure Claims must be filed by the claimant at the same time. To the extent a Sub-Account has separate liabilities to a claimant based on multiple exposure, the Sub-Account shall pay the claimant its several share of the liquidated value of the separate claim or claims for which it is liable, subject to applicable Payment Percentage, Maximum Annual Payment and Claims Payment Ratio limitations described below. Under no circumstances, however, shall any claimant receive more than the full liquidated value of his or her claim.

The Asbestos Personal Injury Trust Distribution Procedures provide that the Trustees, with the consent of the Future Claimants Representative and the TAC, may adjust the Initial Payment Percentage upward or downward depending on a multitude of factors. Therefore, no assurance can be given that some holders of Asbestos Personal Injury Claims may not be subject to a payment percentage that is higher or lower than the Initial Payment Percentage.

### 2. Disease Levels, Scheduled Values and Medical/Exposure Criteria Set Forth in the Asbestos Personal Injury Trust Distribution Procedures

The eight Disease Levels covered by the Asbestos Personal Injury Trust Distribution Procedures, together with the Medical/Exposure Criteria for each and the Scheduled Values for the seven Disease Levels eligible for Expedited Review, are set forth below. These Disease Levels, Scheduled Values, and Medical/Exposure Criteria will apply to all OC and Fibreboard Asbestos Personal Injury Trust Voting Claims filed with the Asbestos Personal Injury Trust on or before the Initial Asbestos Personal Injury Trust's Claims Filing Date (defined below).

Thereafter, with the consent of the TAC and the Future Claimants' Representative, the Trustees may add to, change, or eliminate Disease Levels, Scheduled Values, or Medical/Exposure Criteria; develop subcategories of Disease Levels, Scheduled Values or Medical/Exposure Criteria; or determine that a novel or exceptional asbestos personal injury claim is compensable even though it does not meet the Medical/Exposure Criteria for any of the then current Disease Levels.

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| Mesothelioma (Level VIII) | OCD: $215,000<br><br>FB: $135,000 | (1) Diagnosis of mesothelioma; and (2) credible evidence of OC or FB Exposure.[17] |
| Lung Cancer 1 (Level VII) | OCD: $40,000 | (1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos-Related |

---

[17]    As defined in the Asbestos Personal Injury Trust Distribution Procedures.

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| | FB: $27,000 | Nonmalignant Disease,[18] (2) six months OC or FB Exposure prior to December 31, 1982, (3) Significant Occupational Exposure[19] to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |
| Lung Cancer 2 (Level VI) | None | (1) Diagnosis of a primary lung cancer; (2) OC or FB Exposure prior to December 31, 1982, and (3) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. Lung Cancer 2 (Level VI) claims are claims that do not meet the more stringent medical and/or exposure requirements of Lung Cancer (Level VII) claims. All claims in this Disease Level will be individually evaluated. The estimated likely average of the individual evaluation awards for this category is $20,000 for OCD and $12,000 for Fibreboard, with such awards capped at $50,000 for OCD and $30,000 for Fibreboard, unless the claim qualifies for Extraordinary Claim treatment. |
| | | Level VI claims that show no evidence of either an underlying Bilateral Asbestos-Related Non-malignant Disease or Significant Occupational Exposure may be individually evaluated, although it is not expected that such claims will be treated as having any significant value, especially if the claimant is also a smoker. In any event, no presumption of validity will be available for any claims in this category. |
| Other Cancer (Level V) | OCD: $22,000<br><br>FB: $12,000 | (1) Diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease, (2) six months OC or FB Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |
| Severe Asbestosis (Level IV) | OCD: $42,000 | (1) Diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathological |

---

[18]   Evidence of "Bilateral Asbestos-Related Nonmalignant Disease" for purposes of meeting the criteria for establishing Disease Levels I, II, III, V, and VII is described in the Asbestos Personal Injury Trust Distribution Procedures.

[19]   As defined in the Asbestos Personal Injury Trust Distribution Procedures.

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| | FB: $29,000 | evidence of asbestos, plus (a) TLC less than 65%, or (b) FVC less than 65% and FEV1/FVC ratio greater than 65%, (2) six months OCD or FB Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Asbestos/Pleural Disease (Level III) | OCD: $19,000<br><br>FB: $11,500 | Diagnosis of Bilateral Asbestos-Related Nonmalignant Disease, plus (a) TLC less than 80%, or (b) FVC less than 80% and FEV1/FVC ratio greater than or equal to 65%, and (2) six months OC or FB Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Asbestosis/Pleural Disease (Level II) | OCD: $8,000<br><br>FB: $4,500 | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, and (2) six months OC or FB Exposure prior to December 31, 1982, and (3) five years cumulative occupational exposure to asbestos. |
| Other Asbestos Disease (Level I – Cash Discount Payment) | OCD: $400<br><br>FB: $240 | (1) Diagnosis of a Bilateral Asbestos- Related Nonmalignant Disease or an asbestos-related malignancy other than mesothelioma, and (2) OC or FB Exposure prior to December 31, 1982. |

3.    **Claims Liquidation Procedures**

OC and Fibreboard Asbestos Personal Injury Claims will be processed based on their place in the FIFO Processing Queue (defined below) to be established pursuant to the Asbestos Personal Injury Trust Distribution Procedures. The Asbestos Personal Injury Trust will liquidate all Asbestos Personal Injury Claims that meet the presumptive Medical/Exposure Criteria of Disease Levels I–V, VII and VIII efficiently and expeditiously under the Expedited Review described below.

Claims involving Disease Levels I–V, VII and VIII that do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may undergo the Asbestos Personal Injury Trust's Individual Review Process described below. In such a case, notwithstanding that the claim does not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level, the Asbestos Personal Injury Trust can offer the claimant an amount up to the Scheduled Value of that Disease Level if the Asbestos Personal Injury Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system.

OCD and Fibreboard claimants holding claims involving Disease Levels II-VIII may in addition or alternatively seek to establish a liquidated value for the claim that is greater than its Scheduled Value by electing the Asbestos Personal Injury Trust's Individual Review Process. However, the liquidated value of a more serious Disease Level II-VIII claim that

814526.7                                     227

747

undergoes the Asbestos Personal Injury Trust's Individual Review Process for valuation purposes may be determined by the Asbestos Personal Injury Trust to be less than its Scheduled Value, and in any event may not exceed the Maximum Value for the relevant Disease Level, unless the claim qualifies as an Extraordinary Claim (defined below), in which case its liquidated value cannot exceed the Maximum Value specified in that provision for such claims. Level VI (Lung Cancer 2) claims may be liquidated only pursuant to the Asbestos Personal Injury Trust's Individual Review Process.

All unresolved disputes over a claimant's medical condition, exposure history and/or the liquidated value of the claim will be subject to binding or non-binding arbitration at the election of the claimant. OC and Fibreboard Asbestos Personal Injury Claims that are the subject of a dispute with the Asbestos Personal Injury Trust that cannot be resolved by non-binding arbitration may enter the tort system. However, if and when a claimant obtains a judgment in the tort system, the judgment will be payable from the Asbestos Personal Injury Trust subject to the Payment Percentage, Maximum Available Payment, and Claims Payment Ratio provisions set forth below.

4.    **Payment Percentage**

After the liquidated value of an OC or Fibreboard Asbestos Personal Injury Claim other than a claim involving Other Asbestos Disease (Disease Level I – Cash Discount Payment) is determined by the Asbestos Personal Injury Trust, the claimant will receive a pro-rata share of that value based on a payment percentage (the "Payment Percentage").

With respect to OC Asbestos Personal Injury Trust Voting Claims, the Initial Payment Percentage has been set at ____% (the "OCD Initial Payment Percentage"), and will apply to all OC Asbestos Personal Injury Trust Voting Claims accepted as valid by the Asbestos Personal Injury Trust, unless adjusted by the Asbestos Personal Injury Trust with the consent of the TAC and the Future Claimants' Representative. With respect to Fibreboard Asbestos Personal Injury Trust Voting Claims, the initial Payment Percentage has been set at ____ % (the "Fibreboard Initial Payment Percentage", and together with the OC Initial Payment Percentage, the "Initial Payment Percentage") and will apply to all Fibreboard Asbestos Personal Injury Trust Voting Claims accepted as valid by the Asbestos Personal Injury Trust, unless adjusted by the Asbestos Personal Injury Trust with the consent of the TAC and the Future Claimants' Representative. The term "Asbestos Personal Injury Trust Voting Claims" includes (i) Unpaid OCD and Fibreboard Resolved Asbestos Personal Injury Claims (as defined in the Plan and described); (ii) claims filed against OCD or Fibreboard in the tort system or actually submitted to OCD or Fibreboard pursuant to an administrative settlement agreement prior to the Petition Date; and (iii) all claims filed against another defendant in the tort system prior to the date the Plan was filed with the Bankruptcy Court (the "Plan Filing Date"); provided, however, that the claim described in subsection (i), (ii) or (iii) above actually voted to accept or reject the Plan pursuant to the voting procedures established by the Bankruptcy Court, and provided further that the claim was subsequently filed with the Asbestos Personal Injury Trust on or before the date six months after the Effective Date (the "Initial Claims Filing Date"). The Initial Payment Percentage has been calculated, *inter alia*, on the assumption that the Average Values will be achieved with respect to existing present claims and projected future claims involving Disease Levels IV – VIII.

The Payment Percentage may be adjusted upwards or downwards from time to time by the Asbestos Personal Injury Trust with the consent of the TAC and the Future Claimants' Representative to reflect then-current estimates of the Asbestos Personal Injury Trust's assets and its liabilities, as well as then-estimated values of then-pending and future claims. If the Payment Percentage is increased over time, claimants whose claims were liquidated and paid in prior periods under the Asbestos Personal Injury Trust Distribution Procedures will not receive additional payments. Because there is uncertainty in the prediction of both the number and severity of future claims, and the amount of the Asbestos Personal Injury Trust's assets, no guarantee can be made of any Payment Percentage of an Asbestos Personal Injury Claim's liquidated value other than other than the Initial Payment Percentage of an Asbestos Personal Injury Trust Voting Claim.

### 5.    Maximum Annual Payment and Maximum Available Payment

The Asbestos Personal Injury Trust will estimate or model the amount of cash flow anticipated to be necessary over its entire life to ensure that funds will be available to treat all present and future claimants as similarly as possible. In each year, the Asbestos Personal Injury Trust will be empowered to pay out all of the interest earned during the year, together with a portion of its principal, calculated so that the application of Asbestos Personal Injury Trust funds over its life will correspond with the needs created by the anticipated flow of claims (the "Maximum Annual Payment"). The Asbestos Personal Injury Trust's distributions to all claimants for that year may not exceed the Maximum Annual Payment determined for that year.

In distributing the Maximum Annual Payment, the Asbestos Personal Injury Trust will first allocate the amount in question to outstanding Unpaid OCD and Fibreboard Resolved Asbestos Personal Injury Claims and to liquidated OC and Fibreboard Asbestos Personal Injury Claims involving Disease Level I (Cash Discount Payment), in proportion to the aggregate value of each group of claims. The remaining portion of the Maximum Annual Payment (the "Maximum Available Payment"), if any, will then be allocated and used to satisfy all other liquidated OC and Fibreboard Asbestos Personal Injury Claims, subject to the Claims Payment Ratio (discussed below).

### 6.    Claims Payment Ratio

Based upon OCD's and Fibreboard's claims settlement history and analysis of present and future claims, a Claims Payment Ratio has been determined which, as of the Effective Date, will be set at sixty percent (60%) for Category A claims, which consist of OCD and Fibreboard Asbestos Personal Injury Claims involving severe asbestosis and malignancies (Disease Levels IV – VIII) that were unliquidated as of the Petition Date, and at forty percent (40%) for Category B claims, which are OCD and Fibreboard Asbestos Personal Injury Claims involving non-malignant Asbestosis or Pleural Disease (Disease Levels II and III) that were similarly unliquidated as of the Petition Date. The Claims Payment Ratio will not apply to any Unpaid OC or Fibreboard Resolved Asbestos Personal Injury Claims or to any claims for Other Asbestos Disease (Disease Level I - Cash Discount Payment). In each year, after the determination of the Maximum Available Payment, sixty percent (60%) of that amount will be available to pay Category A claims and forty percent (40%) will be available to pay Category B claims.

The 60%/40% Claims Payment Ratio will apply to all OC and Fibreboard Asbestos Personal Injury Trust Voting Claims and will not be amended until the fifth anniversary of the Effective Date. Thereafter, the Claims Payment Ratio will be continued absent circumstances, such as a significant change in law or medicine, necessitating an amendment to avoid a manifest injustice.

In any event, no amendment to the Claims Payment Ratio may be made without the consent of the TAC and the Future Claimants' Representative. However, the Trustees, with the consent of the TAC and the Future Claimants' Representative, may offer the option of a reduced Payment Percentage to holders of claims in either Category A or Category B in return for prompter payment (the "Reduced Payment Option").

**7.    Indemnity and Contribution Claims**

OC and Fibreboard Indirect Asbestos Personal Injury Claims for indemnity and contribution, if any, will be subject to the same categorization, evaluation, and payment provisions of these Asbestos Personal Injury Trust Distribution Procedures as all other OC and Fibreboard Asbestos Personal Injury Claims, subject to certain conditions and procedures germane to claims for indemnity and contribution.

Plant asserted that various such special provisions of the Asbestos Personal Injury Trust Distribution Procedures were improper. Specifically, Plant alleged that two of the preconditions for processing and payment of OC Indirect Asbestos PI Trust Claims and FB Indirect Asbestos PI Trust Claims cannot be met in a substantial percentage of its cases, thus barring the payment of valid claims. Plant alleged that the requirement that the claimant establish that it has paid in full the liability and obligations of the Asbestos Personal Injury Trust to the individual claimant will be impossible to fulfill in a substantial number of cases involving Plant, because Plant's liability to the holder of the direct claim is allegedly less than Fibreboard's liability in many such cases. Plant also asserted that the requirement that holders of the OC Indirect Asbestos PI Trust Claims and FB Indirect Asbestos PI Trust Claims prove that the individual claimant has fully released the Asbestos Personal Injury Trust from all liability cannot be met in many cases due to the death of the claimant. Plant alleged that the Asbestos Personal Injury Trust Distribution Procedures should contain procedures for the processing of OC Indirect Asbestos PI Trust Claims and FB Indirect Asbestos PI Trust Claims and should not leave the Asbestos Personal Injury Trust with the discretion to formulate procedures, including forms for proofs of claim in addition to those they filed by the Bar Date of April 15, 2002. Plant objected to the Asbestos Personal Injury Trust Distribution Procedures based on other alleged ambiguities in the Asbestos Personal Injury Trust Distribution Procedures language that the Plan Proponents believe assures that holders of OCD Indirect Asbestos PI Trust Claims and FB Indirect Asbestos PI Trust Claims are not granted rights superior to the holders of the direct claims.

The Plan Proponents made several changes to the Asbestos Personal Injury Trust Distribution Procedures to address the Plant objections. The Asbestos Personal Injury Trust Distribution Procedures now provide for individual consideration and evaluation of any OC Indirect Asbestos PI Trust Claim and FB Indirect Asbestos PI Trust Claim that fails to meet the requirements for presumptive validity, including those requirements objected to by Plant. The review shall determine whether the indirect claimant can establish under applicable state law that

814526.7

230

750

it has paid a liability or obligation that the Asbestos Personal Injury Trust would otherwise have to the direct claimant. Any unresolved disputes are subject to non-binding arbitration procedures set forth in the Asbestos Personal Injury Trust Distribution Procedures and, if not resolved by arbitration, resolution through litigation in the tort system. See Section VIII.B.26 of this Disclosure Statement entitled "Suits in the Tort System." Plant continues to assert, despite these modifications to the Asbestos Personal Injury Trust Distribution Procedures, that the Asbestos Personal Injury Trust Distribution Procedures are ambiguous as to whether holders of indemnity claims are precluded from the recovering on account of claims for attorneys' fees and interest, allegedly recoverable under certain conditions pursuant to the laws of most states, including California.

The Plan Proponents contend that the conditions and other limitations in the Asbestos Personal Injury Trust Distribution Procedures concerning payment of OC Indirect Asbestos PI Trust Claims and FB Indirect Asbestos PI Trust Claims are consistent with both state law and bankruptcy law, including Sections 502(e) and 509(c) of the Bankruptcy Code. Plant's objections to the Asbestos Personal Injury Trust Distribution Procedures will be resolved, if necessary, by the Bankruptcy Court or District Court as part of the Confirmation Hearing.

Plant and the Debtors have had a longstanding dispute with respect to the alleged claims of Plant. The Debtors have consistently maintained that Plant's claims are not valid and the Debtors may file objections to the majority of Plant's claims under both applicable state law and the Bankruptcy Code. The Debtors assert that is well established under California law that Plant does not have a right to contractual indemnity against Fibreboard. Plant asserts that it is entitled to indemnification from Fibreboard under California law.

### 8.    Ordering of Claims

The Asbestos Personal Injury Trust will order claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis except as otherwise provided herein (the "FIFO Processing Queue"). For all claims filed on or before the date six months after the Effective Date (the "Initial Asbestos Personal Injury Claims Filing Date"), a claimant's position in the FIFO Processing Queue will be determined as of the earlier of (i) the date prior to the Petition Date (if any) that the specific claim was either filed against OCD or Fibreboard in the tort system or was actually submitted to OCD or Fibreboard pursuant to an administrative settlement agreement; (ii) the date before the Petition Date that a claim was filed against another defendant in the tort system if at the time the claim was subject to a tolling agreement with OCD or Fibreboard; (iii) the date after the Petition Date (if any) but before the Effective Date that the claim was filed against another defendant in the tort system; (iv) the date the claimant filed a ballot in the Bankruptcy Court pursuant to the voting procedures approved by the Court in this Chapter 11 proceeding; or (v) the date after the Effective Date but on or before the Initial Asbestos Personal Injury Claims Filing Date that the claim was filed with the Asbestos Personal Injury Trust.

Following the Initial Asbestos Personal Injury Claims Filing Date, the claimant's position in the FIFO Processing Queue will be determined by the date the claim was filed with the Asbestos Personal Injury Trust.

9.    **Effect of Statutes of Limitations and Repose**

To be eligible for a place in the FIFO Processing Queue, a claim must meet either (i) for claims first filed in the tort system against OCD or Fibreboard prior to the Petition Date, the applicable federal, state and foreign statute of limitation and repose that was in effect at the time of the filing of the claim in the tort system, or (ii) for claims not filed against OCD or Fibreboard in the tort system prior to the Petition Date, the applicable statute of limitation that was in effect at the time of the filing with the Asbestos Personal Injury Trust. However, the running of the relevant statute of limitation will be tolled for purposes of the Asbestos Personal Injury Trust as of the earliest of (A) the actual filing of the claim against OCD or Fibreboard prior to the Petition Date, whether in the tort system or by submission of the claim to OCD or Fibreboard pursuant to an administrative settlement agreement; (B) the filing of the claim against another defendant in the tort system prior to the Petition Date if the claim was tolled against OCD or Fibreboard at the time by an agreement or otherwise; (C) the filing of a claim after the Petition Date but prior to the Effective Date against another defendant in the tort system; (D) the filing of the claim for voting purposes in this Chapter 11 proceeding; or (E) the filing of a proof of claim with the requisite supporting documentation with the Asbestos Personal Injury Trust after the Effective Date.

If an OC or Fibreboard Asbestos Personal Injury Claim meets any of the tolling provisions described in the preceding sentence and the claim was not barred by the applicable statute of limitation at the time of the tolling event, it will be treated by the Asbestos Personal Injury Trust as timely filed if it is actually filed with the Asbestos Personal Injury Trust within three (3) years after the Effective Date. In addition, any claims that were first diagnosed after the Petition Date, irrespective of the application of any relevant statute of limitation or repose, may be filed with the Asbestos Personal Injury Trust within three (3) years after the date of diagnosis or within three (3) years after the Effective Date, whichever occurs later. However, the processing of any OC or Fibreboard Asbestos Personal Injury Claim by the Asbestos Personal Injury Trust may be deferred at the election of the claimant.

10.    **Payment of Claims**

Asbestos Personal Injury Claims that have been liquidated by the Expedited Review (described below), by arbitration or by litigation in the tort system, will be paid in FIFO order based on the date their liquidation became final (the "FIFO Payment Queue").

11.    **Resolution of Unpaid OC and Fibreboard Resolved Asbestos Personal Injury Claims**

As soon as practicable after the Effective Date, the Asbestos Personal Injury Trust will pay, upon submission by the claimant of the applicable Asbestos Personal Injury Trust proof of claim form (included in Attachment B to the Asbestos Personal Injury Trust Distribution Procedures) together with all documentation required thereunder, all Unpaid OCD and Fibreboard Resolved Asbestos Personal Injury Claims as defined in the Plan.

The liquidated value of an Unpaid OC or Fibreboard Resolved Asbestos Personal Injury Claims will not include any punitive or exemplary damages. In the absence of a Final Order of the Bankruptcy Court determining whether an OCD or Fibreboard Asbestos Personal

Injury Claim is an Unpaid OC or Fibreboard Resolved Asbestos Personal Injury Claim, a dispute between the claimant and the Asbestos Personal Injury Trust over this issue will be resolved pursuant to the same procedures that are provided in the Asbestos Personal Injury Trust Distribution Procedures for resolving the validity and/or liquidated value of an OCD or Fibreboard Asbestos Personal Injury Claim.

Unpaid OC and Fibreboard Resolved Asbestos Personal Injury Claims will be processed and paid by the Asbestos Personal Injury Trust in accordance with their order in a separate FIFO queue to be established by the Asbestos Personal Injury Trust based on the date the Asbestos Personal Injury Trust received a completed proof of claim form with all required documentation for the particular claim; provided, however, the amounts payable with respect to such claims will not be subject to or taken into account in consideration of the Claims Payment Ratio, but will be subject to the Maximum Annual Payment and Payment Percentage provisions set forth above.

### 12.    Resolution of Unresolved OC and Fibreboard Asbestos Personal Injury Claims

Within six months after the establishment of the Asbestos Personal Injury Trust, the Trustees, with the consent of the TAC and the Future Claimants' Representative, are required to adopt procedures for reviewing and liquidating all unresolved Asbestos Personal Injury Claims, which will include deadlines for processing such claims. Such procedures will also require that claimants seeking resolution of unresolved Asbestos Personal Injury Claims must first file a proof of claim form, together with the required supporting documentation. It is anticipated that the Asbestos Personal Injury Trust will provide an initial response to the claimant within six months of receiving the proof of claim form.

The proof of claim form will require the claimant to assert his or her claim for the highest Disease Level for which the claim qualifies at the time of filing. Irrespective of the Disease Level alleged on the proof of claim form, all claims will be deemed by the Asbestos Personal Injury Trust Distribution Procedures to be a claim for the highest Disease Level for which the claim qualifies at the time of filing, and all lower Disease Levels for which the claim may also qualify at the time of filing or in the future will be treated as subsumed into the higher Disease Level for both processing and payment purposes.

Upon filing of a valid proof of claim form with the required supporting documentation, the claimant will be placed in the FIFO Processing Queue in accordance with the ordering described above, and will advise the Asbestos Personal Injury Trust whether the claim should be liquidated under the Asbestos Personal Injury Trust's Expedited Review Process or, in certain circumstances, the Asbestos Personal Injury Trust's Individual Review Process (both of which are described below).

### 13.    Expedited Review

The Asbestos Personal Injury Trust's Expedited Review Process ("Expedited Review") is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all claims (except those involving Lung Cancer 2 - Disease Level VI) where the claim can easily be verified by the Asbestos Personal Injury Trust as meeting the presumptive

814526.7                                    233

Medical/Exposure Criteria for the relevant Disease Level. Expedited Review thus provides claimants with a substantially less burdensome process for pursuing Asbestos Personal Injury Claims than does the Individual Review Process. Expedited Review is also intended to provide qualifying claimants a fixed and certain claims payment.

Thus, claims that undergo Expedited Review and meet the presumptive Medical/Exposure Criteria for the relevant Disease Level will be paid the Scheduled Value for such Disease Level. However, except for claims involving Other Asbestos Disease (Disease Level I), all claims liquidated by Expedited Review will be subject to the applicable Payment Percentage, the Maximum Available Payment, and the Claims Payment Ratio limitations set forth above. Claimants holding claims that cannot be liquidated by Expedited Review because they do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may elect the Asbestos Personal Injury Trust's Individual Review Process.

### 14.    Claims Processing Under Expedited Review

All claimants seeking liquidation of their claims pursuant to Expedited Review must file the Asbestos Personal Injury Trust's proof of claim form provided in Attachment B to the Asbestos Personal Injury Trust Distribution Procedures. As a proof of claim form is reached in the FIFO Processing Queue, the Asbestos Personal Injury Trust will determine whether the claim described therein meets the Medical/Exposure Criteria for one of the seven Disease Levels eligible for Expedited Review, and will advise the claimant of its determination. If a Disease Level is determined, the Asbestos Personal Injury Trust will tender to the claimant an offer of payment of the Scheduled Value for the relevant Disease Level multiplied by the applicable Payment Percentage, together with a form of release approved by the Asbestos Personal Injury Trust.

### 15.    Individual Review Process

The Asbestos Personal Injury Trust's Individual Review Process provides a claimant with an opportunity for individual consideration and evaluation of an OC or Fibreboard Asbestos Personal Injury Claim that fails to meet the presumptive Medical/Exposure Criteria for Disease Levels I – V, VII and VIII. In such a case, the Asbestos Personal Injury Trust will either deny the claim, or, if the Asbestos Personal Injury Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system, the Asbestos Personal Injury Trust can offer the claimant a liquidated value amount up to the Scheduled Value for that Disease Level, unless the claim qualifies as an Extraordinary Claim, in which case its liquidated value cannot exceed the Maximum Value for such a claim.

Claimants holding claims involving Disease Levels II – VIII will also be eligible to seek Individual Review of the liquidated value of their claims, as well as of their medical/exposure evidence. The Individual Review Process is intended to result in payments equal to the full liquidated value for each claim multiplied by the Payment Percentage; however, the liquidated value of any OC or Fibreboard Asbestos Personal Injury Claim that undergoes Individual Review may be determined to be less than the Scheduled Value the claimant would have received under Expedited Review. Moreover, the liquidated value for a claim involving Disease Levels II – VIII may not exceed the Maximum Value for the relevant Disease Level, unless the claim meets the requirements of an Extraordinary Claim, in which case its liquidated

value cannot exceed the Maximum Value set forth in that provision for such claims. Because the detailed examination and valuation process pursuant to Individual Review requires substantial time and effort, claimants electing to undergo the Individual Review Process will necessarily be paid the liquidated value of their OC or Fibreboard Asbestos Personal Injury Claims later than would have been the case had the claimant elected the Expedited Review.

### 16.    Valuation Factors to be Considered in Individual Review

The Asbestos Personal Injury Trust will liquidate the value of each OC or Fibreboard Asbestos Personal Injury Claim that undergoes Individual Review based on the historic liquidated values of other similarly situated claims in the tort system for the same Disease Level. The Asbestos Personal Injury Trust will thus take into consideration all of the factors that affect the severity of damages and values within the tort system including, but not limited to (i) the degree to which the characteristics of a claim differ from the presumptive Medical/Exposure Criteria for the Disease Level in question; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependencies, special damages, and pain and suffering; (iii) evidence that the claimant's damages were (or were not) caused by asbestos exposure, including exposure to an asbestos-containing product or to conduct for which OC or Fibreboard has legal responsibility prior to December 31, 1982, (for example, alternative causes, and the strength of documentation of injuries); (iv) the industry of exposure; and (v) settlements, verdicts and the claimant's and other law firms' experience in the claimant's jurisdiction for similarly situated claims.

### 17.    Scheduled, Average and Maximum Values

The Scheduled, Average and Maximum Values for claims involving Disease Levels I – VIII are the following:

| OC SUB-ACCOUNT | | | |
|---|---|---|---|
| **Scheduled Disease** | **Scheduled Value** | **Average Value** | **Maximum Value** |
| Mesothelioma (Level VIII) | $215,000 | $270,000 | $650,000 |
| Lung Cancer (Level VII) | $ 40,000 | $ 50,000 | $150,000 |
| Lung Cancer (Level VI) | None | $ 20,000 | $ 50,000 |
| Other Cancer (Level V) | $ 22,000 | $ 25,000 | $ 60,000 |
| Severe Asbestosis (Level IV) | $ 42,000 | $ 50,000 | $150,000 |
| Asbestos/Pleural Disease (Level III) | $ 19,000 | $ 20,000 | $ 35,000 |
| Asbestos/Pleural Disease (Level II) | $ 8,000 | $ 9,000 | $ 20,000 |
| Other Asbestos Disease (Cash Discount Payment) (Level I) | $    400 | None | None |

| FB SUB-ACCOUNT | | | |
|---|---|---|---|
| **Scheduled Disease** | **Scheduled Value** | **Average Value** | **Maximum Value** |
| Mesothelioma (Level VIII) | $135,000 | $180,000 | $450,000 |
| Lung Cancer (Level VII) | $ 27,000 | $ 35,000 | $ 90,000 |
| Lung Cancer (Level VI) | None | $ 12,000 | $ 30,000 |
| Other Cancer (Level V) | $ 12,000 | $ 15,000 | $ 36,000 |
| Severe Asbestosis (Level IV) | $ 29,000 | $ 30,000 | $ 90,000 |
| Asbestos/Pleural Disease (Level III) | $ 11,500 | $ 12,000 | $ 21,000 |
| Asbestos/Pleural Disease (Level II) | $ 4,500 | $ 5,400 | $ 12,000 |
| Other Asbestos Disease (Cash Discount Payment) (Level I) | $   240 | None | None |

These Scheduled Values, Average Values and Maximum Values will apply to all OC and Fibreboard Asbestos Personal Injury Trust Voting Claims filed with the Asbestos Personal Injury Trust on or before the Initial Claims Filing Date. Thereafter, the Asbestos Personal Injury Trust, with the consent of the TAC and the Future Claimants' Representative, may change these valuation amounts for good cause and consistent with other restrictions on the amendment power.

18.    **Extraordinary and/or Exigent Hardship Claims**

"Extraordinary Claim" means an OC or Fibreboard Asbestos Personal Injury Claim that otherwise satisfies the Medical Criteria for Disease Levels IV - VIII, and that is held by a claimant whose exposure to asbestos was at least 75% the result of exposure to an asbestos-containing product or conduct for which OC or Fibreboard has legal responsibility, and there is little likelihood of a substantial recovery elsewhere. All such Extraordinary Claims will be presented for Individual Review and, if valid, will be entitled to an award of up to a Maximum Value of five (5) times the Scheduled Value for claims qualifying for Disease Levels I -V, VII and VIII, and five (5) times the Average Value for claims in Disease Level VI, multiplied by the applicable Payment Percentage. An Extraordinary Claim, following its liquidation, will be placed in the FIFO Queue ahead of all other OC and Fibreboard Asbestos Personal Injury Claims except Exigent Hardship Claims, which will be first in said FIFO Queue, based on its date of liquidation, subject to the Maximum Available Payment and Claims Payment Ratio described above.

At any time the Asbestos Personal Injury Trust may liquidate and pay certain OC or Fibreboard Asbestos Personal Injury Claims that qualify as Exigent Hardship Claims. Such claims may be considered separately by the Asbestos Personal Injury Trust no matter what the

order of processing otherwise would have been under the Asbestos Personal Injury Trust Distribution Procedures. An Exigent Hardship Claim, following its liquidation, will be placed first in the FIFO Payment Queue ahead of all other liquidated OC or Fibreboard Asbestos Personal Injury Claims, subject to the Maximum Available Payment and Claims Payment Ratio described above.

An OC or Fibreboard Asbestos Personal Injury Claim will qualify for payment as an Exigent Hardship Claim if the claim meets the Medical/Exposure Criteria for Severe Asbestosis (Disease Level IV) or an asbestos-related malignancy (Disease Levels V-VIII), and the Asbestos Personal Injury Trust, in its sole discretion, determines (a) that the claimant needs financial assistance on an immediate basis based on the claimant's expenses and all sources of available income, and (b) that there is a causal connection between the claimant's dire financial condition and the claimant's asbestos-related disease.

## 19. Secondary Exposure Claims

If a claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed person, such as a family member, the claimant may seek Individual Review of his or her claim. In such a case, the claimant will be required to establish that the occupationally exposed person would have met the exposure requirements under the Asbestos Personal Injury Trust Distribution Procedures that would have been applicable had that person filed a direct claim against the Asbestos Personal Injury Trust. In addition, the claimant with secondary exposure must establish that he or she is suffering from one of the eight Disease Levels above, or an asbestos-related disease otherwise compensable under the Asbestos Personal Injury Trust Distribution Procedures, that his or her own exposure to the occupationally exposed person occurred within the same time frame as the occupationally exposed person was exposed to an asbestos-containing product or to conduct for which OC or Fibreboard has legal responsibility, and that such secondary exposure was a cause of the claimed disease. The proof of claim form included in Attachment B to the Asbestos Personal Injury Trust Distribution Procedures contains an additional section for Secondary Exposure Claims. All other liquidation and payment rights and limitations under the Asbestos Personal Injury Trust Distribution Procedures will be applicable to such claims.

## 20. Evidentiary Requirements

### (a)    Medical Evidence

The Asbestos Personal Injury Trust Distribution Procedures require that all diagnoses of a Disease Level presented to the Asbestos Personal Injury Trust be accompanied by either (i) a statement by the physician providing the diagnosis that at least 10 years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a 10-year latency period. A finding by a physician after the Petition Date that a claimant's disease is "consistent with" or "compatible with" asbestosis will not alone be treated by the Asbestos Personal Injury Trust as a diagnosis.

Except for claims filed against OC or Fibreboard or another asbestos defendant in the tort system prior to the Petition Date, all diagnoses of a non-malignant asbestos-

757

related disease (Disease Levels I-IV) submitted to the Asbestos Personal Injury Trust must be based (i) in the case of a claimant who was living at the time the claim was filed, upon (A) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease; (B) for Disease Levels I - III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 3 of the Asbestos Personal Injury Trust Distribution Procedures), and for Disease Level IV, either an ILO reading of 2/1 or greater or pathological evidence of asbestosis, or (C) pulmonary function testing if the claim involves Asbestosis/Pleural Disease (Level III) or Severe Asbestosis (Level IV), or (ii) in the case of a claimant who was deceased at the time the claim was filed, upon (A) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease, or (B) pathological evidence of the non-malignant asbestos-related disease, or (C) for Disease Levels I - III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 3 of the Asbestos Personal Injury Trust Distribution Procedures), and for Disease Level IV, either an ILO reading of 2/1 or greater or pathological evidence of asbestosis; and (iv) for either Disease Level III or IV, pulmonary function testing.

All diagnoses of an asbestos-related malignancy (Disease Levels V – VIII) submitted to the Asbestos Personal Injury Trust must be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease, or (ii) on a diagnosis of such a malignant Disease Level by a board-certified pathologist.

If the holder of an OC or Fibreboard Asbestos Personal Injury Claim has available the medical evidence described above, or if the holder has filed such medical evidence with another asbestos-related personal injury settlement trust that requires such evidence, the Asbestos Personal Injury Trust Distribution Procedures require that the holder provide such medical evidence to the Asbestos Personal Injury Trust notwithstanding any exceptions to the contrary.

## 21.    Credibility of Medical Evidence

The Asbestos Personal Injury Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards before making any payment to a claimant. The Asbestos Personal Injury Trust may require the submission of x-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence, and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedure to assure that such evidence is reliable. Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to OC or Fibreboard to settle for payment similar disease cases prior to OC or Fibreboard's bankruptcy, or (iii) a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state or federal judge, is presumed by the Asbestos Personal Injury Trust to be reliable, although the Asbestos Personal Injury Trust may seek to rebut the presumption.

In addition, claimants who otherwise meet the requirements of the Asbestos Personal Injury Trust Distribution Procedures for payment of an OC or Fibreboard Asbestos

Personal Injury Claim will be paid by the Asbestos Personal Injury Trust irrespective of the results in any litigation at anytime between the claimant and any other defendant in the tort system. However, the Asbestos Personal Injury Trust Distribution Procedures contemplate that any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the Asbestos Personal Injury Trust in any Individual Review proceeding or any Extraordinary Claim proceeding conducted by the Asbestos Personal Injury Trust.

### 22.    Exposure Evidence

To qualify for any Disease Level, the Asbestos Personal Injury Trust Distribution Procedures require that the claimant demonstrate some exposure to an OC or Fibreboard asbestos-containing product or conduct for which OC or Fibreboard has legal responsibility. Claims based on conspiracy theories that involve no such OC or FB Exposure or conduct are not compensable under the Procedures. To meet the presumptive exposure requirements of Expedited Review, the claimant must show (i) for all Disease Levels, OC or FB Exposure as defined below prior to December 31, 1982; (ii) for Asbestos/Pleural Disease Level II, six months OC or FB Exposure prior to December 31, 1982, plus five years cumulative occupational asbestos exposure; and (iii) for Asbestosis/Pleural Disease (Disease Level III), Severe Asbestosis (Disease Level IV), Other Cancer (Disease Level V) or Lung Cancer 1 (Disease Level VII), the claimant must show six months OC or FB Exposure prior to December 31, 1982, plus Significant Occupational Exposure to asbestos. If the claimant cannot meet the relevant presumptive exposure requirements for a Disease Level eligible for Expedited Review, the claimant may seek Individual Review of his or her claim based on exposure to an asbestos-containing product or conduct for which OC or Fibreboard has legal responsibility.

To recover from the Asbestos Personal Injury Trust, the claimant must demonstrate meaningful and credible exposure to asbestos or asbestos-containing products for which OC or Fibreboard has legal responsibility. For these purposes, the Asbestos Personal Injury Trust will consider meaningful and credible evidence, including an affidavit of the claimant, by an affidavit of a co-worker or the affidavit of a family member in the case of a deceased claimant (providing the Asbestos Personal Injury Trust finds such evidence reasonably reliable), by invoices, employment, construction or similar records, or by other credible evidence. The Asbestos Personal Injury Trust may also require submission of other or additional evidence of exposure when it deems such to be necessary. The specific exposure information required by the Asbestos Personal Injury Trust to process a claim under either Expedited or Individual Review is set forth on the proof of claim form to be used by the Asbestos Personal Injury Trust, which is attached as Attachment B to the Asbestos Personal Injury Trust Distribution Procedures. The Asbestos Personal Injury Trust may also require submission of other or additional evidence of exposure when it deems such to be necessary.

### 23.    Second Disease (Malignancy) Claims

The Asbestos Personal Injury Trust Distribution Procedures allow the holder of an OC or Fibreboard Asbestos Personal Injury Claim involving a non-malignant asbestos-related disease (Disease Levels I through IV) to assert a new OC or Fibreboard Asbestos Personal Injury Claim against the Asbestos Personal Injury Trust for a malignant disease (Disease Levels V –

VIII) that is subsequently diagnosed. The Asbestos Personal Injury Trust will not reduce any additional payments to which such claimant may be entitled with respect to such malignant asbestos-related disease by the amount paid for the non-malignant asbestos-related disease, provided that the malignant disease had not been diagnosed at the time the claimant filed his or her original claim involving the non-malignant disease.

### 24.    Punitive Damages

In determining the value of any OC or Fibreboard Asbestos Personal Injury Claim, punitive or exemplary damages, i.e., damages other than compensatory damages, will not be considered or allowed, notwithstanding their availability in the tort system.

### 25.    Interest

Except for an OC or Fibreboard Asbestos Personal Injury Claim involving Other Asbestos Diseases (Disease Level I – Cash Discount Payment) and subject to the limitations set forth below, the Asbestos Personal Injury Trust Distribution Procedures provide that interest will be paid on all OC and Fibreboard Asbestos Personal Injury Claims with respect to which the claimant has had to wait a year or more for payment, provided, however, that no claimant will receive interest for a period in excess of seven (7) years. The applicable interest rate is to be six percent (6%) simple interest per annum for the first five (5) years after the Effective Date; thereafter, the Trustees have the discretion to change the annual interest rate with the consent of the TAC and the Future Claimants' Representative.

Interest is payable on the Scheduled Value of any unresolved OC or Fibreboard Asbestos Personal Injury Claim that meets the requirements of Disease Levels II –V, VII and VIII, whether the claim is liquidated under Expedited Review, Individual Review, or by arbitration. Interest on an unresolved OC or Fibreboard Asbestos Personal Injury Claim that meets the requirements of Disease Level VI will be based on the Average Value of such a claim. Interest on all such unresolved claims will be measured from the date of payment back to the earliest of the date that is one year after the date on which (a) the claim was filed against OC or Fibreboard prior to the Petition Date; (b) the claim was filed against another defendant in the tort system on or after the Petition Date but before the Effective Date; (c) the claim was filed with the Bankruptcy Court during the pendency of these Chapter 11 proceedings; or (d) the claim was filed with the Asbestos Personal Injury Trust after the Effective Date.

Interest is also payable on the liquidated value of all Unpaid OC or Fibreboard Resolved Asbestos Personal Injury Claims. In the case of such claims liquidated by verdict or judgment, interest will be measured from the date of payment back to the date that is one year after the date that the verdict or judgment was entered. In the case of such claims liquidated by a binding, judicially enforceable settlement, interest will be measured from the date of payment back to the date that is one year after the Petition Date.

### 26.    Suits in the Tort System

If the holder of a disputed claim disagrees with the Asbestos Personal Injury Trust's determination regarding the Disease Level of the claim, the claimant's exposure history or the liquidated value of the claim, and if the holder has first submitted the claim to non-binding

arbitration, the Asbestos Personal Injury Trust Distribution Procedures contemplate that the holder may file a lawsuit in the claimant's jurisdiction. All defenses (including, with respect to the Asbestos Personal Injury Trust, all defenses which could have been asserted by OC or Fibreboard) will be available to both sides at trial; however, the Asbestos Personal Injury Trust may waive any defense and/or concede any issue of fact or law. If the claimant was alive at the time the initial pre-petition complaint was filed or on the date the proof of claim was filed, the case will be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.

If and when a claimant obtains a judgment in the tort system, the claim will be placed in the FIFO Payment Queue based on the date on which the judgment became final. Thereafter, the claimant will receive from the Asbestos Personal Injury Trust an initial payment (subject to the applicable Payment Percentage, the Maximum Available Payment, and the Claims Payment Ratio provisions set forth above) of an amount equal to one-hundred percent (100%) of the greater of (i) the Asbestos Personal Injury Trust's last offer to the claimant or (ii) the award that the claimant declined in non-binding arbitration. The claimant will receive the balance of the judgment, if any, in five equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage, the Maximum Available Payment and the Claims Payment Ratio provisions above).

In the case of non-Extraordinary Claims involving Disease Levels II - VIII, the total amounts paid with respect to such claims may not exceed the Maximum Values for such Disease Levels. In the case of Extraordinary Claims, the total amounts paid with respect to such claims may not exceed the Maximum Value for such claims. Under no circumstances will interest be paid on any judgments obtained in the tort system.

### 27.    Objections concerning the Asbestos Personal Injury Trust Distribution Procedures

Some parties have indicated potential objections to the provisions of the Asbestos Personal Injury Trust Distribution Procedures, which set forth the Disease Levels, value of the Asbestos Personal Injury Claims ascribed to the Disease Level and the evidence to be required to support Asbestos Personal Injury Claims, as described above in Section VIII.B.2 entitled "Disease Levels, Scheduled Values and Medical/Exposure Criteria Set Forth in the Asbestos Personal Injury Trust Distribution Procedures" and Section VIII.B.20 entitled "Evidentiary Requirements" and the Asbestos Personal Injury Trust Distribution Procedures, which is Exhibit D-1 to the Plan. Certain insurers assert that the Bankruptcy Court cannot make a finding that the Asbestos Personal Injury Trust Distribution Procedures are fair and equitable as to them, and that any payments made thereunder are not binding on any Insurer(s) absent an adjudication of coverage issues as respects any relevant asbestos claims in proceedings in a separate and appropriate forum. The Insurers assert that the foregoing procedures, as presently disclosed, do not properly protect their contractual rights regarding the defense or settlement of any Asbestos Personal Injury Claims for which coverage is sought and that the result may be that any otherwise available coverage is voided as to such claims. The Debtors disagree with this assertion; the outcome of this dispute cannot be regarded as certain. The Plan Proponents believe that the provisions of the Asbestos Personal Injury Trust Distribution Procedures are fair, equitable and provide appropriate procedures for the allowance of Asbestos Personal Injury

Claims, including Disease Levels and values that are fair, equitable and appropriate. Any objections to the provisions of the Asbestos Personal Injury Trust Distribution Procedures shall be ruled upon by the Bankruptcy Court or District Court at the confirmation hearing.

### C.    The Asbestos Personal Injury Permanent Channeling Injunction

In 1994, the Bankruptcy Code was amended to add subsections (g) and (h) to Section 524. These subsections confirm the validity of existing injunctions (such as those used in the Chapter 11 cases of Johns-Manville Corporation and UNR Corporation) similar to the Asbestos Personal Injury Permanent Channeling Injunction and codify a court's authority to issue a permanent injunction in asbestos-related reorganizations under Chapter 11 to supplement the injunctive relief afforded by Section 524. Section 524(g) provides that, if certain specified conditions are satisfied, a court may issue a supplemental permanent injunction, such as the Asbestos Personal Injury Permanent Channeling Injunction, barring claims and demands against the reorganized company and certain identified protected parties and channeling those claims and demands to an independent trust

Pursuant to the Asbestos Personal Injury Permanent Channeling Injunction and the Plan, the entities listed or described in Schedules VI, VII, and X to the Plan, which is attached to this Disclosure Statement as Appendix A, will be "Protected Parties" and, therefore, protected by the scope of the Asbestos Personal Injury Permanent Channeling Injunction.

Pursuant to the Asbestos Personal Injury Permanent Channeling Injunction, Protected Parties will be protected against Enjoined Actions, which include any claim, demand, suit, proceeding or cause of action, whenever and wherever arising or asserted, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, including, but not limited to: (i) the commencement, conduct, or continuation in any manner, directly or indirectly (including an action directly against a provider of insurance), of any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) the enforcement, attachment (including, without limitation, any prejudgment attachment), collection or seeking to recover any judgment, award, decree, or other order; (iii) the creation, perfection or enforcement in any manner, directly or indirectly, of any Encumbrance, (iv) the setting off, seeking reimbursement of, contribution from, or subrogation against, or other recoupment in any manner, directly or indirectly, of any amount against any liability owed to any Protected Parties, and (v) the commencement or continuation, in any manner, in any place, of any action which, in any such case, does not comply with or is inconsistent with the provisions of the Plan.

**PURSUANT TO THE PLAN AND SECTION 524(g) OF THE BANKRUPTCY CODE AND PURSUANT TO AND IN CONJUNCTION WITH THE CONFIRMATION ORDER, ALL PERSONS SHALL BE PERMANENTLY, FOREVER AND COMPLETELY STAYED, RESTRAINED, PROHIBITED, BARRED AND ENJOINED FROM TAKING ANY ENJOINED ACTION, OR PROCEEDING IN ANY MANNER IN ANY PLACE WITH REGARD TO ANY MATTER THAT IS SUBJECT TO RESOLUTION PURSUANT TO THE ASBESTOS PERSONAL INJURY TRUST AGREEMENT, INCLUDING, WITHOUT LIMITATIONS, WITH RESPECT TO ANY ASBESTOS PERSONAL INJUFY CLAIM OR ANY RESOLVED ASBESTOS**

**PERSONAL INJURY CLAIM AGAINST ANY OF THE DEBTORS, ANY OF THE REORGANIZED DEBTORS, ANY PROTECTED PARTY OR PROPERTY OR INTERESTS IN PROPERTY OF ANY DEBTOR, REORGANIZED DEBTOR OR PROTECTED PARTY, WHETHER DIRECTLY OR INDIRECTLY, DERIVATIVELY OR OTHERWISE, FOR THE PURPOSE OF, DIRECTLY OR INDIRECTLY, COLLECTING, RECOVERING OR RECEIVING PAYMENT OF, ON OR WITH RESPECT TO ANY ASBESTOS PERSONAL INJURY CLAIMS OR ANY RESOLVED ASBESTOS PERSONAL INJURY CLAIMS (OTHER THAN PURSUANT TO THE PROVISIONS OF THE ASBESTOS PERSONAL INJURY TRUST AGREEMENT OR TO ENFORCE THE PROVISIONS OF THE PLAN).**

## IX.    THE FB ASBESTOS PROPERTY DAMAGE TRUST

The following summarizes certain terms of the FB Asbestos Property Damage Trust Agreement (including the purpose of the FB Asbestos Property Damage Trust , the powers and appointment of the FB Asbestos Property Damage Trustee, the transfer of certain property to the FB Asbestos Property Damage Trust and the termination provisions thereof) and the FB Asbestos Property Damage Trust Distribution Procedures.  It is intended only to be a summary, and interested parties should review the FB Asbestos Property Damage Trust Agreement and the FB Asbestos Property Damage Trust Distribution Procedures.  The following summary is qualified in its entirety by such documents.

### A.    General Description of the FB Asbestos Property Damage Trust

### 1.    Purposes of the FB Asbestos Property Damage Trust

The FB Asbestos Property Damage Trust will be established pursuant to the FB Asbestos Property Damage Trust Agreement ("FB Asbestos Property Damage Trust Agreement"), a copy of which will be attached to the Plan as Exhibit E.  In accordance with Section 1.126 of the Plan and Exhibit E to the Plan, the FB Asbestos Property Damage Trust Agreement may be amended up to ten (10) Business Days prior to the Objection Deadline.

The purpose of the FB Asbestos Property Damage Trust is to assume any and all liabilities of Fibreboard or its Affiliates, with respect to any and all FB Asbestos Property Damage Claims, and to use the assets of the FB Asbestos Property Damage Trust and income to promptly pay holders of Allowed FB Asbestos Property Damage Claims.

### 2.    Transfer of Certain Property to and Assumption of Certain Liabilities by the FB Asbestos Property Damage Trust

On the later of the Effective Date and the date by which the FB Asbestos Property Damage Trustee has executed the FB Asbestos Property Damage Trust Agreement, or as soon as practicable thereafter, the Reorganized Debtors shall transfer and assign, or cause to be transferred and assigned, the FB Asbestos Property Damage Insurance Assets to the FB Asbestos Property Damage Trust

On the Effective Date, or as soon thereafter as is practicable, at the sole cost and expense of the FB Asbestos Property Damage Trust and in accordance with written instructions provided to the Reorganized Debtors by the FB Asbestos Property Damage Trust, the Reorganized Debtors will transfer and assign to the FB Asbestos Property Damage Trust copies of all books and records of the Debtors that pertain directly to FB Asbestos Property Damage Claims that have been asserted against the Debtors and/or the Fibreboard Insurance Settlement Trust. The Debtors will request that the Bankruptcy Court, in the Confirmation Order, rule that such transfers shall not result in the invalidation or waiver of any applicable privileges pertaining to such books and records.

In consideration for the property transferred to the FB Asbestos Property Damage Trust pursuant to the Plan, and in furtherance of the purposes of the FB Asbestos Property Damage Trust and the Plan, the FB Asbestos Property Damage Trust shall, and shall be deemed to, assume any and all obligations, liability and responsibility for, under or relating to any and all FB Asbestos Property Damage Claims, and each of the Reorganized Debtors and its respective Related Persons shall have no further financial or other obligations, responsibility or liability therefor. The FB Asbestos Property Damage Trust shall, and shall be deemed to, also assume any and all obligations, liability and responsibility for any and all premiums, deductibles, retrospective premium adjustments, security or collateral arrangements, and any other charges, costs, fees, or expenses (if any) that become due to any insurer in connection with the FB Asbestos Property Damage Insurance Assets as a result of FB Asbestos Property Damage Claims, asbestos related property damage claims against Persons insured under policies included in the FB Asbestos Property Damage Insurance Assets by reason of vendors' endorsements, or under the indemnity provisions of settlement agreements that the Debtors made with any insurers prior to the Confirmation Date to the extent that those indemnity provisions relate to FB Asbestos Property Damage Claims, and each of the Reorganized Debtors and its respective Related Persons shall have no further financial or other obligations, responsibility or liability for any of the foregoing; provided, however, that such liability of the FB Asbestos Property Damage Trust shall be limited to the extent of the benefits of such insurance policies, as reasonably determined by the FB Asbestos Property Damage Trustee, so that the FB Asbestos Property Damage Trust may elect to terminate such liability in the event that the FB Asbestos Property Damage Trustee determines that the benefits of maintaining the insurance policies are no longer worth the costs.

The Reorganized Debtors shall cooperate with the FB Asbestos Property Damage Trust and use commercially reasonable efforts to take or cause to be taken all appropriate actions and to do or cause to be done all things necessary or appropriate to effectuate the transfer of the FB Asbestos Property Damage Insurance Assets to the FB Asbestos Property Damage Trust. By way of enumeration and not of limitation, the Reorganized Debtors shall be obligated (a) to provide the FB Asbestos Property Damage Trust with copies of insurance policies and settlement agreements included within or relating to the FB Asbestos Property Damage Insurance Assets; (b) to provide the FB Asbestos Property Damage Trust with information necessary or helpful to the FB Asbestos Property Damage Trust in connection with its efforts to obtain insurance coverage for FB Asbestos Property Damage Claims; (c) to execute further assignments or allow the FB Asbestos Property Damage Trust to pursue claims relating to the FB Asbestos Property Damage Insurance Assets in its name (subject to appropriate disclosure of the fact that the FB Asbestos Property Damage Trust is doing so and the reasons why it is doing so), including by

means of arbitration, alternative dispute resolution proceedings or litigation, to the extent necessary or helpful to the efforts of the FB Asbestos Property Damage Trust to obtain insurance coverage under the FB Asbestos Property Damage Insurance Assets for FB Asbestos Property Damages Claims; and (d) to pursue and recover insurance coverage in its own name or right to the extent that the transfer and assignment of the FB Asbestos Property Damage Insurance Assets to the FB Asbestos Property Damage Trust is not able to be fully effectuated. The FB Asbestos Property Damage Trust shall be obligated to compensate the Reorganized Debtors for costs reasonably incurred in connection with providing assistance to the FB Asbestos Property Damage Trust, including without limitation, out-of-pocket costs and expenses, consultant fees, and attorneys' fees.

On the Confirmation Date, the Debtors will be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable them to implement effectively the provisions of the Plan and the FB Asbestos Property Damage Trust Agreement.

**3.      The FB Asbestos Property Damage Trustee**

(a)      Appointment of the FB Asbestos Property Damage Trustee

On the Confirmation Date, effective as of the Effective Date, the Bankruptcy Court shall confirm the appointment of the individual selected by the Debtors to serve as the FB Asbestos Property Damage Trustee of the FB Asbestos Property Damage Trust.

(b)      FB Asbestos Property Damage Trustee's Powers and Duties

The FB Asbestos Property Damage Trustee will act as a fiduciary to the FB Asbestos Property Damage Trust in accordance with the provisions of the FB Asbestos Property Damage Trust Agreement and the Plan. The FB Asbestos Property Damage Trustee will be obligated, among other things, at all times, to administer the FB Asbestos Property Damage Trust and the FB Asbestos Property Damage Trust Assets in a manner consistent with the FB Asbestos Property Damage Trust Agreement and the FB Asbestos Property Damage Trust Distribution Procedures. Subject to any limitations set forth in the FB Asbestos Property Damage Trust Agreement, the FB Asbestos Property Damage Trustee shall have the power to take any and all such actions as in the judgment of the FB Asbestos Property Damage Trustee that are necessary or proper to fulfill the purposes of the FB Asbestos Property Damage Trust .

(c)      FB Asbestos Property Damage Trustee's Compensation

The FB Asbestos Property Damage Trustee will be entitled to receive annual compensation plus a per diem allowance for meetings attended in amounts to be determined, disclosed and filed with the Bankruptcy Court at least ten (10) Business Days prior to the Objection Deadline. The FB Asbestos Property Damage Trustee will also be entitled to be reimbursed for out-of-pocket costs and expenses. The FB Asbestos Property Damage Trustee's per annum compensation may only be increased annually at the rate of the Consumer Price Index - All Cities. Any increase in excess of such an adjustment based on the Consumer Price Index may be made only with the Bankruptcy Court's approval.

814526.7

245

4.    **FB Asbestos Property Damage Trust Termination Provisions**

The FB Asbestos Property Damage Trust is irrevocable, but will terminate ninety (90) days after the first day any of the following events occurs:

(i)    the FB Asbestos Property Damage Trustee , in his or her sole discretion, decides to terminate the FB Asbestos Property Damage Trust because (a) all duly filed FB Asbestos Property Damage Claims have been liquidated and satisfied and two years have elapsed since the Effective Date, (b) the FB Asbestos Property Damage Trustee determines that it is unlikely that any new claims will be filed against the FB Asbestos Property Damage Trust;

(ii)    a final order of the Bankruptcy Court is obtained approving the FB Asbestos Property Damage Trustee's procurement of irrevocable insurance policies and establishment of claims handling agreements with suitable third parties adequate to discharge all expected remaining FB Asbestos Property Damage Trust obligations and expenses of the FB Asbestos Property Damage Trust in a manner consistent with the FB Asbestos Property Damage Trust Agreement and the FB Asbestos Property Damage Trust Distribution Procedures;

(iii)    in the judgment of the FB Asbestos Property Damage Trustee, with the consent of the Property Damage Advisory Committee ("PD Advisory Committee"), the continued administration of the FB Asbestos Property Damage Trust is uneconomic or inimical to the best interests of the persons holding FB Asbestos Property Damage Claims, and the termination will not expose Fibreboard, its Affiliates or any other Reorganized Debtor or any successor to any increased or undue risk of having claims asserted against it or them or in any way jeopardize the validity or the enforceability of the injunction channeling FB Asbestos Property Damage Claims; or

(iv)    21 years less 91 days pass after the death of the last survivor of all of the descendants of George Herbert Walker Bush of Texas, living on the date of the establishment of the FB Asbestos Property Damage Trust.

On the Termination Date, after payment of all the FB Property Damage Trust's liabilities have been provided for, the remaining FB Asbestos Property Damage Insurance Assets shall be transferred and assigned to Reorganized OC; all monies, if any, remaining in the FB Property Damage Trust estate shall be transferred to charitable organization(s) exempt from federal income tax under Section 501(c)(3) of the IRC, which tax-exempt organization(s) shall be selected by the Trustee using his or her reasonable discretion; provided, however, that (i) if practicable, the tax-exempt organization(s) shall be related to the treatment of, research, or the relief of suffering of individuals suffering from asbestos-related disorders, and (ii) the tax-exempt organization(s) shall not bear any relationship to FB or its Affiliates within the meaning of Section 468(d)(3) of the IRC. The Plan Proponents believe that the likelihood of any monies remaining in the FB Asbestos Property Damage Trust after the FB Asbestos Property Damage Trust terminates is extremely remote.

**B.    FB Asbestos Property Damage Claims Procedures**

The FB Asbestos Property Damage Trust Distribution Procedures provide the exclusive means of processing, liquidating, paying and satisfying all FB Asbestos Property Damage Claims as provided in and required by the Plan and the FB Asbestos Property Damage Trust Agreement. The FB Asbestos Property Damage Trust Distribution Procedures are designed to provide fair, prompt payment to holders of Allowed FB Asbestos Property Damage Claims and to provide a low transaction cost method of effectuating the resolution of FB Asbestos Property Damage Claims. The FB Asbestos Property Damage Trustee will implement and administer the FB Asbestos Property Damage Trust Distribution Procedures, which are attached to the Plan as Exhibit E-1.

**1.    Property Damage Advisory Committee**

The FB Asbestos Property Damage Trust Distribution Procedures provide for a PD Advisory Committee composed of three persons selected by the Trustees. The Trustee shall participate and consult with the PD Advisory Committee on all major policy and administrative decisions affecting, and the interpretation and implementation of, the FB Asbestos Property Damage Trust Distribution Procedures.

**2.    Claims Categories**

The FB Asbestos Property Damage Trust Distribution Procedures provide for two categories of claims, Category 1 Claims, based on a percentage of actual incurred Abatement Costs or documented anticipated Abatement Costs, and Category 2 Claims, to be paid on a formula based on the linear square footage of asbestos-related products, referred to as "Discounted Payable Costs" in the FB Asbestos Property Damage Trust Distribution Procedures. All claimants must provide Convincing Evidence of a legally viable cause of action and that the asbestos containing product for which the Claim is submitted is a Fibreboard asbestos-containing product, and Category 1 Claims, only, must also provide Convincing Evidence of compensable injury and damages. "Convincing Evidence" means sufficient evidence to be a preponderance of the evidence.

Pursuant to the FB Asbestos Property Damage Trust Distribution Procedures, the Trustee is required to disallow any Asbestos Property Damage Claim under the following conditions: (a) if the Claimant did not file a timely Proof of Claim within the meaning of the Bankruptcy Code and Bankruptcy Rules, such determination shall be made consistent with Section 3.3(c) of the Trust Agreement requiring the Trustee to enforce the Bankruptcy Court's bar date orders; (b) if the Claimant did not file a required Claim form within twelve months of the Effective Date; (c) if there has been a prior judicial determination or stipulation that the asbestos containing product for which the FB Asbestos Property Damage Claim was filed is not a Fibreboard asbestos-containing product; (d) if there is Convincing Evidence that Fibreboard would have been able to obtain summary judgment on the ground that the claim would have been barred as a matter of law or factually time-barred under the laws of the applicable jurisdiction if considered on the Petition Date, unless such claim has been revived or reinstated by reason of legislative enactment in the applicable jurisdiction, provided, however, there is a presumption that Pre-Existing Claims are not factually time-barred; or (e) if there has been a prior adjudication by Final Order (as defined in the Plan) that a FB Asbestos Property Damage Claim

has been time-barred and may not be brought in any other jurisdiction or otherwise revived by the holder of such Claim. "Pre-Existing Claims" means those claims on behalf of a claimant who prior to the General Bar Date filed or intervened in a lawsuit in a court of general jurisdiction against Fibreboard.

### 3.    Required Documentation and Claims Processing

The FB Asbestos Property Damage Trust Distribution Procedures require that all FB Asbestos Property Damage Claims be submitted within twelve (12) months of the Effective Date. Category 1 Claims must submit a completed Claim form and supporting documentation including, copies of all bulk sample analysis results and/or records thereof, Convincing Evidence that the asbestos-containing product that is the subject of the Claim is a Fibreboard asbestos-containing product, and Convincing Evidence supporting a Claim for Abatement Costs. "Abatement Costs" means the reasonable and customary costs of the removal, enclosure, encapsulation or repair of asbestos containing products, including, by way of example, costs for the abatement itself, design, consultant and laboratory fees and costs in connection with the abatement, and, except for abatement upon demolition, the reasonable costs of replacement, as allowed in these Property Damage Claims Procedures, of the asbestos containing products with a non-asbestos containing product. Category 2 Claims must submit a completed Claim form and Convincing Evidence that the asbestos-containing product that is the subject of the Claim is a Fibreboard asbestos-containing product. Claims shall be processed on a first-in-first-out ("FIFO") basis. The facility for the administration of these Claims will notify the Claimant in writing by mail of its determination of the Allowed amount of the Claim within 120 days of receipt of all necessary documentation.

### 4.    Payment of Asbestos Property Damage Claims

The FB Asbestos Property Damage Trust is funded with the FB Asbestos Property Damage Insurance Assets, consisting primarily of rights to insurance recoveries under liability insurance policies issued to Fibreboard for FB Asbestos Property Damage Claims and identified in Schedule XV to the Plan. Upon receiving all of the recoveries from these assets, or 5 years from the Effective Date, whichever occurs first, the Trustee shall determine the amounts to be paid to holders of Allowed Claims based on the total amount of recoveries available at that time. Allowed Category 1 Claims shall be paid based on the following calculations: (a) the Trustee shall subtract the total Allowed amount of all Allowed Category 2 Claims from the available recoveries to determine the available recoveries remaining to compensate holders of Allowed Category 1 Claims; (b) the Trustee, in consultation with the PD Advisory Committee, shall then determine the payment percentage to be used to pay holders of Allowed Category 1 Claims based on the remaining available recoveries; (c) holders of Allowed Category 1 Claims shall then receive payment calculated on the basis of the payment percentage multiplied by the Allowed amount of their Claim. Allowed Category 2 Claims shall be paid their Discounted Payable Costs calculated in accordance with the formula contained in FB Asbestos Property Damage Trust Distribution Procedures; except that, if the remaining available recoveries are insufficient to pay holders of Allowed Category 1 Claims at least as much as they would have received had they submitted their Claims as Category 2 Claims, then all of the holders of Allowed FB Asbestos Property Damage Claims, regardless of claim category, shall receive their pro rata share of all available recoveries. Because the FB Asbestos Property Damage Insurance Assets are estimated

by the Debtors to exceed all Allowed FB Asbestos Property Damage Claims, the Debtors believe that recoveries will be sufficient to pay these Claims in the amount Allowed.

### 5.    Reconsideration of Claims

The FB Asbestos Property Damage Trust Distribution Procedures permit claimants, within 60 days of receiving notice of the Allowed amount of their claim, to request reconsideration of the determined amount of their claim. On reconsideration, the Claim will be reviewed de novo within 90 days by a panel consisting of two claims analysts and one otherwise disinterested member of the PD Advisory Committee. After receipt of the final determination on reconsideration, a Claimant again has 60 days to request reconsideration of its Claim, this time through binding arbitration.

### C.    Injunction Channeling FB Asbestos Property Damage Claims

**ALL CLASS B9 CLAIMS SHALL BE CHANNELED TO FB ASBESTOS PROPERTY DAMAGE TRUST, AND SHALL BE PROCESSED, LIQUIDATED AND PAID PURSUANT TO THE TERMS AND PROVISIONS OF THE FB ASBESTOS PROPERTY DAMAGE TRUST AGREEMENT AND THE FB ASBESTOS PROPERTY DAMAGE TRUST DISTRIBUTION PROCEDURES. THE FB ASBESTOS PROPERTY DAMAGE TRUST SHALL BE FUNDED IN THE MANNER DESCRIBED BELOW. THE SOLE RECOURSE OF THE HOLDER OF AN ALLOWED CLASS B9 CLAIM SHALL BE THE FB ASBESTOS PROPERTY DAMAGE TRUST, AND SUCH HOLDER SHALL HAVE NO RIGHT WHATSOEVER AT ANY TIME TO ASSERT ITS CLASS B9 CLAIM AGAINST ANY REORGANIZED DEBTOR, FB PERSON, OR ANY OF THEIR RESPECTIVE RELATED PERSONS. WITHOUT LIMITING THE FOREGOING, ON THE EFFECTIVE DATE, ALL PERSONS SHALL BE PERMANENTLY AND FOREVER STAYED, RESTRAINED, AND ENJOINED FROM TAKING ANY ENJOINED ACTIONS FOR THE PURPOSE OF, DIRECTLY OR INDIRECTLY, COLLECTING, RECOVERING, OR RECEIVING PAYMENT OF, ON, OR WITH RESPECT TO ANY FB ASBESTOS PROPERTY DAMAGE CLAIMS (OTHER THAN ACTIONS BROUGHT TO ENFORCE ANY RIGHT OR OBLIGATION UNDER THE PLAN, ANY EXHIBITS TO THE PLAN, OR ANY OTHER AGREEMENT OR INSTRUMENT BETWEEN THE DEBTORS OR REORGANIZED DEBTORS AND THE FB ASBESTOS PROPERTY DAMAGE TRUST, WHICH ACTIONS SHALL BE IN CONFORMITY AND COMPLIANCE WITH THE PROVISIONS HEREOF).**

## X.    THE LITIGATION TRUST

### A.    General Description of the Litigation Trust

### 1.    Creation of the Litigation Trust

Effective on the Effective Date, the Litigation Trust will be created pursuant to the Litigation Trust Agreement, substantially in the form of <u>Exhibit C</u> to the Plan. For United States federal income tax purposes, it is intended that the Litigation Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations and that such trust is treated as owned by its beneficiaries. Accordingly, for United States federal income tax

purposes, it is intended that the beneficiaries be treated as if they had received a distribution of an undivided interest in the Litigation Trust Assets and then contributed such interests to the Litigation Trust. The purpose of the Litigation Trust is, among other things, to (a) hold, preserve, manage and maximize the value of the Litigation Trust Assets for distribution, including without limitation, to litigate, settle or otherwise resolve the Tobacco Causes of Action, the Avoidance Actions and the Material Rights of Action transferred to the Litigation Trust; (b) liquidate the Litigation Trust Assets; and (c) distribute the Litigation Trust Recoveries to the holders of Claims as described in the Plan and the Litigation Trust Agreement. The Litigation Trustee will engage in the foregoing actions with no objective to engage in the conduct of a trade or business.

### 2.    The Trustee

The Litigation Trustee for the Litigation Trust shall be designated by the Plan Proponents and approved by the Bankruptcy Court. On or prior to ten (10) Business Days prior to the Objection Deadline, the Plan Proponents shall file with the Bankruptcy Court a notice designating the Person they have selected as Litigation Trustee and seeking approval of such designation at the Confirmation Hearing. Once approved by the Bankruptcy Court, the Litigation Trustee shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Litigation Trust Agreement.

The Litigation Trustee will have full authority to take any steps necessary to administer the Litigation Trust Agreement, including, without limitation, the duty and obligation to liquidate Litigation Trust Assets, transfer, sell, dispose of or otherwise resolve or compromise the Litigation Trust Assets, to make distributions therefrom to the Disbursing Agent for disbursement to holders of Allowed Claims in Classes A5, A6-A and A6-B and to the OC Sub-Account of the Asbestos Personal Injury Trust, to pursue and settle any of the rights and claims with respect to the Litigation Trust Assets, to retain such professionals as it may deem necessary to aid in the performance of its responsibilities and to be responsible for filing all federal, state and local tax returns of the Litigation Trust.

### 3.    Funding of the Litigation Trust

The Debtors will deliver $1 million, or such other amount upon which the Plan Proponents may agree no later than ten (10) Business Days prior to the Objection Deadline (the "Litigation Trust Initial Deposit"), to the Litigation Trustee on the Effective Date. The Litigation Trustee will use the Litigation Trust Initial Deposit consistent with the purpose of the Litigation Trust and subject to the terms and conditions of the Plan and the Litigation Trust Agreement.

### 4.    Transfer of Certain Assets to the Litigation Trust

On the Effective Date, the Debtors will irrevocably transfer the Litigation Trust Assets (except such assets as have been previously settled) to the Litigation Trust, for and on behalf of each of Class A5, A6-A and A6-B and the OC Sub-Account of the Asbestos Personal Injury Trust. The Litigation Trust Assets are comprised of (a) the Litigation Trust Initial Deposit, (b) all of the Debtors' rights and standing to object to, litigate, settle and otherwise resolve (i) the Tobacco Causes of Action, (ii) the Avoidance Actions and Material Rights of Action Expressly Not Released, listed on Schedule XIV to the Plan, and (c) any and all proceeds

814526.7

250

770

of the foregoing, including interest actually earned thereon. Litigation Trust Assets will not include the FB Reversions, the proceeds of which, when recovered, will be transferred to the FB Sub-Account of the Asbestos Personal Injury Trust for the benefit of Class B8 only.

Material Rights of Action means all rights, claims, causes of action, suits or proceedings accruing to any Debtor pursuant to the Bankruptcy Code or pursuant to any statute or legal theory which, if determined in favor of the Debtors or the Estates, would reasonably be expected to result in a recovery in excess of $200,000, but excluding Commercial Claims. Commercial Claims, excluded from the definition of Material Rights of Action and therefore not included in the Litigation Trust Assets, means rights, causes of action, suits or proceedings (whether arising out of contract, tort or otherwise) accruing to any Debtor for the payment and collection of money or other consideration or the enforcement of rights and remedies in connection with, resulting from or arising out of any commercial transaction with any of the Debtors or the performance of services by or for any of the Debtors. "Commercial Claims" shall include, without limitation, claims arising from damage or alleged damage to property of any Debtor, or personal injuries sustained by any employee, contractor or other business agent of any Debtor (other than Asbestos Personal Injury Claims) in any case resulting from or arising out of the conduct of business by such Debtor, the collection of debts owed to any Debtor from purchasers of goods and services from any Debtor or the collection of money or other consideration from vendors, suppliers or other parties for breaches of contract in commercial relationships with any of the Debtors or the recovery of money based on such other commercial relationship of a Debtor that arise in the ordinary course of business. Commercial Claims do not include Avoidance Actions or any other rights, claims, causes of action, suits or proceedings created by Title 11 of the United States Code.

### 5.    Cooperation of the Debtors

The Reorganized Debtors will make available, upon reasonable terms, its personnel, books and records to representatives of the Litigation Trust in order to enable the Litigation Trustee to perform its duties under the Litigation Trust Agreement. In addition, the Litigation Trustee will enter into a confidentiality agreement with the Reorganized Debtors for the purpose of maintaining the confidentiality of and retaining any applicable privilege of any information provided by the Reorganized Debtors.

### 6.    Litigation Trust Termination Provisions

The Bankruptcy Court (or the District Court in the event that the District Court modifies the Reference Order to retain jurisdiction over the Litigation Trust) will approve the termination of the Litigation Trust after the Litigation Trust has distributed all of the Litigation Trust Assets, provided that the Litigation Trust shall terminate within the time frame set forth in the Litigation Trust. The parties may extend the Litigation Trust's termination date for one or more terms, subject to the approval of the Bankruptcy Court (or the District Court in the event that the District Court modifies the Reference Order to retain jurisdiction over the Litigation Trust) that the extension is necessary for the Litigation Trust's liquidating purpose.

### B.    Distributions of Litigation Trust Recoveries

The Litigation Trustee shall apply Litigation Trust Recoveries as follows: (a) first, to pay Litigation Trust Expenses; (b) second, to pay the Litigation Trust Reimbursement Obligation until the Litigation Trust Reimbursement Obligation is paid in full; (c) third, to the Disbursing Agent for any further remaining disbursement amounts (i) to holders of Allowed Claims in each of Classes A5, A6-A and A6-B and (ii) to the Asbestos Personal Injury Trust. The Litigation Trustee will distribute Litigation Trust Recoveries to the Disbursing Agent as soon as practicable after receiving the Litigation Trust Recoveries, except the Litigation Trustee may withhold any distribution, or any portion thereof, if it reasonably believes it is necessary to pay Litigation Trust Expenses or the Litigation Trust Reimbursement Obligation, or if the aggregate proceeds and income available for distribution is insufficient.

## XI.    REGISTRATION RIGHTS/RESTRICTIONS ON TRANSFERS OF CORPORATE SECURITIES AND CERTAIN CLAIMS

The Debtors currently contemplate that, as of the Effective Date, Reorganized OCD will enter into a registration rights agreements with the Asbestos Personal Injury Trust with respect to the shares of New OCD Common Stock (the "Equity Registration Rights Agreement") issued to the Asbestos Personal Injury Trust, as more fully descrived in Exhibit H to the Plan. The Debtors currently contemplate, after consultation with the advisors to the Asbestos Claimants' Committee and the Future Claimants' Representative, that the shares of New OCD Common Stock to be distributed to the Asbestos Personal Injury Trust will be deemed to be restricted securities, because they will be held by an "affiliate" of Reorganized OCD. The Asbestos Personal Injury Trust would be unable to sell shares unless they were registered or another exemption were available. Because the Asbestos Personal Injury Trust may ultimately need liquidity to pay Allowed Claims in Class A7 and Class B8, the Debtors currently contemplate that, in the exercise of their reasonable business judgment, upon the Effective Date they will grant registration rights to the Asbestos Personal Injury Trust to permit the registered resale of securities. The Debtors currently believe that no other shareholder or group of affiliated shareholders will likely receive enough stock shortly after the Effective Date to be considered an "affiliate" subject to sale restrictions under securities laws.

The Debtors currently contemplate that the Asbestos Personal Injury Trust shall have registration rights after the Effective Date in respect of the New OCD Common Stock as more fully described in Exhibit H to the Plan, subject, however, to such further modifications, revisions and supplementation as may be satisfactory in form and substance to the Reorganized Debtors (and any other Plan Proponents) up to ten (10) days prior to the Objection Deadline. The Equity Registration Rights Agreement shall also contain customary provisions regarding registration rights relating to equity securities, including, but not limited to, registration expenses, cross indemnification, holdback agreements, withdrawal rights, participation rights in other offerings, underwriting arrangements and the period of time in which any registration statement shall be kept effective.

## XII.    APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS

It is not currently expected that any registration statement will be filed under the Securities Act or any state securities laws with respect to the issuance or distribution of the New OCD Securities under the Plan or their subsequent transfer or resale, except any registration statement that may be filed in connection with the employee incentive and management plans described above. The Debtors believe that, subject to certain exceptions, including those described below, various provisions of the Securities Act, the Bankruptcy Code and state securities laws exempt from federal and state securities registration requirements (a) the offer and the sale of such securities pursuant to the Plan, and (b) subsequent transfers of such securities.

### A.    Offer and Sale of New OCD Securities Pursuant to the Plan: Bankruptcy Code Exemption from Registration Requirements

Holders of Allowed Claims in Classes A4-I4, A5, A6-A and A6-B, B6-U6 and the Asbestos Personal Injury Trust will receive New OCD Securities pursuant to the Plan. Section 1145(a)(1) of the Bankruptcy Code provides that the registration requirements of federal and state securities laws do not apply to  the offer or sale of securities under a plan of reorganization if three principal requirements are satisfied: (1) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (2) the recipients of the securities must hold a pre-petition or administrative expense claim against the debtor or an interest in the debtor; and (3) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in such exchange and "partly" for cash or property. In reliance upon this exemption, the Debtors believe that the offer and sale of the New OCD Securities under the Plan will be exempt from registration under the Securities Act and state securities laws. In addition, the Debtors will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption. Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by Section 4(1) of the Securities Act, unless the holder is an "underwriter" (see discussion below) with respect to such securities, as that term is defined under the Bankruptcy Code. However, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

### B.    Subsequent Transfers of New OCD Securities

Section 1145(b) of the Bankruptcy Code defines the term "underwriter" for purposes of the Securities Act as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (2) offers to sell securities offered or sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under the plan from the holders of such securities, if the offer to buy is: (a) with a view to distribution of such securities; and (b) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (4) is

an "issuer" with respect to the securities, as the term "issuer" is defined in Section 2(11) of the Securities Act.

The term "issuer" is defined in Section 2(4) of the Securities Act; however, the reference contained in Section 1145(b)(1)(D) of the Bankruptcy Code to Section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor (or its successor) under a plan of reorganization may be deemed to be a "control person," particularly if such management position is coupled with the ownership of a significant percentage of the debtor's (or successor's) voting securities. Moreover, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns at least 10% of the securities of a reorganized debtor may be presumed to be a "control person."

To the extent that persons deemed to be "underwriters" receive New OCD Securities pursuant to the Plan, resales by such persons would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such persons would not be permitted to resell such New OCD Securities unless such securities were registered under the Securities Act or an exemption from such registration requirements were available. Entities deemed to be statutory underwriters for purposes of Section 1145 of the Bankruptcy Code may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act.

Rule 144A provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act for resales to certain "qualified institutional buyers" of securities that are "restricted securities" within the meaning of the Securities Act, irrespective of whether the seller of such securities purchased his, her or its securities under the provisions of Rule 144A. Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons (e.g., "dealers" registered as such pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and "banks" as defined in Section 3(a)(2) of the Securities Act), any entity that purchases securities for its own account or for the account of another qualified institutional buyer and that (in the aggregate) owns and invests on a discretionary basis at least $100 million in the securities of unaffiliated issuers. Subject to certain qualifications, Rule 144A does not exempt the offer or sale of securities that, at the time of their issuance, were securities of the same class of securities then listed on a national securities exchange (registered under Section 6 of the Exchange Act) or quoted in a U.S. automated interdealer quotation system (e.g., NASDAQ). For so long as none of the New OCD Securities to be issued under the Plan are not also listed or quoted as described above, holders of New OCD Securities who are deemed to be "underwriters" within the meaning of Section 1145(b)(1) of the Bankruptcy Code or who may be otherwise deemed to be "affiliates" or "control persons" of Reorganized OCD within the meaning of Rule 405 of Regulation C under the Securities Act, and holders of securities whose securities will be "restricted securities" within

the meaning of the Securities Act should, assuming that all other conditions of Rule 144A are met, be entitled to avail themselves of the safe harbor resale provisions thereof.

To the extent that Rule 144A is unavailable, such holders may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 provides that, if certain conditions are met (e.g., the availability of current public information with respect to the issuer, volume of sale limitations, and notice and manner of sale requirements), specified persons who resell "restricted securities" or who resell securities that are not restricted but such persons are "affiliates" of the issuer, will not be deemed to be "underwriters" as defined in Section 2(11) of the Securities Act.

Pursuant to the Plan, certificates evidencing New OCD Securities received by a holder of 10% or more of the outstanding New OCD Common Stock (which will include the Asbestos Personal Injury Trust) will bear a legend substantially in the form below:

> **THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE, OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.**

Whether or not any particular person would be deemed to be an "underwriter" of New OCD Securities to be issued pursuant to the Plan, or an "affiliate" of Reorganized OCD, would depend upon various facts and circumstances applicable to that person. Accordingly, OCD expresses no view as to whether any such person would be such an "underwriter" or "affiliate."

**THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT HEREBY PROVIDE ANY OPINION OR ADVICE WITH RESPECT TO, THE SECURITIES LAW AND BANKRUPTCY LAW MATTERS DESCRIBED ABOVE. IN LIGHT OF THE COMPLEX AND SUBJECTIVE INTERPRETIVE NATURE OF WHETHER A PARTICULAR RECIPIENT OF NEW DEBT SECURITIES OR NEW OCD COMMON STOCK MAY BE DEEMED TO BE AN "UNDERWRITER" WITHIN THE MEANING OF SECTION 1145(b)(1) OF THE BANKRUPTCY CODE AND/OR AN "AFFILIATE" OR "CONTROL PERSON" UNDER APPLICABLE FEDERAL AND STATE SECURITIES LAWS AND, CONSEQUENTLY, THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND EQUIVALENT STATE SECURITIES AND "BLUE SKY" LAWS, OCD ENCOURAGES EACH CLAIMANT TO CONSIDER CAREFULLY AND CONSULT WITH HIS, HER, OR ITS OWN LEGAL ADVISORS WITH RESPECT TO SUCH (AND ANY RELATED) MATTERS.**

814526.7                                        255

## XIII.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain United States federal income tax aspects of the Plan, for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim or Interest.  This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the IRC, existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions.  Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan.  Any such changes or interpretations may be retroactive and could significantly affect the United States federal income tax consequences of the Plan.

Except as discussed in Section XIII.B.2 below, no ruling has been requested or obtained from the IRS with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto.  No representations or assurances are being made to the holders of Claims or Interests with respect to the United States federal income tax consequences described herein.

Any discussion of U.S. federal tax issues set forth in this Disclosure Statement is written solely in connection with the confirmation of the Plan to which the transactions described in this Disclosure Statement are ancillary.  Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any U.S. federal tax penalties that may be imposed on such person. Each holder of a Claim or Interest should seek advice based on its particular circumstances from an independent tax advisor.

### A.  Federal Income Tax Consequences to the Debtors

### 1.  Cancellation of Indebtedness Income

Under the IRC, a taxpayer generally must recognize income from the cancellation of debt ("COD Income") to the extent that its indebtedness is discharged during the taxable year. Section 108(a)(1)(A) of the IRC provides an exception to this rule, however, where a taxpayer is in bankruptcy and where the discharge is granted, or is effected pursuant to a plan approved, by the bankruptcy court.  In this case, instead of recognizing income, the taxpayer is required, under Section 108(b) of the IRC, to reduce certain of its tax attributes by the amount of COD Income. The attributes of the taxpayer are to be reduced in the following order:  net operating losses ("NOLs"), general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the taxpayer's assets, and finally, foreign tax credit tax carryforwards (collectively, "Tax Attributes").  Section 108(b)(5) of the IRC permits a taxpayer to elect to first apply the reduction to the basis of the taxpayer's depreciable assets, with any remaining balance applied to the taxpayer's other Tax Attributes in the order stated above.  In addition to the foregoing, Section 108(e)(2) of the IRC provides a further exception to the realization of COD Income upon

the discharge of debt, providing that a taxpayer will not recognize COD Income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for United States federal income tax purposes. The effect of Section 108(e)(2) of the IRC, where applicable, is to allow a taxpayer to discharge indebtedness without recognizing income and to avoid any reduction of its Tax Attributes.

As a result of having their debt reduced in connection with their bankruptcy, the Debtors generally will not recognize COD Income from the discharge of indebtedness pursuant to the Plan; however, certain Tax Attributes of the Debtors will be reduced or eliminated. The Debtors have not yet determined whether they will make the election under the IRC to apply any required attribute reduction first to the basis of the Debtors' depreciable property, with any excess next applied to reduce their NOLs, and then to reduce the Debtors' other Tax Attributes. To the extent that the discharge is of amounts that the Debtors would have been entitled to deduct if the Debtors had paid such amounts, no COD Income will be recognized and no reduction of Tax Attributes will occur pursuant to Section 108(e)(2) of the IRC. It is expected that the settlement of certain claims in Classes A7, B8 and B9, all of which should give rise to deductions for United States federal income tax purposes, will satisfy the requirements of Section 108(e)(2) of the IRC and, therefore, will not result in any realization of COD Income or reduction of the Debtors' Tax Attributes.

To the extent that the Debtors are required to reduce their Tax Attributes, the mechanics of such attribute reduction will be governed by Treasury Regulation §1.1502-28, which contains rules that apply where the debtor corporation is a member of a group filing a consolidated return. These rules generally provide that the Tax Attributes attributable to the debtor corporation are the first to be reduced. For this purpose, Tax Attributes attributable to the debtor member include consolidated Tax Attributes (such as consolidated NOLs) that are attributable to the debtor member pursuant to the consolidated return regulations, and also include the basis of property of the debtor (including subsidiary stock), all of which are reduced in the order described above. To the extent that the COD Income of the debtor member exceeds the Tax Attributes attributable to it, the consolidated Tax Attributes attributable to other members of the consolidated group must be reduced. In the case of a consolidated group with multiple debtor members, each debtor member's Tax Attributes must be reduced before such member's COD Income can be reduced by Tax Attributes attributable to other members of the consolidated group. In addition, to the extent that the debtor corporation is required to reduce its basis in the stock of another group member, the lower-tier member also must reduce its Tax Attributes, including the consolidated Tax Attributes attributable to that lower-tier member. Any required attribute reduction will take place after the Debtors have determined their taxable income, and any federal income tax liability, for the taxable year in which the Effective Date occurs.

### 2.    Net Operating Losses and Other Attributes

Following the Effective Date, the Debtors may have NOLs. The Debtors currently have NOLs, and the Debtors will generate NOLs on the Effective Date to the extent that the Debtors have generated deductions for United States federal income tax purposes that are not offset by income and/or gain and are not eliminated by the attribute reduction rules of Section 108(b) of the IRC discussed above. In this regard, it is expected that the Debtors will be

entitled to a current deduction for all transfers of Cash, property other than indebtedness of the Debtors, and New OCD Common Stock to the Asbestos Personal Injury Trust for OC Asbestos Personal Injury Claims and FB Asbestos Personal Injury Claims. The amount of the aggregate deduction to which the Debtors will be entitled will equal the sum of the Cash and the fair market value of the other property (excluding any indebtedness of the Debtors) and New OCD Common Stock transferred to the Asbestos Personal Injury Trust to satisfy such OC Asbestos Personal Injury Claims and FB Asbestos Personal Injury Claims. It should be noted, however, that no deduction for transfers to the Asbestos Personal Injury Trust will be allowed to the extent that the transferred amounts represent amounts received from the settlement of insurance claims, which amounts were not included in the Debtors' gross income. Accordingly, the Debtors will not be entitled to a deduction for transfers to the Asbestos Personal Injury Trust to satisfy Asbestos Personal Injury Claims to the extent such transfers are of insurance proceeds, including any transfer of Existing Fibreboard Insurance Settlement Trust Assets.

After taking into account the foregoing rules and applying the deductions against the income and gain of the Debtors recognized during the taxable year in which the Effective Date occurs, the Debtors anticipate that their NOLs will increase. As explained above, however, the Debtors' NOLs and other Tax Attributes may be reduced or eliminated as of the beginning of the taxable year following the year in which the Effective Date occurs as a result of the COD Income expected to be realized on implementation of the Plan. Accordingly, there can be no assurance that Reorganized OCD will have NOLs following the year in which the Plan is implemented.

As a general rule, an NOL incurred by a taxpayer during a taxable year can be carried back and deducted from its taxable income generated within the two preceding taxable years and the remainder can be carried forward and deducted from the taxpayer's taxable income over the 20 succeeding taxable years. NOLs attributable to certain tort liability losses, however, may be carried back for ten years. It is expected that the transfer of Cash and other property (excluding any indebtedness of the Debtors) and the issuance of New OCD Common Stock to the Asbestos Personal Injury Trust with respect to OC Asbestos Personal Injury Claims and FB Asbestos Personal Injury Claims will generate deductions that relate to a qualifying tort liability and, therefore, any resulting NOLs will be eligible to be carried back for ten years. However, the Debtors have not realized significant amounts of taxable income during the previous ten year period, and, accordingly, there can be no certainty that Reorganized OCD would be entitled to material amounts of tax refunds in respect of that period.

### 3.    Annual Section 382 Limitation on Use of NOLs

With respect to any NOLs of the Debtors remaining after confirmation of the Plan and any required attribute reduction, Section 382 of the IRC contains certain rules limiting the amount of NOLs a corporate taxpayer can utilize in the years following an "ownership change" (the "Annual Section 382 Limitation"). An "ownership change" generally is defined as a more than 50 percentage point change in ownership of the value of the stock of a "loss corporation" (a corporation with NOLs) that takes place during the three year period ending on the date on which such change in ownership is tested. The Debtors will undergo an ownership change on the Effective Date.

As a general rule, a loss corporation's Annual Section 382 Limitation equals the product of the value of the stock of the corporation (with certain adjustments) immediately before the ownership change and the applicable "long-term tax-exempt rate," a rate published monthly by the Treasury Department (4.40% for ownership changes that occur during December, 2005). Any unused portion of the Annual Section 382 Limitation generally is available for use in subsequent years. The Annual Section 382 Limitation is increased if the loss corporation has net unrealized built-in gains, i.e., gains economically accrued but unrecognized at the time of the ownership change, in excess of a threshold amount. Such a corporation can use NOLs in excess of its Annual Section 382 Limitation to the extent that it realizes those net unrealized built-in gains for United States federal income tax purposes in the five years following the ownership change. A correlative rule applies to a corporation that has net unrealized built in losses, i.e., losses economically accrued but unrecognized as of the date of the ownership change in excess of a threshold amount. Such a corporation's ability to deduct its built-in losses (in addition to its NOLs) following an ownership change is limited. If a loss corporation does not continue its historic business or use a significant portion of its assets in a new business for two years after the ownership change, the corporation's Annual Section 382 Limitation is zero.

Section 382(l)(5) of the IRC provides an exception to the application of the Annual Section 382 Limitation when a corporation is under the jurisdiction of a court in a Title 11 case (the "382(l)(5) Bankruptcy Exception"). The 382(l)(5) Bankruptcy Exception provides that where an ownership change occurs pursuant to a bankruptcy reorganization or similar proceeding, the Annual Section 382 Limitation will not apply if the pre-change shareholders and/or "qualified creditors" (as defined by applicable Treasury Regulations) own at least 50 percent of the stock of the reorganized corporation immediately after the ownership change. However, under the 382(l)(5) Bankruptcy Exception, a corporation's pre-change losses and excess credits that may be carried over to a post-change year must be reduced to the extent attributable to any interest paid or accrued on certain debt converted to stock in the reorganization. In addition, if the 382(l)(5) Bankruptcy Exception applies, a second ownership change of the corporation within a two-year period will cause the corporation to forfeit all of its unused NOLs that were incurred prior to the date of the second ownership change.

If a corporation qualifies for the 382(l)(5) Bankruptcy Exception, the use of its NOLs will be governed by that exception unless the corporation affirmatively elects for the provisions not to apply. If a corporation that is eligible for the 382(l)(5) Bankruptcy Exception elects out of that provision, a special rule under Section 382(l)(6) of the IRC will apply in calculating the Annual Section 382 Limitation. Under this special rule, the Annual Section 382 Limitation will be calculated by reference to the lesser of the value of the corporation's stock (with certain adjustments) immediately after the ownership change (as opposed to immediately before the ownership change, as discussed above) or the value of the Debtor's assets (determined without regard to liabilities) immediately before the ownership change.

It is currently expected that Reorganized OCD will qualify for the 382(l)(5) Bankruptcy Exception. The Debtors are currently analyzing whether to affirmatively elect out of the 382(l)(5) Bankruptcy Exception and instead rely on the special rule described above under Section 382(l)(6) of the IRC. One reason the Debtors may choose to elect out of the 382(l)(5) Bankruptcy Exception is the rule described above that a second ownership change within two years of the Effective Date will cause Reorganized OCD to forfeit any NOLs incurred prior to