the date of the second ownership change. Under the terms of the Plan, there can be no assurance that Reorganized OCD will not undergo a second ownership change within two years of the Effective Date. If, because of a potential second ownership change, the Debtors choose to elect out of the Bankruptcy Exception, Reorganized OCD's use of its NOLs will be subject to the Annual Section 382 Limitation following confirmation of the Plan, calculated under the special rule of Section 382(l)(6) of the IRC described above. As noted above, under this special rule, the Annual Section 382 Limitation is generally determined by valuing the loss corporation immediately after the ownership change, including any value resulting from any surrender or cancellation of creditors' claims.

      **4.      Accrued Interest**

           To the extent that the consideration issued to holders of Claims pursuant to the Plan is attributable to accrued but unpaid interest, the Debtors should be entitled to interest deductions in the amount of such accrued interest, but only to the extent the Debtors have not already deducted such amount. The Debtors should not have COD Income from the discharge of any accrued but unpaid interest pursuant to the Plan to the extent that the payment of such interest would have given rise to a deduction pursuant to Section 108(e)(2) of the IRC, as discussed above.

      **5.      Federal Alternative Minimum Tax**

           A corporation may incur alternative minimum tax liability even where NOL carryovers and other tax attributes are sufficient to eliminate its taxable income as computed under the regular corporate income tax. It is possible that Reorganized OCD will be liable for the alternative minimum tax.

      **B.      Federal Income Tax Consequences to Claim Holders**

           The United States federal income tax consequences of the transactions contemplated by the Plan to Claim holders that are United States Persons will depend upon a number of factors. For purposes of the following discussion, a "United States Person" is any person or entity (1) who is a citizen or resident of the United States, (2) that is a corporation or partnership created or organized in or under the laws of the United States or any state thereof, (3) that is an estate, the income of which is subject to United States federal income taxation regardless of its source or (4) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control; or (b) that has elected to continue to be treated as a United States Person for United States federal income tax purposes. In the case of a partnership, the tax treatment of its partners will depend on the status of the partner and the activities of the partnership. United States Persons who are partners in a partnership should consult their tax advisors. A "Non-United States Person" is any person or entity that is not a United States Person. For purposes of the following discussion and unless otherwise noted below, the term "Holder" shall mean a "holder of a Claim that is a United States Person." The general United States federal income tax consequences to Claim holders that are Non-United States Persons are discussed below under Section XIII.B.1(g) of this Disclosure Statement.

The United States federal income tax consequences to Holders and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a Holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (6) the method of tax accounting of the Holder; (7) whether the Claim is an installment obligation for United States federal income tax purposes; and (8) whether the Claim constitutes a "security" for United States federal income tax purposes.. The definition of the term "<u>security</u>" for United States federal income tax purposes is discussed under the heading "Definition of 'Security'", below.  Certain holders of Claims (such as foreign persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations) may be subject to special rules not addressed in this summary of United States federal income tax consequences.  There also may be state, local, and/or foreign income or other tax considerations or United States federal estate and gift tax considerations applicable to holders of Claims, which are not addressed herein.  EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

1.      **United States Federal Income Tax Consequences**

   (a)      General

          A Holder who receives Cash or other consideration (including, without limitation, stock) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest.  A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim.  A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.  Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the Debtors reserve the right, to the extent, consistent with the Plan, to allocate for United States federal income tax purposes the consideration paid pursuant to the Plan with respect to a Claim, first to the principal amount of such Claim as determined for United States federal income tax purposes and then to accrued interest, if any, with respect to such Claim.  Accordingly, in cases where a Holder receives less than the principal amount of its Claim, the Debtors intend to allocate the full amount of consideration transferred to such Holder to the principal amount of such obligation and to take the position that no amount of the consideration to be received by such Holder is attributable to accrued interest.  There is no assurance that such allocation will be respected by the IRS for United States federal income tax purposes.

781

A Holder that receives Senior Notes will generally be required to include interest on the Senior Notes in income in accordance with such Holder's regular method of tax accounting. If, however, the Senior Notes are treated as issued with original issue discount for United States federal income tax purposes, a Holder of Senior Notes will be required to include in income the amount of such original issue discount over the term of the Senior Notes based on the constant yield method. In such case, a Holder will be required to include amounts in income before they are received. A Holder's tax basis in a Senior Note will be increased by the amount of original issue discount included in income and reduced by the amount of cash (other than payments of stated interest) received with respect to the Senior Note.

If not otherwise so required, a Holder that receives New OCD Common Stock in exchange for its Claim will be required to treat gain recognized on a subsequent sale or other taxable disposition of the New OCD Common Stock as ordinary income to the extent of (i) any bad debt deductions taken with respect to the Claim and any ordinary loss deductions incurred upon satisfaction of the Claim, less any income (other than interest income) recognized by the Holder upon satisfaction of its Claim, and (ii) any amounts which would have been included in a Holder's gross income if the Holder's Claim had been satisfied in full, but which was not included in income because of the application of the cash method of accounting.

(b)    Holders of Class A4, A5, A6-A, A6-B, B4, B6, C4, C6, D4, D6, E4, E6, F4, F6, G4, G6, H4, H6, I4, I6, J6, K6, L6, M6, N6, O6, P6, Q6, R6, S6, T6 and U6 Claims (Bank Holders Claims, Bondholders Claims, General Unsecured Claims and General Unsecured/Senior Indebtedness Claims)

The Holders of the Class A4, A5, A6-A, A6-B, B4, B6, C4, C6, D4, D6, E4, E6, F4, F6, G4, G6, H4, H6, I4, I6, J6, K6, L6, M6, N6, O6, P6, Q6, R6, S6, T6 and U6 Claims (the "Debt Claims," and Holders of such Claims, "Debt Claim Holders") will realize gain or loss for United States federal income tax purposes as a result of the consummation of the Plan equal to the difference between their adjusted tax bases in their Claims immediately prior to the Effective Date and the sum of (i) the amount of Cash, (ii) the "issue price" of the Senior Notes (solely for Classes A4-I4) and (iii) the fair market value of the New OCD Common Stock they receive.

The "issue price" of the Senior Notes is generally expected to equal the principal amount thereof if they are not "publicly traded" or their fair market value on the Effective Date if they are "publicly traded." For these purposes, a debt instrument generally is treated as "publicly traded" if, at any time during the 60 day period ending 30 days after the issue date, (i) the debt is listed on a national securities exchange or quoted on an interdealer quotation system sponsored by a national securities association, (ii) it appears on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations (including rates, yields or other pricing information) of one or more identified brokers, dealers or traders or actual prices (including rates, yields or other pricing information) of recent sales transactions or (iii) if, in certain circumstances, price quotations are readily available from dealers, brokers or traders.

If a Debt Claim does not constitute a "security" for United States federal income tax purposes, then the exchange of the Debt Claim will be a taxable transaction, and the Holder of such Claim will be required to recognize the full amount of its gain or loss realized on the exchange. A Debt Claim Holder's initial tax basis in the property it receives in exchange for its Debt Claim should equal the fair market value of such property. Such tax basis would be allocated among the items of property it receives based on the relative fair market values of such items of property on the Effective Date. A Debt Claim Holder's holding period in property it receives in the exchange would commence on the day after the Effective Date.

If a Debt Claim constitutes a "security" for United States federal income tax purposes, then the exchange of the Debt Claim will be treated as a "recapitalization" for United States federal income tax purposes. In such case, a Debt Claim Holder that realizes a loss on the exchange will not be permitted to recognize such loss.

If the exchange of Debt Claims is a recapitalization and the Senior Notes constitute "securities" for United States federal income tax purposes, a Debt Claim Holder that realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized, which will likely be determined by substituting the principal amount of the Senior Notes for their issue price, and (ii) the amount of Cash it receives. A Debt Claim Holder's initial tax basis in the property it receives in exchange for its Debt Claim should equal the sum of (i) its adjusted tax bases in such Debt Claim and (ii) the amount of gain it recognizes on the exchange, reduced by the amount of Cash it receives in the exchange. Such basis will be allocated between the Senior Notes and the New OCD Common Stock it receives based on their relative fair market values. A Debt Claim Holder's holding period in the New OCD Common Stock and Senior Notes it receives will include the holding period in the Debt Claim surrendered.

If the exchange of Debt Claims is a recapitalization and the Senior Notes do not constitute "securities" for United States federal income tax purposes, a Debt Claim Holder that realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized and (ii) the sum of the fair market value of the Senior Notes and the amount of Cash it receives. A Debt Claim Holder's initial tax basis in the property it receives in exchange for its Debt Claims should equal the sum of (i) its adjusted tax bases in the Debt Claims and (ii) the amount of gain it recognizes on the exchange, reduced by the amount of Cash it receives by them in the exchange. Such basis will be allocated first to the Senior Notes, to the extent of their fair market value, and thereafter to the New OCD Common Stock. A Debt Claim Holder's holding period in the New OCD Common Stock it receives will include the holding period in the Debt Claims surrendered. A Debt Claim Holder's holding period in the Senior Notes it receives will commence on the day after the Effective Date.

There is no authority that directly addresses the treatment of the receipt of the right to receive a portion of the Excess Available Cash, Excess New OCD Common Stock and Excess Litigation Trust Recoveries (the "Excess Recoveries"). Debt Claim Holders that receive such rights may be permitted to claim that the fair market value of those rights is speculative as of the Effective Date and that the receipt of such rights should be subject to "open transaction" treatment and taken into account only when such amounts are actually determined. In such case, however, a Debt Claim Holder that realizes a loss may not be permitted to

recognize such loss until the amount of the Excess Recoveries to be distributed to such Holder is finally determined.

For a discussion of the consequences of the receipt of an interest in the Litigation Trust, see Section XIII.B.2, below.

The Debtors currently intend to treat the Disputed Distribution Reserve as a grantor trust for United States federal income tax purposes. Accordingly, it is intended that each Holder of a Disputed Claim will be treated as if such Holder had received a distribution of Cash and other property (including, without limitation, stock) in exchange for its Claim and then contributed such cash and property to the Disputed Distribution Reserve. If such treatment is respected, a Holder of a Disputed Claim will be subject to United States federal income tax on its proportionate share of any income earned with regard to the assets in the Disputed Distribution Reserve. There can, however, be no assurance that the IRS will agree with such treatment.

(c)     Holders of OC Asbestos Personal Injury and FB Asbestos Personal Injury Claims

To the extent that payments from the Asbestos Personal Injury Trust to Holders of OC Asbestos Personal Injury Claims and FB Asbestos Personal Injury Claims represent damages on account of personal physical injuries of such Holders, such Holders should not recognize gross income under Section 104 of the IRC, except to the extent that such payments are attributable to medical expense deductions allowed under Section 213 of the IRC for a prior taxable year.

(d)     Holders of Class B9 Claims (FB Asbestos Property Damage Claims)

The fair market value of any payments from the FB Asbestos Property Damage Trust to Holders of FB Asbestos Property Damage Claims will be taxable to such Holders to the extent of the excess of such fair market value over the amount, if any, of losses with regard to FB Asbestos Property Damage Claims not previously deducted for United States federal income tax purposes by the Holder. Holders of FB Asbestos Property Damage Claims that have not previously deducted losses with regard to such Claims for United States federal income tax purposes will recognize losses equal to the difference between the amount of loss not previously deducted and the fair market value of any payments received.

(e)     Market Discount

The market discount provisions of the IRC may apply to Holders of certain Claims. In general, a debt obligation that is acquired by a holder in the secondary market is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its adjusted issue price) exceeds, by more than a statutory de minimis amount, the tax basis of the debt obligation in the holder's hands immediately after its acquisition. If a Holder has accrued market discount with respect to its Claims and such Holder realizes gain upon the exchange of its Claims for property pursuant to the Plan, such Holder may be required to include as ordinary income the amount of such accrued market discount to the extent of such realized gain. A Holder who realizes loss on such exchange generally will not be required to include the amount of any such accrued market

discount in income. A Holder who receives Senior Notes in an exchange pursuant to the Plan that constitutes a "recapitalization" for United States federal income tax purposes may not be required immediately to include in income the accrued market discount to the extent such accrued market discount is allocable to the Senior Notes. In this event, such portion of the accrued market discount should carry over to the Senior Notes. Holders who have accrued market discount with respect to their claims should consult their tax advisors as to the application of the market discount rules to them in view of their particular circumstances.

(f)     Definition of "Security"

Whether an instrument constitutes a "security" for United States federal income tax purposes is determined based on all of the facts and circumstances. Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument. These authorities have indicated that an initial term of less than five years is evidence that the instrument is not a security, whereas an initial term of ten years or more is evidence that it is a security. Treatment of an instrument with an initial term between five and ten years is generally unsettled. Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness of the obligor, whether or not the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

(g)     Non-United States Persons

A holder of a Claim that is a Non-United States Person generally will not be subject to United States federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for United States federal income tax purposes, or (ii) if such holder is an individual, such holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

(h)     Information Reporting and Backup Withholding

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting by the payor (the relevant Debtor) to the IRS. Moreover, such reportable payments may be subject to backup withholding (currently at a rate of 28%) under certain circumstances. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's United States federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a United States federal income tax return).

814526.7

265

785

2.    **Taxation of the Asbestos Personal Injury Trust and Litigation Trust**

(a)    The Asbestos Personal Injury Trust

The Asbestos Personal Injury Trust is currently expected to constitute a "qualified settlement fund" within the meaning of Section 468B of the IRC and the Treasury Regulations promulgated thereunder. In addition, Fibreboard received a private letter ruling from the IRS that the Fibreboard Insurance Settlement Trust constitutes a "qualified settlement fund" within the meaning of such provisions. The receipt of property, including Cash and New OCD Common Stock by the Asbestos Personal Injury Trust from the Debtors will not constitute taxable income to the Asbestos Personal Injury Trust, the adjusted tax basis of the assets transferred by the Debtors to the Asbestos Personal Injury Trust should be the fair market value of those assets at the time of receipt, and the Asbestos Personal Injury Trust will likely be taxed on modified gross income as defined within the Treasury Regulations (generally at the highest rate applicable to estates and trusts). The transfer of Existing Fibreboard Insurance Settlement Trust Assets to the Asbestos Personal Injury Trust should not result in net taxable income to the Debtors or the Asbestos Personal Injury Trust.

(b)    The Litigation Trust

For United States federal income tax purposes, it is intended that the Litigation Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations and that such trust be treated as owned by its beneficiaries. Accordingly, for United States federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a taxable distribution of an undivided interest in the Litigation Trust Assets, including Cash, and then contributed such interests to the Litigation Trust. There can be no assurance that the IRS will respect the foregoing treatment. For example, the IRS may characterize the Litigation Trust as a grantor trust for the benefit of the Debtors or otherwise as owned by and taxable to the Debtors. Alternatively, the IRS could characterize the Litigation Trust as a so-called "complex trust" subject to a separate entity level tax on its earnings, except to the extent that such earnings are distributed during the taxable year. Moreover, because of the possibility that the amounts of consideration received by a Debt Claim Holder may increase or decrease, depending on whether the Litigation Trust is treated as a grantor trust, such a Holder could be prevented from recognizing a loss until the time at which all of the Litigation Trust Assets have been distributed.

Beneficiaries of the Litigation Trust are urged to consult their tax advisors regarding the potential United States federal income tax treatment of the Litigation Trust and the consequences to them of such treatment (including the effect on the computation of a Holder's gain or loss in respect of its Claim, the subsequent taxation of any distribution from the Litigation Trust, and the possibility of taxable income without a corresponding receipt of Cash or property with which to satisfy the tax liability).

C.    **Federal Income Tax Consequences to Holders of Class A12 Interests and Integrex Minority Interests.**

Pursuant to the Plan, all Class A12 Interests and Integrex Minority Interests (collectively, the "Extinguished Interests") shall be deemed cancelled and extinguished, and holders of the Extinguished Interests will receive nothing in exchange for such Interests. As a result, each

814526.7                              266

holder of the Extinguished Interests generally should recognize a loss equal to the holder's tax basis in its Extinguished Interest extinguished under the Plan unless the holder previously claimed a loss with respect to such stock under its regular method of accounting. In general, if the holder held its Extinguished Interest as a capital asset, the loss will be treated as a loss from the sale or exchange of such capital asset. Capital loss will be long-term if the Extinguished Interest was held by the holder for more than one year and otherwise will be short-term. Any capital losses realized generally may be used by a corporate holder only to offset capital gains, and by an individual holder only to the extent of capital gains plus $3,000 of other income.

### D.    Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

### E.    Reservation of Rights

This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan. The Debtors and their advisors reserve the right to further modify, revise or supplement Article XIII and the other tax related sections of the Plan up to ten (10) days prior to the Objection Deadline.

## XIV.   FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

### A.    Feasibility of the Plan

In connection with confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible pursuant to Section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.

To support their belief in the feasibility of the Plan, the Debtors have relied, among other things, upon the Financial Projections, which are annexed to this Disclosure Statement as Appendix B.

The Financial Projections indicate that the Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations, including the Exit Facility, and to fund their operations as contemplated by the Business Plan. Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of Section 1129(a)(11) of the Bankruptcy Code.

The Financial Projections were not prepared with a view toward compliance with the published guidelines of the American Institute of Certified Public Accountants or any other

814526.7                                    267

regulatory or professional agency or body or generally accepted accounting principles. Furthermore, the Debtors' independent certified public accountants have not compiled or examined the Financial Projections and accordingly do not express any opinion or any other form of assurance with respect thereto and assume no responsibility for the Financial Projections.

The Financial Projections assume that (1) the Plan will be confirmed and consummated in accordance with its terms, (2) there will be no material change in legislation or regulations, or the administration thereof, including environmental legislation or regulations, that will have an unexpected effect on the operations of the Reorganized Debtors, (3) there will be no change in United States generally accepted accounting principles that will have a material effect on the reported financial results of the Reorganized Debtors, and (4) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Reorganized Debtors. To the extent that the assumptions inherent in the Financial Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are considered reasonable by the Debtors when taken as a whole, the assumptions and estimates underlying the Financial Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Accordingly, the Financial Projections are speculative in nature. It should be expected that some or all of the assumptions in the Financial Projections will not be realized and that actual results will vary from the Financial Projections, which variations may be material and may increase over time. The Financial Projections should therefore not be regarded as a representation by the Debtors or any other person that the results set forth in the Financial Projections will be achieved. In light of the foregoing, readers are cautioned not to place undue reliance on the Financial Projections. The Financial Projections should be read together with the information in Section VI of this Disclosure Statement entitled "Future Business of the Reorganized Debtors," which summarizes the Business Plan and certain assumptions underlying the Financial Projections, as well as Section XV of the Disclosure Statement entitled "Certain Risk Factors to be Considered," which sets forth important factors that could cause actual results to differ from those in the Financial Projections.

OC is subject to the informational requirements of the Securities Exchange Act of 1934, as amended, and in accordance therewith files periodic reports and other information with the SEC relating to its business, financial statements and other matters. Such filings will not include projected financial information. The Debtors do not intend to update or otherwise revise the Financial Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtors do not intend to update or revise the Financial Projections to reflect changes in general economic or industry conditions.

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995: The Financial Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995. "Forward-looking statements" in the Financial Projections include the intent, belief or current expectations of OC and members of its management team with respect to the timing,

788

completion and scope of the current restructuring, reorganization plan, Business Plan, bank financing, and debt and equity market conditions and OC's future liquidity, as well as the assumptions up on which such statements are based. While OC believes that the expectations are based on reasonable assumptions within the bounds of its knowledge of its business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements. Important factors currently known to management that could cause actual results to differ materially from those contemplated by the forward-looking statements in the Financial Projections include, but are not limited to, further adverse developments with respect to the liquidity position of OC or operations of the various businesses of OC, adverse developments in the bank financing or public or private markets for debt or equity securities of OCD, adverse developments in the timing or results of the implementation of the Business Plan (including the time line to emerge from Chapter 11), the difficulty in controlling industry costs and integrating new operations, the ability of the OC to realize the anticipated general and administrative expense savings and overhead reductions contemplated in the Financial Projections, the ability of OC to maintain profitability of their operations, the level and nature of any restructuring and other one-time charges, the difficulty in estimating costs relating to exiting certain markets and consolidating and closing certain operations, and the possible negative effects of a change in applicable legislation.

### B.    Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds (2/3) in dollar amount and more than one half (50%) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, each of Classes A3-U3, A4-I4, A5, A6-A, A6-B, B6-U6, A7, B8, B9, and A10-U10 will have voted to accept the Plan only if two-thirds (2/3) in dollar amount and a majority in number actually voting in each Class cast their Ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting the Plan.

In order to satisfy the requirements of Section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code, seventy-five (75%) percent of each of Classes A7 and B8, covering the respective holders of the OC Asbestos Personal Injury Claims and FB Asbestos Personal Injury Claims actually voting must vote in favor of the Plan in order for the Reorganized Debtors to obtain the benefits of Section 524(g) of the Bankruptcy Code.

The Voting Procedures provide certain special rules concerning the calculation of the amount of Claims voting in a Class of Claims (for further information regarding voting procedures see Section XVII of this Disclosure Statement entitled "The Solicitation; Voting Procedure.") The following special rules concerning calculation of the amount of Claims are for illustrative purposes.

A Ballot will not be counted if a Claim has been disallowed or an objection is pending to the Claim as of the _____, and the claimant has not obtained, on or before the Voting Deadline, a Bankruptcy Court order allowing such Claim, either in whole or in part, for all purposes or for voting purposes only.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING PROCEDURES ON THE BALLOT AND RECEIVED NO LATER THAN THE VOTING DEADLINE BY THE VOTING AGENT.  DO NOT RETURN ANY STOCK CERTIFICATES OR DEBT INSTRUMENTS WITH YOUR BALLOT.  In addition, a vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

C.    Best Interests Test

As noted above, even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan.  The "best interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the Debtors were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its Chapter 11 cases were converted to Chapter 7 cases under the Bankruptcy Code.  This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral, and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 cases and the Chapter 11 cases.  Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its Chapter 11 cases (such as compensation of attorneys, financial advisors and accountants) that are allowed in the Chapter 7 cases, litigation costs, and claims arising from the operations of the debtor during the pendency of the Chapter 11 cases.  The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business.  Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general claims or to make any distribution in respect of equity interests.  The liquidation would also prompt the rejection of a large number of executory

contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection claims.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

**D.     Liquidation Analysis**

In order to determine the amount of liquidation value available to creditors, the Debtors, with the assistance of their financial advisor, Lazard, prepared a liquidation analysis, annexed hereto as Appendix C (the "Liquidation Analysis"), which concludes that in a Chapter 7 liquidation, holders of Allowed Claims in the impaired classes of each of the Debtors would receive less than under the Plan. This conclusion is premised upon the assumptions set forth in Appendix C hereto, which the Debtors and Lazard believe are reasonable.

Notwithstanding the foregoing, the Debtors believe that any liquidation analysis with respect to the Debtors is inherently speculative. The liquidation analysis for the Debtors necessarily contains estimates of the net proceeds that would be received from a sale of assets and/or business units, as well as the amount of Claims that will ultimately become Allowed Claims. Claims estimates are based solely upon the Debtors' incomplete review of any Claims filed and the Debtors' books and records. No Order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the liquidation analysis. In preparing the liquidation analysis, the Debtors have projected an amount of Allowed Claims that is at the lowest end of a range of reasonableness such that, for purposes of the liquidation analysis, the largest possible Chapter 7 liquidation dividend to holders of Allowed Claims can be assessed. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan. The estimate of Allowed Claims is based upon different assumptions and formula for different purposes than the estimates of Allowed Claims set forth in other sections of this Disclosure Statement.

The Plan Proponents and Lazard have assumed that a Chapter 7 trustee would be forced to sell assets in a traditional "bricks and mortar" liquidation with the loss of most if not all "going-concern" value attributable to the Debtors' assets. For purposes of this analysis, the Plan Proponents and Lazard have also assumed that future asbestos claimants would participate in distributions in a Chapter 7 liquidation, rather than make a speculative assumption to the contrary, including speculation as to the priority of asbestos claims which accrue under state law during the bankruptcy case (after the Petition Date or conversion date and before the case were closed). As a result of the foregoing, the Plan Proponents and Lazard assert that holders of Allowed Claims in each of the impaired classes would receive less in a Chapter 7 liquidation than under the Plan.

For a more detailed discussion of this liquidation analysis and the dispute with the Unsecured Creditors' Committee, see Appendix C to this Disclosure Statement. The Bankruptcy Court or the District Court will determine, in conjunction with confirmation, whether the Plan satisfies the "best interests test" of Section 1129(a)(7).

### E.    Valuation of the Reorganized Debtors

**THE VALUATION INFORMATION CONTAINED IN THIS SECTION WITH REGARD TO THE REORGANIZED DEBTORS IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.**

### 1.    Overview

The Debtors have been advised by Lazard, its financial advisor, with respect to the consolidated Enterprise Value (as hereinafter defined) of the Reorganized Debtors (which consists of the aggregate enterprise value of Reorganized OCD and its direct and indirect Subsidiaries, including both Debtor and Non-Debtor Subsidiaries) on a going-concern basis. Lazard undertook this valuation analysis for the purpose of determining value available for distribution to holders of Allowed Claims and Interests, respectively, pursuant to the Plan and to analyze the relative recoveries to such holders thereunder. The consolidated total value available for distribution (the "Total Distributable Value") to holders of Allowed Claims and Interests is comprised of the following components: (a) the estimated value of the Reorganized Debtors' operations on a going concern basis (the "Enterprise Value," as identified above), (b) the value of certain projected tax attributes such NOLs as of an assumed Effective Date of December 31, 2005, with which the Debtors will emerge from bankruptcy, and (c) the estimated amount of cash-on-hand in excess of that which is required to operate the business ("Excess Cash") as of an assumed Effective Date of December 31, 2005.

Based in part on information provided by the Debtors, Lazard has concluded solely for purposes of the Plan that the Total Distributable Value of the Reorganized Debtors ranges from approximately $5.9 billion to $6.7 billion (with a mid-point estimate of $6.3 billion) as of an assumed Effective Date of December 31, 2005. This estimated Total Distributable Value includes approximately $200 million associated with the expected utilization of NOLs created as part of the Plan[20] and $1.1 billion deemed to be Excess Cash.

**THE ASSUMED RANGE OF THE TOTAL DISTRIBUTABLE VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF DECEMBER 31, 2005, REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO LAZARD AS OF DECEMBER 2005. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, LAZARD DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATE.**

---

[20]    This estimation remains subject to further analysis and potential revision by the Company and its tax advisors.

792

Based upon the assumed range of the Enterprise Value of the Reorganized Debtors of between $4.6 billion and $5.4 billion, less an assumed total debt of $1.931 billion as of an assumed Effective Date of December 31, 2005 (including approximately $70 million of existing debt, $1.8 billion of Senior Notes and approximately $61 million principal amount of debt issued to the IRS for its Allowed Priority Tax Claim), plus a value for NOLs of $200 million, Lazard imputed an estimated range of equity values for the Reorganized Debtors of between $2.869 billion and $3.669 billion, with a point estimate of $3.269 billion. Assuming a distribution of 130.8 million shares of New OCD Common Stock pursuant to the Plan, the imputed estimate of the range of equity values on a per share basis is between $21.93 and $28.08 per share (with a mid-point estimate of approximately $25.00 per share). These values do not give effect to the potentially dilutive impact of any restricted stock or stock options that may be granted under a management incentive plan. Lazard's estimate of Enterprise Value does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

With respect to the Financial Projections prepared by the management of the Debtors and included as Appendix B to this Disclosure Statement, Lazard assumed that such Financial Projections were reasonably prepared in good faith and on a basis reflecting the most accurate currently available estimates and judgments of the Debtors as to the future operating and financial performance of the Reorganized Debtors. Lazard's estimate of a range of Enterprise Value assumes that operating results projected by the Debtors will be achieved by the Reorganized Debtors in all material respects, including revenue growth and improvements in operating margins, earnings and cash flow. If the business performs at levels below those set forth in the Financial Projections, such performance may have a material impact on Enterprise Value.

In estimating the range of the Enterprise Value and equity value of the Reorganized Debtors, Lazard (a) reviewed certain historical financial information of OC for recent years and interim periods; (b) reviewed certain internal financial and operating data of OC, including the Financial Projections as described in Section VI.D of this Disclosure Statement, which data was prepared and provided to Lazard by the management of OC and which relate to OC's business and its prospects; (c) met with certain members of senior management of OC to discuss OC's operations and future prospects; (d) reviewed publicly available financial data and considered the market value of public companies that Lazard deemed generally comparable to the operating business of OC; (e) considered relevant precedent transactions in the building products industry; (f) considered certain economic and industry information relevant to the operating business; and (g) conducted such other studies, analysis, inquiries, and investigations as it deemed appropriate. Although Lazard conducted a review and analysis of OC's business and the Reorganized Debtors' business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by OC, as well as publicly available information.

In addition, Lazard did not independently verify management's projections in connection with such estimates of the Enterprise Value and equity value, and no independent valuations or appraisals of OC were sought or obtained in connection herewith. In the case of the Reorganized Debtors, the estimates of the Enterprise Value prepared by Lazard represent the hypothetical reorganization value of the Reorganized Debtors. Such estimates were developed

solely for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to creditors thereunder. Such estimates reflect computations of the range of the estimated Enterprise Value of the Reorganized Debtors through the application of various valuation techniques and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein.

The value of an operating business is subject to numerous uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimate of the range of the Enterprise Value of the Reorganized Debtors set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Because such estimates are inherently subject to uncertainties, neither OC, Lazard, nor any other person assumes responsibility for their accuracy. In addition, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the anticipated initial securities holdings of pre-petition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis, and other factors that generally influence the prices of securities.

As noted above, this valuation consists of the aggregate enterprise value of Reorganized OCD and its direct and indirect Subsidiaries, including both Debtor and Non-Debtor Subsidiaries) on a going-concern basis. The Plan is premised upon complete deconsolidation of the Debtor entities. As such, the values of the separate Debtor and Non-Debtor Subsidiaries and the Claims against the Debtors and liabilities of the Non-debtor Subsidiaries may affect what is available for distribution to the creditors of each separate Debtor. The assumptions for purposes of estimation of distributions in this Disclosure Statement may be found in Schedule XII to the Plan, which is to be filed no later than five (5) Business Days prior to the Disclosure Statement Hearing, and in Appendix I, entitled "Distribution Assumptions."

2.    **Additional Assumptions Regarding the Reorganized Debtors**

With respect to the valuation of the Reorganized Debtors, in addition to the foregoing, Lazard has relied upon the following assumptions:

- the Reorganized Debtors' Enterprise Value consists of the aggregate enterprise value of Reorganized OCD and its direct and indirect Subsidiaries, including the Non-Debtor Subsidiaries.

- The Enterprise Value of the Reorganized Debtors assumes the pro forma debt levels (as set forth in the Financial Projections) adjusted for ownership percentages in order to calculate a range of equity value.

- The projections for the Reorganized Debtors are predicated upon the assumption that Reorganized OCD will be able to obtain all necessary financing, as described herein, and that no asset sales other than those contemplated to be consummated

814526.7

274

by the Company prior to the Effective Date, or assumed in the Financial Projections, will be required to meet the Reorganized Debtors' ongoing financial requirements. Lazard makes no representations as to whether the Company will obtain financing or consummate such asset sales or as to the terms upon which such financing may be obtained or such asset sales may be consummated.

- The present senior management of OC will continue following consummation of the Plan, and general financial and market conditions as of the assumed Effective Date of the Plan will not differ materially from those conditions prevailing as of the date of this Disclosure Statement.

Lazard's valuation represents a hypothetical value that reflects the estimated intrinsic value of the Company derived through the application of various valuation techniques. Such analysis does not purport to represent valuation levels which would be achieved in, or assigned by, the public markets for debt and equity securities or private markets for corporations. Estimates of Enterprise Value do not purport to be appraisals or necessarily reflect the values which may be realized if assets are sold as a going concern, in liquidation, or otherwise.

### 3. Valuation Methodology

The following is a brief summary of certain financial analyses performed by Lazard to arrive at its estimation of the Enterprise Value and Total Distributable Value of the Reorganized Debtors. Lazard performed certain procedures, including each of the financial analyses described below, and reviewed the assumptions with the management of OC on which such analyses were based and other factors, including the projected financial results of the Reorganized Debtors. Lazard's estimate of Enterprise Value must be considered as a whole and selecting just one methodology or portions of the analysis, without considering the analysis as a whole, could create a misleading or incomplete conclusion as to Enterprise Value.

Under the valuation methodologies summarized below, Lazard derived a range of Enterprise Values assuming the Reorganized Debtors are full taxpayers. Lazard separately analyzed the value of the Debtors' tax attributes, including NOLs, as of the assumed Effective Date and added this value and the Excess Cash to the Enterprise Value range to calculate a Total Distributable Value range. A discussion of Lazard's analysis of such tax attributes, including the methodology used to value them, is presented below in Section XIV.E.3(d).

#### (a) Discounted Cash Flow Analysis

The Discounted Cash Flow ("DCF") analysis is a forward-looking enterprise valuation methodology that relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated blended rate of return that debt and equity investors would require to invest in the business based on its capital structure. This DCF analysis has two components: the present value of the projected un-levered after-tax free cash flows for a determined period and the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the projections).

814526.7

275

As the estimated cash flows, estimated Discount Rate and expected capital structure of the Reorganized Debtors are used to derive a potential value, an analysis of the results of such an estimate is not purely mathematical, but instead involves complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtors, as well as other factors that could affect the future prospects and cost of capital considerations for the Reorganized Debtors.

The DCF calculation was performed based on un-levered after-tax free cash flows for the projection period 2006 to 2014, discounted to December 31, 2005. Lazard utilized management's detailed financial projections for the period 2006 to 2008 as the primary input. Management assisted Lazard with the development of projections for the extended period of 2009 to 2014. Beginning with earnings before interest and taxes ("EBIT"), the analysis taxes this figure at an assumed rate of 40% to calculate an un-levered net income figure. The analysis then adds back the non-cash operating expense of depreciation and amortization. In addition, other factors affecting free cash flow are taken into account, such as the change in working capital and capital expenditures, all of which do not affect the income statement and therefore require separate adjustments in the calculation.

In performing the calculation, Lazard made assumptions for the Discount Rate, which is used to value future cash flows based on the riskiness of the projections, and the exit multiple of earnings before interest, taxes, depreciation and amortization ("EBITDA"), which is used to determine the future value of the enterprise after the end of the projected period. To estimate the Discount Rate, Lazard used the cost of equity and the after-tax cost of debt for the Reorganized Debtors, assuming a range of targeted long-term capital structure of approximately 30% to 50% debt to total capital.

Lazard estimated the cost of equity based on the Capital Asset Pricing Model, which assumes that the required equity return is a function of the risk-free cost of capital and the correlation ("Beta") of a publicly traded stock's performance to the return on the broader market. Lazard used Betas from comparable companies on an un-levered basis to determine a composite un-levered Beta. In estimating the Reorganized Debtors' cost of debt, Lazard considered a number of factors including the likely interest associated with the Reorganized Debtors' post-emergence financing, the expected term of such financing, and the effective yield for publicly traded debt securities for comparable companies in the industry. Lazard's DCF valuation was based upon a range of Discount Rates between 10.0% and 11.0%, with a mid-point of 10.5%. In determining an EBITDA exit multiple, Lazard relied upon various analyses including a review of current and historical EBITDA trading multiples for the Debtors and comparable companies operating in the building products sector. Lazard's terminal value was based upon a range of EBITDA multiples between 7.0x and 8.0x, with a mid-point of 7.5x. Lazard believes that this range of EBITDA multiples is consistent with the observed multiples for companies similar to the Debtors that operate in cyclical industry sectors.

 (b) Publicly Traded Company Analysis

A publicly traded company analysis estimates value based on a comparison of the target company's financial statistics with the financial statistics of public companies that are similar to the target company. The analysis establishes a benchmark for asset

valuation by deriving the value of "comparable" assets, standardized using a common variable such as EBIT, and EBITDA. The analysis includes a detailed multi-year financial comparison of each company's income statement, balance sheet, and cash flow statement. In addition, each company's performance, profitability, margins, leverage and business trends are also examined. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company. Criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, maturity of businesses, market presence, size, and scale of operations. The selection of truly comparable companies is often difficult and subject to limitations due to sample size and the availability of meaningful market-based information. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value.

In performing the Comparable Public Company Analysis, the following publicly traded companies ("Peer Group") deemed generally comparable to the Debtors in one or more of the factors described above, were selected: American Woodmark, Black & Decker, CRH, Elkcorp, Georgia-Pacific, Griffon, James Hardie, Masco, NCI Building Systems, Owens Illinois, PPG Industries, and Sherwin Williams. Lazard excluded several building products manufacturers that were deemed not comparable because of size, specific product comparability and/or status of comparable companies (e.g., currently in a chapter 11).

Lazard primarily observed valuation ratios as a function of enterprise value of each company as indicated by the book value of debt less cash plus the equity market capitalization. Lazard calculated multiples for the Peer Group of enterprise value to various historical and projected earnings measures, including EBITDA. To calculate the multiple of enterprise value to projected EBITDA, Lazard divided the enterprise values of each comparable company by their projected EBITDA for 2005 and 2006, as estimated in current equity research and I/B/E/S data services. This analysis produced multiples of enterprise value to estimated 2005 EBITDA ranging from a low of approximately 4.5x to a high of approximately 9.3x, with a mean of approximately 7.6x. Multiples of enterprise value to estimated 2006 EBITDA ranged from a low of approximately 3.7x to a high of approximately 7.9x, with a mean of approximately 6.8x.

Having calculated these statistics and other similar statistics, Lazard then applied a range of multiples to the Debtors' financial results and forecasts, including forecasted 2005 and 2006 EBITDA ($805 million and $865 million, respectively) to determine a range of Enterprise Values. Lazard's application of these multiples to the Reorganized Debtors' financial results took into account a variety of factors, both quantitative and qualitative, in an effort to consider the relative valuation which the Reorganized Debtors would command given the availability of alternative investments. It should be noted that these multiples are based upon historical profitability metrics which could generally be described as representing a possible "peak" of the business cycle. As a result, the observed multiples are generally higher than historical averages.

8145267                                277

(c)    Precedent Transactions Analysis

Precedent transactions analysis estimates value by examining public merger and acquisition transactions. An analysis of a company's transaction value as a multiple of various operating statistics provides industry-wide valuation multiples for companies in similar lines of businesses to the Debtors. These transaction multiples were calculated based on the purchase price (including any debt assumed, less cash) paid to acquire companies that are comparable to the Debtors. These multiples were then applied to the Reorganized Debtors' key operating statistics, to determine the total enterprise value or value to a potential strategic buyer. Lazard evaluated each of these multiples and made judgments as to their relative significance in determining the Reorganized Debtors' range of reorganization value.

Unlike the comparable public company analysis, the valuation in this methodology includes a "control" premium, representing the purchase of a majority or controlling position in a company's assets. Thus, this methodology generally produces higher valuations than the comparable public company analysis. Other aspects of value that manifest itself in a precedent transaction analysis include the following: (a) circumstances surrounding a merger transaction may introduce idiosyncratic factors into the analysis (e.g., an additional premium may be extracted from a buyer in the case of a competitive bidding contest); (b) the market environment is not identical for transactions occurring at different periods of time; and (c) circumstances pertaining to the financial position of a company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

As with the comparable company analysis, because no acquisition used in any analysis is identical to a target transaction, valuation conclusions cannot be based solely on quantitative results. The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations and prospects of each. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition. The number of completed transactions over the prior three years for which public data is available also limits this analysis. Because the precedent transaction analysis explains other aspects of value besides the inherent value of a company, there are limitations as to its use in the Reorganized Debtors' valuation.

Lazard evaluated various merger and acquisition transactions that have occurred in the building products industry between 2000 and 2005. Lazard calculated multiples of Transaction Value (as hereinafter defined) to the latest twelve months' ("LTM") EBITDA and EBIT of the target companies by dividing the disclosed purchase price of the target's equity, plus any debt assumed as part of the transaction (the "Transaction Value," as identified above), by disclosed LTM EBITDA and EBIT. This analysis produced multiples of Transaction Value to LTM EBITDA ranging from a low of approximately 4.4x to a high of approximately 9.9x, with a mean of approximately 7.1x. Lazard then applied a range of multiples to the Debtors' LTM EBITDA and EBIT to determine a range of Enterprise Values.

814526.7

278

(d)    Analysis of Post-Emergence Tax Attributes

The Reorganized Debtors expect to have NOLs following their emergence from bankruptcy. It is expected that the Debtors NOLs as of the filing date, plus the NOLs created through the funding of the 524(g) Trust, will exceed cancellation of debt income (COD). Lazard has valued these NOLs of the Reorganized Debtors by calculating the present value of the tax savings they would be expected to provide relative to the taxes the Reorganized Debtors would otherwise pay absent the availability of such attributes. Lazard assumed that the cash flows resulting from the benefit of Reorganized Debtors' tax attributes will be subject to an annual utilization limitation, per Section 382(I)(6) of the Tax Code. These cash flows were then discounted at a range of discount rates, based on the Reorganized Debtors' cost of capital. Further, Lazard took into account a variety of qualitative factors in estimating the value of the NOLs, including such factors as implementation and utilization risk.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY LAZARD. THE PREPARATION OF AN ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUSCEPTIBLE TO SUMMARY DESCRIPTION. IN PERFORMING THEIR ANALYSES, LAZARD AND THE DEBTORS MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS. THE ANALYSES PERFORMED BY LAZARD ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

F.    Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation

It is impossible to determine with any specificity the value each creditor will receive as a percentage of its Allowed Claim. This difficulty in estimating the value of recoveries is due to, among other things, the lack of any public market for the New OCD Common Stock.

Notwithstanding the difficulty in quantifying recoveries to holders of Allowed Claims with precision, the Debtors believe that the financial disclosures and projections contained herein imply a greater or equal recovery to holders of Claims in Impaired Classes than the recovery available in a Chapter 7 liquidation. As set forth below, the Debtors have set forth an estimate of the comparative distributions between a Chapter 7 liquidation and the Plan.

Accordingly, the Debtors believe that the "best interests" test of Section 1129 of the Bankruptcy Code is satisfied.

Because the Unsecured Creditors' Committee previously contended that the liquidation analysis is not permitted to assume any payment to future asbestos claimants in a Chapter 7 liquidation, and based on certain other assumptions, the Unsecured Creditors' Committee contended that creditors would receive more in a Chapter 7 liquidation than under the Plan. Therefore, the Unsecured Creditors' Committee contended that the plans filed prior to the Plan

failed to satisfy the "best interests test" of Section 1129(a)(7). The Plan Proponents and Lazard disagree with this analysis. For a more detailed discussion of this dispute, see Section XIV.D of this Disclosure Statement entitled "Liquidation Analysis" and the Liquidation Analysis contained in Appendix C. The Bankruptcy Court or the District Court will determine, in conjunction with confirmation, whether the Plan satisfies the "best interests test" of Section 1129(a)(7).

**G.    Confirmation Without Acceptance of All Impaired Classes: "Cramdown"**

The Debtors will request confirmation of the Plan, as it may be modified from time to time, under Section 1129(a) of the Bankruptcy Code, and have reserved the right to modify the Plan to the extent, if any, that confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification.

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if it is not accepted by all impaired classes of claims and interests, as long as at least one impaired class of claims has accepted the plan. The Bankruptcy Court may confirm a plan notwithstanding the rejection or deemed rejection of an impaired class of claims or interests if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has rejected, or is deemed to have rejected, the plan.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a rejecting impaired class is treated equally with respect to other classes of equal rank. The Bankruptcy Code establishes different standards for what is "fair and equitable" for holders of unsecured claims, and equity interests.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan if, among other things, the plan provides (1) that each holder of a claim in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the Plan, equal to the allowed amount of the claim or (2) that no holder of a claim that is junior to the claims of the rejecting class will receive or retain under the plan any property on account of such junior claim.

With respect to equity interests, a plan is fair and equitable as to a class of equity interests that rejects the plan if, among other things, the plan provides (1) that each holder of an equity interest in the rejecting class will receive or retain on account of such interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any interest that is junior to the interest of such class will not receive under the plan any property on account of such junior interest.

The Debtors believe that the Plan may be confirmed pursuant to the above-described "cramdown" provisions, over the dissent of certain Classes of Claims and Interests, including Class A11 and Class A12 (which are deemed to have rejected the Plan) in view of the treatment proposed for such Classes. The Debtors would seek confirmation of the Plan pursuant to the above-described "cramdown" provisions over the dissent of any Class other than Classes A7 and B8. In addition, the Debtors do not believe that the Plan unfairly discriminates against, or is otherwise unfair or inequitable, with respect to any Class who may vote to reject the Plan.

814526.7                                   280

## XV.    CERTAIN RISK FACTORS TO BE CONSIDERED

### A.    Certain Factors Relating to the Chapter 11 Proceedings

### 1.    There can be no assurance that the Plan will be consummated as proposed.

The Plan sets forth a method, determined by negotiation between OC and certain of its creditor constituencies, for resolving Claims and reorganizing the Debtors. However, the Plan has not been approved by all of the Debtors' creditor constituencies and, as a result, there remains significant uncertainty as to whether the proposed resolution of Claims as described herein (including the amount and form of recoveries) will be effected. Although it is possible under applicable bankruptcy law to approve and confirm a plan of reorganization over the objection of various creditor groups, no assurance can be given that such a resolution will be achievable in this instance. Claimants who object to the terms of the Plan may be expected to challenge it in court proceedings and there can be no assurance that any such proceedings will be resolved favorably to the Debtors or that such proceedings, or further negotiations, will not result in significant changes to the terms of the Plan, including the amount and form of recoveries.

The proposed relative amounts of recovery by holders of Claims and Interests is the result of negotiation among various of the constituencies of claimants with the Company, as well as the application of legal principles regarding ranking of Claims and Interests, and other matters. While the Company believes that the overall treatment of Claims and Interests under the Plan is fair and reasonable, not all Claims and Interests are treated equally, and certain Claims and Interests receive no distributions pursuant to the Plan.

The ultimate recoveries under the Plan to holders of Claims (other than holders whose entire Distribution is paid in Cash under the Plan) depend upon the realizable value of the Senior Notes and the New OCD Common Stock, which are subject to a number of material risks, including, but not limited to, those specified below under the caption "Certain Factors Relating to Securities to be Issued Pursuant to the Plan." In addition, changes to the terms of the Plan, including to the form and amount of recoveries, may significantly affect the nature of recoveries, or may make further distinctions between the recoveries applicable to different classes of creditors.

### 2.    Even if holders of Claims vote to approve the Plan, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court and consummated.

Even if all Impaired Classes entitled to vote in fact vote in favor of the Plan and, with respect to any Impaired Class deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which as a court of equity may exercise substantial discretion, may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors (see Section XIV.A of this Disclosure Statement), and that the value of distributions to dissenting holders of Claims and Interests may not be less than the value such holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. See Section XIV.C of this Disclosure Statement. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. See Appendix C annexed

801

hereto for a liquidation analysis of the Debtors. The Bankruptcy Court or the District Court will determine, in conjunction with confirmation, whether the Plan satisfies the "best interests test" of Section 1129(a)(7).

The Plan provides for certain conditions that must be fulfilled prior to confirmation of the Plan and the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be met (or waived), that other conditions to consummation, if any, will be satisfied, or that supervening factors will not prevent the Plan from being consummated. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated. If a liquidation or protracted reorganization were to occur, there is a substantial risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of all stakeholders.

**B.      Certain Factors Relating to Securities to be Issued Pursuant to the Plan**

The Senior Notes and the shares of New OCD Common Stock that will be issued pursuant to the Plan are securities for which there is currently no market. While the Debtors may apply to list the Senior Notes or the New OCD Common Stock, or both, on a securities exchange, or to have them included in an interdealer quotation system, no determination to do so has been made. Accordingly, there can be no assurance as to the development or liquidity of any market for the Senior Notes or the shares of New OCD Common Stock. If a trading market does not develop or is not maintained, holders of Senior Notes or shares of New OCD Common Stock may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such market were to exist, such securities could trade at prices higher or lower than the value attributed to such securities in connection with their distribution under the Plan, depending upon many factors, including, without limitation, prevailing interest rates, markets for similar securities, industry conditions and the performance of, and investor expectations for, the Reorganized Debtors. In addition, some persons who receive Senior Notes and shares of New OCD Common Stock may prefer to liquidate their investment in the near term rather than hold such securities on a long-term basis. Accordingly, any market for such securities may be volatile, at least for an initial period following the Effective Date, and may be depressed until the market has had time to absorb any such sales and to observe the performance of the Reorganized Debtors.

**C.      Certain Factors Relating to the Reorganized Debtors**

**1.      The Asbestos Personal Injury Trust will own a majority of the outstanding shares of New OCD Common Stock and will thereby be able to control Reorganized OCD.**

The Asbestos Personal Injury Trust will beneficially own more than 50% of the issued and outstanding shares of New OCD Common Stock. Accordingly, the Asbestos Personal Injury Trust will have significant control over Reorganized OCD and eventually may have the power to elect the majority of the Reorganized OCD directors, and, by virtue of its ability to elect a majority of directors, to appoint new management and approve any action requiring the approval of the holders of New OCD Common Stock, including adopting amendments to the Amended and Restated Certificate of Incorporation and approving mergers or sales of all or substantially all of Reorganized OCD's assets. This concentration of ownership could also

814526.7                                  282

802

facilitate or hinder a negotiated change of control of Reorganized OCD, and, consequently, could have an impact upon the value of the New OCD Common Stock. There can be no assurance that the interests of the Asbestos Personal Injury Trust will not conflict with the interests of Reorganized OCD's other stakeholders.

### 2.    The financial projections are inherently uncertain.

The Financial Projections set forth in <u>Appendix B</u> hereto cover the Debtors' projected future operations through fiscal 2008. The Financial Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995. "Forward-looking statements" in the Financial Projections include the intent, belief or current expectations of OC and members of its management team with respect to the timing and completion of the implementation of the Plan, the feasibility of the Business Plan, the availability of bank and other financing, the conditions of the debt and equity markets, the state of general business and economic conditions, and OC's future liquidity, as well as the assumptions upon which such statements are based. While OC believes that these expectations are based on reasonable assumptions within the bounds of its knowledge of its business and operations, parties in interest are cautioned that any such forward-looking statements are not guaranties of future performance, and involve risks and uncertainties, and that actual results are likely to differ materially from those contemplated by such forward-looking statements.

Important factors currently known to OC's management that could cause actual results to differ materially from those contemplated by the forward-looking statements in the Financial Projections include, but are not limited to, adverse developments with respect to the liquidity position of OC or operations of the various businesses of OC, adverse developments in the bank financing or public or private markets for debt or equity securities of OCD, adverse developments in the timing or results of the implementation of the Business Plan (including the time to emerge from Chapter 11), the difficulty in controlling industry costs and integrating new operations, the ability of the OC to realize the anticipated general and administrative expense savings and overhead reductions contemplated in the Financial Projections, the ability of OC to maintain profitability of their operations, the level and nature of any restructuring and other one-time charges, the difficulty in estimating costs relating to exiting certain markets and consolidating and closing certain operations, and the possible negative effects of a change in applicable legislation. <u>See</u> Section VI.D of this Disclosure Statement.

### 3.    There can be no assurance that the Reorganized Debtors will be able to refinance certain indebtedness.

Following the Effective Date of the Plan, the Debtors' working capital needs and letter of credit requirements are anticipated to be funded under the new Exit Facility. <u>See</u> Section VII.D.19 of this Disclosure Statement. Obtaining the Exit Facility is a condition precedent to the Effective Date. There can be no assurance, however, that the Reorganized Debtors will be able to obtain replacement financing for such facility to fund future working capital needs and letters of credit, or that replacement financing, if obtained, would be on terms equally as favorable to the Reorganized Debtors. Furthermore, there can be no assurance that the

Reorganized Debtors will be able to refinance the Senior Notes upon their maturity, should such a need arise.

4.    **Retention of key management and technical personnel may be important to the future performance of the Reorganized Debtors.**

Many aspects of the business of the Debtors require personnel with significant experience or technical expertise. In addition, the past business performance of the Debtors has been achieved, in part, by the skills of key management personnel who possess very particular knowledge and expertise relating to the Debtors' business. There can be no assurance that such personnel can be retained or, that if any such personnel do not continue in the employ of the Reorganized Debtors, that the Reorganized Debtors will be able to replace such key personnel.

5.    **There can be no assurance that Reorganized OCD will pay dividends.**

The Debtors cannot anticipate whether Reorganized OCD will pay any dividends on the New OCD Common Stock in the foreseeable future. In addition, restrictive covenants in certain debt instruments to which Reorganized OCD will be a party, including the Exit Facility, may limit the ability of Reorganized OCD to pay dividends.

6.    **The Reorganized Debtors are subject to environmental regulation and failure to comply with environmental regulation could harm its business.**

The Reorganized Debtors will remain subject to a variety of environmental laws and regulations governing, among other things, discharges to air and water, the handling, storage, and disposal of hazardous or solid waste materials, and may also be required to undertake the remediation of contamination associated with releases of hazardous substances. Such laws and regulations and the risk of attendant litigation can cause significant delays and add significantly to the cost of operations. Violations of these environmental laws and regulations could subject the Reorganized Debtors and their management to civil and criminal penalties and other liabilities based on their post-petition conduct. There can be no assurance that such laws and regulations will not become more stringent, or more stringently implemented, in the future.

Various federal, state and local environmental laws and regulations, as well as common law, may impose liability for property damage and costs of investigation and cleanup of hazardous or toxic substances on property currently or previously owned by the Debtors or arising out of the Debtors' waste management activities. Such laws may impose responsibility and liability without regard to knowledge of or causation of the presence of the contaminants, and the liability under such laws is joint and several. The Debtors have potential liabilities associated with their past waste disposal activities and with their current and prior ownership of certain property. In general, the Debtors believe that the likely amount of such liabilities will not be material, because the Debtors may have a valid defense to liability with respect to a given site or the Debtors should only be responsible for a small percentage of the total cleanup costs with respect to a given site. However, because liability under such laws is joint and several, no assurances can be given that the Reorganized Debtors will not eventually be responsible for all or a substantial portion of the liabilities associated with one or more of these sites, which liabilities could be material either individually or in the aggregate.

814526.7

7.    **OC's tax reserves may be insufficient and any revision to these reserves may adversely affect OC's financial position.**

In accordance with generally accepted accounting principles, OC maintains tax reserves to cover audit issues. While OC believes that the existing reserves are appropriate in light of the audit issues involved, its defenses, its prior experience in resolving audit issues, and its ability to realize certain challenged deductions in subsequent tax returns if the IRS were successful, there can be no assurance that such reserves will be sufficient. OC will continue to review its tax reserves on a periodic basis and make such adjustments as may be appropriate. Any such revision could be material to OC's consolidated financial position and results of operations in any given period.

8.    **The performance of OC's business reflects the impact of business cycles.**

Sales of OC's products are correlated to business activity in the new construction and remodeling markets, which are highly sensitive to national and regional economic conditions. From time to time, the construction industry has been adversely affected in various parts of the country by unfavorable economic conditions, low use of manufacturing capacity, high vacancy rates, changes in tax laws affecting the real estate industry, high interest rates and the unavailability of financing. In addition, sales of OC's products may be adversely affected by weakness in demand within particular customer groups or a recession in the general construction industry or in particular geographic regions. OC cannot predict the timing or severity of future economic or industry downturns. Any economic downturn, particularly in states where many of OC's sales are made, could have a material adverse effect on its results of operations and financial condition.

9.    **Particular risks involving international operations may affect the performance of the Reorganized Debtors.**

OC pursues project opportunities throughout the world through foreign and domestic subsidiaries as well as agreements with foreign joint-venture partners. These foreign operations are subject to special risks, including: uncertain political and economic environments, potential incompatibility with foreign joint-venture partners, foreign currency controls and fluctuations, war and military operations, civil disturbances and labor strikes.

## XVI.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords holders of Claims the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders.

If, however, the requisite acceptances are not received, or the Plan is not subsequently confirmed and consummated, the theoretical alternatives include: (a) formulation of an alternative plan or plans of reorganization, or (b) liquidation of the Debtors under Chapter 7 or 11 of the Bankruptcy Code.

### A.    Alternative Plan(s) of Reorganization or Liquidation

If the requisite acceptances are not received by the Voting Deadline or if the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive periods in which to file and solicit acceptances of a plan of reorganization have expired, any other party-in-interest) could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plan(s) might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of the Debtors' assets.

With respect to an alternative plan, the Debtors have explored various alternatives in connection with the formulation and development of the Plan. The Debtors believe that the Plan enables the holders of Claims against the Debtors to realize the greatest possible value under the circumstances, and that, as compared to any alternative plan of reorganization, the Plan has the greatest chance to be confirmed and consummated.

### B.    Liquidation Under Chapter 7 or Chapter 11

If no plan is confirmed, the Chapter 11 Cases may be converted to cases under Chapter 7 of the Bankruptcy Code, pursuant to which one or more trustees would be elected or appointed to liquidate the Debtors' assets for distribution to claimants in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Interests in the Debtors.

The Debtors believe that in a liquidation under Chapter 7, before claimants receive any distribution, additional administrative expenses arising from the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtors' Estates. The assets available for distribution to claimants would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, arising by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' Estates.

The Debtors could also be liquidated pursuant to the provisions of a Chapter 11 plan of reorganization. In a liquidation under Chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7. Thus, a Chapter 11 liquidation might result in larger recoveries than in a Chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Because a trustee is not required in a Chapter 11 case, expenses for professional fees could be lower than in a Chapter 7 case, in which a trustee must be appointed. Any distribution to the holders of Claims under a Chapter 11 liquidation plan probably would be delayed substantially. Moreover, without the support of the holders of Asbestos Personal Injury Claims, the purchaser or purchasers of assets from the Debtors would not be assured the protection from liability for asbestos-related claims available under Section 524(g) of the Bankruptcy Code, thus potentially diminishing the value of such assets in a sale under Chapter 11.

The Debtors believe that any alternative liquidation under Chapter 11, if feasible at all, is a much less attractive alternative to creditors than the Plan. THE COMPANY BELIEVES

THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO CREDITORS THAN WOULD A LIQUIDATION UNDER CHAPTER 7 OR CHAPTER 11 OF THE BANKRUPTCY CODE.

The Liquidation Analysis, prepared by the Debtors with the assistance of Lazard, is premised upon a liquidation in a Chapter 7 case. In the analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate realizable value of such assets, and the extent to which the assets are subject to liens and security interests.

The likely form of any liquidation would be the sale of individual assets. Based on this analysis, it is likely that a liquidation of the Debtors' assets would produce less value for distribution to creditors than that recoverable in each instance under the Plan. In the Debtors' opinion, the recoveries projected to be available in liquidation are not likely to afford holders of Claims as great a realization potential as does the Plan.

For a more detailed discussion, see Appendix C to this Disclosure Statement. The Bankruptcy Court or the District Court will determine, in conjunction with confirmation, whether the Plan satisfies the "best interests test" of Section 1129(a)(7).

## XVII. THE SOLICITATION; VOTING PROCEDURE

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code and that the disclosures by the Debtors concerning the Plan have been adequate and have included information concerning all payments made or to be made in connection with the Plan and the Chapter 11 Cases. In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law and, under Rule 3020(b)(2) of the Bankruptcy Rules, it may do so without receiving evidence if no objection is timely filed.

In particular, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that (a) the Plan has been accepted by the requisite votes of the Classes of Impaired Claims, unless approval will be sought under Section 1129(b) of the Bankruptcy Code despite the dissent of one or more such classes, which will be the case under the Plan, (b) the Plan is "feasible," which means that there is a reasonable probability that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization, and (c) the Plan is in the "best interests" of all holders of Claims and Interests, which means that such holders will receive at least as much under the Plan as they would receive in a liquidation under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court must find that all conditions mentioned above are met before it can confirm the Plan. Thus, even if all Classes of Impaired Claims and Interests accept the Plan by the requisite votes, the Bankruptcy Court must make an independent finding that the Plan conforms to the requirements of the Bankruptcy Code, that the Plan is feasible, and that the Plan is in the best interests of the holders of Claims against, and Interests in, the Debtors. These statutory conditions to confirmation are discussed above.

By Order dated _____ (the "Voting Procedures Order"), the Court has approved certain Voting Procedures which govern, among other things, the manner in which votes on the Plan will be solicited and Ballots and Master Ballots on the Plan tabulated. A copy of the Voting Procedures is attached hereto as Appendix J. For further information regarding Voting

814526.7

Procedures and rules concerning the calculation of the amount of Claims voting in a Class of Claims, see Section XIV.B of this Disclosure Statement entitled "Feasibility of the Plan and Best Interests of Creditors - Acceptance of the Plan."

### A.    Parties in Interest Entitled to Vote

Under Section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be impaired under a Plan unless (1) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (1) the claim or interest is allowed, which means generally that no party in interest has objected to such claim or interest, and (2) the claim or interest is impaired by the plan. If the holder of an impaired claim or interest will not receive or retain any distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan. If the claim or interest is not impaired, the Bankruptcy Code deems that the holder of such claim or interest has accepted the plan and the plan proponent need not solicit such holder's vote.

The holder of a Claim against a Debtor that is Impaired under the Plan is entitled to vote to accept or reject the Plan if (i) the Plan provides a distribution in respect to such Claim and (ii) (a) the Claim has been Scheduled by the Debtors (and such claim is not Scheduled at zero or as disputed, contingent, or unliquidated) or (b) it has filed a Proof of Claim on or before the bar date applicable to such holder, pursuant to Sections 502(a) and 1126(a) of the Bankruptcy Code and Bankruptcy Rules 3003 and 3018. Any Claim as to which an objection has been timely filed and has not been withdrawn or dismissed or denied by Final Order is not entitled to vote unless the Bankruptcy Court, pursuant to Federal Rule of Bankruptcy Procedure 3018(a), upon application of the holder of the Claim with respect to which there has been objection, temporarily allows the Claim in an amount that the Bankruptcy Court deems proper for the purpose of accepting or rejecting the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to Section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Voting Procedures Order also sets forth assumptions and procedures for tabulating Ballots that are not completed fully or correctly.

### B.    Classes Impaired under the Plan

To the extent and in the manner provided in the Voting Procedures Order, Classes A3-U3, A5, A6-A, A6-B, B6-U6, A7, 17, B8, B9, A10-U10, A-11, and, to the extent they are deemed to be Impaired, Classes A4-14, are entitled to vote to accept or reject the Plan. In Classes A7 and B8, only holders of present Asbestos Personal Injury Claims will vote on the Plan. By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan. By operation of law, Classes A12 and I12, are deemed to have rejected the Plan and therefore are not entitled to vote to accept or reject the Plan.

814526.7                                        288

## C.    Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots or Master Ballots will be determined by the Voting Agent or the Special Voting Agent, as applicable, and the Debtors in accordance with the Voting Procedures in their sole discretion, which determination will be final and binding. The Debtors also reserve the right to reject any and all Ballots and Master Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful. The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot or Master Ballot.

## D.    Withdrawal of Ballots; Revocation

Any party who has delivered a valid Ballot or Master Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent or Special Voting Agent, as applicable, at any time prior to the Voting Deadline in accordance with the Voting Procedures. The Debtors intend to consult with the Voting Agent or Special Voting Agent to determine whether any withdrawals of Ballots or Master Ballots were received and whether the requisite acceptances of the Plan have been received. As stated above, the Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of Ballots and Master Ballots.

## E.    Further Information; Additional Copies

If you have any questions about (1) the Voting Procedures for voting your Claim or Interest or with respect to the packet of materials that you have received or (2) the amount of your Claim, or if you wish to obtain, at your own expense, unless otherwise specifically required by Federal Rule of Bankruptcy Procedure 3017(d), an additional copy of the Plan, this Disclosure Statement or any appendices or Exhibits to such documents, please contact:

OWENS CORNING
c/o Omni Management Group, LLC
16161 Ventura Blvd., PMB 517
Encino, CA 91436
818-905-6542 (fax)
contact@omnimgt.com

814526.7

289

809

## XVIII. RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Plan Proponents believe that confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Plan Proponents urge all holders of Allowed Claims in Impaired Classes to vote to ACCEPT the Plan, and to complete and return their Ballots or Master Ballots so that they will be actually RECEIVED by the Voting Agent or Special Voting Agent, as applicable, on or before 4:00 p.m. prevailing Eastern Time on the Voting Deadline.

Dated: December 31, 2005

OWENS CORNING, et al.
(for itself and on behalf of the Subsidiary Debtors)

By:      */s/ Stephen K. Krull*
Name:   Stephen K. Krull
Title:    Sr. Vice President, General Counsel
         and Secretary

814526.7

290

810

SAUL EWING LLP
Norman L. Pernick (I.D. # 2290)
J. Kate Stickles (I.D. #2917)
222 Delaware Avenue
P.O. Box 1266
Wilmington, DE 19899-1266
(302) 421-6800

Charles O. Monk, II
Jay A. Shulman
Lockwood Place
500 E. Pratt Street
Baltimore, MD 21202
(410) 332-8600

Adam H. Isenberg
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
(215) 972-7777

Attorneys for the Debtors and
Debtors-in-Possession

KAYE SCHOLER LLP
Andrew A. Kress
Jane W. Parver
Edmund M. Emrich
425 Park Avenue
New York, NY 10022
(212) 836-8000


YOUNG CONAWAY
STARGATT & TAYLOR, LLP
James L. Patton, Jr. (I.D. # 2202)
Edwin J. Harron (I.D. # 3396)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19899-0391
(302) 571-6600


Attorneys for James J. McMonagle,
Legal Representative for Future Claimants

SIDLEY AUSTIN LLP
James F. Conlan
Larry J. Nyhan
Jeffrey C. Steen
Dennis M. Twomey
Eric J. Pearson
1 South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Attorneys for the Debtors and
Debtors-in-Possession


COVINGTON & BURLING
Mitchell F. Dolin
Anna P. Engh
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
(202) 662-6000

Special Insurance Counsel to Debtors
and Debtors-in-Possession

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, NY 10152-3500
(212) 319-7125

Peter Van N. Lockwood
Julie W. Davis
One Thomas Circle, N.W.
Washington, D.C. 20005
(202) 862-5000

CAMPBELL & LEVINE, LLC
Marla Eskin (I.D. # 2989)
Mark T. Hurford (I.D. # 3299)
Kathleen Campbell Davis (I.D.#4229)
800 King Street
Wilmington, DE 19801
(302) 426-1900

Attorneys for the Official
Committee of Asbestos Claimants

814526.7

291

811