**1.120** **"FAIR Act"** means that certain Fairness in Asbestos Injury Resolution Act, denominated as S. 852, which was voted out of the Senate Judiciary Committee on May 26, 2005, if and to the extent that such legislation (or legislation on substantially similar terms) is enacted into law.

**1.121** **"Falcon Foam"** means Falcon Foam Corporation, a Delaware corporation.

**1.122** **"FB Asbestos Personal Injury Claim"** means any present or future right to payment, claim, remedy, liability or Demand against any FB Person for death, bodily injury, or other personal damages (whether physical, emotional or otherwise), whether or not such right, claim, remedy, liability or Demand is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal basis for such right, claim, remedy, liability or Demand are known or unknown, under any theory of law, equity, admiralty, or otherwise, to the extent caused or allegedly caused, directly or indirectly, by the presence of, or exposure to, asbestos or asbestos-containing products for which any FB Person may be legally liable, including, without limitation, the presence of, or exposure to, asbestos or asbestos-containing products that were manufactured, installed, fabricated, sold, supplied, produced, distributed, released, or in any way at any time marketed or disposed of by any FB Person, including, without express or implied limitation, any right, claim, remedy, liability or Demand for compensatory damages (such as loss of consortium, wrongful death, survivorship, proximate, consequential, general and special damages) and including punitive damages. FB Asbestos Personal Injury Claims (i) include FB Indirect Asbestos PI Trust Claims and Unpaid FB Resolved Asbestos Personal Injury Claims, but (ii) exclude FB Resolved Asbestos Personal Injury Claims, FB Asbestos Property Damage Claims, FB Indirect Asbestos Property Damage Claims, workers' compensation claims, OC Asbestos Personal Injury Claims, OC Indirect Asbestos PI Trust Claims, OC Asbestos Property Damage Claims, and OC Indirect Asbestos Property Damage Claims. Any FB Asbestos Personal Injury Claim which is filed as a priority or secured claim will be deemed and treated as an FB Asbestos Personal Injury Claim and not as an Administrative Claim, Other Priority Claim or Other Secured Claim.

**1.123** **"FB Asbestos Property Damage Claim"** means any present or future right to payment, claim, remedy, or liability against, or debt or obligation of, any FB Person, whether or not such right, claim, remedy, or liability is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts or legal basis for such right, claim, remedy, liability, debt or obligation are known or unknown, under any theory of law, equity, admiralty, or otherwise for, relating to, or arising by reason of, directly or indirectly, damage to property, including, without limitation, diminution in the value thereof, or environmental damage or economic loss related thereto, caused or allegedly caused, directly or indirectly, in whole or in part by the presence in buildings or other systems or structures of asbestos or asbestos-containing products for which any FB Person may be legally

21

849

liable, including, without limitation, the presence of, or exposure to, asbestos or asbestos-containing products that were manufactured, installed, fabricated, sold, supplied, produced, distributed, released or in any way at any time marketed or disposed of by any FB Person, or for which any FB Person is liable due to the acts or omissions of any FB Person, including, without express or implied limitation, any right, claim, remedy, liability against, or debt or obligation for compensatory damages (such as proximate, consequential, general and special damages) and including punitive damages. FB Asbestos Property Damage Claims include FB Indirect Asbestos Property Damage Claims.

1.124 **"FB Asbestos Property Damage Insurance Assets"** means rights to coverage for FB Asbestos Property Damage Claims under liability insurance policies issued to Fibreboard and identified in Schedule XV, as it may be amended up to ten (10) Business Days prior to the Objection Deadline. The foregoing includes, without limitation, (i) rights under such insurance policies, rights under settlement agreements made with respect to such insurance policies, Insolvent Insurer PD Rights, and Insurance Guarantee Fund PD Rights; (ii) the right, on behalf of the Debtors, to give a full release of the insurance rights of the Debtors for FB Asbestos Property Damage Claims under any such policies or related agreements, provided that a reciprocal release of the Debtors in connection with said policies or agreements is given in exchange by the insurer or other released insurance entity and further provided that any such release shall not encompass rights with respect to coverage for worker's compensation claims or with respect to coverage other than for FB Asbestos Property Damage Claims; and (iii) to the extent any of the foregoing cannot be assigned under applicable law as affected by the Bankruptcy Code, such proceeds as are recoverable by any of the Debtors in enforcement of its rights under such insurance policies, rights under settlement agreements made with respect to such insurance policies, Insolvent Insurer PD Rights, and Insurance Guarantee Fund PD Rights.

1.125 **"FB Asbestos Property Damage Trust"** means the trust established by Fibreboard in accordance with the FB Asbestos Property Damage Trust Agreement.

1.126 **"FB Asbestos Property Damage Trust Agreement"** means that certain FB Asbestos Property Damage Settlement Trust Agreement, executed by Fibreboard and the FB Asbestos Property Damage Trustee, substantially in the form of Exhibit E, as it may be amended up to ten (10) Business Days prior to the Objection Deadline.

1.127 **"FB Asbestos Property Damage Trust Distribution Procedures"** means the FB Asbestos Property Damage Trust Distribution Procedures to be implemented by the FB Asbestos Property Damage Trustee pursuant to the terms and conditions of the Plan and the FB Asbestos Property Damage Trust Agreement to process, liquidate, and pay FB Asbestos Property Damage Claims, substantially in the form of Exhibit E-1, as it may be amended up to ten (10) Business Days prior to the Objection Deadline.

22

**1.128** **"FB Asbestos Property Damage Trustee"** means the Person confirmed by the Bankruptcy Court to serve as trustee of the FB Asbestos Property Damage Trust, pursuant to the terms of the FB Asbestos Property Damage Trust Agreement, or as subsequently may be appointed pursuant to the provisions of the FB Asbestos Property Damage Trust Agreement.

**1.129** **"FB Indirect Asbestos PI Trust Claim"** means any present or future right to payment, claim, remedy, liability, or Demand against any FB Person, whether or not such right, claim, remedy, liability or Demand is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal basis for such right, claim, remedy, liability, or Demand are known or unknown, under any theory of law, equity, admiralty, or otherwise, that is (i) asserted by (a) any Person (other than (I) an FB Person or (II) Related Persons of the Debtors or Reorganized Debtors entitled to indemnification pursuant to Section 7.5 of the Plan) who has been, is or may be a defendant in an action seeking damages for death, bodily injury or other personal damages (whether physical, emotional or otherwise), to the extent caused or allegedly caused, directly or indirectly, by the presence of, or exposure to, asbestos or asbestos-containing products for which any FB Person may be legally liable, including, without limitation, the presence of, or exposure to, asbestos or asbestos-containing products that were manufactured, installed, fabricated, sold, supplied, produced, distributed, released, or in any way at any time marketed or disposed of by any FB Person, or (b) any assignee or transferee of such Person, and (ii) on account of alleged liability of any FB Person for reimbursement, contribution, subrogation or indemnification of any portion of any damages such Person has paid or may pay to the plaintiff in such action.

**1.130** **"FB Indirect Asbestos Property Damage Claim"** means any present or future right to payment, claim, remedy or liability against, or debt or obligation of, any FB Person, whether or not such right, claim, remedy, or liability is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal basis for such right, claim, remedy or liability, debt or obligation are known or unknown, under any theory of law, equity, admiralty, or otherwise that is (i) asserted by (a) any Person (other than (I) an FB Person or (II) a Related Person of the Debtors or Reorganized Debtors entitled to indemnification pursuant to Section 7.5 of the Plan) who has been, is, or may be a defendant in an action seeking damages for, relating to, or arising by reason of, directly or indirectly, damage to property, including without limitation, diminution in the value thereof, or environmental damage or economic loss related thereto, caused or allegedly caused, directly or indirectly, in whole or in part by the presence in buildings or other systems or structures of asbestos or asbestos-containing products for which any FB Person may be legally liable, including, without limitation, the presence of, or exposure to, asbestos or asbestos-containing products that were manufactured, installed, fabricated, sold, supplied, produced, distributed, released or in any way at any time marketed or disposed of by any FB Person, or for which any FB Person is otherwise liable due to the acts or omissions of any FB Person

23

or (b) any assignee or transferee of such Person, and (ii) on account of alleged liability of any FB Person for reimbursement, contribution, subrogation or indemnification of any portion of any damages such Person has paid or may pay to the plaintiff in such action.

1.131  **"FB Person"** means each of (i) Fibreboard and its direct or indirect Subsidiaries, (ii) Fibreboard's and its direct or indirect Subsidiaries' respective predecessors in interest, but solely to the extent listed on <u>Schedule VIII</u>, to be filed no later than ten (10) Business Days prior to the Objection Deadline, (iii) Fibreboard's and its direct or indirect Subsidiaries' respective successors in interest, but solely to the extent they either (a) are listed on <u>Schedule VIII</u>, or (b) are post-Effective Date successors in interest, (iv) Fibreboard's and its direct or indirect Subsidiaries' respective Affiliates, but solely to the extent listed on <u>Schedule VIII</u>, and (v) the respective former and present employees, directors or officers of the Persons identified in clauses (i), (ii), (iii) and (iv), acting in such capacity.

1.132  **"FB Resolved Asbestos Personal Injury Claim"** means an FB Asbestos Personal Injury Claim with respect to which and to the extent that (i) the holder of such Claim (a) is represented by an attorney of record who has entered into an enforceable NSP Agreement with Fibreboard, (b) was identified to Fibreboard by such attorney prior to the Petition Date, and (c) has satisfied all of the preconditions to payment under the applicable NSP Agreement prior to the Petition Date as determined by the Bankruptcy Court; (ii) such Claims are eligible to be paid from NSP Administrative Deposit Accounts in respect of FB Asbestos Personal Injury Claims; and (iii) such monies are available to pay such claims. To the extent that a claim otherwise qualifies as an FB Resolved Asbestos Personal Injury Claim, but such funds are not available in NSP Administrative Deposit Accounts to pay such Claims in full, the attorney of record shall allocate such funds amongst qualifying clients Pro Rata, with any deficiency constituting an FB Asbestos Personal Injury Claim.

1.133  **"FB Restricted Cash"** means the amount of administrative deposits made by Fibreboard into the NSP Administrative Deposit Accounts (together with earnings thereon) in respect of FB Asbestos Personal Injury Claims to facilitate claims processing under the NSP as of five (5) Business Days prior to the Effective Date.

1.134  **"FB Reversions"** means such amounts as may from time to time be released from the NSP Administrative Deposit Accounts in respect of FB Asbestos Personal Injury Claims and returned to the Fibreboard Insurance Settlement Trust or transferred to the FB Sub-Account of the Asbestos Personal Injury Trust, whichever is applicable. FB Reversions shall include any recoveries, including any recoveries on account of Avoidance Actions, which recover funds paid from the Fibreboard Insurance Settlement Trust.

1.135  **"FB Sub-Account"** means the sub-account of the Asbestos Personal Injury Trust established for the purposes of assuming any and all liabilities and responsibility for FB Asbestos Personal Injury Claims and making payments in respect of such

Claims in accordance with the Plan and the Asbestos Personal Injury Trust Distribution Procedures.

1.136 **"FB Sub-Account Settlement Payment"** means the Standard Combination of Cash and New OCD Common Stock, with an aggregate value of $140 million as of the Effective Date, to be paid into the FB Sub-Account of the Asbestos Personal Injury Trust for the benefit of the holders of FB Asbestos Personal Injury Claims upon the Effective Date.

1.137 **"Fibreboard"** means Fibreboard Corporation, a Delaware corporation.

1.138 **"Fibreboard Insurance Settlement Trust"** means the Fibreboard Settlement Trust established by the Irrevocable Settlement Trust Agreement, dated as of December 30, 1996, among Fibreboard, as trustor, Michael R. Douglas, as interim trustee, and certain insurance companies, pursuant to the Settlement Agreement dated October 12, 1993.

1.139 **"Filing"** means the filing with the Bankruptcy Court of voluntary petitions for relief under Chapter 11 made by OCD and the Subsidiary Debtors.

1.140 **"Final Distribution Date"** means a date selected by the Reorganized Debtors that is no later than thirty (30) days after the date that all Disputed Claims shall have been Allowed or Disallowed pursuant to a Final Order of the Bankruptcy Court or such other court with competent jurisdiction over Disputed Claims.

1.141 **"Final Order"** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket of such court, the operation or effect of which has not been stayed, reversed, or amended and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending.

1.142 **"Future Claimants' Representative"** means James J. McMonagle, the legal representative for future claimants appointed by order of the Bankruptcy Court dated September 28, 2001, or his successors.

1.143 **"General Unsecured Claim"** means a Claim against any of the Debtors that is not a DIP Facility Claim, an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Tax Claim, an Other Secured Claim, a Convenience Claim, a Bank Holders Claim, a Bondholders Claim, an OC Asbestos Personal Injury Claim, an FB Asbestos Personal Injury Claim, an FB Asbestos Property Damage Claim, an Intercompany Claim, a Senior Indebtedness Claim, a Subordinated Claim or an Interest. General Unsecured Claims include, without limitation, all Environmental Claims and OC Asbestos Property Damage Claims.

1.144 **"General Unsecured/Senior Indebtedness Claim"** means a Claim against OCD that satisfies both of the following criteria: (a) such Claim is a Senior

25

Indebtedness Claim and (b) such Claim is not a DIP Facility Claim, an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Tax Claim, an Other Secured Claim, a Convenience Claim, a Bank Holders Claim, a Bondholders Claim, an OC Asbestos Personal Injury Claim, a FB Asbestos Personal Injury Claim, a FB Asbestos Property Damage Claim, an Intercompany Claim, a Subordinated Claim, or an OCD Interest.

1.145    **"Granite State"** means Granite State Insurance Company.

1.146    **"Hartford Entities"** means (i) the Hartford Financial Services Group, Inc., Excess Insurance Company, Ltd., Fencourt Reinsurance Company, Ltd., First State Insurance Company, Hartford Accident and Indemnity Company, Hartford Casualty Insurance Company, Hartford Fire Insurance Company, Hartford Insurance Company of Canada, Hartford Insurance Company of Illinois, Hartford Insurance Company of the Midwest, Hartford Insurance Company of the Southeast, Hartford Insurance, Ltd. (Bermuda), Hartford Lloyds Insurance Company, Hartford Underwriters Insurance Company (formerly New York Underwriters Insurance Company), New England Insurance Company, New England Reinsurance Corporation, Nutmeg Insurance Company, Pacific Insurance Company, Ltd., Property and Casualty Insurance Company of Hartford, Sentinel Insurance Company, Ltd., Trumbull Insurance Company, and Twin City Fire Insurance Company; as well as (ii) all of their respective predecessors, successors, assigns, subsidiaries, affiliates, holding companies (if any), parent companies (if any), merged companies and acquired companies, exclusive of any former asset, affiliate, or member company of Reliance Group Holdings, Inc.; and (iii) all of the respective employees, officials, agents, attorneys, representatives, officers, and directors, in their capacity as such, of the entities encompassed by clauses (i) and (ii).

1.147    **"Hartford Policies"** means the following policies issued to OCD:

| Issuer | Policy Period | Policy Number |
|--------|---------------|---------------|
| First State | 06/18/74 to 10/22/74 | 921434 |
| | 10/22/74 to 10/22/75 | 921434 |
| | 10/22/75 to 10/22/76 | 921434 |
| | 10/22/76 to 10/22/77 | 923542 |
| | 10/22/77 to 9/01/78 | 925625 |
| | 09/01/78 to 09/01/79 | 926735 |
| | 03/08/79 to 09/01/79 | 927953 |
| | 09/01/82 to 09/01/83 | 934962 |
| Twin City | 09/01/82 to 09/01/83 | TXX111365 |
| Excess | 09/01/79 to 09/01/80 | EL 10300 (EL 10-87) |
| First State | 09/01/82 to 09/01/83 | 933186 |
| | 09/01/83 to 09/01/84 | EU 935321 |

26

854

|          |                     |             |
|----------|---------------------|-------------|
|          | 09/01/83 to 09/01/84 | EU 935324   |
|          | 10/31/79 to 11/29/82 | GC802752    |
|          | 04/01/81 to 04/01/84 | GC802770    |
|          | 05/01/88 to 05/01/89 | GC009556    |
|          | 05/01/89 to 05/01/90 | GC010810    |
| Hartford | 12/01/74 to 12/01/75 | 57 IC 620122 |
| Pacific  | 05/01/93 to 05/01/94 | ZG 0001003  |
|          | 04/01/94 to 04/01/95 | ZG 0002864  |
|          | 05/01/95 to 05/01/96 | ZG 0004839  |
|          | 05/01/96 to 05/01/97 | ZG 0006912  |
|          | 05/01/97 to 05/01/98 | ZG 0008946  |
| Twin City | 09/01/83 to 09/01/84 | TXX 102719 |

Hartford Policies shall also be deemed to include all insurance policies other than the above-listed policies, that were issued, prior to January 1, 2001, by and in the name of one of the specifically named Hartford Entities, either to OCD or that insure OCD, and such unknown policies shall include all known and unknown primary, umbrella, excess, or other insurance policies, contracts, and/or agreements of any nature, type, of kind (including but not limited to: all comprehensive general liability policies; general liability policies; casualty policies, environmental liability policies; environmental impairment policies; difference in conditions policies; directors' and officers' liability policies; errors and omissions liability policies; contractual liability policies; automobile liability policies; products liability policies; and workers' compensation policies); *provided, however,* that notwithstanding any of the foregoing and for the avoidance of any doubt, "Hartford Policies" shall not, and shall not be deemed to, include: (i) policies issued by one of the specifically named Hartford Entities to Persons other than OCD or the Debtors (except to the extent of the interest of OCD in such policies); (ii) policies issued to Persons that become Affiliates of OCD or Reorganized OCD after June 18, 2001; (iii) policies issued or subscribed by Excess Insurance Company Ltd. that are subject to a May 15, 1999 settlement agreement between OCD and London Market Insurers; (iv) First State policy number EU 935321 to the extent that it provides coverage for products/completed operations claims other than asbestos claims; and (v) policies issued to or insuring Fibreboard.

1.148 **"Hartford Settlement Agreement"** means the settlement agreement between Owens Corning and the Hartford Financial Services Group, Inc., dated June 18, 2001, and approved by the Bankruptcy Court on July 16, 2001.

1.149 **"HOMExperts"** means HOMExperts LLC, a Delaware limited liability company.

1.150 **"Impaired"** means, when used with reference to a Claim or Interest, or a Class of Claims or Interests, a Claim or Interest, or a Class of Claims or Interests, that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

1.151 **"Indemnification Obligations"** means any obligations of any of the Debtors under their charters, by-laws, contracts assumed by them pursuant to Section 365 of the Bankruptcy Code or any statute and enforceable under applicable state law to indemnify, reimburse or provide contribution to any or all persons who may serve or who have served at any time as directors, officers, employees, agents, professionals or advisors of such Debtor, or who at the request of any of the Debtors served as directors, officers, employees, agents, professionals or advisors of another corporation (including Subsidiaries of the Debtors) or of any partnership, joint venture, trust or other enterprise, and any directors, officers, employees, agents, professionals or advisors of any of the Debtors who at the request of such Debtor may serve or have served as agents or fiduciaries of an employee benefit plan of such Debtor or any of its Subsidiaries, from and against any of the expenses, liabilities or other matters arising under or in or covered by applicable law, *provided* that the basis of any proceeding potentially giving rise to indemnification is alleged action in an official capacity as a director, officer, employee, agent, professional or advisor or in any other capacity while serving as a director, officer, employee, agent, professional or advisor, and provided that such obligations shall not cover willful misconduct. Notwithstanding anything to the contrary herein, Indemnification Obligations shall not include any obligations of the Debtors to pay or reimburse any party seeking indemnification under the charter or by-laws of the Debtor against whom indemnification is sought, or any assumed contract or any statute for (i) funds recovered or to be recovered from such party pursuant to an Avoidance Action, (ii) except to the extent necessary to retain the benefit of coverage under insurance policies covering directors' or officers' conduct, claims arising out of or in connection with the case of *John Hancock Life Insurance Co., et al. v. Goldman, Sachs & Co., et al.,* in the United States District Court for the District of Massachusetts, C.A. No. 01-10729-RWZ, or (iii) except to the extent necessary to retain the benefit of coverage under insurance policies covering directors' or officers' conduct, claims alleging pre-petition conduct in violation of federal or state securities laws brought in shareholder litigation.

1.152 **"Indenture Trustee Fees"** means the reasonable compensation, fees, expenses, disbursements and indemnity claims, including, without limitation, attorneys' and agents' fees, expenses and disbursements, incurred by any Pre-petition Indenture

28

Trustee, whether prior to or after the Petition Date and whether prior to or after the consummation of the Plan.

1.153 **"Initial Bank Holders' Distribution"** means the distribution to be made by the Debtors or Reorganized Debtors, as the case may be, pursuant to Sections 3.3(b)(ii)(A) or 3.3(b)(ii)(B) of the Plan.

1.154 **"Initial Distribution Date"** means a date selected by the Reorganized Debtors that is not later than forty-five (45) days after the Effective Date.

1.155 **"Insolvent Insurer PD Rights"** means all of the Debtors' rights and claims as of the Effective Date to coverage and causes of action and choses in action for accrued or future coverage claims, for demands, or for other entitlements to insurance proceeds from any insolvent insurance company, whether domestic or foreign, and whether in receivership, liquidation, rehabilitation, run-off, scheme of arrangement or any other form of proceeding, as well as the rights to any payments of initial dividends, or scheme payments from the Receiver, Liquidator or Scheme Administrator of any insolvent insurance company and the rights to any supplemental dividends or supplemental scheme payments that may be declared from time to time, on account of FB Asbestos Property Damage Claims.

1.156 **"Insolvent Insurer PI Rights"** means all of the Debtors' rights and claims as of the Effective Date to coverage and causes of action and choses in action for accrued or future coverage claims, for demands, or for other entitlements to insurance proceeds from any insolvent insurance company, whether domestic or foreign, and whether in receivership, liquidation, rehabilitation, run-off, scheme of arrangement or any other form of proceeding, as well as the rights to any payments of initial dividends, or scheme payments from the Receiver, Liquidator or Scheme Administrator of any insolvent insurance company and the rights to any supplemental dividends or supplemental scheme payments that may be declared from time to time, on account of Asbestos Personal Injury Claims.

1.157 **"Insurance Guarantee Fund PD Rights"** means all of the Debtors' rights, and claims to coverage and causes of action and choses in action for accrued or future coverage claims, for demands, or for other entitlements to payment (whether asserted on their own behalf or on behalf of others) from any state insurance guaranty association, arising under, or in connection with, any state insurance guaranty association statutes (including, without limitation, those statutes under which claims have been made previously by Debtors) on account of FB Asbestos Property Damage Claims.

1.158 **"Insurance Guarantee Fund PI Rights"** means all of the Debtors' rights, and claims to coverage and causes of action and choses in action for accrued or future coverage claims, for demands, or for other entitlements to payment (whether asserted on their own behalf or on behalf of others) from any state insurance guaranty association, arising under, or in connection with, any state insurance guaranty association statutes (including, without limitation, those statutes under

29

857

which claims have been made previously by Debtors) on account of Asbestos Personal Injury Claims.

1.159 **"Integrex"** means Integrex, a Delaware corporation.

1.160 **"Integrex Asbestos Personal Injury Claims"** means those OC Asbestos Personal Injury Claims, if any, asserted directly against Integrex in connection with the Contribution Agreement or on account of any related successor liability, veil-piercing or related claims, as such may be determined by the Court in connection with the Confirmation Hearing.

1.161 **"Integrex Minority Interests"** means all shares of Preferred Stock and Common Stock of Integrex, together with any options, warrants, conversion rights, rights of first refusal or other rights, contractual, equitable or otherwise, relating to such stock, held by Blue Ridge Investments, L.L.C. or its successors and assigns.

1.162 **"Intercompany Claim"** means any pre-petition Claim by a Debtor against another Debtor or a non-Debtor Subsidiary against a Debtor.

1.163 **"Interested Party"** means all parties listed on <u>Schedule IX,</u> to be filed at least ten (10) Business Days prior to the Objection Deadline.

1.164 **"Interests"** means, collectively, any equity interests in the Debtors represented by existing common or preferred stock shares of capital stock, whether or not issued, including, without limitation, (i) the OCD Interests, (ii) the Subsidiary Interests, and (iii) the legal, equitable, contractual or other rights of any Person to acquire or receive any of the foregoing.

1.165 **"IPM"** means IPM, Inc., a Delaware corporation.

1.166 **"IRC"** means the Internal Revenue Code of 1986, as amended.

1.167 **"IRS"** means the United States Internal Revenue Service.

1.168 **"Jefferson Holdings"** means Jefferson Holdings, Inc., a Delaware corporation.

1.169 **"Litigation Trust"** means the trust that is created pursuant to the Plan and the Litigation Trust Agreement to be administered by the Litigation Trustee, all as more specifically set forth in <u>Section 5.9</u> of the Plan and the Litigation Trust Agreement.

1.170 **"Litigation Trust Agreement"** means the trust agreement that is to govern the Litigation Trust, in substantially the form of <u>Exhibit C,</u> as it may be amended up to ten (10) Business Days prior to the Objection Deadline.

1.171 **"Litigation Trust Assets"** means those rights, claims or other assets to be transferred to and owned by the Litigation Trust pursuant to <u>Section 5.9</u> of the Plan for the benefit of each of Classes A5, A6-A, A6-B and A7, which are

858

comprised of (i) the Litigation Trust Initial Deposit, (ii) all of the Debtors' rights and standing to object to, litigate, settle and otherwise resolve the Tobacco Causes of Action, the Avoidance Actions and the Material Rights of Action listed on Schedule XIV, and (iii) any and all proceeds of the foregoing and interest actually earned.  Litigation Trust Assets shall not include the FB Reversions or OCD Reversions.

1.172  **"Litigation Trust Expenses"** means all costs and expenses associated with the administration of the Litigation Trust, including those rights, obligations and duties described in Section 5.9 of the Plan and in accordance with the Litigation Trust Agreement.

1.173  **"Litigation Trust Initial Deposit"** means the distribution, in the amount of $1 million, or such other amount upon which the Plan Proponents may agree no later than ten (10) Business Days prior to the Objection Deadline, to be made by the Debtors to the Litigation Trust as set forth in Section 5.9 of the Plan.

1.174  **"Litigation Trust Recoveries"** means (i) any and all proceeds received by the Litigation Trust from the Tobacco Causes of Action, the Avoidance Actions and the Material Rights of Action listed on Schedule XIV, and (ii) interest actually earned with respect to the foregoing and the Litigation Trust Initial Deposit.

1.175  **"Litigation Trust Reimbursement Obligation"** means the obligation of the Litigation Trust to pay to Reorganized OCD any and all Litigation Trust Recoveries until such time as the Litigation Trust Initial Deposit plus interest at the rate of 5% per annum, or such other rate upon which the Plan Proponents may agree no later than ten (10) Business Days prior to the Objection Deadline, has been repaid in full.

1.176  **"Litigation Trustee"** means the trustee of the Litigation Trust appointed pursuant to Section 5.9 of the Plan.

1.177  **"Management Arrangements"** means, collectively, the management compensation and benefit plans or programs as summarized in Exhibit F, to be filed at least five (5) Business Days prior to the Disclosure Statement Hearing, as it may be amended up to ten (10) Business Days prior to the Objection Deadline, and the documents governing such plans, to be filed up to ten (10) Business Days prior to the Objection Deadline.

1.178  **"Material Rights of Action"** means all rights, remedies, claims, causes of action, suits or proceedings accruing to the Debtors or any assets or other property of the Debtors pursuant to the Bankruptcy Code or pursuant to any statute or legal theory which, if determined in favor of the Debtors or the Estates, would reasonably be expected to result in a recovery in excess of $200,000, but excluding Commercial Claims and Avoidance Actions.

1.179  **"Merged Plan"** means the Owens Corning Merged Retirement Plan.

31

1.180  **"MIPS Claims and Interests"** means all Claims directly or indirectly against OCD (or Interests to the extent any such Claims may be characterized as Interests) by the holders of the 6 ½ % Convertible Monthly Income Preferred Securities issued by Owens-Corning Capital L.L.C. or any Person (including any trustee) asserting such Claims derivatively or otherwise on behalf of such holders, including (i) the Claims of Owens-Corning Capital L.L.C. for approximately $253 million original aggregate principal amount arising from OCD's 6.5% Convertible Subordinated Debentures due 2002, issued pursuant to an indenture dated as of May 10, 1995, between OCD, Owens-Corning Capital L.L.C. and Harris Trust and Savings Bank, as trustee, (ii) Claims arising under the guarantee agreement, dated as of May 10, 1995, in respect of such Convertible Subordinated Debentures executed by OCD as guarantor, (iii) the Claim of The Bank of New York, as Special Trustee on behalf of the holders of the 6 ½ % Convertible Monthly Income Preferred Securities, and (iv) any Interests of the foregoing to the extent any rights of such holders may be characterized as Interests.

1.181  **"Mt. McKinley Entities"** means Mt. McKinley Insurance Company, f/k/a known as Gibraltar Casualty Company; Everest Reinsurance Company, f/k/a as Prudential Reinsurance Company and Everest Reinsurance Holdings, Inc.; as well as (a) all of their past, present, and future parents, subsidiaries, affiliates, controlled entities, predecessors, successors, reorganized companies, holding companies (if any), merged companies, acquired companies, and assigns; and (b) all of the respective employees, officials, representatives, agents, attorneys, officers, and directors, in their capacity as such, of the entities encompassed by clause (a).

1.182  **"Mt. McKinley Policies"** means the following policies issued to OCD:

| Issuer | Policy Period | Policy Number |
|--------|--------------|---------------|
| Mt. McKinley | 9/1/79 to 9/1/80 | GMX 00232 |
| Mt. McKinley | 9/1/79 to 9/1/80 | GMX 00236 |
| Mt. McKinley | 9/1/80 to 9/1/81 | GMX 00719 |
| Mt. McKinley | 9/1/80 to 9/1/81 | GMX 00720 |
| Mt. McKinley | 9/1/81 to 9/1/82 | GMX 01308 |
| Mt. McKinley | 9/1/81 to 9/1/82 | GMX 01309 |
| Mt. McKinley | 9/1/82 to 9/1/83 | GMX 01828 |
| Mt. McKinley | 9/1/82 to 9/1/83 | GMX 01829 |
| Mt. McKinley | 9/1/83 to 9/1/84 | GMX 02346 |
| Mt. McKinley | 9/1/83 to 9/1/84 | GMX 02347 |
| Mt. McKinley | 9/1/84 to 9/1/85 | GMX 02697 |

"Mt. McKinley Policies" shall also be deemed to include all insurance policies other than the above-listed policies, that were issued by Mt. McKinley Insurance

32

860

Company or Everest Reinsurance Company prior to January 1, 2002; *provided, however,* that notwithstanding any of the foregoing and for the avoidance of doubt, "Mt. McKinley Policies" shall not include: (a) policies issued to any Person that is merged into or acquired by OCD after November 1, 2004 or (b) policies issued by any insurance company that is merged into or acquired by Mt. McKinley Insurance Company or Everest Reinsurance Company after November 1, 2004.

1.183  **"Mt. McKinley Settlement Agreement"** means the settlement agreement between OCD and Mt. McKinley Insurance Company, f/k/a Gibraltar Casualty Company, Everest Reinsurance Company, and Everest Reinsurace Company, f/k/a Prudential Reinsurance Company, approved by the Bankruptcy Court on December 21, 2004.

1.184  **"New OCD Common Stock"** means the common stock, par value $0.10 per share, of Reorganized OCD, the principal terms and conditions of which (including applicable registration rights) are set forth on Exhibit H, which shall be filed no later than five (5) Business Days prior to the Disclosure Statement Hearing, as it may be amended up to ten (10) Business days prior to the Objection Deadline.

1.185  **"New OCD Securities"** means the New OCD Common Stock and the Senior Notes (if applicable) to be issued by Reorganized OCD and distributed pursuant to the Plan.

1.186  **"Non-Debtor Subsidiaries"** means all direct and indirect Subsidiaries of OCD that are not Subsidiary Debtors.

1.187  **"Non-Participating Insurers"** means Affiliated FM Insurance Company, Allianz Insurance Company, Allianz Underwriters Insurance Company and AXA-Belgium S.A., National Union Fire Insurance Company of Pittsburgh, Pa., Lexington Insurance Co., Landmark Insurance Co., Granite State Insurance Co., and Birmingham Fire Insurance Co. of Pennsylvania and Royal Indemnity Company, which parties did not participate in the proceedings to estimate OC Asbestos Personal Injury Claims conducted with respect to confirmation of the Plan pursuant to the Order Regarding Certain Insurers' Motion and Memorandum For An Order Clarifying that Asbestos Claims Estimation for Plan Confirmation Purposes Will Not Affect Them, entered by the Bankruptcy Court on August 16, 2004.

1.188  **"NSP"** means the National Settlement Program pursuant to which OCD and Fibreboard entered into agreements with certain law firms prior to the Petition Date for the purpose of attempting to settle OC Asbestos Personal Injury Claims and FB Asbestos Personal Injury Claims, respectively.

1.189  **"NSP Administrative Deposit Accounts"** means settlement accounts maintained by the Depository Law Firms in respect of OC Asbestos Personal Injury Claims

33

and/or FB Asbestos Personal Injury Claims to facilitate claims processing under the NSP, including interest earned on funds held in such accounts.

1.190 **"NSP Agreements"** means the settlement agreements entered into between OCD and/or Fibreboard and each law firm participating in the NSP.

1.191 **"Objection Deadline"** means the date set forth in the Order of the Bankruptcy Court or the District Court by which a creditor or interest holder or other party in interest must file an objection to confirmation of the Plan.

1.192 **"OC"** means, collectively, OCD and its Subsidiaries.

1.193 **"OC Asbestos Personal Injury Claim"** means any present or future right to payment, claim, remedy, liability or Demand against any OC Person for death, bodily injury, or other personal damages (whether physical, emotional or otherwise), whether or not such right, claim, remedy, liability or Demand is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal basis for such right, claim, remedy, liability or Demand are known or unknown, under any theory of law, equity, admiralty, or otherwise, to the extent caused or allegedly caused, directly or indirectly, by the presence of, or exposure to, asbestos or asbestos-containing products for which any OC Person may be legally liable, including, without limitation, the presence of, or exposure to, asbestos or asbestos-containing products that were manufactured, installed, fabricated, sold, supplied, produced, distributed, released, or in any way at any time marketed or disposed of by any OC Person, including, without express or implied limitation, any right, claim, remedy, liability or Demand for compensatory damages (such as loss of consortium, wrongful death, survivorship, proximate, consequential, general and special damages) and including punitive damages. OC Asbestos Personal Injury Claims (i) include Integrex Asbestos Personal Injury Claims, OC Indirect Asbestos PI Trust Claims and Unpaid OC Resolved Asbestos Personal Injury Claims, but (ii) exclude OC Resolved Asbestos Personal Injury Claims, OC Asbestos Property Damage Claims, OC Indirect Asbestos Property Damage Claims, workers' compensation claims, FB Asbestos Personal Injury Claims, FB Indirect Asbestos PI Trust Claims, FB Asbestos Property Damage Claims, and FB Indirect Asbestos Property Damage Claims. Any OC Asbestos Personal Injury Claim which is filed as a priority claim will be deemed and treated as an OC Asbestos Personal Injury Claim and not as an Administrative Claim or Other Priority Claim.

1.194 **"OC Asbestos Personal Injury Liability Insurance Assets"** means rights to coverage for asbestos-related personal injury claims (including past, present, and future claims) as OCD may have under excess liability insurance policies issued to OCD and identified in <u>Schedule XVI</u>, as it may be amended up to ten (10) Business Days prior to the Objection Deadline, and rights under settlement agreements made with respect to such insurance policies (including the Wellington Agreement), including, without limitation, (i) rights under such

34

policies and agreements, whether against the insurers that issued such policies and their successors and assigns, or, with respect to any insolvent insurers, Insolvent Insurer PI Rights and Insurance Guarantee Fund PI Rights; and (ii) the right, on behalf of the Debtors, to give a full release of the insurance rights of the Debtors for asbestos-related personal injury claims under any such policies and settlement agreements, provided that a reciprocal release of the Debtors in connection with said policies and settlement agreements is given in exchange by the insurer or other released insurance entity and further provided that any such release shall not encompass rights with respect to coverage for workers' compensation claims or claims other than asbestos-related personal injury claims.

1.195   **"OC Asbestos Property Damage Claim"** means any present or future right to payment, claim, remedy or liability against, or debt or obligation of, any OC Person, whether or not such right, claim, remedy, or liability is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts or legal basis for such right, claim, remedy, liability, debt or obligation are known or unknown, under any theory of law, equity, admiralty, or otherwise for, relating to, or arising by reason of, directly or indirectly, damage to property, including, without limitation, diminution in the value thereof, or environmental damage or economic loss related thereto, caused or allegedly caused, directly or indirectly, in whole or in part by the presence in buildings or other systems or structures of asbestos or asbestos-containing products that were manufactured, installed, fabricated, sold, supplied, produced, distributed, released or in any way at any time marketed or disposed of by any OC Person, or for which any OC Person is liable due to the acts or omissions of any OC Person, including, without express or implied limitation, any right, claim, remedy, liability against, or debt or obligation for compensatory damages (such as proximate, consequential, general and special damages) and including punitive damages. OC Asbestos Property Damage Claims include OC Indirect Asbestos Property Damage Claims, but do not include FB Asbestos Property Damage Claims.

1.196   **"OCD"** means Owens Corning, a Delaware corporation.

1.197   **"OCD/FB Settlement"** means a global settlement of various issues and potential claims among Fibreboard, on the one hand, and OCD, on the other hand, pursuant to which, among other things, upon the Effective Date, (i) the FB Sub-Account Settlement Payment shall be made by OCD to the FB Sub-Account, (ii) the assets distributable to the FB Sub-Account and the FB Asbestos Property Damage Trust shall be limited to those described in Section 3.4(d) and Section 3.4(e), respectively, below, and (iii) holders of Allowed Class B6 and B10 Claims shall be paid in full (excluding post-petition interest).

1.198   **"OCD Asbestos Personal Injury Estimation Order"** means that certain order entered by the District Court on March 31, 2005 (as supplemented on April 13, 2005) which estimated the total amount of contingent and unliquidated claims

35

against OCD for personal injury caused by exposure to asbestos (including pending claims, future claims, and contract claims) to be $7,000,000,000.

1.199  **"OCD Insurance Escrow"** means the escrowed insurance proceeds received from certain of OCD's solvent excess insurance carriers in connection with the settlement of disputes concerning coverage for asbestos-related personal injury claims, which are reflected in OC's consolidated balance sheet as restricted assets, together with all accrued earnings thereon, an estimate of which as of the Effective Date shall be set forth on Schedule XII, to be filed no later than five (5) Business Days prior to the Disclosure Statement Hearing, as it may be amended up to ten (10) Business Days prior to the Objection Deadline.

1.200  **"OCD Interests"** means, collectively, all Existing OCD Common Stock, Existing OCD Preferred Stock and Existing OCD Options, together with any options, warrants, conversion rights, rights of first refusal or other rights, contractual, equitable or otherwise, to acquire or receive any Existing OCD Common Stock, Existing OCD Preferred Stock, Existing OCD Options or other capital stock in OCD, or any contract subscription, commitment or agreement pursuant to which any Person was or could have been entitled to receive any share of the capital stock of OCD, or any such option, warrant, conversion right, right of first refusal or other right (including, without limitation, any rights of any 401(k) plan or the interest of any participant therein), in each case issued or entered into by, or otherwise the obligation of, OCD or another Debtor. The OCD Interests shall, and shall be deemed to, include the rights of the holders of MIPS Claims and Interests, to the extent such rights may be classified as interests.

1.201  **"OCD Restricted Cash"** means the amount of administrative deposits made by OCD to the NSP Administrative Deposit Accounts (together with earnings therein) in respect of OC Asbestos Personal Injury Claims to facilitate claims processing under the NSP as of five (5) Business Days prior to the Effective Date.

1.202  **"OCD Reversions"** means such amounts as may from time to time be delivered from the NSP Administrative Deposit Accounts in respect of OC Asbestos Personal Injury Claims and returned to OCD in accordance with an order of a court of competent jurisdiction, settlement among the parties, or otherwise.

1.203  **"OCFBV Class A11 Claim"** means the Allowed, Subordinated Claim of O.C. Funding B.V. against OCD approved by the Bankruptcy Court on June 23, 2004 in the amount of approximately $23,336,305.

1.204  **"OCFT"** means Owens-Corning Fiberglas Technology Inc., an Illinois corporation.

1.205  **"OCHT"** means Owens Corning HT, a Delaware corporation.

1.206  **"OC Indirect Asbestos PI Trust Claim"** means any present or future right to payment, claim, remedy, liability, or Demand against any OC Person, whether or not such right, claim, remedy, liability or Demand is reduced to judgment,

36

liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal basis for such right, claim, remedy, liability, or Demand are known or unknown, under any theory of law, equity, admiralty, or otherwise, that is (i) asserted by (A) any Person (other than (I) an OC Person or (II) Related Persons of the Debtors or Reorganized Debtors entitled to indemnification pursuant to <u>Section 7.5</u> of the Plan) who has been, is or may be a defendant in an action seeking damages for death, bodily injury or other personal damages (whether physical, emotional or otherwise), to the extent caused or allegedly caused, directly or indirectly, by the presence of, or exposure to asbestos or asbestos-containing products for which any OC Person may be legally liable, including, without limitation, the presence of, or exposure to, asbestos or asbestos-containing products that were manufactured, installed, fabricated, sold, supplied, produced, distributed, released, or in any way at any time marketed or disposed of by any OC Person, or (B) any assignee or transferee of such Person, and (ii) on account of alleged liability of any OC Person for reimbursement, contribution, subrogation or indemnification of any portion of any damages such Person has paid or may pay to the plaintiff in such action.

1.207  **"OC Indirect Asbestos Property Damage Claim"** means any present or future right to payment, claim, remedy or liability against, or debt or obligation of, any OC Person, whether or not such right, claim, remedy, or liability is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal basis for such right, claim, remedy, liability, debt or obligation are known or unknown, under any theory of law, equity, admiralty, or otherwise that is (i) asserted by (a) any Person (other than (I) a OC Person or (II) a Related Person of the Debtors or Reorganized Debtors entitled to indemnification pursuant to <u>Section 7.5</u> of the Plan) who has been, is, or may be a defendant in an action seeking damages for, relating to, or arising by reason of, directly or indirectly, damage to property, including without limitation, diminution in the value thereof, or environmental damage or economic loss related thereto, caused or allegedly caused, directly or indirectly, in whole or in part by the presence in buildings or other systems or structures of asbestos or asbestos-containing products that were manufactured, installed, fabricated, sold, supplied, produced, distributed, released or in any way at any time marketed or disposed of by any OC Person, or for which any OC Person is otherwise liable due to the acts or omissions of any OC Person or (b) any assignee or transferee of such Person, and (ii) on account of alleged liability of any OC Person for reimbursement, contribution, subrogation or indemnification of any portion of any damages such Person has paid or may pay to the plaintiff in such action.

1.208  **"OC Overseas"** means Owens-Corning Overseas Holdings Inc., a Delaware corporation.

1.209  **"OC Person"** means each of (i) OCD and its direct or indirect Subsidiaries which are not FB Persons, (ii) the respective predecessors in interest of OCD and its

37

direct or indirect Subsidiaries which are not FB Persons, but solely to the extent listed on <u>Schedule VIII</u>, to be filed no later than ten (10) Business Days prior to the Objection Deadline, (iii) the respective successors in interest of OCD and its direct or indirect Subsidiaries which are not FB Persons, but solely to the extent they either (a) are listed on <u>Schedule VIII</u>, or (b) are post-Effective Date successors in interest, (iv) OCD's and its direct or indirect Subsidiaries' respective Affiliates which are not FB Persons, but solely to the extent listed on <u>Schedule VIII</u>, and (v) the respective present and former employees, directors or officers of the Persons identified in clauses (i), (ii), (iii) and (iv), acting in such capacity.

1.210   **"OC Remodeling"** means Owens Corning Remodeling Systems, LLC, a Delaware limited liability company.

1.211   **"OC Resolved Asbestos Personal Injury Claim"** means an OC Asbestos Personal Injury Claim with respect to which and to the extent that (i) the holder of such Claim (a) is represented by an attorney of record who has entered into an enforceable NSP Agreement with OC, (b) was identified to OCD by such attorney prior to the Petition Date, and (c) has satisfied all of the preconditions to payment under the applicable NSP Agreement prior to the Petition Date, as determined by the Bankruptcy Court; (ii) such Claims are eligible to be paid from NSP Administrative Deposit Accounts in respect of OC Asbestos Personal Injury Claims; and (iii) such monies are available to pay such claims and have not been avoided or otherwise recovered for the benefit of the Debtors' estates.  To the extent that a claim otherwise qualifies as an OC Resolved Asbestos Personal Injury Claim, but such funds are not available in NSP Administrative Deposit Accounts to pay such Claims in full, the attorney of record shall allocate such funds amongst qualifying clients Pro Rata, with any deficiency constituting an OC Asbestos Personal Injury Claim.

1.212   **"OC Sub-Account"** means the sub-account of the Asbestos Personal Injury Trust established for purposes of assuming any and all liabilities and responsibility for OC Asbestos Personal Injury Claims and making payments in respect of such Claims in accordance with the Plan and the Asbestos Personal Injury Trust Distribution Procedures.

1.213   **"OC Sweden"** means Owens-Corning Fiberglas Sweden Inc. and/or Owens-Corning (Sweden) AB, a corporation incorporated in Delaware and/or Sweden.

1.214   **"Other Priority Claims"** means all Claims entitled to priority pursuant to Section 507(a) of the Bankruptcy Code other than DIP Facility Claims, Administrative Claims or Priority Tax Claims.

1.215   **"Other Secured Claims"** means all Claims secured by a valid Encumbrance in or on any of the Debtors' property, which is not void or voidable under the Bankruptcy Code or any other applicable law, to the extent of the value of the Claim holder's interest in the Debtors' property, as determined pursuant to

Section 506 of the Bankruptcy Code. Other Secured Claims do not include Other Secured Tax Claims.

1.216 **"Other Secured Tax Claims"** means all Claims secured by a valid Encumbrance in or on any of the Debtors' property, (i) which is not void or voidable under the Bankruptcy Code or any other applicable law, to the extent of the value of the Claim holder's interest in the Debtors' property, as determined pursuant to Section 506 of the Bankruptcy Code, and (ii) which absent such Claim's secured status, would be entitled to priority in right of payment under Section 507(a)(8) of the Bankruptcy Code.

1.217 **"Person"** means an individual, corporation, partnership, association, joint stock company, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity, or any government, governmental agency or any subdivision, department or other instrumentality thereof.

1.218 **"Petition Date"** means October 5, 2000, the date of the Filing (or, in the event that IPM, OC Sweden or Vytec, as the context may require, files a case under Chapter 11, the date on which such entity files its respective Chapter 11 case).

1.219 **"Plan"** means this Chapter 11 reorganization plan and all exhibits and schedules annexed hereto or referenced herein, as the same may be amended, modified or supplemented from time to time.

1.220 **"Plan Proponents"** means the Debtors, the Asbestos Claimants' Committee, and the Future Claimants' Representative, as proponents of the Plan.

1.221 **"Pre-petition Bond Indentures"** means all indentures relating to Pre-petition Bonds including but not limited to (i) the Indenture, dated as of May 5, 1997, between OCD and The Bank of New York, as trustee, pursuant to which OCD issued the $250 Million Notes, $400 Million Debenture and the $550 Million Term Notes; (ii) the Indenture, dated as of May 21, 1992, between OCD and The Bank of New York, as trustee, pursuant to which OCD issued the $300 Million High Coupon Debentures; and (iii) the Underwriting Agreement, dated as of November 15, 1985, between OCD, Dresdner Bank AG and the other banks listed therein, and the Agreement for the Listing, the Trusteeship and the Paying Agency, dated as of November 15, 1985, between OCD and Dresdner Bank AG, pursuant to which OCD issued the 130 Million DEM Bearer Bonds.

1.222 **"Pre-petition Bonds"** means, collectively, (i) all industrial revenue bonds issued prior to the Petition Date for which one or more of the Debtors is obligated; (ii) the $550 Million Term Notes, of which $300 million in aggregate principal amount was outstanding in the First Series as of the Petition Date and $250 million in aggregate principal amount was outstanding in the Second Series as of the Petition Date; (iii) the $400 Million Debentures, of which $400 million in aggregate principal amount was outstanding as of the Petition Date; (iv) the $250

39

Million Notes, of which $250 million in aggregate principal amount was outstanding as of the Petition Date; (v) the $300 Million High Coupon Debentures, consisting of the 8.875% Debentures, of which $40 million in aggregate principal amount was outstanding as of the Petition Date, and the 9.375% Debentures, of which $7 million in aggregate principal amount was outstanding as of the Petition Date; (vi) the 130 Million DEM Bearer Bonds, of which approximately $60 million in aggregate principal amount was outstanding as of the Petition Date; and (vii) OCD's guarantee of the $150 Million Debentures, of which $42 million in aggregate principal amount was outstanding as of the Petition Date.

1.223 **"Pre-petition Indenture Trustees"** means collectively, the Persons serving from time to time as trustees or paying agents under the Pre-petition Bond Indentures, pursuant to the terms of the applicable Pre-Petition Bond Indentures.

1.224 **"Priority Tax Claim"** means an unsecured Claim asserted by a federal or state governmental authority for taxes specified in Section 507(a)(8) of the Bankruptcy Code.

1.225 **"Pro Rata"** when used with respect to the treatment of a Claim, means the proportion that the Face Amount of a Claim in a particular Class bears to the aggregate Face Amount of all Claims (including Disputed Claims) in such Class.

1.226 **"Professional Services"** means Integrex Professional Services LLC, a Delaware limited liability company.

1.227 **"Proof of Claim"** means the proof of claim that must be filed by a holder of a Claim by the date(s), if any, designated by the Bankruptcy Court as the last date(s) for filing proofs of claims or interests against the Debtors.

1.228 **"Protected Party"** means any of the following: (i) any Debtor and its Related Persons, but solely to the extent set forth on Schedule X, to be filed no later than five (5) Business Days prior to the Disclosure Statement Hearing, as it may be amended up to ten (10) Business Days prior to the Objection Deadline; (ii) any Reorganized Debtor and its Related Persons, but solely to the extent set forth on Schedule X; (iii) any Person that, pursuant to the Plan or after the Effective Date becomes a direct or indirect transferee of, or successor to, any assets of any of the Debtors, the Reorganized Debtors, or the Asbestos Personal Injury Trust (but only to the extent that liability is asserted to exist by reason of such Person's becoming or being such a transferee or successor); (iv) any Person that, pursuant to the Plan or after the Effective Date, makes a loan to any of the Reorganized Debtors or the Asbestos Personal Injury Trust or to a successor to, or transferee of, any assets of any of the Debtors, the Reorganized Debtors, or the Asbestos Personal Injury Trust, including, without limitation, any Person that makes a loan pursuant to the Exit Facility (but only to the extent that liability is asserted to exist by reason of such Person's becoming or being such a lender or to the extent any pledge of assets made in connection with such a loan is sought to be upset or impaired);

40

(v) any Person to the extent such Person is alleged to be directly or indirectly liable for the conduct of, Claims against, or Demands on any of the Debtors, the Reorganized Debtors, or the Asbestos Personal Injury Trust on account of Asbestos Personal Injury Claims by reason of one or more of the following: (a) such Person's ownership of a financial interest in any of the Debtors or Reorganized Debtors, a past or present Affiliate of any of the Debtors or the Reorganized Debtors, or predecessor in interest of any of the Debtors or the Reorganized Debtors, but solely to the extent set forth on <u>Schedule X</u>, (b) such Person's involvement in the management of any predecessor in interest of any of the Debtors or the Reorganized Debtors, but solely to the extent set forth on <u>Schedule X</u>, or (c) such Person's service as an officer, director, or employee, or involvement in the management, of any of the Debtors, the Reorganized Debtors or any Interested Party; (vi) any past, present or future purchaser or other transferee of the assets or business, in whole or in part, or all of the outstanding capital stock, of any one or more of the Debtors, Reorganized Debtors, or past or present Affiliates of the Debtors or Reorganized Debtors, however effectuated, by operation of law or otherwise, and any Related Person of such purchaser or transferee, including, without limitation, such Persons set forth in <u>Schedule VI</u>, to be filed no later than ten (10) Business days prior to the Objection Deadline, but only to the extent that liability is asserted to exist by reason of such Person becoming or being such a purchaser, transferee or successor; (vii) the Hartford Entities, to the extent set forth in the Hartford Settlement Agreement, with respect to the liability for any Asbestos Personal Injury Claims that arise out of or in connection with the Hartford Policies; (viii) the Mt. McKinley Entities, to the extent set forth in the Mt. McKinley Settlement Agreement, with respect to the liability for any Asbestos Personal Injury Claims that arise out of or in connection with the Mt. McKinley Policies; (ix) the AXA Entities, to the extent set forth in the AXA Settlement Agreement, with respect to the liability for any Asbestos Personal Injury Claims that arise out of or in connection with the AXA Policies; (x) the Affiliated FM Entities, to the extent set forth in the Affiliated FM Settlement Agreement, with respect to the liability for any Asbestos Personal Injury Claims that arise out of or in connection with the Affiliated FM Policy; (xi) the AIG Company Entities, to the extent set forth in the AIG Companies Settlement Agreement, with respect to the liability for any Asbestos Personal Injury Claims that arise out of or in connection with the AIG Policies; (xii) if the Allianz Settlement Agreement is approved, the Allianz Entites, to the extent set forth in the Allianz Settlement Agreement, with respect to the liability for any Asbestos Personal Injury Claims that arise out of or in connection with the Allianz Policies; and (xiii) such other insurance companies, liquidators of insolvent insurance companies, and state guaranty associations, including, without limitation, those insurance companies, liquidators, and guaranty associations to the extent set forth in <u>Schedule VII</u>, to be filed no later than ten (10) Business Days prior to the Objection Deadline, and with respect to liability for any Asbestos Personal Injury Claims, but only if and to the extent that any such insurance company, liquidator, or guaranty association has entered into a settlement agreement with one or more of the Debtors with respect to liability for

41

Asbestos Personal Injury Claims prior to the Effective Date, or such later date to which the Plan Proponents may agree, and such agreement expressly provides for the payment by any such Person of insurance or other proceeds to the Asbestos Personal Injury Trust, whether directly or indirectly, and either the comprehensive release of such Person's further liability for Asbestos Personal Injury Claims or such Person's entitlement to the protection of the Asbestos Permanent Channeling Injunction in the Chapter 11 Cases as a Protected Party.

1.229 **"Quarterly Distribution Date"** means the calendar quarters ending in March, June, September and December, on which dates the Reorganized Debtors shall make payments and distributions from the reserve established for Disputed Claims to each holder of a Disputed Claim that has become an Allowed Claim during the preceding calendar quarter.

1.230 **"Record Date"** means the first Business Day following the Confirmation Date.

1.231 **"Reference Order"** means the Order (i) Referring Certain Cases to the Bankruptcy Court and (ii) allocating responsibilities between the District Court and the Bankruptcy Court, entered by the District Court on December 10, 2001, as amended and modified by the Case Management Order entered December 24, 2002, and as it may be subsequently be modified or amended.

1.232 **"Reinstatement"** means (i) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the holder of such Claim so as to leave such Claim unimpaired in accordance with Section 1124 of the Bankruptcy Code or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (a) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code; (b) reinstating the maturity of such Claim as such maturity existed before the default; (c) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the holder of such Claim; *provided, however,* that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, without limitation, financial coverage ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence, prohibiting certain transactions or actions contemplated by the Plan, or conditioning such transactions or actions on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement.

1.233 **"Related Persons"** means, with respect to any Person, such Person's predecessors, successors and assigns (whether by operation of law or otherwise) and their respective present and former Affiliates and each of their respective present and former members, partners, equity-holders, officers, directors,

42

employees, representatives, advisors, attorneys, agents and professionals, acting in such capacity, and any Person claiming by or through any of them.

1.234 **"Released Actions"** means all Claims, Avoidance Actions, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities (including, without limitation, all claims or causes of action relating to successor liability or piercing the corporate veil) and all Interests and rights of an equity security holder, whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date in connection with or related to the Debtors and Reorganized Debtors and their respective Estates, the Chapter 11 Cases or the Plan, except for (i) the Avoidance Actions listed on Schedule XIV, to be filed no later than ten (10) Business Days prior to the Objection Deadline, (ii) the Tobacco Causes of Action and the Material Rights of Action listed on Schedule XIV, to be filed no later than ten (10) Business Days prior to the Objection Deadline, (iii) the Commercial Claims, and (iv) Asbestos Personal Injury Claims. Without limiting the foregoing, Released Actions shall include, and shall be deemed to include, the release of all Claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities against the Debtors and the Non-Debtor Subsidiaries arising from the 1997 Credit Agreement or the guarantees of the obligations under the 1997 Credit Agreement.

1.235 **"Released Parties"** means (i) the Unsecured Creditors' Committee and its present and former members, representatives, advisors, attorneys, agents and professionals, acting in such capacity, (ii) the Asbestos Claimants' Committee and its present and former members, representatives, advisors, attorneys, agents and professionals, acting in such capacity, (iii) the Future Claimants' Representative and his present and former representatives, advisors, attorneys, agents and professionals, acting in such capacity, (iv) the respective Related Persons of the Debtors and the Reorganized Debtors and their respective Estates as of the Petition Date and thereafter and (v) the present and former officers and directors of the Debtors and Reorganized Debtors; except in each case for the Persons listed on Schedule III, to be filed no later than ten (10) Business Days prior to the Objection Deadline, against which Claims, obligations, suits, judgments, damages, Demands, debts, rights, remedies, causes of action, liabilities, Interests and other rights of an equity security holder shall not be released under the Plan.

1.236 **"Reorganized Debtors"** means, collectively, Reorganized OCD and the Reorganized Subsidiary Debtors.

1.237 **"Reorganized Integrex"** means reorganized Integrex, on and after the Effective Date.

43

**1.238**  **"Reorganized OCD"** means reorganized OCD, its successor or its successor issuer under Section 12(b) of the Securities Exchange Act of 1934, on and after the Effective Date.

**1.239**  **"Reorganized OCD Board"** means the board of directors of Reorganized OCD, as more specifically set forth in Section 5.16(a) of the Plan

**1.240**  **"Reorganized Subsidiary Debtors"** means the reorganized Subsidiary Debtors and their respective successors, on and after the Effective Date.

**1.241**  **"Reserved OCD Distribution Package"** means that portion of the Combined OCD Distribution Package not distributed on the Initial Distribution Date to the OC Sub-Account on account of the Class A7 Aggregate Amount and holders of Allowed Claims in Classes A5, A6-A and A6-B as of the Effective Date, the aggregate value of which portion shall, as of the Effective Date, be equal to the Combined OCD Distribution Package multiplied by a fraction, the numerator of which is the aggregate amount of all Disputed Claims in Classes A6-A and A6-B as of the Effective Date, and the denominator of which is the sum of (i) the aggregate amount of all Allowed Claims in Classes A5, A6-A, A6-B and A11, (ii) the Class A7 Aggregate Amount, and (iii) the aggregate amount of all Disputed Claims in Classes A6-A and A6-B, in each case as of the Effective Date.

**1.242**  **"Resolved Asbestos Personal Injury Claims"** means OC Resolved Asbestos Personal Injury Claims and FB Resolved Asbestos Personal Injury Claims.

**1.243**  **"Restricted Cash"** means, collectively, OCD Restricted Cash and FB Restricted Cash.

**1.244**  **"Restructuring Transactions"** means those transactions or other actions (including without limitation, mergers, consolidations, restructures, dispositions, offerings, liquidations, or dissolutions) that one or more of the applicable Debtors or Reorganized Debtors may enter into on or prior to, or as soon as practicable after, the Effective Date outside the ordinary course of business of such Reorganized Debtors in accordance with Section 5.6 hereof, including, without limitation, actions to effect a corporate restructuring of their respective businesses, to realign the overall corporate structure of the Reorganized Debtors and their Affiliates or to reincorporate certain of the Subsidiary Debtors under the laws of jurisdictions other than the laws of which the applicable Subsidiary Debtors are presently incorporated.

**1.245**  **"Senior Indebtedness Claim"** means any Claim against OCD that: (1) arises for borrowed money, securities sold, funds provided, assets or services purchased or any other transaction whether or not in the ordinary course of business and which is evidenced by a promissory note, bond, debenture, writing or other instrument of indebtedness or reflected on the accounting records of the Debtors as a payable (but expressly excluding (A) amounts owed for compensation to employees, (B) obligations owing under judgments arising out of obligations that are not

44

872

indebtedness for borrowed money (other than any such obligations arising from obligations which are otherwise Senior Indebtedness), (C) any indebtedness which by the terms of the instrument creating or evidencing the same is not superior in right of payment to or is junior in right of payment to the MIPS Claims and Interests, (D) any liability for federal, state, local or other taxes owed or owing by the Company, (E) any liability in respect of any employee benefit plan (including, without limitation, any liability to the Pension Benefit Guaranty Corporation or any successor thereto) and (F) indebtedness or obligations to a Subsidiary of the Debtors); (2) is owed with respect to any lease, conditional sale or installment sale agreement or other financing instrument or agreement which in accordance with generally accepted accounting principles is, at the time the lease, conditional sale or installment sale agreement or other financing instrument or agreement is entered into, assumed or guaranteed, directly or indirectly, by one or more of the Debtors, required to be reflected as a liability on the face of the balance sheet of the Debtors; (3) is for principal of and interest on any loan and other extension of credit under any lines of credit, revolving credit agreements or promissory notes from a bank or other financial institution (including ,without limitation, any letters of credit, bankers' acceptances, performance bonds and other credit facilities under such borrowing arrangements) and all fees, expenses, reimbursements, indemnities, premiums and other amounts payable under such borrowing arrangements; (4) is for any amounts payable in respect of any interest rate exchange agreement, ceiling rate agreement, currency exchange agreement or similar agreement; and (5) is a renewal, deferral, amendment, modification, supplement, extension, or refunding of any of the indebtedness described in clauses (1) through (5), inclusive, or evidences of indebtedness issued in exchange for such Senior Indebtedness. Without limitation, Senior Indebtedness shall not include any: (a) Environmental Claim; (b) OC Asbestos Property Damage Claim; (c) FB Asbestos Property Damage Claim; (d) OC Asbestos Personal Injury Claim; (e) FB Asbestos Personal Injury Claim; (f) non-asbestos tort Claim; (g) Claim of any present or former employee of the Debtors for compensation; (h) Claim for on account of any tax; and (i) Claim with respect to any employee benefit plan, including without limitation any Claim of the Pension Benefit Guaranty Corporation.

1.246   **"Senior Indebtedness Final Distribution Percentage"** means the percentage determined, as of the Final Distribution Date, by dividing the total amount of the Allowed OCFBV Class A11 Claim and the Allowed MIPS Claims and Interests in Class A11 by the sum of (i) the aggregate amount of all Allowed Claims in Classes A5, A6-A, A6-B and A11 and (ii) the Class A7 Aggregate Amount.

1.247   **"Senior Indebtedness Initial Distribution Percentage"** means the percentage determined, as of the Effective Date, by dividing the total amount of the Allowed OCFBV Class A11 Claim and the Allowed MIPS Claims and Interests in Class A11 by the sum of (i) the aggregate amount of all Allowed Claims in Classes A5, A6-A, A6-B and A11, (ii) the Class A7 Aggregate Amount, and (iii) the aggregate amount of all Disputed Claims in Classes A6-A and A6-B, in each case as of the Effective Date.

45

1.248  **"Senior Notes"** means such unsubordinated obligations for the payment of money as any of the Reorganized Debtors may issue or incur on or about the Effective Date in connection with the Plan (including, without limitation, any refinancing of the obligations owed to the Bank Holders under the 1997 Credit Agreement), the principal terms and conditions of which are summarized in Exhibit G, which shall be filed no later than five (5) Business Days prior to the Disclosure Statement Hearing, as it may be amended up to ten (10) Business days prior to the Objection Deadline.

1.249  **"Senior Notes Amount"** means the total principal amount of the Senior Notes as of the Effective Date, the amount of which shall be set forth in Schedule XII, to be filed no later than five (5) Business Days prior to the Disclosure Statement Hearing, as it may be amended up to ten (10) Business Days prior to the Objection Deadline.

1.250  **"SOFAS"** means the Schedules and Statements of Financial Affairs filed in the Chapter 11 Cases by OCD and each of the Subsidiary Debtors, as amended from time to time.

1.251  **"Soltech"** means Soltech, Inc., a Kentucky corporation.

1.252  **"Standard Combination"** means, with respect to certain distributions to be made under the Plan, a combination of 16.2% Cash and 83.8% New OCD Common Stock; *provided, however*, that such respective percentages may be modified in Schedule XII, to be filed no later than five (5) Business Days prior to the Disclosure Statement Hearing, as it may be amended up to ten (10) Business Days prior to the Objection Deadline.

1.253  **"Subordinated Claims"** means the Claims or Interests (in the event that a Claim might be characterized as an Interest) of any Person who has entered into a subordination or other agreement that is enforceable under applicable bankruptcy or non-bankruptcy law and which subordinates such Claims or Interests to any holders of Claims who will not be paid in full on account of such holders' Allowed Claims under the Plan; *provided, however*, that, such term shall include the MIPS Claims and Interests and the OCFBV Class A11 Claims.

1.254  **"Subsidiary"** means, with respect to any Person, any corporation, association or other business entity of which more than 50% of the total voting power of shares of stock (or equivalent ownership or controlling interest) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more other Persons controlled by such Person or a combination thereof.

1.255  **"Subsidiary Debtors"** means the direct and indirect Subsidiaries of OCD that are set forth in Schedule I hereto and such other Subsidiaries of OCD as may file for

874

protection under Chapter 11 of the Bankruptcy Code subsequent to the date hereof and prior to the Confirmation Date.

1.256 **"Subsidiary Interests"** means, (i) collectively, the issued and outstanding ownership interests in the Subsidiary Debtors, together with any options, warrants, conversion rights, rights of first refusal or other rights, contractual, equitable or otherwise, to acquire or receive any ownership interests in the Subsidiary Debtors, or any contract subscription, commitment or agreement pursuant to which any Person was or could have been entitled to receive any share of any ownership interests in the Subsidiary Debtors, or any such option, warrant, conversion right, right of first refusal or other right (including, without limitation, any rights of any 401(k) plan or the interest of any participant therein), in each case issued or entered into by, or otherwise the obligation of, the applicable Subsidiary Debtor, and, in each case owned beneficially and of record, directly or indirectly, by OCD; and (ii) the Integrex Minority Interests.

1.257 **"Supplemental Excess Available Cash"** means the Senior Indebtedness Final Distribution Percentage of the amount of Available Cash, if any, together with interest earned thereon (if any), remaining in the Disputed Distribution Reserve after all Disputed Claims shall have been Allowed and paid or Disallowed pursuant to a Final Order of the Bankruptcy Court.

1.258 **"Supplemental Excess Litigation Trust Recoveries"** means the Senior Indebtedness Final Distribution Percentage of the amount of Litigation Trust Recoveries, if any, together with interest earned thereon (if any), remaining in the Disputed Distribution Reserve after all Disputed Claims shall have been Allowed and paid or Disallowed pursuant to a Final Order of the Bankruptcy Court.

1.259 **"Supplemental Excess New OCD Common Stock"** means the Senior Indebtedness Final Distribution Percentage of the aggregate number of shares of New OCD Common Stock, if any, remaining in the Disputed Distribution Reserve after all Disputed Claims shall have been Allowed and paid or Disallowed pursuant to a Final Order of the Bankruptcy Court.

1.260 **"Supply Chain Solutions"** means Integrex Supply Chain Solutions LLC, a Delaware limited liability company.

1.261 **"TAC"** means the Trustees' Advisory Committee established under the Asbestos Personal Injury Trust Agreement.

1.262 **"Testing Systems"** means Integrex Testing Systems LLC, a Delaware limited liability company.

1.263 **"Tobacco Causes of Action"** means any and all claims by OCD and Fibreboard for restitution/unjust enrichment, fraud, and violations of state antitrust law against tobacco companies to obtain payment of monetary damages (including punitive damages) for payments made by OCD and Fibreboard to asbestos claimants who developed smoking-related diseases, including, without limitation,

47

the lawsuit brought by OCD and Fibreboard in the Superior Court of California, County of Alameda, styled Fibreboard Corp., et al. v. R.J. Reynolds Tobacco Company, et al., Case No. 791919-8.

1.264 **"Total [Entity] Distributable Value"** means, with respect to each Debtor other than Falcon Foam, Fibreboard, IPM, OCD and Ventures, the sum of (i) the enterprise value allocated to such Debtor as of the Effective Date, (ii) the Available Cash held by such Debtor as of the Effective Date, and (iii) any value credited to such Debtor, if any, as of the Effective Date on account of Intercompany Claims against other Debtors.

1.265 **"Total Enterprise Value"** means the estimated going concern value of the Debtors and the Non-Debtor Subsidiaries as a whole as of the Effective Date and shall include the present value of cash flows related to the utilization of net operating loss carry forwards available to the Reorganized Debtors as of the Effective Date; *provided, however,* that an estimate of such value as of the Effective Date shall be set forth in Schedule XII, to be filed no later than five (5) Business Days prior to the Disclosure Statement Hearing, as it may be amended up to ten (10) Business Days prior to the Objection Deadline.

1.266 **"Total Falcon Foam Distributable Value"** means the sum of (i) the portion of the Total Enterprise Value allocated to Falcon Foam (excluding any equity value of Falcon Foam subsidiaries) as of the Effective Date, (ii) the Available Cash held by Falcon Foam as of the Effective Date, (iii) amounts credited to Falcon Foam, if any, on account of Intercompany Claims against other Debtors, as of the Effective Date, and (iv) the value retained by Falcon Foam, if any, as of the Effective Date on account of the Integrex Interests.

1.267 **"Total FB Distributable Value"** means the sum of (i) the portion of the Total Enterprise Value allocated to Fibreboard (excluding any equity value of Fibreboard subsidiaries) as of the Effective Date, (ii) the Available Cash held by Fibreboard as of the Effective Date, (iii) amounts credited to Fibreboard, if any, on account of Intercompany Claims against other Debtors as of the Effective Date, excluding the amount of the FB Sub-Account Settlement Payment (which shall be distributed to the FB Sub-Account, as described herein), and (iv) the value retained by Fibreboard, if any, on account of the ESI Interests and the Vytec Interests as of the Effective Date; *provided, however,* that such value shall not include the FB Reversions or amounts in the Fibreboard Insurance Settlement Trust and the Committed Claims Account.

1.268 **"Total IPM Distributable Value"** means the sum of (i) the portion of the Total Enterprise Value allocated to IPM (excluding any equity value of IPM subsidiaries) as of the Effective Date, (ii) the Available Cash held by IPM as of the Effective Date, (iii) amounts credited to IPM, if any, on account of Intercompany Claims against other Debtors, as of the Effective Date, and (iv) the value retained by IPM, if any, as of the Effective Date on account of its interests

876

in its subsidiaries and joint ventures, including, without limitation, the OC Sweden Interests.

1.269 **"Total OCD Distributable Value"** means the sum of (i) the portion of the Total Enterprise Value allocated to OCD (excluding any equity value of OCD subsidiaries) as of the Effective Date, (ii) the Available Cash held by OCD as of the Effective Date, (iii) amounts credited to OCD, if any, on account of Intercompany Claims against other Debtors, as of the Effective Date, and (iv) the value retained by OCD, if any, as of the Effective Date on account of its interests in its subsidiaries, including, without limitation, the IPM Interests, the OCFT Interests, the Soltech Interests, and the Falcon Foam Interests.

1.270 **"Total Ventures Distributable Value"** means the sum of (i) the portion of the Total Enterprise Value allocated to Ventures (excluding any equity value of Ventures subsidiaries) as of the Effective Date, (ii) the Available Cash held by Ventures as of the Effective Date, (iii) amounts credited to Ventures, if any, on account of Intercompany Claims against other Debtors, as of the Effective Date, and (iv) the value retained by Ventures, if any, as of the Effective Date on account of its Interests in Professional Services, HOMExperts, Testing Systems and the Supply Chain Solutions.

1.271 **"Unclassified Claims"** means the DIP Facility Claims, Administrative Claims and Priority Tax Claims, collectively.

1.272 **"Unimpaired"** means, when used with reference to a Claim, Class or Interest, a Claim, Class or Interest that is not impaired within the meaning of Section 1124 of the Bankruptcy Code.

1.273 **"Unpaid FB Resolved Asbestos Personal Injury Claim"** means an FB Asbestos Personal Injury Claim (i) with respect to which the holder of such Claim (a) is represented by an attorney of record who has entered into an enforceable NSP Agreement with OC, (b) was identified to Fibreboard by such attorney prior to the Petition Date, and (c) has satisfied all of the preconditions to payment under the applicable NSP Agreement prior to the Petition Date or can satisfy all such conditions, in either case, as determined by the Asbestos Personal Injury Trust; and (ii) to the extent such Claim has not been, and will not be, paid from the NSP Administrative Deposit Accounts.

1.274 **"Unpaid OC Resolved Asbestos Personal Injury Claim"** means an OC Asbestos Personal Injury Claim (i) with respect to which the holder of such Claim (a) is represented by an attorney of record who has entered into an enforceable NSP Agreement with OC, and (b) was identified to OC by such attorney prior to the Petition Date, and (c) has satisfied all of the preconditions to payment under the applicable NSP Agreement prior to the Petition Date (including, without limitation, the submission of information about the Claim holder's exposure and injury as well as the delivery of a properly executed release relating to such

49

Claim); and (ii) to the extent such Claim has not been, and will not be, paid from the NSP Administrative Deposit Accounts.

**1.275** **"Unsecured Creditors' Committee"** means the official creditors' committee representing general unsecured creditors, which was appointed pursuant to Section 1102(a) of the Bankruptcy Code by the United States Trustee for the District of Delaware on October 23, 2000 and which includes the unofficial sub-committee representing the Bank Holders and the unofficial sub-committee representing the Bondholders and trade creditors, each of which sub-committees is represented by separate counsel and financial advisors.

**1.276** **"Ventures"** means Integrex Ventures LLC, a Delaware limited liability company.

**1.277** **"Voting Deadline"** means the date set forth in the Voting Procedures Order by which a creditor or interest holder must deliver a ballot voting to accept or reject the Plan.

**1.278** **"Voting Procedures"** means the detailed instructions and procedures relating to the solicitation of votes with respect to the Plan.

**1.279** **"Voting Procedures Order"** means the order of the Bankruptcy Court or District Court approving the Voting Procedures.

**1.280** **"Vytec"** means Vytec Corporation, a Canadian corporation.

**1.281** **"Wellington Agreement"** means that certain Agreement Concerning Asbestos-Related Claims dated as of June 19, 1985.

## C.   Rules of Interpretation

For purposes of the Plan (i) any reference in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (ii) any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified or supplemented; (iii) unless otherwise specified, all references in the Plan to sections, articles, schedules and exhibits are references to sections, articles, schedules and exhibits of or to the Plan; (iv) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (v) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; and (vi) the rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

## D.   Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Federal Rule of Bankruptcy Procedure 9006(a) shall apply.

50

E.    **Governing Law**

Unless the application of a specific rule of law or procedure is required by federal law (including the Bankruptcy Code and the Bankruptcy Rules), or is otherwise expressly provided for, (i) the laws of the State of Delaware shall govern the construction and implementation of the Plan and any agreements, documents and instruments executed in connection with the Plan (unless such agreement, document or instrument shall specify another state's law) and (ii) the laws of the state of incorporation of each Debtor and Reorganized Debtor shall govern corporate governance matters with respect to such Debtor or Reorganized Debtor, in each case without giving effect to the principles of conflicts of law thereof.

## ARTICLE II

## CLASSIFICATION OF CLAIMS AND INTERESTS

**2.1    Introduction**

Pursuant to Sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for all purposes, including, without express or implied limitation, voting, confirmation and distribution pursuant to the Plan, as set forth herein below. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

ALLOWED CLAIMS HELD AGAINST ONE DEBTOR SHALL BE SATISFIED SOLELY FROM THAT PORTION OF THE NEW OCD COMMON STOCK, SENIOR NOTES, CASH AND/OR OTHER ASSETS TO BE DISTRIBUTED ON ACCOUNT OF THE VALUE ATTRIBUTABLE TO SUCH DEBTOR AND ITS ESTATE, PROVIDED THAT, TO THE EXTENT OF ANY INSUFFICIENCY, FUNDS MAY BE ADVANCED TO THE RELEVANT DEBTORS BY THE ESTATE OF OCD. EXCEPT AS SPECIFICALLY SET FORTH HEREIN, NOTHING IN THE PLAN OR THE DISCLOSURE STATEMENT SHALL CONSTITUTE OR BE DEEMED TO CONSTITUTE AN ADMISSION THAT ANY ONE OF THE DEBTORS IS SUBJECT TO OR LIABLE FOR ANY CLAIM AGAINST ANY OTHER DEBTOR. A CLAIM AGAINST MULTIPLE DEBTORS, TO THE EXTENT ALLOWED IN EACH DEBTOR'S CASE, SHALL BE TREATED AS A SEPARATE CLAIM AGAINST EACH DEBTOR'S ESTATE FOR ALL PURPOSES (INCLUDING, BUT NOT LIMITED TO, VOTING AND DISTRIBUTION, PROVIDED, HOWEVER, THAT NO HOLDER SHALL BE ENTITLED TO RECEIVE MORE THAN PAYMENT IN FULL OF ITS ALLOWED CLAIM (PLUS POSTPETITION INTEREST, IF AND TO THE EXTENT PROVIDED IN THIS PLAN)), AND SUCH CLAIMS SHALL BE ADMINISTERED AND TREATED IN THE MANNER PROVIDED IN THE PLAN.

In accordance with Section 1123(a)(1) of the Bankruptcy Code, DIP Facility Claims, Administrative Claims and Priority Tax Claims have not been classified, and the respective treatment of such Unclassified Claims is set forth in Section 3.1 of the Plan.

### 2.2    Owens Corning (Classes A1 through A12)

(a)    *Class A1:  OCD Other Priority Claims*

Class A1 consists of all Other Priority Claims against OCD.

(b)    *Class A2-A:  OCD Other Secured Tax Claims*

Class A2-A consists of all Other Secured Tax Claims against OCD.

(c)    *Class A2-B:  OCD Other Secured Claims*

Class A2-B consists of all Other Secured Claims against OCD.

(d)    *Class A3:  OCD Convenience Claims*

Class A3 consists of all Convenience Claims against OCD.

(e)    *Class A4:  OCD Bank Holders Claims*

Class A4 consists of all Bank Holders Claims against OCD.

(f)    *Class A5:  OCD Bondholders Claims*

Class A5 consists of all Bondholders Claims against OCD.

(g)    *Class A6-A:  OCD General Unsecured Claims*

Class A6-A consists of all General Unsecured Claims against OCD.

(h)    *Class A6-B:  OCD General Unsecured/Senior Indebtedness Claims*

Class A6-B consists of all OCD General Unsecured/Senior Indebtedness Claims.

(i)    *Class A7:  OC Asbestos Personal Injury Claims*

Class A7 consists of all OC Asbestos Personal Injury Claims.

(j)    *Class A10:  OCD Intercompany Claims*

Class A10 consists of all Intercompany Claims against OCD other than the MIPS Claims and Interests and the OCFBV Class A11 Claims.

52

(k)   *Class A11:  OCD Subordinated Claims*

Class A11 consists of all Subordinated Claims against OCD.

(l)   *Class A12:  OCD Interests*

Class A12 consists of all Interests in OCD.

**2.3   Fibreboard Corporation (Classes B1 through B12)**

(a)   *Class B1:  Fibreboard Other Priority Claims*

Class B1 consists of all Other Priority Claims against Fibreboard.

(b)   *Class B2-A:  Fibreboard Other Secured Tax Claims*

Class B2-A consists of all Other Secured Tax Claims against Fibreboard.

(c)   *Class B2-B:  Fibreboard Other Secured Claims*

Class B2-B consists of all Other Secured Claims against Fibreboard.

(d)   *Class B3:  Fibreboard Convenience Claims*

Class B3 consists of all Convenience Claims against Fibreboard.

(e)   *Class B4:  Fibreboard Bank Holders Claims*

Class B4 consists of all Bank Holders Claims against Fibreboard.

(f)   *Class B6:  Fibreboard General Unsecured Claims*

Class B6 consists of all General Unsecured Claims against Fibreboard.

(g)   *Class B8:  FB Asbestos Personal Injury Claims*

Class B8 consists of all FB Asbestos Personal Injury Claims.

(h)   *Class B9:  FB Asbestos Property Damage Claims*

Class B9 consists of all FB Asbestos Property Damage Claims.

(i)   *Class B10:  Fibreboard Intercompany Claims*

Class B10 consists of all Intercompany Claims against Fibreboard.

53

881

(j)    *Class B12:  FB Interests*

Class B12 consists of all Interests in Fibreboard.

### 2.4    Exterior Systems, Inc. (Classes C1 through C12)

(a)    *Class C1:  ESI Other Priority Claims*

Class C1 consists of all Other Priority Claims against ESI.

(b)    *Class C2-A:  ESI Other Secured Tax Claims*

Class C2-A consists of all Other Secured Tax Claims against ESI.

(c)    *Class C2-B:  ESI Other Secured Claims*

Class C2-B consists of all Other Secured Claims against ESI.

(d)    *Class C3:  ESI Convenience Claims*

Class C3 consists of all Convenience Claims against ESI.

(e)    *Class C4:  ESI Bank Holders Claims*

Class C4 consists of all Bank Holders Claims against ESI.

(f)    *Class C6:  ESI General Unsecured Claims*

Class C6 consists of all General Unsecured Claims against ESI.

(g)    *Class C10:  ESI Intercompany Claims*

Class C10 consists of all Intercompany Claims against ESI.

(h)    *Class C12:  ESI Interests*

Class C12 consists of all Interests in ESI.

### 2.5    Vytec Corporation (Classes D1 through D12)[2]

---

[2] Although Vytec has not filed under Chapter 11 as of the date of the Plan, OCD reserves the right to initiate a prepackaged chapter 11 case on behalf of Vytec prior to the Confirmation Hearing to be administratively consolidated with the pending Chapter 11 Cases, in the event OCD deems it necessary to do so in order to effectuate the terms of the Plan.  The Vytec classification and treatment provisions described herein are presently for illustrative purposes, and shall only apply in the event that Vytec files for bankruptcy prior to the Confirmation Hearing.

54

    (a)    *Class D1: Vytec Other Priority Claims*

           Class D1 consists of all Other Priority Claims against Vytec.

    (b)    *Class D2-A: Vytec Other Secured Tax Claims*

           Class D2-A consists of all Other Secured Tax Claims against Vytec.

    (c)    *Class D2-B: Vytec Other Secured Claims*

           Class D2-B consists of all Other Secured Claims against Vytec.

    (d)    *Class D3: Vytec Convenience Claims*

           Class D3 consists of all Convenience Claims against Vytec.

    (e)    *Class D4: Vytec Bank Holders Claims*

           Class D4 consists of all Bank Holders Claims against Vytec.

    (f)    *Class D6: Vytec General Unsecured Claims*

           Class D6 consists of all General Unsecured Claims against Vytec.

    (g)    *Class D10: Vytec Intercompany Claims*

           Class D10 consists of all Intercompany Claims against Vytec.

    (h)    *Class D12: Vytec Interests*

           Class D12 consists of all Interests in Vytec.

**2.6**    **Soltech, Inc. (Classes E1 through E12)**

    (a)    *Class E1: Soltech Other Priority Claims*

           Class E1 consists of all Other Priority Claims against Soltech.

    (b)    *Class E2-A: Soltech Other Secured Tax Claims*

           Class E2-A consists of all Other Secured Tax Claims against Soltech.

    (c)    *Class E2-B: Soltech Other Secured Claims*

           Class E2-B consists of all Other Secured Claims against Soltech.

55

(d)    *Class E3:  Soltech Convenience Claims*

Class E3 consists of all Convenience Claims against Soltech.

(e)    *Class E4:  Soltech Bank Holders Claims*

Class E4 consists of all Bank Holders Claims against Soltech.

(f)    *Class E6:  Soltech General Unsecured Claims*

Class E6 consists of all General Unsecured Claims against Soltech.

(g)    *Class E10:  Soltech Intercompany Claims*

Class E10 consists of all Intercompany Claims against Soltech.

(h)    *Class E12:  Soltech Interests*

Class E12 consists of all Interests in Soltech.

**2.7    <u>Owens-Corning Fiberglas Technology Inc.</u> (Classes F1 through F12)**

(a)    *Class F1:  OCFT Other Priority Claims*

Class F1 consists of all Other Priority Claims against OCFT.

(b)    *Class F2-A:  OCFT Other Secured Tax Claims*

Class F2-A consists of all Other Secured Tax Claims against OCFT.

(c)    *Class F2-B:  OCFT Other Secured Claims*

Class F2-B consists of all Other Secured Claims against OCFT.

(d)    *Class F3:  OCFT Convenience Claims*

Class F3 consists of all Convenience Claims against OCFT.

(e)    *Class F4:  OCFT Bank Holders Claims*

Class F4 consists of all Bank Holders Claims against OCFT.

(f)    *Class F6:  OCFT General Unsecured Claims*

Class F6 consists of all General Unsecured Claims against OCFT.

56

    (g)     *Class F10:  OCFT Intercompany Claims*

           Class F10 consists of all Intercompany Claims against OCFT.

    (h)     *Class F12:  OCFT Interests*

           Class F12 consists of all Interests in OCFT.

**2.8**    <u>**Owens-Corning Fiberglas Sweden Inc.**</u> **(Classes G1 through G12)**[3]

    (a)     *Class G1:  OC Sweden Other Priority Claims*

           Class G1 consists of all Other Priority Claims against OC Sweden.

    (b)     *Class G2-A:  OC Sweden Other Secured Tax Claims*

           Class G2-A consists of all Other Secured Tax Claims against OC Sweden.

    (c)     *Class G2-B:  OC Sweden Other Secured Claims*

           Class G2-B consists of all Other Secured Claims against OC Sweden.

    (d)     *Class G3:  OC Sweden Convenience Claims*

           Class G3 consists of all Convenience Claims against OC Sweden.

    (e)     *Class G4:  OC Sweden Bank Holders Claims*

           Class G4 consists of all Bank Holders Claims against OC Sweden.

    (f)     *Class G6:  OC Sweden General Unsecured Claims*

           Class G6 consists of all General Unsecured Claims against OC Sweden.

    (g)     *Class G10:  OC Sweden Intercompany Claims*

           Class G10 consists of all Intercompany Claims against OC Sweden.

---

[3] Although OC Sweden has not filed under Chapter 11 as of the date of the Plan, OCD reserves the right to initiate a prepackaged chapter 11 case on behalf of OC Sweden prior to the Confirmation Hearing to be administratively consolidated with the pending Chapter 11 Cases, in the event OCD deems it necessary to do so in order to effectuate the terms of the Plan. The OC Sweden classification and treatment provisions described herein are presently for illustrative purposes, and shall only apply in the event that OC Sweden files for bankruptcy prior to the Confirmation Hearing.

(h)  *Class G12: OC Sweden Interests*

Class G12 consists of all Interests in OC Sweden.

### 2.9  IPM, Inc. (Classes H1 through H12)[4]

(a)  *Class H1: IPM Other Priority Claims*

Class H1 consists of all Other Priority Claims against IPM.

(b)  *Class H2-A: IPM Other Secured Tax Claims*

Class H2-A consists of all Other Secured Tax Claims against IPM.

(c)  *Class H2-B: IPM Other Secured Claims*

Class H2-B consists of all Other Secured Claims against IPM.

(d)  *Class H3: IPM Convenience Claims*

Class H3 consists of all Convenience Claims against IPM.

(e)  *Class H4: IPM Bank Holders Claims*

Class H4 consists of all Bank Holders Claims against IPM.

(f)  *Class H6: IPM General Unsecured Claims*

Class H6 consists of all General Unsecured Claims against IPM.

(g)  *Class H10: IPM Intercompany Claims*

Class H10 consists of all Intercompany Claims against IPM.

(h)  *Class H12: IPM Interests*

Class H12 consists of all Interests in IPM.

### 2.10  Integrex (Classes I1 through I12)

---

[4] Although IPM has not filed under Chapter 11 as of the date of the Plan, OCD reserves the right to initiate a prepackaged chapter 11 case on behalf of IPM prior to the Confirmation Hearing to be administratively consolidated with the pending Chapter 11 Cases, in the event OCD deems it necessary to do so in order to effectuate the terms of the Plan. The IPM classification and treatment provisions described herein are presently for illustrative purposes, and shall only apply in the event that IPM files for bankruptcy prior to the Confirmation Hearing.

886

(a)    *Class I1:  Integrex Other Priority Claims*

Class I1 consists of all Other Priority Claims against Integrex.

(b)    *Class I2-A:  Integrex Other Secured Tax Claims*

Class I2-A consists of all Other Secured Tax Claims against Integrex.

(c)    *Class I2-B:  Integrex Other Secured Claims*

Class I2-B consists of all Other Secured Claims against Integrex.

(d)    *Class I3:  Integrex Convenience Claims*

Class I3 consists of all Convenience Claims against Integrex.

(e)    *Class I4:  Integrex Bank Holders Claims*

Class I4 consists of all Bank Holders Claims against Integrex.

(f)    *Class I6:  Integrex General Unsecured Claims*

Class I6 consists of all General Unsecured Claims against Integrex.

(g)    *Class I7:  Integrex Asbestos Personal Injury Claims*

Class I7 consists of all Integrex Asbestos Personal Injury Claims (if any).

(h)    *Class I10:  Integrex Intercompany Claims*

Class I10 consists of all Intercompany Claims against Integrex.

(i)    *Class I12:  Integrex Interests*

Class I12 consists of all Interests in Integrex.

887

**2.11** **CDC Corporation** (Classes J1 through J12)

    (a)    *Class J1: CDC Other Priority Claims*

           Class J1 consists of all Other Priority Claims against CDC.

    (b)    *Class J2-A: CDC Other Secured Tax Claims*

           Class J2-A consists of all Other Secured Tax Claims against CDC.

    (c)    *Class J2-B: CDC Other Secured Claims*

           Class J2-B consists of all Other Secured Claims against CDC.

    (d)    *Class J3: CDC Convenience Claims*

           Class J3 consists of all Convenience Claims against CDC.

    (e)    *Class J6: CDC General Unsecured Claims*

           Class J6 consists of all General Unsecured Claims against CDC.

    (f)    *Class J10: CDC Intercompany Claims*

           Class J10 consists of all Intercompany Claims against CDC.

    (g)    *Class J12: CDC Interests*

           Class J12 consists of all Interests in CDC.

**2.12** **Owens Corning HT, Inc.** (Classes K1 through K12)

    (a)    *Class K1: OCHT Other Priority Claims*

           Class K1 consists of all Other Priority Claims against OCHT.

    (b)    *Class K2-A: OCHT Other Secured Tax Claims*

           Class K2-A consists of all Other Secured Tax Claims against OCHT.

    (c)    *Class K2-B: OCHT Other Secured Claims*

           Class K2-B consists of all Other Secured Claims against OCHT.

    (d)    *Class K3: OCHT Convenience Claims*

           Class K3 consists of all Convenience Claims against OCHT.

    (e)    *Class K6: OCHT General Unsecured Claims*

           Class K6 consists of all General Unsecured Claims against OCHT.

    (f)    *Class K10: OCHT Intercompany Claims*

           Class K10 consists of all Intercompany Claims against OCHT.

    (g)    *Class K12: OCHT Interests*

           Class K12 consists of all Interests in OCHT.

**2.13**    **Owens Corning Remodeling Systems, LLC (Classes L1 through L12)**

    (a)    *Class L1: OC Remodeling Other Priority Claims*

           Class L1 consists of all Other Priority Claims against OC Remodeling.

    (b)    *Class L2-A: OC Remodeling Other Secured Tax Claims*

           Class L2-A consists of all Other Secured Tax Claims against OC Remodeling.

    (c)    *Class L2-B: OC Remodeling Other Secured Claims*

           Class L2-B consists of all Other Secured Claims against OC Remodeling.

    (d)    *Class L3: OC Remodeling Convenience Claims*

           Class L3 consists of all Convenience Claims against OC Remodeling.

    (e)    *Class L6: OC Remodeling General Unsecured Claims*

           Class L6 consists of all General Unsecured Claims against OC Remodeling.

    (f)    *Class L10: OC Remodeling Intercompany Claims*

           Class L10 consists of all Intercompany Claims against OC Remodeling.

    (g)    *Class L12: OC Remodeling Interests*

           Class L12 consists of all Interests in OC Remodeling.

**2.14**    **Engineered Yarns America, Inc. (Classes M1 through M12)**

889