## SECTION 1

## AGREEMENT OF TRUST

   1.1    **Creation and Name.** OC as Settlor hereby creates a trust known as the Asbestos Personal Injury Settlement Trust or PI Trust, which is provided for and referred to in the Plan. The Trustees of the PI Trust may transact the business and affairs of the PI Trust in the name of the PI Trust.

   1.2    **Purpose.** The purpose of the PI Trust is to assume the liabilities of OC and Fibreboard, their predecessors and successors in interest, for all PI Trust Claims (as defined in the Plan), and to use the PI Trust Assets and income to pay the holders of all PI Trust Claims in accordance with this PI Trust Agreement and the TDP in such a way that such holders of PI Trust Claims are treated fairly, equitably and reasonably in light of the limited assets available to satisfy such claims, and to otherwise comply in all respects with the requirements of a trust set forth in Section 524(g)(2)(B) of the Bankruptcy Code.

   1.3    **Transfer of Assets.** Pursuant to the Plan, the PI Trust Share (as defined in the Plan) has been transferred and assigned to the PI Trust to settle and discharge all Asbestos Personal Injury Claims. Pursuant to the Plan, OC, its successors in interest thereto, from and after the Effective Date ("Reorganized OC") and others may also transfer and assign additional assets to the PI Trust from time to time (the "PI Trust Assets"). In all events, the PI Trust Assets will be transferred to the PI Trust free and clear of any liens or other claims by OC, Reorganized OC, any creditor, or other entity. OC, Reorganized OC, and any other transferors shall also execute and deliver such documents to the PI Trust as the Trustees reasonably request to transfer and assign the PI Trust Assets to the PI Trust.

713708.2 12/30/03                                  4

### 1.4    Acceptance of Assets and Assumption of Liabilities

(a)    In furtherance of the purposes of the PI Trust, the Trustees, on behalf of

the PI Trust, hereby expressly accept the transfer and assignment to the PI Trust of the PI Trust

Assets in the time and manner contemplated in the Plan.

(b)    In furtherance of the purposes of the PI Trust, the Trustees, on behalf of

the PI Trust, expressly assume all liability for all Asbestos Personal Injury Claims.  Except as

otherwise provided in this PI Trust Agreement and the TDP, the PI Trust shall have all defenses,

cross-claims, offsets, and recoupments, as well as rights of indemnification, contribution,

subrogation, and similar rights, regarding such claims that OC and Reorganized OC have or

would have had under applicable law.  Regardless of the foregoing, however, a claimant must

meet otherwise applicable federal, state and foreign statutes of limitations and repose, except as

otherwise provided in Section 5.1(a)(2) of the TDP.

(c)    No provision herein or in the TDP shall be construed to mandate

distributions on any claims or other actions that would contravene the PI Trust's compliance with

the requirements of a qualified settlement fund within the meaning of section 1.468B-1 *et seq.* of

the Treasury Regulations promulgated under section 468B of the IRC.

(d)    OC and Reorganized OC shall be entitled to indemnification from the PI

Trust for any expenses, costs, and fees (including reasonable attorneys' fees and costs, but

excluding any such expenses, costs, and fees incurred prior to the Effective Date), judgments,

settlements, or other liabilities arising from or incurred in connection with any action based

upon, arising out of, or attributable to OC and Fibreboard Asbestos Personal Injury Claims,

1054

including, but not limited to, indemnification or contribution for such claims prosecuted against Reorganized OC

(e)    Nothing in this PI Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Section 524(g) injunction issued in connection with the Plan or the PI Trust's assumption of all liability for PI Trust Claims, subject to the provisions of Section 1.4(b) above.

## SECTION 2

## POWERS AND TRUST ADMINISTRATION

### 2.1    Powers.

(a)    The Trustees are and shall act as the fiduciaries to the PI Trust in accordance with the provisions of this PI Trust Agreement and the Plan. The Trustees shall, at all times, administer the PI Trust and the PI Trust Assets in accordance with the purposes set forth in Section 1.2 above. Subject to the limitations set forth in this PI Trust Agreement, the Trustees shall have the power to take any and all actions that, in the judgment of the Trustees, are necessary or proper to fulfill the purposes of the PI Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)    Except as required by applicable law or otherwise specified herein, the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

1055

(c)     Without limiting the generality of Section 2.1(a) above, and except as limited below, the Trustees shall have the power to:

(i)     receive and hold the PI Trust Share and the PI Trust Assets, vote the Reorganized OC common stock, and exercise all rights with respect to, and sell, any securities issued by Reorganized OC that are included in the PI Trust assets, subject to any restrictions set forth in the Restated Certificate of Reorganized OC;

(ii)     invest the monies held from time to time by the PI Trust;

(iii)     sell, transfer, or exchange any or all of the PI Trust Assets at such prices and upon such terms as the Trustees may consider proper, consistent with the other terms of this PI Trust Agreement;

(iv)     enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to permit the PI Trust to operate;

(v)     pay liabilities and expenses of the PI Trust, including, but not limited to, PI Trust expenses;

(vi)     establish such funds, reserves and accounts within the PI Trust estate, as deemed by the Trustees to be useful in carrying out the purposes of the PI Trust;

(vii)     sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding;

(viii)     establish, supervise and administer the PI Trust in accordance with the TDP and the terms thereof;

1056

(ix)    appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing and forecasting, and other consultants and agents as the business of the PI Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of this PI Trust;

(x)    pay employees, legal, financial, accounting, investment, auditing, and forecasting, and other consultants, advisors, and agents, including those engaged by the PI Trust in connection with its alternative dispute resolution activities, reasonable compensation;

(xi)    compensate the Trustees, the TAC members, and the Future Claimants' Representative as provided below, and their employees, legal, financial, accounting, investment and other advisors, consultants, independent contractors, and agents, and reimburse the Trustees, the TAC members and the Future Claimants' Representative all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xii)    execute and deliver such instruments as the Trustees consider proper in administering the PI Trust;

(xiii)    enter into such other arrangements with third parties as are deemed by the Trustees to be useful in carrying out the purposes of the PI Trust, provided such arrangements do not conflict with any other provision of this PI Trust Agreement;

(xiv)    in accordance with Section 4.6 below, defend, indemnify and hold harmless (and purchase insurance indemnifying) (A) the Trustees and (B) the TAC, the Future

Claimants' Representative, the officers and employees of the PI Trust, and any agents, advisors and consultants of the PI Trust, the TAC or the Future Claimants' Representative (the "Additional Indemnitees"), to the fullest extent that a corporation or trust organized under the law of the PI Trust's situs is from time to time entitled to indemnify and/or insure its directors, trustees, officers, employees, agents, advisors and representatives;

(xv)    indemnify Reorganized OC by reason of any present or future PI Trust Claims against all expenses, costs, fee (including attorneys' fees), judgments, awards, settlements, and other liabilities incurred in connection therewith.

(xvi)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the PI Trust Share or PI Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 4.4 below;

(xvii)    consult with Reorganized OC, the TAC and the Future Claimants' Representative at such times and with respect to such issues relating to the conduct of the PI Trust as the Trustees consider desirable; and

(xviii)    make, pursue (by litigation or otherwise), collect, compromise or settle, in the name of the PI Trust or in the name of Reorganized OC, any claim, right, action, or cause of action included in the PI Trust assets including, but not limited to, insurance recoveries, before any court of competent jurisdiction; provided that settlement of actions before the Bankruptcy Court require the approval of the Bankruptcy Court after notice to Reorganized OC as the case may be.

773708.2 12/2005

9

(d)    The Trustees shall not have the power to guarantee any debt of other persons.

(e)    The Trustees shall give the TAC, the Future Claimants' Representative, and Reorganized OC prompt notice of any act performed or taken pursuant to Sections 2.1(c)(i), (iii), (vii), or (xv) above, and any act proposed to be performed or taken pursuant to Section 2.2(f) below.

2.2    **General Administration.**

(a)    The Trustees shall adopt and act in accordance with the PI Trust Bylaws. To the extent not inconsistent with the terms of this PI Trust Agreement, the PI Trust Bylaws shall govern the affairs of the PI Trust. In the event of an inconsistency between the PI Trust Bylaws and this PI Trust Agreement, the PI Trust Agreement shall govern.

(b)    The Trustees shall (i) timely file income tax and other returns and statements and shall timely pay all taxes required to be paid, (ii) comply with all withholding obligations, as required under the applicable provisions of the IRC and of any state law and the regulations promulgated thereunder, (iii) meet without limitation all requirements necessary to qualify and maintain qualification of the PI Trust as a qualified settlement fund within the meaning of Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the IRC, and (iv) take no action that could cause the PI Trust to fail to qualify as a qualified settlement fund within the meaning of Section 1.468B-1 et seq. of the Treasury Regulations promulgated under Section 468B of the IRC.

(c)    The Trustees shall timely account to the Bankruptcy Court as follows:

1059

(i)    The Trustees shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event within one hundred and twenty (120) days following the end of each fiscal year, an annual report containing financial statements of the PI Trust (including, without limitation, a balance sheet of the PI Trust as of the end of such fiscal year and a statement of operations for such fiscal year) audited by a firm of independent certified public accountants selected by the Trustees and accompanied by an opinion of such firm as to the fairness of the financial statements' presentation of the cash and investments available for the payment of claims and as to the conformity of the financial statements with generally accepted accounting principles. The Trustees shall provide a copy of such report to the TAC, the Future Claimants' Representative, and Reorganized OC when such reports are filed with the Bankruptcy Court.

(ii)    Simultaneously with delivery of each set of financial statements referred to in Article 2.2(c)(i) above, the Trustees shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of claims disposed of during the period covered by the financial statements. The Trustees shall provide a copy of such report to the TAC, the Future Claimants' Representatives, and Reorganized OC when such report is filed.

(iii)    All materials required to be filed with the Bankruptcy Court by this Section 2.2(c) shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court and shall be filed with the Office of the United States Trustee for the District of Delaware.

1060

(d)      The Trustees shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year and the succeeding four fiscal years. The budget and cash flow projections shall include determining the Maximum Annual Payment pursuant to Section 2.4 of the TDP, and the Asbestos Personal Injury Claims Payment Ratio pursuant to Section 2.5 of the TDP. The Trustees shall provide a copy of the budget and cash flow projections to the TAC and the Future Claimants' Representative.

(e)      The Trustees shall consult with the TAC and the Future Claimants' Representative (i) on the general implementation and administration of the PI Trust; (ii) on the general implementation and administration of the TDP; and (iii) on such other matters as may be required under this PI Trust Agreement and the TDP.

(f)      The Trustees shall be required to obtain the consent of the TAC and the Future Claimants' Representative pursuant to the Consent Process set forth in Section 5.7(b) and 6.6(b) below, in addition to any other instances elsewhere enumerated, in order:

(i)  To change the Claims Payment Ratio described in Section 2.5 of the TDP in the event that the requirements for such a change as set forth in said provision have been met;

(ii)      to change the Disease Levels, Medical/Exposure Criteria set forth in Section 5.3(a)(3) of the TDP, and/or the Scheduled, Average and/or Maximum Values set forth in Sections 5.3(b)(4) and 5.3(b)(5) of the TDP;

1061

                     (iii)     to change the Payment Percentage described in Section 4.2 of the TDP;

                     (iv)     to establish and/or to change the Proof of Claim Forms and other claims materials to be provided holders of PI Trust Claims under Section 6.1 of the TDP;

                     (v)     to require that claimants provide additional kinds of medical or exposure evidence pursuant to Section 5.7 of the TDP;

                     (vi)     to change the form of release to be provided pursuant to Section 7.8 of the TDP;

                     (vii)     to terminate the PI Trust pursuant to Section 7.2 below;

                     (viii)     to settle the liability of any insurer under any insurance policy or legal action related thereto;

                     (ix)     to change the compensation of the members of the TAC, the Future Claimants' Representative or Trustees, other than to reflect cost-of-living increases or changes approved by the Bankruptcy Court as otherwise provided herein;

                     (x)     to take structural or other actions to minimize any tax on the PI Trust Assets;

                     (xi)     to amend the PI Trust Bylaws in accordance with the terms thereof;

                     (xii)     to amend any provision of the PI Trust Agreement or the TDP in accordance with the terms thereof;

1062

      (xiii)   to vote the shares of Reorganized OC held by the PI Trust for purposes of electing members of the Board of Directors of Reorganized OC; and

      (xiv)   to merge any asbestos claims resolution organization formed by the PI Trust with another asbestos claims resolution organization that is not specifically created by this PI Trust Agreement or the TDP, or to contract with another asbestos claims resolution organization or other entity that is not specifically created by this PI Trust Agreement or the TDP, or permit any other party to join in any asbestos claims resolution organization that is formed by the PI Trust pursuant to the PI Trust Agreement or the TDP; provided that such merger, contract or joinder shall not (a) subject Reorganized OC or any successors in interest thereto, to any risk of having any PI Trust Claim asserted against it or them, or (b) otherwise jeopardize the validity or enforceability of the Section 524(g) injunction; and provided further that the terms of such merger will require the surviving organization to make decisions about the allowability and value of claims in accordance with Section 2.1 of the TDP which requires that such decisions be based on the provisions of the TDP.

      (g)   The Trustees shall meet with the TAC and the Future Claimants' Representative no less often than quarterly. The Trustees shall meet in the interim with the TAC and the Future Claimants' Representative when so requested by either.

      (h)   The Trustees, upon notice from either the TAC or the Future Claimants' Representative, if practicable in view of pending business, shall at their next meeting with the TAC or the Future Claimants' Representative consider issues submitted by the TAC or the Future Claimants' Representative.

1063

(i)    Periodically, but not less often than once a year, the Trustees shall make available to claimants and other interested parties the number of claims by disease levels that have been resolved both by individual review and by arbitration, as well as by trial, indicating the amounts of the awards and the averages of the awards by jurisdiction pursuant to Section 7.10 of the TDP.

**2.3    Claims Administration.**

The Trustees shall promptly proceed to implement the TDP.

## SECTION 3

## ACCOUNTS, INVESTMENTS, AND PAYMENTS

**3.1    Accounts.** The Trustees may, from time to time, create such accounts and reserves within the PI Trust estate as they may deem necessary, prudent, or useful in order to provide for the payment of expenses and payment of PI Trust Claims and may, with respect to any such account or reserve, restrict the use of monies therein.

**3.2    Investments.** Investment of monies held in the PI Trust shall be administered in the manner in which individuals of ordinary prudence, discretion, and judgment would act in the management of their own affairs, subject to the following limitations and provisions:

(a)    The PI Trust shall not acquire, directly or indirectly, equity in any entity (other than Reorganized OC, or any successor to Reorganized OC) or business enterprise if, immediately following such acquisition, the PI Trust would hold more than 5% of the equity in such entity or business enterprise. The PI Trust shall not hold, directly or indirectly, more than

1064

10% of the equity in any entity (other than Reorganized OC, or any successor to Reorganized OC) or business enterprise.

(b)     The PI Trust shall not acquire or hold any long-term debt securities unless (i) such securities are included in the PI Trust Share or PI Trust Assets under the Plan, (ii) such securities are rated "Baa" or higher by Moody's, "BBB" or higher by Standard & Poor's ("S&P's"), or have been given an equivalent investment grade rating by another nationally recognized statistical rating agency, or (iii) have been issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.

(c)     The PI Trust shall not acquire or hold for longer than ninety (90) days any commercial paper unless such commercial paper is rated "Prime-1" or higher by Moody's or "A-1" or higher by S&P's or has been given an equivalent rating by another nationally recognized statistical rating agency.

(d)     Excluding any securities of OC or Reorganized OC, the PI Trust shall not acquire or hold any common or preferred stock or convertible securities unless such stock or securities are rated "A" or high by Moody's or "A" or higher by S&P's or have been given an equivalent investment grade rating by another nationally recognized statistical rating agency.

(e)     Excluding any securities of OC or Reorganized OC, the PI Trust shall not acquire any debt securities or other instruments issued by any entity (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof) if, following such acquisition, the aggregate market value of all debt securities and instruments issued by such entity held by the PI Trust would exceed 2% of the aggregate value of the PI Trust estate.  The PI Trust shall not hold any

1065

debt securities or other instruments issued by any entity (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof and other than debt securities or other instruments of Reorganized OC, or any successor to Reorganized OC) to the extent that the aggregate market value of all securities and instruments issued by such entity held by the PI Trust would exceed 5% of the aggregate value of the PI Trust Assets.

(f)     The PI Trust shall not acquire or hold any certificates of deposit unless all publicly held, long-term debt securities, if any, of the financial institution issuing the certificate of deposit and the holding company, if any, of which such financial institution is a subsidiary, meet the standards set forth in Section 3.2(b) above.

(g)     The PI Trust may acquire and hold any securities or instruments issued by Reorganized OC or any successor to Reorganized OC, or obtained as proceeds of litigation or otherwise to resolve disputes, without regard to the limitations set forth in Subsections (a)-(f) above.

(h)     The PI Trust shall not acquire or hold any repurchase obligations unless, in the opinion of the Trustees, they are adequately collateralized.

(i)     The PI Trust shall not acquire or hold any options.

3.3     **Source of Payments.**  All PI Trust expenses and payments and all liabilities with respect to claims shall be payable solely by the Trustees out of the PI Trust Assets.  Neither OC, Reorganized OC, or their subsidiaries, any successor in interest, or the present or former shareholders, directors, officers, employees or agents of OC, Reorganized OC, or their

1066

subsidiaries, nor the Trustees, the TAC or Future Claimants' Representative, or any of their officers, agents, advisors, or employees shall be liable for the payment of any PI Trust expense or any other liability of the PI Trust.

## SECTION 4

## TRUSTEES

**4.1     Number.**  There shall be five (5) Trustees.  The initial Trustees shall be those persons named on the signature page hereof. At their first meeting, the initial Trustees shall designate one of their number to serve as the Managing Trustee of the PI Trust, with such administrative duties as the Trustees may determine. The Trustees may change the designation of the individual to serve as Managing Trustee from time to time as circumstances warrant.

**4.2     Term of Service.**

(a)     The five initial Trustees named pursuant to Article 4.1 above shall each serve an initial two (2) year term. At the expiration of these initial two (2) year terms, the number of Trustees shall be reduced from five (5) to three (3). At that time, the five initial Trustees, after consultation with the TAC and the Future Claimants' Representative, shall decide which three individuals among their number shall continue to serve, and the three (3) Trustees so selected shall then serve staggered terms of three (3), four (4) and five (5) years each.  Thereafter, each Trustee's term of service shall be five (5) years.  The initial Trustees shall serve from the Effective Date until the earlier of (i) the end of his or her term, (ii) his or her death, (iii) his or her resignation pursuant to Section 4.2(b) below, (iv) his or her removal pursuant to Section 4.2(c) below, or (v) the termination of the PI Trust pursuant to Section 7.2 below.

1067

(b)    A PI Trustee may resign at any time by written notice to the remaining Trustees, the TAC and the Future Claimants' Representative. Such notice shall specify a date when such resignation shall take place, which shall not be less than 90 days after the date such notice is given, where practicable.

(c)    A Trustee may be removed by unanimous vote of the remaining Trustees in the event that he or she becomes unable to discharge his or her duties hereunder due to accident or physical or mental deterioration, or for other good cause. Good cause shall be deemed to include, without limitation, any substantial failure to comply with the general administration provisions of Section 2.2 above, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustees hereunder, or repeated non-attendance at scheduled meetings. Such removal shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

### 4.3    Appointment of Successor Trustees.

(a)    In the event of a vacancy in the position of PI Trustee, whether by death, term expiration, resignation or removal, the remaining Trustees shall consult with the TAC and the Future Claimants' Representative concerning appointment of a successor Trustee. The vacancy shall be filled by the unanimous vote of the remaining Trustees unless a majority of the TAC or the Future Claimants' Representative vetoes the appointment. In the event that the remaining Trustees cannot agree on a Successor PI Trustee, or a majority of the TAC or the Future Claimants' Representative vetoes the appointment of the proposed successor PI Trustee, the Bankruptcy Court shall make the appointment. Nothing shall prevent the reappointment of a PI Trustee for an additional term or terms pursuant to the provisions of this Section 4.3(a).

1068

(b)    Immediately upon the appointment of any Successor PI Trustee, all rights, titles, duties, powers and authority of the predecessor PI Trustee hereunder shall be vested in, and undertaken by, the Successor PI Trustee without any further act. No Successor PI Trustee shall be liable personally for any act or omission of his or her predecessor Trustees.

(c)    Each Successor PI Trustee shall serve until the earlier of (i) the end of a full term of five (5) years if the predecessor PI Trustee completed his or her term, (ii) the end of the remainder of the term of the PI Trustee whom he or she is replacing if said predecessor PI Trustee did not complete said term, (iii) his or her death, (iv) his or her resignation pursuant to Section 4.2(b) above, (v) his or her removal pursuant to Section 4.2(c) above, or (vi) the termination of the PI Trust pursuant to Section 7.2 below.

**4.4    Liability of Trustees, Officers and Employees.**  The Trustees and the individuals identified as Additional Indemnitees in Section 2.1(c)(xiv) above shall not be liable to the PI Trust, to any individual holding an asbestos claim, or to any other person, except for such individual's own breach of trust committed in bad faith or willful misappropriation. In addition, the Trustees and the Additional Indemnitees shall not be liable for any act or omission of any other Trustee or Additional Indemnitee unless such person acted with bad faith in the selection or retention of such other Trustee or Additional Indemnitee.

**4.5    Compensation and Expenses of Trustees.**

(a)    The Trustees shall receive compensation from the PI Trust for their services as Trustees in the amount of $60,000.00 per annum, except that the Managing Trustee shall receive $75,000.00 per annum for his or her service. All Trustees shall also receive a per diem allowance for meetings or other PI Trust business performed in the amount of $1,500.00.

1069

For purposes of the per diem allowance, PI Trust business includes, but is not limited to, attendance at meetings of Reorganized OC's Board of Directors. For purposes of Section 7.4 below, the Trustees shall determine the scope and duration of activities that constitute a meeting and, if the Trustees elect to provide for payment for activities of less than a full day's duration, may provide for partial payment of per diem amounts on a proportional basis for activities of less than a full day's duration. The per annum and per diem compensation payable to the Trustees hereunder shall be reviewed every three (3) years and appropriately adjusted for changes in the cost of living. Any other changes in compensation of the Trustees shall be made subject to the approval of the Bankruptcy Court.

(b)    The PI Trust will promptly reimburse the Trustees for all reasonable out-of-pocket costs and expenses incurred by the Trustees in connection with the performance of their duties hereunder.

(c)    The PI Trust shall include a description of the amounts paid under this Section 4.5 in the accounts to be filed with the Bankruptcy Court and provided to the TAC, the Future Claimants' Representative, and Reorganized OC pursuant to Section 2.2(c)(i).

   **4.6    Indemnification of Trustees and Additional Indemnitees.**

(a)    The PI Trust shall indemnify and defend the Trustees, as well as the Additional Indemnitees in the performance of their duties hereunder to the fullest extent that a corporation or trust organized under the laws of the PI Trust's situs is from time to time entitled to indemnify and defend such persons against any and all liabilities, expenses, claims, damages or losses incurred by them in the performance of their duties. Notwithstanding the foregoing, the Trustees and the Additional Indemnitees shall not be indemnified or defended in any way for any

773708.2 120565                              21

liability, expense, claim, damage, or loss for which he or she is ultimately held liable under Section 4.4 above.

(b)    Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of a PI Trustee or Additional Indemnitee in connection with any action, suit, or proceeding, whether civil, administrative or arbitrative from which they are indemnified by the PI Trust pursuant to Section 4.6(a) above, shall be paid by the PI Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trustees or Additional Indemnitee, to repay such amount in the event that it shall be determined ultimately by final order that such PI Trustee or Additional Indemnitee is not entitled to be indemnified by the PI Trust.

(c)    The Trustees may purchase and maintain reasonable amounts and types of insurance on behalf of an individual who is or was a PI Trustee or Additional Indemnitee including against liability asserted against or incurred by such individual in that capacity or arising from his or her status as a PI Trustee, TAC member, Future Claimants' Representative, or officer, employee, agent or other representative of the PI Trustees or Additional Indemnitees.

4.7    **Trustees' Lien.**  The Trustees and the Additional Indemnitees shall have a first priority lien upon the PI Trust Assets to secure the payment of any amounts payable to them pursuant to Section 4.6 above.

4.8    **Trustees' Employment of Experts.**  The Trustees may, but shall not be required to, retain and/or consult with counsel, accountants, appraisers, auditors and forecasters, and other parties deemed by the Trustees to be qualified as experts on the matters submitted to them, and the written opinion of or information provided by any such parties on any matters submitted to

1071

them by the Trustees shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustees hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

4.9    **Trustees' Independence.**  The Trustees shall not, during the term of their service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for Reorganized OC.  Notwithstanding the foregoing, any PI Trustee may serve, without any additional compensation other than the per diem compensation to be paid by the PI Trust pursuant to Section 4.5(a) above, as a director of Reorganized OC.  No PI Trustee shall act as an attorney for any person who holds an asbestos claim.

4.10    **Bond.**  The Trustees shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

### SECTION 5

### TRUST ADVISORY COMMITTEE

5.1    **Members.**  The TAC shall consist of seven (7) members, who shall initially be the persons named on the signature page hereof.

5.2    **Duties.**  The members of the TAC shall serve in a fiduciary capacity representing all holders of present PI Trust Claims.  The Trustees must consult with the TAC on matters identified in Section 2.2(e) above and in other provisions herein, and must obtain the consent of the TAC on matters identified in Section 2.2(f) above.  Where provided in the TDP, certain other actions by the Trustees are also subject to the consent of the TAC.

1072

**5.3    Term of Office.**

(a)    A member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) below, (iii) his or her removal pursuant to Section 5.3(c) below, or (iv) the termination of the PI Trust pursuant to Section 7.2 below.

(b)    A member of the TAC may resign at any time by written notice to the other members of the TAC, the Trustees and the Future Claimants' Representative. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated non-attendance at scheduled meetings, or other good cause. Such removal shall be made at the recommendation of the remaining members of the TAC with the approval of the Bankruptcy Court.

**5.4    Appointment of Successor.**

(a)    In the event of a vacancy caused by the resignation or death of a TAC member, his or her successor shall be pre-selected by the resigning or deceased TAC member, or by his or her law firm in the event that such member has not pre-selected a successor. If neither the member nor the law firm exercises the right to make such a selection, the successor shall be chosen by a majority vote of the remaining TAC members. If a majority of the remaining members cannot agree, the Bankruptcy Court shall appoint the successor. In the event of a

733708.2 120405                               24

vacancy caused by the removal of a TAC member, the remaining members of the TAC by majority vote shall name the successor. If the majority of the remaining members of the TAC cannot reach agreement, the Bankruptcy Court shall appoint the successor.

(b)    Each successor TAC member shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) above, (iii) his or her removal pursuant to Section 5.3(c) above, or (iv) the termination of the PI Trust pursuant to Section 7.2 below.

### 5.5    TAC's Employment of Professionals.

(a)    The TAC may but is not required to retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, and financial and investment advisors, and such other parties deemed by the TAC to be qualified as experts on matters submitted to the TAC (the "Professionals"). The TAC and its Professionals shall at all times have complete access to the PI Trust's officers, employees and agents, as well as to the Professionals retained by the PI Trust, and shall also have complete access to all information generated by them or otherwise available to the PI Trust or the Trustees. In the absence of gross negligence, the written opinion of or information provided by any Professional deemed by the TAC to be qualified as an expert on the particular matter submitted to the TAC shall be full and complete authorization and protection in support of any action taken or not taken by the TAC in good faith and in accordance with the written opinion of or information provided by the Professional.

(b)    The Trust shall promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of legal counsel

1074

pursuant to this provision in connection with the TAC's performance of its duties hereunder. The Trust shall also promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of any other Professional pursuant to this provision in connection with the TAC's performance of its duties hereunder; provided, however, that (i) the TAC has first submitted to the Trust a written request for such reimbursement setting forth the reasons (A) why the TAC desires to employ such Professional, and (B) why the TAC cannot rely on Professionals retained by the Trust to meet the need of the TAC for such expertise or advice, and (ii) the Trust has approved the TAC's request for reimbursement in writing. If the Trust agrees to pay for the TAC Professional, such reimbursement shall be treated as a Trust Expense. If the Trust declines to pay for the TAC Professional, it must set forth its reasons in writing. If the TAC still desires to employ such Professional at Trust expense, the TAC and the Trustees shall resolve their dispute pursuant to Section 7.13 below.

### 5.6    Compensation and Expenses of TAC.

The members of the TAC shall receive compensation from the PI Trust for their services as TAC members in the form of a reasonable hourly rate set by the Trustees for attendance at meetings or other conduct of PI Trust business. The members of the TAC shall also be reimbursed promptly for all reasonable out-of-pocket costs and expenses incurred by the TAC members in connection with the performance of their duties hereunder. Such reimbursement or direct payment shall be deemed a PI Trust expense. The PI Trust shall include a description of the amounts paid under this Section 5.6 in the accounts to be filed with the Bankruptcy Court and provided to the Trustees, the Future Claimants' Representative, and Reorganized OC pursuant to Section 2.2(c)(i).

5.7    **Procedures for Consultation With and Obtaining the Consent of the TAC.**

    (a)    **Consultation Process.**

    (i) In the event the Trustees are required to consult with the TAC pursuant to Section 2.2(e) above or on other matters as provided herein, the Trustees shall provide the TAC with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustees shall also provide the TAC with such reasonable access to Professionals and other experts retained by the PI Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustees are considering such matter, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustees.

    (ii)    The Trustees shall take into consideration the time required for the TAC, if its members so wish, to engage and consult with its own independent financial or investment advisors as to such matter.

    (b)    **Consent Process.**

    (i)    In the event the Trustees are required to obtain the consent of the TAC pursuant to Section 2.2(f) above, the Trustees shall provide the TAC with a written notice stating that their consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustees propose to take, and explaining in detail the reasons why the Trustees desire to take such action. The Trustees shall provide the TAC as much relevant additional information concerning the proposed action as is reasonably practicable under the

1076

circumstances. The Trustees shall also provide the TAC with such reasonable access to Professionals and other experts retained by the PI Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustees are considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustees.

(ii)     The TAC must consider in good faith and in a timely fashion any request for its consent by the Trustees, and must in any event advise the Trustees in writing of its consent or its objection to the proposed action within 30 days of receiving the original request for consent from the Trustees. The TAC may not withhold its consent unreasonably. If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action. If the TAC does not advise the Trustees in writing of its consent or its objections to the action within 30 days of receiving notice regarding such request, the TAC's consent to the proposed actions shall be deemed to have been affirmatively granted.

(iii)     If, after following the procedures specified in this Section 5.7(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustees and/or the TAC shall resolve their dispute pursuant to Section 7.13. However, the burden of proof with respect to the validity of the TAC's objection and withholding of its consent shall be on the TAC.

## SECTION 6

## THE FUTURE CLAIMANTS' REPRESENTATIVE

6.1    **Duties**. The Future Claimants' Representative shall be the individual identified on the signature pages hereto. He or she shall serve in a fiduciary capacity, representing the interests of the holders of future PI Trust Claims for the purpose of protecting the rights of such persons. The Trustees must consult with the Future Claimants' Representative on matters identified in Section 2.2(e) above and on certain other matters provided herein, and must obtain the consent of the Future Claimants' Representative on matters identified in Section 2.2(f) above. Where provided in the TDP, certain other actions by the Trustees are also subject to the consent of the Future Claimants' Representative.

6.2    **Term of Office**.

(a)    The Future Claimants' Representative shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 6.2(b) below, (iii) his or her removal pursuant to Section 6.2(c) below, or (iv) the termination of the PI Trust pursuant to Section 7.2 below.

(b)    The Future Claimants' Representative may resign at any time by written notice to the Trustees. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    The Future Claimants' Representative may be removed by the Bankruptcy Court in the event he or she becomes unable to discharge his or her duties hereunder due to

1078

accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties hereunder, such as repeated non-attendance at scheduled meetings.

6.3    Appointment of Successor. A vacancy caused by death or resignation shall be filled with an individual nominated prior to the death or the effective date of the resignation by the deceased or resigning Future Claimants' Representative, and a vacancy caused by removal of the Future Claimants' Representative shall be filled with an individual nominated by the Trustees in consultation with the TAC, subject to the approval of the Bankruptcy Court. In the event a majority of the Trustees cannot agree, or a nominee has not been pre-selected, the successor shall be chosen by the Bankruptcy Court.

6.4    Future Claimants' Representative's Employment of Professionals.

(a)    The Future Claimants' Representative may but is not required to retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, and financial and investment advisors, and such other parties deemed by the Future Claimants' Representative to be qualified as experts on matters submitted to the Future Claimants' Representative (the "Professionals"). The Future Claimants' Representative and his or her experts shall at all times have complete access to the PI Trust's officers, employees and agents, as well as to the Professionals retained by the PI Trust, and shall also have complete access to all information generated by them or otherwise available to the PI Trust or the Trustees. In the absence of gross negligence, the written opinion of or information provided by any Professional deemed by the Future Claimants' Representative to be qualified as an expert on the particular matter submitted to the Future Claimants' Representative shall be full and complete authorization and protection in

support of any action taken or not taken by the Future Claimants' Representative in good faith and in accordance with the written opinion of or information provided by the Professional.

(b)     The Trust shall promptly reimburse, or pay directly if so instructed, the Future Claimants' Representative for all reasonable fees and costs associated with the Future Claimants' Representative's employment of legal counsel pursuant to this provision in connection with the Future Claimants' Representative's performance of his or her duties hereunder. The Trust shall also promptly reimburse, or pay directly if so instructed, the Future Claimants' Representative for all reasonable fees and costs associated with the Future Claimants' Representative's employment of any other Professionals pursuant to this provision in connection with the Future Claimants' Representative's performance of his or her duties hereunder; provided, however, that (i) the Future Claimants' Representative has first submitted to the Trust a written request for such reimbursement setting forth the reasons (A) why the Future Claimants' Representative desires to employ the Professional, and (B) why the Future Claimants' Representative cannot rely on Professionals retained by the Trust to meet the need of the Future Claimants' Representative for such expertise or advice, and (ii) the Trust has approved the Future Claimants' Representative's request for reimbursement in writing. If the Trust agrees to pay for the Future Claimants' Representative's Professional, such reimbursement shall be treated as a Trust Expense. If the Trust declines to pay for the Future Claimants' Representative's Professional, it must set forth its reasons in writing. If the Future Claimants' Representative still desires to employ the Professional at Trust expense, the Future Claimants' Representative and the Trustees shall resolve their dispute pursuant to Section 7.13 below.

1080

**6.5**     **Compensation and Expenses of the Future Claimants' Representative.**

(a)     The Future Claimants' Representative shall receive compensation from the PI Trust in the form of the Future Claimants' Representative's normal hourly rate for services performed. The PI Trust will promptly reimburse the Future Claimants' Representative for all reasonable out-of-pocket costs and expenses incurred by the Future Claimants' Representative in connection with the performance of his or her duties hereunder. Such reimbursement or direct payment shall be deemed a PI Trust expense. The PI Trust shall include a description of the amounts paid under this Section 6.5 in the accounts to be filed with the Bankruptcy Court and provided to the Trustees, the Future Claimants' Representative, and Reorganized OC pursuant to Section 2.2(c)(i).

**6.6**     **Procedures for Consultation With and Obtaining the Consent of the Future Claimants' Representative.**

(a)     **Consultation Process.**

(i)     In the event the Trustees are required to consult with the Future Claimants' Representative pursuant to Section 2.2(e) above or on any other matters specified herein, the Trustees shall provide the Future Claimants' Representative with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustees shall also provide the Future Claimants' Representative with such reasonable access to Professionals and other experts retained by the PI Trust and its staff (if any) as the Future Claimants' Representative may reasonably request during the time that the Trustees are considering such matter, and shall also provide the Future Claimants' Representative the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustees.

(ii)     The Trustees shall take into consideration the time required for the Future Claimants' Representative, if he or she so wishes, to engage and consult with his or her own independent financial or investment advisors as to such matter.

(b)     **Consent Process.**

(i)     In the event the Trustees are required to obtain the consent of the Future Claimants' Representative pursuant to Section 2.2(f) above, the Trustees shall provide the Future Claimants' Representative with a written notice stating that his or her consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustees propose to take, and explaining in detail the reasons why the Trustees desire to take such action. The Trustees shall provide the Future Claimants' Representative as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustees shall also provide the Future Claimants' Representative with such reasonable access to Professional and other experts retained by the PI Trust and its staff (if any) as the Future Claimants' Representative may reasonably request during the time that the Trustees are considering such action, and shall also provide the Future Claimants' Representative the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustees.

(ii)     The Future Claimants' Representative must consider in good faith and in a timely fashion any request for his or her consent by the Trustees, and must in any event advise the Trustees in writing of his or her consent or objection to the proposed action within 30 days of receiving the original request for consent from the Trustees. The Future Claimants' Representative may not withhold his or her consent unreasonably. If the Future Claimants'

1082

Representative decides to withhold consent, he or she must explain in detail his or her objections to the proposed action.  If the Future Claimants' Representative does not advise the Trustees in writing of his or her consent or objections to the proposed action within 30 days of receiving the notice from the Trustees regarding such consent, the Future Claimants' Representative's  consent shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 5.7(b), the Future Claimants' Representative continues to object to the proposed action and to withhold its consent to the proposed action, the Trustees and/or the Future Claimants' Representative shall resolve their dispute pursuant to Section 7.13. However, the burden of proof with respect to the validity of the Future Claimants' Representative's objection and withholding of his or her consent shall be on the Future Claimants' Representative.

## SECTION 7

## GENERAL PROVISIONS

7.1    **Irrevocability.**  The PI Trust is irrevocable.

7.2    **Termination.**

(a)    The PI Trust shall automatically terminate on the date ninety (90) days after the first to occur of the following events:

(i)    the Trustees decide to terminate the PI Trust because (A) they deem it unlikely that new asbestos claims will be filed against the PI Trust, (B) all PI Trust Claims duly filed with the PI Trust have been liquidated and paid to the extent provided in this PI

773588.2 12/20/03                    34

Trust Agreement and the TDP or disallowed by a final, non-appealable order, to the extent possible based upon the funds available through the Plan, and (C) twelve (12) consecutive months have elapsed during which no new asbestos claim has been filed with the PI Trust; or

(ii)     if the Trustees have procured and have in place irrevocable insurance policies and have established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses of the PI Trust in a manner consistent with this PI Trust Agreement and the TDP, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a final order; or

(iii)     to the extent that any rule against perpetuities shall be deemed applicable to the PI Trust, twenty-one (21) years less ninety-one (91) days pass after the death of the last survivor of all of the descendants of Joseph P. Kennedy, Sr., of Massachusetts, father of the late President John F. Kennedy, living on the date hereof.

(b)     On the Termination Date, after payment of all the PI Trust's liabilities have been provided for, all monies remaining in the PI Trust estate shall be given to such organization(s) exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustees using their reasonable discretion; provided, however, that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on, or the relief of suffering of individuals suffering from asbestos related lung disorders, and (ii) the tax-exempt organization(s) shall not bear any relationship to Reorganized OC within the meaning of Section 468B(d)(3) of

the Internal Revenue Code. Notwithstanding any contrary provision of the Plan and related documents, this Section 7.2(b) cannot be modified or amended.

7.3    **Amendments.** The Trustees, after consultation with the TAC and the Future Claimants' Representative, and subject to the consent of the TAC and the Future Claimants' Representative, may modify or amend this PI Trust Agreement and the PI Trust By-laws. The Trustees, after consultation with the TAC and the Future Claimants' Representative, and subject to the consent of the TAC and the Future Claimants' Representative, may modify or amend the TDP, provided, however, that no amendment to the TDP shall be inconsistent with the limitations on amendments provided therein, and, in particular, the provisions limiting amendment of the Claims Payment Ratio set forth in Section 2.5 of the TDP and of the Payment Percentage set forth in Section 4.2 of the TDP. Any modification or amendment made pursuant to this Article must be done in writing. Notwithstanding anything contained in this PI Trust Agreement to the contrary, neither this PI Trust Agreement, the PI Trust Bylaws, the TDP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify the applicability of Section 524(g) of the Bankruptcy Code, the efficacy or enforceability of the injunction entered thereunder, or the PI Trust's qualified settlement fund status under Section 468B of the Internal Revenue Code.

7.4    **Meetings.** For purposes of determining whether a Trustee is entitled to per diem compensation as provided in Section 4.5 above, the Trustees shall be deemed to have attended a meeting in the event such person spends four hours or more during a day conferring, in person or by telephone conference call, on PI Trust matters with the TAC, the Future Claimants' Representative, or Trustees, as applicable. A Trustee shall also be deemed to have attended a meeting in the event he or she spends four hours or more during a day engaging in activities

related to Reorganized OC, including attendance at its Board of Directors meetings. The Trustees shall have complete discretion to determine whether a meeting, as described herein, occurred for purposes of Sections 4.5 above, including whether a Trustee who spends less than four hours during a given day on PI Trust activities should be compensated on a pro rata basis for purposes of payment of the per diem.

7.5    Severability. Should any provision in this PI Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this PI Trust Agreement.

7.6    Notices. Notices to persons asserting claims shall be given by first class mail, postage prepaid, at the address of such person, or, where applicable, such person's Future Claimants' Representative, in each case as provided on such person's claim form submitted to the PI Trust with respect to his or her PI Trust Claim.

(a)    Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by telex, telecopy or facsimile pursuant to the instructions listed below, or mailed by registered or certified mail, return receipt requested, postage prepaid, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the PI Trust through the Trustees:

To Reorganized OC:

771708.2 12/00/05

37

1086

To the TAC:

To the Future Claimants' Representative:

(b)    All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

7.7    **Successors and Assigns.**  The provisions of this PI Trust Agreement shall be binding upon and inure to the benefit of OC, Reorganized OC, the PI Trust, and the Trustees and their respective successors and assigns, except that neither OC, Reorganized OC, the PI Trust, or the Trustees may assign or otherwise transfer any of its, or their, rights or obligations under this PI Trust Agreement except, in the case of the PI Trust and the Trustees, as contemplated by Section 2.1 above.

7.8    **Limitation on Claim Interests for Securities Laws Purposes.**  PI Trust Claims, and any interests therein (a) shall not be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution; (b) shall not be evidenced by a certificate or other instrument; (c) shall

1087

not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest; provided, however, that clause (a) of this Section 7.8 shall not apply to the holder of a claim that is subrogated to a PI Trust Claim as a result of its satisfaction of such PI Trust Claim.

7.9    **Entire Agreement; No Waiver.**   The entire agreement of the parties relating to the subject matter of this PI Trust Agreement is contained herein and in the documents referred to herein, and this PI Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof.   No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege.   The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

7.10    **Headings.**   The headings used in this PI Trust Agreement are inserted for convenience only and do not constitute a portion of this PI Trust Agreement, nor in any manner affect the construction of the provisions of this PI Trust Agreement.

7.11    **Governing Law.**   This PI Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to Delaware conflict of law principles.

7.12    **Settlors' Representations and Cooperation.**   OC is hereby irrevocably designated as the Settlor, and is hereby authorized to take any action required of the Settlor in connection with the PI Trust Agreement.   OC agrees to cooperate in implementing the goals and objectives of this PI Trust.

773704.2 12/30/05                            39

**7.13    Dispute Resolution.**  Any disputes that arise under this PI Trust Agreement or under the TDP shall be resolved by submission of the matter to an alternative dispute resolution ("ADR") process mutually agreeable to the parties involved.  Should any party to the ADR process be dissatisfied with the decision of the arbitrator(s), that party may apply to the Bankruptcy Court for a judicial determination of the matter.  In either case, if the dispute arose pursuant to the consent provision set forth in Section 5.7(b) (in the case of the TAC) or Section 6.6(b) (in the case of the Future Claimants' Representative), the burden of proof shall be on the party or parties who withheld consent to show that the objection was valid. Should the dispute not be resolved by ADR process within thirty (30) days after submission, the parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court.  Notwithstanding anything else herein contained, to the extent any provision of this PI Trust Agreement is inconsistent with any provision of the Plan or the TDP, the Plan or the TDP shall control.

**7.14    Enforcement and Administration.**  The provisions of this PI Trust Agreement and the TDP attached hereto shall be enforced by the Bankruptcy Court pursuant to the Plan.  The parties hereby further acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction over the settlement of the accounts of the Trustees and over any disputes hereunder not resolved by alternative dispute resolution in accordance with Section 7.13 above.

**7.15    Effectiveness.**  This PI Trust Agreement shall not become effective until it has been executed and delivered by all the parties hereto.

**7.16    Counterpart Signatures.**  This PI Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument.

1089

**IN WITNESS WHEREOF,** the parties have executed this PI Trust Agreement this

_____ day of _____, _____.


**SETTLOR: Owens Corning**


By:_____

_____
Name and Title

**TRUSTEES**

_____


_____


_____


_____


_____

1090

**ASBESTOS CREDITORS COMMITTEE**

By:_____

**TRUST ADVISORY COMMITTEE**

_____
Russell W. Budd, Esq.

_____
John D. Cooney, Esq.

_____
Theodore Goldberg, Esq.

_____
Steven Kazan, Esq.

_____
Michael V. Kelley, Esq.

_____
Joseph F. Rice, Esq.

_____
Perry Weitz, Esq.

**FUTURE CLAIMANTS' REPRESENTATIVE**

_____
James A. McMonagle

1091

**Exhibit D-1**
Form of Asbestos Personal Injury Trust Distribution Procedures

# OWENS CORNING/FIBREBOARD

# FORM OF ASBESTOS PERSONAL INJURY
# TRUST DISTRIBUTION PROCEDURES

OWENS CORNING/FIBREBOARD

ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES

**TABLE OF CONTENTS**

Page

SECTION I — Introduction ............................................................................... 1

    1.1    Purpose ............................................................................................. 1
    1.2    Interpretation ................................................................................... 1

SECTION II — Overview ................................................................................. 2

    2.1    PI Trust Goals ................................................................................. 2
    2.2    Claims Liquidation Procedures ...................................................... 3
    2.3    Application of the Payment Percentage ......................................... 5
    2.4    Determination of the Maximum Annual Payment and
            Maximum Available Payment ...................................................... 7
    2.5    Claims Payment Ratio .................................................................... 8
    2.6    Indemnity and Contribution Claims .............................................. 11

SECTION III — TDP Administration ............................................................. 11

    3.1    PI Trust Advisory Committee and Future Claimants'
            Representative ............................................................................. 11
    3.2    Consent and Consultation Procedures ........................................... 12

SECTION IV — Payment Percentage; Periodic Estimates ............................. 12

    4.1    Uncertainty of OC 's and Fibreboard's Total Personal Injury
            Asbestos Liabilities ..................................................................... 12
    4.2    Computation of Payment Percentage ............................................ 13
    4.3    Applicability of the Payment Percentage ..................................... 15

1093

SECTION V — Resolution of PI Trust Claims ............................................................ 16

5.1   Ordering, Processing and Payment of Claims ......................................... 16
    (a)  Ordering of Claims ................................................................ 16
        (1)  Establishment of the FIFO Processing Queues................ 16
        (2)  Effect of Statutes of Limitations and Repose .................. 17
    (b)  Processing of Claims............................................................... 18
    (c)  Payment of Claims.................................................................. 18
5.2   Resolution of Pre-Petition Liquidated PI Trust Claims ......................... 20
    (a)  Processing and Payment ......................................................... 20
    (b)  Marshalling of Security .......................................................... 21
5.3   Resolution of Unliquidated PI Trust Claims ........................................... 22
    (a)  Expedited Review Process ...................................................... 23
        (1)  In General ................................................................... 23
        (2)  Claims Processing under Expedited Review .................. 23
        (3)  Disease Levels, Scheduled Values
            and Medical/Exposure Criteria ...................................... 24
    (b)  Individual Review Process ...................................................... 28
        (1)  In General ................................................................... 28
            (A)  Review of Medical/Exposure Criteria ............... 29
            (B)  Review of Liquidated Value............................... 29
        (2)  Valuation Factors to be Considered in
            Individual Review ......................................................... 30
        (3)  Processing and Payment Limitations for Claims
            Involving Disease Levels III and II ............................... 31
            (A)  Disease Level III Claims .................................... 31
            (B)  Disease Level II Claims ..................................... 31
        (4)  Scheduled, Average and Maximum Values ..................... 32
5.4   Categorizing Claims as Extraordinary
    and/or Exigent Hardship ...................................................................... 33
    (a)  Extraordinary Claims ............................................................. 33
    (b)  Exigent Hardship Claims ....................................................... 34
5.5   Secondary Exposure Claims ................................................................. 35
5.6   Indirect PI Trust Claims ....................................................................... 35
5.7   Evidentiary Requirements .................................................................... 38
    (a)  Medical Evidence .................................................................. 38
        (1)  In General ................................................................... 38
            (A)  Disease Levels I – IV.......................................... 38
            (B)  Disease Levels V – VIII...................................... 39
            (C)  Treatment of Certain Pre-Petition Claims ........... 39
        (2)  Credibility of Medical Evidence .................................... 40
    (b)  Exposure Evidence................................................................. 41
        (1)  In General ................................................................... 41
        (2)  Significant Occupational Exposure ................................ 41
        (3)  OC or Fibreboard Exposure .......................................... 42
5.8   Claims Audit Program .......................................................................... 42
5.9   Second Disease (Malignancy) Claims ................................................... 43

5.10    Arbitration ......................................................................................    44
    (a)    Establishment of ADR Procedures .............................................    44
    (b)    Claims Eligible for Arbitration..................................................    44
    (c)    Limitations on and Payment of Arbitration Awards....................    45
5.11    Litigation ......................................................................................    45

SECTION VI — Claims Materials    ...........................................................................    46

6.1    Claims Materials .............................................................................    46
6.2    Content of Claims Materials ...........................................................    46
6.3    Withdrawal or Deferral of Claims ..................................................    47
6.4    Filing Requirements and Fees .........................................................    47

SECTION VII — General Guidelines for Liquidating and Paying Claims ....................    48

7.1    Showing Required ...........................................................................    48
7.2    Costs Considered ............................................................................    48
7.3    Discretion to Vary Order and Amounts of Payments in
    Event of Limited Liquidity ............................................................    49
7.4    Punitive Damages    .........................................................................    49
7.5    Interest ..........................................................................................    50
    (a)    In General...............................................................................    50
    (b)    Unliquidated PI Trust Claims .....................................................    50
    (c)    Interest on Liquidated Pre-Petition Claims..................................    51
7.6    Suits in the Tort System...................................................................    51
7.7    Payment of Judgments for Money Damages .........................................    51
7.8    Releases .........................................................................................    52
7.9    Third-Party Services ........................................................................    53
7.10    PI Trust Disclosure of Information........................................................    53

SECTION VIII — Miscellaneous    ...........................................................................    53

8.1    Amendments ...................................................................................    53
8.2    Severability    ...................................................................................    54
8.3    Governing Law ................................................................................    54

# OWENS CORNING/FIBREBOARD

## ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES

The Asbestos Personal Injury Trust Distribution Procedures ("TDP") contained herein provide for resolving all Asbestos Personal Injury Claims for which Owens Corning ("OC") and/or its wholly owned subsidiary, Fibreboard Corporation ("Fibreboard"), and their predecessors, successors, and assigns have legal responsibility (respectively, OC Asbestos Personal Injury Claims ("OC Claims") and Fibreboard Asbestos Personal Injury Claims ("Fibreboard Claims"), which terms are defined in the Fifth Amended Joint Plan of Reorganization for Owens Corning and its Affiliated Debtors and Debtors-in-Possession ("Plan") (hereinafter collectively referred to in this TDP as "PI Trust Claims")). The Plan and the Asbestos Personal Injury Trust Agreement ("PI Trust Agreement") establish the Asbestos Personal Injury Trust (the "PI Trust"). The Trustees of the PI Trust ("Trustees") shall implement and administer this TDP in accordance with the PI Trust Agreement. Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Plan and the PI Trust Agreement.

## SECTION I

## Introduction

**1.1    Purpose.** This TDP has been adopted pursuant to the PI Trust Agreement. It is designed to provide fair, equitable, and substantially similar treatment for all PI Trust Claims that may presently exist or may arise in the future.

**1.2    Interpretation.** Nothing in this TDP shall be deemed to create a substantive right for any claimant.

## SECTION II

## Overview

2.1    **PI Trust Goals.** The goal of the PI Trust is to treat all holders of PI Trust
Claims equitably and in accordance with the requirements of Section 524(g) of the Bankruptcy
Code. To achieve that goal, the PI Trust consists of two separate Sub-Accounts, an OC Sub-
Account for payment of OC Claims and a Fibreboard Sub-Account for payment of Fibreboard
Claims (together the "PI Trust Sub-Accounts").

A claimant may assert separate claims against the OC Sub-Account and the Fibreboard
Sub-Account based on separate exposures to asbestos or asbestos-containing products
manufactured or distributed by OC and Fibreboard, respectively ("Multiple Exposure Claims");
however, all such Multiple Exposure Claims must be filed by the claimant at the same time. To
the extent that the OC Sub-Account and the Fibreboard Sub-Account each has separate liability
to a claimant based on Multiple Exposure Claims, each Sub-Account shall pay the claimant the
liquidated value of the separate claim for which it is liable, subject to applicable Payment
Percentage, Maximum Annual Payment, Maximum Available Payment and Claims Payment
Ratio limitations set forth below.

This TDP sets forth procedures for processing and paying all PI Trust Claims from the
two Sub-Accounts on an impartial, first-in-first-out ("FIFO") basis, with the intention of paying
all claimants over time as equivalent a share as possible of the value of their claims based on
historical values for substantially similar claims in the tort system.[1] This TDP also
establishes a single schedule of eight asbestos-related diseases ("Disease Levels"), seven of
which have presumptive medical and exposure requirements ("Medical/Exposure Criteria")

---

[1]    As used in this TDP, the phrase "in the tort system" shall include only claims asserted by
way of litigation and not claims asserted against a trust established pursuant to section 524(g)
and/or section 105 of the Bankruptcy Code or any other applicable law.

- 2 -

1097

that are applicable to both OC and Fibreboard Claims, as well as two separate schedules with liquidated values ("Scheduled Values"), anticipated average values ("Average Values"), and caps on liquidated values ("Maximum Values") that are applicable to OC Claims and Fibreboard Claims, respectively.

These Disease Levels, Medical/Exposure Criteria, Scheduled Values, Average Values and Maximum Values, which are set forth in Sections 5.3 and 5.4 below, have all been selected and derived with the intention of achieving a fair allocation of the assets held by the separate OC and Fibreboard Sub-Accounts as among their respective claimants suffering from different disease processes in light of the best available information considering the settlement histories of OC and Fibreboard, and the rights that OC and Fibreboard claimants would have in the tort system absent the bankruptcy.

2.2    **Claims Liquidation Procedures.** PI Trust Claims shall be processed based on their place in separate FIFO Processing Queues to be established for each of the two PI Trust Sub-Accounts pursuant to Section 5.1(a) below.  The PI Trust shall take all reasonable steps to resolve OC and Fibreboard Claims as efficiently and expeditiously as possible at each stage of claims processing and arbitration. To this end, the PI Trust, in its sole discretion, may conduct settlement discussions with claimants' representatives with respect to more than one claim at a time, provided that the claimants' respective positions in the FIFO Processing Queues are maintained, and each claim is individually evaluated pursuant to the valuation factors set forth in Section 5.3(b)(2) below. The PI Trust shall also make every effort to resolve each year at least that number of PI Trust Claims required to exhaust the Maximum Annual Payment and the Maximum Available Payment for Category A and Category B claims, as those terms are defined below.

- 3 -

1098

The PI Trust shall liquidate all OC and Fibreboard Claims except foreign claims that meet the presumptive Medical/Exposure Criteria of Disease Levels I – V, VII and VIII under the Expedited Review Process described in Section 5.3(a) below. PI Trust Claims involving Disease Levels I – V, VII and VIII that do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may undergo the PI Trust's Individual Review Process described in Section 5.3(b) below. In such a case, notwithstanding that the claim does not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level, the PI Trust can offer the claimant an amount up to the Scheduled Value of that Disease Level if the PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system.

OC and Fibreboard claimants holding PI Trust Claims involving Disease Levels II – VIII may in addition or alternatively seek to establish liquidated values for their claims that are greater than their Scheduled Values by electing the PI Trust's Individual Review Process. However, the liquidated values of PI Trust Claims that undergo the Individual Review Process for valuation purposes may be determined to be less than the Scheduled Values, and in any event shall not exceed the respective Maximum Values for the Disease Levels set forth for OC and Fibreboard Claims in Section 5.3(b)(4) below, unless the claims qualify as Extraordinary Claims as defined in Section 5.4(a) below, in which case their liquidated value cannot exceed the Maximum Values specified in that provision for such claims. OC and Fibreboard Level VI (Lung Cancer 2) Claims and all foreign claims may be liquidated only pursuant to the PI Trust's Individual Review Process.

Based upon OC 's and Fibreboard's claims settlement history in light of applicable tort law, and current projections of present and future unliquidated claims, the Scheduled Values

- 4 -

and Maximum Values set forth in Section 5.3(b)(4) for OC and Fibreboard Claims, respectively, have been established for each of the Disease Levels that are eligible for Individual Review of their liquidated values, with the expectation that the combination of settlements at the Scheduled Values and those resulting from the Individual Review Process will result in the Average Values also set forth in that provision.

All unresolved disputes over a claimant's medical condition, exposure history and/or the liquidated value of the claim shall be subject to binding or non-binding arbitration pursuant to Section 5.10 below, at the election of the claimant, under the ADR Procedures that are provided in Attachment A hereto. PI Trust Claims that are the subject of a dispute with the PI Trust that cannot be resolved by non-binding arbitration may enter the tort system as provided in Sections 5.11 and 7.6 below. However, if and when an OC or Fibreboard claimant obtains a judgment in the tort system, the judgment will be payable (subject to the Payment Percentage, Maximum Available Payment, and Claims Payment Ratio provisions set forth below) as provided in Section 7.7 below.

2.3     **Application of the Payment Percentage.** After the liquidated value of an OC or Fibreboard Claim other than a claim involving Other Asbestos Disease (Disease Level I – Cash Discount Payment), as defined in Section 5.3(a)(3) below, is determined pursuant to the procedures set forth herein for Expedited Review, Individual Review, arbitration, or litigation in the tort system, the claimant will ultimately receive a pro-rata share of that value based on the Payment Percentages separately set for OC and Fibreboard Claims pursuant to Section 4.2 below. These Payment Percentages shall also apply to all Pre-Petition Liquidated Claims as provided in Section 5.2 below.

- 5 -

The Initial Payment Percentage for the OC Sub-Account has been set at [_____] %, and the Initial Payment Percentage for the Fibreboard Sub-Account has been set at [_____] %. These Initial Payment Percentages shall apply to all OC and Fibreboard PI Trust Voting Claims accepted as valid by the PI Trust, unless adjusted by the PI Trust pursuant to the consent of the PI Trust Advisory Committee ("TAC") and the Legal Representative for Future Asbestos Claimants ("Future Claimants' Representative") (who are described in Section 3.1 below) pursuant to Section 4.2 below.

The term "PI Trust Voting Claims" includes (i) Pre-Petition Liquidated Claims as provided in Section 5.2 below; (ii) OC and Fibreboard Claims filed against OC and/or Fibreboard in the tort system or actually submitted to OC and/or Fibreboard pursuant to an administrative settlement agreement prior to the Petition Date of October 5, 2000; and (iii) all OC and Fibreboard Claims filed against another defendant in the tort system prior to the date the Plan was first filed with the Bankruptcy Court (January 17, 2003 (the "Plan Filing Date")), provided, however, that the holder of a claim described in subsection (i), (ii) or (iii) above, or his or her authorized agent, actually voted to accept or reject the Plan pursuant to the voting procedures established by the Bankruptcy Court, and provided further that the claim was subsequently filed with the PI Trust pursuant to Section 6.1 below by the Initial Claims Filing Date as defined in Section 5.1(a) below.

The Initial Payment Percentages for the OC and Fibreboard Sub-Accounts set forth above have been calculated on the assumption that the Average Values set forth in Section 5.3(b)(4) below will be achieved with respect to existing present claims and projected future claims involving Disease Levels II – VIII. However, either or both of these Payment Percentages may be adjusted upwards or downwards from time to time pursuant to Section 4.2 below by the PI

- 6 -

Trust with the consent of the TAC and the Future Claimants' Representative to reflect then-current estimates of the assets and liabilities allocable to OC and Fibreboard Claims, respectively, as well as the then-estimated value of pending and future OC and Fibreboard Claims. If the Payment Percentage for either the OC or Fibreboard Sub-Account is increased over time, claimants whose OC or Fibreboard Claims were liquidated and paid in prior periods under the TDP will not receive additional payments. Because there is uncertainty in the prediction of both the number and severity of future claims, and the amount of the PI Trust's assets, no guarantee can be made of any Payment Percentage for either OC or Fibreboard Claims.

    2.4    **Determination of the Maximum Annual Payment and Maximum Available Payment.** For each of the OC and the Fibreboard Sub-Accounts, the PI Trust shall estimate or model the amount of cash flow anticipated to be necessary over the entire life of the Sub-Account to ensure that amounts will be available to treat all holders of OC and/or Fibreboard Claims as similarly as possible, given the assets and liabilities allocable to each of the two Sub-Accounts. In each year, for each Sub-Account, the PI Trust will be empowered to pay out all of the interest earned during the year by the Sub-Account, together with a portion of the Sub-Account's principal, calculated so that the application of the Sub-Account's assets over its life shall correspond with the needs created by the anticipated flow of claims to the Sub-Account (the "Maximum Annual Payment"), taking into account the Payment Percentage provisions set forth in Sections 2.3 above and 4.2 below. The PI Trust's distributions from each Sub-Account to all holders of claims against the Sub-Account for that year shall not exceed the Maximum Annual Payment determined for that year.

-7-

In distributing the Maximum Annual Payment from each Sub-Account, the PI Trust shall first allocate the amount in question to outstanding Pre-Petition Liquidated Claims against the Sub-Account, and to liquidated claims against the Sub-Account involving Disease Level I (Cash Discount Payment), in proportion to the aggregate value of each group of claims. The remaining portion of the Maximum Annual Payment (the "Maximum Available Payment"), if any, shall then be allocated and used to satisfy all other previously liquidated PI Trust Claims against the Sub-Account, subject to the Claims Payment Ratio for the Sub-Account set forth in Section 2.5 below.

In the event there are insufficient amounts in any year to pay the total number of outstanding Pre-Petition Liquidated Claims and/or previously liquidated Disease Level I Claims against the Sub-Account, the available amounts allocated to that group of claims shall be paid to the maximum extent to claimants in the particular group based on their place in their Sub-Account's FIFO Payment Queue. Claims in either group for which there are insufficient amounts in the Sub-Account shall be carried over to the next year and placed at the head of the FIFO Payment Queue for that Sub-Account.

2.5     **Claims Payment Ratio.** Based upon OC 's and Fibreboard's claims settlement history and analysis of present and future claims, a single Claims Payment Ratio has been determined for both Sub-Accounts, which, as of the Effective Date, has been set at 60% for Category A claims, which consist of PI Trust Claims against OC and/or Fibreboard involving severe asbestosis and malignancies (Disease Levels IV – VIII) that were unliquidated as of the Petition Date, and at 40% for Category B claims, which are PI Trust Claims against OC and/or Fibreboard involving non-malignant Asbestosis or Pleural Disease (Disease Levels II and III) that were similarly unliquidated as of the Petition Date. However, the Claims Payment Ratio

- 8 -

shall not apply to any Pre-Petition Liquidated Claims or to any claims for Other Asbestos
Disease (Disease Level I - Cash Discount Payment) payable from either OC or Fibreboard Sub-
Accounts.

In each year, after the determination of the Maximum Available Payment described in
Section 2.4 above, 60% of that amount will be available to pay Category A claims and 40% will
be available to pay Category B claims that have been liquidated since the Petition Date. In the
event there are insufficient amounts in either the OC or Fibreboard Sub-Accounts in any year to
pay the liquidated claims within either or both of the Categories, the available amounts allocated
to the particular Category within the Sub-Account shall be paid to the maximum extent to
claimants in that Category based on their place in the Sub-Account's FIFO Payment Queue
described in Section 5.1(c) below, which will be based upon the date of claim liquidation.

Claims for which there are insufficient amounts allocated to the relevant Category within
a Sub-Account shall be carried over to the next year where they will be placed at the head of the
Sub-Account's FIFO Payment Queue. If there are excess amounts in either or both Categories
within a Sub-Account, because there is an insufficient amount of liquidated claims to exhaust the
respective Sub-Account's Maximum Available Payment amount for that Category, then the
excess amounts for either or both Categories will be rolled over and remain dedicated to the
respective Category to which they were originally allocated.

The 60%/40% Claims Payment Ratio and its rollover provision shall apply to all OC and
Fibreboard PI Trust Voting Claims as defined in Section 2.3 above (except Pre-Petition
Liquidated Claims and Other Asbestos Claims (Disease Level I – Cash Discount Payment)), and
shall not be amended until the fifth anniversary of the Effective Date. Thereafter, the Sub-
Account's Claims Payment Ratio and its rollover provision shall be continued absent

-9-

circumstances, such as a significant change in law or medicine, necessitating amendment to avoid a manifest injustice. However, the accumulation, rollover and subsequent delay of claims against one or both Sub-Accounts resulting from the application of the Claims Payment Ratio, shall not, in and of itself, constitute such circumstances. Nor may an increase in the numbers of Category B claims against a Sub-Account beyond those predicted or expected be considered as a factor in deciding whether to reduce the percentage allocated to Category A claims.

In considering whether to make any amendments to the Claims Payment Ratio and/or its rollover provisions for either Sub-Account, the Trustees should also consider the reasons for which the Claims Payment Ratio and its rollover provisions were adopted, the settlement histories of OC and Fibreboard that gave rise to its calculation, and the foreseeability or lack of the foreseeability of the reasons why there would be any need to make an amendment. In that regard, the Trustees should keep in mind the interplay between the Payment Percentage and the Claims Payment Ratio as it affects the net cash actually paid to claimants from either Sub-Account.

In any event, no amendment to the Claims Payment Ratio for either Sub-Account may be made without the consent of the TAC and the Future Claimants' Representative pursuant to the consent process set forth in Sections 5.7(b) and 6.6(b) of the PI Trust Agreement. However, the Trustees, with the consent of the TAC and the Future Claimants' Representative, may offer the option of a reduced Payment Percentage to holders of claims in either Category A or Category B against either Sub-Account in return for prompter payment by the Sub-Account (the "Reduced Payment Option").

      **2.6**     **Indemnity and Contribution Claims.** As set forth in Section 5.6

- 10 -

1105

below, PI Trust Claims for indemnity and contribution (defined in the Plan as OC Indirect

Asbestos Personal Injury Claims and Fibreboard Indirect Asbestos Personal Injury Claims, and

hereinafter referred to as "Indirect PI Trust Claims") against either the OC or the Fibreboard

Sub-Accounts, if any, will be subject to the same categorization, evaluation, and payment

provisions of this TDP as all other OC and Fibreboard Claims.

**SECTION III**

**TDP Administration**

3.1    **PI Trust Advisory Committee and Future Claimants' Representative.**

Pursuant to the Plan and the PI Trust Agreement, the PI Trust and this TDP shall be administered

by the Trustees in consultation with the TAC, which represents the interests of holders of present

PI Trust Claims against OC and Fibreboard, and the Future Claimants' Representative, who

represents the interests of holders of PI Trust Claims against OC and/or Fibreboard that will be

asserted in the future. The Trustees shall obtain the consent of the TAC and the Future

Claimants' Representative on any amendments to these Procedures pursuant to Section 8.1

below, and on such other matters as are otherwise required below and in Section 2.2(f) of the PI

Trust Agreement. The Trustees shall also consult with the TAC and the Future Claimants'

Representative on such matters as are provided below and in Section 2.2(e) of the PI Trust

Agreement. The initial members of the TAC and the initial Future Claimants' Representative are

identified in the PI Trust Agreement.

3.2    **Consent and Consultation Procedures.** In those circumstances in which

consultation or consent is required, the Trustees will provide written notice to the TAC and the

Future Claimants' Representative of the specific amendment or other action that is proposed.

The Trustees will not implement such amendment nor take such action unless and until the

- 11 -

parties have engaged in the Consultation Process described in Sections 5.7(a) and 6.6(a), or the Consent Process described in Sections 5.7(b) and 6.6(b) of the PI Trust Agreement, respectively.

### SECTION IV

### Payment Percentage; Periodic Estimates

**4.1    Uncertainty of OC's and Fibreboard's Total Personal Injury Asbestos Liabilities.** As discussed above, there is inherent uncertainty regarding OC's and Fibreboard's total asbestos-related tort liabilities, as well as the total value of the assets available to the OC and Fibreboard Sub-Accounts to pay PI Trust Claims asserted against each Sub-Account. Consequently, there is inherent uncertainty regarding the amounts that holders of PI Trust Claims will receive. To seek to ensure substantially similar treatment of all present and future claims against either the OC or the Fibreboard Sub-Accounts, the Trustees must determine from time to time the percentage of full liquidated value that holders of claims against the Sub-Account will be likely to receive, i.e. the "Payment Percentage" described in Section 2.3 above and Section 4.2 below.

**4.2    Computation of Payment Percentage.** As provided in Section 2.3 above, the Initial Payment Percentage for claims against the OC Sub-Account shall be [_____] %, and for claims against the Fibreboard Sub-Account [_____] %. These percentages shall apply to all OC and Fibreboard PI Trust Voting Claims as defined in Section 2.3 above, unless the Trustees, with the consent of the TAC and the Future Claimants' Representative, determine that the Initial Payment Percentage for one or both Sub-Accounts should be changed to assure that the PI Trust will be in a financial position to pay holders of unliquidated and/or unpaid PI Trust Voting Claims and present and future PI Trust Claims against the OC and Fibreboard Sub-Accounts, respectively, in substantially the same manner. In making any such adjustment, the Trustees, the

- 12 -

1107

TAC and the Future Claimants' Representative shall take into account the fact that the holders of PI Trust Voting Claims voted on the Plan relying on the findings of experts that the Initial Payment Percentage for each Sub-Account represented a reasonably reliable estimate of the PI Trust's total assets and liabilities over its life based on the best information available at the time, and shall thus give due consideration to the expectations of PI Trust Voting Claimants that the Initial Payment Percentage would be applied to their PI Trust Claims.

Except with respect to PI Trust Voting Claims to which the Initial Payment Percentage applies, the Payment Percentage for either the OC or the Fibreboard Sub-Accounts shall be subject to change pursuant to the terms of this TDP and the PI Trust Agreement if the Trustees determine that an adjustment is required. No less frequently than once every three years, commencing with the first day of January occurring after the Plan is consummated, the Trustees shall reconsider the then applicable Payment Percentage for each of the OC and Fibreboard Sub-Accounts to assure that the respective percentage is based on accurate, current information and may, after such reconsideration, change the Payment Percentage for either Sub-Account if necessary with the consent of the TAC and the Future Claimants' Representative.

The Trustees shall also reconsider the then applicable Payment Percentages for either or both Sub-Accounts at shorter intervals if they deem such reconsideration to be appropriate or if requested to do so by the TAC or the Future Claimants' Representative. The Trustees must base their determination of the Payment Percentage on current estimates of the number, types, and values of present and future PI Trust Claims against the respective Sub-Accounts, the value of the assets then available to the respective Sub-Accounts for their payment, all anticipated administrative and legal expenses of the respective Sub-Accounts, and any other material matters that are reasonably likely to affect the sufficiency of the respective Sub-Accounts' assets to pay a

- 13 -

comparable percentage of full value to all holders of claims against the Sub-Accounts. When making these determinations, the Trustees shall exercise common sense and flexibly evaluate all relevant factors. The Payment Percentage applicable to Category A or Category B claims against the respective Sub-Accounts may not be reduced to alleviate delays in payments of claims in the other Category; both Categories will receive the same Payment Percentage, but the payment from either or both Sub-Accounts may be deferred as needed pursuant to Section 7.3 below, and a Reduced Payment Option may be instituted for either Sub-Account as described in Section 2.5 above.

      **4.3**     **Applicability of the Payment Percentage.** No holder of a PI Trust Voting Claim other than a PI Trust Voting Claim for Other Asbestos Disease (Disease Level I - Cash Discount Payment) as defined in Section 5.3(a)(3) below shall receive a payment that exceeds the PI Trust's determination of the Initial Payment Percentage for the relevant Sub-Account of the liquidated value of the claim. Except as otherwise provided in Section 5.1(c) below for PI Trust Claims involving deceased or incompetent claimants for which court or probate approval of the PI Trust's offer is required, no holder of any other PI Trust Claim shall receive a payment that exceeds the Payment Percentage for the respective Sub-Account in effect at the time of payment. PI Trust Claims involving Other Asbestos Disease (Disease Level I - Cash Discount Payment) shall not be subject to such Sub-Account's Payment Percentage, but shall instead be paid the full amount of their Scheduled Value as set forth in Section 5.3(a)(3) below.

      If a redetermination of the respective Sub-Account's Payment Percentage has been proposed in writing by the Trustees to the TAC and the Future Claimants' Representative but has not yet been adopted, the claimant shall receive the lower of such Sub-Account's current Payment Percentage or the proposed Payment Percentage. However, if the proposed Payment

- 14 -

Percentage for such Sub-Account was the lower amount but was not subsequently adopted, the claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount.  Conversely, if the proposed Payment Percentage for such Sub-Account was the higher amount and was subsequently adopted, the claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount.

**SECTION V**

**Resolution of PI Trust Claims.**

5.1     **Ordering, Processing and Payment of Claims.**

5.1(a)     **Ordering of Claims.**

5.1(a)(1)  **Establishment of FIFO Processing Queues.**  The PI Trust will order separately all OC and Fibreboard Claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis except as otherwise provided herein (the "FIFO Processing Queues"). For all claims filed on or before the date six months after the Effective Date (the "Initial Claims Filing Date"), a claimant's position in either FIFO Processing Queue shall be determined as of the earlier of (i) the date prior to the Petition Date (if any) that the specific claim was either filed against OC or Fibreboard in the tort system or was actually submitted to OC or Fibreboard pursuant to an administrative settlement agreement; (ii) the date before the Petition Date that the claim was filed against another defendant in the tort system if at the time the claim was subject to a tolling agreement with OC or Fibreboard; (iii) the date after the Petition Date but before the Effective Date that the claim was filed against another defendant in the tort system; (iv) the date after the Petition Date the claimant filed a proof of claim form in OC's and/or Fibreboard's Chapter 11 proceeding; (v) the date after the Petition Date the claimant submitted a ballot in OC's Chapter 11 proceeding for purposes of voting on the Plan pursuant to

- 15 -

the voting procedures approved by the Bankruptcy Court; or (vi) the date after the Effective Date but on or before the Initial Claims Filing Date that the claim was filed with the PI Trust.

Following the Initial Claims Filing Date, the claimant's position in one of the two FIFO Processing Queues shall be determined by the date the claim was filed with the PI Trust. If any claims are filed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by date of the claimant's diagnosis of asbestos-related disease. If any claims are filed and diagnosed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the date of the claimant's birth, with older claimants given priority over younger claimants.

5.1(a)(2)    Effect of Statutes of Limitations and Repose. To be eligible for a place in either the OC or Fibreboard FIFO Processing Queues, (i) claims first filed in the tort system against OC or Fibreboard, respectively prior to the Petition Date must meet the applicable federal, state and foreign statute of limitation and repose that was in effect at the time of the filing of the claim in the tort system, and (ii) claims that were not filed against either OC or Fibreboard in the tort system prior to the Petition Date must meet the applicable federal, state or foreign statute of limitation that was in effect at the time of the filing with the PI Trust.

However, the running of the relevant statute of limitation shall be tolled as of the earliest of (A) the actual filing of the claim against OC or Fibreboard prior to the Petition Date, whether in the tort system or by submission of the claim to OC or Fibreboard pursuant to an administrative settlement agreement; (B) the filing of the claim against another defendant in the tort system prior to the Petition Date if the claim was tolled against OC or Fibreboard at the time by an agreement or otherwise; (C) the filing of a claim after the Petition Date but prior to the Effective Date against another defendant in the tort system; (D) the submission by the claimant

- 16 -

of a ballot in OC's and or Fibreboard's Chapter 11 proceeding for purposes of voting on the Plan pursuant to the voting procedures approved by the Bankruptcy Court; or (E) the filing of a proof of claim with the requisite supporting documentation with the PI Trust after the Effective Date.

If a PI Trust Claim meets any of the tolling provisions described in the preceding sentence and the claim was not barred by the applicable federal, state or foreign statute of limitation at the time of the tolling event, it will be treated as timely filed if it is actually filed with the PI Trust within three (3) years after the Effective Date.  In addition, any claims that were first diagnosed after the Petition Date, irrespective of the application of any relevant federal, state or foreign statute of limitation or repose, may be filed with the PI Trust within three (3) years after the date of diagnosis or within three (3) years after the Effective Date, whichever occurs later.  However, the processing of any PI Trust Claim by the PI Trust may be deferred at the election of the claimant pursuant to Section 6.3 below.

5.1(b)    Processing of Claims. As a general practice, the PI Trust will review its claims files on a regular basis and notify all claimants whose claims are likely to come up in either the OC or Fibreboard FIFO Processing Queue in the near future. However, claims that were not filed (i) against OC or Fibreboard in the tort system or actually submitted to OC or Fibreboard pursuant to an administrative settlement agreement prior to the Petition Date, or (ii) against another defendant in the tort system prior to the Plan Filing Date, shall not be processed until after the Initial Claims Filing Date.

5.1(c)    Payment of Claims. PI Trust Claims against the OC and/or Fibreboard Sub-Accounts that have been liquidated under the provisions of this TDP by the Expedited Review Process as provided in Section 5.3(a) below, by the Individual Review Process as provided in Section 5.3(b) below, by arbitration as provided in Section 5.10 below, or by

- 17 -

litigation in the tort system provided in Section 5.11 below, shall be paid in FIFO order from the relevant Sub-Account based on the date their liquidation became final (the "FIFO Payment Queue"), all such payments being subject to the applicable Payment Percentage, the Maximum Annual Payment, the Maximum Available Payment, and the Claims Payment Ratio, except as otherwise provided herein. Pre-Petition Liquidated Claims, as defined in Section 5.2 below, shall be subject to the Maximum Annual Payment and Payment Percentage limitations, but not to the Maximum Available Payment and Claims Payment Ratio provisions set forth above.

Where the claimant is deceased or incompetent, and the settlement and payment of his or her claim must be approved by a court of competent jurisdiction or through a probate process prior to acceptance of the claim by the claimant's representative, an offer made by the PI Trust on the claim shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the PI Trust has been furnished with evidence that the settlement offer has been submitted to such court or probate process for approval. If the offer is ultimately approved by the court or through the probate process and accepted by the claimant's representative, the PI Trust shall pay the claim from the relevant Sub-Account in the amount so offered, multiplied by the Payment Percentage in effect for such Sub-Account at the time the offer was first made.

If any claims are liquidated on the same date, the claimant's position in a Sub-Account's FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's asbestos-related disease. If any claims are liquidated on the same date and the respective holders' asbestos-related diseases were diagnosed on the same date, those claimants' positions in the Sub-Account's FIFO Payment Queue shall be determined by the PI Trust based on the dates of the claimants' birth, with older claimants given priority over younger claimants.

- 18 -

1113

5.2    **Resolution of Pre-Petition Liquidated PI Trust Claims.**

5.2(a)    **Processing and Payment.** As soon as practicable after the Effective
Date, the PI Trust shall pay, upon submission by the claimant of the applicable PI Trust proof of
claim form (included in Attachment B) together with all documentation required thereunder, all
PI Trust Claims that were liquidated by (i) a binding settlement agreement for the particular
claim entered into prior to the Petition Date that is judicially enforceable by the claimant, (ii) a
jury verdict in the tort system obtained prior to the Petition Date, or (iii) by a final or non-final
judgment prior to the Petition Date (collectively "Pre-Petition Liquidated Claims").

The liquidated value of a Pre-Petition Liquidated Claim shall be the unpaid amount of the
claim, including interest, if any, that has accrued on that amount in accordance with the terms of
a binding settlement agreement, if any, or under applicable state law for settlements or judgments
as of the Petition Date; however, pursuant to Section 7.4 below, the liquidated value of a Pre-
Petition Liquidated Claim shall not include any punitive or exemplary damages. In addition, the
amounts payable with respect to such claims shall not be subject to or taken into account in
consideration of the Claims Payment Ratio and the Maximum Available Payment limitations, but
shall be subject to the Maximum Annual Payment and Payment Percentage provisions. In the
absence of a Final Order of the Bankruptcy Court determining whether a settlement agreement is
binding and judicially enforceable, a dispute between a claimant and the PI Trust over this issue
shall be resolved pursuant to the same procedures in this TDP that are provided for resolving the
validity and/or liquidated value of a PI Trust Claim (i.e., arbitration and litigation in the tort
system as set forth in Sections 5.10 and 5.11 below).

Pre-Petition Liquidated Claims shall be processed and paid from the OC and/or
Fibreboard Sub-Accounts in accordance with their order in separate FIFO queues to be

- 19 -

1114

established for each Sub-Account by the PI Trust based on the date the PI Trust received a completed proof of claim form with all required documentation for the particular claim. If any Pre-Petition Liquidated Claims are filed with the PI Trust on the same date, the claimant's position in the Sub-Account's FIFO queue for such claims shall be determined by the date on which the claim was liquidated. If any Pre-Petition Liquidated Claims are both filed with the PI Trust and liquidated by a Sub-Account on the same dates, those claimants' positions in the FIFO queue shall be determined by the dates of the claimants' birth, with older claimants given priority over younger claimants.

      5.2(b)    **Marshalling of Security.** Holders of Pre-Petition Liquidated Claims that are secured by letters of credit, appeal bonds, or other security or sureties shall first exhaust their rights against any applicable security or surety before making a claim against the PI Trust. Only in the event that such security or surety is insufficient to pay the Pre-Petition Liquidated Claim in full shall the deficiency be processed and paid as a Pre-Petition Liquidated Claim.

    5.3    **Resolution of Unliquidated PI Trust Claims.** Within six months after the establishment of the PI Trust, the Trustees with the consent of the TAC and the Future Claimants' Representative shall adopt procedures for reviewing and liquidating all unliquidated PI Trust Claims, which shall include deadlines for processing such claims. Such procedures shall also require claimants seeking resolution of unliquidated PI Trust claims to first file a proof of claim form, together with the required supporting documentation, in accordance with the provisions of Sections 6.1 and 6.2 below. It is anticipated that the PI Trust shall provide an initial response to the claimant within six months of receiving the proof of claim form.

    The proof of claim form shall require the claimant to assert his or her OC and/or Fibreboard Claim for the highest Disease Level for which the claim qualifies at the time of filing.

- 20 -

Irrespective of the Disease Level alleged on the proof of claim form, each OC and/or Fibreboard Claims shall be deemed to be a claim for the highest Disease Level for which the claim qualifies at the time of filing, and all lower Disease Levels for which the claim may also qualify at the time of filing or in the future shall be treated as subsumed into the higher Disease Level for both processing and payment purposes.

Upon filing of a valid proof of claim form with the required supporting documentation, the claim shall be placed in the relevant OC and/or Fibreboard FIFO Processing Queue in accordance with the ordering criteria described in Section 5.1(a) above. The PI Trust shall provide the claimant with six-months notice of the date by which it expects to reach the claim in the FIFO Queue, following which the claimant shall promptly (i) advise the PI Trust whether the claim should be liquidated under the PI Trust's Expedited Review Process described in Section 5.3(a) below or, in certain circumstances, under the PI Trust's Individual Review Process described in Section 5.3(b) below; (ii) provide the PI Trust with any additional medical and/or exposure evidence that was not provided with the original claim submission; and (iii) advise the PI Trust of any change in the claimant's Disease Level. If a claimant fails to respond to the PI Trust's notice prior to the reaching of the claim in the FIFO Queue, the PI Trust will process and liquidate the claim under the Expedited Review Process based upon the medical/exposure evidence previously submitted by the claimant, although the claimant shall retain the right to request Individual Review as described in Section 5.3(b) below.

       **5.3(a)**    **Expedited Review Process.**

           **5.3(a)(1)**    **In General.**  The PI Trust's Expedited Review Process is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all OC and Fibreboard Claims (except those involving Lung Cancer 2 – Disease Level VI and all

- 21 -

foreign claims, which must be liquidated pursuant to the PI Trust's Individual Review Process)
where the claim can easily be verified by the PI Trust as meeting the presumptive
Medical/Exposure Criteria for the relevant Disease Level. Expedited Review thus provides
claimants with a substantially less burdensome process for pursuing PI Trust Claims than does
the Individual Review Process described in Section 5.3(b) below. Expedited Review is also
intended to provide qualifying claimants a fixed and certain claims payment.

Thus, claims that undergo Expedited Review and meet the presumptive
Medical/Exposure Criteria for the relevant Disease Level shall be paid the Scheduled Value (or
Values in the case of Multiple Exposure Claims) for such Disease Level set forth in Section
5.3(a)(3) below. However, except for claims involving Other Asbestos Disease (Disease Level I),
all claims liquidated by Expedited Review shall be subject to the applicable Payment Percentage,
the Maximum Annual Payment, the Maximum Available Payment, and the Claims Payment
Ratio limitations set forth above. Claimants holding OC and/or Fibreboard Claims that cannot be
liquidated by Expedited Review because they do not meet the presumptive Medical/Exposure
Criteria for the relevant Disease Level may elect the PI Trust's Individual Review Process set
forth in Section 5.3(b) below.

5.3(a)(2)  Claims Processing under Expedited Review.  All claimants
seeking liquidation of an OC and/or Fibreboard Claim pursuant to Expedited Review shall file
the PI Trust's proof of claim forms provided in Attachment B hereto. As a proof of claim form is
reached in the OC or Fibreboard FIFO Processing Queue, the PI Trust shall determine whether
the claim described therein meets the Medical/Exposure Criteria for one of the seven Disease
Levels eligible for Expedited Review, and shall advise the claimant of its determination. If a
Disease Level is determined, the PI Trust shall tender to the claimant an offer of payment from

- 22 -

1117

the relevant OC or Fibreboard Sub-Account of the Scheduled Value for the relevant Disease

Level multiplied by the applicable Payment Percentage, together with a form of release approved

by the PI Trust. If the claimant accepts the Scheduled Value and returns the release properly

executed, the claim shall be placed in the Sub-Account's FIFO Payment Queue, following which

the PI Trust shall disburse payment subject to the limitations of the Maximum Available

Payment and Claims Payment Ratio, if any.

    5.3(a)(3) Disease Levels, Scheduled Values and Medical/Exposure

**Criteria.** The eight Disease Levels covered by this TDP, together with the Medical/Exposure

Criteria for each, and the separate OC and Fibreboard Scheduled Values for the seven Disease

Levels eligible for Expedited Review, are set forth below. These Disease Levels, Scheduled

Values, and Medical/Exposure Criteria shall apply to all PI Trust Voting Claims (other than Pre-

Petition Liquidated Claims) filed with the PI Trust on or before the Initial Claims Filing Date

provided in Section 5.1 above for which the claimant elects the Expedited Review Process.

Thereafter, for purposes of administering the Expedited Review Process and with the consent of

the TAC and the Future Claimants' Representative, the Trustees may add to, change or eliminate

Disease Levels, Scheduled Values, or Medical/Exposure Criteria; develop subcategories of

Disease Levels, Scheduled Values or Medical/Exposure Criteria; or determine that a novel or

exceptional asbestos personal injury claim is compensable even though it does not meet the

Medical/Exposure Criteria for any of the then current Disease Levels.

**Disease Level**   **OC/Fibreboard Scheduled Values**   **Medical/Exposure Criteria**

- 23 -

1118

| | | |
|---|---|---|
| Mesothelioma (Level VIII) | $215,000/$135,000 | (1) Diagnosis[2] of mesothelioma; and (2) credible evidence of OC or Fibreboard Exposure (as defined in Section 5.7(b)(3) below) |
| Lung Cancer 1 (Level VII) | $ 40,000/$27,000 | (1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease[3], (2) six months OC or Fibreboard Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos,[4] and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |
| Lung Cancer 2 (Level VI) | None | (1) Diagnosis of a primary lung cancer; (2) OC or Fibreboard Exposure prior to December 31, 1982, and (3) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |

---

[2]    The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of this TDP are set forth in Section 5.7 below.

[3]    Evidence of "Bilateral Asbestos-Related Nonmalignant Disease" for purposes of meeting the criteria for establishing Disease Levels I, II, III, V, and VII, means either (i) a chest X-ray read by a qualified B reader of 1/0 or higher on the ILO scale or (ii)(x) a chest X-ray read by a qualified B reader, (y) a CT scan read by a qualified physician, or (z) pathology, in each case showing either bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification. Solely for claims filed against OC or Fibreboard or another asbestos defendant in the tort system prior to the Petition Date, if an ILO reading is not available, either (i) a chest X-ray or a CT scan read by a qualified physician, or (ii) pathology, in each case showing either bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification, consistent with or compatible with a diagnosis of asbestos-related disease, shall be evidence of a "Bilateral Asbestos-Related Nonmalignant Disease" for purposes of meeting the presumptive medical requirements of Disease Levels I, II, III, V and VII. Pathological evidence of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982).

[4]    "Significant Occupational Exposure" is defined in Section 5.7 below.

- 24 -

Lung Cancer 2 (Level VI) claims are
claims that do not meet the more
stringent medical and/or exposure
requirements of Lung Cancer (Level
VII) claims. All claims in this
Disease Level will be individually
evaluated. The estimated likely
Average Value of the individual
evaluation awards for this category
for OC Claims is $20,000 and for
Fibreboard Claims is $12,000, with
such awards capped at a Maximum
Value of $50,000 for OC Claims and
$30,000 for Fibreboard Claims,
unless the claim qualifies for
Extraordinary Claim treatment
(discussed in Section 5.4 below).

Level VI claims that show no
evidence of either an underlying
Bilateral Asbestos-Related Non-
malignant Disease or Significant
Occupational Exposure may be
individually evaluated, although it is
not expected that such claims will be
treated as having any significant
value, especially if the claimant is
also a Smoker. [5] In any event, no
presumption of validity will be
available for any claims in this
category.

---

[5]     There is no distinction between Non-Smokers and Smokers for either Lung Cancer
(Level VII) or Lung Cancer (Level VI), although a claimant who meets the more stringent
requirements of Lung Cancer (Level VII) (evidence of an underlying Bilateral Asbestos-Related
Nonmalignant Disease plus Significant Occupational Exposure), and who is also a Non-Smoker,
may wish to have his or her claim individually evaluated by the PI Trust. In such a case, absent
circumstances that would otherwise reduce the value of the claim, it is anticipated that the
liquidated value of the claim might well exceed the Scheduled Values for Lung Cancer (Level
VII) claims against OC and Fibreboard, respectively, shown above. "Non-Smoker" means a
claimant who either (a) never smoked or (b) has not smoked during any portion of the twelve
(12) years immediately prior to the diagnosis of the lung cancer.

- 25 -

1120

| | | |
|---|---|---|
| Other Cancer (Level V) | $ 22,000/$12,000 | (1) Diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease, (2) six months OC or Fibreboard Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |
| Severe Asbestosis (Level IV) | $ 42,000/$29,000 | (1) Diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathological evidence of asbestos, plus (a)TLC less than 65%, or (b) FVC less than 65% and FEV1/FVC ratio greater than 65%, (2) six months OC or Fibreboard Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Asbestosis/ Pleural Disease (Level III) | $ 19,000/$11,500 | (1) Diagnosis of Bilateral Asbestos-Related Nonmalignant Disease plus (a) TLC less than 80%, or (b) FVC less than 80% and FEV1/FVC ratio greater than or equal to 65%, and (2) six months OC or Fibreboard Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Asbestosis/ | | |

- 26 -

1121

| | | |
|---|---|---|
| Pleural Disease (Level II) | $ 8,000/$4,500 | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, and (2) six months OC or Fibreboard Exposure prior to December 31, 1982, and (3) five years cumulative occupational exposure to asbestos. |
| Other Asbestos Disease (Level 1 - Cash Discount Payment) | $ 400/$240 | (1) Diagnosis of a Bilateral Asbestos- Related Nonmalignant Disease or an asbestos-related malignancy other than mesothelioma, and (2) OC or Fibreboard Exposure prior to December 31, 1982. |

### 5.3(b)    Individual Review Process

5.3(b)(1) **In General.** Subject to the provisions set forth below, an OC or Fibreboard Claimant may elect to have his or her PI Trust Claim reviewed for purposes of determining whether the claim would be compensable in the tort system even though it does not meet the presumptive Medical/Exposure Criteria for any of the Disease Levels set forth in Section 5.3(a)(3) above. In addition or alternatively, an OC or Fibreboard claimant may elect to have a claim undergo the Individual Review Process for purposes of determining whether the liquidated value of the claim exceeds the Scheduled Value for the relevant Disease Level also set forth in said provision. However, until such time as the PI Trust has made an offer on a claim pursuant to Individual Review, the claimant may change his or her Individual Review election and have the claim liquidated pursuant to the PI Trust's Expedited Review Process. In the event of such a change in the processing election, the claimant shall nevertheless retain his or her place in the FIFO Processing Queue.

The liquidated value of all foreign claims shall be established pursuant to the PI Trust's Individual Review Process. In reviewing foreign claims, the PI Trust shall take into account all

- 27 -

relevant procedural and substantive legal rules to which the claims would be subject in the Claimant's Jurisdiction as defined in Section 5.3(b)(2) below. The PI Trust shall determine the liquidated value of foreign claims based on historical settlements and verdicts in the Claimant's Jurisdiction as well as the other valuation factors set forth in Section 5.3(b)(2) below.

For purposes of the Individual Review Process, the Trustees, with the consent of the TAC and the Future Claimants' Representative, may develop separate Medical/Exposure Criteria and standards, as well as separate requirements for physician and other professional qualifications, which shall be applicable to foreign claims; however, such criteria, standards or requirements shall not effectuate substantive changes to the claims eligibility requirements under this TDP, but rather shall be made only for the purpose of adapting those requirements to the particular licensing provisions and/or medical customs or practices of the foreign country in question.

At such time as the PI Trust has sufficient historical settlement, verdict and other valuation data for claims from a particular foreign jurisdiction, the Trustees, with the consent of the TAC and the Future Claimants' Representative, may also establish a separate valuation matrix for such claims based on that data.

5.3(b)(1)(A)    Review of Medical/Exposure Criteria. The PI Trust's Individual Review Process provides an OC or Fibreboard claimant with an opportunity for individual consideration and evaluation of a PI Trust Claim that fails to meet the presumptive Medical/Exposure Criteria for Disease Levels I – V, and VII-VIII. In such a case, the PI Trust shall either deny the claim, or, if the PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system, the PI Trust can offer the claimant a liquidated value amount up to the Scheduled Value for that Disease Level, unless the

- 28 -

claim qualifies as an Extraordinary Claim as defined in Section 5.4(a) below, in which case its

liquidated value cannot exceed the Maximum Value for such a claim.

> **5.3(b)(1)(B) Review of Liquidated Value.** Claimants

holding claims involving Disease Levels II – VIII shall also be eligible to seek Individual

Review of the liquidated value of their OC and Fibreboard Claims, as well as of their

medical/exposure evidence. The Individual Review Process is intended to result in payments

from the OC and/or Fibreboard Sub-Accounts equal to the full liquidated value for each claim

multiplied by the Payment Percentage; however, the liquidated value of any OC or Fibreboard

Claim that undergoes Individual Review may be determined to be less than the Scheduled Value

the claimant would have received under Expedited Review. Moreover, the liquidated value for a

claim involving Disease Levels II – VIII shall not exceed the Maximum Value for the relevant

Disease Level set forth in Section 5.3(b)(4) below, unless the claim meets the requirements of an

Extraordinary Claim described in Section 5.4(a) below, in which case its liquidated value cannot

exceed the Maximum Value set forth in that provision for such claims. Because the detailed

examination and valuation process pursuant to Individual Review requires substantial time and

effort, claimants electing to undergo the Individual Review Process will ordinarily be paid the

liquidated value of their PI Trust Claims later than would have been the case had the claimant

elected the Expedited Review Process.

> **5.3(b)(2)    Valuation Factors to be Considered in Individual Review.**

The PI Trust shall liquidate the value of each OC and Fibreboard Claim that undergoes

Individual Review based on the historic liquidated values of other similarly situated claims in the

tort system for the same Disease Level. The PI Trust will thus take into consideration all of the

factors that affect the severity of damages and values within the tort system including, but not

- 29 -

limited to (i) the degree to which the characteristics of a claim differ from the presumptive Medical/Exposure Criteria for the Disease Level in question; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependencies, special damages, and pain and suffering; (iii) evidence that the claimant's damages were (or were not) caused by asbestos exposure to an asbestos-containing product prior to December 31, 1982 for which OC or Fibreboard has legal responsibility (for example, alternative causes, and the strength of documentation of injuries); (iv) the industry of exposure; and (v) settlements, verdicts, and the claimant's and other law firms' experience in the Claimant's Jurisdiction for similarly situated claims.

For these purposes, the "Claimant's Jurisdiction" is the jurisdiction in which the claim was filed (if at all) against OC or Fibreboard in the tort system prior to the Petition Date. If the claim was not filed against OC or Fibreboard in the tort system prior to the Petition Date, the claimant may elect as the Claimant's Jurisdiction either (i) the jurisdiction in which the claimant resides at the time of diagnosis or when the claim is filed with the PI Trust; or (ii) a jurisdiction in which the claimant experienced exposure to an asbestos-containing product for which OC or Fibreboard has legal responsibility.

5.3(b)(3) **Processing and Payment Limitations for Claims Involving Disease Levels III and II.** The PI Trust shall administer Individual Review for Disease Levels III and II so that Individual Review does not reduce payments to claimants electing the Scheduled Value for such PI Trust Claims under Expedited Review. As one means of implementing this requirement, the following shall apply for Disease Levels III and II claims:

- 30 -

1125

5.3(b)(3)(A)  Disease Level III Claims. No more than 13% or 9% of Disease Level III claims paid in any year from either the OC or the Fibreboard Sub-Account, respectively, shall be PI Trust Claims allowed under Individual Review, and the total payments to such Disease Level III claims allowed under Individual Review shall be no more than 17% or 13% of payments to all Disease Level III claimants from either the OC or Fibreboard Sub-Account, respectively, during any year.

5.3(b)(3)(B)  Disease Level II Claims. No more than 15% or 20% of Disease Level II claims paid in any year from either the OC or the Fibreboard Sub-Account, respectively, shall be PI Trust Claims allowed under Individual Review, and the total payments to such Disease Level II claims allowed under Individual Review shall be no more than 24% or 33% of payments to all Disease Level II claimants from either the OC or Fibreboard Sub-Account, respectively, during any year.

5.3(b)(4)  Scheduled, Average and Maximum Values.  The Scheduled, Average and Maximum Values for the Disease Levels compensable under this TDP from the OC and Fibreboard Sub-Accounts are the following:

## OC SUB-ACCOUNT

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
| --- | --- | --- | --- |
| Mesothelioma (Level VIII) | $215,000 | $270,000 | $650,000 |
| Lung Cancer 1 (Level VII) | $ 40,000 | $ 50,000 | $150,000 |
| Lung Cancer 2 (Level VI) | None | $ 20,000 | $ 50,000 |
| Other Cancer (Level V) | $ 22,000 | $ 25,000 | $ 60,000 |
| Severe Asbestosis (Level IV) | $ 42,000 | $ 50,000 | $150,000 |
| Asbestosis/Pleural Disease | | | |

- 31 -

1126

| | | | |
|---|---|---|---|
| (Level III) | $19,000 | $20,000 | $35,000 |
| Asbestosis/Pleural Disease (Level II) | $8,000 | $9,000 | $20,000 |
| Other Asbestos Disease Cash Discount Payment (Level I) | $400 | None | None |

### FIBREBOARD SUB-ACCOUNT

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Mesothelioma (Level VIII) | $135,000 | $180,000 | $450,000 |
| Lung Cancer1 (Level VII) | $27,000 | $35,000 | $90,000 |
| Lung Cancer 2 (Level VI) | None | $12,000 | $30,000 |
| Other Cancer (Level V) | $12,000 | $15,000 | $36,000 |
| Severe Asbestosis (Level IV) | $29,000 | $30,000 | $90,000 |
| Asbestosis/Pleural Disease (Level III) | $11,500 | $12,000 | $21,000 |
| Asbestosis/Pleural Disease (Level II) | $4,500 | $5,400 | $12,000 |
| Other Asbestos Disease Cash Discount Payment (Level I) | $240 | None | None |

These OC and Fibreboard Scheduled Values, Average Values and Maximum Values shall apply to all PI Trust Voting Claims other than Pre-Petition Liquidated Claims filed with the PI Trust on or before the Initial Claims Filing Date as provided in Section 5.1 above. Thereafter, the PI Trust, with the consent of the TAC and the Future Claimants' Representative pursuant to Sections 5.7(b) and 6.6(b) of the PI Trust Agreement, may change these valuation amounts for good cause and consistent with other restrictions on the amendment power.

**5.4    Categorizing Claims as Extraordinary and/or Exigent Hardship**

- 32 -

5.4(a)  **Extraordinary Claims.** "Extraordinary Claim" means a PI Trust Claim that otherwise satisfies the Medical Criteria for Disease Levels II - VIII, and that is held by a claimant whose exposure to asbestos (i) occurred predominately as the result of working in a manufacturing facility of OC or Fibreboard during a period in which OC or Fibreboard was manufacturing asbestos-containing products at that facility, or (ii) was at least 75% the result of exposure to an asbestos-containing product for which OC or Fibreboard has legal responsibility, and in either case there is little likelihood of a substantial recovery elsewhere. All such Extraordinary Claims shall be presented for Individual Review and, if valid, shall be entitled to an award of up to a Maximum Value of five (5) times the Scheduled Value for claims qualifying for Disease Levels II – V, VII and VIII, and five (5) times the Average Value for claims in Disease Level VI, multiplied by the applicable Payment Percentage.

Any dispute as to Extraordinary Claim status shall be submitted to a special Extraordinary Claims Panel to be established by the PI Trust with the consent of the TAC and the Future Claimants' Representative. All decisions of the Extraordinary Claims Panel shall be final and not subject to any further administrative or judicial review. An Extraordinary Claim, following its liquidation, shall be placed in the Trust's FIFO Queue ahead of all other PI Trust Claims except Exigent Hardship Claims, which shall be first in said Queue, based on its date of liquidation and shall be subject to the Maximum Available Payment and Claims Payment Ratio described above.

5.4(b)  **Exigent Hardship Claims.** At any time the PI Trust may liquidate and pay PI Trust Claims that qualify as Exigent Hardship Claims as defined below.  Such claims may be considered separately no matter what the order of processing otherwise would have been under this TDP.  An Exigent Hardship Claim, following its liquidation, shall be placed first in

- 33 -

the relevant Sub-Account's FIFO Payment Queue ahead of all other liquidated claims, and shall be subject to the Maximum Available Payment and Claims Payment Ratio described above. A PI Trust Claim qualifies for payment as an Exigent Hardship Claim if the claim meets the Medical/Exposure Criteria for Severe Asbestosis (Disease Level IV) or an asbestos-related malignancy (Disease Levels V-VIII), and the PI Trust, in its sole discretion, determines (i) that the claimant needs financial assistance on an immediate basis based on the claimant's expenses and all sources of available income, and (ii) that there is a causal connection between the claimant's dire financial condition and the claimant's asbestos-related disease.

5.5    **Secondary Exposure Claims.** If a claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed person, such as a family member, the claimant is entitled to seek Individual Review of his or her OC and/or Fibreboard Claim pursuant to Section 5.3(b) above. In such a case, the claimant must establish that the occupationally exposed person would have met the exposure requirements under this TDP that would have been applicable had that person filed a direct claim against the PI Trust. In addition, the claimant with secondary exposure must establish that he or she is suffering from one of the eight Disease Levels described in Section 5.3(a)(3) above or an asbestos-related disease otherwise valid and cognizable in the tort system, that his or her own exposure to the occupationally exposed person occurred within the same time frame as the occupationally exposed person was exposed to asbestos products produced by OC or Fibreboard, and that such secondary exposure to OC or Fibreboard products was a cause of the claimed disease. The proof of claim form included in Attachment B hereto contains an additional section for Secondary Exposure Claims. All other liquidation and payment rights and limitations under this TDP shall be applicable to such claims.

- 34 -

5.6     **Indirect PI Trust Claims.** Indirect PI Trust Claims asserted against either the OC or Fibreboard Sub-Accounts based upon theories of contribution or indemnification under applicable law, shall be treated as presumptively valid and paid by the PI Trust subject to the applicable Payment Percentage if (a) such claim satisfied the requirements of the Bar Date for such claims established by the Bankruptcy Court, if applicable, and is not otherwise disallowed by Section 502(e) of the Code or subordinated under Section 509(c) of the Code, and (b) the holder of such claim (the "Indirect Claimant") establishes to the satisfaction of the Trustees that (i) the Indirect Claimant has paid in full the liability and obligation of the Trust to the individual claimant to whom the PI Trust would otherwise have had a liability or obligation under these Procedures (the "Direct Claimant"), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the Trust from all liability to the Direct Claimant, and (iii) the claim is not otherwise barred by a statute of limitation or repose or by other applicable law. In no event shall any Indirect Claimant have any rights against the PI Trust superior to the rights of the related Direct Claimant against the PI Trust, including any rights with respect to the timing, amount or manner of payment. In addition, no Indirect Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has actually paid the related Direct Claimant.

To establish a presumptively valid Indirect PI Trust Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement (with an appropriate full release in favor of the PI Trust) or a Final Order (as defined in the Plan) provided that such claim is valid under the applicable state law. In any case where the Indirect Claimant has satisfied the claim of a Direct Claimant against the PI Trust under applicable law by way of a settlement, the Indirect Claimant

- 35 -

1130

shall obtain for the benefit of the PI Trust a release in form and substance satisfactory to the Trustees.

If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the PI Trust with a full release of the Direct Claimant's claim, the Indirect Claimant may request that the PI Trust review the Indirect PI Trust Claim individually to determine whether the Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid a liability or obligation that the PI Trust would otherwise have to the Direct Claimant. If the Indirect Claimant can show that it has satisfied such a liability or obligation, the PI Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so satisfied, times the then applicable Payment Percentage. However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled. Further, the liquidated value of any Indirect PI Trust Claim paid by the PI Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any PI Trust Claim that might be subsequently asserted by the Direct Claimant against the PI Trust.

Any dispute between the PI Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR procedures provided in Section 5.10 below and set forth in Attachment A hereto. If such dispute is not resolved by said ADR procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Sections 5.11 above and 7.6 below.

The Trustees may develop and approve a separate proof of claim form for Indirect PI Trust Claims. Indirect PI Trust Claims that have not been disallowed, discharged, or otherwise resolved by prior order of the Bankruptcy Court shall be processed in accordance with

- 36 -

procedures to be developed and implemented by the Trustees consistent with the provisions of this Section 5.6, which procedures (a) shall determine the validity, allowability and enforceability of such claims; and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the PI Trust would have afforded the holders of the underlying valid PI Trust Claims. Nothing in this TDP is intended to preclude a trust to which asbestos-related liabilities are channeled from asserting an Indirect PI Trust Claim against the PI Trust subject to the requirements set forth herein.

### 5.7   Evidentiary Requirements

#### 5.7(a)   Medical Evidence.

5.7(a)(1)   **In General.**  All diagnoses of a Disease Level shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least 10 years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a 10-year latency period. A finding by a physician after the Petition Date that a claimant's disease is "consistent with" or "compatible with" asbestosis will not alone be treated by the PI Trust as a diagnosis.

5.7(a)(1)(A).  **Disease Levels I-IV.**  Except for claims filed against OC, Fibreboard or another asbestos defendant in the tort system prior to the Petition Date, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I-IV) shall be based in the case of a claimant who was living at the time the claim was filed, upon a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease. In addition, all living claimants must provide (i) for Disease Levels I-III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 3 above); (ii)for

- 37 -

Disease Level IV,[6], an ILO reading of 2/1 or greater or pathological evidence of asbestosis, and (iii) for Disease Levels III and IV, pulmonary function testing[7]

In the case of a claimant who was deceased at the time the claim was filed, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I-IV) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease; or (ii) pathological evidence of the non-malignant asbestos-related disease; or (iii) in the case of Disease Levels I-III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 3 above), and for Disease Level IV, either an ILO reading of 2/1 or greater or pathological evidence of asbestosis; and (iv) for either Disease Level III or IV, pulmonary function testing.

**5.7(a)(1)(B). Disease Levels V – VIII.** All diagnoses of an asbestos-related malignancy (Disease Levels V – VIII) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease, or (ii) on a diagnosis of such a malignant Disease Level by a board-certified pathologist.

**5.7(a)(1)(C). Exception to the Exception for Certain Pre-Petition Claims.** If the holder of a PI Trust Claim that was filed against OC, Fibreboard or

---

[6]     All diagnoses of Asbestos/Pleural Disease (Disease Levels II and III) not based on pathology shall be presumed to be based on findings of bilateral asbestos or pleural disease, and all diagnoses of Mesothelioma (Disease Level VIII) shall be presumed to be based on findings that the disease involves a malignancy. However, the PI Trust may rebut such presumptions.

[7]     "Pulmonary Function Testing" shall mean spirometry testing that is in material compliance with the quality criteria established by the American Thoracic Society ("ATS") and is performed on equipment which is in material compliance with ATS standards for technical quality and calibration.

another defendant in the tort system prior to the Petition Date has not provided the PI Trust with a diagnosis of the asbestos-related disease by a physician who conducted a physical examination of the holder as described in Section 5.7(a)(1)(A), but the holder has available such a diagnosis by an examining physician engaged by the holder, or the holder has filed such diagnosis with another asbestos-related personal injury settlement trust that requires such evidence, the holder shall provide such diagnosis to the PI Trust notwithstanding the exception in Section 5.7(a)(1)(A).

5.7(a)(2)    **Credibility of Medical Evidence.** Before making any payment to a claimant, the PI Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards. The PI Trust may require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence, and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedure to assure that such evidence is reliable. Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to OC to settle for payment similar disease cases prior to OC 's bankruptcy, or (iii) a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state or federal judge, is presumptively reliable, although the PI Trust may seek to rebut the presumption.

In addition, claimants who otherwise meet the requirements of this TDP for payment of a PI Trust Claim shall be paid irrespective of the results in any litigation at anytime between the claimant and any other defendant in the tort system. However, any relevant evidence submitted

- 39 -

in a proceeding in the tort system involving another defendant, other than any findings of fact, a verdict, or a judgment, may be introduced by either the claimant or the PI Trust in any Individual Review proceeding conducted pursuant to 5.3(b) or any Extraordinary Claim proceeding conducted pursuant to 5.4(a).

### 5.7(b)    Exposure Evidence

5.7(b)(1)    **In General.**  As set forth in Section 5.3(a)(3) above, to qualify for any Disease Level, the claimant must demonstrate a minimum exposure to an asbestos-containing product manufactured or distributed by OC or Fibreboard. Claims based on conspiracy theories that involve no exposure to an asbestos-containing product produced by OC or Fibreboard are not compensable under this TDP. To meet the presumptive exposure requirements of Expedited Review set forth in Section 5.3(a)(3) above, the claimant must show (i) for all Disease Levels, OC or Fibreboard Exposure as defined in Section 5.7(b)(3) below prior to December 31, 1982; (ii) for Asbestos/Pleural Disease Level II, six months OC or Fibreboard Exposure prior to December 31, 1982, plus five years cumulative occupational asbestos exposure; and (iii) for Asbestosis/Pleural Disease (Disease Level III), Severe Asbestosis (Disease Level IV), Other Cancer (Disease Level V) or Lung Cancer 1 (Disease Level VII), the claimant must show six months OC or Fibreboard Exposure prior to December 31, 1982, plus Significant Occupational Exposure to asbestos as defined below. If the claimant cannot meet the relevant presumptive exposure requirements for a Disease Level eligible for Expedited Review, the claimant may seek Individual Review pursuant to Section 5.3(b) above of his or her exposure to an asbestos-containing product for which by OC or Fibreboard has legal responsibility.

5.7(b)(2)    **Significant Occupational Exposure.**  "Significant Occupational Exposure" means employment for a cumulative period of at least five years, with a

- 40 -

1135

minimum of two years prior to December 31, 1982 in an industry and an occupation in which the claimant (a) handled raw asbestos fibers on a regular basis; (b) fabricated asbestos-containing products so that the claimant in the fabrication process was exposed on a regular basis to raw asbestos fibers; (c) altered, repaired or otherwise worked with an asbestos-containing product such that the claimant was exposed on a regular basis to asbestos fibers; or (d) was employed in an industry and occupation such that the claimant worked on a regular basis in close proximity to workers engaged in the activities described in (a), (b) and/or (c).

        **5.7(b)(3)**      **OC or Fibreboard Exposure.** All PI Trust claimants must demonstrate meaningful and credible exposure, which occurred prior to December 31, 1982, to asbestos or asbestos-containing products supplied, specified, manufactured, installed, maintained , or repaired by either OC or Fibreboard, and/or any entity, including an OC or Fibreboard contracting unit, for which OC or Fibreboard has legal liability. That meaningful and credible exposure evidence may be established by an affidavit of the claimant, by an affidavit of a co-worker or the affidavit of a family member in the case of a deceased claimant (providing the PI Trust finds such evidence reasonably reliable), by invoices, employment, construction or similar records, or by other credible evidence. The specific exposure information required by the PI Trust to process a claim under either Expedited or Individual Review is set forth on the proof of claim form to be used by the PI Trust, which is attached as Attachment B hereto. The PI Trust can also require submission of other or additional evidence of exposure when it deems such to be necessary.

    **5.8**    **Claims Audit Program.** The PI Trust with the consent of the TAC and the Future Claimants' Representative may develop methods for auditing the reliability of medical evidence, including additional reading of X-rays, CT scans and verification of pulmonary

- 41 -

1136

function tests, as well as the reliability of evidence of exposure to asbestos, including exposure to asbestos-containing products manufactured or distributed by OC or Fibreboard prior to December 31, 1982. In the event that the PI Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical evidence to the Trust, it may decline to accept additional evidence from such provider in the future.

Further, in the event that an audit reveals that fraudulent information has been provided to the PI Trust, the PI Trust may penalize any claimant or claimant's attorney by disallowing the PI Trust Claim and/or by other means including, but not limited to, requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' PI Trust Claims, raising the level of scrutiny of additional information submitted from the same source or sources, refusing to accept additional evidence from the same source or sources, seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. §152, and seeking sanctions from the Bankruptcy Court.

     5.9       **Second Disease (Malignancy) Claims.** The holder of a PI Trust Claim involving a non-malignant asbestos-related disease (Disease Levels I through IV) may file a new PI Trust Claim against the PI Trust for a malignant disease (Disease Levels V – VIII) that is subsequently diagnosed. Any additional payments to which such claimant may be entitled with respect to such malignant asbestos-related disease shall not be reduced by the amount paid for the non-malignant asbestos-related disease, provided that the malignant disease had not been diagnosed at the time the claimant was paid with respect to his or her original claim involving the non-malignant disease.

     5.10    **Arbitration.**

- 42 -

1137

5.10(a)    **Establishment of ADR Procedures.**  The PI Trust, with the consent of the TAC and the Future Claimants' Representative, shall institute binding and non-binding arbitration procedures in accordance with the ADR Procedures included in Attachment A hereto for resolving disputes concerning whether a Pre-Petition settlement agreement with OC or Fibreboard is binding and judicially enforceable in the absence of a Final Order of the Bankruptcy Court determining the issue, whether the PI Trust's outright rejection or denial of a claim was proper, or whether the claimant's medical condition or exposure history meets the requirements of this TDP for purposes of categorizing a claim involving Disease Levels I – VIII.  Binding and non-binding arbitration shall also be available for resolving disputes over the liquidated value of a claim involving Disease Levels II – VIII.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary requirements that are set forth in Section 5.7 above.  In the case of an arbitration involving the liquidated value of a claim involving Disease Levels II – VIII, the arbitrator shall consider the same valuation factors that are set forth in Section 5.3(b)(2) above. With respect to all claims eligible for arbitration, the claimant, but not the PI Trust, may elect either non-binding or binding arbitration. The ADR Procedures set forth in Attachment A hereto may be modified by the PI Trust with the consent of the TAC and the Future Claimants' Representative.

5.10(b)    **Claims Eligible for Arbitration.**  In order to be eligible for arbitration, the claimant must first complete the Individual Review Process set forth in Section 5.3(b) above, as well as either the Pro-Bono Evaluation or the Mediation processes set forth in the ADR Procedures included in Attachment A, with respect to the disputed issue. Individual Review will be treated as completed for these purposes when the claim has been individually reviewed by the PI Trust, the PI Trust has made an offer on the claim, the claimant has rejected the liquidated value

- 43 -

1138

resulting from the Individual Review, and the claimant has notified the PI Trust of the rejection in writing. Individual Review will also be treated as completed if the PI Trust has rejected the claim.

         **5.10(c)    Limitations on and Payment of Arbitration Awards.** In the case of a non-Extraordinary Claim involving Disease Levels II – VIII, the arbitrator shall not return an award in excess of the Maximum Value for the appropriate Disease Level as set forth in Section 5.3(a)(4) above, and for an Extraordinary Claim involving one of those Disease Levels, the arbitrator shall not return an award greater than the Maximum Extraordinary Value for such a claim as set forth in Section 5.4(a) above. A claimant who submits to arbitration and who accepts the arbitral award will receive payments in the same manner as one who accepts the PI Trust's original valuation of the claim.

      **5.11    Litigation.** Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in the tort system against the PI Trust pursuant to Section 7.6 below. However, a claimant shall be eligible for payment of a judgment for monetary damages obtained in the tort system from the PI Trust's available cash only as provided in Section 7.7 below.

## SECTION VI

### Claims Materials

      **6.1    Claims Materials.** The PI Trust shall prepare suitable and efficient claims materials ("Claims Materials") for all PI Trust Claims, and shall provide such Claims Materials upon a written request for such materials to the PI Trust. The proof of claim form to be submitted

      – 44 –

to the PI Trust shall require the claimant to assert the highest Disease Level for which the claim qualifies at the time of filing, and shall include a certification by the claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure. In developing its claim filing procedures, the PI Trust shall make every reasonable effort to provide claimants with the opportunity to utilize currently available technology at their discretion, including filing claims and supporting documentation over the internet and electronically by disk or CD-rom. A copy of the proof of claim forms to be used by the PI Trust for OC and Fibreboard Pre-Petition Liquidated Claims and unliquidated PI Trust Claims is included in Attachment B hereto. The proof of claim forms may be changed by the PI Trust with the consent of the TAC and the Future Claimants' Representative.

6.2    **Content of Claims Materials.** The Claims Materials shall include a copy of this TDP, such instructions as the Trustees shall approve, and a detailed proof of claim form. If feasible, the forms used by the PI Trust to obtain claims information shall be the same or substantially similar to those used by other asbestos claims resolution organizations. Instead of collecting some or all of the claims information from a claimant or the claimant's attorney, the PI Trust may also obtain such information from electronic data bases maintained by any other asbestos claims resolution organization. However, the PI Trust shall inform the claimant that it plans to obtain information as available from such other organizations and may do so unless the claimant objects in writing or provides such information directly to the PI Trust. If requested by the claimant, the PI Trust shall accept information provided electronically. The claimant may, but will not be required to, provide the PI Trust with evidence of recovery from other asbestos defendants and claims resolution organizations.

-45 -

1140