6.3     **Withdrawal or Deferral of Claims.**  A claimant can withdraw a PI Trust Claim at any time upon written notice to the PI Trust and file another claim subsequently without affecting the status of the claim for statute of limitations purposes, but any such claim filed after withdrawal shall be given a place in the FIFO Processing Queue based the date of such subsequent filing. A claimant can also request that the processing of his or her PI Trust Claim by the PI Trust be deferred for a period not to exceed three (3) years without affecting the status of the claim for statute of limitation purposes, in which case the claimant shall also retain his or her original place in the FIFO Processing Queue. Except for PI Trust Claims held by representatives of deceased or incompetent claimants for which court or probate approval of the PI Trust's offer is required, or a PI Trust Claim for which deferral status has been granted, a claim will be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within six months of the PI Trust's written offer of payment or rejection of the claim. Upon written request and good cause, the PI Trust may extend either the deferral or withdrawal period for an additional six months.

6.4     **Filing Requirements and Fees.** The Trustees shall have the discretion to determine, with the consent of the TAC and the Futures Representative, (a) whether a claimant must have previously filed the PI Trust Claim in the tort system to be eligible to file the claim with the PI Trust and (b) whether a filing fee should be required for any PI Trust claims.

## SECTION VII

### General Guidelines for Liquidating and Paying Claims

7.1     **Showing Required.**  To establish a valid PI Trust Claim, a claimant must meet the requirements set forth in this TDP. The PI Trust may require the submission of X-rays, CT scans, laboratory tests, medical examinations or reviews, other medical evidence, or any other

- 46 -

evidence to support or verify the PI Trust Claim, and may further require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods, and procedures to assure that such evidence is reliable.

7.2    **Costs Considered.**  Notwithstanding any provisions of this TDP to the contrary, the Trustees shall always give appropriate consideration to the cost of investigating and uncovering invalid PI Trust Claims so that the payment of valid PI Trust Claims is not further impaired by such processes with respect to issues related to the validity of the medical evidence supporting a PI Trust Claim.  The Trustees shall also have the latitude to make judgments regarding the amount of transaction costs to be expended by the PI Trust so that valid PI Trust Claims are not unduly further impaired by the costs of additional investigation.  Nothing herein shall prevent the Trustees, in appropriate circumstances, from contesting the validity of any claim against the PI Trust whatever the costs, or declining to accept medical evidence from sources that the Trustees have determined to be unreliable pursuant to the Claims Audit Program described in Section 5.7 above.

7.3    **Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity.**  Consistent with the provisions hereof and subject to the FIFO Processing and Liquidation Queues, the Maximum Annual Payment, the Maximum Available Payment and the Claims Payment Ratio requirements set forth above, the Trustees shall proceed as quickly as possible to liquidate valid PI Trust Claims, and shall make payments to holders of such claims in accordance with this TDP from the OC and/or Fibreboard Sub-Accounts promptly as monies become available and as claims are liquidated, while maintaining sufficient assets within each Sub-Account to pay future valid claims in substantially the same manner.

- 47 -

1142

Because the PI Trust's income over time remains uncertain, and decisions about payments must be based on estimates that cannot be done precisely, they may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment for claims against either Sub-Account. However, the Trustees shall use their best efforts to treat similar claims in substantially the same manner, consistent with their duties as Trustees, the purposes of the PI Trust, the established allocation of monies to claims in Categories A and B, , and the practical limitations imposed by the inability to predict the future with precision. In the event that either or both of the OC or the Fibreboard Sub-Accounts face temporary periods of limited liquidity, the Trustees may, with the consent of the TAC and the Future Claimants' Representative, suspend the normal order of payment from such Sub-Account, may temporarily limit or suspend payments from such Sub-Account altogether, and may offer a Reduced Payment Option for the Sub-Account as described in Section 2.5 above.

7.4     **Punitive Damages.**  In determining the value of any liquidated or unliquidated PI Trust Claim, punitive or exemplary damages, i.e., damages other than compensatory damages, shall not be considered or allowed, notwithstanding their availability in the tort system.

7.5     **Interest.**

1143

7.5(a)    **In General.** Except for PI Trust Claims involving Other Asbestos Disease (Disease Level I – Cash Discount Payment) and subject to the limitations set forth below, interest shall be paid on all PI Trust Claims with respect to which the claimant has had to wait a year or more for payment, provided, however, that no claimant shall receive interest for a period in excess of seven (7) years. The applicable interest rate shall be six percent (6%) simple interest per annum for each of the first five (5) years after the Effective Date; thereafter, the PI Trust shall have the discretion to change the annual interest rate with the consent of the TAC and the Future Claimants' Representative.

7.5(b)    **Unliquidated PI Trust Claims.** Interest shall be payable on the Scheduled Value of any unliquidated PI Trust Claim that meets the requirements of Disease Levels II – V, VII and VIII, whether the claim is liquidated under Expedited Review, Individual Review, or by arbitration. No interest shall be paid on any claim liquidated in the tort system pursuant to section 5.11 above and 7.6 below. Interest on an unliquidated PI Trust Claim that meets the requirements of Disease Level VI shall be based on the Average Value of such a claim. Interest on all such unliquidated claims shall be measured from the date of payment back to the earliest of the date that is one year after the date on which (a) the claim was filed against OC or Fibreboard prior to the Petition Date; (b) the claim was filed against another defendant in the tort system on or after the Petition Date but before the Effective Date; or (c) the claim was filed with the PI Trust after the Effective Date.

7.5(c)    **Interest on Liquidated Pre-Petition Claims.** Interest shall also be payable on the liquidated value of all Pre-Petition Liquidated Claims described in Section 5.2(a) above. In the case of Pre-Petition Liquidated Claims liquidated by verdict or judgment, interest shall be measured from the date of payment back to the date that is one year after the date that

- 49 -

the verdict or judgment was entered. In the case of Pre-Petition Liquidated Claims liquidated by

a binding, judicially enforceable settlement, interest shall be measured from the date of payment

back to the date that is one year after the Petition Date.

7.6     **Suits in the Tort System.** If the holder of a disputed claim disagrees with the PI

Trust's determination regarding the Disease Level of the claim, the claimant's exposure history

or the liquidated value of the claim, and if the holder has first submitted the claim to non-binding

arbitration as provided in Section 5.10 above, the holder may file a lawsuit in the Claimant's

Jurisdiction as defined in Section 5.3(b)(2) above. Any such lawsuit must be filed by the

claimant in her or her own right and name and not as a member or representative of a class, and

no such lawsuit may be consolidated with any other lawsuit. All defenses (including, with

respect to the PI Trust, all defenses which could have been asserted by OC or Fibreboard) shall

be available to both sides at trial; however, the PI Trust may waive any defense and/or concede

any issue of fact or law. If the claimant was alive at the time the initial pre-petition complaint

was filed or on the date the proof of claim was filed with the PI Trust, the case will be treated as

a personal injury case with all personal injury damages to be considered even if the claimant has

died during the pendency of the claim.

7.7     **Payment of Judgments for Money Damages.** If and when an OC or Fibreboard

claimant obtains a judgment in the tort system, the claim shall be placed in the relevant FIFO

Payment Queue based on the date on which the judgment became final. Thereafter, the claimant

shall receive from the OC or Fibreboard Sub-Account an initial payment (subject to the

applicable Payment Percentage, the Maximum Available Payment, and the Claims Payment

Ratio provisions set forth above) of an amount equal to one-hundred percent (100%) of the

greater of (i) the PI Trust's last offer to the claimant or (ii) the award that the claimant declined

- 50 -

in non-binding arbitration. The claimant shall receive the balance of the judgment, if any, in five equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage, the Maximum Available Payment and the Claims Payment Ratio provisions set forth above).

In the case of non-Extraordinary claims involving Disease Levels II - VIII, the total amounts paid with respect to such claims shall not exceed the Maximum Values for such Disease Levels set forth in Section 5.3(b)(4). In the case of Extraordinary Claims, the total amounts paid with respect to such claims shall not exceed the Maximum Value for such claims set forth in Section 5.4(a) above. Under no circumstances shall interest be paid pursuant to Section 7.5 or under any statute on any judgments obtained in the tort system pursuant to Sections 5.11 and 7.6 above.

7.8    **Releases.** The Trustees shall have the discretion to determine the form and substance of the releases to be provided to the PI Trust in order to maximize recovery for claimants against other tortfeasors without increasing the risk or amount of claims for indemnification or contribution from the PI Trust. As a condition to making any payment to a claimant, the PI Trust shall obtain a general, partial, or limited release as appropriate in accordance with the applicable state or other law. If allowed by state law, the endorsing of a check or draft for payment by or on behalf of a claimant shall constitute such a release.

7.9    **Third-Party Services.** Nothing in this TDP shall preclude the PI Trust from contracting with another asbestos claims resolution organization to provide services to the PI Trust so long as decisions about the categorization and liquidated value of PI Trust Claims are based on the relevant provisions of this TDP, including the Disease Levels, Scheduled Values, Average Values, Maximum Values, and Medical/Exposure Criteria set forth above.

- 51 -

**7.10    PI Trust Disclosure of Information.**  Periodically, but not less often than once a year, the PI Trust shall make available to claimants and other interested parties, the number of claims by disease levels that have been resolved both by the Individual Review Process and by arbitration as well as by litigation in the tort system, indicating the amounts of the awards and the averages of the awards by jurisdiction.

### SECTION VIII

#### Miscellaneous

**8.1    Amendments.**  Except as otherwise provided herein, the Trustees may amend, modify, delete, or add to any provisions of this TDP (including, without limitation, amendments to conform this TDP to advances in scientific or medical knowledge or other changes in circumstances), provided they first obtain the consent of the TAC and the Future Claimants' Representative pursuant to the Consent Process set forth in Sections 5.7(b) and 6.6(b) of the PI Trust Agreement, except that the right to amend the Claims Payment Ratio is governed by the restrictions in Section 2.5 above, and the right to adjust the Payment Percentage is governed by Section 4.2 above.

**8.2    Severability.**  Should any provision contained in this TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this TDP.  Should any provision contained in this TDP be determined to be inconsistent with or contrary to OC's or Fibreboard's obligations to any insurance company providing insurance coverage to OC and/or Fibreboard in respect of claims for personal injury based on exposure to asbestos-containing products manufactured or produced by OC or Fibreboard, the PI Trust with the consent of the TAC and the Future Claimants' Representative may amend this TDP and/or the PI Trust Agreement to make the provision of

-52-

1147

either or both documents consistent with the duties and obligations of OC or Fibreboard to said insurance company.

8.3    **Governing Law.** Except for purposes of determining the liquidated value of any PI Trust Claim, administration of this TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware. The law governing the liquidation of PI Trust Claims in the case of Individual Review, arbitration or litigation in the tort system shall be the law of the Claimant's Jurisdiction as described in Section 5.3(b)(2) above.

**EXHIBIT E**

**FORM OF**
**FIBREBOARD ASBESTOS PROPERTY DAMAGE TRUST AGREEMENT[1]**

This Trust Agreement is among Fibreboard Corporation, a Delaware corporation and debtor-in-possession ("FB"), and [insert name of Trustee], as Trustee ("Trustee"), pursuant to the Fifth Amended Joint Plan of Reorganization for Owens Corning and its Affiliated Debtors and Debtors-In-Possession, dated December 31, 2005 (the "Plan").

WHEREAS, at the time of the entry of the order for relief in the Chapter 11 Cases, FB was named as a defendant in property damage actions seeking recovery for damages allegedly caused by the presence of asbestos or asbestos-containing products in buildings and other property, and

WHEREAS, FB has reorganized under the provisions of Chapter 11 of the Bankruptcy Code in a case pending in the United States Bankruptcy Court for the District of Delaware and administratively consolidated with In re Owens Corning, et al., Case No. 00-3837 (JKF) ("Chapter 11 Cases"), and

WHEREAS, the Plan, filed by the Debtors, the Official Committee for Asbestos Claimants ("Asbestos Claimants' Committee"), and the Legal Representative for Future Claimants appointed by the Bankruptcy Court pursuant to its order of September 28, 2001 ("Future Representative"), has been confirmed by the Bankruptcy Court, and

WHEREAS, the Plan provides, *inter alia*, for the creation of the Fibreboard Asbestos Property Damage Settlement Trust (the "FB Property Damage Trust"), and

WHEREAS, pursuant to the Plan, the FB Property Damage Trust is to be funded in whole by the FB Asbestos Property Damage Insurance Assets, and

WHEREAS, pursuant to the Plan, the FB Property Damage Trust is to use its assets or income to pay FB Asbestos Property Damage Claims, and

WHEREAS, the Plan provides, among other things, for the complete settlement and satisfaction of all liabilities and obligations of FB with respect to FB Asbestos Property Damage Claims; and

WHEREAS, pursuant to the Plan, the FB Property Damage Trust is intended to qualify as a "Qualified Settlement Fund" within the meaning of Section 1 468B-1 of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code, and

WHEREAS, pursuant to the Plan, all Fibreboard Asbestos Property Damage Claims will be channeled to the FB Property Damage Trust and all Persons shall otherwise be permanently and

---

[1] This Asbestos Property Damage Trust Agreement remains subject to revision in order to conform with the Plan.

forever stayed, restrained, and enjoined from taking any Enjoined Actions for the purposes of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any FB Asbestos Property Damage Claims,

NOW, THEREFORE, it is hereby agreed as follows:

## ARTICLE 1

### DEFINITIONS

As used herein, the following terms shall have the meanings specified below:

1.1    "**Affiliate**" of, or a Person "**Affiliated**" with, a specified Person, is a Person that directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified; *provided*, that with respect to an "Affiliate" of a Debtor or a Person "Affiliated" with a Debtor, such term shall include, without limiting the foregoing definition, the meaning ascribed thereto in Section 101(2) of the Bankruptcy Code.

1.2    "**Assets**" means the FB Asbestos Property Damage Insurance Assets, as that term is defined in the Plan.

1.3    "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Case to the extent of any reference made to it by the District Court pursuant to 28 U.S.C. §157 as a unit of such District Court pursuant to 28 U.S.C. §151.

1.4    "**Business Day**" means any day, excluding Saturdays, Sundays or "legal holidays" (as defined in Federal Rule of Bankruptcy Procedure 9006(a)), on which commercial banks are open for business in New York, New York.

1.5    "**Claim**" means any right to payment from a Debtor whether or not any such right is reduced to judgment, liquidated, unliquidated, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from a Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, whether or not asserted, including, without limitation, any "claim" (as defined in Section 101(a)(5) of the Bankruptcy Code).

1.6    "**Class**" means a category of holders of Claims or Interests, as described in Articles II and III of the Plan.

1.7    "**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan.

1.8    "**Disallowed Claim**" means a FB Asbestos Property Damage Claim that is disallowed in its entirety pursuant to the FB Asbestos Property Damage Trust Distribution Procedures.

2

1150

1.9    "**Effective Date**" means the Business Day on which all conditions to the consummation of the Plan have been satisfied or waived as provided in Article XII of the Plan, and on which date all acts, events, terms and conditions contemplated under the Plan to occur on the Effective Date or as soon as practicable thereafter shall be deemed to have occurred simultaneously.

1.10    "**Encumbrance**" means, with respect to any property, tangible or intangible, any mortgage, lien, pledge, charge, security interest, assignment, or encumbrance of any nature in respect of such property (including, without express or implied limitation, any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction).

1.11    "**Enjoined Action**" means any claim, demand, suit, proceeding or cause of action, whenever and wherever arising or asserted, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, including, but not limited to: (i) the commencement, conduct, or continuation in any manner, directly or indirectly (including an action directly against a provider of insurance), of any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) the enforcement, attachment (including, without limitation, any prejudgment attachment), collection or seeking to recover any judgment, award, decree, or other order; (iii) the creation, perfection or enforcement in any manner, directly or indirectly, of any Encumbrance; (iv) the setting off, seeking reimbursement of, contribution from, or subrogation against, or other recoupment in any manner, directly or indirectly, of any amount against any liability owed to any Protected Parties, and (v) the commencement or continuation, in any manner, in any place, of any action which, in any such case, does not comply with or is inconsistent with the provisions of the Plan.

1.12    "**Entity**" means an individual, corporation, partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, or government or any political subdivision thereof, or other person or entity.

1.13    "**FB Asbestos Property Damage Claim**" means any present or future right to payment, claim, remedy, or liability against, or debt or obligation of, any FB Person, whether or not such right, claim, remedy, or liability is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts or legal basis for such right, claim, remedy, liability, debt or obligation are known or unknown, under any theory of law, equity, admiralty, or otherwise for, relating to, or arising by reason of, directly or indirectly, damage to property, including, without limitation, diminution in the value thereof, or environmental damage or economic loss related thereto, caused or allegedly caused, directly or indirectly, in whole or in part by the presence in buildings or other systems or structures of asbestos or asbestos-containing products for which any FB Person may be legally liable, including, without limitation, the presence of, or exposure to, asbestos or asbestos-containing products that were manufactured, installed, fabricated, sold, supplied, produced, distributed, released or in any way at any time marketed or disposed of by any FB Person, or for which any FB Person is liable due to the acts or omissions of any FB Person, including, without express or implied limitation, any right, claim, remedy, liability against, or debt or obligation for compensatory damages (such as proximate, consequential, general and special damages) and including punitive damages. FB Asbestos Property Damage Claims include FB Indirect Asbestos Property Damage Claims.

3

1.14  **"FB Asbestos Property Damage Claims Procedures"** means the FB Asbestos Property Damage Trust Distribution Procedures to be implemented by the FB Property Damage Trustee pursuant to the terms and conditions of the Plan and the FB Asbestos Property Damage Trust Agreement to process, liquidate, and pay FB Asbestos Property Damage Claims, and attached hereto as Annex A.

1.15  **"FB Asbestos Property Damage Trustee"** means the Person confirmed by the Bankruptcy Court to serve as the trustee of the FB Property Damage Trust, pursuant to the terms of the FB Asbestos Property Damage Trust Agreement, or as subsequently may be appointed pursuant to the provisions of the FB Asbestos Property Damage Trust Agreement.

1.16  **"FB Indirect Asbestos Property Damage Claim"** means any present or future right to payment, claim, remedy or liability against, or debt or obligation of, any FB Person, whether or not such right, claim, remedy, or liability is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal basis for such right, claim, remedy or liability, debt or obligation are known or unknown, under any theory of law, equity, admiralty, or otherwise that is (i) asserted by (a) any Person (other than (I) an FB Person or (II) a Related Person of the Debtors or Reorganized Debtors entitled to indemnification pursuant to Section 7.5 of the Plan) who has been, is, or may be a defendant in an action seeking damages for, relating to, or arising by reason of, directly or indirectly, damage to property, including without limitation, diminution in the value thereof, or environmental damage or economic loss related thereto, caused or allegedly caused, directly or indirectly, in whole or in part by the presence in buildings or other systems or structures of asbestos or asbestos-containing products for which any FB Person may be legally liable, including, without limitation, the presence of, or exposure to, asbestos or asbestos-containing products that were manufactured, installed, fabricated, sold, supplied, produced, distributed, released or in any way at any time marketed or disposed of by any FB Person, or for which any FB Person is otherwise liable due to the acts or omissions of any FB Person or (b) any assignee or transferee of such Person, and (ii) on account of alleged liability of any FB Person for reimbursement, contribution, subrogation or indemnification of any portion of any damages such Person has paid or may pay to the plaintiff in such action.

1.17  **"Final Order"** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket of such court, the operation or effect of which has not been stayed, reversed, or amended and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending.

1.18  **"Petition Date"** means October 5, 2000, the date of the Filing.

1.19  **"Proof of Claim"** means the proof of claim that must be filed by a holder of a Claim by the date(s), if any, designated by the Bankruptcy Court as the last date(s) for filing proofs of claims or interests against the Debtors.

1.20  **"Related Parties"** means (a) any past or present affiliate of any of the Debtors or the Reorganized Debtors, (b) any predecessor in interest of any of the Debtors or the Reorganized Debtors, or (c) any Entity that owned a financial interest in any of the Debtors or the Reorganized

4

Debtors, any past or present affiliate of any of the Debtors or the Reorganized Debtors, or any predecessor in interest of any of the Debtors or the Reorganized Debtors.

All capitalized terms used herein and not defined in this Article I or in another provision of this Trust Agreement shall have the meanings assigned to them in the Plan and/or the Bankruptcy Code, which definitions are incorporated by reference herein.

## ARTICLE 2

## AGREEMENT OF TRUST

2.1    <u>Creation and Name</u>. The Settlors hereby create a trust known as the "Fibreboard Asbestos Property Damage Settlement Trust," which is the FB Property Damage Trust provided for and referred to in the Plan. The Trustee of the FB Property Damage Trust may transact the business and affairs of the FB Property Damage Trust in the name, "Fibreboard Asbestos Property Damage Settlement Trust."

2.2    <u>Purpose</u>. The purpose of the FB Property Damage Trust is to assume any and all liabilities of Fibreboard or its Affiliates, with respect to any and all FB Asbestos Property Damage Claims, and to use the FB Property Damage Trust's assets and income to promptly pay holders of valid FB Asbestos Property Damage Claims. This purpose shall be fulfilled through the provisions of this Trust Agreement and the FB Asbestos Property Damage Claims Procedures attached hereto as Annex A.

2.3    <u>Transfer of Assets</u>. The Settlors hereby transfer and assign to the FB Property Damage Trust the property set forth in Section 3.4(e)(ii) of the Plan (herein the "Assets").

2.4    <u>Acceptance of Assets and Assumption of Liabilities</u>.

(a)    In furtherance of the purposes of the FB Property Damage Trust, the Trustee, on behalf of the FB Property Damage Trust, hereby expressly accepts the transfer and assignment to the FB Property Damage Trust of the Assets.

(b)    In furtherance of the purposes of the FB Property Damage Trust, and subject to Article 5.4 hereof, the Trustee, on behalf of the FB Property Damage Trust, expressly assumes all liability for all FB Asbestos Property Damage Claims as provided for in Section 11.4 of the Plan. Except as otherwise provided in the FB Asbestos Property Damage Claims Procedures, the FB Property Damage Trust shall have all defenses, cross-claims, offsets, and recoupments regarding FB Asbestos Property Damage Claims that FB has or would have had under applicable law.

(c)    Nothing in this section or any other section of this Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the general injunction issued in connection with the Plan or the FB Property Damage Trust's assumption of all liability with respect to FB Asbestos Property Damage Claims.

5

1153

## ARTICLE 3

## POWERS AND TRUST ADMINISTRATION

3.1    Powers.

(a)    Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the FB Property Damage Trust, including, without limitation, each power expressly granted in this Article 3.1, any power reasonably incidental thereto, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)    Except as otherwise specified herein, the Trustee needs not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    Without limiting the generality of Article 3.1(a) above, the Trustee shall have the power to

(i)    receive and hold the Assets,

(ii)    invest the monies held from time to time by the FB Property Damage Trust,

(iii)    sell, transfer or exchange any or all of the Assets at such prices and upon such terms as they may consider proper, consistent with the other terms of this Trust Agreement,

(iv)    pay liabilities and expenses of the FB Property Damage Trust,

(v)    change the state of domicile of the FB Property Damage Trust,

(vi)    establish such funds, reserves and accounts within the FB Property Damage Trust estate, as deemed by the Trustee to be useful in carrying out the purposes of the FB Property Damage Trust,

(vii)    sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitral or other proceeding,

(viii)    amend the Bylaws, a copy of which is annexed hereto as Annex B (the "Bylaws"),

(ix)    appoint such officers and hire such employees and engage such legal, financial, accounting, investment and other advisors, alternative dispute resolution panelists, and agents as the business of the FB Property Damage Trust requires, and to delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his or her discretion, deem advisable or necessary in order to carry out the terms of this FB Property Damage Trust,

6

(x)    pay employees, legal, financial, accounting, investment and other advisors and agents reasonable compensation, including without limitation, compensation at rates approved by the Trustee for services rendered prior to the execution hereof,

(xi)    reimburse the Trustee, subject to Article 5.5, and reimburse such officers, employees, legal, financial, accounting, investment and other advisors and agents all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder, including without limitation, costs and expenses incurred prior to the execution hereof,

(xii)    execute and deliver such deeds, leases and other instruments as the Trustee considers proper in administering the FB Property Damage Trust,

(xiii)    enter into such other arrangements with third parties as are deemed by the Trustee to be useful in carrying out the purposes of the FB Property Damage Trust, provided such arrangements do not conflict with any other provision of this Trust Agreement,

(xiv)    in accordance with Article 5.6, indemnify (and purchase insurance indemnifying) the Trustee and PD Advisory Committee members (as hereinafter defined), and officers, employees, agents, advisers and representatives of the FB Property Damage Trust or the PD Advisory Committee to the fullest extent that a corporation or trust organized under the law of the FB Property Damage Trust's domicile is from time to time entitled to indemnify and/or insure its directors, trustees, officers, employees, agents, advisers and representatives,

(xv)    indemnify (and purchase insurance indemnifying) the Additional Indemnitees as defined in Article 5.6 hereof,

(xvi)    delegate any or all of the authority therein conferred with respect to the investment of all or any portion of the Assets to any one or more reputable individuals or recognized institutional investment advisers or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Article 5.4,

(xvii)    consult with FB or its Affiliates at such times and with respect to such issues relating to the conduct of the FB Property Damage Trust as the Trustee considers desirable,

(xviii)    make, pursue (by litigation or otherwise), collect, compromise or settle any claim, right, action or cause of action included in the Assets, and

(xix)    merge or contract with other claims resolution facilities that are not specifically created by this Agreement or the FB Asbestos Property Damage Claims Procedures, subject to Article 3.2(e) of this Agreement, provided that such merger or contract shall not (a) alter the FB Asbestos Property Damage Claims Procedures; (b) subject the FB Property Damage Trust to any additional liabilities for FB Asbestos Property Damage Claims, (c) subject the Reorganized Debtors or any successor in interest to any risk of having any Asbestos Property Damage Claim asserted against it or them; or (e) otherwise jeopardize the validity or enforceability of the General Injunction.

7

1155

(d)     The Trustee shall not have the power to guaranty any debt of other persons.

3.2     General Administration.

(a)     The Trustee shall act in accordance with the Bylaws. To the extent not inconsistent with the terms of this Trust Agreement, the Bylaws govern the affairs of the FB Property Damage Trust.

(b)     The Trustee shall timely file such income tax and other returns and statements and comply with all withholding obligations, as required under the applicable provisions of the Internal Revenue Code and of any state law and the regulations promulgated thereunder.

(c)     (i) The Trustee shall cause to be prepared and filed with the Bankruptcy Court as soon as available, and in any event within ninety (90) days following the end of each fiscal year an annual report containing financial statements of the FB Property Damage Trust (including, without limitation, a balance sheet of the FB Property Damage Trust as of the end of such fiscal year and a statement of operations for such fiscal year) audited by a firm of independent certified public accountants selected by the Trustee and accompanied by an opinion of such firm as to the fairness of the financial statements' presentation of the cash and investments available for the payment of claims and as to the conformity of the financial statements with generally accepted accounting principles. The Trustee shall provide a copy of such report to the PD Advisory Committee and to Reorganized FB.

(ii)     Simultaneously with delivery of each set of financial statements referred to in Article 3.2(c)(i) above, the Trustee shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of Claims disposed of during the period covered by the financial statements.

(iii)     All materials requested to be filed with the Bankruptcy Court by this Article 3.2 shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court.

(d)     The Trustee shall cause to be prepared and submitted to the PD Advisory Committee as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year and the succeeding four fiscal years.

(e)     The Trustee shall consult with the PD Advisory Committee (as hereinafter defined) on the appointment of a successor Trustee and the implementation and administration of the FB Asbestos Property Damage Claims Procedures. The Trustee shall be required to obtain the consent of a majority of the members of the PD Advisory Committee in order:

(i)     to amend materially the FB Asbestos Property Damage Claims Procedures, unless such amendment relates to the specific amounts or percentages to be paid to holders of Asbestos Property Damage Claims who have not elected discounted payment, in which case, PD Advisory Committee consent is not required, or

8

(ii)    to merge or participate with any claims resolution facility that was not specifically created under this Trust Agreement or the FB Asbestos Property Damage Claims Procedures, or

(iii)    to amend any provision of Article 6 herein; or

(iv)    to terminate the FB Property Damage Trust pursuant to Article 7.2(a)(iii) herein.

The PD Advisory Committee shall not unreasonably withhold any consent required hereunder, and if ever the PD Advisory Committee shall withhold any consent required hereunder, at the election of the Trustee, the dispute between the Trustee and the PD Advisory Committee shall be resolved through the implementation of binding alternative dispute resolution procedures mutually agreed to by the Trustee and the PD Advisory Committee.

3.3    Claims Administration.

(a)    General Principles.  The Trustee shall proceed quickly to implement the FB Asbestos Property Damage Claims Procedures.  The FB Property Damage Trust shall pay holders of valid Asbestos Property Damage Claims in accordance with the provisions hereof as promptly as funds become available.  In his or her administration of the FB Asbestos Property Damage Claims Procedures, the Trustee shall favor settlement over arbitration, and fair and efficient resolution of Claims in all cases, while endeavoring to preserve and enhance the FB Property Damage Trust estate.

(b)    FB Asbestos Property Damage Claims.

(i)    The Trustee shall administer the processing and payment of FB Asbestos Property Damage Claims in accordance with the FB Asbestos Property Damage Claims Procedures, a copy of which is annexed hereto as Annex A, as the same may be amended from time to time, in accordance with the provisions hereof and thereof.

(c)    Bankruptcy Court Claims Bar Date Orders

(i)    As provided herein, the Trustee shall enforce the Bankruptcy Court's claims bar date orders that are applicable to Asbestos Property Damage Claims.

(ii)    The Trustee shall disallow any Asbestos Property Damage Claim if they determine the claimant inexcusably failed to comply with an applicable claims bar date order entered by the Bankruptcy Court, and any such decision shall be final and non-appealable.

(iii)    The Trustee shall have complete discretion to determine whether a claimant inexcusably failed to comply with an applicable claims bar date order.  In making this determination, the Trustee may be guided by the "excusable neglect" standard developed under federal bankruptcy law in connection with the adjudication of late filed proofs of claim in bankruptcy cases.

9

## ARTICLE 4

## ACCOUNTS, INVESTMENTS, AND PAYMENTS

4.1     Accounts.  The Trustee may, from time to time, create such accounts and reserves within the FB Property Damage Trust estate as they may deem necessary, prudent or useful in order to provide for the payment of expenses and valid Asbestos Property Damage Claims and may, with respect to any such account or reserve, restrict the use of monies therein.

4.2     Investments.  Investment of monies held in the FB Property Damage Trust shall be administered in the manner in which individuals of ordinary prudence, discretion and judgment would act in the management of their own affairs, subject to the following limitations and provisions:

(a)     Except with respect to entities owned and controlled by the FB Property Damage Trust for purposes of carrying out provisions of this Trust Agreement, the FB Property Damage Trust shall not acquire or hold any equity in any Person or business enterprise unless such equity is in the form of securities that are traded on a national securities exchange or major international securities exchange or over the National Association of Securities Dealers Automated Quotation System.

(b)     The FB Property Damage Trust shall not acquire or hold any repurchase obligations unless, in the opinion of the Trustee, they are adequately collateralized.

4.3     Source of Payments.  All FB Property Damage Trust expenses, payments and all liabilities with respect to FB Asbestos Property Damage Claims shall be payable solely out of the FB Property Damage Trust estate.  Neither FB, its Affiliates, its subsidiaries, any successor in interest or the present or former directors, officers, employees or agents of FB, its Affiliates, or its subsidiaries, nor the Trustee, the PD Advisory Committee, or any of their officers, agents, advisers or employees shall be liable for the payment of any FB Property Damage Trust expenses or any Asbestos Property Damage Claim or any other liability of the FB Property Damage Trust.

## ARTICLE 5

## THE TRUSTEE

5.1     Number.  There shall be one (1) Trustee.  The Trustee shall be the person named on the signature page hereof.

5.2     Term of Service.

(a)     The Trustee shall serve until the earlier of (i) the termination of the FB Property Damage Trust pursuant to Article 7.2 below, (ii) his or her death, (iii) his or her resignation pursuant to Article 5.2(c) below, or (iv) his or her removal pursuant to Article 5.2(c) below, at which time his or her term shall terminate automatically.

10

(b)    The Trustee may resign at any time by written notice to the PD Advisory Committee. Such notice shall specify a date when such resignation shall take effect, which shall not be less than 90 days after the date such notice is given, where practicable.

(c)    The Trustee may be removed in the event that the Trustee becomes unable to discharge his or her duties hereunder due to accident or physical or mental deterioration, or for other good cause. Good cause shall be deemed to include, without limitation, any failure to comply with Article 5.9, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustee hereunder, or repeated nonattendance at scheduled meetings. Such removal shall require the unanimous decision of the PD Advisory Committee. Such removal shall take effect at such time as the PD Advisory Committee shall determine.

5.3    Appointment of Successor Trustee.

(a)    In the event of a vacancy in the position of Trustee, the vacancy shall be filled by majority vote of the PD Advisory Committee who shall refrain from making an appointment that may result in the appearance of impropriety.

(b)    Immediately upon the appointment of a successor Trustee, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee.

5.4    Liability of the Trustee. No Trustee, officer, or employee of the FB Property Damage Trust shall be liable to the FB Property Damage Trust, to any person holding an Asbestos Property Damage Claim, or to any other Person except for such Trustee's, officer's or employee's own breach of trust committed in bad faith or for willful misappropriation. No Trustee, officer, or employee of the FB Property Damage Trust shall be liable for any act or omission of any other officer, agent, or employee of the FB Property Damage Trust, unless the FB Trustee acted with bad faith or willful misconduct in the selection or retention of such officer, agent, or employee.

5.5    Compensation and Expenses of the Trustee.

(a)    The Trustee shall receive compensation from the FB Property Damage Trust for his or her services as Trustee in the amount of $_____ per annum, plus a per diem allowance for meetings attended in the amount of $1,000. The Trustee shall determine the scope and duration of activities that constitute a meeting and may provide for partial payment of per diem amounts for activities of less than a full day's duration. The per annum compensation payable to the Trustee hereunder may only be increased annually by the PD Advisory Committee proportionately with any increase in the Consumer Price Index – All Cities (or any successor index) for the corresponding annual period. Any increase in excess of that amount may be made only with the approval of the Bankruptcy Court.

(b)    The FB Property Damage Trust will promptly reimburse the Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of his or her duties hereunder.

11

1159

5.6    Indemnification of the Trustee and Others.

(a)    The FB Property Damage Trust shall indemnify and defend the Trustee, the FB Property Damage Trust's officers, agents, advisers or employees, to the fullest extent that a corporation or trust organized under the laws of the FB Property Damage Trust's domicile is from time to time entitled to indemnify and defend its directors, trustees, officers, employees, agents or advisers against any and all liabilities, expenses, claims, damages or losses incurred by them in the performance of their duties hereunder. Notwithstanding the foregoing, the Trustee shall not be indemnified or defended in any way for any liability, expense, claim, damage or loss for which he or she is liable under Article 5.4. Additionally, each member of the PD Advisory Committee (collectively "**Additional Indemnitees**") who was or is a party, or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding of any kind, whether civil, administrative or arbitral, by reason of any act or omission of such Additional Indemnitees with respect to (i) the Chapter 11 Cases, (ii) the liquidation of any Asbestos Property Damage Claims, or (iii) the administration of the FB Property Damage Trust and the implementation of the FB Asbestos Property Damage Claims Procedures, shall be indemnified and defended by the FB Property Damage Trust against expenses, costs and fees (including attorneys' fees), judgments, awards, costs, amounts paid in settlement, and liabilities of all kinds incurred by each Additional Indemnitee in connection with or resulting from such action, suit, or proceeding, except for bad faith or willful misconduct.

(b)    Reasonable expenses, costs and fees (including attorney's fees) incurred by or on behalf of the Trustee or any Additional Indemnitee in connection with any action, suit, or proceeding, whether civil, administrative or arbitral from which they are indemnified by the FB Property Damage Trust pursuant to this Article 5.6, may be paid by the FB Property Damage Trust in advance of the final disposition thereof upon receipt of an undertaking by or on behalf of such Trustee or Additional Indemnitee to repay such amount unless it shall be determined ultimately that such Trustee or Additional Indemnitee is entitled to be indemnified by the FB Property Damage Trust.

(c)    The Trustee may purchase and maintain reasonable amounts and types of insurance on behalf of an individual who is or was a Trustee, officer, employee, agent or representative of the FB Property Damage Trust or Additional Indemnitee against liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trustee, officer, employee, agent or representative.

5.7    The Trustee's and Additional Indemnitees' Lien. The Trustee and any Additional Indemnitee shall have a prior lien upon the FB Property Damage Trust corpus to secure the payment of any amounts payable to them pursuant to Articles 5.5 and 5.6.

5.8    The Trustee's Employment of Experts. The Trustee may, but shall not be required to, consult with counsel, accountants, appraisers and other parties deemed by the Trustee to be qualified as experts on the matters submitted to them (regardless of whether any such party is affiliated with the Trustee in any manner, except as otherwise expressly provided in this Trust Agreement), and the opinion of any such parties on any matters submitted to them by the Trustee shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee hereunder in good faith and in accordance with the written opinion of any such party.

12

5.9    <u>The Trustee's Independence.</u>  The Trustee shall not, during the term of his or her service, hold a position with or financial interest in an insurance company identified in Schedule XVl to the Plan, or act as attorney or advisor for any person who holds an Asbestos Property Damage Claim.

5.10    <u>The Trustee's Service as Officer or Consultant to the FB Property Damage Trust.</u> The Trustee may, but is not required to, serve as an officer or manager of the FB Property Damage Trust or as a consultant to the FB Property Damage Trust.  In the event the Trustee serves the FB Property Damage Trust in such a capacity, the FB Property Damage Trust shall compensate the Trustee in an amount determined by the PD Advisory Committee.  Compensation for the Trustee's service as an officer or manager of the FB Property Damage Trust or as a consultant to the FB Property Damage Trust shall be in addition to compensation paid pursuant to Article 5.5.

5.11    <u>Bond.</u>  The Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**ARTICLE 6**

**PROPERTY DAMAGE ADVISORY COMMITTEE**

6.1    <u>Formation; Duties.</u>  A Property Damage Advisory Committee (the "PD Advisory Committee") shall be formed.  The Trustee shall consult with the PD Advisory Committee on the appointment of a successor Trustee and the implementation and administration of the FB Asbestos Property Damage Claims Procedures.  The Trustee may consult with the PD Advisory Committee on any matter affecting the FB Property Damage Trust, and certain actions by the Trustee are subject to the prior consent of the PD Advisory Committee as provided in Article 3.2(e) hereof.  The PD Advisory Committee shall endeavor to act in the best interests of the holders of all Asbestos Property Damage Claims.

6.2    <u>Number; Chairperson.</u>

(a)    There shall be three members of the PD Advisory Committee.  The initial PD Advisory Committee members shall be _____, _____ and _____. The PD Advisory Committee shall act in all cases by majority vote.

(b)    There shall be a Chairperson of the PD Advisory Committee.  The Chairperson of the PD Advisory Committee shall be _____.  The Chairperson shall act as the PD Advisory Committee's liaison, he or she shall coordinate and schedule meetings of the PD Advisory Committee, and he or she shall handle all administrative matters that come before the PD Advisory Committee.

6.3    <u>Term of Office.</u>

(a)    Each member of the PD Advisory Committee shall serve for the duration of the FB Property Damage Trust, subject to the earlier of his or her death, resignation, or removal.

13

(b)     Subject to Article 6.4(b) hereof, any member of the PD Advisory Committee may resign at any time by written notice to each of the remaining members specifying the date when such resignation shall take place.

(c)     Any member of the PD Advisory Committee may be removed in the event such member becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated nonattendance at scheduled meetings. Such removal shall be made by the unanimous decision of the other members of the PD Advisory Committee, and it shall be effective at such time as all other members of the PD Advisory Committee determine.

6.4     Appointment of Successor.

(a)     A vacancy in the PD Advisory Committee caused by the resignation of a PD Advisory Committee member shall be filled with an individual nominated by the resigning PD Advisory Committee member and approved by the unanimous vote of all PD Advisory Committee members. The resigning PD Advisory Committee member's resignation shall not be effective until such approval is obtained and the successor PD Advisory Committee member has accepted the appointment.

(b)     In the event of a vacancy in the membership of the PD Advisory Committee other than one caused by resignation, the vacancy shall be filled by the unanimous vote of the remaining member(s) of the PD Advisory Committee.

6.5     Compensation and Expenses of PD Advisory Committee Members.

(a)     Each member of the PD Advisory Committee shall receive compensation from the FB Property Damage Trust for his or her services in the amount of $3,000 per diem for meetings attended by such member, payable as determined by the Trustee, but not less frequently than quarterly. Such per diem amount shall be increased or decreased annually pro rata with the amount that the per diem for meetings paid to the Trustee is increased or decreased pursuant to Article 5.5(a). For purposes of determining the per diem amount hereunder, the same definition of "meeting" shall apply to the PD Advisory Committee as is adopted by the Trustee for meetings of the Trustee.

(b)     All reasonable out-of-pocket costs and expenses incurred by PD Advisory Committee members in connection with the performance of their duties hereunder will be promptly reimbursed to such members by the FB Property Damage Trust.

6.6     Procedure for Obtaining Consent of PD Advisory Committee. In the event a matter is subject to the consent of the PD Advisory Committee pursuant to the terms hereof, the Trustee shall provide the PD Advisory Committee with the appropriate information regarding the matter in question. Upon receipt of such information, the PD Advisory Committee shall be given a period of twenty (20) days to respond to the Trustee's request for consent. This twenty (20) day period may be extended with the consent of the Trustee. In the event that the PD Advisory Committee does not respond to the Trustee within such twenty (20) day period, or any extension thereof, as to their approval or non-approval to such matter, then approval by the PD Advisory Committee shall be

14

deemed to have been granted. The members of the PD Advisory Committee must consider in good faith any request by the Trustee prior to any non-approval thereof, and no member of the PD Advisory Committee may withhold his consent unreasonably.

## ARTICLE 7

## GENERAL PROVISIONS

7.1     Irrevocability.  The FB Property Damage Trust is irrevocable during the term of the trust, but is subject to amendment as provided in Article 7.3.

7.2     Termination.

(a)     The FB Property Damage Trust shall automatically terminate on the date (the "Termination Date") 90 days after the first occurrence of any of the following events:

(i)     the Trustee in his or her sole discretion decides to terminate the FB Property Damage Trust because (A) he or she deems it unlikely that new Asbestos Property Damage Claims will be filed against the FB Property Damage Trust and (B) all Asbestos Property Damage Claims duly filed with the FB Property Damage Trust have been liquidated and satisfied and two years have elapsed since the Effective Date; or

(ii)     if the Trustee has procured and has in place irrevocable insurance policies or coverage in place agreements and has established claims handling agreements and other necessary arrangements adequate to discharge all expected remaining obligations and expenses of the FB Property Damage Trust in a manner consistent with this Trust Agreement and the FB Asbestos Property Damage Claims Procedures, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes final; or

(iii)     if in the judgment of the Trustee, with the consent of the PD Advisory Committee (which consent shall not be unreasonably withheld), the continued administration of the FB Property Damage Trust is uneconomic or inimical to the best interests of the persons holding Asbestos Property Damage Claims and the termination of the FB Property Damage Trust will not expose or subject FB, its Affiliates, or any other Reorganized Debtor or any successor in interest to any increased or undue risk of having any Asbestos Property Damage Claims asserted against it or them or in any way jeopardize the validity or enforceability of the General Injunction; or

(iv)     21 years less 91 days pass after the death of the last survivor of all the descendants of George Herbert Walker Bush of Texas living on the date hereof.

(b)     On the Termination Date, after payment of all the FB Property Damage Trust's liabilities have been provided for, the remaining FB Asbestos Property Damage Insurance Assets shall be transferred and assigned to Reorganized OC; all monies, if any, remaining in the FB Property Damage Trust estate shall be transferred to charitable organization(s) exempt from federal income tax under Section 501 (c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustee using his or her reasonable discretion; provided, however, that (i) if

15

1163

practicable, the tax-exempt organization(s) shall be related to the treatment of, research, or the relief of suffering of individuals suffering from asbestos-related disorders, and (ii) the tax-exempt organization(s) shall not bear any relationship to FB or its Affiliates within the meaning of Section 468(d)(3) of the Internal Revenue Code.

 7.3 Amendments. The Trustee, after consultation with the PD Advisory Committee, and subject to the PD Advisory Committee's consent when so provided herein, may modify or amend this Trust Agreement or any document annexed to it, including, without limitation, the By Laws, or the FB Asbestos Property Damage Claims Procedures, except that Articles 2.2 (Purpose), 2.4 (Acceptance of Assets and Assumption of Liabilities), 3.1(d) (Precluding Guaranty of Certain Debt), 3.2(e) (Trustee's consultation with PD Advisory Committee), 3.3(a)-(c) (Claims Administration), 5.1 (Number of Trustees), 5.2 (Term of Service), 5.3 (Appointment of a Successor Trustee), 5.5 (Compensation and Expenses of FB Property Damage Trust ), 5.6 (Indemnification of the Trustee and Others), 5.9 (Trustee's Disinterestedness), 6.1 (PD Advisory Committee Formation and Duties), 6.2 (PD Advisory Committee Number and Chairperson), 6.4 (Appointment of Successor (PD Advisory Committee)), 7.1 (Irrevocability), 7.2 (Termination) and 7.3 (Amendments) herein shall not be modified or amended in any respect. No consent from the Settlors shall be required to modify or amend this Trust Agreement or any document annexed to it. Any modification or amendment made pursuant to this section must be done in writing. Notwithstanding anything contained herein to the contrary, neither this Trust Agreement nor the FB Asbestos Property Damage Claims Procedures shall be modified or amended in any way that would jeopardize the efficacy or enforceability of the General Injunction.

 7.4 Meetings. For purposes of Articles 5.5 and 6.5 of this Trust Agreement, a PD Advisory Committee member or the Trustee shall be deemed to have attended a meeting in the event such person spends a substantial portion of the day conferring, by phone or in person, on FB Property Damage Trust matters with members, the Trustee, or advisors hired by the FB Property Damage Trust. The Trustee shall have complete discretion to determine whether a meeting, as described herein, occurred for purposes of Articles 5.5 and 6.5.

 7.5 Severability. Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

 7.6 Notices. Notices to persons asserting claims shall be given at the address of such person, or, where applicable, such person's legal representative, in each case as provided on such person's claim form submitted to the FB Property Damage Trust with respect to his or her Asbestos Property Damage Claim. Any notices or other communications required or permitted hereunder shall be in writing and delivered at the addresses designated below, or sent by telecopy pursuant to the instructions listed below, or mailed by registered or certified mail, return receipt requested, postage prepaid, addressed as follows, or to such other address or addresses as may hereafter be furnished by any of Reorganized FB, the Trustee or the PD Advisory Committee to the others in compliance with the terms hereof:

To the FB Property
  Damage Trust or
  the Trustee:        _____
                      _____
                      _____

                      and

                      _____
                      _____
                      _____


To the PD Advisory
  Committee           _____
                      _____
                      _____

                      and

                      _____
                      _____
                      _____

                      and

                      _____
                      _____
                      _____

To [_____]         _____
                      _____
                      _____

                      and

                      _____
                      _____
                      _____
                      _____

        All such notices and communications shall be effective when delivered at the designated
addresses or when the telecopy communication is received at the designated addresses and
confirmed by the recipient by return telecopy in conformity with the provisions hereof.

17

7.7    Counterparts. This Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument.

7.8    Successors and Assigns. The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Settlors, the FB Property Damage Trust, and the Trustee and their respective successors and assigns, except that neither the Settlors nor the FB Property Damage Trust nor the Trustee may assign or otherwise transfer any of its, or his or her rights or obligations under this Trust Agreement except, in the case of the FB Property Damage Trust and the Trustee, as contemplated by Articles 3.1 or 7.2(b).

7.9    Entire Agreement; No Waiver. The entire agreement of the parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein, and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of other rights under law or in equity.

7.10    Headings. The headings used in this Trust Agreement are inserted for convenience only and neither constitute a portion of this Trust Agreement nor in any manner affect the construction of the provisions of this Trust Agreement.

7.11    Governing Law. This Trust Agreement shall be governed by, and construed in accordance with. the laws of the State of Delaware.

7.12    Settlors' Representative. FB is hereby irrevocably designated as the representative of the Settlors, and it is hereby authorized to take any action required of the Settlors in connection with the Trust Agreement.

7.13    Dispute Resolution. Any disputes that arise under this Agreement or under the Annexes hereto shall be resolved by the Bankruptcy Court pursuant to Article XIII of the Plan, except as otherwise provided herein or in the Annexes hereto. Notwithstanding anything else herein contained, to the extent any provision of this Trust Agreement is inconsistent with any provision of the Plan, the Plan shall control.

7.14    Enforcement and Administration. The parties hereby acknowledge the Bankruptcy Court's continuing exclusive jurisdiction to interpret and enforce the terms of this Trust Agreement and the Annexes hereto, pursuant to Article XIII of the Plan.

7.15    Effectiveness. This Trust Agreement shall not become effective until it has been executed and delivered by all the parties hereto and until the Effective Date.

IN WITNESS WHEREOF, the parties have executed this Trust Agreement this ___ day of _____, 2006

18

1166

SETTLORS

_____

By:_____
    Name_____
    Title_____

By:_____
    Name_____
    Title_____

By:_____
    Name_____
    Title_____

TRUSTEE

_____
Name

19

FIBREBOARD ASBESTOS PROPERTY DAMAGE SETTLEMENT TRUST

## BYLAWS

## ARTICLE 1

## OFFICES

1.1  .  Principal Office. The initial principal office of the Fibreboard Asbestos Property Damage Settlement Trust (the "FB Property Damage Trust") shall be in Wilmington, Delaware or at such other place as the Trustee shall from time to time select.

1.2  .  Other Offices. The FB Property Damage Trust may have such other offices at such other places as the Trustee may from time to time determine to be necessary for the efficient and cost effective administration of the FB Property Damage Trust.

## ARTICLE 2

## THE TRUSTEE

2.1  .  Control of Property, Business and Affairs. The property, business and affairs of the FB Property Damage Trust shall be managed by or under the discretion of the Trustee, provided that certain decisions of the Trustee shall be subject to the consent of the PD Advisory Committee as provided in the Trust Agreement to which these Bylaws are attached as Annex B.

2.2  .  Number, Resignation and Removal. The number of Trustee[s] and the provisions governing the' resignation and removal of the Trustee and the appointment of a successor Trustee shall be governed by the provisions of Article 5 of the Trust Agreement.

2.3  .  Quorum and Manner of Acting. All of the Trustees shall be required for the transaction of business. In the absence of all Trustees, the Trustee[s] present may adjourn the meeting from time to time until all shall be present. The unanimous vote, at a meeting at which all Trustees are present, shall be an act of the Trustees.

2.4  .  Regular Meetings. Regular meetings of the Trustee may be held at such time and place as shall from time to time be determined by the Trustee provided that the Trustee shall meet at least once per calendar quarter. After there has been such determination, and a notice thereof has been once given to the PD Advisory Committee, regular meetings may be held without further notice being given. The PD Advisory Committee members shall be entitled to attend every regular meeting of the Trustee unless the Trustee reasonably determines that their attendance at all or part of a regular meeting would compromise a privileged communication or that a confidential discussion among the Trustee and his or her advisors is required.

2.5  .  Special Meetings. Special meetings of the Trustee shall be held whenever called by the Trustee. Notice of each such meeting, unless impracticable, shall be sent to each member of the PD Advisory Committee at his or her residence or usual place of business by personal delivery or by telephone or telecopy not later than two (2) days before the day on which such meeting is to be held. Such notice shall state the place, date and hour of the meeting and the

K73608.2 12/30/05

purposes for which it is called. In lieu of the notice to be given as set forth above, a waiver thereof in writing, signed by the member of the PD Advisory Committee entitled to receive such notice, whether before or after the meeting shall be deemed equivalent thereto for purposes of this Section 5. The PD Advisory Committee shall be entitled to attend every special meeting of the Trustee, unless the Trustee reasonably determines that their attendance at all or part of a special meeting would compromise a privileged communication or that a confidential discussion among the Trustee and his or her advisors is required. No notice or waiver by the Trustee, or any PD Advisory Committee member with respect to any special meeting shall be required if such person shall be present at said meeting. In the event a special meeting of the Trustee is held without notice to or the presence of the PD Advisory Committee, the PD Advisory Committee shall be given prompt notice after the fact of any resolution adopted by the Trustee at such special meeting.

2.6    Action Without a Meeting: Meeting by Conference Call. Any action required or permitted to be taken at any meeting of the Trustee may be taken without a meeting if the Trustee consents thereto in writing, and the writing is filed with the minutes of proceedings of the Trustee.

The Trustee also may take any action required or permitted to be taken at any meeting by means of conference telephone or similar communication equipment, provided that all persons participating in the meeting can hear each other. Participation in a meeting pursuant to this paragraph shall constitute presence in person at such meeting.

In the event the Trustee takes any action pursuant to this Section 6, the PD Advisory Committee shall be given prompt notice after the fact of any resolution adopted by the Trustee in writing.

2.7    Minutes of Proceedings of Trustees. Minutes of the meetings of the Trustee shall be maintained by the FB Property Damage Trust. The PD Advisory Committee shall receive copies of the minutes promptly after they have been approved by the Trustee.

2.8    Notice Recipient. The PD Advisory Committee members shall designate a representative to receive the notices and minutes required to be provided by this Article II. The Trustee's delivery of the notices and minutes to such designated notice recipient shall suffice for all purposes of this Article II.

## ARTICLE 3

## OFFICERS

3.1    Principal Officers. The principal officer of the FB Property Damage Trust shall be an Executive Director. The FB Property Damage Trust may also have such other officers as the Trustee may appoint after determining, that such appointment will promote the efficient and cost-effective administration of the FB Property Damage Trust.

3.2    Election and Term of Office. The principal officer(s) of the FB Property Damage Trust shall be chosen by the Trustee. Each such officer shall hold office until his successor shall have been duly chosen and qualified or until his earlier death, resignation or removal.

2

3.3     Subordinate Officers. In addition to the principal officer enumerated in 3.1 of this Article 3, the FB Property Damage Trust may have such other subordinate officers, agents and employees as the Trustee may deem necessary for the efficient and cost-effective administration of the FB Property Damage Trust, each of whom shall hold office for such period, have such authority, and perform such duties as the Trustee may from time to time determine. The Trustee may delegate to any principal officer the power to appoint and to remove any such subordinate officers, agents or employees.

3.4     Removal. The Executive Director or any other officer may be removed with or without cause, at any time, by resolution adopted by the Trustee at any regular meeting of the Trustee or at any special meeting of the Trustee called for that purpose.

3.5     Resignations. Any officer may resign at any time by giving written notice to the Trustee. The resignation of any officer shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

3.6     Powers and Duties. The officers of the FB Property Damage Trust shall have such powers and perform such duties as may be conferred upon or assigned to them by the Trustee.

## ARTICLE 4

## PD ADVISORY COMMITTEE

4.1     Regular Meetings. Regular meetings of the PD Advisory Committee may be held at such time and place as shall from time to time be determined by the PD Advisory Committee, provided it shall meet as often as is necessary to respond promptly to matters referred to it for consultation or consent by the Trustee. After a schedule for regular meetings has been determined, and a notice thereof has been once given to each PD Advisory Committee member, regular meetings may be held without further notice being given.

4.2     Special Meeting; Notice. Special meetings of the PD Advisory Committee shall be held whenever called by one or more of the PD Advisory Committee members. Notice of each such meeting shall be delivered by overnight courier to each PD Advisory Committee member, addressed to him or her at his or her residence or usual place of business, at least three (3) days before the date on which the meeting is to be held, or shall be sent to him or her at such place by personal delivery or by telephone or telecopy, not later than two (2) days before the date on which such meeting is to be held. Such notice shall state the place, date and hour of the meeting and the purposes for which it is called. In lieu of the notice to be given as set forth above, a waiver thereof in writing, signed by the PD Advisory Committee members entitled to receive such notice, whether before or after the meeting, shall be deemed equivalent thereto for purposes of this 4.2. No notice to or waiver by any PD Advisory Committee member with respect to any special meeting shall be required if such PD Advisory Committee member shall be present at such meeting.

4.3     Action Without a Meeting; Meeting by Conference Call. Any action required or permitted to be taken at any meeting of the PD Advisory Committee may be taken without a

3

meeting if all members of the PD Advisory Committee consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the PD Advisory Committee.

The PD Advisory Committee may take any action required or permitted to be taken at any meeting by means of conference telephone or similar communication equipment provided that all persons participating in the meeting can hear each other. Participation in a meeting pursuant to this paragraph shall constitute presence in person at such meeting.

4.4    .        Reimbursement of Expenses. All reasonable out-of-pocket expenses incurred by each member of the PD Advisory Committee in connection with the performance of his or her duties hereunder will be paid directly or reimbursed promptly to such member by the FB Property Damage Trust upon presentation of appropriate documentation.

**ARTICLE 5**

**AMENDMENTS**

The Bylaws of the FB Property Damage Trust, other than Article II, Article IV and Article V, may be amended by the Trustee at any meeting of the Trustee, provided that notice of the proposed amendment is contained in the notice of such meeting. The remaining Bylaws may be amended by the Trustee only after receipt of the consent of the PD Advisory Committee to the proposed amendment.

4

175608.2 12/5/003

ANNEX A to the FB Property Damage Trust Agreement

## EXHIBIT E-1

## FORM OF FIBREBOARD ASBESTOS PROPERTY
## DAMAGE CLAIMS RESOLUTION PROCEDURES[1]

These Fibreboard Asbestos Property Damage Claims Resolution Procedures ("**FB Property Damage Claims Procedures**") have been prepared in connection with the Fifth Amended Joint Plan of Reorganization for Owens Corning and Its Affiliated Debtors and Debtors-in-possession, dated as of December 30, 2005 (the "**Plan**"), and in connection with the Fibreboard Asbestos Property Damage Settlement Trust Agreement (the "**Trust Agreement**") filed in connection with the Plan.

These Property Damage Claims Procedures provide for the exclusive means of processing, liquidating, paying and satisfying all Fibreboard Asbestos Property Damage Claims as provided in and required by the Plan and the Trust Agreement. The trustee (the "**Trustee**") of the Fibreboard Asbestos Property Damage Trust (the "**FB Property Damage Trust**") shall implement and administer these Property Damage Claims Procedures in accordance with the Trust Agreement.

## ARTICLE 1

### Definitions

Capitalized terms used herein not otherwise defined shall have the meanings set forth in the Trust Agreement and if not defined herein nor defined in the Trust Agreement, but defined in the Plan shall have the meanings ascribed to them in the Plan.

1.1    Abatement. "Abatement" shall mean and refer to the removal, enclosure, encapsulation or repair of asbestos containing products.

1.2    Abatement Costs. "Abatement Costs" shall mean and refer to the reasonable and customary costs of Abatement, including, by way of example, costs for the Abatement itself, design, consultant and laboratory fees and costs in connection with the Abatement, and, except for Abatement upon Demolition, the reasonable costs of replacement, as allowed in these Property Damage Claims Procedures, of the asbestos containing products with a non-asbestos containing product.

1.3    Allowed Claim. "Allowed Claim" shall mean and refer to any Claim allowed for payment under the terms of these FB Property Damage Claims Procedures. An Allowed Claim shall be, and be deemed to be, a judgment against the FB Property Damage Trust (as successor for all purposes to the liabilities of Fibreboard in respect of FB Asbestos Property Damage Claims), in the Allowed Amount of such Claim.

---

[1] The FB Asbestos Property Damage Claims Resolution Procedures remain subject to revision in order to conform with the Plan.

1.4    Allowed Costs. "Allowed Costs" are those costs actually incurred that are reasonably and customary in the circumstances and which are allowed under these FB Property Damage Claims Procedures.

1.5    Approved Laboratory. "Approved Laboratory" shall mean and refer to a laboratory competent to perform constituent analysis of bulk samples of asbestos containing products approved by the Trustee with the concurrence of the PD Advisory Committee.

1.6    Asbestos Coordinator. "Asbestos Coordinator" shall mean and refer to Claimant's employee or agent who has primary responsibility for the Claimant's asbestos abatement, management and control activities.

1.7    Claim. "Claim" shall mean a Fibreboard Asbestos Property Damage Claim.

1.8    Claimant. "Claimant" shall mean an Entity holding a Fibreboard Asbestos Property Damage Claim.

1.9    Convincing Evidence. "Convincing Evidence" shall mean and refer to sufficient evidence to be a preponderance of the evidence.

1.10    Cost Model. "Cost Model" shall mean and refer to an appropriate model or formula developed by the Trustee with the advice and concurrence of the PD Advisory Committee for the purpose of estimating Past and Future Abatement Costs.

1.11    Demolition. "Demolition" shall mean and refer to the deliberate removal or destruction of a building or a part thereof, or a building system or component thereof, for any purpose by its owner or operator, by those acting for or on behalf of the owner or operator, or by a government agency, undertaken at least in principal part for reasons not related to asbestos management or control.

1.12    Disallowed Claim. "Disallowed Claim" shall mean and refer to any Claim that has been determined by the Trustee to not qualify for payment under these FB Property Damage Claims Procedures.

1.13    Discounted Payable Costs. "Discounted Payable Costs" shall mean and refer to the Abatement Costs payable to a Category 2 Claimant calculated in accordance with Exhibit 1.

1.14    Effective Date. "Effective Date" shall mean the Business Day on which all conditions to the consummation of the Plan have been satisfied or waived as provided in Article XII of the Plan, and on which date all acts, events, terms and conditions contemplated under the Plan to occur on the Effective Date or as soon as practicable thereafter shall be deemed to have occurred simultaneously.

1.15    Future Abatement Costs. "Future Abatement Costs" shall mean and refer to estimated Abatement Costs to be incurred by the Claimant based upon the Cost Model. Future Abatement Costs shall include the Abatement Costs for removal of previously encapsulated or enclosed asbestos containing products.

1173

1.16    Homogeneous Area.  "Homogeneous Area" shall mean and refer to a section of asbestos-containing product within a building that appears uniform in color and texture.

1.17    Past Abatement Costs.  "Past Abatement Costs" shall mean and refer to Abatement Costs actually incurred by the Claimant prior to the date of submission of its Claim to the Property Damage Facility, or, at the Claimant's option, costs for such Abatement as calculated by application of the Cost Model.

1.18    Payment Percentage.  "Payment Percentage" shall mean and refer to the percentage of the Allowed Amount of all Asbestos Property Damage Claims that the Trustee, from time to time, determine pursuant to the requirements set forth in Section 7.1(c) of the FB Property Damage Claims Procedures.

1.19    Pre-Existing Claims.  "Pre-Existing Claims" shall mean and refer to those claims on behalf of a Claimant who prior to the Bar Date filed or intervened in a lawsuit in a court of general jurisdiction against Fibreboard ("Fibreboard Pre-Existing Claimant").

1.20    Product Identification.  "Product Identification" shall mean and refer to Convincing Evidence that the asbestos-containing product which is the subject of a Claim is a Fibreboard asbestos-containing product.

1.21    Property Damage Claim Form.  "PD Claim Form" or "Claim Form" shall mean and refer to the form(s) and supporting instructions approved by the Trustee to be used by Claimants in the proper submission of Claims to the Property Damage Facility.

1.22    Property Damage Facility.  "Property Damage Facility" shall mean and refer to the mechanism or system established by the Trustee for the disposition and payment of Claims pursuant to these FB Property Damage Claims Procedures.

1.23    Qualified Person.  "Qualified Person" shall mean and refer to a trained industrial hygienist, engineer, contractor, consultant and/or asbestos coordinator who is certified, licensed and/or specially trained and experienced to identify and assess asbestos-containing products and to select appropriate Abatement.

### ARTICLE 2

### Purpose and Interpretation

2.1    Purpose.  These FB Property Damage Claims Procedures are adopted pursuant to the Trust Agreement.  They are designed to provide fair, prompt payment to holders of valid FB Property Damage Claims and to provide a low transaction cost method of effectuating the resolution of such Claims.

2.2    Interpretation.  Nothing in these FB Property Damage Claims Procedures shall be deemed to create a substantive right for any Claimant.  Without limiting the foregoing, these FB Property Damage Claims Procedures specifically shall not create any substantive right for any claimant to be afforded now, or in the future, a discounted cash payment election, as described in Section 4.3(b) herein, in any amount.  These FB Property Damage Claims Procedures are

- 3 -

1174

procedural, and they may be amended, deleted, or added to pursuant to the terms of the Trust Agreement and the terms of these FB Property Damage Claims Procedures.

## ARTICLE 3

### Property Damage Advisory Committee

There shall be a Property Damage Advisory Committee (the "PD Advisory Committee") composed of three persons selected by the Trustee. The Trustee shall participate and consult with the PD Advisory Committee on all major policy and administrative decisions affecting, and the interpretation and implementation of, the FB Property Damage Claims Procedures. Where consultation is required under the Trust Agreement or these FB Property Damage Claims Procedures, the Trustee need only seek advice and counsel from the PD Advisory Committee and are independent and free to accept or reject any recommendation of the PD Advisory Committee. In addition to any provisions in the Trust Agreement that may require the consent of the PD Advisory Committee, the Trustee shall obtain the consent of the PD Advisory Committee regarding (i) participation or merger with another claim resolution organization or contracting the operation of the FB Property Damage Trust (as defined herein) to another claim resolution organization; (ii) material changes other than any changes related to specific amounts to be paid or percentages to be paid in these FB Property Damage Claims Procedures in respect of Allowed Asbestos Property Damage Claims; (iii) the designation of approved laboratories; and (iv) the approval of a Cost Model for Past and Future Abatement Costs (as defined herein) under these FB Property Damage Claims Procedures.

## ARTICLE 4

### Claims Categories

4.1     Categories of Asbestos Property Damage Claims. All FB Asbestos Property Damage Claims shall be divided into two categories:

(a)     Category 1 Claims. Category 1 Claims shall include those Claims for Individual Review which are filed within twelve months of the Effective Date.

(b)     Category 2 Claims. Category 2 Claims shall include those Claims for Discounted Payable Costs which are filed within twelve months of the Effective Date.

(c)     No Claimant may file a Claim in more than one category.

4.2     Allowed Asbestos Property Damage Claims. For a Category 1 Claim or a Category 2 Claim to be Allowed, the Claimant must provide Convincing Evidence of each of the following:

(a)     The asbestos containing product for which the Claim is submitted is a Fibreboard asbestos-containing product; and

(b)     A legally viable cause of action; and

-4-

(c)    A Category 1 Claim, only, must also provide Convincing Evidence of compensable injury and damages.

4.3    Allowed Amounts.

(a)    Category 1 Claims shall be Allowed in the amount of the Allowed Costs, as adjusted to take into account the historical difficulty of proving such claims in the tort system and in no event shall the Allowed amount be greater than 50% of the Allowed Costs.

(b)    Category 2 Claims shall be Allowed in the amount of their Discounted Payable Costs as provided in Exhibit 1.

4.4    Disallowed Asbestos Property Damage Claims.  The Property Damage Facility will disallow any Asbestos Property Damage Claim:

(a)    for which the Claimant did not file a timely Proof of Claim within the meaning of the Bankruptcy Code and Bankruptcy Rules, such determination shall be made consistent with Section 3.3(c) of the Trust Agreement requiring the Trustee to enforce the Bankruptcy Court's bar date orders;

(b)    for which the Claimant did not file a Property Damage Claim Form within twelve months of the Effective Date;

(c)    where there has been a prior judicial determination or stipulation that the asbestos containing product for which the Asbestos Property Damage Claim was filed is not a Fibreboard asbestos-containing product;

(d)    by any Claimant where there is Convincing Evidence that Fibreboard would have been able to obtain summary judgment on the ground that the claim would have been barred as a matter of law or factually time-barred under the laws of the applicable jurisdiction if considered on the Petition Date, unless such claim has been revived or reinstated by reason of legislative enactment in the applicable jurisdiction; provided, however, there is a presumption that Pre-Existing Claims are not factually time-barred; or

(e)    where there has been a prior adjudication by Final Order (as defined in the Plan) that an Asbestos Property Damage Claim has been time-barred and may not be brought in any other jurisdiction or otherwise revived by the holder of such Claim.

4.5    Fibreboard Indirect Asbestos Property Damage Claim.  Fibreboard Indirect Asbestos Property Damage Claims asserted against the FB Property Damage Trust that fall within the Plan's definition of Fibreboard Indirect Asbestos Property Damage Claims, and which have not been disallowed, discharged, or otherwise resolved, shall be processed, allowed or disallowed, liquidated, paid, and satisfied in accordance with procedures to be developed and implemented by the Trustee, which procedures (a) shall determine the validity and allowance of such claims consistent with Section 502(e) of the Bankruptcy Code, (b) shall require binding arbitration for the resolution of all disputes and thereby foreclose resort to the tort system for dispute resolution, and (c) shall otherwise provide the same processing and payment to the holders of such claims that are allowed as the FB

- 5 -

Property Damage Trust would have afforded the holders of any underlying valid Fibreboard Asbestos Property Damage Claims under this Section IV.

## ARTICLE 5

### Processing and Review of Asbestos Property Damage Claims.

5.1    Submission of Asbestos Property Damage Claims. All Asbestos Property Damage Claims shall be submitted on the Property Damage Claim Form within twelve (12) months of the Effective Date, and shall include all of the documentation (as set forth in Section VI below) required to substantiate the Claim.

The Property Damage Facility may establish procedures designed to reduce administrative costs, which do not prejudice the Claimants' substantive rights. The Property Damage Facility also may establish guidelines to prevent abuse of the Property Damage Facility's objective of providing for cost-effective and reasonable methods of Abatement which do not prejudice the Claimants' substantive rights and which are not inconsistent with these FB Property Damage Claims Procedures. The Property Damage Facility may negotiate and compromise Claims in the best interests of the Category 1 and Category 2 Claims pursuant to these FB Property Damage Claims Procedures.

5.2    Review of Asbestos Property Damage Claims. Upon receipt of a Property Damage Claim Form, the Property Damage Facility shall review the Property Damage Claim Form to determine whether the necessary documentation (as set forth in Section VI) has been submitted. If additional documentation is required in order to evaluate the Claim, the Property Damage Facility shall notify the Claimant in writing within 90 days of receipt of such Property Damage Claim Form by the Facility. Any Claim requiring additional documentation as to which no such further documentation is provided within 60 days from the date of such notification, or such reasonable extension as may be granted by the Trustee (but which, in no event, shall exceed an additional 30 days), shall be a Disallowed Claim, provided that the Claimant shall have the right to request reconsideration and binding dispute resolution pursuant to the procedures set forth in Sections 5.3 and 5.4 below.

Once all of the necessary documentation pertinent to a Claim is received, the Property Damage Facility will determine whether the Claim will be Allowed. The Property Damage Facility shall notify the Claimant in writing by mail of its determination within 120 days of receipt of all necessary documentation.

Where Product Identification evidence under Section 6.2(c) is submitted, the Property Damage Facility shall have the right, upon reasonable notice to the Claimant, to inspect Claimant's building(s) or structure(s) and conduct non-invasive or non-destructive tests reasonably necessary for the evaluation of the Claim. Such inspection and/or testing shall be limited to visual inspection, photography, bulk sample collection and constituent analysis by an approved laboratory under these FB Property Damage Claims Procedures, and other such reasonable tests, and shall be done at times reasonably convenient to the Claimant and in accordance with all applicable federal, state and local rules or regulations regarding safe practices and the Claimant's operations and maintenance program, if any. Unless otherwise agreed, inspection or testing shall not extend the time for making

- 6 -

a determination with respect to a Claim. For the purposes of this Section, the requirement that any testing by the Property Damage Facility be non-invasive or non-destructive shall not preclude securing bulk samples, provided, however, that the sampling shall be conducted in accordance with all applicable federal, state and local rules or regulations regarding safe practices and the Claimant's operations and maintenance program, if any, and further that the Property Damage Facility shall repair, including cosmetically, the material from which the sample is taken.

The Property Damage Facility's official determination of a Claim shall include the dollar amount of Abatement Costs. If the Property Damage Facility determines that the claim amount for Abatement Costs of a Claim, as filed, is greater than the reasonable and customary costs of the allowable action undertaken under the circumstances, it shall allow only such reasonable and customary costs. If the dollar amount allowed is less than the total amount of the Claim filed by the Claimant for any reason, the Property Damage Facility's notification shall include the reason for its determination, a response to any contention previously raised by the Claimant in support of its Claim, copies of all reports of any inspection and/or testing, and a full disclosure of the Claimant's rights to request reconsideration and binding dispute resolution. If the Claimant accepts the determination of the Property Damage Facility as to the amount of such Claimant's Allowed Claim, that decision will be final and binding on both parties and may not be reopened.

5.3     Reconsideration of Asbestos Property Damage Claim. A Claimant shall have 60 days from the date of receipt of the Property Damage Facility's notice of its official determination to file with the Property Damage Facility a written request for reconsideration of that determination. The Claimant must state in writing the reason(s) for seeking reconsideration and include any additional materials not theretofore submitted which the Claimant wishes to be considered in connection with the reconsideration.

Once the Property Damage Facility has received a request for reconsideration, it shall review the Asbestos Property Damage Claim, the supporting documentation, Claimant's reason for seeking reconsideration and arguments in support thereof, any newly submitted material, the notice of determination and reasons therefor, and any other relevant material. The review shall be conducted de novo by a panel consisting of two Property Damage Facility claims analysts and one otherwise disinterested member of the PD Advisory Committee. The claims analyst who made the original determination shall not sit on the reconsideration panel. Neither the Property Damage Facility nor the panel members may raise or rely on any reasons not stated in the Notice of Determination as a basis for denying the request for reconsideration. The panel shall have 90 days from the date of receipt of Claimant's request for reconsideration to issue a final determination. If no final determination is issued within said 90-day time period, the Asbestos Property Damage Claim shall be Allowed as originally submitted.

The reconsideration panel shall issue its final determination in writing to the Claimant. The Allowed Amount shall include the amount of the Abatement Costs, if any. If the amount allowed is less that the Claim as filed by the Claimant for any reason or the Claim is disallowed in whole or in part, the final determination shall include a detailed, written statement supporting the panel's finding, including a response to any contention previously raised by the Claimant in support of its Claim, as well as a full disclosure of Claimant's right to request binding dispute resolution.

- 7 -

5.4    Binding Dispute Resolution.  A final determination upon reconsideration by the panel which denies either in full or in part a Claim may be submitted to an arbitrator for binding dispute resolution.  A Claimant shall have 60 days from the date of receipt of the Property Damage Facility's final determination upon reconsideration to file with the Property Damage Facility a written request for binding dispute resolution.

The Property Damage Facility shall maintain a list of a minimum of 15 independent arbitrators who are available to hear disputes between the Property Damage Facility and Claimants. Once a request for Binding Dispute Resolution is received by the Property Damage Facility, the Property Damage Facility shall, within 10 days of receipt of such request, send to the Claimant the names and addresses of 10 independent arbitrators which shall have been selected by a random process.  Claimant shall have 30 days from the date the list is received to strike five arbitrators, and to return that information to the Property Damage Facility.

The Property Damage Facility, once it has received Claimant's choices, shall select one of the five potential arbitrators not stricken by the Claimant and then arrange a mutually acceptable date and location for the binding dispute resolution to take place.  The binding dispute resolution shall be commenced within 90 days of receipt by the Property Damage Facility of Claimant's choices of arbitrators.  Upon confirmation of the date that binding dispute resolution is to commence, the Property Damage Facility shall notify the Claimant in writing of the identity of the arbitrator and the date and location of commencement of the binding dispute resolution.  Telephone arbitrations may be conducted by the Property Damage Facility, where requested by the Claimant.

The arbitrator shall review the Claim de novo pursuant to the standards set forth in these FB Property Damage Claims Procedures.  In no event shall the arbitrator's determination be an amount lower than the amount of the final determination by the Property Damage Facility upon reconsideration, unless the arbitrator determines that the Claim is a Disallowed Claim.  The Property Damage Facility shall pay the arbitrators' fees, provided, however, that, in the event a Claimant fails to obtain an award in an amount equal to or greater than 125% of the Property Damage Facility's final determination of its Claim, such fees shall be borne by the Claimant.

### ARTICLE 6

### Required Documentation

6.1    Requirements.  Except as otherwise may be provided for herein, no Asbestos Property Damage Claim shall be Allowed unless the following documentation is submitted to the Property Damage Facility in support of the Asbestos Property Damage Claim.  All documentation provided by a Claimant must be sufficient to constitute Convincing Evidence as required by these FB Property Damage Claims Procedures.  The absence of one or more of the categories of documents set forth below shall not prejudice the allowance of, or constitute the basis for the disallowance of, a Claim if the Claimant certifies that, despite reasonable efforts, the required material could not be located.  In such case, alternative documents or testimony that provides Convincing Evidence of the necessary facts to support the Claim shall be accepted.  Claimants may also use evidence submitted and determinations made by the claims processing facilities in other asbestos bankruptcies to constitute Convincing Evidence, as appropriate, of the quantity of asbestos-containing product in their buildings or structures and/or their costs of Abatement.

- 8 -

6.2 <u>Category 1 Claims</u>. The following documentation must be supplied:

(a) A completed PD Claim Form, describing the location, type and quantity of asbestos-containing product and the installation date thereof, including a certification of the information contained therein; and

(b) Copies of all bulk sample analysis results and/or records thereof (existing as of the Effective Date) showing that abated material contained asbestos. The bulk sample analysis technique must be polarized light microscopy or another generally acceptable method, including those acceptable to the United States Environmental Protection Agency. A minimum of one sample from each Homogeneous Area for which Abatement Costs are claimed must have been analyzed; and

(c) Convincing Evidence that the asbestos-containing product that is the subject of the Claim is a Fibreboard asbestos-containing product, which the Trustee may confirm by any method and which confirmation shall be at the expense of the Claimant. Identification of Fibreboard asbestos-containing product may be established by any of the following, among others:

(i) constituent analysis of representative bulk sample(s) showing that the asbestos-containing product that is the subject of the Claim is a Fibreboard asbestos-containing product; or

(ii) a sworn affidavit of an individual with personal knowledge that Fibreboard asbestos-containing product was used in the building or structure for which the Claim is made, setting forth the individual's conclusion that Fibreboard is the designer, manufacturer, supplier, distributer or seller of the asbestos-containing product and the factual basis for that conclusion; or

(iii) documentation evidencing that Fibreboard asbestos-containing product was used in the building or structure for which the Claim is made including, without limitation, sales invoices; purchase orders; architectural specifications and records; bid documents; contracts and subcontracts; change orders; material approvals; maintenance, repair and renovation records; complaints to contractors; installation records; advertisements; insurance claims; supplier records; documents from discovery in lawsuits; and Fibreboard records. For this purpose, a specification without some additional substantiating proof that Fibreboard asbestos-containing product was used shall not sustain a Claim; or

(iv) A prior judicial determination or stipulation entered into by Fibreboard that the asbestos-containing product that is the subject of the Claim is Fibreboard asbestos-containing product; and

(d) Convincing Evidence supporting a Claim for Abatement Costs including one or more of the following:

(i) a copy of a report from a Qualified Person or Asbestos Coordinator describing the type, location, and quantity of asbestos-containing product, and type and scope of Abatement which was performed; or

- 9 -

(ii)     copies of receipted bills, or vouchers or other proof of all Abatement Costs; or

(iii)     copies of bid specifications and contracts for all Abatement work performed by persons other than the Claimant's employees; or

(iv)     copies of all special insurance policies purchased directly by Claimant to cover risks resulting from Abatement or copies of receipted bills, vouchers, or other proof of special insurance; or

(v)     with respect to costs attributable to Abatement performed by Claimant's employees, copies of personnel contracts or other proof of the salary of Claimant's employees and the number of hours spent by them on Abatement, including a breakdown of those activities. Such proof shall include a sworn statement by Claimant setting forth the basis for attributing such employee costs to and/or Abatement and the job description and qualifications of each such employee; and

(e)     Claimants submitting a Claim for Future Abatement Costs must supply a copy of the report of a Qualified Person or an Asbestos Coordinator detailing information sufficient for the Trustee to apply the Cost Model based on the type, location and quantity of Fibreboard or asbestos-containing product  and type and scope of Abatement to be performed.

6.3     Category 2 Claims.  The following documentation must be provided:

(a)     A completed Property Damage Claim Form, describing the location, type and quantity of asbestos-containing product and the installation date thereof, including a certification of the information contained therein; and

(b)     Convincing Evidence that the asbestos-containing product that is the subject of the Claim is a Fibreboard asbestos-containing product, which the Trustee may confirm by any method and which confirmation shall be at the expense of the Claimant.

### ARTICLE 7

### Payment of Asbestos Property Damage Claims

7.1     Payment Procedures.

(a)     To the extent that Claims, as a part of a voluntary procedure, have not already been liquidated during the these Reorganization Cases, or are not in the process of being liquidated, the Trustee shall use these procedures to process all Claims as quickly as practicable after the Effective Date.  Claims shall be processed on a first-in-first-out ("FIFO") order.

(b)     As soon as all Claims submitted to the FB Property Damage Trust according to these FB Property Damage Claims Procedures have been finally determined to be Allowed Claims or Disallowed Claims, the Trustee, in consultation with the PD Advisory Committee, shall calculate the total Allowed Amount of all Allowed Category 1 Claims and the total Allowed Amount of all Allowed Category 2 Claims.

1181

(c)    The FB Asbestos Property Damage Trust is funded with Assets primarily consisting of rights to insurance recoveries (the "Recoveries") under liability insurance policies issued to Fibreboard for FB Asbestos Property Damage Claims and identified in Schedule XVI to the Plan. The Trust shall use the Recoveries to pay holders of Allowed Claims pursuant to these FB Property Damage Claims Procedures.

(d)    Upon receiving all of the Recoveries from the Assets, or 5 years from the Effective Date, whichever occurs first, the Trustee shall determine the amounts to be paid to holders of Allowed Claims based on the total amount of Recoveries available at that time ("Available Recoveries").

(i)    Allowed Category 1 Claims shall be paid based on the following calculations: The Trustee shall subtract the total Allowed Amount of all Allowed Category 2 Claims from the Available Recoveries to determine the Available Recoveries remaining to compensate holders of Allowed Category 1 Claims  ("Remaining Available Recoveries").  The Trustee, in consultation with the PD Advisory Committee, shall then determine the Payment Percentage to be used to pay holders of Allowed Category 1 Claims based on the Remaining Available Recoveries.  Holders of Allowed Category 1 Claims shall then receive payment calculated on the basis of the Payment Percentage multiplied by the Allowed Amount of their Claim.

(ii)    Allowed Category 2 Claims shall be paid their Discounted Payable Costs calculated in accordance with Exhibit 1; except that, if the Remaining Available Recoveries are insufficient to pay holders of Allowed Category 1 Claims at least as much as they would have received had they submitted their Claim as a Category 2 Claim, then all of the holders of Allowed Claims, regardless of claim category, shall receive their pro rata share of all Available Recoveries.

(iii)    Should additional recoveries ("Additional Recoveries") from the Assets become available after payment has been made to holders of Allowed Claims pursuant to Sub-sections 7.1(d)(i) – (ii), as soon as practicable after they become available, the Additional Recoveries shall be distributed to holders of Allowed Claims pursuant to Sub-sections 7.1(d)(i)-(ii); provided that holders of Allowed Category 2 Claims shall not be entitled to receive more than their Discounted Payable Costs, such that any Additional Recoveries that become available after all holders of Allowed Category 2 Claims have received their total Allowed Amounts shall be paid only to holders of Allowed Category 1 Claims based on the Payment Percentage; provided further that holders of Allowed Category 1 Claims shall not be entitled to receive more than their Allowed Amount.

(e)    Notwithstanding any other provision above, if the Claimant has previously received payment through any other lawsuit or bankruptcy case for damages that would qualify as Allowed Costs under these procedures for the same asbestos-containing product for which it is now seeking payment from the Trust, the amount actually received from the Trust attributable to that asbestos-containing product  shall be adjusted.  The payment that would otherwise have been received from the Trust shall be reduced to the extent necessary to ensure that the amount received herein, when combined with the payment received in the prior lawsuit or bankruptcy, will not allow the Claimant to receive more than 100% of its Allowed Costs for said asbestos-containing product.

- 11 -

7.2   Timing of Payments. Payments to holders of Allowed Claims shall be made as soon as practicable after Available Recoveries or Additional Recoveries become available.

1183

**EXHIBIT 1**

1.                              Except as otherwise may be the case pursuant to sections 2 and 3, below, Claimants who elect Category 2 treatment for their claims shall receive Discounted Payable Costs based upon the quantity of asbestos-containing product identified in the building(s) or structure(s) specified in their respective Property Damage Claim Forms. Any such Claim must be supported by the documentation required in Section 6.3 and shall be reviewed and approved by the Property Damage Facility using the procedures set forth in Section V. One-hundred percent (100%) of the quantity of asbestos-containing product approved by the Property Damage Facility shall be used in computing a Claimant's Allowed Claim where Past Abatement Costs have been incurred for the relevant asbestos-containing product; sixty-five percent (65%) of the quantity of approved asbestos-containing product shall be used in computing a Claimant's Allowed Claim where such Past Abatement Costs have not been incurred.

2.                              After determining the aggregate allowed amounts of the quantity of asbestos-containing product as provided in paragraph 1, hereof, and subject to the provisions of paragraph 3, below, the Trustee shall Allow each Category 2 Claimant Discounted Payable Costs in the amount of $1.00 times each linear and/or square foot of asbestos-containing product. If there are not sufficient funds to pay all Discounted Payable Costs in full, the available funds will be distributed, pro rata, among the holders of the Category 2 Claims.

3.                              To further encourage the efficient and consensual resolution of Claims, a Claimant may propose to the Trustee, within six months of the Effective Date, that, in lieu of the provisions of paragraph 1, that its Discounted Payable Cost be determined on the basis of a lump-sum settlement, based on either evidence of a relevant settlement history, an extrapolation of the quantity of asbestos-containing product for the type or types of asbestos-containing product for which it seeks payment, or a combination of the two methods. The following procedures then shall apply:

(a)                     The Claimant's proposal must be accompanied by supporting information, including, at a minimum:

(i)                     the relevant history of prior settlements in the tort system (whether or not this is the basis for Claimant's proposal); and

(ii)                     amounts the Claimant has received in connection with other asbestos bankruptcies and the basis upon which those payments were made.

The Claimant may, but need not, include a specific amount it proposes for settlement.

(b)                     Upon receiving a proposal to settle for a lump-sum, the Trustee may either accept the initial specific amount proposed by the Claimant or enter into good-faith negotiations with the Claimant to determine such a lump-sum settlement amount. The Trustee's initial response to the proposal must be made to the Claimant within two months after receiving the Claimant's proposal.

(c)         If within two months after the Trustee's initial response they have not agreed with the Claimant upon a lump-sum settlement, the Trustee may, but need not, declare an impasse, in which case, the parties may continue to negotiate until such time as the Trustee declares an impasse. Thereafter, the Claimant will be given a minimum of an additional four months to file a Category 2 Claim, pursuant to the provisions of paragraph 1, above.

(d)         In their negotiations with the Claimant, the Trustee shall take into account all matters they deem relevant including, but not limited to, prior settlements reached by the Claimant in the tort system; amounts the Claimant has received in connection with other asbestos bankruptcies and the basis upon which those payments were made; the amount of Past Abatement Costs incurred by the Claimant versus the Future Abatement Costs to be incurred by the priority accorded to Past Abatement Costs herein; the total quantity of asbestos-containing product present in the Claimant's buildings or structures as determined by extrapolation or other means as compared with the aggregate quantity submitted by all other Category 2 Claimants; the limitation of total payments per square or linear foot of asbestos-containing product set forth in paragraph 2 above; and the Discounted Payable Costs being sought by the other Category 2 Claimants.

(e)         The Trustee's offer to the Claimant of a lump sum settlement may be expressed in terms of an allowed amount of Discounted Payable Costs and/or an actual cash payment the Claimant may expect to receive.

(f)         If the Trustee and the Claimant agree upon an Allowed Amount based upon Discounted Payable Costs, that amount will be included in the aggregate amount of Discounted Payable Costs described in paragraph 2, above, and the Claimant will receive its appropriate pro rata share from the funds available.

(g)         Notwithstanding any other provision herein, the Trustee has the discretion to defer making any settlement offer for an actual cash payment until he or she has processed and determined the aggregate quantity of asbestos-containing product used in computing all other Claims submitted by the Category 2 Claimants.

**Exhibit F**
**Management Arrangements and Employee Arrangements**
**including Summary of Incentive Compensation Program**

[To be provided at least five (5) Business Days prior to the Disclosure Statement Hearing,
as it may be amended up to ten (10) Business Days prior to the Objection Deadline]

**Exhibit G**
**Principal Terms and Conditions of the Senior Notes**

[To be provided at least five (5) Business Days prior to the Disclosure Statement Hearing,
as it may be amended up to ten (10) Business Days prior to the Objection Deadline]

**Exhibit H**
**Principal Terms and Conditions of the New OCD Common Stock**

[To be provided at least five (5) Business Days prior to the Disclosure Statement Hearing,
as it may be amended up to ten (10) Business Days prior to the Objection Deadline]

**Exhibit I**
**Principal Terms and Conditions of Integrex Settlement Agreement**

[To be provided at least five (5) Business Days prior to the Disclosure Statement Hearing,
as it may be amended up to ten (10) Business Days prior to the Objection Deadline]

**APPENDIX B**

Pro Forma Financial Projections and Reorganization Balance Sheet

[To Be Provided]

**APPENDIX C**

**Liquidation Analysis**

**[To Be Provided]**

**APPENDIX D**

**Owens Corning Annual Report on Form 10-K for the period ending December 31, 2004,
and other referenced reports filed with the Securities and Exchange Commission**

Although these documents are incorporated by reference as part of the Disclosure Statement, the Plan Proponents will not attach this document to the copies of the Disclosure Statement that will be mailed to creditors along with their ballots. Copies of these documents may be obtained, free of charge, through OC's website at www.owenscorning.com or by sending a written request, including by telecopy or e-mail to:

**OWENS CORNING**
c/o Omni Management Group, LLC
16161 Ventura Blvd., PMB 517
Encino, CA 91436
818-905-6542 (fax)
contact@omnimgt.com

These documents may also be obtained at the Securities and Exchange Commission's "Edgar" website at www.sec.gov/edgar.shtml.

# APPENDIX E-1

## Estimated Claims Summaries

**Appendix E-1: Estimated Claims Summaries**

The Debtors' review of all Claims filed is ongoing, and is anticipated to be completed after the Confirmation Date. Based on their analysis of the Claims thus far, the Debtors have estimated the Claims that are likely to become Allowed Claims. Such estimates have been prepared on a Debtor-by-Debtor and class-by-class basis, and are attached hereto. The Debtors' allocation of Claims among the various Debtors is based on the Third Circuit's Substantive Consolidation Order, as described in the Disclosure Statement, the Debtors' books and records and the Debtors' review of the Claims. Such review has included, without limitation, consideration of the asserted priority of claims and the assertion by certain parties of entitlement to liens and/or constructive trusts. The Debtors' estimates have not been examined by independent accountants and the Debtors make no representations regarding the accuracy of the estimates contained herein, which are based on information available to the Debtors as of November 30, 2005, and which do not take into account those claims filed against the Debtors in an "u

Nothing contained herein is intended to restrict or otherwise affect any creditor's right to contest any objection by the Debtors to any Claim, including without limitation any objection seeking to reallocate one or more Claims to a Debtor other than the Debtor(s) against which such Claim was asserted.

NOTWITHSTANDING THE DEBTORS' ESTIMATES AS SET FORTH HEREIN, THE ACTUAL AMOUNT OF CLAIMS THAT ULTIMATELY BECOME ALLOWED CLAIMS COULD MATERIALLY EXCEED THE AMOUNTS SET FORTH ON THE ATTACHED SCHEDULES, AND IN SUCH EVENT, THE ESTIMATED PERCENTAGE RECOVERIES FOR HOLDERS OF SOME OR ALL CLAIMS COULD BE MATERIALLY LESS THAN AS ESTIMATED IN THIS DISCLOSURE STATEMENT.

1194

*Claims Summary*                                                     **APPENDIX E – 1**

## Owens Corning
### Case Number 00-03837

**IMPORTANT:**
This Claims Summary must be read in conjunction with the Introductory Notes accompanying this Schedule. This Claims Summary has not been examined by independent accountants and the Debtors make no representations regarding the accuracy of the estimates contained herein, which are based on information available to the Debtors as of November 30, 2005, and which do not take into account those claims filed against the Debtors in an "unliquidated" amount.

| Owens Corning (00-03837) Plan Class | | Current Claims As Of 11/30/05 | Anticipated Range of Allowed Claims | |
|---|---|---|---|---|
| | | | Low | High |
| A1 | Other Priority Claims | $486,180,609.60 | $399,602.16 | $2,816,585.77 |
| A2-A | Other Secured Tax Claims | $4,351,256.74 | $2,575,220.57 | $2,778,525.16 |
| A2-B | Other Secured Claims | $76,484,550.06 | $9,467,210.95 | $9,652,957.01 |
| A3 | Convenience Class | $5,568,534.83 | $5,216,449.82 | $5,231,784.62 |
| A4 | Bank Debt Holders | $1,586,967,516.99 | $1,463,000,000.00 | $1,586,967,516.99 |
| A5 | Bond Claims | $1,409,573,506.24 | $1,388,323,505.80 | $1,409,573,506.24 |
| A6-A | General Unsecured – Total | $1,076,799,555.01 | $76,831,224.78 | $100,487,136.10 |
| A6-B | General Unsecured/Sr. Indebtedness – Total | $298,993,878.63 | $207,177,187.43 | $213,636,422.21 |
| A7 | OC Asbestos PI Claims – Total | $0.00 | $7,000,000,000.00 | $7,000,000,000.00 |
| A10 | Intercompany Claims | $2,563,781,627.00 | $2,563,781,627.00 | $2,563,781,627.00 |
| A11 | Subordinated Claims | $276,729,456.40 | $276,729,456.40 | $276,729,456.40 |
| Unclassified | Administrative Claims | $60,415,404.56 | $328,117.16 | $58,331,799.82 |
| Unclassified | Priority Tax Claims | $505,289,206.41 | $64,536,073.68 | $500,571,953.12 |
| | Total | $8,351,135,102.47 | $13,058,365,675.15 | $13,730,559,270.44 |

*NOTWITHSTANDING THE DEBTORS' ESTIMATES AS SET FORTH HEREIN, THE ACTUAL AMOUNT OF CLAIMS THAT ULTIMATELY BECOME ALLOWED CLAIMS COULD MATERIALLY EXCEED THE AMOUNTS SET FORTH ON THIS SCHEDULE, AND IN SUCH EVENT, THE ESTIMATED PERCENTAGE RECOVERIES FOR HOLDERS OF SOME OR ALL CLAIMS COULD BE MATERIALLY LESS THAN ESTIMATED.*

*Claims Summary*                                                 *APPENDIX E - 1*

# CDC Corporation
## Case Number 00-03838

> **IMPORTANT:**
> This Claims Summary must be read in conjunction with the introductory Notes accompanying this Schedule. This Claims Summary has not been examined by independent accountants and the Debtors make no representations regarding the accuracy of the estimates contained herein, which are based on information available to the Debtors as of November 30, 2005, and which do not take into account those claims filed against the Debtors in an "unliquidated" amount.

| | | Current Claims As Of 11/30/05 | Anticipated Range of Allowed Claims Low | High |
|---|---|---|---|---|
| **CDC Corporation (00-03838)** | | | | |
| **Plan Class** | | | | |
| J1 | Other Priority Claims | $7,895,487.37 | $0.00 | $0.00 |
| J2-A | Other Secured Tax Claims | $229,066.09 | $0.00 | $0.00 |
| J2-B | Other Secured Claims | $6,237,993.89 | $3,158.01 | $3,158.01 |
| J3 | Convenience Class | $431,387.55 | $145,208.83 | $145,208.83 |
| J6 | General Unsecured Claims | $20,746,880.67 | $480,197.46 | $480,197.46 |
| J10 | Intercompany Claims | $400,043.40 | $400,043.40 | $400,043.40 |
| Unclassified | Administrative Claims | $7,823.06 | $0.00 | $153.53 |
| Unclassified | Priority Tax Claims | $43,145.05 | $583.47 | $583.47 |
| | **Total** | **$35,991,827.08** | **$1,029,191.17** | **$1,029,344.70** |

*NOTWITHSTANDING THE DEBTORS' ESTIMATES AS SET FORTH HEREIN, THE ACTUAL AMOUNT OF CLAIMS THAT ULTIMATELY BECOME ALLOWED CLAIMS COULD MATERIALLY EXCEED THE AMOUNTS SET FORTH ON THIS SCHEDULE, AND IN SUCH EVENT, THE ESTIMATED PERCENTAGE RECOVERIES FOR HOLDERS OF SOME OR ALL CLAIMS COULD BE MATERIALLY LESS THAN ESTIMATED.*

1196

*Claims Summary*                                                                    *APPENDIX E - 1*

## Engineered Yarns America, Inc.
### Case Number 00-03839

**IMPORTANT:**

*This Claims Summary must be read in conjunction with the Introductory Notes accompanying this Schedule. This Claims Summary has not been examined by independent accountants and the Debtors make no representations regarding the accuracy of the estimates contained herein, which are based on information available to the Debtors as of November 30, 2005, and which do not take into account those claims filed against the Debtors in an "unliquidated" amount.*

| | | Current Claims As Of 11/30/05 | Anticipated Range of Allowed Claims | |
|---|---|---|---|---|
| | | | Low | High |
| **Engineered Yarns America, Inc. (00-03839)** | | | | |
| **Plan Class** | | | | |
| M1 | Other Priority Claims | $7,895,487.37 | $0.00 | $0.00 |
| M2-A | Other Secured Tax Claims | $195,945.02 | $0.00 | $0.00 |
| M2-B | Other Secured Claims | $6,234,835.88 | $0.00 | $0.00 |
| M3 | Convenience Class | $325,908.93 | $0.00 | $0.00 |
| M6 | General Unsecured Claims | $20,317,067.55 | $10.00 | $10.00 |
| Unclassified | Administrative Claims | $7,669.53 | $0.00 | $0.00 |
| Unclassified | Priority Tax Claims | $50,156.43 | $5,169.24 | $8,700.41 |
| | *Total* | $35,027,070.71 | $5,179.24 | $8,710.41 |

*NOTWITHSTANDING THE DEBTORS' ESTIMATES AS SET FORTH HEREIN, THE ACTUAL AMOUNT OF CLAIMS THAT ULTIMATELY BECOME ALLOWED CLAIMS COULD MATERIALLY EXCEED THE AMOUNTS SET FORTH ON THIS SCHEDULE. AND IN SUCH EVENT, THE ESTIMATED PERCENTAGE RECOVERIES FOR HOLDERS OF SOME OR ALL CLAIMS COULD BE MATERIALLY LESS THAN ESTIMATED.*

1197

*Claims Summary*                                                      *APPENDIX E - 1*

## Falcon Foam Corporation
### Case Number 00-03840

> **IMPORTANT:**
> This Claims Summary must be read in conjunction with the Introductory Notes accompanying this Schedule. This Claims Summary has not been examined by independent accountants and the Debtors make no representations regarding the accuracy of the estimates contained herein, which are based on information available to the Debtors as of November 30, 2005, and which do not take into account those claims filed against the Debtors in an "unliquidated" amount.

| | | Current Claims As Of 11/30/05 | Anticipated Range of Allowed Claims | |
|---|---|---|---|---|
| | | | Low | High |
| **Falcon Foam Corporation (00-03840)** | | | | |
| **Plan Class** | | | | |
| N1 | Other Priority Claims | $7,895,487.37 | $0.00 | $0.00 |
| N2-A | Other Secured Tax Claims | $195,945.02 | $0.00 | $0.00 |
| N2-B | Other Secured Claims | $6,234,835.88 | $0.00 | $0.00 |
| N3 | Convenience Class | $324,219.90 | $0.00 | $0.00 |
| N4 | Bank Debt Holders | $1,586,967,516.99 | $1,463,000,000.00 | $1,586,967,516.99 |
| N6 | General Unsecured Claims | $21,192,608.37 | $100,009.00 | $866,266.50 |
| Unclassified | Administrative Claims | $29,839.53 | $22,170.00 | $22,170.00 |
| Unclassified | Priority Tax Claims | $110,394.61 | $67,249.56 | $67,249.56 |
| | **Total** | $1,622,950,847.67 | $1,463,189,428.56 | $1,587,923,203.05 |

*NOTWITHSTANDING THE DEBTORS' ESTIMATES AS SET FORTH HEREIN, THE ACTUAL AMOUNT OF CLAIMS THAT ULTIMATELY BECOME ALLOWED CLAIMS COULD MATERIALLY EXCEED THE AMOUNTS SET FORTH ON THIS SCHEDULE, AND IN SUCH EVENT, THE ESTIMATED PERCENTAGE RECOVERIES FOR HOLDERS OF SOME OR ALL CLAIMS COULD BE MATERIALLY LESS THAN ESTIMATED.*

1198

*Claims Summary*                                                                    **APPENDIX E - 1**

# Integrex
## Case Number 00-03841

**IMPORTANT:**

*This Claims Summary must be read in conjunction with the Introductory Notes accompanying this Schedule. This Claims Summary has not been examined by independent accountants and the Debtors make no representations regarding the accuracy of the estimates contained herein, which are based on Information available to the Debtors as of November 30, 2005, and which do not take into account those claims filed against the Debtors in an "unliquidated" amount.*

| | | Current Claims | Anticipated Range of Allowed Claims | |
|---|---|---|---|---|
| | | As Of 11/30/05 | Low | High |
| **Integrex (00-03841)** | | | | |
| **Plan Class** | | | | |
| I1 | Other Priority Claims | $7,952,483.72 | $0.00 | $0.00 |
| I2-A | Other Secured Tax Claims | $195,945.02 | $0.00 | $0.00 |
| I2-B | Other Secured Claims | $6,234,835.88 | $12,718.61 | $12,718.61 |
| I3 | Convenience Class | $497,413.77 | $184,471.79 | $188,568.10 |
| I4 | Bank Debt Holders | $1,586,967,516.99 | $1,463,000,000.00 | $1,586,967,516.99 |
| I6 | General Unsecured Claims | $24,633,738.34 | $4,286,935.32 | $4,709,243.92 |
| I10 | Intercompany Claims (o) | $1,151,853,618.34 | $318,853,618.34 | $1,151,853,618.34 |
| Unclassified | Administrative Claims | $7,669.53 | $0.00 | $0.00 |
| Unclassified | Priority Tax Claims | $83,333.41 | $12,165.00 | $12,165.00 |
| | Total | $2,778,426,555.00 | $1,786,349,909.06 | $2,743,743,830.00 |

(o) includes $833 million due to Owens Corning on account of December 24, 1997 Contribution Agreement.

*NOTWITHSTANDING THE DEBTORS' ESTIMATES AS SET FORTH HEREIN, THE ACTUAL AMOUNT OF CLAIMS THAT ULTIMATELY BECOME ALLOWED CLAIMS COULD MATERIALLY EXCEED THE AMOUNTS SET FORTH ON THIS SCHEDULE, AND IN SUCH EVENT, THE ESTIMATED PERCENTAGE RECOVERIES FOR HOLDERS OF SOME OR ALL CLAIMS COULD BE MATERIALLY LESS THAN ESTIMATED.*

1199

*Claims Summary*                                                                    **APPENDIX E - 1**

## Fibreboard Corporation
### Case Number 00-03842

> **IMPORTANT:**
> *This Claims Summary must be read in conjunction with the introductory Notes accompanying this Schedule. This Claims Summary has not been examined by independent accountants and the Debtors make no representations regarding the accuracy of the estimates contained herein, which are based on information available to the Debtors as of November 30, 2005, and which do not take into account those claims filed against the Debtors in an "unliquidated" amount.*

| | | Current Claims | Anticipated Range of Allowed Claims | |
|---|---|---|---|---|
| | | As Of 11/30/05 | Low | High |
| **Fibreboard Corporation (00-03842)** | | | | |
| *Plan Class* | | | | |
| B1 | Other Priority Claims | $9,387,821.72 | $0.00 | $0.00 |
| B2-A | Other Secured Tax Claims | $230,596.02 | $0.00 | $0.00 |
| B2-B | Other Secured Claims | $6,235,684.94 | $849.06 | $849.06 |
| B3 | Convenience Class | $382,886.38 | $62,445.70 | $63,945.70 |
| B4 | Bank Debt Holders | $1,586,967,516.99 | $1,463,000,000.00 | $1,586,967,516.99 |
| B6 | General Unsecured Claims | $26,271,092.02 | $4,331,891.16 | $4,383,633.53 |
| B8 | FB Asbestos PI Claims – Total | $0.00 | $3,220,032,004.00 | $3,220,032,004.00 |
| B9 | FB Asbestos PD Claims – Total | $3,385,946.00 | $0.00 | $3,385,946.00 |
| B10 | Intercompany Claims | $763,034,224.68 | $763,034,224.68 | $763,034,224.68 |
| Unclassified | Administrative Claims | $22,626.53 | $0.00 | $14,957.00 |
| Unclassified | Priority Tax Claims | $1,165,526.06 | $847,445.02 | $1,154,531.67 |
| | **Total** | $2,397,083,921.36 | $5,451,308,859.62 | $5,579,037,608.63 |

*NOTWITHSTANDING THE DEBTORS' ESTIMATES AS SET FORTH HEREIN, THE ACTUAL AMOUNT OF CLAIMS THAT ULTIMATELY BECOME ALLOWED CLAIMS COULD MATERIALLY EXCEED THE AMOUNTS SET FORTH ON THIS SCHEDULE, AND IN SUCH EVENT, THE ESTIMATED PERCENTAGE RECOVERIES FOR HOLDERS OF SOME OR ALL CLAIMS COULD BE MATERIALLY LESS THAN ESTIMATED.*

*Claims Summary*                                                                 **APPENDIX E - 1**

## Exterior Systems, Inc.
### Case Number 00-03843

| IMPORTANT: |
|---|
| This Claims Summary must be read in conjunction with the introductory Notes accompanying this Schedule. This Claims Summary has not been examined by independent accountants and the Debtors make no representations regarding the accuracy of the estimates contained herein, which are based on information available to the Debtors as of November 30, 2005, and which do not take into account those claims filed against the Debtors in an "unliquidated" amount. |

| | | Current Claims As Of 11/30/05 | Anticipated Range of Allowed Claims | |
|---|---|---|---|---|
| | | | Low | High |
| **Exterior Systems, Inc. (00-03843)** | | | | |
| **Plan Class** | | | | |
| C1 | Other Priority Claims | $7,960,247.23 | $16,413.36 | $16,413.36 |
| C2-A | Other Secured Tax Claims | $761,966.46 | $913,584.86 | $928,754.75 |
| C2-B | Other Secured Claims | $6,339,039.01 | $92,605.69 | $126,447.86 |
| C3 | Convenience Class | $3,011,290.87 | $2,850,692.40 | $2,918,688.29 |
| C4 | Bank Debt Holders | $1,586,967,516.99 | $1,463,000,000.00 | $1,586,967,516.99 |
| C6 | General Unsecured Claims | $77,603,769.97 | $60,663,896.44 | $78,013,864.60 |
| C10 | Intercompany Claims | $678,864,040.96 | $678,864,040.96 | $678,864,040.96 |
| Unclassified | Administrative Claims | $351,289.99 | $189,794.84 | $389,782.67 |
| Unclassified | Priority Tax Claims | $1,170,066.17 | $496,136.33 | $568,708.06 |
| | **Total** | $2,363,029,207.65 | $2,207,087,164.88 | $2,368,794,217.54 |

*NOTWITHSTANDING THE DEBTORS' ESTIMATES AS SET FORTH HEREIN, THE ACTUAL AMOUNT OF CLAIMS THAT ULTIMATELY BECOME ALLOWED CLAIMS COULD MATERIALLY EXCEED THE AMOUNTS SET FORTH ON THIS SCHEDULE, AND IN SUCH EVENT, THE ESTIMATED PERCENTAGE RECOVERIES FOR HOLDERS OF SOME OR ALL CLAIMS COULD BE MATERIALLY LESS THAN ESTIMATED.*

1201

*Claims Summary*                                                    **APPENDIX E - 1**

## Integrex Ventures, LLC
### Case Number 00-03844

**IMPORTANT:**

*This Claims Summary must be read in conjunction with the Introductory Notes accompanying this Schedule. This Claims Summary has not been examined by independent accountants and the Debtors make no representations regarding the accuracy of the estimates contained herein, which are based on information available to the Debtors as of November 30, 2005, and which do not take into account those claims filed against the Debtors in an "unliquidated" amount.*

| Integrex Ventures, LLC (00-03844) | | Current Claims As Of 11/30/05 | Anticipated Range of Allowed Claims | |
|---|---|---|---|---|
| Plan Class | | | Low | High |
| S1 | Other Priority Claims | $7,895,487.37 | $0.00 | $0.00 |
| S2-A | Other Secured Tax Claims | $195,945.02 | $0.00 | $0.00 |
| S2-B | Other Secured Claims | $6,234,835.88 | $0.00 | $0.00 |
| S3 | Convenience Class | $324,219.90 | $0.00 | $0.00 |
| S6 | General Unsecured Claims | $20,429,241.05 | $10.00 | $10.00 |
| Unclassified | Administrative Claims | $7,669.53 | $0.00 | $0.00 |
| Unclassified | Priority Tax Claims | $43,145.05 | $0.00 | $0.00 |
| | Total | $35,130,543.80 | $10.00 | $10.00 |

*NOTWITHSTANDING THE DEBTORS' ESTIMATES AS SET FORTH HEREIN, THE ACTUAL AMOUNT OF CLAIMS THAT ULTIMATELY BECOME ALLOWED CLAIMS COULD MATERIALLY EXCEED THE AMOUNTS SET FORTH ON THIS SCHEDULE, AND IN SUCH EVENT, THE ESTIMATED PERCENTAGE RECOVERIES FOR HOLDERS OF SOME OR ALL CLAIMS COULD BE MATERIALLY LESS THAN ESTIMATED.*

1202

*Claims Summary*

## Integrex Professional Services, LLC
### Case Number 00-03845

**IMPORTANT:**

This Claims Summary must be read in conjunction with the Introductory Notes accompanying this Schedule. This Claims Summary has not been examined by independent accountants and the Debtors make no representations regarding the accuracy of the estimates contained herein, which are based on information available to the Debtors as of November 30, 2005, and which do not take into account those claims filed against the Debtors in an "unliquidated" amount.

| | | Current Claims | Anticipated Range of Allowed Claims | |
|---|---|---|---|---|
| | | As Of 11/30/05 | Low | High |
| Integrex Professional Services, LLC (00-03845) | | | | |
| **Plan Class** | | | | |
| P1 | Other Priority Claims | $7,895,487.37 | $0.00 | $0.00 |
| P2-A | Other Secured Tax Claims | $195,945.02 | $0.00 | $0.00 |
| P2-B | Other Secured Claims | $6,234,835.88 | $0.00 | $0.00 |
| P3 | Convenience Class | $324,219.90 | $0.00 | $0.00 |
| P6 | General Unsecured Claims | $20,429,242.05 | $10.00 | $10.00 |
| Unclassified | Administrative Claims | $7,669.53 | $0.00 | $0.00 |
| Unclassified | Priority Tax Claims | $43,145.05 | $0.00 | $0.00 |
| | **Total** | $35,130,544.80 | $10.00 | $10.00 |

NOTWITHSTANDING THE DEBTORS' ESTIMATES AS SET FORTH HEREIN, THE ACTUAL AMOUNT OF CLAIMS THAT ULTIMATELY BECOME ALLOWED CLAIMS COULD MATERIALLY EXCEED THE AMOUNTS SET FORTH ON THIS SCHEDULE, AND IN SUCH EVENT, THE ESTIMATED PERCENTAGE RECOVERIES FOR HOLDERS OF SOME OR ALL CLAIMS COULD BE MATERIALLY LESS THAN ESTIMATED.

1203

*Claims Summary*                                                              *APPENDIX E - 1*

## Integrex Supply Chain Solutions, LLC
### Case Number 00-03846

**IMPORTANT:**

*This Claims Summary must be read in conjunction with the introductory Notes accompanying this Schedule. This Claims Summary has not been examined by independent accountants and the Debtors make no representations regarding the accuracy of the estimates contained herein, which are based on information available to the Debtors as of November 30, 2005, and which do not take into account those claims filed against the Debtors in an "unliquidated" amount.*

| | | Current Claims | Anticipated Range of Allowed Claims | |
|---|---|---|---|---|
| | | As Of 11/30/05 | Low | High |
| Integrex Supply Chain Solutions, LLC (00-03846) | | | | |
| Plan Class | | | | |
| R1 | Other Priority Claims | $7,925,487.37 | $0.00 | $0.00 |
| R2-A | Other Secured Tax Claims | $195,945.02 | $0.00 | $0.00 |
| R2-B | Other Secured Claims | $6,234,835.88 | $0.00 | $0.00 |
| R3 | Convenience Class | $324,219.90 | $0.00 | $0.00 |
| R6 | General Unsecured Claims | $20,526,242.05 | $10.00 | $10.00 |
| Unclassified | Administrative Claims | $7,669.53 | $0.00 | $0.00 |
| Unclassified | Priority Tax Claims | $43,145.05 | $0.00 | $0.00 |
| | Total | $35,257,544.80 | $10.00 | $10.00 |

*NOTWITHSTANDING THE DEBTORS' ESTIMATES AS SET FORTH HEREIN, THE ACTUAL AMOUNT OF CLAIMS THAT ULTIMATELY BECOME ALLOWED CLAIMS COULD MATERIALLY EXCEED THE AMOUNTS SET FORTH ON THIS SCHEDULE, AND IN SUCH EVENT, THE ESTIMATED PERCENTAGE RECOVERIES FOR HOLDERS OF SOME OR ALL CLAIMS COULD BE MATERIALLY LESS THAN ESTIMATED.*

1204

*Claims Summary*                                                    *APPENDIX E - 1*

## Integrex Testing Systems, LLC
### Case Number 00-03847

> **IMPORTANT:**
>
> This Claims Summary must be read in conjunction with the Introductory Notes accompanying this Schedule. This Claims Summary has not been examined by independent accountants and the Debtors make no representations regarding the accuracy of the estimates contained herein, which are based on information available to the Debtors as of November 30, 2005, and which do not take into account those claims filed against the Debtors in an "unliquidated" amount.

| | | Current Claims | Anticipated Range of Allowed Claims | |
| --- | --- | --- | --- | --- |
| | | As Of 11/30/05 | Low | High |
| **Integrex Testing Systems, LLC (00-03847)** | | | | |
| **Plan Class** | | | | |
| Q1 | Other Priority Claims | $7,895,487.37 | $0.00 | $0.00 |
| Q2-A | Other Secured Tax Claims | $195,945.02 | $0.00 | $0.00 |
| Q2-B | Other Secured Claims | $6,234,835.88 | $0.00 | $0.00 |
| Q3 | Convenience Class | $325,476.14 | $0.00 | $0.00 |
| Q6 | General Unsecured Claims | $20,429,243.05 | $10.00 | $10.00 |
| Unclassified | Administrative Claims | $7,669.53 | $0.00 | $0.00 |
| Unclassified | Priority Tax Claims | $43,145.05 | $0.00 | $0.00 |
| | **Total** | $35,131,802.04 | $10.00 | $10.00 |

NOTWITHSTANDING THE DEBTORS' ESTIMATES AS SET FORTH HEREIN, THE ACTUAL AMOUNT OF CLAIMS THAT ULTIMATELY BECOME ALLOWED CLAIMS COULD MATERIALLY EXCEED THE AMOUNTS SET FORTH ON THIS SCHEDULE, AND IN SUCH EVENT, THE ESTIMATED PERCENTAGE RECOVERIES FOR HOLDERS OF SOME OR ALL CLAIMS COULD BE MATERIALLY LESS THAN ESTIMATED.

*Claims Summary*                                                    *APPENDIX E - 1*

# Homexperts, LLC
## Case Number 00-03848

> **IMPORTANT:**
> This Claims Summary must be read in conjunction with the Introductory Notes accompanying this Schedule. This Claims Summary has not been examined by independent accountants and the Debtors make no representations regarding the accuracy of the estimates contained herein, which are based on information available to the Debtors as of November 30, 2005, and which do not take into account those claims filed against the Debtors in an "unliquidated" amount.

| | | Current Claims As Of 11/30/05 | Anticipated Range of Allowed Claims Low | Anticipated Range of Allowed Claims High |
|---|---|---|---|---|
| **Homexperts, LLC (00-03848)** | | | | |
| **Plan Class** | | | | |
| O1 | Other Priority Claims | $7,895,487.37 | $0.00 | $0.00 |
| O2-A | Other Secured Tax Claims | $195,945.02 | $0.00 | $0.00 |
| O2-B | Other Secured Claims | $6,284,466.32 | $3.88 | $49,630.44 |
| O3 | Convenience Class | $324,219.90 | $0.00 | $0.00 |
| O6 | General Unsecured Claims | $20,434,642.05 | $11.00 | $11.00 |
| Unclassified | Administrative Claims | $7,869.53 | $0.00 | $200.00 |
| Unclassified | Priority Tax Claims | $43,345.05 | $200.00 | $200.00 |
| | **Total** | **$35,185,975.24** | **$214.88** | **$50,041.44** |

*NOTWITHSTANDING THE DEBTORS' ESTIMATES AS SET FORTH HEREIN, THE ACTUAL AMOUNT OF CLAIMS THAT ULTIMATELY BECOME ALLOWED CLAIMS COULD MATERIALLY EXCEED THE AMOUNTS SET FORTH ON THIS SCHEDULE. AND IN SUCH EVENT, THE ESTIMATED PERCENTAGE RECOVERIES FOR HOLDERS OF SOME OR ALL CLAIMS COULD BE MATERIALLY LESS THAN ESTIMATED.*

1206

*Claims Summary*                                                              *APPENDIX E - 1*

# Jefferson Holdings, Inc.
## Case Number 00-03849

| IMPORTANT: |
|---|
| This Claims Summary must be read in conjunction with the introductory Notes accompanying this Schedule. This Claims Summary has not been examined by independent accountants and the Debtors make no representations regarding the accuracy of the estimates contained herein, which are based on information available to the Debtors as of November 30, 2005, and which do not take into account those claims filed against the Debtors in an "unliquidated" amount. |

| | | Current Claims | Anticipated Range of Allowed Claims | |
|---|---|---|---|---|
| | | As Of 11/30/05 | Low | High |
| **Jefferson Holdings, Inc. (00-03849)** | | | | |
| **Plan Class** | | | | |
| T1 | Other Priority Claims | $7,895,487.37 | $0.00 | $0.00 |
| T2-A | Other Secured Tax Claims | $195,945.02 | $0.00 | $0.00 |
| T2-B | Other Secured Claims | $6,234,835.88 | $0.00 | $0.00 |
| T3 | Convenience Class | $324,219.90 | $0.00 | $0.00 |
| T6 | General Unsecured Claims | $20,317,066.55 | $9.00 | $9.00 |
| Unclassified | Administrative Claims | $7,869.53 | $200.00 | $200.00 |
| Unclassified | Priority Tax Claims | $73,227.25 | $30,082.20 | $30,082.20 |
| | Total | $35,048,651.50 | $30,291.20 | $30,291.20 |

*NOTWITHSTANDING THE DEBTORS' ESTIMATES AS SET FORTH HEREIN, THE ACTUAL AMOUNT OF CLAIMS THAT ULTIMATELY BECOME ALLOWED CLAIMS COULD MATERIALLY EXCEED THE AMOUNTS SET FORTH ON THIS SCHEDULE, AND IN SUCH EVENT, THE ESTIMATED PERCENTAGE RECOVERIES FOR HOLDERS OF SOME OR ALL CLAIMS COULD BE MATERIALLY LESS THAN ESTIMATED.*

1207

*Claims Summary*　　　　　　　　　　　　　　　　　　　　　　　　　　　　**APPENDIX E - 1**

## Owens-Corning Fiberglass Technology, Inc.
### Case Number 00-03850

| IMPORTANT: |
|---|
| This Claims Summary must be read in conjunction with the introductory Notes accompanying this Schedule. This Claims Summary has not been examined by independent accountants and the Debtors make no representations regarding the accuracy of the estimates contained herein, which are based on information available to the Debtors as of November 30, 2005, and which do not take into account those claims filed against the Debtors in an "unliquidated" amount. |

Owens-Corning Fiberglass Technology, Inc. (00-03850)

| Plan Class | | Current Claims As Of 11/30/05 | Anticipated Range of Allowed Claims | |
|---|---|---|---|---|
| | | | Low | High |
| F1 | Other Priority Claims | $7,895,487.37 | $0.00 | $0.00 |
| F2-A | Other Secured Tax Claims | $195,945.02 | $0.00 | $0.00 |
| F2-B | Other Secured Claims | $6,234,835.88 | $0.00 | $0.00 |
| F3 | Convenience Class | $359,908.56 | $16,127.41 | $16,127.41 |
| F4 | Bank Debt Holders | $1,586,967,516.99 | $1,463,000,000.00 | $1,586,967,516.99 |
| F6 | General Unsecured Claims | $24,673,972.57 | $185,275.10 | $185,275.10 |
| F10 | Intercompany Claims | $511,465,333.36 | $511,465,333.36 | $511,465,333.36 |
| Unclassified | Administrative Claims | $7,669.53 | $0.00 | $0.00 |
| Unclassified | Priority Tax Claims | $54,139.05 | $0.00 | $0.00 |
| | Total | $2,137,854,808.33 | $1,974,666,735.87 | $2,098,634,252.86 |

*NOTWITHSTANDING THE DEBTORS' ESTIMATES AS SET FORTH HEREIN, THE ACTUAL AMOUNT OF CLAIMS THAT ULTIMATELY BECOME ALLOWED CLAIMS COULD MATERIALLY EXCEED THE AMOUNTS SET FORTH ON THIS SCHEDULE, AND IN SUCH EVENT, THE ESTIMATED PERCENTAGE RECOVERIES FOR HOLDERS OF SOME OR ALL CLAIMS COULD BE MATERIALLY LESS THAN ESTIMATED.*

AssofDate: 11/30/2005
Printed On 12/31/2005 9:30 AM
912961　　　　　　　　　　　　　**Page 15 of 19**

1208

*Claims Summary*                                           *APPENDIX E - 1*

## Owens Corning HT, Inc.
### Case Number 00-03851

**IMPORTANT:**
*This Claims Summary must be read in conjunction with the Introductory Notes accompanying this Schedule. This Claims Summary has not been examined by independent accountants and the Debtors make no representations regarding the accuracy of the estimates contained herein, which are based on information available to the Debtors as of November 30, 2005, and which do not take into account those claims filed against the Debtors in an "unliquidated" amount.*

| | | Current Claims As Of 11/30/05 | Anticipated Range of Allowed Claims Low | High |
|---|---|---|---|---|
| **Owens Corning HT, Inc. (00-03851)** | | | | |
| **Plan Class** | | | | |
| K1 | Other Priority Claims | $7,895,487.37 | $0.00 | $0.00 |
| K2-A | Other Secured Tax Claims | $195,945.02 | $0.00 | $0.00 |
| K2-B | Other Secured Claims | $6,234,835.86 | $0.00 | $0.00 |
| K3 | Convenience Class | $396,778.19 | $88,202.99 | $88,202.99 |
| K6 | General Unsecured Claims | $20,766,682.24 | $789,859.37 | $789,859.37 |
| K10 | Intercompany Claims | $6,594,416.33 | $6,594,416.33 | $6,594,416.33 |
| Unclassified | Administrative Claims | $7,669.53 | $0.00 | $0.00 |
| Unclassified | Priority Tax Claims | $43,145.05 | $0.00 | $0.00 |
| | **Total** | $42,134,959.61 | $7,472,478.69 | $7,472,478.69 |

*NOTWITHSTANDING THE DEBTORS' ESTIMATES AS SET FORTH HEREIN, THE ACTUAL AMOUNT OF CLAIMS THAT ULTIMATELY BECOME ALLOWED CLAIMS COULD MATERIALLY EXCEED THE AMOUNTS SET FORTH ON THIS SCHEDULE, AND IN SUCH EVENT, THE ESTIMATED PERCENTAGE RECOVERIES FOR HOLDERS OF SOME OR ALL CLAIMS COULD BE MATERIALLY LESS THAN ESTIMATED.*

*Claims Summary*                                                    *APPENDIX E - 1*

# Owens-Corning Overseas Holdings, Inc.
## Case Number 00-03852

> **IMPORTANT:**
> This Claims Summary must be read in conjunction with the introductory Notes accompanying this Schedule. This Claims Summary has not been examined by independent accountants and the Debtors make no representations regarding the accuracy of the estimates contained herein, which are based on information available to the Debtors as of November 30, 2005, and which do not take into account those claims filed against the Debtors in an "unliquidated" amount.

| Owens-Corning Overseas Holdings, Inc. (00-03852) | | Current Claims As Of 11/30/05 | Anticipated Range of Allowed Claims | |
|---|---|---|---|---|
| Plan Class | | | Low | High |
| U1 | Other Priority Claims | $7,895,487.37 | $0.00 | $0.00 |
| U2-A | Other Secured Tax Claims | $195,945.02 | $0.00 | $0.00 |
| U2-B | Other Secured Claims | $6,234,835.88 | $0.00 | $0.00 |
| U3 | Convenience Class | $324,219.90 | $0.00 | $0.00 |
| U6 | General Unsecured Claims | $20,317,067.55 | $10.00 | $10.00 |
| Unclassified | Administrative Claims | $7,669.53 | $0.00 | $0.00 |
| Unclassified | Priority Tax Claims | $43,145.05 | $0.00 | $0.00 |
| | Total | $35,018,370.30 | $10.00 | $10.00 |

*NOTWITHSTANDING THE DEBTORS' ESTIMATES AS SET FORTH HEREIN, THE ACTUAL AMOUNT OF CLAIMS THAT ULTIMATELY BECOME ALLOWED CLAIMS COULD MATERIALLY EXCEED THE AMOUNTS SET FORTH ON THIS SCHEDULE, AND IN SUCH EVENT, THE ESTIMATED PERCENTAGE RECOVERIES FOR HOLDERS OF SOME OR ALL CLAIMS COULD BE MATERIALLY LESS THAN ESTIMATED.*

1210

*Claims Summary*                                              **APPENDIX E - 1**

## Owens Corning Remodeling Systems, LLC
### Case Number 00-03853

**IMPORTANT:**

*This Claims Summary must be read in conjunction with the introductory Notes accompanying this Schedule. This Claims Summary has not been examined by independent accountants and the Debtors make no representations regarding the accuracy of the estimates contained herein, which are based on information available to the Debtors as of November 30, 2005, and which do not take into account those claims filed against the Debtors in an "unliquidated" amount.*

| | | Current Claims As Of 11/30/05 | Anticipated Range of Allowed Claims | |
|---|---|---|---|---|
| | | | Low | High |
| Owens Corning Remodeling Systems, LLC (00-03853) | | | | |
| Plan Class | | | | |
| L1 | Other Priority Claims | $7,895,487.37 | $0.00 | $0.00 |
| L2-A | Other Secured Tax Claims | $195,945.02 | $0.00 | $0.00 |
| L2-B | Other Secured Claims | $6,248,086.13 | $0.00 | $0.00 |
| L3 | Convenience Class | $324,692.85 | $55.73 | $55.73 |
| L6 | General Unsecured Claims | $20,317,069.55 | $12.00 | $12.00 |
| L10 | Intercompany Claims | $1,761,131.19 | $1,761,131.19 | $1,761,131.19 |
| Unclassified | Administrative Claims | $7,669.53 | $0.00 | $0.00 |
| Unclassified | Priority Tax Claims | $43,145.05 | $0.00 | $0.00 |
| | **Total** | **$36,793,226.69** | **$1,761,198.92** | **$1,761,198.92** |

*NOTWITHSTANDING THE DEBTORS' ESTIMATES AS SET FORTH HEREIN, THE ACTUAL AMOUNT OF CLAIMS THAT ULTIMATELY BECOME ALLOWED CLAIMS COULD MATERIALLY EXCEED THE AMOUNTS SET FORTH ON THIS SCHEDULE, AND IN SUCH EVENT, THE ESTIMATED PERCENTAGE RECOVERIES FOR HOLDERS OF SOME OR ALL CLAIMS COULD BE MATERIALLY LESS THAN ESTIMATED.*

AsofDate: 11/30/2005
Printed On 12/31/2005 9:30 AM
912961

1211

*Claims Summary*                                                        **APPENDIX E - 1**

## Soltech, Inc.
### Case Number 00-03854

> **IMPORTANT:**
> This Claims Summary must be read in conjunction with the introductory Notes accompanying this Schedule. This Claims Summary has not been examined by independent accountants and the Debtors make no representations regarding the accuracy of the estimates contained herein, which are based on information available to the Debtors as of November 30, 2005, and which do not take into account those claims filed against the Debtors in an "Unliquidated" amount.

| Soltech, Inc. (00-03854) | | Current Claims As Of 11/30/05 | Anticipated Range of Allowed Claims | |
|---|---|---|---|---|
| Plan Class | | | Low | High |
| E1 | Other Priority Claims | $7,902,032.51 | $5,409.54 | $5,409.54 |
| E2-A | Other Secured Tax Claims | $199,032.02 | $182.00 | $182.00 |
| E2-B | Other Secured Claims | $6,234,835.88 | $0.00 | $0.00 |
| E3 | Convenience Class | $556,864.30 | $272,591.78 | $272,741.78 |
| E4 | Bank Debt Holders | $1,586,967,516.99 | $1,463,000,000.00 | $1,586,967,516.99 |
| E6 | General Unsecured Claims | $22,196,731.13 | $1,652,631.61 | $1,658,614.20 |
| E10 | Intercompany Claims | $58,861,480.86 | $58,861,480.86 | $58,861,480.86 |
| Unclassified | Administrative Claims | $7,669.53 | $0.00 | $0.00 |
| Unclassified | Priority Tax Claims | $66,120.81 | $55,680.23 | $55,680.23 |
| | Total | $1,682,992,284.03 | $1,523,847,976.02 | $1,647,821,625.60 |

*NOTWITHSTANDING THE DEBTORS' ESTIMATES AS SET FORTH HEREIN, THE ACTUAL AMOUNT OF CLAIMS THAT ULTIMATELY BECOME ALLOWED CLAIMS COULD MATERIALLY EXCEED THE AMOUNTS SET FORTH ON THIS SCHEDULE, AND IN SUCH EVENT, THE ESTIMATED PERCENTAGE RECOVERIES FOR HOLDERS OF SOME OR ALL CLAIMS COULD BE MATERIALLY LESS THAN ESTIMATED.*

1212

**APPENDIX E-2**

**Pre-Petition Intercompany Claims**

## Appendix E-2:  Pre-Petition Intercompany Claims

On November 20, 2001, the Debtors filed Amended and Restated Schedules of Assets and Liabilities (the "Amended Schedules") for OCD and each of the 17 Subsidiary Debtors.  The Amended Schedules amended and wholly superseded the Schedules filed by the Debtors in November 2000.  Revisions to the Amended Schedules were filed on January 30, 2002 for certain of the Debtors. The Amended Schedules reflected approximately $5,270 million of pre-petition intercompany indebtedness owed by Debtors as of the Petition Date, including the following:

| Debtor | Claim Amount | Creditor |
|---|---|---|
| Owens Corning | $712.22 | Owens Corning (Nanjing) Foamular Board Company |
| Owens Corning | $3,592.65 | OC Fiberglas Espana SA |
| Owens Corning | $4,726.00 | LMP Impianti SRL |
| Owens Corning | $10,496.68 | Owens Corning (Anshan) Fiberglass Co., Ltd. |
| Owens Corning | $10,847.60 | Flowtite Technology AS |
| Owens Corning | $10,945.40 | Owens Corning (Nanjing) Foamular Board Company |
| Owens Corning | $16,000.00 | Falcon Manufacturing Co |
| Owens Corning | $18,255.00 | Owens Corning Fiberglas Technology, Inc. |
| Owens Corning | $19,530.57 | Owens Corning (Japan) Ltd |
| Owens Corning | $22,591.52 | Owens Corning Fiberglas Technology, Inc. |
| Owens Corning | $23,463.36 | Owens Corning (Guangzhou) Fiberglas Co., Ltd. |
| Owens Corning | $27,599.09 | Owens Corning (Guangzhou) Fiberglas Co., Ltd. |
| Owens Corning | $32,540.96 | Wrexham A.R. Glass Ltd. |
| Owens Corning | $36,842.00 | OC Fiberglas Sweden Inc. |
| Owens Corning | $59,988.05 | Owens Corning (Guangzhou) Fiberglas Co., Ltd. |
| Owens Corning | $64,147.65 | Owens Corning Australia Pty Ltd |
| Owens Corning | $82,536.00 | Owens Corning South Africa (Pty) Ltd. |
| Owens Corning | $109,020.00 | Engineered Yarns America, Inc. |
| Owens Corning | $145,227.44 | Owens Corning Australia Pty Ltd |
| Owens Corning | $193,397.65 | Owens Corning (Shanghai) Fiberglas Co, Ltd. |
| Owens Corning | $232,828.00 | Owens Corning Canada, Inc. |
| Owens Corning | $241,992.51 | OC Real Estate Corp. |
| Owens Corning | $301,688.40 | Owens Corning (Japan) Ltd |
| Owens Corning | $342,850.27 | Owens Corning (Singapore) Pte Ltd. |
| Owens Corning | $363,689.24 | Owens Corning (Shanghai) Fiberglas Co, Ltd. |
| Owens Corning | $364,091.51 | Owens Corning (Shanghai) Fiberglas Co, Ltd. |
| Owens Corning | $696,945.14 | Owens Corning HT, Inc. |
| Owens Corning | $1,000,000.00 | Flowtite Technology AS |
| Owens Corning | $1,431,573.74 | OC Celfortec, Inc. |
| Owens Corning | $1,524,513.32 | Vytec Corporation |
| Owens Corning | $1,743,287.88 | Owens Corning Canada, Inc. |
| Owens Corning | $2,200,429.57 | Owens Corning (China) Investment Company, Ltd. |
| Owens Corning | $2,571,911.72 | OC Celfortec, Inc. |
| Owens Corning | $4,781,250.00 | Fibreboard Corporation |
| Owens Corning | $5,563,089.00 | Jefferson Holdings, Inc. |
| Owens Corning | $5,744,415.36 | Owens Corning FSC, Inc. |
| Owens Corning | $6,117,189.04 | Vytec Corporation |

Appendix E-2

| | | |
|---|---|---|
| Owens Corning | $7,023,235.83 | Exterior Systems, Inc. |
| Owens Corning | $12,974,123.49 | IPM, Inc. |
| Owens Corning | $13,456,355.00 | Owens Corning Canada, Inc. |
| Owens Corning | $14,553,845.07 | Owens Corning Fiberglas Technology, Inc. |
| Owens Corning | $20,387,333.00 | Special Situations Investment Group |
| Owens Corning | $22,559,437.80 | Falcon Foam Corporation |
| Owens Corning | $30,000,000.00 | IPM, Inc. |
| Owens Corning | $38,038,893.00 | Owens Corning Fiberglas Technology, Inc. |
| Owens Corning | $41,345,307.16 | Soltech, Inc |
| Owens Corning | $113,062,846.37 | Palmetto Products, Inc. |
| Owens Corning | $198,112,000.00 | Jefferson Holdings, Inc. |
| Owens Corning | $205,785,529.01 | IPM, Inc. |
| Owens Corning | $294,516,119.00 | Integrex |
| Owens Corning | $405,528,706.00 | Fibreboard Corporation |
| Owens Corning | $419,630,226.82 | Fibreboard Corporation |
| Owens Corning | $711,080,797.91 | Owens Corning Fiberglas Technology, Inc. |
| CDC Corp. | $400,043.40 | Owens Corning |
| Integrex | $318,853,618.34 | Owens Corning |
| Fibreboard Corp. | $5,640,000.00 | Integrex |
| Fibreboard Corp. | $179,000,000.00 | Integrex |
| Fibreboard Corp. | $234,515,108.98 | Exterior Systems, Inc. |
| Fibreboard Corp. | $343,879,115.70 | Owens Corning |
| Exterior Systems Inc. | $105,125.00 | Owens Corning Fiberglas Technology, Inc. |
| Exterior Systems Inc. | $440,400.19 | Vytec Corporation |
| Exterior Systems Inc. | $910,599.00 | Owens Corning Fiberglas Technology, Inc. |
| Exterior Systems Inc. | $1,052,022.66 | Vytec Corporation |
| Exterior Systems Inc. | $3,058,270.18 | Owens Corning |
| Exterior Systems Inc. | $5,631,952.00 | Owens Corning Fiberglas Technology, Inc. |
| Exterior Systems Inc. | $14,826,276.71 | Fibreboard Corporation |
| Exterior Systems Inc. | $116,605,749.80 | Fibreboard Corporation |
| Exterior Systems Inc. | $230,000,000.00 | Fibreboard Corporation |
| Exterior Systems Inc. | $306,233,645.42 | Owens Corning |
| OCFT | $10,465,333.36 | Integrex |
| OCFT | $501,000,000.00 | Integrex |
| Owens Corning HT, Inc. | $802.48 | Owens Corning |
| Owens Corning HT, Inc. | $6,593,613.85 | Owens Corning |
| Owens Corning Remodeling Systems, LLC | $52,145.80 | Owens Corning |
| Owens Corning Remodeling Systems, LLC | $1,708,985.39 | Owens Corning |
| Soltech, Inc. | $2,127,655.25 | Owens Corning |
| Soltech, Inc. | $56,733,825.61 | Owens Corning |

The foregoing list does not include, *inter alia*, amounts due under Contribution Agreement
between Owens Corning and Faloc, Inc. n/k/a Integrex, dated as of December 24, 1997 and may
not include pre-petition intercompany indebtedness owed by Debtors on account of the allocation
of overhead or expenses, including without limitation taxes, among Debtors.

-2-

1215

**APPENDIX F**

**Principal Terms and Conditions of Senior Notes**

**[To Be Provided]**

# APPENDIX G

## OC's Current Corporate Structure of Company

### [To Be Provided]

**APPENDIX H**

**Restructuring Transactions**

**[To Be Provided]**

1218

**APPENDIX I**

Distribution Assumptions

## DISTRIBUTION ASSUMPTIONS SUMMARY

The following represents a summary of the key assumptions underlying the estimates of distributions to creditors under the Plan:

Total Distributable Value. It is more likely than not that Total Distributable Value would be no less than $6.185 billion, comprised of the estimated Total Enterprise Value of the Debtors as of December 31, 2005, plus estimated Excess Cash as of December 31, 2005, will be available for distribution under the Plan as of the Effective Date. This Total Distributable Value does not include (i) the amounts described below under "Asbestos Related Assets Available for Distribution on Asbestos Claims," (ii) the approximately $70 million of existing funded debt owed by non-Debtor Affiliates that will remain outstanding and unimpaired, and (iii) the approximately $45 million of New OCD Common Stock (or appropriate equivalent interests) reserved for issuance to the Company's employees as of the Effective Date as employee benefits and incentives upon emergence.

Total Enterprise Value. It is more likely than not that the Total Enterprise Value ("TEV") based upon the estimated going concern value of the Debtors and the non-Debtor Affiliates as a whole will be no less than $5.000 billion as of December 31, 2005. In addition to this TEV, the Debtors currently estimate that the present value of cash flows related to the utilization of net operating loss carry forwards available to the Reorganized Debtors will be approximately $200 million as of December 31, 2005.

Excess Cash Available for Distribution. Estimated excess cash (the "Excess Cash") available for distribution is estimated to be no less than $1.100 billion as of December 31, 2005. This consists of cash and cash equivalents of the Debtors and non-Debtor Affiliates as of the Effective Date, less a reserve of approximately $350 million for working capital and pension contribution purposes.

Senior Notes.[1] The Plan contemplates approximately $1.800 billion in senior indebtedness issued upon the Effective Date, which indebtedness may be in the form of senior notes (or other cash pay debt instruments) based on, among other things, the issuance of one or more series of senior notes and/or the refinancing of the obligations owed to the Bank Holders under the 1997 Credit Agreement (the "Senior Notes"). Additionally, the Plan contemplates distribution of notes in the approximate amount of $61 million on account of certain tax-related claims. Approximately $70 million of existing funded debt owed by non-Debtor Affiliates will remain outstanding and unimpaired.

Common Equity Available for Distribution. The Plan contemplates the issuance of approximately $3.224 billion of New OCD Common Stock (excluding the New OCD Common

---

[1]    The types and amounts of debt and equity to be distributed under the Plan are subject to change based on, among other things, continuing developments and further diligence by the Company and its advisors. For example, the Company reserves the right to conduct offerings of New OCD Common Stock and/or Senior Notes prior to or after the Initial Distribution Date, as it may deem appropriate (subject to the reasonable consent of the Plan Proponents).

Stock (or equivalent interests) reserved for issuance to the Company's employees as employee incentives and benefits upon emergence. On the Effective Date, Reorganized OCD, will authorize 200 million shares of New OCD Common Stock and will issue approximately 129 million shares (excluding 1.8 million shares (or equivalent interests) reserved for issuance to the Company's employees) with an assumed value (for plan purposes only) of approximately $25.00 per share. Each share of New OCD Common Stock will entitle its holder to one vote. The New OCD Common Stock will be subject to dilution as a result of further issuances, including shares that may be issued under management or employee incentive programs (other than the 1.8 million shares (or equivalent interests) reserved for issuance to the Company's employees).

Asbestos Related Assets Available for Distribution on Asbestos Claims. The Plan contemplates that there will be certain assets available solely for distribution to Asbestos Personal Injury Claims, consisting of the following approximate amounts: (1) $1.301 billion from the Fibreboard Settlement Trust; (2) $127 million from the Fibreboard Administrative Escrow Deposits; (3) $140 million in value on account of the FB Sub-Account Settlement Payment; (5) $109 million from the OC Administrative Escrow Deposits[2]; and $80 million from the OC Insurance Escrow.

**NOTE: THIS SUMMARY IS PRELIMINARY AND SUBJECT TO MODIFICATIONS TO BE FILED NO LATER THAN FIVE (5) BUSINESS DAYS PRIOR TO THE DISCLOSURE STATEMENT HEARING.**

---

[2]    This estimate includes all amounts currently held in law firm deposit accounts, including amounts that may be determined to constitute OC Reversions and, accordingly, would be delivered to OCD for ratable distribution among its creditors.

## SUMMARY OF KEY ASSUMPTIONS

**OC Total Enterprise Value**

| | |
|---|---|
| Enterprise Value | 5,000 |
| NOL Value | 200 |
| Total Enterprise Value | 5,200 |
| Less: Total Debt | (1,931) |
| Implied Equity Value | 3,269 |
| Less: Emp. Rest. Stock | (45) |
| | 3,224 |
| Shares Issued | 130.8 |
| Share Price | $ 25.00 |

**Distributable Value**

| | | |
|---|---|---|
| Excess Cash | 1,100 | |
| Debt (Senior Notes) | 1,800 | Banks |
| Debt (Tax Notes) | 61 | Bonds |
| Equity Value Sub-Total | 3,224 | Trade Creditors |
| Total | 6,185 | OC Asbestos |
| Existing Debt | 70 | FB Asbestos |
| Emp. Rest Stock | 45 | Total |
| Total | 6,300 | Emp. Rest Stock |

**Equity Ownership[3]**

| | | |
|---|---|---|
| Banks | - | 0.0% |
| Bonds | 22.5 | 17.2% |
| Trade Creditors | 7.6 | 5.8% |
| OC Asbestos | 94.2 | 72.0% |
| FB Asbestos | 4.6 | 3.6% |
| Total | 129.0 | 98.6% |
| Emp. Rest Stock | 1.8 | 1.4% |
| | 130.8 | 100.0% |

[3] The following are: (i) based on the assumption that Class A5 accepts the Plan; and (ii) do not include the restricted shares of New OCD Common Stock and options to purchase shares of New OCD Common Stock to be granted to certain members of management as part of the management incentive program, as described in the Disclosure Statement and/or Plan.

**NOTE: THIS SUMMARY IS PRELIMINARY AND SUBJECT TO MODIFICATIONS TO BE FILED NO LATER THAN FIVE (5) BUSINESS DAYS PRIOR TO THE DISCLOSURE STATEMENT HEARING.**

1222

**APPENDIX J**

**Voting Procedures**

**[This Document will be inserted when the Voting Procedures are approved by the Court]**

**APPENDIX K**

**Letter dated December 30, 2005, from the Steering Committee**

# WEIL, GOTSHAL & MANGES LLP

767 FIFTH AVENUE · NEW YORK, NY 10153-0119

(212) 310-8000

FAX: (212) 310-8007

DALLAS
HOUSTON
MENLO PARK
(SILICON VALLEY)
MIAMI
WASHINGTON, D. C.

BRUSSELS
BUDAPEST
FRANKFURT
LONDON
PRAGUE
WARSAW

December 30, 2005

MARTIN J. BIENENSTOCK
DIRECT LINE (212) 310-8130
E-MAIL: martin.bienenstock@wc9.com

By Email
stephen.k.krull@owenscorning.com

Stephen K. Krull, Esq.
Sr. Vice President, General Counsel and Secretary
Owens Corning
One Owens Corning Parkway
Toledo, Ohio 43659

> Re:    Owens Corning, et al., chapter 11 debtors in possession ("OC") –
> Steering Committee of Bank Debt Holders (the "Steering
> Committee")

Dear Mr. Krull:

This firm has represented Credit Suisse, Cayman Branch (f/k/a Credit Suisse First Boston), as agent (the "Agent") under Owens Corning's credit agreement dated as of June 26, 1997, as amended (the "Credit Agreement"), in the Owens Corning chapter 11 cases. OC has requested prior to proposing OC's proposed Fifth Amended Joint Plan of Reorganization (as such plan may be amended, modified or supplemented, the "Plan"), certain assurances as to the positions of the members of the Steering Committee and the bank debt holders under the Credit Agreement (the "Bank Debt Holders") on certain issues set forth below. We have been authorized to advise you of the following positions the members of the Steering Committee will take on their respective individual behalf on the following issues, subject to the reservations listed below:

1. Payment in cash on the effective date or distribution date of the Plan of the claims of the Bank Debt Holders under the Credit Agreement shall constitute full payment under the Credit Agreement, and shall be deemed to render such claims unimpaired for purposes of Section 1124 of the Bankruptcy Code and otherwise (regardless of the outcome of the ultimate vote of the class of Bank Debt Holders on the Plan), if the amount of cash equals all then unpaid (A) prepetition (i) interest under the Credit Agreement computed at LIBOR plus 1.25% and (ii) letter of credit, facility and agency fees payable under the Credit Agreement

WEIL, GOTSHAL & MANGES LLP

Stephen K. Krull, Esq.
December 30, 2005
Page 2 of 4

totaling $9,734,553, and (B) postpetition: (i) principal outstanding under the Credit Agreement, (ii) interest accrued through the date of payment under the Plan on the principal amount(s) outstanding under the Credit Agreement computed at the Base Rate (as defined in the Credit Agreement) plus 2%, compounded quarterly, and (iii) letter of credit fees, facility fees, agency fees, and expenses payable under the Credit Agreement (for example, such amount totals $2,276,730,200 as of March 31, 2006 assuming prime rate increases of 25 basis points on January 31 and March 28, 2006). Letters of credit totaling $83,837,342.28 issued under the Credit Agreement are outstanding and undrawn as of today. It is assumed that $14,670,570.28 of these related to asbestos judgment appeals are drawn prior to confirmation and the balance of $69,166,772.00 is to be replaced with an exit facility upon the effective date. We understand there is a discrepancy of approximately $9 million between OC and the Steering Committee members with respect to certain of the foregoing amounts owed to the Bank Debt Holders, and such discrepancy will be reconciled and resolved in the near term by the parties' respective financial advisors;

2. The Steering Committee shall support the confirmation of OC's Plan providing for the unavoidable and nondisgorgeable payment on its distribution date consistent with paragraph 1 above, which payment shall be prior to or simultaneous with the discharge by the Plan and any confirmation order of the Credit Agreement claims;

3. If OC's Plan is confirmed and results in an unavoidable and nondisgorgeable payment on its distribution date consistent with paragraph 1 above, then each of the OC debtors and the nondebtor Owens Corning subsidiaries shall have no further liability under the Credit Agreement, inclusive of their guarantees;

4. The Agent (and the Steering Committee) shall take such actions, including participation in and testifying at judicial hearings, filing supporting pleadings in connection therewith, and supporting reasonable extensions of exclusivity, as are reasonably desirable to attain confirmation of the Plan resulting in such payment;

5. The Agent, with the support of the Steering Committee, shall, no later than January 20, 2006, seek authorization and instruction from other Bank Debt Holders to take the same positions on behalf of all Bank Debt Holders as the Steering Committee and its members have agreed to take hereunder;

6. To the extent, if any, that the Steering Committee members hereafter transfer their claims under the Credit Agreement (other than claims held for clients or by their trading desks), the claims shall be transferred subject to this letter; and

WEIL, GOTSHAL & MANGES LLP

Stephen K. Krull, Esq.
December 30, 2005
Page 3 of 4

7.  The Agent, with the support of the Steering Committee, shall, no later than
January 20, 2006, (i) seek authorization to then withdraw without prejudice the
pending trustee and examiner motions, the opposition to the Debtors' pending
severance motion, and the Kensington action filed by or on behalf of the Agent or
the Bank Debt Holders, and (ii) seek authorization and instruction from other
Bank Debt Holders (and shall otherwise use their best efforts) to withdraw with
prejudice and without costs to any party, on the Effective Date of the Plan
resulting in a payment consistent with paragraph 1 above, all pleadings filed by or
on behalf of the Agent or the Bank Debt Holders concerning the pending
estimation and KERP appeals.

The Steering Committee and each of its members expressly reserve all their
respective rights:

- to object to confirmation of the Plan if (i) the Court finds that the Bank
  Debt Holders are impaired and (ii) the class of Bank Debt Holders does
  not accept the Plan;

- to take all actions to oppose treatment of the claims under the Credit
  Agreement in any manner other than the treatment specified in paragraph
  1 above, including without limitation, actions to prevent confirmation of
  the Plan or any other chapter 11 plan if its confirmation would result in
  any other treatment providing less cash than provided in paragraph 1
  above to Bank Debt Holders based on their unimpairment or on their
  impairment and acceptance of such plan by their class;

- to take all actions to obtain on behalf of the Credit Agreement claims more
  than provided in paragraph 1 above if (i) the Credit Agreement claims are
  deemed impaired by the Court and the class of Bank Debt Holders does
  not accept the Plan, or (ii) not all Bank Debt Holders under the Credit
  Agreement are treated the same;

- to terminate this letter if (i) the Credit Agreement claims are not paid
  consistent with paragraph 1 above on or before December 31, 2006, (ii)
  the Plan provides or is amended to provide that the Credit Agreement
  claims shall receive less cash than provided in paragraph 1 above if the
  class of Bank Debt Holders is deemed impaired and accepts the Plan, or
  (iii) if any Plan proponent asserts the Plan impairs the Credit Agreement
  claims or that the Credit Agreement claims should be paid under the Plan

WEIL, GOTSHAL & MANGES LLP

Stephen K. Krull, Esq.
December 30, 2005
Page 4 of 4

(or otherwise) less cash than provided in paragraph 1 above if the class of Bank Debt Holders is deemed impaired and accepts the Plan;

- to oppose any and all actions by any entities or parties in interest that may delay or hinder confirmation of a Plan resulting in the treatment of the Credit Agreement claims consistent with paragraph 1 above; and

- to prosecute the pleadings set forth in paragraph 7 above prior to confirmation of the Plan that will be withdrawn with prejudice on the conditions set forth above, to the extent such prosecution may be necessary to avoid prejudice to such pleadings.

The Steering Committee members are or are affiliates of: CS First Boston, JPMorgan/Chase, CP Capital Investments, LLC, Angelo Gordon, and Cyrus Capital Partners, L.P..

Sincerely,

Martin J. Bienenstock

cc:    Steering Committee
       James F. Conlan, Esq.